### UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

————————————————————————

DALIAN MEISEN WOODWORKING CO., LTD.

*Plaintiff,*

CABINETS TO GO, LLC,

*Plaintiff-Intervenor,*

v.

UNITED STATES,

*Defendant,*

and

AMERICAN KITCHEN CABINET ALLIANCE

*Defendant-Intervenor.*

————————————————————————

Court No. 20-00109

### <u>ORDER</u>

Upon consideration of the motions for judgment on the administrative record filed by plaintiff and plaintiff-intervenor, the responses thereto filed by the defendant and the defendant-intervenor, plaintiff's and plaintiff-intervenor's reply, the administrative record, and all other papers and proceedings herein, it is hereby:

**ORDERED** that the motion is **DENIED**; and it is further

**ORDERED** that the U.S. Department of Commerce's final determination is sustained; and it is further

**ORDERED** that plaintiffs' complaint is **DISMISSED**.

It is **SO ORDERED**.

_____

Honorable Gary S. Katzmann, Judge
U.S. Court of International Trade

Dated:_____, 2021
　　　New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |  |
|---|---|---|
| ———————————————————————— | ) | |
| DALIAN MEISEN WOODWORKING CO., LTD. | ) | |
| | ) | |
| *Plaintiff,* | ) | PUBLIC VERSION |
| | ) | |
| CABINETS TO GO, LLC, | ) | |
| | ) | |
| *Plaintiff-Intervenor,* | ) | |
| | ) | |
| v. | ) | Court No. 20-00109 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN KITCHEN CABINET ALLIANCE | ) | |
| | ) | |
| *Defendant-Intervenor.* | ) | |
| ———————————————————————— | ) | |

**DEFENDANT-INTERVENOR'S RESPONSE BRIEF IN OPPOSITION
TO THE MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 719-7000

*Counsel for the American Kitchen
Cabinet Alliance*

Dated: January 14, 2020

PUBLIC VERSION

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2(c)(1) .................................................................. 1

I.      Administrative Determination Under Review ................................................ 1

II.     Issues Presented for Review ......................................................................... 2

SUMMARY OF ARGUMENT ................................................................................. 2

STANDARD OF REVIEW ...................................................................................... 6

STATEMENT OF FACTS ....................................................................................... 8

ARGUMENT ......................................................................................................... 12

I.      Commerce's Decision to Apply Facts Available Is Supported by Substantial Evidence and Otherwise in Accordance with Law ........................................................ 12

  A.    Legal Standard for Application of Facts Available ....................................... 12

  B.    The Statutory Requirements for Applying Facts Available Were Met ......................... 13

  C.    Meisen Did Not Disclose the Discrepancy at Issue on Its Own .................................. 17

  D.    Meisen Bore the Burden of Disclosing This Discrepancy to Commerce ..................... 18

  E.    Meisen Failed to Provide Information That Would Allow Commerce to Conduct a Proper Comparison of U.S. Price to Normal Value ........................................ 19

II.     Commerce's Decision to Apply AFA Was Supported by Substantial Evidence and in Accordance with Law ................................................................................ 21

  A.    Legal Standard for Application of an Adverse Inference ............................... 21

  B.    Substantial Evidence Supports Commerce's Determination that Meisen Failed to Cooperate to the Best of Its Ability ........................................ 22

  C.    Commerce Properly Relied on Meisen's Silence in Finding that It Withheld Information and Failed to Cooperate to the Best of Its Ability ...................... 26

  D.    Meisen's Failure to Report Cost and Sales Data that Allowed for Accurate Comparisons of U.S. Price to Normal Value, By Itself, Warranted Application of AFA .................. 27

  E.    Commerce's Application of AFA to Meisen Was Not a Punishment of the Respondent for Lying to Its Customers ................................................................ 29

III.    Commerce's Decision to Cancel Verification Was In Accordance with Law .............. 30

IV.     Commerce's Determination to Apply Total AFA Is Supported by Substantial Evidence ................................................................................ 32

V.      Conclusion ................................................................................ 34

PUBLIC VERSION

# TABLE OF AUTHORITIES

**CASES**

*AK Steel Corp. v. United States*, 28 CIT 1408, 346 F.Supp.2d 1348 (2004)................................ 21

*Baxter v. Palmigiano*, 425 U.S. 308 (1976)................................................................................. 26

*Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) .......................... 7

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ...................... 7

*Chia Far Indus. Factory Co. v. United States*, 28 C.I.T. 1337 (2004) ......................................... 19

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ............................................................... 6

*Daewoo Elecs. Co. v. United States*, 6 F.3d 1511 (Fed. Cir. 1993).............................................. 8

*Deacero S.A.P.I. de C.V. v. United States*, 353 F. Supp. 3d 1303, (2018) .................................. 32

*Diamond Sawblades Manufacturers' Coal. v. United States*, 2018 WL 5281941 (Ct. Int'l Trade 2018) ....................................................................................................................................... 21

*F.lli De Cecco Di Filippo Fara S. Martin S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ....................................................................................................................................... 29

*Gerber Food (Yunnan) Co. v. United States*, 491 F. Supp. 2d 1326 (Ct. Int'l Trade 2007) ......... 18

*Hyundai Elec. & Energy Sys. Co. v. United States*, 466 F. Supp. 3d 1303 (Ct. Int'l Trade 2020) ........................................................................................................................................ 30, 31

*Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332 (Ct. Int'l Trade 2018)................. 30, 31

*Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018)....................... 25

*Jiangsu Changbao Steel Tube Co., Ltd v. United States*, 884 F. Supp. 2d. 1295 (Ct. Int'l Trade 2012) ................................................................................................................................. 21, 23

*Jindal Poly Films Ltd. of India v. United States*, 439 F. Supp. 3d 1354 (Ct. Int'l Trade 2020) ... 32

*Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed. Cir. 1994)................................................... 8

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)........................... 6, 7

*Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017) ...................................... 29

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) .......................... 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29 (1983) .............................................. 7

*Nan Ya Plastics Corp.* v. *United States,* 810 F.3d 1333 (Fed. Cir. 2016) .................................... 29

*Nat'l Nail Corp. v. United States*, 390 F.Supp.3d 1356 (Ct. Int'l Trade 2019) ........................... 32

*Nippon Steel v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)............................... 3,13, 21, 23 27

*NSK Ltd. v. United States*, 28 CIT 1535, 346 F. Supp. 2d 1312 (2004), *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007) ............................................................................................................................. 7

*Papierfabrik August Koehler S.E. v. United States*, 7 F. Supp. 3d 1304 (Ct. Intl Trade 2014).... 33

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001)...................... 7

*RHP Bearings v. United States*, 875 F.Supp. 854 (Ct. Int'l Trade 1995)...................................... 18

*Shandong Huarong Machinery Co., Ltd. v. United States*, 30 CIT 1269, 435 F.Supp.2d 1261 (2006) ...................................................................................................................................... 21

*Societe Nouvelle De Roulements v. United States*, 910 F.Supp. 689  (Ct. Int'l Trade 1995)........ 18

*Steel Auth. of India v. United States*, 149 F. Supp. 2d 921 (Ct. Int'l Trade 2001) ................. 33, 34

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ........ 6

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) ................... 8

*Taian Ziyang Food Co. v. United States*, 33 C.I.T. 828 (2009)..................................................... 17

*Thuan An Prod. Trading & Serv. Co. v. United States*, 348 F. Supp. 3d 1340 (Ct. Int'l Trade 2018) ........................................................................................................................................ 27

*Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F.Supp. 1008, 16 CIT 931 (1992) ........ 19

*Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752 (2001)......................................................... 25

*United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149  (1923)..................................................... 26

*United States Steel Group v. United States*, 96 F.3d 1352 (Fed. Cir. 1996)................................... 6

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ........................................................................ 8

*United States v. Hale,* 422 U.S. 171 (1975)................................................................................... 26

*Washington Int'l Ins. Co. v. United States*, 34 C.I.T. 171 (2010) ................................................. 33

*Yamaha Motor Co., Ltd. v. United States*, 910 F.Supp. 679 (Ct. Int'l Trade 1995)..................... 18

*Yantai Xinke Steel Structure Co. v. United States*, 36 C.I.T. 1035 (2012) ............................. 21, 22

PUBLIC VERSION

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................... 6

19 U.S.C. § 1677e(a)(2) ............................................................................... 12, 19

19 U.S.C. § 1677e(b) ............................................................................... 13, 21

19 U.S.C. § 1677m(e)(3) ............................................................................... 30

**REGULATIONS**

19 C.F.R. § 351.301 (c)(l)(v) ............................................................................... 14

**ADMINISTRATIVE DETERMINATIONS**

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from the People's Republic of China*, 83 Fed. Reg .16322 (Apr. 16, 2018) ........................................................ 27

*Circular Welded Non-Alloy Steel Pipe from Korea*, 79 Fed. Reg. 37,284 (July 1, 2014) ........... 28

*Forged Steel Fittings from China*, 83 Fed. Reg. 50339, (Oct., 5, 2018) ...................................... 27

*Stainless Steel Bar from India, 83 Fed. Reg. 17,529* (Apr. 20, 2018) .......................................... 27

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China,* 85 Fed. Reg. 11953 (February 28, 2020) .................................................................................. 2

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 84 Fed. Reg. 12587 (Dep't Commerce April 2,2019) ...................................................................................................................................... 8

PUBLIC VERSION

**UNITED STATES COURT OF INTERNATIONAL TRADE**
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

―――――――――――――――――――――――――――

| | |
|---|---|
| DALIAN MEISEN WOODWORKING CO., LTD. ) | |
| ) | |
| *Plaintiff,* ) | PUBLIC VERSION |
| ) | |
| CABINETS TO GO, LLC, ) | |
| ) | |
| *Plaintiff-Intervenor,* ) | |
| ) | |
| v. ) | Court No. 20-00109 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| *Defendant,* ) | |
| ) | |
| and ) | |
| ) | |
| AMERICAN KITCHEN CABINET ALLIANCE ) | |
| ) | |
| *Defendant-Intervenor.* ) | |

―――――――――――――――――――――――――――

**DEFENDANT-INTERVENOR'S RESPONSE BRIEF IN OPPOSITION
TO THE MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to USCIT Rule 56.2 and the Court's amended scheduling order, Defendant-Intervenor the American Kitchen Cabinet Alliance ("AKCA" or the "Petitioner") submits the following response in opposition to the motion for judgment on the agency record filed by Plaintiff Dalian Meisen Woodworking Co., Ltd. ("Meisen") in the above-captioned action.

**STATEMENT PURSUANT TO RULE 56.2(c)(1)**

**I.      Administrative Determination Under Review**

The administrative determination under review is the final determination of the U.S. Department of Commerce ("Commerce") in the antidumping investigation of *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China,* 85 Fed. Reg. 11953

(February 28, 2020) ("Final Determination"), including the accompanying Issues and Decision

Memorandum ("IDM") (P.D. 1554).[1]

## II.   Issues Presented for Review

1. Whether Commerce's decision to resort to facts available was supported by substantial evidence.

2. Whether Commerce correctly decided to apply adverse facts available ("AFA") to Meisen based on its finding that Meisen failed to cooperate to the best of its ability.

3. Whether Commerce's decision to cancel verification of Meisen was supported by substantial evidence and in accordance with law.

4. Whether Commerce correctly decided to apply total AFA as opposed to neutral facts available or partial AFA.

## <u>SUMMARY OF ARGUMENT</u>

To determine whether subject merchandise is being sold in the United States at less than

fair value, Commerce must make a comparison between U.S. price and normal value. Thus, one

of the most basic requirements of foreign exporters under U.S. antidumping law is maintaining

and reporting sales and cost data in a manner that will allow Commerce to conduct an

appropriate comparison of U.S. sales prices to normal value. To make an appropriate

comparison, Commerce must be able to compare U.S. sales prices for merchandise with certain

physical characteristics to a normal value with the same of similar physical characteristics. As

the Federal Circuit has long recognized, a respondent is not excused from reporting data that

allows this apples-to-apples comparison merely because the respondent does not maintain

---

[1]   Citations to confidential documents from the Index to the Administrative Record are designated as "C.D. __," and citations to public documents and public versions are designated as "P.D. __."

PUBLIC VERSION

accurate books and records in the normal course of business. The statute requires that a respondent cooperate to "the best of its ability," and this standard presumes that parties are familiar with the rules governing the sales of goods from other countries into the United States. It thus requires that parties, to avoid a risk of an adverse inference determination, take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable party should anticipate being called upon to produce as part of an antidumping proceeding. *See Nippon Steel v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003).

As discussed in greater detail below, Meisen failed in spades to meet this standard. For all of its sales during the period of investigation, Meisen represented to its U.S. customers that its cabinets were made of maple wood. This representation was reflected in [                    ] as well as [    ] of its sales documentation, such as its product catalogs, [                    ]. Meisen's U.S. prices thus reflected sales of maple cabinets. However, it turns out that Meisen was defrauding its U.S. customers by charging them for higher priced maple cabinets when, in fact, all of its cabinets were made of birch wood – a wood species that is significantly cheaper than maple wood. This fundamental discrepancy between Meisen's U.S. sales prices and cost data meant that Meisen's ability to provide accurate data to Commerce was doomed from the start. But to make matters worse, after Commerce initiated the underlying antidumping investigation, Meisen failed to disclose to Commerce this fundamental discrepancy. Meisen informed Commerce that it made its cabinets using birch wood but withheld the fact that its cabinets were sold as maple cabinets. The discrepancy came to light only after Petitioner conducted independent factual research and submitted evidence regarding the severity of the situation to Commerce.

PUBLIC VERSION

Furthermore, when Commerce issued supplemental questionnaires to Meisen to understand the discrepancy, Meisen offered evasive and contradictory explanations in its supplemental responses. Because Meisen withheld information regarding this discrepancy and then obfuscated the issue, it was unclear for most of the investigation whether: (i) Meisen had actually used maple wood to produce its cabinets but had lied to Commerce about using birch wood; or (ii) Meisen had really used birch wood to produce its cabinets, as it had reported to Commerce, but had been lying to its customers about using maple wood.

As the contradiction between what Meisen represented to its customers and what Meisen reported to Commerce crystalized, Commerce decided to cancel verification, as this issue raised serious concerns regarding the data reported for the physical characteristics of the merchandise used for normal value and the physical characteristics of the merchandise reported for U.S. prices. Commerce ultimately decided to apply total AFA to Meisen.

As established in greater detail below, Commerce's decision to resort to facts available was supported by substantial evidence and should be upheld. Meisen withheld information from Commerce when it failed to disclose a fundamental discrepancy in its reported U.S. sales and cost data. Meisen's conduct both in failing to report this discrepancy and then later in offering contradictory and evasive answers to explain the discrepancy significantly impeded Commerce's antidumping investigation. Finally, the record was missing sales and cost data that would allow an apples-to-apples comparison of U.S. price to normal value. Commerce thus had no choice but to resort to facts available.

Commerce's decision to apply an adverse inference in selecting from the facts available should also be upheld. Meisen's failure to maintain and report sales and cost information that would allow Commerce to calculate an accurate dumping margin, its failure to report the

fundamental flaw in its reported data to Commerce, and its evasive conduct throughout the investigation did not—to say the very least—evince a respondent cooperating to the best of its ability. Congress intended for adverse inferences to be applied in precisely these types of scenarios to ensure that respondents do not benefit from failing to cooperate with Commerce and to induce compliance from respondents in future antidumping proceedings.

This Court has recognized that Commerce has considerable administrative discretion in its application of AFA that requires judicial deference thereto. Furthermore, the Court has upheld Commerce's application of AFA to respondents in prior cases where the respondents withheld information that their sales and production documents were not accurate because they contained contradictory statements that were made to their customers or other government agencies. There is thus no reason to disturb Commerce's discretion in the application of AFA in this case.

Commerce's decision to cancel verification is also supported by substantial evidence and consistent with established case law that recognizes that there is no need to verify data that is so flawed that it cannot be used to calculate an accurate dumping margin. After Meisen ultimately conceded to Commerce that it sold its cabinets as maple cabinets but produced all of its cabinets with birch wood, verification of Meisen's sales and cost data would serve no purpose. The fundamental mismatch in the CONNUMs of the U.S. price and normal value would not allow an accurate dumping margin to be calculated.

Finally, the Court should sustain Commerce's application of total AFA as opposed to neutral facts available or partial AFA. The problems with Meisen's reported data impacted all of its U.S. sales and the normal value for all of its reported CONNUMs. It would thus be impossible and inappropriate to apply AFA to only part of its reported U.S. sales and costs. Furthermore, the

fact that Meisen's selective reporting of information undermined its credibility and warranted the rejection of all of its reported sales and cost data.

## **STANDARD OF REVIEW**

The standard of review requires that the Court uphold an agency determination as lawful unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law" 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In evaluating Commerce's determination, the Court must decide whether "the administrative record contain{s} substantial evidence to support" Commerce's decision and whether that decision was "rational." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

A plaintiff must do more than simply point to contradictory evidence in the record to overturn the agency's decision. "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (citations omitted). To the extent, therefore, that a plaintiff claims the evidence before Commerce "could be open to multiple interpretations, its argument does not require, or even allow, reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001) (citing *Matsushita*, 750 F.2d at 933). In addition, a plaintiff may not ask the Court to re-weigh the evidence and decide the case for Commerce. *See Matsushita*, 750 F.2d at 933. The role of the Court is not to question the agency's decisions about the weight or quality of the evidence. *See United States Steel Group v. United States*, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) (it is the agency's task to evaluate and assign weight to the evidence); *see also Matsushita*, 750 F.2d at 933 (it is not the weight of the evidence, but whether it reasonably supports a rational

PUBLIC VERSION

decision, that is evaluated by a reviewing court). The Court may not substitute its judgment or its interpretation of the evidence for that of the agency. *See Matsushita*, 750 F.2d at 936.

The standard also requires Commerce to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983). While Commerce must explain the basis for its decisions, the court "will . . . 'uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

In reviewing Commerce's interpretation of a statutory provision, this Court is guided by the principles set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Under *Chevron*, a court reviewing an agency's interpretation of a statute must begin with the statutory test: "{i}f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43 (citations omitted). If this Court finds that the statute is silent or ambiguous with respect to the specific question at issue, the question for the Court is whether Commerce's interpretation is based on a permissible interpretation of the statute. *Chevron*, 467 U.S. at 842. The agency's reasonable interpretations of its statutory responsibilities are entitled to judicial deference. *Id.* at 844; *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379-80 (Fed. Cir. 2001).

Finally, given Commerce's special expertise in applying the antidumping law, this Court has repeatedly held that Commerce is the "master" of the antidumping law, entitling its decision to great deference from the courts. *See NSK Ltd. v. United States*, 28 CIT 1535, 1561, 346 F. Supp. 2d 1312, 1335 (2004), *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007) (citation omitted). The

Federal Circuit has also noted that Commerce's "special expertise in administering the anti-dumping law entitles its decisions to deference from the courts." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (citations omitted); *see also Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) ("Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws.") (citing *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1516 (Fed. Cir. 1993)). In addition, the Supreme Court has held that where the agency is applying the antidumping statute, "we ask only whether the Department's application was reasonable." *United States v. Eurodif S.A.*, 555 U.S. 305, 319 (2009).

## STATEMENT OF FACTS

On April 2, 2019, Commerce initiated the underlying investigation of wooden cabinets and vanities and components thereof from China. *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 84 Fed. Reg. 12587 (Dep't Commerce April 2,2019). In its notice of initiation, Commerce stated that it was providing interested parties an opportunity to comment on the appropriate physical characteristics of wooden cabinets and vanities to be reported in response to the antidumping questionnaire. *Id.* Commerce explained that the comments would "be used to identify the key physical characteristics of the subject merchandise in order to report the relevant factors of production ('FOPs') accurately, as well as to develop appropriate product-comparison criteria." *Id.*

Meisen submitted both affirmative and rebuttal comments regarding the appropriate physical characteristics that should be used to report FOPs and compare normal value to U.S. price. In its comments, Meisen emphasized the importance of ensuring an accurate match between the type of wood used to produce the cabinets and the type of cabinets that the U.S.

customer was purchasing. *See* Meisen Rebuttal Product Characteristics Comments (Apr. 25, 2019) (P.D. 507). Meisen stated that "{t}he reporting of the type of wood used as the face material is plainly an important characteristic, and thus must be reported precisely." *Id.* Meisen thus advocated that, rather than grouping specific species of wood into different grade categories for matching purposes, Commerce's model match methodology should only allow a normal value based on one specific wood to be matched to a U.S. price for that same specific wood. Meisen explain that "{t}his methodology makes the most sense and is the most accurate for model matching purposes as oak will be compared to oak, rather than comparing broad categories that include various wood species, most of which would not even be included in the product being sold to the United States." *Id.* at 4. Meisen pointed out that matching a U.S. price based on one type of wood to the cost of a cabinet based on another type of wood would result in "various distortions." *Id.* As evidence of these distortions, Meisen pointed to the different costs of each type of wood. *Id.* Meisen submitted a chart showing that the cost of maple wood (143 Euros per cubic meter ("EUR/M3")) was almost four times the cost of birch wood at (38 EUR/M3). *Id* at Exhibit 2.

In recognition of the need to ensure accurate matching between U.S. prices and a respondent's costs, Commerce's final model match methodology divided species of wood into different grades. IDM at Comment 22 (P.D. 1554). Commerce's methodology does not allow cabinets made of birch wood to be matched to U.S. sales of maple cabinets because birch and maple are in different grades of wood. *Id.* (citing Antidumping Questionnaire) (classifying birch as a common grade hardwood species under code "4" and maple as a mid-grade hardwood species under code "5").

In its initial response to Commerce's antidumping questionnaire, Meisen reported that all

PUBLIC VERSION

of its cabinets were produced from birch wood and that all of the cabinets sold in the United

States were [                    ]. *See* Meisen Sec. C Resp. (July 19, 2019) (P.D. 910, C.D. 1011) at

Exhibit C-1; Meisen Sec. D Resp. (July 19, 2019) (P.D. 908) at 13 and Exhibit D-5. Meisen's

responses did not mention any discrepancy between the type of wood was used to produce the

cabinets and the type of wood as which they were sold. *See id.*

Commerce had requested as part of its antidumping questionnaire that Meisen provide

price lists, brochures, and other marketing materials for its U.S. sales. *See* Meisen Sec. A Resp.

(July 3, 2019) (P.D. 869) at 16, 19. In response, Meisen provided marketing materials that

appeared to suggest that its U.S. sales were all sales of maple cabinets. *See* Meisen Br. at 4-5.

For example, one product catalog described the first step in the production process for Meisen's

cabinets as follows: "The finest ***solid maple wood*** is sanded until smooth and vacuumed."

Meisen Supp. Sec. A Resp. (Aug 13, 2019) (P.D. 984) at Exhibit A-41 (emphasis added). In

addition, sales documentation provided by Meisen, including invoices issued to its customers,

referenced cabinets described as "maple." *See* Meisen Br. at 5.

This discrepancy between Meisen's responses to Commerce (which indicated that all of

its cabinets were made of birch wood) and Meisen's marketing materials (which indicated that

all of its cabinets were made of maple wood) raised a serious question as to whether Meisen was

accurately reporting its FOPs to Commerce. Petitioner thus conducted a factual investigation of

this issue and submitted on the record of the investigation the additional evidence it uncovered.

Petitioner Pre-Prelim Comments for Meisen (Sept. 27, 2019), (C.D. 1429-1432, P.D. 1400-

1404). This evidence included a declaration from an U.S. cabinets industry participant who

stated that Meisen's [                    ], had consistently represented to U.S.

customers that Meisen sells cabinets made of solid maple wood. *Id.* at 2-8 and Exhibit 7.

[                    ] made these representations to the industry participant through direct

discussions with [                        ] representatives and also through information provided

on [                ] websites and in [                ] product catalogs. *Id.* Based on this

definitive and compelling evidence that Meisen had represented to its U.S. customers that its

cabinets were made of maple wood, Petitioner argued in pre-preliminary comments before

Commerce that total AFA should be applied to Meisen. *Id.*

Commerce issued the preliminary determination in the underlying investigation on

October 2, 2020. In its preliminary determination, Commerce applied total AFA to Meisen. *See*

Preliminary Decision Memorandum (Oct. 2, 2020) (P.R. 1407). Commerce explained that the

basis for applying AFA was that the record information indicated that Meisen marketed and had

sales of merchandise under consideration during the POI that were produced using maple wood,

a primary raw material that Meisen failed to report, because Meisen's response only included

FOP data for the consumption of birch wood. *Id.*

On October 18, 2019, Commerce suspended verification of Meisen and its U.S. affiliates.

*See* Commerce Memo re: Verification of Meisen (Oct. 18, 2019) (P.D. 1437). Commerce then

issued two supplemental questionnaires to Meisen focused on whether its cabinets were made

from birch or maple wood and whether they were sold as birch or maple cabinets. *See*

Supplemental Questionnaire (Oct. 24, 2019) (P.D. 1446); Supplemental Questionnaire (Nov. 18,

2019) (P.D. 1487). Meisen's responses to these supplemental questionnaires made it clear that,

while Meisen had reported to Commerce that all of its cabinets were made with birch wood,

Meisen had been intentionally misleading its customers to believe they were purchasing maple

cabinets and that, as a result, Meisen's customers were paying U.S. prices based on the mistaken

belief that they were paying for maple cabinets. *See* Meisen First Post-Prelim Resp. (Nov. 6,

2019) (P.D. 1459); Meisen Second Post-Prelim Resp. (Nov. 21, 2019) (P.D. 1487); IDM at

Comment 22 (P.D. 1554).

On December 27, 2020, Commerce canceled verification of Meisen's questionnaire

responses. Commerce stated explained its decision as follows:

> The dissonance between what Meisen marketed to its customers and what Meisen
> reported to Commerce was information that Meisen had in its possession and
> could have voluntarily presented to Commerce early in the investigation. Instead,
> Meisen chose not to disclose this information until after the petitioner raised it in
> its comments and Commerce issued an adverse preliminary determination,
> suspended verification, and expended considerable time and resources to issue
> multiple supplemental questionnaires and review thousands of pages of
> documentation in response to those questionnaires.
> ….
> Specifically, the admission that Meisen marketed and sold its cabinets as maple
> cabinets when, in fact, Meisen claims that they were made of birch, highlights
> continued concerns regarding the data reported in the control numbers for the
> normal value and the reported U.S. prices.

Letter re: Verification, dated December 27, 2019 (P.D. 1524) at 1-2 (emphasis omitted).

Commerce published its Final Determination on February 28, 2020 and continued to

assign Meisen a margin based on total adverse facts available. IDM at Comment 22 (P.D. 1554).

## ARGUMENT

**I.    Commerce's Decision to Apply Facts Available Is Supported by Substantial
Evidence and Otherwise in Accordance with Law**

### A.    Legal Standard for Application of Facts Available

The statute requires Commerce to apply facts available where either necessary

information is not on the record or an interested party: (i) withholds information that has been

requested by Commerce; (ii) fails to provide information within the deadlines established or in

the form and manner requested; (iii) significantly impedes a proceeding; or (iv) provides

information that cannot be verified. 19 U.S.C. § 1677e(a)(2). In selecting facts available,

Commerce may employ an adverse inference (*i.e.*, apply AFA) if an interested party fails to

cooperate by not acting to the best of its ability to comply with Commerce's requests for information. *Id.* § 1677e(b). It is not enough for a respondent to simply submit any information to the Department; the information provided by the respondent must represent the "maximum it is able to do" and must be complete and accurate. *Nippon Steel v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

### B.     The Statutory Requirements for Applying Facts Available Were Met

Commerce found in the final determination that the statutory requirements for applying facts available were met because: (1) Meisen withheld information regarding discrepancies between the products that it marketed to its customers and those it reported to Commerce until this issue was raised by Petitioner; (2) Meisen impeded the investigation by not disclosing information regarding these issues until after Commerce had expended considerable time and resources to issue multiple supplemental questionnaires and review thousands of pages of documentation; and (3) Meisen failed to provide information that would allow for accurate comparisons of normal value to U.S. sales. *See* IDM at Cmnt. 22. Substantial evidence supports all of Commerce's findings.

First, prior to the preliminary determination, Meisen withheld information when it failed to address a fundamental discrepancy in its original questionnaire responses between the type of wood it reported using to produce its cabinets to Commerce the type of wood it reported using to produce its cabinets to its U.S. customers. Significantly, Meisen had several opportunities to disclose this discrepancy prior to the preliminary determination, and it failed to take advantage of any of them. For example, on August 28, 2019, prior to the preliminary determination, Commerce sought clarifying information regarding Meisen's wood purchases in a Section D supplemental questionnaire, asking the respondent to clarify that it "only consumed birch boards during the POI and did not consume any other species of boards." *See* Meisen Supp. D-E Resp.

(Sept. 17, 2019) (P.D. 1361) at 15. In response, Meisen confirmed that "it only consumed birch

boards in the production of the MUC during the POI and did not consume any other species of

boards." *Id*. In that response, Meisen could have clarified the discrepancy between its

questionnaire responses, which only describe birch as being used to produce Meisen's cabinets,

and the marketing materials for its U.S. sales, which describe Meisen-made cabinets as primarily

being made of maple, but Meisen chose not to do so. It withheld this information.

Meisen had another opportunity to clarify this discrepancy by submitting surebuttal

information in response to Petitioner's September 26, 2019 pre-preliminary comments, but it

failed to submit any such information. Commerce's regulations allow the original submitter of a

questionnaire response to submit new factual information in response to rebuttal factual

information submitted by another party. 19 C.F.R. § 351.301 (c)(l)(v). This surebuttal

information must be submitted within seven days of the rebuttal submission. *Id.* By failing to

submit surebuttal factual information to the rebuttal factual information contained in Petitioner's

pre-preliminary comments, Meisen passed up another opportunity to provide this critically

relevant information. As Commerce explained in the final determination, while its decision to

apply total AFA was not rooted in Meisen's failure to respond to Petitioner's comments:

> {G}iven the importance of the information to Commerce's analysis and gravity of
> the evidence cited in the petitioner's September 26 letter, it is notable that Meisen
> had the opportunity to respond with factual information and explanation of its
> own but chose not to and, instead, waited until after the Preliminary
> Determination to request that Commerce allow Meisen to clarify the record.

IDM at Comment 22 (citations omitted).

Second, Meisen impeded the investigation both through failing to disclose this

discrepancy on its own and through its conduct after the issue was brought to Commerce's

attention by Petitioner. By failing to disclose the discrepancy on its own, Meisen forced

14

Petitioner and Commerce to expend time and resources ascertaining whether Meisen had lied to Commerce about using birch wood or lied to its Customers about using maple wood. Furthermore, when Commerce explored this discrepancy after the preliminary determination by issuing supplemental questionnaires, Meisen initially attempted to downplay the severity of the problem and the number of U.S. sales that were impacted. In its first post-preliminary determination supplemental questionnaire response, Meisen stated that this problem was limited to "the sales of these few nominally 'maple' products." Meisen First Post-Prelim Resp. (Nov. 6, 2019) (P.D. 1459) at 2. Meisen also claimed that only [

]. *See id.* at Exhibit SD2-1. [

]. Furthermore, as the record was further developed, it became clear that this discrepancy affected all of Meisen's U.S. sales—not just a "few nominally 'maple' products."

As Commerce found in the final determination, in its post-preliminary questionnaire responses "Meisen gave conflicting and unconvincing reasons as to why its marketing materials misrepresented the species of wood used in its cabinets." IDM at Comment 22. Meisen stated in its first post-preliminary response that "the maple references indicate the [

] rather than the type of wood that comprise the construction." Meisen Supp. Resp. (Nov. 6, 2019) (P.D. 1459, C.D. 1475) at 2. In other words, Meisen refused to confess that it had misrepresented to its customers the type of wood it had used.  In a second supplemental questionnaire directed at Meisen, Commerce asked a number of direct questions as to why Meisen and its U.S. affiliates advertise cabinets made of solid maple wood (if all of the products were actually made of birch) and whether Meisen's affiliate really had been

misrepresenting the actual species of wood used to produce the cabinets sold in the United States. Below is one example:

> **Question:**   "{P}lease state whether your sales representatives present your products as being made of solid maple wood to your U.S. customers."

> **Response:**   "The J&K Company sales representatives present the products as being made of solid wood ***with a maple look***."

Meisen Second Post-Prelim Resp. (Nov. 21, 2019) (P.D. 1487) at 3 (emphasis added). Meisen again refused to answer directly whether it represented the products as being made of maple wood and instead insisted that it only marketed that its products were made with a "maple look." Meisen similarly stated that "{t}he marketing materials are not a reflection of the actual material used in the production of the wooden cabinets during the POI but rather a reflection of the 'look' of the cabinets." *Id.* On the other hand, Meisen stated in the same response that it "advertises its cabinets ***as solid maple wood*** because there is no optical difference in the finished good between maple and birch once the cabinet is finished." *Id.* at 3 (emphasis added).

In other words, Meisen simultaneously claimed to Commerce that: (1) it was representing to its customers that its cabinets had a "maple look" but was not representing to its customers that the cabinets were actually made of maple wood; and (2) it really was misrepresenting to its customers that its cabinets were made of maple wood when in fact they were made of birch wood, because there was no "optical difference" for the customers between the two wood species. It is plain why Meisen initially withheld this information from Commerce and later provided evasive answers on this issue. As Meisen itself emphasized in the beginning of the investigation, to calculate an accurate dumping margin, it was critical that the wood type used for normal value must match the wood type reflected in the U.S. price.

Finally, in this regard, the record supports Commerce's findings that Meisen failed to provide information that would allow for accurate comparisons of normal value to U.S. sales. As Commerce explained in the final determination:

> Although Meisen provided significant amounts of documentation supporting its reported FOPs, its U.S. sales database is comprised of sales of merchandise priced under CONNUMs that are not included in its FOP database. Moreover, Meisen's U.S. CONNUMs do not represent the maple cabinets it purported to sell and the record does not contain FOP data for the products Meisen represented selling in the U.S. market. As a result, U.S. prices for purported maple cabinets and NV for birch cabinets introduces a significant mismatch between the two pillars of our AD margin calculation. Given the above, we cannot calculate an accurate dumping margin with the data reported by Meisen, nor would verification of the accuracy of Meisen's reported data resolve the discrepancy such that the distortion could be remedied. Accordingly, we conclude that the rejection of Meisen's data is appropriate for this final determination.

IDM at Comment 22.

The bottom line is that substantial evidence supports Commerce's findings that Meisen withheld information regarding a fundamental discrepancy in its reported data, impeded Commerce's investigation by offering delayed, evasive, and contradictory responses regarding this discrepancy, and ultimately failed to provide information that would allow Commerce to calculate an accurate dumping margin. There is thus no question that the statutory requirements for applying facts available were met.

### C.    Meisen Did Not Disclose the Discrepancy at Issue on Its Own

It is preposterous for Meisen to assert that it "fully disclosed" the discrepancy between its reported consumption of birch wood and the sale of its products as maple cabinets when it attached sales documents as exhibits to its questionnaire response that mentioned "maple." *See* Meisen Br. at 17-18. This Court has recognized that a respondent does not fully disclose information to Commerce when that information is buried in exhibits attached to its questionnaire responses. *See Taian Ziyang Food Co. v. United States*, 33 C.I.T. 828 (2009)

(upholding Commerce's application of facts available based on a finding that respondent impeded a review by failing to provide complete and reliable information in the form and manner requested Commerce when it buried the requested information in a 600-page document). The Court has also recognized that condoning the type of behavior engaged in by Meisen would impede Commerce's investigations and waste the agency's resources. *Gerber Food (Yunnan) Co. v. United States*, 491 F. Supp. 2d 1326, 1337 (Ct. Int'l Trade 2007) ("{A} party's unresponsiveness and failure to cooperate prior to providing the needed and verifiable information might significantly and unnecessarily impede the proceeding and waste the Department's resources."). If the Court were to agree with Meisen that a respondent "fully discloses" critical information when that information is merely suggested through obscure references buried in voluminous exhibits, this would give a blaring green light to parties in future antidumping proceedings to engage in similar uncooperative behavior.

### D.    Meisen Bore the Burden of Disclosing This Discrepancy to Commerce

The Court should also reject Meisen's attempt to shift blame away from itself when it claims that "{r}esolving the discrepancy and deciding whether Meisen used birch or maple wood is part of Commerce's responsibilities, but Commerce abdicated that responsibility by relying on Petitioner's allegations." Meisen Br. at 21. To the contrary, it was Meisen's burden to provide accurate and reliable information to Commerce. This Court has long recognized that the general rule with regard to a respondent's submission of information to Commerce during the course of an antidumping investigation is that the respondent bears the burden and responsibility of creating an accurate record within the statutory timeline. *See RHP Bearings v. United States*, 875 F.Supp. 854, 857 (Ct. Int'l Trade 1995); *see also Yamaha Motor Co., Ltd. v. United States*, 910 F.Supp. 679, 687 (Ct. Int'l Trade 1995) ("It is the respondent's obligation to supply Commerce

with accurate information."); *Societe Nouvelle De Roulements v. United States*, 910 F.Supp. 689, 694 (Ct. Int'l Trade 1995) ("Respondents 'must submit accurate data' and 'cannot expect Commerce, with its limited resources to serve as a surrogate to guarantee the correctness of submissions.' "); *Chia Far Indus. Factory Co. v. United States*, 28 C.I.T. 1337 (2004) ("Ultimately, the burden of creating an adequate record lies with the respondents, not Commerce.") (citing *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F.Supp. 1008, 16 CIT 931, 936 (1992)). Thus, Meisen bore the burden of disclosing this discrepancy clearly and accurately at the outset of the investigation. And when the discrepancy was discovered, it was Meisen's burden to set the record straight. It is preposterous for Meisen to assert that it was Commerce's responsibility to discover this discrepancy on its own and then determine how to resolve the discrepancy while Meisen sat back and did nothing.

### E. Meisen Failed to Provide Information That Would Allow Commerce to Conduct a Proper Comparison of U.S. Price to Normal Value

As discussed above, Commerce's determination that it was forced to resort to facts available was based, in part, on the fact that the discrepancy between the wood species that Meisen consumed and the wood species for which its customers believed they were paying resulted in a "significant mismatch between the two pillars of our {antidumping} margin calculation," which meant that Commerce could not calculate an accurate dumping margin with the data reported by Meisen. IDM at Comment 22. As an initial matter, this finding is not essential to Commerce's application of facts available, as Meisen failed to provide information regarding the discrepancy in its reported wood usage and significantly impeded Commerce's investigation. Either one of these findings is sufficient under the statute for Commerce to resort to the application of facts available. 19 U.S.C. § 1677e(a)(2). However, this finding does provide additional support for Commerce's application of facts available in the underlying investigation.

The Court should reject Meisen's claim that there was no mismatch between its U.S. sales prices (based on sales of higher-priced maple wood) and its reported FOPs (based on consumption of lower-cost birch wood). According to Meisen, the "fact that the cabinets may have been sold at higher prices garnered for cabinets made of maple wood does not 'mask' any dumping. Rather it indicates that there was no dumping to the extent that the U.S. price was higher than the normal value." *See* Meisen Br. at 10. First of all, the very fact that Meisen's birch cabinets were priced, marketed, and sold in the United States as maple cabinets created a fundamental difference between the Chinese cost information and the U.S. sales information provided by Meisen that prevented an accurate comparison – regardless of whether it masked the extend of dumping. Second, the record supports Commerce's finding that this mismatch potentially masked the extent of dumping, because the record shows that maple wood is substantially more expensive than birch wood. *See* Petitioner Pre-Prelim Cmts. at 7, Exhibit 7 ("Based on my experience in the wooden cabinets and vanities industry, maple is significantly more expensive than birch. … In many instances, maple solid wood or veneers can be twice as expensive as birch solid wood or veneers."). If Meisen's cabinets were priced and sold as birch cabinets, then they would have been sold at much lower prices. The fact that they were priced and sold as maple cabinets means that Meisen was able to obtain artificially higher U.S. sales prices. Using this information to calculate a dumping margin would thus significantly underestimate that actual amount of dumping that occurred during the POI. Furthermore, there was no way for Commerce to determine what Meisen's U.S. sales prices would have been if its cabinets were correctly priced as birch cabinets.

Significantly, Meisen itself recognized in its model match comments at the outset of the investigation that "{t}he reporting of the type of wood used as the face material is plainly an

important characteristic, and thus must be reported precisely." Meisen Rebuttal Product

Characteristics Comments (Apr. 25, 2019) (P.D. 507) at 3. In fact, Meisen emphasized that it

was extremely important to compare a normal value based on one type of wood to a U.S. price

based on the same type of wood, because matching a U.S. sales price based on the sale of one

type of wood to costs based on another type of wood would result in "various distortions." *Id.* at

4. And Meisen even submitted evidence showing that Chinese maple wood could cost up to four

times as much as birch wood. *Id* at Exhibit 2.

## II.   Commerce's Decision to Apply AFA Was Supported by Substantial Evidence and in Accordance with Law

### A.  Legal Standard for Application of an Adverse Inference

Once Commerce determines that it must resort to facts available, Commerce may employ

an adverse inference (*i.e*., apply AFA) if an interested party fails to cooperate by not acting to the

best of its ability to comply with Commerce's requests for information. *Id.* 19 U.S.C. § 1677e(b).

It is not enough for a respondent to simply submit any information to the Department; the

information provided by the respondent must represent the "maximum it is able to do" and must

be complete and accurate. *Nippon Steel v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

The AFA statute "has been held to confer administrative discretion in its application and to

require judicial deference thereto." *Diamond Sawblades Manufacturers' Coal. v. United States*,

2018 WL 5281941 (Ct. Int'l Trade 2018) (citing *Shandong Huarong Machinery Co., Ltd. v.

United States*, 30 CIT 1269, 1297, 435 F.Supp.2d 1261, 1285-86 (2006); *AK Steel Corp. v.

United States*, 28 CIT 1408, 1416, 346 F.Supp.2d 1348, 1355 (2004)).  The Court has upheld

Commerce's application of AFA to respondents in prior cases where the respondents withheld

information that their sales and production documents were not accurate because they contained

contradictory statements that were made to their customers or other government agencies.  *See,*

*e.g., Yantai Xinke Steel Structure Co. v. United States*, 36 C.I.T. 1035, 1047-48 (2012); *Jiangsu Changbao Steel Tube Co., Ltd* v. *United States*, 884 F. Supp. 2d. 1295, 1306 (Ct. Int'l Trade 2012).

**B.    Substantial Evidence Supports Commerce's Determination that Meisen Failed to Cooperate to the Best of Its Ability**

In its final determination, Commerce found that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference was warranted in assigning a final margin to Meisen based on its failure to raise the issue of the discrepancies between the products that it marketed to its customers and those it reported to Commerce early in the investigation and based on Meisen's choice not to disclose this information until after the preliminary and only after Commerce suspended verification and expended considerable time and resources to issue multiple supplemental questionnaires and review thousands of pages of documentation in response to those questionnaires. IDM at Comment 22 (P.D. 1554). The Court should reject Meisen's claims that it did, in fact, cooperate to the best of its ability in the investigation.

Meisen mischaracterizes Commerce's determination when it argues that the application of AFA was not based "on any misstatements to Commerce but rather on alleged misstatements made by Meisen's U.S. affiliates to their customers in advertising and marketing materials." *See* Meisen Br. at 2. Commerce's determination was not based simply on the misstatements made by its U.S. affiliates. It was based on Meisen's failure to disclose the discrepancy between its reporting to Commerce that it made cabinets using birch wood and its misrepresenting to its customers that its cabinets were made of maple wood. Furthermore, as Commerce found, even when presented an opportunity to come clean, "Meisen gave conflicting and unconvincing reasons as to why its marketing materials misrepresented the species of wood used in its cabinets," which called into question the veracity of its responses. IDM at Comment 22.

PUBLIC VERSION

The Court's prior decision in *Yantai Xinke* is instructive. 36 C.I.T. at 1047-48. In that case, the respondent had claimed throughout the underlying investigation that it used only narrow steel strip in coils as inputs and submitted to Commerce certain mill test certificates from its suppliers supporting this claim. *Id.* The company submitted only this documentation to Commerce and failed to disclose that it had prepared mill test certificates for its customers that conflicted with the supplier mill test certificates. *Id.* However, the respondent's importer of record had submitted these mill test certificates to Customs. *Id.* Following questions being raised by the petitioners, Commerce requested from Customs the mill test certificates that the respondent had prepared for its customers. Only after learning that Commerce had requested these documents from Customs did the respondent produce them for Commerce's examination. *Id.* Commerce determined that this behavior warranted the application of AFA. *Id.* at 1049. This Court upheld Commerce's determination. It explained that by not disclosing the fact that it had provided its customers with mill test certificates that contradicted the claims it had made to Commerce regarding its steel input, the respondent had failed to "cooperate to the best of its ability" to provide requested information. *Id.* at 1054 (quoting Nippon Steel, 337 F.3d at 1381). Thus, the Court concluded, Commerce's decision to apply AFA was supported by substantial evidence. *Id.*

Similarly, in *Jiangsu Changbao*, Commerce applied total AFA to a respondent that had failed to disclose discrepancies between the information it had provided to Commerce regarding the chemical composition of the steel billets used to make the subject merchandise and the information it had provided to its own customers regarding the chemical composition of the subject merchandise. 884 F. Supp. 2d. at 1306. The respondent had maintained during the investigation that it used only alloy steel to produce the subject merchandise. *Id.* At a later stage

of the investigation, however, it was discovered that the respondent had maintained two sets of

mill test certificates – one set that was consistent with the information reported to Commerce

regarding and another set that was provided to its customers that contradicted its reporting to

Commerce. Commerce found that the respondent had failed to cooperate to the best of its ability

by, among other conduct, failing to disclose that it had furnished its customers with mill test

certificates indicating something other than what the respondent was claiming before Commerce.

*Id.* This Court upheld Commerce's determination, explaining:

> It is reasonable for Commerce to infer that a respondent who admits to having
> intentionally deceived Commerce officials, and does so only after Commerce
> itself supplies contradictory evidence, exhibits behavior suggestive of a general
> willingness and ability to deceive and cover up the deception until exposure
> becomes absolutely necessary. Here, Commerce determined that, in the absence
> of additional reassurance or an explanation sufficient to rehabilitate Changbao's
> damaged credibility, Commerce had no way of knowing whether or not Changbao
> may have been less than straightforward with regard also to its remaining
> submissions and representations in this investigation.

*Id.* at 1306.

The similarities between *Yantai Xinke*, *Jiangsu Changbao*, and the instant case are quite

plain. In all three cases, the respondents reported one set of facts to Commerce regarding the

inputs they used to produce the subject merchandise and another set of contradictory facts to

their customers regarding the inputs they used. In all three cases, the respondents failed to

disclose these discrepancies to Commerce until the issue was brought to the attention of the

agency by the petitioners at a late stage of the investigation once Commerce had expended

considerable resources in determining the appropriate surrogate values for the inputs based on

what the respondent had chosen to report. In all three cases, when confronted with the

discrepancy, the respondents offered evasive, contradictory, and disingenuous explanations for

the discrepancy. And in all three cases, the respondents' failure to disclose the discrepancy

resulted in Commerce not having the information necessary to calculate an accurate dumping margin.

The Court's prior holdings in *Yantai Xinke Jiangsu Changbao* are already powerful precedent for upholding Commerce's application of AFA to Meisen in this case. But there is even more legal authority for upholding Commerce's decision. In particular, this court has also upheld the application of AFA where there are inconsistencies in a respondent's reporting of sales data and CONNUM characteristics that result in an inaccurate matching of normal value to U.S. sales. *See Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1353 (Ct. Int'l Trade 2018) ("Plaintiff had the opportunity to explain any additional product characteristics or reporting inconsistencies in the narrative portion of Commerce's questionnaire, but failed to do so prior to verification, and, even then, failed to provide adequate explanations for its reporting."); *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752 (2001) ("These missing fields, and the complete lack of matching data for the U.S. sales, appear to substantiate Commerce's position that the matching needed for a proper margin computation was adversely impacted.").

Here, as Commerce explained in the final determination:

A consequence of Meisen's misrepresentations is the potential masking of dumped sales. The question before Commerce is simple: what is the "fair" value of the products Meisen sold in the United States during the POI? By comparing Meisen's cabinets that are priced as though they were produced with maple, (and which may or may not have been sold at prices below NV for maple cabinets) to an NV based on a non-maple wood species, the degree to which Meisen may be selling at LTFV is effectively obscured. The purpose of soliciting comments and making a reasoned decision on how respondents are to report physical characteristics in construction of the CONNUM is to avoid the very scenario we are presented with here. Commerce intentionally separated certain species by grade into separate codes in order to match similar prices to similar costs. Meisen has subverted Commerce's intent and process by misrepresenting the product being sold, thereby distorting the comparison that Commerce is tasked with making.

IDM at Comment 22. In other words, Meisen's failure to cooperate to the best of its ability began

with its failure to sell products in a way that would allow Commerce to make an accurate

comparison of normal value to the U.S. sales price.

### C.      Commerce Properly Relied on Meisen's Silence in Finding that It Withheld Information and Failed to Cooperate to the Best of Its Ability

As discussed above, Commerce found it notable in applying AFA that Meisen had the

opportunity to respond with factual information and explanation of its own to Petitioner's

September 26, 2019 pre-preliminary comments but chose not to and, instead, waited until after

the preliminary determination to request that Commerce allow Meisen to clarify the record. *See*

IDM at Comment 22.  The Court should reject Meisen's argument that that no significance or

evidentiary weight should be accorded to its silence because "the law and regulations are clear

that Meisen is not required to respond to allegations made by Petitioner." Meisen Br. at 19. In

fact, the U.S. Supreme Court has recognized the evidentiary significance of a party's silence

when charged with wrongdoing, explaining that the "'{f}ailure to contest an assertion … is

considered evidence of acquiescence … if it would have been natural under the circumstances to

object to the assertion in question.'" *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) (quoting

*United States v. Hale,* 422 U.S. 171, 176 (1975)). *See also United States ex rel. Bilokumsky v.*

*Tod*, 263 U.S. 149, 153—154 (1923) ("Conduct which forms a basis for inference is evidence.

Silence is often evidence of the most persuasive character."). This is why, in civil litigation, a

defendant's silence or failure to provide relevant evidence permits the drawing of an adverse

inference against the defendant. *Baxter*, 425 U.S. at 318.

PUBLIC VERSION

**D.      Meisen's Failure to Report Cost and Sales Data that Allowed for Accurate Comparisons of U.S. Price to Normal Value, By Itself, Warranted Application of AFA**

Commerce is charged with the responsibility of calculating accurate dumping margins for respondents in antidumping proceedings. Commerce's ability to carry out this responsibility depends on respondents' maintaining accurate information regarding their U.S. sales prices and costs that will allow Commerce to perform an accurate apples-to-apples comparison of U.S. price to normal value. It is not enough for a respondent to simply submit any information to Commerce; the information provided by the respondent must represent the "maximum it is able to do" and must be complete and accurate. *Nippon Steel*, 337 F.3d at 1382. This standard presumes that parties are familiar with the rules and regulations governing the sales of goods from other countries into the United States "and requires that {parties}, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries … take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable {party} should anticipate being called upon to produce" as part of an antidumping proceeding. *Id.* at 1383. Consistent with the statute and the Federal Circuit's guidance, Commerce has applied AFA to respondents that fail to maintain full and complete records in the ordinary course of business that would allow the respondents to provide accurate and verifiable information to Commerce. *See, e.g.*, *Forged Steel Fittings from China*, 83 Fed. Reg. 50339, (Oct., 5, 2018) and accompanying IDM at Comment 5; *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from China*, 83 Fed. Reg .16322 (Apr. 16, 2018) and accompanying IDM at Belkovsky Comment 1.

Commerce's application of AFA thus includes situations where respondents have failed to maintain complete records that would allow them to accurately report their costs on a

CONNUM-specific basis. *Thuan An Prod. Trading & Serv. Co. v. United States*, 348 F. Supp. 3d 1340, 1354 (Ct. Int'l Trade 2018). Commerce has long recognized that "the requirement to report product-specific sales and cost data is one of the most basic and significant requirements in performing the dumping analysis and margin calculation." *Stainless Steel Bar from India*, 83 Fed. Reg. 17,529 (Apr. 20, 2018) and accompanying IDM at Comment 22. When a respondent fails to report sales and cost data that accurately reflect the physical characteristics of the merchandise that was produced and sold, Commerce cannot conduct appropriately its sales-below-cost test, determine similar matches between the U.S. prices and normal value comparisons, adjust for physical differences between similar matches, and calculate accurate dumping margins. *Id.*; *see also* IDM in *Circular Welded Non-Alloy Steel Pipe from Korea*, 79 Fed. Reg. 37,284 (July 1, 2014) at Comment 1.

In the instant case, Meisen failed to maintain books and records that would allow it to report to Commerce the CONNUMs of its U.S. sales in an accurate manner. Meisen's failure was not due to the complete absence of an accounting system, an accounting system that failed to track the physical characteristics of the merchandise being sold, or simply the respondent's unwillingness to roll up its sleeves and devise a methodology for reporting its U.S. sales on a CONNUM-specific basis using the documentation available. Rather, Meisen's inability to accurately report the CONNUMs of its U.S. sales was due to the widespread fraud it was perpetrating on its U.S. customers – *i.e.*, Meisen's failure to represent accurately to its U.S. customers the wood from which its cabinets were made. Under Commerce's established practice, as upheld by the Court, Meisen's failure to report the CONNUMs of its U.S. sales in a manner that would allow an accurate comparison to normal value warranted the application of AFA.

**E.      Commerce's Application of AFA to Meisen Was Not a Punishment of the Respondent for Lying to Its Customers**

There is no basis for Meisen's suggestion that Commerce applied AFA to punish Meisen for lying to its U.S. customers. According to Meisen, that "{t}o the extent Meisen's U.S. affiliates gained some market advantage by misrepresenting its cabinets as made of maple, that is not an issue to be investigated under the antidumping law nor is it an issue that can be punished under the antidumping law." Meisen Br. at 23. Nowhere does the record support the notion that Commerce was using the antidumping law as a tool to punish Meisen for lying to its U.S. customers and cheating them out of their money. Commerce's basis for applying AFA was Meisen's failure to disclose the discrepancy in its representations to its customers and its reporting to Commerce, its conduct once the discrepancy came to light, and the resulting inability to conduct accurate comparisons of U.S. price to normal value because of the discrepancy.

As the courts have recognized, "the purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017) (quoting *F.lli De Cecco Di Filippo Fara S. Martin S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). Meisen ignores that Commerce did not apply total AFA on the grounds that Meisen hoodwinked its customers but rather because Meisen failed to disclose this fraud to Commerce and routinely provided contradictory information that called into question the veracity of all of the information it provided. Commerce's application of AFA is not a punishment for bad behavior to bring justice to Meisen's U.S. customers. It is a deterrent to ensure that Meisen and other respondents cooperate to the best of their ability in future antidumping proceedings. *Nan Ya Plastics Corp.* v.

*United States,* 810 F.3d 1333, 1348 (Fed. Cir. 2016) (recognizing that "consideration of the deterrent effect of Commerce's determination reflects the law's expectation").

## III.    Commerce's Decision to Cancel Verification Was In Accordance with Law

In the final determination, Commerce explained that it had canceled the verification of Meisen's cost and sales data for the following reasons:

> {W}e are not relying upon any of Meisen's reported information for this final determination and, therefore, there is no information that must be verified. Moreover, as a result of the dissonance between Meisen's reported U.S. sales data and its FOP data, its questionnaire responses contain fundamental discrepancies that were not directly addressed until well after the Preliminary Determination and that remain unresolved even after Meisen's belated attempt at clarification. When a party submits substantially deficient responses, Commerce is under no obligation to use this information. Under these circumstances, there is no requirement to verify the information. If a respondent provides substantially incomplete questionnaire responses and Commerce must then base the company's rate entirely on facts available, as in this case, then verification is "meaningless."

IDM at Comment 22 (citations omitted).

Meisen is wrong when it contends that Commerce cannot cancel a verification "by simply rejecting all information submitted by a respondent and then declaring that it is not relying on that information so there is no need for verification." Meisen Br. at 26. This Court has recognized Commerce need not verify the sales and cost data of a respondent when the data is incomplete or otherwise unusable for purposes of calculating an accurate dumping margin. *See, e.g., Hyundai Elec. & Energy Sys. Co. v. United States*, 466 F. Supp. 3d 1303, 1318 (Ct. Int'l Trade 2020); *Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332, 1350 (2018). For example, in *Hyundai Elec.*, Commerce found that the respondent failed to provide requested cost information, both with respect to its product-specific costs and its cost-reconciliation information. 466 F. Supp. 3d at 1317. Commerce thus found that the "cost information was so incomplete as to be unverifiable." *Id.* This Court upheld Commerce's decision to cancel verification on this basis. The Court explained that "Commerce is not obligated to consider

information that is 'so incomplete that it cannot serve as a reliable basis for reaching the applicable determination.'" *Id.* (quoting 19 U.S.C. § 1677m(e)(3)).

Similarly, in *Hyundai Steel*, the Court upheld Commerce's decision to cancel the verification of a respondent's further manufacturing cost data and apply AFA because the data contained "inconsistencies, and ... multiple unexplained, or insufficiently explained, changes." 282 F. Supp. 3d at 1350. Commerce determined that the respondent's cost data "was so fundamentally flawed that it was unverifiable." *Id.* The Court found no fault with Commerce's cancellation of verification because these types of "deficiencies are not fairly testable, as the crux of the deficiency is that Commerce, upon reviewing the submissions in question, cannot discern which data is meant to be tested." *Id.*

Here, as in *Hyundai Elec.* and *Hyundai Steel*, there was a fundamental flaw with the cost and sales data that Meisen submitted to Commerce. Meisen's U.S. sales reflected the prices of the sales of maple wood cabinets, as evidenced by the respondent's product catalogs, websites, [                                                                                       ]. However, its reported FOPs reflected the costs of birch wood cabinets. This discrepancy rendered the data completely unverifiable and unusable for purposes of calculating an accurate dumping margin. Thus, consistent with its practice in prior cases, as upheld by the Court, Commerce's properly declined to conduct a verification of Meisen's sales and cost data.

Meisen diverts attention from Commerce's rationale for canceling verification when it characterizes the central issue as "whether Meisen used birch or maple wood for the cabinets it produced and sold" – which it asserts is "an issue that could have been resolved by an on-site verification." Meisen Br. at 26. Commerce could not deem Meisen's reported data to be usable and without any flaws by verifying that Meisen used only birch wood to produce cabinets and

verifying that it only sold the cabinets as being made from maple wood. This fundamental discrepancy is simply not the type of deficiency that could be tested and cured by comparing the reported data to Meisen's internal accounting and sales documentation. The discrepancy would remain ever after verification was complete.

For similar reasons, Meisen misses the point when it contends that Commerce could have looked to its parallel countervailing duty investigation where Commerce found that maple was not used an input in the production of Meisen's products. Meisen Br. at 15, 27. As Commerce explained in the final determination, "it is not clear how information from the CVD investigation would shed any light on the deficiencies in Meisen's reported information in this AD investigation," because "Meisen itself admit{ted} that it represented its products to U.S. customers as products made from maple but claims that its products were actually produced using birch wood." IDM at Comment 22. Thus, placing information from the CVD investigation on the record of this AD investigation would not serve any purpose. *Id.*

## IV.     Commerce's Determination to Apply Total AFA Is Supported by Substantial Evidence

In the final determination, Commerce correctly decided to apply total AFA as opposed to neutral facts available or partial AFA. This Court has recently explained that the phrase "total adverse inferences" or "total AFA" encompasses a series of steps that Commerce takes to reach the conclusion that all of a party's reported information is unreliable or unusable and that as a result of a party's failure to cooperate to the best of its ability, it must use an adverse inference in selecting among the facts otherwise available. *Jindal Poly Films Ltd. of India v. United States*, 439 F. Supp. 3d 1354, 1359 (Ct. Int'l Trade 2020). Thus, "total adverse facts available" refers to "Commerce's application of adverse facts available not only to the facts pertaining to specific sales or information ... not present on the record, but to the facts respecting all of respondents'

production and sales information that the {agency} concludes is needed for an investigation or review. *Nat'l Nail Corp. v. United States*, 390 F.Supp.3d 1356, 1374 (Ct. Int'l Trade 2019) (citation omitted). *See also Deacero S.A.P.I. de C.V. v. United States*, 353 F. Supp. 3d 1303, 1307 n.2 (2018) (Commerce uses "total AFA" when it concludes "that all of a party's reported information is unreliable or unusable and that as a result of a party's failure to cooperate to the best of its ability, it must use an adverse inference in selecting among the facts otherwise available."). This is precisely what happened here.

Meisen argues that even if Commerce's concerns regarding the discrepancy between its cost and sales data were valid, "the obvious solution is not to resort to total adverse facts available but to apply some form of neutral facts available or partial adverse facts available with respect to this sole issue." Meisen Br. at 29. The only thing that is obvious, however, is that it would be impossible to apply any type of neutral facts available or partial AFA. The discrepancy between Meisen's reported costs and sales data affected each and every single U.S. sale, because Meisen marketed and sold all of its merchandise as maple wood cabinets, and the discrepancy affected the normal value for all of its reported CONNUMs, as Meisen reported using birch wood to produce all of its cabinets. Thus, not a single valid apples-to-apples comparison could be conducted for any of Meisen's U.S. sales.

Furthermore, this Court has recognized that when a respondent fails to disclose discrepancies in its data and is instead is selective in providing information to Commerce it is appropriate to reject all of the respondent's submitted data (instead of simply a portion of the data) and apply total AFA to calculate the respondent's dumping margin. *See, e.g., Steel Auth. of India v. United States*, 149 F. Supp. 2d 921, 928 (Ct. Int'l Trade 2001); *Papierfabrik August Koehler S.E. v. United States*, 7 F. Supp. 3d 1304, 1314 (Ct. Intl Trade 2014); *Washington Int'l*

*Ins. Co. v. United States*, 34 C.I.T. 171, 174 (2010) ("{T}he reality is that WII confronts a determination on the credibility of certain declarations by Xuzhou that affect the reliability of Xuzhou's reported U.S. sales information in its entirety. Such a credibility determination may thus result in a record of information that is 'so incomplete that it cannot serve as a reliable basis for reaching the applicable determination{,}' even if the respondent has been 'cooperative' and acted to the best of its ability in providing some information."), *aff'd*, 409 F. App'x 346 (Fed. Cir. 2011). Indeed, if Commerce "were forced to use the partial information submitted by respondents, interested parties would be able to manipulate the process by submitting only beneficial information." *Steel Auth.*, 149 F. Supp. 2d at 928. As a result, "{r}espondents, not {Commerce}, would have the ultimate control to determine what information would be used for the margin calculation," which would be "in direct contradiction to the policy behind the use of facts available." *Id.*

Here, Meisen and its U.S. affiliates were fully aware of the fundamental discrepancy between how their merchandise was sold as higher-priced maple cabinets in the United States but produced from lower cost birch wood in China. However, Meisen failed to disclose this discrepancy to Commerce and instead selectively reported only that the cabinets were made from birch wood. This type of conduct undermines Meisen's credibility as it shows the company was willing to be selective in providing information to Commerce and manipulate the process by submitting only beneficial information that would result in a lower dumping margin instead of fully disclosing all relevant facts to Commerce.

## V.    Conclusion

For the foregoing reasons, Petitioner respectfully request that the Court uphold Commerce's final determination as supported by substantial evidence and in accordance with law.

Respectfully submitted,

*/s/ Luke A. Meisner*
Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 719-7000

*Counsel for the American Kitchen Cabinet Alliance*

Dated: January 14, 2021

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing response brief contains 10,679 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures.


Dated: January 14, 2020                                <u>/s/ Luke A. Meisner</u>
                                                       Luke A. Meisner