## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE**: **THE HONORABLE GARY S. KATZMANN, JUDGE**

_____

| | | |
|---|---|---|
| DALIAN MEISEN WOODWORKING CO., LTD., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| CABINETS TO GO, LLC, | ) | PUBLIC DOCUMENT |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | Court No. 20-00109 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN KITCHEN CABINET ALLIANCE, | ) | |
| | ) | |
| *Defendant-Intervenors*. | ) | |

_____)

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Of Counsel:

W. MITCH PURDY
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director

IOANA CRISTEI
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0001

January 14, 2021

*Attorneys for Defendant*

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2(c)(1) ................................................................ 2

    I.    Administrative Determination Under Review ........................................ 2

    II.    Issues Presented For Review ................................................................ 2

STATEMENT OF FACTS ................................................................................................ 2

    I.    Preliminary Determination And Post Preliminary Determination Questionnaires . 3

    II.    Final Determination ............................................................................ 5

SUMMARY OF THE ARGUMENT ................................................................................ 7

ARGUMENT ................................................................................................................... 8

    I.    Applicable Legal Framework ............................................................... 8

        A.    Standard Of Review ................................................................ 8

        B.    Application Of Facts Available With An Adverse Inference .................. 10

    II.    Commerce's Application Of Total Adverse Facts Available To Meisen Is Supported By Substantial Evidence and In Accordance With Law ............... 11

    III.    Commerce's Decision Not To Verify Meisen's Factors Of Production Is Supported By Substantial Evidence And In Accordance With Law ................... 22

CONCLUSION ................................................................................................................ 26

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Bebitz Flanges Works Private Limited v. United States*,
  433 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) .......................................................... 17

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ................................................................................................. 8

*Essar Steel Ltd. v. United States*,
  678 F.3d 1268 (Fed. Cir. 2012) ........................................................................... 9, 10

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
  216 F.3d 1027 (Fed. Cir. 2000) .............................................................................. 10

*FPC v. Transcon. Gas Pipe Line Corp.*,
  423 U.S. 326 (1976) ................................................................................................. 9

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996) .................................................................................. 8

*Goldlink Indus. Co. v. United States*,
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................................... 9

*Mukand, Ltd. v. United States*,
  767 F.3d 1300 (Fed. Cir. 2014) ......................................................................... 17, 21

*Nat'l Nail Corp. v. United States*,
  390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) ......................................................... 19

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003) ......................................................................... 10, 17

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) .................................................................. 9, 10, 17

*NSK Ltd. v. United States*,
  481 F.3d 1355 (Fed. Cir. 2007) .............................................................................. 24

*Ozdemir Boru San. Ve Tic. Ltd. v. United States*,
  273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ......................................................... 11

*PAM, S.p.A. v. United States*,
  582 F.3d 1336 (Fed. Cir. 2009) ................................................................................ 8

*PSC VSMPO-Avisma Corp. v. United States,*
    688 F.3d 751 (Fed. Cir. 2012) ..................................................................... 9

*QVD Food Co. v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011) ............................................................. 20, 22

*Shandong Dongfang Bayley Wood Co., Ltd. v. United States,*
    375 F.Supp.3d 1339 (Ct. Int'l Trade 2019) ......................................... 24, 25

*Timken Co. v. United States,*
    699 F. Supp. 300 (Ct. Int'l Trade 1988) ..................................................... 9

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009) ................................................................................... 8

*Zenith Elecs. Corp. v. United States,*
    988 F.2d 1573 (Fed. Cir. 1993) ............................................................... 21

**Statutes**

19 U.S.C. § 1671 ........................................................................................... 23

19 U.S.C. § 1677b(c) ................................................................................. 3, 13

19 U.S.C. § 1677e ................................................................................. *passim*

19 U.S.C. § 1677m ............................................................................... *passim*

**Regulations**

19 C.F.R. § 351.308(c) ................................................................................. 11

19 C.F.R. § 351.401(a) ................................................................................. 13

84 Fed. Reg. 12,587 ....................................................................................... 2

84 Fed. Reg. 54,106 ....................................................................................... 3

84 Fed. Reg. 61,875 ....................................................................................... 3

85 Fed. Reg. 11,953 ....................................................................................... 2

85 Fed. Reg. 17,855 ....................................................................................... 2

**Other Authorities**

Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1,
   *reprinted* 1994 U.S.C.C.A.N. 4040 ................................................................................. 11

**Administrative Determinations**

*Initiation of Less-Than-Fair Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China*,
   84 Fed. Reg. 12587 (Dep't of Commerce Apr. 2, 2019) …………………………………2

*Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*,
   85 Fed. Reg. 11,953 (Dep't of Commerce Feb. 28, 2020) ……………………………….2

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*,
   84 Fed. Reg. 54,106 (Dep't of Commerce Oct. 9, 2019) ………………………...……….3

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE
_____

|  |  |  |
|---|---|---|
| DALIAN MEISEN WOODWORKING CO., LTD., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| CABINETS TO GO, LLC, | ) | PUBLIC DOCUMENT |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | Court No. 20-00109 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN KITCHEN CABINET ALLIANCE, | ) | |
| | ) | |
| *Defendant-Intervenors*. | ) | |
_____ )

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response to the motion for

judgment on the agency record filed by plaintiff, Dalian Meisen Woodworking Co. (Meisen),

challenging the Department of Commerce's final determination in the antidumping investigation

of wooden cabinets and vanities from the People's Republic of China (China).  As demonstrated

below, Commerce's affirmative determination is supported by substantial evidence and is

otherwise in accordance with law.  Accordingly, the United States respectfully requests that the

Court sustain Commerce's determination, deny Meisen's motion and enter judgment in favor of

the United States.

1

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

I.   **Administrative Determination Under Review**

Meisen challenges the final determination of the antidumping duty investigation of wooden cabinets and vanities from China, published as *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 11,953 (Dep't of Commerce Feb. 28, 2020) (*Final Determination*) (P.R. 1559) and accompanying Issues and Decision Memorandum dated April 22, 2019 (IDM) (P.R. 1555), corrected by *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:  Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 17,855 (Dep't of Commerce Mar. 31, 2020) (*Corrected Final Determination*) (P.R. 1575).  The period of investigation is July 1, 2018 through December 31, 2018.  *Id.*

II.   **Issues Presented For Review**

1.   Whether Commerce's application of facts available with an adverse inference was based on substantial evidence and is in accordance with law.

2.   Whether Commerce's decision not to conduct verification with respect to Meisen was supported by substantial evidence and is in accordance with law.

## STATEMENT OF FACTS

Commerce initiated its less-than-fair-value investigation of wooden cabinets and vanities from China on March 26, 2019.  *See Initiation of Less-Than-Fair Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China*, 84 Fed. Reg. 12587 (Dep't of Commerce Apr. 2, 2019) (P.R. 67).  In accordance with 19 U.S.C. § 1677f(1)(c)(2)(B), Commerce selected three mandatory respondents for investigation:  The Ancientree Cabinet Co., Rizhao Foremost Woodwork Manufacturing Company Ltd., and

Meisen.  *See* Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Respondent Selection Memo (P.R. 838) (C.R. 948).  Where the subject merchandise is exported from a nonmarket economy country, Commerce must calculate the normal value based on the value of the factors of production used in producing the merchandise.  *Id*. (citing 19 U.S.C. § 1677b(c)).  To make such a comparison, Commerce uses a set of physical characteristics to assign a control-number (CONNUM) to each unique product reported in the U.S. sales database as the first step in its dumping analysis.  IDM at 87.  This CONNUM matches a corresponding CONNUM in the factors of production database.  *Id*.  As part of this process, Commerce considered comments from interested parties to determine the key physical characteristics used to identify subject merchandise to report the relevant factors of production accurately and develop appropriate product-comparison criteria.  *Id*.  Commerce subsequently issued questionnaires to the mandatory respondents requesting information concerning the respondents' U.S. pricing practices.

I.	**Preliminary Determination And Post Preliminary Determination Questionnaires**

Commerce issued its preliminary affirmative determination on October 9, 2019.  *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 Fed. Reg. 54,106 (Dep't of Commerce Oct. 9, 2019) (P.R. 1421), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 1407), as corrected by *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Amended Preliminary Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 61,875 (Dep't of Commerce Nov. 14, 2019) (P.R. 1485).

In the preliminary determination, Commerce found that Meisen did not accurately represent and report its production process and the factors of production it consumed in the production of merchandise under consideration, withheld information, failed to provide information in the form or manner requested, and significantly impeded the investigation.  PDM at 24.  Commerce additionally concluded that Meisen failed to cooperate to the best of its ability and thus the application of total adverse facts available was appropriate.  *Id.* at 24-25.

Commerce based its findings in the preliminary determination on record information indicating that, during the period of investigation, Meisen marketed and sold merchandise produced using maple wood, a primary raw material input that Meisen failed to report.  *Id.*  The finding was also based in part on information on the record submitted by the petitioner and defendant-intervenor, American Kitchen Cabinet Alliance.  *Id.* at 24.  This information included online and print marketing materials from Meisen, and a sworn affidavit from an individual with extensive experience in the wooden cabinets and vanities industry.  *Id.*  This individual, who, through direct discussions and information provided on the websites of J&K Companies— Meisen's affiliated, exclusive U.S. seller of subject merchandise—stated that the merchandise in question was represented to him to be made from solid maple wood.  *Id*.  Commerce explained it would continue to consider whether the application of adverse facts available to Meisen was warranted in light of any rebuttal factual information that may be provided by Meisen and, if appropriate, any further information requested by Commerce after the issuance of the preliminary determination.  *Id*. at 25.

Subsequently, the parties submitted comments regarding Commerce's preliminary determination.  IDM at 86.  Commerce notified parties that it was suspending the planned verification of Meisen in order to consider the post-preliminary determination comments

submitted, and might seek to reschedule the verification at a later date.  Commerce's Letter

Suspending Verification (P.R. 1437).  Commerce issued two supplemental questionnaires to

Meisen to address the discrepancy between the information Meisen provided on factors of

production, and the information on the record indicating Meisen's cabinets were sold as made of

solid maple wood.   Post-Prelim Supplemental Questionnaire  (P.R. 1446); Second Post-Prelim

Supplemental Questionnaire (P.R. 1487).

       Commerce, after considering Meisen's responses to both questionnaires, notified Meisen

that it would not conduct verification and would continue to find the application of adverse facts

available was warranted for Meisen because "the admission that Meisen marketed and sold its

cabinets as maple cabinets when, in fact, Meisen claims that they were made of birch, highlights

continued concerns regarding the data reported {in the control numbers (CONNUMS)} for the

normal value and reported U.S. prices."  Commerce's Letter Cancelling Verification at 2 (P.R.

1524).

## II.    <u>Final Determination</u>

       In the final determination, Commerce continued to find that the application of total

adverse facts to Meisen was warranted, and that its decision to delay, and ultimately cancel

verification was also warranted.  IDM at 86.  Commerce found that, although Meisen provided

documentation supporting its reported factors of production, its U.S. sales database was

comprised of sales of merchandise priced under CONNUMs that are not included in its factors-

of-production database.  IDM at 89.  Commerce further found that Meisen's U.S. CONNUMs do

not represent the maple cabinets it purported to sell in its advertising materials, and that the

record does not contain factors-of-production data for the products Meisen represented selling in

the U.S. market.  *Id.*

       Commerce explained that the factors-of-production data submitted by Meisen for birch

cabinets could not be compared to the U.S. sales information on the record because the sales information indicated the cabinets were sold as maple cabinets.  IDM at 89.  Due to the large difference in value between the two types of wood, Commerce found a significant mismatch between the purported U.S. sales price for maple cabinets, and the normal value for the birch cabinets as produced by Meisen under the factors-of-production methodology used for nonmarket economy countries.  As a result, Commerce found it could not compare the U.S. sales price of Meisen's cabinets to a normal value based on non-maple wood cabinets to determine whether Meisen may be selling its cabinets at less than fair value.  *Id*.

Commerce determined that Meisen failed to fully disclose its U.S. pricing practices, including reporting information essential to the proper construction of the CONNUMs, and fully responding to questionnaires related to these U.S. pricing practices.  Commerce also determined that Meisen failed to resolve the discrepancies between the factors of production that Meisen reported it consumed in the production of merchandise under consideration, and the information on the record related to Meisen's marketing and sale of merchandise under consideration during the period of investigation.  Accordingly, Commerce found that Meisen withheld information, failed to provide information in a timely manner, and significantly impeded the investigation pursuant to 19 U.S.C. § 1677e(a)(2)(A)-(C).  IDM at 92.  Commerce also found that Meisen had failed to cooperate to the best of its ability, and thus Commerce determined that an adverse inference was warranted in assigning a final margin to Meisen in accordance with 19 U.S.C. § 1677e(b).  *Id.*  Commerce thus based the final margin assigned to Meisen only on the facts available.  *Id.*

Commerce further found that, because it was not relying on any of Meisen's reported information for the final determination, there was no factual information upon which it relied

that must be verified under 19 U.S.C. § 1677m(i)(1) and 19 C.F.R. § 351.307(b)(1)(i). Under these circumstances, Commerce determined that it was not required to verify the information, because in the situation where a respondent provides substantially incomplete questionnaire responses and Commerce must then base the company's rate entirely on facts available, verification was "meaningless." IDM at 90.

## SUMMARY OF THE ARGUMENT

Commerce's final determination is supported by substantial evidence and in accordance with law, and therefore, should be sustained. First, Commerce correctly applied total adverse facts available with respect to Meisen. Meisen failed to fully disclose its U.S. pricing practices, including reporting information essential to the proper construction of the CONNUMs, which are the first building block in Commerce's dumping analysis, and failed to fully respond to questionnaires related to these U.S. pricing practices. Meisen also failed to resolve the discrepancies between its reported factors of production for the subject merchandise and the information on the record related to Meisen's marketing and sale of merchandise under consideration during the period of investigation. Accordingly, Commerce reasonably applied total adverse facts available to fill the gaps left by the absence of two comparable databases.

Meisen challenges Commerce's determination that necessary information was missing from the record, contending that Commerce had all the information it needed to make a determination. Meisen further argues that the burden was in fact on Commerce to verify any discrepancy between U.S. sales price information and factors-of-production data. The law plainly places the burden on Meisen to provide the necessary information required by Commerce to make its determination. Nevertheless, Meisen's arguments are contradictory and rely on its assertion that because birch cabinets "look" like maple cabinets, and there is no optical difference between the finished products, they were correctly advertised as maple cabinets. As

7

demonstrated below, these arguments have no merit.

Second, Commerce did not act contrary to law when it declined to verify Meisen's information.  Commerce did not rely on any of Meisen's reported information in making a final determination in the investigation, and thus was not required under 19 U.S.C. § 1677m to verify any of the information Meisen submitted.

Accordingly, the Court should sustain Commerce's determination to apply adverse facts available with respect to Meisen because it was based on substantial evidence and is in accordance with law.

## ARGUMENT

### I.   Applicable Legal Framework

#### A.   Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding, or conclusion found' by Commerce unless it is 'unsupported by substantial evidence upon the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  Further, "{t}he specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). The requisite proof may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).

Moreover, "the court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation and quotation marks omitted); *see also Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (stating that it is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record"). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).

When reviewing Commerce's determinations, "absent constitutional constraints or extremely compelling circumstances," this Court "will defer to the judgment of an agency regarding the development of the agency record." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) (internal quotations and citations omitted). "To do otherwise would 'run the risk of propelling the courts into the domain which Congress has set aside exclusively for the administrative agency.'" *Id.* (quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). Rather, "{t}he role of judicial review is limited to determining whether the record is adequate to support the administrative action." *Id.* at 761.; *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) (reversing the Court of International Trade's order instructing Commerce to consider extra-record information because "the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance").

**B.**     **Application Of Facts Available With An Adverse Inference**

Commerce will use "facts otherwise available" to fill gaps in the record if: (1) necessary information is not available or (2) an interested party withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceeding, or provides information that cannot be verified.  19 U.S.C. § 1677e(a).  If Commerce finds that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available.  19 U.S.C. § 1677e(b).  Indeed, Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, regardless of motivation or intent."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Id.*  Further, the standard requires that importers "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so."  *Id.*

"Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one."  *Essar Steel*, 678 F.3d at 1276.  Thus, "{t}he purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation."  *Id*. (*quoting F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

In selecting an adverse facts available rate, Commerce may rely on information from: (1) the petition, (2) the final determination in the investigation, (3) any previous administrative review, or (4) any other information placed on the record.  *See* 19 U.S.C. § 1677e(b); 19 C.F.R.

§ 351.308(c).  When selecting an adverse rate from among the possible sources, Commerce

seeks to use a rate that is sufficiently adverse to effectuate the statutory purpose of inducing

respondents to provide Commerce with complete and accurate information in a timely manner.

*See Ozdemir Boru San. Ve Tic. Ltd. v. United States*, 273 F. Supp. 3d 1225, 1245 (Ct. Int'l Trade

2017).  This ensures "that the party does not obtain a more favorable result by failing to

cooperate than if it had cooperated fully."  *See* Statement of Administrative Action (SAA), H.R.

Doc. No. 103-316, vol. 1, at 870, *reprinted* in 1994 U.S.C.C.A.N. 4040, 4199.

## II.    Commerce's Application Of Total Adverse Facts Available To Meisen Is Supported By Substantial Evidence and In Accordance With Law

The Court should sustain Commerce's application of total adverse facts available to

Meisen because Commerce's decision is supported by substantial evidence and is in accordance

with law.  Commerce applied facts available with an adverse inference to Meisen for several

reasons.  First, Meisen failed to fully disclose its U.S. pricing practices, including reporting

information essential to the proper construction of the CONNUMs .  *See* IDM at 85-90.  Second,

Meisen failed to fully respond to questionnaires related to these U.S. pricing practices.  *Id.*  In

failing to respond to questionnaires, Meisen failed to resolve discrepancies between the factors of

production that Meisen reported it consumed in the production of the subject merchandise, and

the information on the record related to Meisen's marketing and sale of merchandise under

consideration during the period of investigation.  *See id*.  Commerce repeatedly requested that

Meisen resolve these discrepancies, but did not receive adequate responses explaining why

Meisen's reported U.S. sales price information and its factors-of-production data appeared to

involve two different products.  *Id.*  As a result of Meisen's failure to resolve these fundamental

discrepancies, Commerce found that Meisen did not cooperate to the best of its ability and relied

on total facts available with an adverse inference to calculate an antidumping duty rate for Meisen. *Id.*

In the final determination, Commerce explained that the use of facts available was warranted because Meisen withheld information, failed to provide information in a timely manner, and significantly impeded the investigation. IDM at 92. Specifically, Commerce found that Meisen failed to explain why it exclusively markets its cabinets as "the finest solid maple" despite claiming that it only produces cabinets using birch wood. *Id.* at 88. Meisen did not give any explanation for this contradiction until after Commerce suspended verification and issued multiple supplemental questionnaires requesting an explanation. *Id.*

The information that Meisen withheld or failed to provide, in the form or manner requested, was necessary for Commerce to perform its margin calculation. When Commerce determines whether a product is being sold for less than fair value, it compares the U.S. sales price for the product with a normal value for the product in question. *Id.* at 89. Thus, Commerce solicits comments so that it can make a reasoned decision about how respondents are to report physical characteristics in construction of the CONNUM. *Id.* The purpose of this process is to avoid a scenario where the U.S. price for a more expensive product is compared to the normal value for a less expensive product (or vice versa). *Id.* In accordance with this purpose, Commerce intentionally separated certain species of wood by grade into separate codes in order to match similar prices to similar costs. *Id.* By misrepresenting the product being sold, Meisen distorted the comparison that Commerce is tasked with making. Instead, Meisen created a situation in which the information on the record related to U.S. sales price and to the factors of production are for two different products—maple cabinets and birch cabinets. *Id.*

To determine whether a product is being sold at less than fair value, Commerce must establish how products are differentiated.  Differentiation allows Commerce to make an appropriate comparison between the export price or constructed export price of the subject merchandise, and the normal value of that subject merchandise.  IDM at 87 (citing 19 C.F.R. § 351.401(a)).  Where the subject merchandise is exported from a nonmarket economy country, Commerce must calculate the normal value based on the value of the factors of production used in producing the merchandise.  *Id.* (citing 19 U.S.C. § 1677b(c)).  To make such a comparison, Commerce uses a set of physical characteristics to assign a CONNUM to each unique product reported in the U.S. sales database.  IDM at 87.  This CONNUM matches a corresponding CONNUM in the factors of production database.  *Id.*  As part of this process, Commerce considered comments from interested parties to determine the key physical characteristics used to identify subject merchandise to report the relevant factors of production accurately and develop appropriate product-comparison criteria.  *Id.*

Meisen, in its initial comments for the establishment of CONNUMs for this investigation, argued against grouping wood species used as the face material of the subject merchandise in broad groupings of solid wood products.  In support, Meisen stated that "reporting the type of wood used as the face material is plainly an important characteristic, and thus must be reported precisely." Meisen's Letter Meisen's Letter Regarding Rebuttal Comments on Product Characteristics at 3  (P.R. 507).  Meisen further argued that grouping products in such a "vague grouping" is "not tenable" as it would "allow for manipulation and distortion of surrogate values" and would ultimately result in "a less accurate margin calculation."  *Id.*  Meisen characterized such a grouping as resulting in an "apples-to-oranges" comparison and suggested instead collecting data based on individual wood species.  *Id.*

Meisen's argument in its initial comments is in direct contrast to Meisen's current argument against Commerce's decision to apply total adverse facts available.  *Id.*  In the investigation, Meisen failed to provide any adequate explanation or supporting evidence justifying why all of its marketing materials referred to the sale of maple cabinets, when its narrative explanations and information related to the factors of production indicate Meisen only produced birch cabinets.  *Id.*  Instead of explaining the discrepancy, Meisen restated in its first post-preliminary supplemental questionnaire response that it only sold cabinets produced from birch.  Meisen's Post-Preliminary Supplemental Questionnaire Response at 11 (P.R. 1459).  Meisen further contended that because Meisen only sold birch cabinets, that J&K Companies only sold cabinets produced by Meisen, J&K Companies thus only sold cabinets that were produced by Meisen using birch wood.  IDM at 88.  Meisen provided no further explanation for this circular argument.  Finally, in its second post-preliminary questionnaire response, Meisen discounted the difference between birch and maple by stating that the price lists indicating it only sells maple cabinets are generic price lists used as pricing guides for the sales person, and do not include final descriptions.  *Id.*

Meisen also characterized references to maple in the advertising information as references to the facial appearance of the cabinets.  *Id.*  According to Meisen, the cabinets were exclusively marketed as maple cabinets because Meisen's birch cabinets "look" like maple cabinets.  *Id.*  Meisen also claimed that the advertising discrepancy was because there is no "optical difference" between maple and birch once the cabinet is finished.  *Id.*  Meisen thus admits that it has neither advertised, nor offered birch cabinets for sale.  Accordingly, based on the many references in the record of maple cabinets, Meisen's admission that it does not advertise any birch products, and Meisen's statements alleging no difference between its cabinets

and maple cabinets, Commerce reasonably concluded that Meisen's U.S. sales price does not represent the U.S. sales price of birch cabinets. *Id.*

Meisen's argument that Commerce should nevertheless rely on Meisen's reported U.S. sales price database as a comparison point for birch cabinets is untenable. Meisen Br. at 15-16. Using Meisen's own rationale, comparing the species of wood used as the "face" of a cabinet— the appearance of the wood—allows for "manipulation and distortion" of surrogate values and a "less accurate margin calculation" than if Commerce were to compare based on individual wood species. *Id.* at 87. Using individual wood species would ensure a more precise comparison between the species sold in the U.S. market and the species used in the factors of production. *Id.*

Meisen did not provide any adequate explanation for why its U.S. sales database is comprised of merchandise priced as products not included in its factors-of-production database. *Id.* at 89. In addition, Meisen's U.S. CONNUMs do not represent the maple cabinets it advertised, and the record does not contain factors of production for the products Meisen represented that it was selling in the U.S. market. *Id.* The resulting U.S. prices for maple cabinets and factors-of-production data for birch cabinets introduces "a significant mismatch between the two pillars of {Commerce's} antidumping duty calculation." *Id.* Accordingly, Commerce only had available for use in its determination two non-comparable databases. These databases were a U.S. price database for sales of products advertised and represented as maple cabinets (irrespective of whether Meisen reported them as sales of birch cabinets), and a factors-of-production database for cabinets made of birch wood. *Id.* at 88-89. Because the databases were based on products made of different wood with significantly different surrogate values, Commerce could not adequately compare the U.S. sales price with the factors-of-production information provided by Meisen. Thus, Commerce could not determine whether Meisen's

cabinets were being sold at less than fair value, regardless of whether the determination was with respect to maple cabinets or birch cabinets.  *Id.*

Without the necessary information related to either factors of production for maple cabinets, or U.S. price information for birch cabinets, Commerce found that Meisen had withheld information, failed to provide such information in a timely manner, and significantly impeded the investigation, pursuant to 19 U.S.C. § 1677e(a)(2)(A)-(C).  *Id.* at 92.  Commerce found that Meisen could have raised the issue of the discrepancies between the products it marketed to its customers and those it reported to Commerce earlier in the investigation.  This finding was reasonable particularly in light of the fact that Meisen had expressed concerns of properly capturing the wood species in the CONNUM and that the way CONNUMs captured wood species could affect product matches, and therefore the dumping margin.  *Id.*

Commerce also found that Meisen did not cooperate to the best of its ability in responding to Commerce's request for information by not disclosing the fact that it exclusively marketed its cabinets as maple cabinets until after the preliminary determination.  In fact, Meisen only disclosed that information "after Commerce suspended verification and expended considerable time and resources to issue multiple supplemental questionnaires and review thousands of pages of documentation submitted in response to those questionnaires."  *Id.* Commerce therefore found that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference was warranted in assigning a final margin to Meisen, in accordance with 19 U.S.C. § 1677e(b)(1)(A).  *Id.*

The statute authorizes  Commerce to "use an inference that is adverse to the interests of th{e} party in selecting from among the facts otherwise available" if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for

16

information{.}"  19 U.S.C. § 1677e(b)(1).  This standard "requires the respondent to do the maximum it is able to do."  *Nippon Steel*, 337 F.3d at 1382.  "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent."  *Id.*  When relying on facts available with an adverse inference, the Federal Circuit has held that "{i}n general, use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty."  *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307-1308 (Fed. Cir. 2014).  This Court has sustained the application of total adverse facts available under similar factual circumstances, where Commerce provided multiple opportunities to resolve a deficiency through supplemental questionnaires and the respondent company still failed to provide the requested information.  *See Bebitz Flanges Works Private Limited v. United States*, 433 F. Supp. 3d 1309, 1323, 1326-1329 (Ct. Int'l Trade 2020) (finding Commerce was justified in disregarding respondent's submissions and applying total adverse facts available when respondent failed to submit complete, verifiable databases despite multiple supplemental questionnaires addressing the deficiency).

Here, similar to the factual circumstances in *Bebitz*, Commerce did not have any partial facts available to apply in order to calculate a margin for Meisen.  As Commerce explained in the final determination, the U.S. sales price information and factors of production information are two pillars of the antidumping duty calculation.  Because Meisen established the U.S. price based on a different type of wood than it reported in its factors-of-production database, Commerce could not perform a meaningful comparison of normal value to U.S. price through a maple-cabinets-to-maple-cabinets or birch-cabinets-to-birch cabinets comparison.  IDM at 89.  With no information available that Commerce could use to determine whether Meisen may be

selling at less than fair value, Commerce had to rely on total adverse facts available in order to calculate a margin.  *Id.* at 85-92.

Meisen, contrary to what the record demonstrates, argues that there is no necessary information missing from the record, there are no gaps in the record, and there are no deficiencies in Meisen's responses.  Meisen further attempts to paint the discrepancy found on the record solely as an issue of "whether the cabinets made by Meisen and sold by Meisen's U.S. affiliates were made of maple or birch wood."  Meisen Br. at 14.  According to Meisen, Commerce had all of the information it needed to make a determination based on the information and explanations submitted by Meisen.  *Id.* at 15.  Under Meisen's reasoning, Commerce merely needed to compare the sales of Meisen's birch cabinets made at the price for maple cabinets— represented in the U.S. market exclusively as maple cabinets—with the constructed normal value for birch cabinets, using the provided factors-of-production data for birch cabinets.  *Id.* at 16. Meisen further argues that Commerce "improperly relied on a finding that Meisen's U.S. affiliates misstated the type of wood to its customers to support the imposition of total adverse facts available."  In addition, Meisen argues that even if Meisen's U.S. affiliates were "misleading their customers by claiming that the cabinets were made of maple when they were really of birch… then the information Meisen submitted in its databases is correct and Commerce had all of the information it needed to determine if there was dumping."  *Id.* at 23.

According to Meisen, Commerce does not have the authority to invoke adverse inferences against Meisen under the circumstances because Meisen misrepresenting its products to U.S. customers is allegedly a matter under the jurisdiction of the Federal Trade Commission matter, not  Commerce has authority.  *Id.* at 24.  Finally, Meisen argues that, even if Commerce had the power to impose facts available or adverse inferences under these circumstances, the

discrepancy of whether Meisen produced and sold cabinets made of maple or birch wood "is not a sufficient basis for rejecting all of the information submitted by Meisen and use total adverse facts available." *Id.* at 28.

But Commerce was well within its statutory authority to rely upon total adverse facts available because the information before it was contradictory. *See* IDM at 87-92. On one hand, Commerce had U.S. sales price information for cabinets represented as one type of wood, and on the other, it had factors-of-production data based on cabinets made from a different, much cheaper type of wood. *See id.* As Meisen argues in citing *National Nail Corp. v. United States*, the Court has sustained Commerce's use of total adverse facts available where the record contained "no usable information for core components of Commerce's dumping analysis… and (2) substantial evidence showed that the respondent was egregious in its failure or refusal to comply with Commerce's requests for information." Meisen Br. at 28 (citing *Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1375 (Ct. Int'l Trade 2019)).

The fact of the matter is that Meisen represented and sold its cabinets as maple cabinets, despite the cabinets being made solely using birch wood. IDM at 89; Meisen Br. at 23. This misleading representation results in a U.S. sales price based on the customer's understanding that the cabinet being sold is made of maple. IDM at 89; Meisen Br. at 23. Commerce's less-than-fair-value calculation is based on separating products by unique codes to ensure similar products are matched with each other, and to further ensure reliability and accuracy. Thus, it is unclear how Commerce could compare U.S. sales prices of products under one CONNUM with the factors-of-production data based on the surrogate value of another product under a different CONNUM. IDM at 89.

Further, contrary to what Meisen claims, Commerce's application of total adverse facts available was not an attempt at "punishing Meisen for what it believes to be misstatements in its U.S. affiliates' marketing material and statements to customers."  Meisen Br. at 22.  Commerce's application of total adverse facts available was due to the inability to accurately compare the U.S. sales price information with the factors-of-production data on the record.  IDM at 88-89. Commerce clearly stated in the final determination that "such business practices fall within the expertise of the U.S. Federal Trade Commission" and thus the punishment or any related enforcement actions would be handled by that agency.  IDM at 92.

Meisen was given numerous chances to explain why its cabinets were exclusively advertised and sold to customers in the United States as maple cabinets despite being made solely of birch.  Despite these chances, Meisen never provided an adequate explanation for the discrepancy.  The explanation Meisen did give failed to resolve the issue Commerce was facing. IDM at 88.  In responding to Commerce's requests for information, Meisen was required to respond to Commerce's questions and submit documents demonstrating that it only used birch wood, as it claimed.  Meisen Br. at 21.  Meisen should have responded fully and directly to Commerce's request for an explanation regarding the discrepancy on the record.  It was Meisen's sole responsibility to build the record and to respond to Commerce's questions to the best of its ability.  *See QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("Although Commerce has authority to place documents in the administrative record that it deems relevant, 'the burden of creating an adequate record lies with {interested parties} and not with Commerce'") (citations omitted).  Contrary to Meisen's claims, Commerce did not have the responsibility to resolve the discrepancy through verification.  Instead, it was Meisen's responsibility to exercise its best effort in responding to Commerce's questionnaires by

explaining to Commerce why it exclusively advertised and sold its cabinets under the premise that they were made of maple, despite being made of birch and reported in their U.S. sales database as sales of birch cabinets.  As the "party in possession of the necessary information," Meisen bore "{t}he burden of production," which it did not fulfill.  *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993).

Meisen's responses to two supplemental questionnaires further solidified the discrepancy between the U.S. sales price information and the factors-of-production data.  As a result, Commerce was faced with comparing two databases based on two different products with significantly different prices, which is completely contradictory to the rationale and purpose of Commerce's antidumping duty calculations.  IDM at 88.  Meisen's only explanation was that its cabinets "look" like maple cabinets, despite being made of birch, and thus "there is no optical difference in the finished good between maple and birch once the cabinet is finished."  *Id.* Whether a product looks like another product does not change the actual materials from which that product is made, and thus it is unclear how such an explanation was meant to resolve the discrepancies between information contained on the record of the investigation.  Notably, Meisen itself does not explain what record facts were available to use as "neutral facts available or partial adverse facts available" to otherwise resolve this discrepancy if Commerce were to apply an adverse inference other than total adverse facts available.  *See id.* at 28-29.  Commerce instead reasonably applied total adverse facts available, and has met the standard that total adverse facts available is appropriate when "the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty." *Mukand*, 767 F.3d at 1307-1308.

Thus, Commerce's total adverse facts available determination is based on Meisen's failure, based on the information reasonably available to it, to fully disclose its selling practices to Commerce in a timely manner, to provide Commerce with a reasonable explanation for the discrepancies between Meisen's sales advertisements and factors-of-production data located on the record, despite being given several opportunities to provide such information, and to provide useable data for purposes of calculating an accurate dumping margin. Accordingly, this Court should sustain Commerce's use of an adverse inference in selecting from the facts otherwise available in calculating an antidumping duty margin for Meisen.

**III.     Commerce's Decision Not To Verify Meisen's Factors Of Production Is Supported By Substantial Evidence And In Accordance With Law**

Meisen contends that "{t}o the extent that there were factual discrepancies that Commerce believed needed to be resolved Commerce was required to conduct a verification." Meisen also argues that the issue could have been resolved through verification because Commerce verified the same issue in the parallel countervailing duty verification. Meisen Br. at 26-27. As an initial matter, these assertions are irrelevant because Meisen should have responded to Commerce's questionnaires to explain why there was a discrepancy on the record between the U.S. sales information and the factors-of-production information. Again, it was Meisen's responsibility to build the record and to respond to Commerce's questions to the best of its ability. *See, e.g.*, *QVD Food*, 658 F.3d at 1324 ("Although Commerce has authority to place documents in the administrative record that it deems relevant, 'the burden of creating an adequate record lies with {interested parties} and not with Commerce.'") The burden to resolve any discrepancy does not belong with Commerce. Accordingly, Meisen has failed to provide any explanation for why this burden should be shifted to Commerce in contradiction to established precedent. *See* Meisen Br. at 24-27.

The information obtained through verification in the countervailing duty investigation would not resolve the deficiencies in Meisen's reported information on the record of this investigation.  IDM at 89.  Verification in this proceeding also would not resolve the deficiencies.  *Id.*  The statutory purpose of a countervailing duty investigation does not entail comparison between normal value and export price.  *See* 19 U.S.C. § 1671 *et seq.*  Regardless, verification would at best have shown that Meisen produced cabinets made solely of birch wood, as it did in the CVD investigation.  Verification could not have resolved the obvious discrepancies between the U.S. sales price information for cabinets that were exclusively advertised as, and sold under the pretenses of being, maple cabinets—despite the cabinets being made solely of birch wood.  *Id.*  Instead, Meisen had the responsibility to report accurate factors-of-production and sales information, to disclose early in the proceeding any issues related to that data, and to respond fully and completely, to the best of its ability, to Commerce's repeated questions regarding an explanation for the discrepancies contained on the record.

Verification also would not have served to resolve any discrepancies, and Meisen fails to establish any legal error committed by Commerce in not verifying.  *See* Meisen Br. at 24-27. Commerce is required to "verify all information *relied upon*" in making a final determination in an investigation.  19 U.S.C. § 1677m(i) (emphasis added).  In making a determination, Commerce is only required to consider and rely upon information under section 1677m(e) when that information can be verified.  *See* 19 U.S.C. § 1677m(e)(2).  Here, Commerce found that necessary information, such as factors of production for maple cabinets or a U.S. sales price database for birch cabinets, was missing from the record.  Commerce also determined that Meisen had not acted to the best of its ability in providing the information requested to otherwise explain the discrepancies found on the investigation record.  Thus, because Meisen had

submitted substantially deficient responses that did not directly address why Meisen was exclusively advertising their cabinets as made of maple despite being made entirely of birch, Commerce was under no obligation to use the information.  *See* 19 U.S.C. § 1677m(e); IDM at 90.  Because Commerce could not use the information, it had no reason to verify it.  *See* 19 U.S.C. § 1677m(i) (Commerce "shall verify all information *relied upon . . . .*") (emphasis added).

This Court has previously explained the extent of Commerce's duty to follow up and clarify discrepancies on the record.   "If Commerce 'determines that a response to a request for information … does not comply with the request,' Commerce 'shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency.'"  *Shandong Dongfang Bayley Wood Co., Ltd. v. United States*, 375 F.Supp.3d 1339, 1347 (Ct. Int'l Trade 2019)(citing 19 U.S.C. § 1677m(d)).  Commerce "'satisf{ies} its obligations under section 1677m(d) when it issue{s} a supplemental questionnaire specifically pointing out and requesting clarification of {the party's} deficient responses.'"  *Shandong*, 375 F. Supp. 3d at 1347 (citing *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)).  Furthermore, the Court in *Shandong* held that because "Commerce did not rely upon Bayley's questionnaires, it did not need to verify them."  *Id.* at 1346.

The Court is faced with the same situation here.  Commerce based its adverse facts available application in the preliminary determination in large part on the discrepancies between the U.S. sales price information and the factors-of-production information on the record.  IDM at 85.  To resolve this discrepancy, Commerce, through multiple questionnaires, requested an explanation for why Meisen's products were marketed and sold to customers exclusively as maple cabinets, despite being made exclusively of birch based on information Meisen itself

submitted to the record.  *Id.* at 86.  Meisen failed to adequately respond to the questions and instead stated that its cabinets were solely made of birch and sold as birch cabinets, but were marketed as maple cabinets because they "look" like maple cabinets after being finished.  *Id.* at 88-89.  Commerce found these questionnaire responses to be inadequate, notified Meisen that it found its responses to be inadequate, and did not rely on that information in making its final determination.  *Id.* at 86-92.  Meisen's claim that Commerce used the discrepancy as a means to resort to adverse facts available and should instead have verified the reported information, is contradictory and shows a clear misunderstanding of the statute.  *See* Meisen Br. at 26.  Just as the Court found in *Shandong*, here Commerce did not have to verify the information Meisen submitted to the record because it did not rely on this information in making its final determination.  Instead, Commerce relied on the total adverse facts available because of an inability to square away the discrepancies between two fundamental pillars of the antidumping duty calculation.  *See Shandong*, 375 F.Supp.3d at 1346-1347; IDM at 89-92.

Accordingly, this Court should sustain Commerce's decision not to verify Meisen's submitted information in the investigation.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's final

affirmative determination in the  investigation of wooden cabinets and vanities from China.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:

/s/ Ioana Cristei
IOANA CRISTEI
W. MITCH PURDY                          Trial Attorney
Legal Counsel                                 Civil Division/National Courts
Office of the Chief Counsel              U.S. Department of Justice
    for Trade Enforcement & Compliance   P.O. Box 480
U.S. Department of Commerce          Washington, DC 20044
                                            (202) 305-0001
                                            Fax: (202) 305-7644
                                            Email: ioana.cristei@usdoj.gov

January 14, 2021                             Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 7,267 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Ioana Cristei

January 14, 2021

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on this 14th day of January, 2021,

"DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2

MOTION FOR JUDGMENT ON THE AGENCY RECORD" was filed electronically.  I

understand that notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ Ioana Cristei</u>
Ioana Cristei

28