# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| ) | |
| DALIAN MEISEN WOODWORKING ) | |
| CO., LTD. ) | |
| ) | |
| ) | |
| Plaintiff, ) | Court No. 20-00109 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| Defendant, ) | |
| ) | |
| ) | |

## CORRECTED REPLY BRIEF OF DALIAN MEISEN WOODWORKING CO., LTD.

Jeffrey S. Neeley
Stephen W. Brophy
Husch Blackwell, LLP

750 17th St., N.W.
Suite 900
Washington, D.C. 20006
(202) 378-2357
Jeffrey.Neeley@huschblackwell.com
Stephen.Brophy@huschblackwell.com

Dated:  May 26, 2021

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................. 1

II.  ARGUMENT ...................................................................... 8

   A.   Commerce's Application of Total Adverse Facts Available to Meisen Was Not Supported by Substantial Evidence and Otherwise in Accordance with Law ...................................................... 8

      1.   Meisen Properly Reported its FOPs and U.S. Sales in Accordance with the Department's Instructions and the Statute ....................... 8

      2.   The Use of Facts Available with Adverse Inferences is not Supported by Substantial Evidence or Otherwise in Accordance with Law .................................................................. 19

      3.   Commerce Possible Reliance on Partial Adverse Facts Available .................................................................. 26

   B.   Commerce Improperly Canceled Its Statutorily Mandated Verification .................................................................. 27

III. CONCLUSION ................................................................ 32

# TABLE OF AUTHORITIES

## Cases

*Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1353 (Ct. Int'l Trade 2018) ...................................................................... 25

*Jiangsu Changbao Steel Tube Co., Ltd. v. United States*, 884 F. Supp. 2d. 1295, 1299 (CIT 2012) ................................................. 23

*Nat'l Nail Corp. v. United States,* 390 F. Supp. 3d 1356, 1375 (Ct. Int'l Trade 2019)................................................................ 27

*Shandong Dongfang Bayley Wood Co. v. United States*, 375 F. Supp. 3d 1339, 1348 (Ct. Int'l Trade 2019) ......................................... 28

*Taian Ziyang Food Co. v. United States*, 33 C.I.T. 828 (2009) .............. 20

*Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752 (2001) ................. 26

*United States v. Mead*, 533 U.S. 218, 226- 227 (2001) ........................... 14

*Yantai Xinke Steel Structure Co. Ltd. v. United States*, 36 CIT 1035, 1045-1046 (2012) ................................................................ 23

## Statutes

19 U.S.C. § 1677a(c) & (d) ............................................................... 18

19 U.S.C. § 1677b(c)........................................................................ 16

19 U.S.C. 1677a(b) ......................................................................... 13

19 U.S.C. 1677b((c)(1)(B) ................................................................ 12

19 U.S.C.§ 1677b(a)(6).................................................................... 15

19 U.S.C.A. § 1677 .................................................................... 3, 13

19 U.S.C.A. § 1677b ................................................................... 3, 13

19 USC. 1677b(a) ........................................................................... 13

5 U.S.C. § 706(2) ........................................................................... 14

## Other Authorities

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 11962 (February 28, 2020) ................ 2, 29

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| AFA | Adverse Facts Available |
| CIT | Court of International Trade |
| Def't Br. | January 14, 2021 response brief filed by Defendant, the United States |
| Def't.-Int. Br. | January 14, 2021 response brief filed by Defendant-Intervenor the American Kitchen Cabinet Alliance |
| POI | Period of Investigation |
| U.S.C. | United States Code |

## REPLY BRIEF OF DALIAN MEISEN WOODWORKING CO., LTD.

Pursuant to Rule 56.2 of the Rules of this Court, Dalian Meisen Woodworking Co., Ltd. ("Meisen") hereby files this reply to the January 14, 2021 response briefs filed by Defendant, the United States ("Def't Br.") and Defendant-Intervenor the American Kitchen Cabinet Alliance ("Def't.-Int. Br.").  For the reasons discussed below, the Court should grant Meisen's Rule 56.2 Motion for Judgment on the Agency Record and remand the case to the U.S. Department of Commerce ("Commerce") with instructions to reconsider its final determination consistent with the findings of this Court.

## I.    INTRODUCTION

This appeal is based upon the text of the statute and the record of this investigation. Meisen reiterates to the Court that the record establishes that it only produced cabinets made of birch wood and its U.S. affiliates only sold cabinets made of birch wood during the period of investigation. Defendant and Defendant-Intervenor have pointed to no evidence to the contrary but have simply restated the concerns and follow up questions raised in the underlying investigation that Commerce should ask related to Meisen's U.S. affiliates advertising

materials. The record is abundantly clear that Commerce did follow up on these questions with additional questions to Meisen, which Meisen answered. The problem is not with Meisen's responses, but rather is Commerce's refusal to follow up on those answers and conduct a verification, as required by statute and as it had done in the parallel countervailing duty case. In light of the facts, Meisen properly reported birch wood as a factor or production and properly reported U.S. sales of birch cabinets by constructing its CONNUMs using code "4," which covered birch wood. Commerce verified that Meisen only produced birch cabinets in the parallel countervailing duty investigation and easily could have verified the same fact here, but for the fact that it improperly cancelled the statutorily mandated verification. *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 11962 (February 28, 2020) and accompanying Issues and Decision Memorandum at Comment 9.

It is undisputed that at least some of the U.S. affiliates marketed to their customers that the birch cabinets were made of maple wood, when in fact they were only birch cabinets with a maple look. Had those

affiliates revealed to their customers that the wood was actually birch, they may well have received a lower price than they did for the cabinets, but the Meisen affiliates' advertising claims and the reasons that the affiliates were able to obtain a higher price are not within Commerce's statutory purview, either to make an adjustment to U.S. price or to take other remedial actions.

Defendant and Defendant-Intervenors mistakenly claim that the advertising created a CONNUM mismatch. Defendant and Defendant Intervenor claim that by misrepresenting the product being sold to its customers, "Meisen distorted the comparison that Commerce is tasked with making" because "Meisen's U.S. sales price does not represent the U.S. sales price of birch cabinets." *See e.g.* Def't Br. at 19 and 23. This claim reveals a fundamental misunderstanding of the antidumping laws. Commerce is tasked with comparing the normal value of the product as produced with the U.S. price *actually* charged. Commerce's only authority under the statute is to determine the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C.A. § 1677; *see also* 19 U.S.C.A. § 1677b. To the extent that the export price or constructed export price is

higher than normal value, there is no dumping and Commerce must so find.  Nothing in the text of the statute gives Commerce the authority to determine the theoretical "worth" of a product and whether the U.S. price was too high compared to that theoretical "worth." Had Commerce been given such authority the possibilities for "adjustments" for things Commerce deems unfair are almost endless. Of course, if a higher export price or constructed export price were achieved through the violation of another law, Commerce may forward the issue to the appropriate government agency to take action.

The statute does not give Commerce the authority to either make adjustments to prices or to punish companies without authority in the statute. There is simply no statutory provision for Commerce to make an adjustment to U.S. price for advertising claims just like there is no statutory provision for Commerce to adjust U.S. price for violations of antitrust laws, intellectual property laws, or any other means by which a business may charge its customers a price that is higher than what the product  otherwise would be sold for. To the extent that Meisen's U.S. affiliates gained a higher price through marketing birch cabinets as "maple," that is an issue to resolved under other laws before the

4

appropriate government agency, or the courts, using the applicable legal standards. Commerce has not been given free-ranging authority under the statute to punish companies for issues it finds that are not within its jurisdiction, or to reject truthful submissions.

Defendant and Defendant-Intervenor also argue that Meisen should have reported the inconsistency in its advertising claims to Commerce sooner during the investigation. However, they conveniently ignore that Meisen truthfully answered the questions that Commerce asked, including providing advertising and other documentation in its responses that showed that it marketed the cabinets as maple to U.S. customers. While respondent bears the burden of creating an accurate record, there is no requirement that respondents force- feed the facts to Commerce, particularly when the facts are not legally relevant to Commerce's margin calculation. Defendant and Defendant-Intervenor explain what a "full confession" at the outset would have accomplished, given their position that the alleged advertising claims created a CONNUM mismatch that could not be resolved. That is simply factually incorrect. Meisen could not accurately report a factor of production for maple wood and could not code any U.S. sales as maple

under code "5" as maple because none of the cabinets were *actually* made of maple wood. Had Meisen done so, the reporting would have been inaccurate and Commerce would have failed Meisen at verification because of the mismatch between the code used and what actually was sold and produced.

In short, the cabinets produced were made of birch and the cabinets sold were made of birch, Meisen accurately reported these facts to Commerce, and there is no CONNUM mismatch as claimed by Defendant and Defendant-Intervenor. Meisen repeatedly and consistently reported that all of the cabinets produced and sold during the period of investigation were made of birch wood. Neither Meisen nor its U.S. affiliates submitted any false information to Commerce or withheld any information from Commerce and there was no information requested or required by the statute that was missing from the record. The only information missing from the record was a verification report, and that missing element was solely because Commerce unilaterally cancelled the verification in this investigation. Therefore, there was no basis for Commerce to resort to facts available, let alone facts available with adverse inferences in this case.

These facts apparently presented Commerce with a dilemma of its own making, given that the statute does not provide for any adjustment to normal value or export price in this situation, but Commerce still wanted to devise a means by which to punish Meisen for its advertising claims to its customers. Commerce resolved this dilemma by improperly resorting to adverse facts available, despite the fact that Meisen did not provide Commerce with any false information and despite the fact that Meisen did not withhold any information required by Commerce to calculate a dumping margin under the statute. Ultimately, however, Meisen's behavior is not a trade remedy issue and Commerce is not the agency to which Congress delegated the power to punish such behavior. As discussed in Meisen's opening brief, Commerce has already referred this issue to the Federal Trade Commission. That is all it is empowered to do with respect to any misrepresentations made by Meisen's U.S. affiliates to their customers. Having exercised that power, Commerce cannot further penalize Meisen and must calculate a dumping margin for Meisen based on the actual production and prices reported.  Its failure to do so, warrants a remand by this Court.

7

## II.   ARGUMENT

### A. Commerce's Application of Total Adverse Facts Available to Meisen Was Not Supported by Substantial Evidence and Otherwise in Accordance with Law

1. Meisen Properly Reported its FOPs and U.S. Sales in Accordance with the Department's Instructions and the Statute

Meisen used birch wood in the production of the subject merchandise and Meisen's U.S. affiliates only sold these birch cabinets in the United States during the period of investigation. Meisen's books and records supported these facts. *See e.g.* Post-Prelim Supplemental Questionnaire Response, dated November 6, 2019 at pages 2 and 3 (APPX086572-086573). And Exhibits SD2-2 (APPX087475, 087476, 087478, 087483, 087495, 087496, 087533, 087540, 087547, 087595, 087598, 087602, 087624, 087629, 087661), SD2-5 (APPX087668-087675), SD2-7 (APPX087678, 087679, 087681, 087691, 087731), SD2-8 (APPX087760, 087761), SD2-9 (APPX087773-087778), SD2-11 (APPX087781-087782). Meisen reported a factor of production for birch wood and constructed its CONNUMs as "4", which included birch wood, because that is the wood that was actually used. This reporting was in accordance with the instructions of the Department and the statute.

Mesien's reporting was in accordance with Commerce's instructions in the sales questionnaire response as well.  Commerce's questionnaire instructed Meisin to "[i]ndicate the primary type of material **used** in the forward face (including the doors and drawers) of the product."  Section C Questionnaire Response, dated July 19, 2019 at page 9 (APPX082759). It was also in accordance with Commerce's instruction in the factors of production questionnaire to "[r]eport each raw material **used to produce** a unit of the merchandise under consideration."  See Section D Questionnaire Response, dated July 19, 2019 at page 13 (APPX082664). As Defendant itself notes, "[w]hether a product looks like another product does not change the actual materials from which that product is made…"  Def't Br. at 33. Neither Defendant nor Defendant-Intervenor explain how Meisen should have reported its factors of production or U.S. sales price differently, given the instructions provide by Commerce. Meisen could not report any factor of production for maple wood and could not code any U.S. sales as maple under code "5" as maple because none of the cabinets were actually made of maple wood. Had Meisen done so, the reporting would have

been inaccurate and Commerce would have failed Meisen at verification.

In their response briefs, Defendant and Defendant-Intervenor do not seriously challenge the fact that Meisen only used birch wood to produce the subject merchandise or that Meisen's U.S. affiliates only sold cabinets made of birch wood. Rather, Defendant relies on representations made by at least some of Meisen's U.S. affiliates to their U.S. customers that the cabinets were made of maple wood. Defendant claims that these representations were relevant to the antidumping determination because these birch cabinets were priced and advertised as if they were made of maple, a more expensive wood. Defendant and Defendant Intervenor claim that by representing the product being sold to its customers, "Meisen distorted the comparison that Commerce is tasked with making" because "Meisen's U.S. sales price does not represent the U.S. sales price of birch cabinets." *See e.g.* Def't Br. at 19 and 23. Defendant claims that "Meisen failed to fully disclose its U.S. pricing practices, including reporting information essential to the proper construction of the CONNUMS" (Def't Br. at 11) and that "[t]his misleading representation results in a U.S. sales price

based on the customer's understanding that the cabinet being sold is made of maple." Def't Br. at 30. "As a result, Commerce was faced with comparing two databases based on two different products with significantly different prices, which is completely contradictory to the rationale and purpose of Commerce's antidumping duty calculations." Def't Br. at 33. According to Commerce, the purpose of the process "is to avoid a scenario where the U.S. price for a more expensive product is compared to the normal value for a less expensive product (or vice versa)." Def't. Br. at 19.  Likewise, Defendant-Intervenor claims that Meisen was able to obtain artificially higher U.S. sales price for its birch cabinets by selling them as made of maple wood.  Def't-Int. Br. at 32. According to Defendant-Intervenor, Commerce could not use these sales prices in the calculation because it would "underestimate that actual amount of dumping that occurred during the POI" and "there was no way for Commerce to determine what Meisen's U.S. sales prices would have been if its cabinets were correctly priced as birch cabinets." Def't-Int. Br. at 32. (Emphasis added).

These claims reveal a fundamental misunderstanding of the antidumping statute and the authority of Commerce under the statute.

11

Commerce, under the statute, takes the sales values and factors of production as it finds them. The statute is only concerned with the <u>actual</u> factors of production used in the production of the subject merchandise and the <u>actual</u> price charged for the subject merchandise, not the "real" prices or other subjective factors as determined by a U.S. government official. Commerce is tasked with determining if that U.S. price is lower than the normal value and, if so, determining the dumping margin. The antidumping statute does not permit the imposition of a dumping margin if the U.S. price is higher than the normal value, regardless of why the U.S. price is higher.

In non-market economy cases, the statute requires Commerce to base normal value on the facts of produced actually used in the production of the subject merchandise:

> the administering authority shall determine the normal value of the subject merchandise **on the basis of the value of the factors of production utilized in producing the merchandise** and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses.

19 U.S.C. 1677b((c)(1)(B) (emphasis added). The statute also defines constructed export price as the price at which the merchandise is actually sold to an unaffiliated purchaser:

> The term "constructed export price" means **the price at which the subject merchandise is first sold** (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

19 U.S.C. 1677a(b) (emphasis added). Commerce's authority under the statute is to determine there is dumping by comparing this normal value to the constructed export price:

> In determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value.

19 USC. 1677b(a). The statute also provides that "[t]he term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C.A. § 1677; *see also* 19 U.S.C.A. § 1677b.

Commerce's authority under the statute is limited to determining whether such a dumping margin exists based on a comparison of the normal value based on the factors of production actually used in the production of the subject merchandise with the constructed export price based on the price actually paid by the first unaffiliated U.S. customer.

13

It is a fundamental principle of administrative law that a government agency may take action only to the extent that Congress has, through passage of specific statutory authority, granted it the power to do so. *See United States v. Mead*, 533 U.S. 218, 226- 227 (2001) (an agency cannot act unless Congress has delegated authority); *see also* 5 U.S.C. § 706(2) (instructing a court to "hold unlawful and set aside agency action . . . found to be. . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

While the statute provides for various adjustments to normal value and constructed export price, it does so explicitly, and there are no permitted adjustments to account for customers misunderstanding of the product it was actually purchasing. The statute provides for only certain specific adjustments to normal value:

**(6) Adjustments**
The price described in paragraph (1)(B) shall be--
    **(A)** increased by the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States;
    **(B)** reduced by--
        **(i)** when included in the price described in paragraph (1)(B), the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the foreign like

14

product in condition packed ready for shipment to the place of delivery to the purchaser,

**(ii)** the amount, if any, included in the price described in paragraph (1)(B), attributable to any additional costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser, and

**(iii)** the amount of any taxes imposed directly upon the foreign like product or components thereof which have been rebated, or which have not been collected, on the subject merchandise, but only to the extent that such taxes are added to or included in the price of the foreign like product, and

**(C)** increased or decreased by the amount of any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise provided under this section) that is established to the satisfaction of the administering authority to be wholly or partly due to--

**(i)** the fact that the quantities in which the subject merchandise is sold or agreed to be sold to the United States are greater than or less than the quantities in which the foreign like product is sold, agreed to be sold, or offered for sale,

**(ii)** the fact that merchandise described in subparagraph (B) or (C) of section 1677(16) of this title is used in determining normal value, or

**(iii)** other differences in the circumstances of sale.

19 U.S.C.§ 1677b(a)(6). The statute also provides for level of trade adjustments, constructive export price offsets, and special rules for non-market economy cases:

**(c) Nonmarket economy countries**

**(1) In general** If--

> **(A)** the subject merchandise is exported from a nonmarket economy country, and
> **(B)** the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined under subsection (a),

the administering authority shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and <u>to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses.</u> Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c) (emphasis added). The statute provides for only certain specific adjustments to export price and constructed export price:

**(c) Adjustments for export price and constructed export price**

The price used to establish export price and constructed export price shall be--

> **(1)** increased by--
>
> > **(A)** when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States,
> > **(B)** the amount of any import duties imposed by the country of exportation which have been rebated, or

16

which have not been collected, by reason of the exportation of the subject merchandise to the United States, and

(C) the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy, and

(2) reduced by--

(A) except as provided in paragraph (1)(C), the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States, and

(B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title.

## (d) Additional adjustments to constructed export price

For purposes of this section, the price used to establish constructed export price     shall also be reduced by--

(1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)--

(A) commissions for selling the subject merchandise in the United States;

(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

(C) any selling expenses that the seller pays on behalf of the purchaser;        and

(D) any selling expenses not deducted under subparagraph (A), (B), or    (C);

17

**(2)** the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e); and
**(3)** the profit allocated to the expenses described in paragraphs (1) and (2).

19 U.S.C. § 1677a(c) & (d).

There is no statutory provision for Commerce to make a downward adjustment to U.S. price for advertising claims that Commerce finds to be inaccurate, just like there is no statutory provision for Commerce to adjust U.S. price for violations of antitrust laws, intellectual property laws, or any other means by which a business may charge its customers a price that is higher than the product is theoretically worth.

Nor is there a provision of the antidumping statute which grants Commerce the authority to punish a company for charging unfairly high prices, by imposing adverse facts available. Again, the antidumping statute is not concerned with situation in which the U.S. price is higher than the normal value and does not permit the imposition of a dumping margin if the U.S. price is higher than the normal value, regardless of why the U.S. price is higher. To the extent Meisen's U.S. affiliates gained some market advantage by mispresenting its cabinets as made of maple, that is not an issue to be investigated under the antidumping

law nor is it an issue that can be punished under the antidumping law. If an unfairly high U.S. price was achieved through the violation of another law, Commerce should forward the issue to the appropriate government agency.

This issue should be remanded to Commerce to reconsider its decision to apply total adverse facts available without consideration of any alleged misstatements by Meisen's U.S. affiliates to their customers.

## 2. The Use of Facts Available with Adverse Inferences is not Supported by Substantial Evidence or Otherwise in Accordance with Law

Defendant and Defendant-Intervenor incorrectly claim that Meisen withheld information, failed to provide information in a timely manner and significantly impeded the investigation. According to Defendant, Meisen failed to explain why it exclusively markets its cabinets as made of maple wood despite claiming that it only produced cabinets made of birch and that Meisen could have raised the issue earlier in the investigation. Def't Int. Br. at 14-19.

Meisen did not withhold any information from Commerce or impede the investigation. In fact, it supplied all of the information requested by

Commerce by the deadlines set by Commerce. Indeed, the very reason that Commerce now claims that it is entitled to apply AFA is grounded in information that Meisen itself submitted to Commerce. This was not information solicited in a supplemental questionnaire by Commerce but was part of Meisen's original Section A response, the first response on the record as part of the investigation. As pointed out in our initial brief, Commerce itself noted in the preliminary determination that the record evidence submitted by Meisen fully disclosed the advertising. Preliminary Determination Memorandum for Dalian Meisen Woodworking Co., Ltd., dated October 2, 2019 (APPX086549-086550). Therefore, the Department was on notice of the advertising issue as early as the Section A Questionnaire Response.

Defendant-Intervenor cites to *Taian Ziyang* for the proposition that a respondent does not fully disclose information to Commerce when that information is buried in exhibits attached to its questionnaire responses. *See Taian Ziyang Food Co. v. United States*, 33 C.I.T. 828 (2009). In that case, however, respondent explicitly <u>denied</u> using a particular factor of production and the fact that this information was incorrect was buried in a lengthy response. In this case, Meisen only

used birch in the production of the subject merchandise and its U.S.
affiliates only sold cabinets made of birch and Meisen <u>accurately</u>
reported that information to Commerce. While respondent bears the
burden of creating an accurate record as pointed out by Defendant-
Intervenor (Def't Int. Br. at 20), there is no requirement that
respondents explicitly point out every fact to Commerce, particularly
those that are legally irrelevant to the calculation Commerce's dumping
margin.

Moreover, it is not explained how explicitly disclosing the
information to Commerce earlier would have would have allowed
Commerce to calculate a company-specific rate for Meisen given the
position taken by Commerce in this case. As discussed above, Defendant
has already taken the position that marketing birch cabinets as maple
creates an irreconcilable mismatch between U.S. price and normal
value, regardless of the actual composition of the cabinets. Def't Br. at
24. In Commerce's view, and without reference to statutory authority,
in Commerce's tortured analysis – simply marketing the birch cabinets
as maple by itself leads inevitably to adverse facts available. Thus, it
seems apparent that the explicit disclosure argument is simply an

avoidance of the real reason for Commerce's AFA decision, which was Commerce's annoyance at some Meisen affiliates claiming birch product was maple, and not just birch product with a maple look.

Defendant-Intervenor throws in the allegation that Meisen failed to maintain books and records that would allow it to report to Commerce the CONNUMs of its U.S. sales in an accurate manner. But it does not explain what books and records were not maintained and makes no reference to such a finding by Commerce. Def't Int. Br. at 30. This is not accurate and Defendant-Intevenor cites to no evidence supporting this assertion. Meisen maintained accurate books and record demonstrating the type of cabinets it actually made and sold, which is precisely why it was able to correctly report both its factors of production and its sales based upon the actual physical characteristics.

Defendant-Intervenor also cites to the Court's decisions in *Yuantai Xinke* and *Jiangsu Changbao,* but these cases are distinguishable. In *Yuantai Xinke*, the respondent reported using narrow coil steel strip to produce the subject merchandise and, when requested to provide evidence supporting this assertion, filed purchase orders and mill test certificates from its suppliers to Commerce. *Yantai Xinke Steel*

*Structure Co. Ltd. v. United States*, 36 CIT 1035, 1045-1046 (2012).

Respondent also provided Commerce with similar evidence at

verification. *Id.* The respondent did not report to Commerce that it also

prepared its own mill test certificates that conflicted with the mill test

certificates from the suppliers. Post-verification, Commerce obtained

these other mill test certificates from U.S. Customs, as they were

included by the importer with the entry documentation. *Id.* at 1047.

Respondent then acknowledged that the supplier mill test certificates

that had been submitted to Commerce were often inaccurate or false.

*Id.* at 1048.  The Court held that the imposition of AFA was reasonable

under these circumstances finding that it was reasonable to find that

respondent "impeded the investigation by submitting questionnaire

responses it knew to be inaccurate and by not providing all of the

documents in its possession." *Id.* at 1049.

In *Jiangsu Changbao*, respondent had initially reported to Commerce

using both alloy and non-alloy steel billets to produce the subject

merchandise, but later recanted and claimed to have only used alloy

steel billets. *Jiangsu Changbao Steel Tube Co., Ltd. v. United States*,

884 F. Supp. 2d. 1295, 1299 (CIT 2012).  Respondent maintained this

23

claim through verification despite Commerce finding discrepancies between hard copy mill test certificates and the versions maintained in respondent's computer accounting system. *Id.* at 1300. After verification, Commerce received additional mill test certificates from U.S. Customs that was different from the mill test certificate respondent submitted for the same sale at verification. *Id.* Specifically, the mill test certificate received from Customs indicated that the subject merchandise was produced from non-alloy steel, rather than alloy steel as reported at verification. *Id.* at 1301. The Court held that it was reasonable for Commerce to determine that the respondent withheld information requested of it when Commerce discovered that respondent officials had lied during verification, claiming that the mill test certificates provided to verifying officials were those that accompanied the invoices of sales under investigation, while knowing that this was not true. *Id.* at 1305. Moreover, the Court held that it is reasonable for Commerce to infer that a respondent who admits to having intentionally deceived Commerce officials, and does so only after Commerce itself supplies contradictory evidence, exhibits behavior

suggestive of a general willingness and ability to deceive and cover up the deception until exposure becomes absolutely necessary. *Id.* at 1306.

In both of these cases, respondent maintained two sets of contradictory records regarding the composition of the subject merchandise, which made it impossible for Commerce to determine which set of documents was correct. Moreover, respondents made false statements in their questionnaire responses and at verification, such that Commerce did not become aware of the facts until after verification. Those are not the facts here. Meisen consistently and accurately reported that the cabinets it produced and sold were made of birch. In fact, Commerce does not even seem to dispute this fact. The only issue here is how the cabinets were marketed, which, as shown above, is not relevant to the antidumping calculation.

Likewise, Defendant-Intervenors citation to *Hyundai Steel* and *Tung Mung* are inapposite. In *Hyundai Steel*, respondent failed to report accurate CONNUMS and reported CONNUM characteristics that were contradicted by documents supplied at verification. *See Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1353 (Ct. Int'l Trade 2018). In *Tung Mung*, the respondent failed to report certain home market

25

sales contrary to the instructions of Commerce. *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752 (2001). In this case, Meisen accurately reported that all of its production and sales were of birch cabinets. The record reveals that neither Meisen nor its U.S. affiliates withheld any information, there was no relevant information missing from the record, and the information reported by Meisen was accurate. Therefore, there was no basis for Commerce to resort to facts available, let alone facts available with adverse inferences.

3.  Commerce Possible Reliance on Partial Adverse Facts Available

Defendant and Defendant-Intervenor argue that Commerce did not have any partial facts available to apply in order to calculate a margin for Meisen and that Meisen itself does not explain what record facts could have been used as neutral or partial adverse facts available. Def't. Br. at 34 and Def't Int. Br. at 52-53. First, Commerce made no findings below regarding the possibility of using partial facts available because it immediately resorted to total adverse facts available. The argument that it now raises is a *post hoc* rationalization created for the purpose of this litigation. Second, if any facts available could be properly used by Commerce is an issue that should be argued at Commerce on remand.

The fact remains that there is only one issue identified by Commerce with respect to the voluminous data and information submitted by Meisen, *i.e.* that some Meisen affiliates marketed birch cabinets as if they were made of maple wood. That is not a sufficient basis to reject all of the information submitted by Meisen and use total adverse facts available. The Court has found the use of partial adverse facts available appropriate where a respondent only failed to provide information in one respect and that, in such cases, the use of only partial adverse facts available is the reasonable approach. *Nat'l Nail Corp. v. United States,* 390 F. Supp. 3d 1356, 1375 (Ct. Int'l Trade 2019). But here, where there was no legal authority for Commerce to make any adjustment at all based on the advertising, even that partial facts available was inappropriate.

## B. Commerce Improperly Canceled Its Statutorily Mandated Verification

To the extent Commerce had any doubt about whether Meisen produced and sold birch or maple cabinets, the doubts could have been resolved at verification.  Indeed, that is the very purpose of verification. Defendant defends Commerce's decision not to verify based on the claim

that it was Meisen's responsibility to build the record and explain why there was a supposed discrepancy on the record. Def't Br. at 35. However, there is no real discrepancy on the record. Meisen responded to all of Commerce's questionnaires and provided the information requested by Commerce. At the very least, the facts surrounding the maple issue were clear and the fact that Meisen and Petitioner may have been offering different interpretations of the record evidence is not an excuse to cancel verification. Meisen is not required to concede to Petitioner's interpretation of the facts before Commerce verifies the facts on the record. In this instance, Commerce failed to complete its investigation and improperly cancelled verification.

Defendant cites to this Court's decision in *Shandong Bailey* in support of its decision not to verify. In that case, however, Commerce found that the respondent in a countervailing duty investigation failed to report all of its affiliated companies, which meant that all of its questionnaire responses were incomplete and verification of those responses futile, as it was too late for Commerce to collect new factual information. *Shandong Dongfang Bayley Wood Co. v. United States*, 375 F. Supp. 3d 1339, 1348 (Ct. Int'l Trade 2019). In the instant case,

28

the only possible outstanding question is simply whether the cabinets produced and sold by Meisen during the period of investigation were truly made of birch or maple wood, a fact that could have been resolved at verification by reviewing Meisen's books and records. Indeed, the accuracy of this kind of information is what Commerce is tasked with reviewing in every case. Commerce verified the same issue in the parallel countervailing duty verification and found that Meisen only produced cabinets made of birch wood. *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China*, 85 Fed. Reg. 11,962 (February 28, 2020) (final countervailing duty determination) and accompanying Issues and Decision Memorandum at Comment 9. In short, there is no reason that Commerce could not have resolved any lingering doubt in this antidumping investigation.

Defendant also argues that verification would have been useless because it would have at best shown that Meisen produced cabinets produced of birch wood, which "could not have resolved the obvious discrepancies between the U.S. sales price information for cabinets that were exclusively advertised as, and sold under the pretense of being maple cabinets – despite the cabinets being made solely of birch wood."

Def't Br. at 36. "Regardless. verification would at best have shown that Meisen produced cabinets made solely of birch wood, as it did in the CVD investigation. Verification could not have resolved the obvious discrepancies between the U.S. sales price information for cabinets that were exclusively advertised as, and sold under the pretenses of being, maple cabinets—despite the cabinets being made solely of birch wood." Def't Br. at 36. Likewise, Defendant-Intervenor argue that Meisen's reported data was unusable because of the apparent inconsistencies in its advertising claims: "Commerce could not deem Meisen's reported data to be usable and without any flaws by verifying that Meisen used only birch wood to produce cabinets and verifying that it only sold the cabinets as being made from maple wood. This fundamental discrepancy is simply not the type of deficiency that could be tested and cured by comparing the reported data to Meisen's internal accounting and sales documentation. The discrepancy would remain ever after verification was complete." Def't Int. Br. at 52.

Thus, Commerce and Defendant-Intervenors' own arguments belie the assertion that the cancellation of verification had anything to do with a failure to submit a complete record by Meisen so that

30

information could not be verified. They simply want to avoid the issue of whether any discrepancies in Meisen's advertising claims was relevant to Commerce's determination under the antidumping laws. Indeed, the upshot of their theory of the case is that the entire investigation, including all of Meisen's questionnaire responses, made no difference once the advertising discrepancy was detected. This argument is not supported by the statute, the regulations, or common sense. If the fact that Meisen advertised birch cabinets as made of maple wood is relevant to the antidumping determination, then by extension, Meisen could not have reported its data in any manner that would have been acceptable to Commerce for purposes of calculating an actual dumping margin. Under this theory, taken to its logical conclusion, petitioners should start alleging false advertising, antitrust violations, or violations of intellectual property laws in the petition so that Commerce can simply apply AFA immediately upon initiation of a case without conducting any investigation as to whether a respondent's actual normal value is higher than the actual U.S. sales price. Commerce could thereby take responsibility for enforcing a wide variety of U.S. laws and unfair business practices under the antidumping laws, making other

31

agencies and statutes unnecessary. As shown above, however, Commerce simply does not have the authority to make adjustments for claims which do not impact the calculation of an antidumping duty margin. In this case, Commerce should have limited its investigation to the actual factors of production used to produce the subject merchandise and the actual prices charged for the subject merchandise in the United States. should have verified that information, and concerned itself with adjustments to price or cost only as allowed by the statute.

## III.   CONCLUSION

For the reasons stated above, Meisen respectfully requests that the Court:  (1) determine that Commerce's final determination in the antidumping investigation is unsupported by substantial evidence and otherwise not in accordance with law in the ways alleged above; (2) remand this case to Commerce with instructions to reconsider its final determination consistent with the findings of this Court; and (3) provide such other relief as this Court may deem just and proper.

Respectfully submitted,

/s/Jeffrey S. Neeley
Jeffrey S. Neeley
Nithya Nagarajan
Stephen W. Brophy
**Husch Blackwell LLP**
750 17th St., NW, Suite 900
Washington, DC 20006
(202) 378-2409
Jeffrey.Neeley@huschblackwell.com

*Counsel for Plaintiff Dalian Meisen
Woodworking Co., Ltd.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(2), the undersigned certifies that this submission complies with the word limitation requirement. The word count for this submission, as computed by Husch Blackwell's word processing system Microsoft Word 2019, is 6,546 words.

/s/ Jeffrey S. Neeley

Jeffrey S. Neeley
Husch Blackwell LLP
*Counsel for Plaintiff Dalian*
*Meisen Woodworking Co., Ltd.*