# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DALIAN MEISEN WOODWORKING CO., LTD. ) ) ) ) | |
| Plaintiff, ) | |
| ) | Court No. 20-00109 |
| v. ) ) | |
| UNITED STATES, ) | |
| ) | **PUBLIC** |
| Defendant, ) | **VERSION** |
| ) | |

# CORRECTED
# JOINT APPENDIX

Jeffrey S. Neeley
Stephen W. Brophy
Husch Blackwell LLP
750 17th Street NW
Suite 900
Washington, DC 20006
(202) 378 – 2357

Jeffrey.Neeley@huschblackwell.com
*Attorneys for Plaintiff Dalian Meisen Woodworking Co., Ltd.*

Dated:  May 26, 2021

## TABLE OF CONTENTS

| Document | Confidential Record | Public Record | Appx Pages |
|---|---|---|---|
| Initiation of Less-Than-Fair Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China, 84 Fed. Reg. 12587 (Dep't of Commerce Apr. 2, 2019) | | P.R. 101 | APPX001000-APPX001005 |
| Meisen's Letter Meisen's Letter Regarding Rebuttal Comments on Product Characteristics (April 25, 2019) | | P.R. 507 | APPX001006-APPX001025 |
| Decision Memorandum for the Preliminary Affirmative Determination of Sales at Less Than Fair Value (October 2, 2019) | | P.R. 1407 | APPX001026-APPX001093 |
| Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of | | P.R. 1426 | APPX001094-APPX001102 |

| | | | |
|---|---|---|---|
| Provisional Measures, 84 Fed. Reg. 54,106 (Dep't of Commerce Oct. 9, 2019) | | | |
| Memorandum to the File, Verification of the Questionnaire Responses of Dalian Meisen Woodworking Co. Ltd. (October 18, 2019) | | P.R. 1437 | APPX001103 |
| Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Amended Preliminary Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 61,875 (Dep't of Commerce Nov. 14, 2019) | | P.R. 1485 | APPX001104-APPX001106 |
| Letter re: Verification (December 27, 2019) | | P.R. 1524 | APPX001107-APPX001108 |
| Issues and Decision Memorandum (February 21, 2019) | | P.R. 1554 | APPX001109-APPX001201 |
| Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair | | P.R. 1559 | APPX001202-APPX001211 |

| | | | |
|---|---|---|---|
| Value, 85 Fed. Reg. 11,953 (Dep't of Commerce Feb. 28, 2020) | | | |
| Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value, 85 Fed. Reg. 17,855 (Dep't of Commerce Mar. 31, 2020) (Corrected Final Determination) | | P.R. 1575 | APPX001212-APPX001218 |
| Respondent Selection Memorandum (June 4, 2019) | C.R. 948 | P.R. 838 | APPX080000-APPX080010 |
| Meisen Section A Questionnaire Response (July 3, 2019) | C.R. 967-971 | P.R. 869 | APPX080011-APPX082644 |
| Meisen Section D Questionnaire Response (July 19, 2019) | C.R. 989 | P.R. 908 | APPX082645-APPX082743 |
| Meisen Section C Questionnaire Response (July 19, 2019) | C.R. 1011-1015 | P.R. 910 | APPX082744-APPX083285 |
| Meisen Supplemental Section A Questionnaire | C.R. 1090-1114 | P.R. 984-988 | APPX083286-APPX085087 |

| | | | |
|---|---|---|---|
| Response (August 14, 2019) | | | |
| Meisen Supplemental Section C Questionnaire Response (August 28, 2019) | C.R. 1197-1201 | P.R. 1164 | APPX085088-APPX085511 |
| Meisen Supp. D-E Response (September 17, 2019) | C.R. 1320-1323 | P.R. 1361 | APPX085512-APPX086251 |
| Pre-Preliminary Comments for Meisen (September 27, 2019) | C.R. 1429-1430 | P.R. 1400-1402 | APPX086252-APPX086548 |
| Preliminary Determination Memorandum for Dalian Meisen Woodworking Co., Ltd. (October 2, 2019) | C.R. 1437 | P.R. 1413 | APPX086549-APPX086550 |
| Meisen Post-Prelim Supplemental Questionnaire (October 24, 2019) | C.R. 1466 | P.R. 1446 | APPX086551-APPX086562 |
| Meisen Post-Prelim Supplemental Questionnaire Response (November 6, 2019) | C.R. 1475-1478 | P.R. 1459 | APPX086563-APPX087930 |
| Meisen 2nd Post-Prelim Supplemental Questionnaire (November 18, 2019) | C.R. 1525 | P.R. 1487 | APPX087931-APPX087940 |
| Meisen 2nd Post-Prelim Supplemental Questionnaire Response (November 21, 2019) | C.R. 1526 | P.R. 1492 | APPX087941-APPX088577 |

| | | |
|---|---|---|
| Initiation of Less-Than-Fair Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China, 84 Fed. Reg. 12587 (Dep't of Commerce Apr. 2, 2019) | P.R. 101 | APPX001000-APPX001005 |

## Notification to Importers

This notice serves as a preliminary reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during these PORs. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

## Notification Regarding Administrative Protective Orders

This notice also serves as a reminder to parties subject to administrative protective order (APO) of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

Commerce is issuing and publishing the preliminary results of this new shipper review in accordance with sections 751(a)(2)(B) and 777(i) of the Act, and 19 CFR 351.214 and 351.221(b)(4).

Dated: March 27, 2019.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix

### List of Topics Discussed in the Preliminary Decision Memorandum

I. Summary
II. Background
III. Scope of the Order
IV. *Bona Fides* Analysis
V. Discussion of the Methodology
  A. Non-Market-Economy Country Status
  B. Surrogate Country
  C. Separate Rate
  D. Absence of *De Jure* Control
  1. Absence of *De Facto* Control
  D. Fair Value Comparisons
  1. Determination of Comparison Method
  2. Results of the Differential Pricing Analysis
  E. U.S. Price
  F. Date of Sale
  G. Normal Value
  H. Surrogate Values
VI. Currency Conversion
VII. Recommendation

[FR Doc. 2019–06314 Filed 4–1–19; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–106]

### Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable March 26, 2019.

**FOR FURTHER INFORMATION CONTACT:** Amanda Brings at (202) 482–3927 or Rachel Greenberg at (202) 482–0652, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

### The Petition

On March 6, 2019, the U.S. Department of Commerce (Commerce) received an antidumping duty (AD) Petition concerning imports of wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the People's Republic of China (China), filed in proper form on behalf of the American Kitchen Cabinet Alliance (the petitioner).[1] The AD Petition was accompanied by a countervailing duty (CVD) Petition concerning imports of wooden cabinets and vanities from China.

Between March 11 and 20, 2019, Commerce requested supplemental information pertaining to certain aspects of the Petition.[2] The petitioner filed responses to these requests between March 12 and 22, 2019.[3]

---

[1] *See* Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Wooden Cabinets and Vanities from the People's Republic of China," dated March 6, 2019 (the Petition); *see also* Memorandum, "Phone Call with Counsel to the Petitioner," dated March 26, 2019.

[2] *See* Commerce's Letters, "Re: Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Wooden Cabinets and Vanities from the People's Republic of China: Supplemental Questions," dated March 11, 2019 (General Issues Supplemental Questionnaire) and "Re: Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Wooden Cabinets and Vanities from the People's Republic of China: Supplemental Questions," dated March 11, 2019 (AD Supplemental Questionnaire). *See also* Memorandum, "Phone Call with Counsel to the Petitioner," dated March 18, 2019 (March 18, 2019 Memorandum) and Memorandum, "Phone Call with U.S. Customs and Border Protection Officials and Counsel to the Petitioner," dated March 20, 2019 (March 20, 2019 Memorandum).

[3] *See* Petitioner's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), the petitioner alleges that imports of wooden cabinets and vanities from China are being, or are likely to be, sold in the United States at less-than-fair value (LTFV) within the meaning of section 731 of the Act, and that such imports are materially injuring, or threatening material injury to, the domestic industry producing wooden cabinets and vanities in the United States. Consistent with section 732(b)(1) of the Act, the Petition is accompanied by information reasonably available to the petitioner supporting its allegations.

Commerce finds that the petitioner filed this Petition on behalf of the domestic industry because the petitioner is an interested party as defined in section 771(9)(E) of the Act. Commerce also finds that the petitioner demonstrated sufficient industry support with respect to the initiation of the requested AD investigation.[4]

### Period of Investigation

Because the Petition was filed on March 6, 2019, the period of investigation (POI) is July 1, 2018, through December 31, 2018.

### Scope of the Investigation

The merchandise covered by this investigation consists of wooden cabinets and vanities from China. For a full description of the scope of this investigation, *see* the Appendix to this notice.

### Comments on Scope of the Investigation

During our review of the Petition, we contacted the petitioner regarding the proposed scope to ensure that the scope language in the Petition is an accurate

---

Petitioner's Responses to Supplemental Questions Regarding Petition Volume I Injury," dated March 12, 2019 (General Issues Supplement); Petitioner's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Petitioner's Responses to Supplemental Questions Regarding Petition Volume II China AD," dated March 12, 2019 (AD Supplement); Petitioner's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Second Supplemental Responses—Volume I Injury," dated March 20, 2019 (Second General Issues Supplement); Petitioner's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Second Supplemental Responses—Volume II Injury," dated March 20, 2019 (Second AD Supplement); and Petitioner's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Petitioner's Response to Department of Commerce's March 20, 2019 Memorandum," dated March 22, 2019 (Scope Clarification).

[4] *See* "Antidumping Duty Investigation Initiation Checklist: Wooden Cabinets and Vanities from the People's Republic of China," (AD Initiation Checklist). This checklist is dated concurrently with, and hereby adopted by, this notice and on file electronically via ACCESS. Access to documents filed via ACCESS is also available in the Central Records Unit, Room B8024 of the main Department of Commerce building.

reflection of the products for which the domestic industry is seeking relief.[5] As a result, the scope of the Petition was modified to clarify the description of the merchandise covered by the Petition. The description of the merchandise covered by this investigation, as described in the Appendix to this notice, reflects these clarifications.

As discussed in the *Preamble* to Commerce's regulations, we are setting aside a period for interested parties to raise issues regarding product coverage (scope).[6] Commerce will consider all comments received from interested parties and, if necessary, will consult with interested parties prior to the issuance of the preliminary determination. If scope comments include factual information,[7] all such factual information should be limited to public information. To facilitate preparation of its questionnaires, Commerce requests that all interested parties submit scope comments by 5:00 p.m. Eastern Time (ET) on April 15, 2019, which is 20 calendar days from the signature date of this notice. Any rebuttal comments, which may include factual information, must be filed by 5:00 p.m. ET on April 25, 2019, which is 10 calendar days from the initial comment deadline.[8]

Commerce requests that any factual information the parties consider relevant to the scope of the investigation be submitted during this time period. However, if a party subsequently finds that additional factual information pertaining to the scope of the investigation may be relevant, the party may contact Commerce and request permission to submit the additional information. All such comments must also be filed on the record of the concurrent CVD investigation.

**Filing Requirements**

All submissions to Commerce must be filed electronically using Enforcement and Compliance's Antidumping Duty and Countervailing Duty Centralized Electronic Service System (ACCESS).[9]

An electronically filed document must be received successfully in its entirety by the time and date it is due. Documents exempted from the electronic submission requirements must be filed manually (*i.e.*, in paper form) with Enforcement and Compliance's APO/Dockets Unit, Room 18022, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230, and stamped with the date and time of receipt by the applicable deadlines.

**Comments on Product Characteristics for AD Questionnaires**

Commerce is providing interested parties an opportunity to comment on the appropriate physical characteristics of wooden cabinets and vanities to be reported in response to Commerce's AD questionnaire. This information will be used to identify the key physical characteristics of the subject merchandise in order to report the relevant factors of production (FOPs) accurately, as well as to develop appropriate product-comparison criteria.

Interested parties may provide any information or comments that they feel are relevant to the development of an accurate list of physical characteristics. In order to consider the suggestions of interested parties in developing and issuing the AD questionnaire, all comments must be filed by 5:00 p.m. ET on April 15, 2019, which is 20 calendar days from the signature date of this notice.[10] Any rebuttal comments must be filed by 5:00 p.m. ET on April 25, 2019. All comments and submissions to Commerce must be filed electronically using ACCESS, as explained above, on the record of this AD investigation.

**Determination of Industry Support for the Petition**

Section 732(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 732(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) At least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 732(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic

producers or workers accounting for more than 50 percent of the total production of the domestic like product, Commerce shall: (i) Poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the "industry."

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs Commerce to look to producers and workers who produce the domestic like product. The International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both Commerce and the ITC must apply the same statutory definition regarding the domestic like product,[11] they do so for different purposes and pursuant to a separate and distinct authority. In addition, Commerce's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[12]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (*i.e.*, the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, the petitioner does not offer a definition of the domestic like product distinct from the scope of the Petition.[13] Based on our analysis of the information submitted on the record, we have determined that wooden cabinets and vanities, as defined in the scope, constitute a single domestic like product, and we have analyzed industry support in terms of that domestic like product.[14]

---

[5] *See* General Issues Supplement; *see also* March 18, 2019 Memorandum, March 20, 2019 Memorandum, and Scope Clarification; *see also* Memorandum, "Phone Call with Counsel to the Petitioner," dated March 21, 2019.

[6] *See Antidumping Duties; Countervailing Duties,* 62 FR 27296, 27323 (May 19, 1997).

[7] *See* 19 CFR 351.102(b)(21) (defining "factual information").

[8] *See* 19 CFR 351.303(b).

[9] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures,* 76 FR 39263 (July 6, 2011); *see also Enforcement and Compliance; Change of Electronic Filing System Name,* 79 FR 69046 (November 20, 2014) for details of Commerce's electronic filing requirements, effective August 5, 2011. Information on help using

ACCESS can be found at *https://access.trade.gov/help.aspx* and a handbook can be found at *https://access.trade.gov/help/Handbook%20on%20Electronic%20Filling%20Procedures.pdf.*

[10] *See* 19 CFR 351.303(b).

[11] *See* section 771(10) of the Act.

[12] *See USEC, Inc.* v. *United States,* 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd.* v. *United States,* 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[13] *See* Volume I of the Petition, at 18–20; *see also* General Issues Supplement, at 6–7.

[14] For a discussion of the domestic like product analysis as applied to this case and information regarding industry support, *see* AD Initiation

In determining whether the petitioner has standing under section 732(c)(4)(A) of the Act, we considered the industry support data contained in the Petition with reference to the domestic like product as defined in the "Scope of the Investigation," in the Appendix to this notice. To establish industry support, the petitioner provided 2018 shipments of the domestic like product for the U.S. producers that support the Petition.[15] The petitioner estimated the production of the domestic like product for the entire domestic industry based on shipment value data, because production quantity data for the entire domestic industry are not available, and shipments are a close approximation of production in the wooden cabinets and vanities industry.[16] The petitioner compared the shipments of the companies supporting the Petition to the estimated total 2018 shipments of the domestic like product for the entire domestic industry.[17] We relied on data provided by the petitioner for purposes of measuring industry support.[18]

On March 20, 2019, we received comments on industry support from American Home Furnishings Alliance (AHFA), an alliance representing the U.S. residential furniture industry, and Fabuwood Cabinetry Corp. (Fabuwood), a U.S. importer.[19] On March 22, 2019, we received industry support comments from Huisen Furniture Longnan Co. Ltd. (Huisen), a Chinese producer and exporter of living room floor-standing furniture, and Kimball Hospitality Inc. (Kimball), a U.S. producer and importer of hospitality furniture.[20] The petitioner

responded to the industry support comments from AHFA, Fabuwood, Huisen, and Kimball on March 25, 2019.[21]

Our review of the data provided in the Petition, the General Issues Supplement, the Petitioner's Letter, and other information readily available to Commerce indicates that the petitioner has established industry support for the Petition.[22] First, the Petition established support from domestic producers (or workers) accounting for more than 50 percent of the total production of the domestic like product and, as such, Commerce is not required to take further action in order to evaluate industry support (e.g., polling).[23] Second, the domestic producers (or workers) have met the statutory criteria for industry support under section 732(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petition account for at least 25 percent of the total production of the domestic like product.[24] Finally, the domestic producers (or workers) have met the statutory criteria for industry support under section 732(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petition.[25] Accordingly, Commerce determines that the Petition was filed on behalf of the domestic industry within the meaning of section 732(b)(1) of the Act.

**Allegations and Evidence of Material Injury and Causation**

The petitioner alleges that the U.S. industry producing the domestic like product is being materially injured, or is threatened with material injury, by reason of the imports of the subject merchandise sold at LTFV. In addition, the petitioner alleges that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[26]

The petitioner contends that the industry's injured condition is illustrated by a significant and increasing volume of subject imports; reduced market share; underselling and

price depression or suppression; lost sales and revenues; closure of manufacturing facilities and hindered planned expansion efforts due to market conditions caused by subject imports; a decline in the domestic industry's U.S. production, capacity utilization, commercial shipments, employment, and financial performance; and the magnitude of the alleged dumping margins.[27] We have assessed the allegations and supporting evidence regarding material injury, threat of material injury, causation, as well as negligibility, and we have determined that these allegations are properly supported by adequate evidence, and meet the statutory requirements for initiation.[28]

**Allegations of Sales at Less Than Fair Value**

The following is a description of the allegation of sales at LTFV upon which Commerce based its decision to initiate an AD investigation of imports of wooden cabinets and vanities from China. The sources of data for the deductions and adjustments relating to U.S. price and normal value (NV) are discussed in greater detail in the AD Initiation Checklist.

**Export Price**

The petitioner based export price (EP) on an offer for sale for wooden cabinets produced in China and offered for sale to a customer in the United States.[29] The petitioner made deductions from U.S. price for foreign inland freight and foreign brokerage and handling charges.[30]

**Normal Value**

With respect to China, Commerce considers China to be an NME country.[31] In accordance with section

---

Checklist, at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Wooden Cabinets and Vanities from the People's Republic of China (Attachment II).

[15] See Volume I of the Petition, at 2–4 and Exhibits I–3, I–5, and I–7; see also General Issues Supplement, at 10–14 and Exhibits I–Supp–5, I–Supp–8 and I–Supp–12.

[16] See Volume I of the Petition at 3 and Exhibits I–3, I–4 and I–15; see also General Issues Supplement, at 9.

[17] See General Issues Supplement, at 10, 13, and 14.

[18] See Volume I of the Petition, at 2–4 and Exhibits I–3, I–4, I–5, and I–7; see also General Issues Supplement, at 9–14 and Exhibits I–Supp–5, I–Supp–8, I–Supp–10, I–Supp–11, and I–Supp–12. For further discussion, see AD Initiation Checklist, at Attachment II.

[19] See AHFA's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Comments on Industry Support," dated March 20, 2019 (AHFA's Letter). See Fabuwood's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Request to Dismiss Petitions or Otherwise Postpone Initiation," dated March 20, 2019 (Fabuwood's Letter).

[20] See Huisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Comments on Industry Support," dated March 22, 2019 (Huisen's Letter).

[21] See Petitioner's Letter, "Wooden, Cabinets and Vanities from the People's Republic of China: Petitioners Response to Request to Various Parties' Requests to Dismiss or Postpone," dated March 25, 2019 (Petitioner's Letter).

[22] See AD Initiation Checklist, at Attachment II.

[23] See section 732(c)(4)(D) of the Act; see also AD Initiation Checklist, at Attachment II.

[24] See AD Initiation Checklist, at Attachment II.

[25] Id.

[26] See General Issues Supplement, at 15–16 and Exhibits I–Supp–10 and I–Supp–13.

[27] See Volume I of the Petitions, at 15–18, 21–35 and Exhibits I–4, I–11 through I–29; see also General Issues Supplement, at 14–16 and Exhibits I–Supp–10 and I–Supp–12.

[28] See AD Initiation Checklist, at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Antidumping and Countervailing Duty Petitions Covering Wooden Cabinets and Vanities from the People's Republic of China (Attachment III).

[29] See Volume II of the Petition, at 3 and Exhibit II–2; see also AD Supplement, at 1 and Exhibit II–Supp–2.

[30] See Volume II of the Petition, at 5–7 and Exhibit II–3, Exhibit II–7, Exhibit II–12; see also AD Supplement, at 3 and Exhibit II–Supp–3, Exhibit II–Supp–4, Exhibit II–Supp–5.

[31] See Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination, 82 FR 50858, 50861 (November 2, 2017), and accompanying decision memorandum, China's Status as a Non-Market

Continued

771(18)(C)(i) of the Act, any determination that a foreign country is an NME country shall remain in effect until revoked by Commerce. Therefore, we continue to treat China as an NME country for purposes of the initiation of this investigation. Accordingly, NV in China is appropriately based on FOPs valued in a surrogate market economy country, in accordance with section 773(c) of the Act.[32]

The Petition claims that Brazil is an appropriate surrogate country for China because it is a market economy that is at a level of economic development comparable to that of China and it is a significant producer of comparable merchandise.[33] The petitioner provided publicly available information from Brazil to value all FOPs. Based on the information provided by the petitioner, we determine that it is appropriate to use Brazil as a surrogate country for initiation purposes.

Interested parties will have the opportunity to submit comments regarding surrogate country selection and, pursuant to 19 CFR 351.301(c)(3)(i), will be provided an opportunity to submit publicly available information to value FOPs within 30 days before the scheduled date of the preliminary determination.

### Factors of Production

Because information regarding the volume of inputs consumed by the Chinese producer/exporter was not reasonably available, the Petition used the product-specific consumption rates of a U.S. wooden cabinets and vanities producer as a surrogate to estimate the Chinese manufacturer's FOPs.[34] The Petition valued the estimated FOPs using surrogate values from Brazil, as noted above. [35] The Petition used an average exchange rate to convert the data to U.S. dollars, where applicable. The petitioner calculated factory overhead, selling, general and administrative expenses, and profit based on the experience of a Brazilian producer of wooden cabinets.[36]

### Fair Value Comparisons

Based on the data provided by the Petition, there is reason to believe that imports of wooden cabinets and vanities from China are being, or are likely to be,

sold in the United States at LTFV. Based on comparisons of EP to NV, in accordance with sections 772 and 773 of the Act, the estimated dumping margins for wooden cabinets and vanities from China range from 177.36 to 262.18 percent.[37]

### Initiation of LTFV Investigation

Based upon the examination of the Petition on wooden cabinets and vanities from China, we find that the Petition meets the requirements of section 732 of the Act. Therefore, we are initiating an AD investigation to determine whether imports of wooden cabinets and vanities from China are being, or are likely to be, sold in the United States at LTFV. In accordance with section 733(b)(1)(A) of the Act and 19 CFR 351.205(b)(1), unless postponed, we will make our preliminary determination no later than 140 days after the date of this initiation.

### Respondent Selection

The petitioner named 727 companies in China as producers/exporters of wooden cabinets and vanities.[38] After considering our resources, Commerce has determined that we do not have sufficient administrative resources to issue quantity and value (Q&V) questionnaires to all 727 identified producers and exporters. Therefore, Commerce has determined to limit the number of Q&V questionnaires we will send out to exporters and producers identified in U.S. Customs and Border Protection (CBP) data for U.S. imports of wooden cabinets and vanities during the POI under the appropriate Harmonized Tariff Schedule of the United States numbers listed in the "Scope of the Investigation," in the Appendix. Accordingly, Commerce will send Q&V questionnaires to the largest producers and exporters that are identified in the CBP data for which there is address information on the record.

On March 26, 2019, Commerce released CBP data on imports of wooden cabinets and vanities from China under APO to all parties with access to information protected by APO and indicated that interested parties wishing to comment on the CBP data must do so within three business days of the publication date of the notice of initiation of this investigation.[39] We

further stated that we will not accept rebuttal comments.

In addition, Commerce will post the Q&V questionnaire along with filing instructions on the Enforcement and Compliance website at *http://www.trade.gov/enforcement/news.asp.* In accordance with our standard practice for respondent selection in AD cases involving NME countries, we intend to base respondent selection on the responses to the Q&V questionnaire that we receive.

Producers/exporters of wooden cabinets and vanities from China that do not receive Q&V questionnaires by mail may still submit a response to the Q&V questionnaire and can obtain a copy from the Enforcement & Compliance website. The Q&V response must be submitted by the relevant China exporters/producers no later than April 15, 2019. All Q&V responses must be filed electronically via ACCESS.

### Separate Rates

In order to obtain separate-rate status in an NME investigation, exporters and producers must submit a separate-rate application.[40] The specific requirements for submitting a separate-rate application in the China investigation are outlined in detail in the application itself, which is available on Commerce's website at *http://enforcement.trade.gov/nme/nme-sep-rate.html.* The separate-rate application will be due 30 days after publication of this initiation notice.[41] Exporters and producers who submit a separate-rate application and have been selected as mandatory respondents will be eligible for consideration for separate-rate status only if they respond to all parts of Commerce's AD questionnaire as mandatory respondents. Commerce requires that companies from China submit a response to both the Q&V questionnaire and the separate-rate application by the respective deadlines in order to receive consideration for separate-rate status. Companies not filing a timely Q&V response will not receive separate rate consideration.

### Use of Combination Rates

Commerce will calculate combination rates for certain respondents that are eligible for a separate rate in an NME

---

*Economy,* unchanged in *Certain Aluminum Foil from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 83 FR 9282 (March 5, 2018).

[32] *See* AD Initiation Checklist.

[33] *Id.* at 9–10 and Exhibit II–9, Exhibit II–10.

[34] *Id.* at 2, 10–11 and Exhibit II–11, Exhibit II–12.

[35] *Id.* at 14–17.

[36] *See* Volume II of the Petition at 15–17 and Exhibit II–21 and Exhibit II–22.

[37] *See* Second AD Supplement at Exhibit II–Supp—2–3; *see also* AD Initiation Checklist.

[38] *See* Petition Volume I at Exhibit I–9; *see also* General Issues Supplement at Exhibit I–Supp–1.

[39] *See* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities from China: Release of U.S. Customs and Border Protection Data;" dated March 26, 2019.

[40] *See* Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigation involving Non-Market Economy Countries (April 5, 2005), available at *http://enforcement.trade.gov/policy/bull05-1.pdf* (Policy Bulletin 05.1).

[41] Although in past investigations this deadline was 60 days, consistent with 19 CFR 351.301(a), which states that "the Secretary may request any person to submit factual information at any time during a proceeding," this deadline is now 30 days.

investigation. The Separate Rates and Combination Rates Bulletin states:

{w}hile continuing the practice of assigning separate rates only to exporters, all separate rates that the Department will now assign in its NME Investigation will be specific to those producers that supplied the exporter during the period of investigation. Note, however, that one rate is calculated for the exporter and all of the producers which supplied subject merchandise to it during the period of investigation. This practice applies both to mandatory respondents receiving an individually calculated separate rate as well as the pool of non-investigated firms receiving the weighted-average of the individually calculated rates. This practice is referred to as the application of ''combination rates'' because such rates apply to specific combinations of exporters and one or more producers. The cash-deposit rate assigned to an exporter will apply only to merchandise both exported by the firm in question *and* produced by a firm that supplied the exporter during the period of investigation.[42]

## Distribution of Copies of the Petition

In accordance with section 732(b)(3)(A) of the Act and 19 CFR 351.202(f), a copy of the public version of the Petition has been provided to the government of China via ACCESS. Because of the particularly large number of producers/exporters identified in the Petition, Commerce considers the service of the public version of the Petition to the foreign producers/exporters satisfied by delivery of the public version to the government of China, consistent with 19 CFR 351.203(c)(2).

## ITC Notification

We will notify the ITC of our initiation, as required by section 732(d) of the Act.

## Preliminary Determinations by the ITC

The ITC will preliminarily determine, within 45 days after the date on which the Petition was filed, whether there is a reasonable indication that imports of wooden cabinets and vanities from China are materially injuring or threatening material injury to a U.S. industry.[43] A negative ITC determination will result in the investigation being terminated.[44] Otherwise, this investigation will proceed according to statutory and regulatory time limits.

## Submission of Factual Information

Factual information is defined in 19 CFR 351.102(b)(21) as: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of

allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by Commerce; and (v) evidence other than factual information described in (i)–(iv). Any party, when submitting factual information, must specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted [45] and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct.[46] Time limits for the submission of factual information are addressed in 19 CFR 351.301, which provides specific time limits based on the type of factual information being submitted. Please review the regulations prior to submitting factual information in this investigation.

## Extensions of Time Limits

Parties may request an extension of time limits before the expiration of a time limit established under 19 CFR 351.301, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the expiration of the time limit established under 19 CFR 351.301. For submissions that are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. ET on the due date. Under certain circumstances, we may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, we will inform parties in a letter or memorandum of the deadline (including a specified time) by which extension requests must be filed to be considered timely. An extension request must be made in a separate, stand-alone submission; under limited circumstances we will grant untimely-filed requests for the extension of time limits. Parties should review *Extension of Time Limits; Final Rule,* 78 FR 57790 (September 20, 2013), available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm,* prior to submitting factual information in these investigations.

## Certification Requirements

Any party submitting factual information in an AD or CVD

proceeding must certify to the accuracy and completeness of that information.[47] Parties must use the certification formats provided in 19 CFR 351.303(g).[48] Commerce intends to reject factual submissions if the submitting party does not comply with the applicable certification requirements.

## Notification to Interested Parties

Interested parties must submit applications for disclosure under administrative protective order (APO) in accordance with 19 CFR 351.305. On January 22, 2008, Commerce published *Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures,* 73 FR 3634 (January 22, 2008). Parties wishing to participate in this investigation should ensure that they meet the requirements of these procedures (*e.g.,* the filing of letters of appearance as discussed in 19 CFR 351.103(d)).

This notice is issued and published pursuant to sections 732(c)(2) and 777(i) of the Act, and 19 CFR 351.203(c).

Dated: March 28, 2019.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix

**Scope of the Investigation**

The merchandise subject to this investigation consists of wooden cabinets and vanities that are for permanent installation (including floor mounted, wall mounted, ceiling hung or by attachment of plumbing), and wooden components thereof. Wooden cabinets and vanities and wooden components are made substantially of wood products, including solid wood and engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo. Wooden cabinets and vanities consist of a cabinet box (which typically includes a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves) and may or may not include a frame, door, drawers and/or shelves. Subject merchandise includes wooden cabinets and vanities with or without wood veneers, wood, paper or other overlays, or laminates, with or without non-wood components or trim such as metal, marble, glass, plastic, or other resins,

---

[42] *See* Policy Bulletin 05.1 at 6 (emphasis added).

[43] *See* section 733(a) of the Act.

[44] *Id.*

[45] *See* 19 CFR 351.301(b).

[46] *See* 19 CFR 351.301(b)(2).

[47] *See* section 782(b) of the Act.

[48] *See also Certification of Factual Information to Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*). Answers to frequently asked questions regarding the *Final Rule* are available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

Barcode:3813764-01 A-570-106 INV - Investigation -

whether or not surface finished or unfinished, and whether or not completed.

Wooden cabinets and vanities are covered by the investigation whether or not they are imported attached to, or in conjunction with, faucets, metal plumbing, sinks and/or sink bowls, or countertops. If wooden cabinets or vanities are imported attached to, or in conjunction with, such merchandise, only the wooden cabinet or vanity is covered by the scope.

Subject merchandise includes the following wooden component parts of cabinets and vanities: (1) Wooden cabinet and vanity frames (2) wooden cabinet and vanity boxes (which typically include a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves), (3) wooden cabinet or vanity doors, (4) wooden cabinet or vanity drawers and drawer components (which typically include sides, backs, bottoms, and faces), (5) back panels and end panels, (6) and desks, shelves, and tables that are attached to or incorporated in the subject merchandise.

Subject merchandise includes all unassembled, assembled and/or ''ready to assemble'' (RTA) wooden cabinets and vanities, also commonly known as ''flat packs,'' except to the extent such merchandise is already covered by the scope of antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR 513 (January 4, 2018). RTA wooden cabinets and vanities are defined as cabinets or vanities packaged so that at the time of importation they may include: (1) Wooden components required to assemble a cabinet or vanity (including drawer faces and doors); and (2) parts (*e.g.,* screws, washers, dowels, nails, handles, knobs, adhesive glues) required to assemble a cabinet or vanity. RTAs may enter the United States in one or in multiple packages.

Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following: trimming, cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope product.

Excluded from the scope of this investigation, if entered separate from a wooden cabinet or vanity are:

(1) Aftermarket accessory items which may be added to or installed into an interior of a cabinet and which are not considered a structural or core component of a wooden cabinet or vanity. Aftermarket accessory items may be made of wood, metal, plastic, composite material, or a combination thereof that can be inserted into a cabinet and which are utilized in the function of organization/accessibility on the interior of a cabinet; and include:

• Inserts or dividers which are placed into drawer boxes with the purpose of organizing or dividing the internal portion of the drawer into multiple areas for the purpose of containing smaller items such as cutlery, utensils, bathroom essentials, etc.

• Round or oblong inserts that rotate internally in a cabinet for the purpose of accessibility to foodstuffs, dishware, general supplies, etc.

(2) Solid wooden accessories including corbels and rosettes, which serve the primary purpose of decoration and personalization.

(3) Non-wooden cabinet hardware components including metal hinges, brackets, catches, locks, drawer slides, fasteners (nails, screws, tacks, staples), handles, and knobs.

Also excluded from the scope of this investigation are:

(1) All products covered by the scope of the antidumping duty order on *Wooden Bedroom Furniture from the People's Republic of China. See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture From the People's Republic of China,* 70 FR 329 (January 4, 2005).

(2) All products covered by the scope of the antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR 513 (January 4, 2018).

Imports of subject merchandise are classified under Harmonized Tariff Schedule of the United States (HTSUS) statistical numbers 9403.40.9060 and 9403.60.8081. The subject component parts of wooden cabinets and vanities may be entered into the United States under HTSUS statistical number 9403.90.7080. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.

[FR Doc. 2019–06388 Filed 4–1–19; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### RIN 0648–XG920

## North Pacific Fishery Management Council; Public Meeting

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice of public workshop.

**SUMMARY:** The North Pacific Fishery Management Council (Council) Salmon Bycatch Workshop will meet April 15, 2019 through April 16, 2019.

**DATES:** The meeting will be held on Monday, April 15, 2019, from 8:30 a.m. to 5 p.m. and Tuesday, April 16, 2019, from 8 a.m. to 12 p.m., Pacific Standard Time.

**ADDRESSES:** The meeting will be held in the Traynor Room, Building 4 at the Alaska Fisheries Science Center, 7600 Sand Point Way NE, Seattle, WA 98115.

*Council address:* North Pacific Fishery Management Council, 605 W 4th Ave., Suite 306, Anchorage, AK 99501–2252; telephone: (907) 271–2809.

**FOR FURTHER INFORMATION CONTACT:** Diana Stram, Council staff; telephone: (907) 271–2806.

**SUPPLEMENTARY INFORMATION:**

### Agenda

*Monday, April 15, 2019 to Tuesday, April 16, 2019*

The agenda will include a review and discussion of existing salmon bycatch genetics evaluations and discussion of and plan for proposed improvements to facilitate better use of information by stakeholders for bycatch avoidance. The Agenda is subject to change, and the latest version will be posted at *https://meetings.npfmc.org/Meeting/Details/603* prior to the meeting, along with meeting materials.

### Public Comment

Public comment letters will be accepted and should be submitted either electronically to *https://meetings.npfmc.org/Meeting/Details/603* or through the mail: North Pacific Fishery Management Council, 605 W 4th Ave., Suite 306, Anchorage, AK 99501–2252. In-person oral public testimony will be accepted at the discretion of the chair.

### Special Accommodations

These meetings are physically accessible to people with disabilities. Requests for sign language interpretation or other auxiliary aids should be directed to Shannon Gleason at (907) 271–2809 at least 7 working days prior to the meeting date.

Dated: March 27, 2019.

**Rey Israel Marquez,**

*Acting Deputy Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*

[FR Doc. 2019–06315 Filed 4–1–19; 8:45 am]

**BILLING CODE 3510–22–P**

| | | |
|---|---|---|
| Meisen's Letter Meisen's Letter Regarding Rebuttal Comments on Product Characteristics (April 25, 2019) | P.R. 507 | APPX001006-APPX001025 |

**HUSCH BLACKWELL**

Jeffrey S. Neeley
Partner

Husch Blackwell LLP
750 17th St. N.W., Suite 900
Washington, DC  20006
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

April 25, 2019

Case Nos. A-570-106
Total Pages:20
Investigation
E&C: Office VIII

**<u>PUBLIC DOCUMENT</u>**

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

     **Re:**    **Wooden Cabinets and Vanities from the People's Republic of China:**
                **Rebuttal Comments on Product Characteristics**

Dear Secretary Ross:

     On behalf of Dalian Meisen Woodworking Co., Ltd., we hereby submit rebuttal

comments on the product characteristics in response to the comments filed by the American

Kitchen Cabinet Alliance ("Petitioner") on April 15, 2019.   As discussed below, there are a

number of problems with the product characteristics suggested by Petitioner, including the

inclusion of products specifically excluded from the scope of the investigation, vague and

APPX001006

unworkable terminology, irrational and unworkable groupings of wood types, and the

burdensome collection of additional data based on other criteria for no discernible reason.

## I.     Legal Standards

In identifying similar merchandise Commerce uses a model-match methodology based on

a hierarchy of product characteristics that are commercially significant to the merchandise at

issue. *See Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1329 (Ct. Int'l Trade

2015) *citing JTEKT Corp. v. United States,* 33 CIT 1797, 1805, 675 F.Supp.2d 1206, 1218

(2009) ("*JTEKT I* "); *Fagersta Stainless AB v. United States,* 32 CIT 889, 893, 577 F.Supp.2d

1270, 1276 (2008).  The selection of appropriate matching criteria to define identical

merchandise under section 771(16)(A) of the Act is based on "meaningful" characteristics.

Commerce does not attempt to account for every conceivable characteristic when selecting

matching criteria but prioritizes the most meaningful characteristics. The criteria selection

process allows Commerce to draw reasonable distinctions between products for matching

purposes, without attempting to account for every possible difference inherent in the

merchandise.  In this process, the Department matches products as "identical," consistent with

section 771(16)(A) of the Act, even though they may contain minor physical differences.  See e.g

*Notice of Final Determination of Sales at Less Than Fair Value: Steel Wire Rod from Canada*,

63 Fed. Reg. 9182, 9197 (February 24, 1998) and Issues and Decision Memorandum for the

Final Results of the Antidumping Duty Administrative Review: Certain Circular Welded Non-

Alloy Steel Pipe from Mexico; 2015-2016, dated May 17, 2018 at page 5. Thus, as a range of

products may be considered "identical" within the meaning of the statute"); *Final Determination*

*of Sales at Less Than Fair Value; Gray Portland Cement and Clinker From Mexico*, 55 Fed.

Reg. 29244 (July 18, 1990) (the Department determined that products within same ASTM

standard would be deemed "identical in physical characteristics to the merchandise sold in [the home market]").

## II.  Stage of Completeness

Rather than categorizing products with specificity, Petitioner has chosen to make its first criterion the vague and unworkable "stage of completeness" test.  This is a subjective test that, to the best of our knowledge, is found nowhere in industry usage.   Its purported purpose to is segregate component parts from "finished or near-finished cabinets and vanities," whatever that may mean, which remains undefined.  We suggest that the Department remove all references to those vague terms and simply list specific types of products to be reported, such as cabinets or doors or drawer boxes.

It also is imperative that the Department not include in the list of products in its product characteristics those products which, when sold alone, are outside the scope of the investigation. The initiation of these investigations, published on April 2, 2019, in the <u>Federal Register</u> excludes certain items, including: "Solid wooden accessories including corbels and rosettes, which serve the primary purpose of decoration and personalization."   As a result, items such as crown moldings and toe kicks, which are listed as reportable by Petitioner, have been expressly excluded from this investigation and should not be required to be reported.

## III.  Primary Face Material Type

The reporting of the type of wood used as the face material is plainly an important characteristic, and thus must be reported precisely.  Petitioners' suggestion  to report a  vague grouping of products is not tenable as it will  allow for manipulation and distortion of surrogate values.

3

Barcode:3825164-01 A-570-106 INV - Investigation  -

Petitioner proposes that the Department collect data under "Field 3.3 Face Type" based on broad groupings of wood species, including softwood, tropical hardwood, common grade hardwood, mid-grade hardwood, and premium grade hardwood, rather than collecting data based on the individual species themselves.  This proposal is contrary to the way the Department has collected data on wood species in previous proceedings involving wood products and would result in a less accurate margin calculation than if the Department followed its prior practice.

In both *Multilayered Wood Flooring* and *Wooden Bedroom Furniture*, the Department collected data based on individual wood species rather than broad categories of species.  *See* Exhibit 1.  This methodology makes the most sense and is the most accurate for model matching purposes as oak will be compared to oak, rather than comparing broad categories that include various wood species, most of which would not even included in the product being sold to the United States.  As can be seen by comparing the surrogate value data collected in the most recently conducted  *Multilayered Wood Flooring* administrative review, Petitioner's proposal would likely result in various distortions.  *See* Exhibit 2.   In that review, so called "common grade" woods had very different average unit values, as did so-called "mid-grade" woods and some mid-grade woods had the same "average unit value" as some premium grade woods.

Furthermore, Petitioner has offered no justification for its grouping of the various hardwood species into the three categories it proposes.   For example, Petitioner has offered no industry standards suggesting that cherry and walnut should be grouped together as premium grade, while oak and maple should be grouped together as mid-grade.   Nor has Petitioner explained how respondents are to report wood species that are not specifically listed under any of the proposed categories.  The broad groupings which result in multiple types of wood species

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 4/25/19 11:00 AM, Submission Status: Approved

being required to be reported together, effectively creates a commingled reporting hierarchy which would result in an "apples-to-oranges" comparison.

### IV.   Fields Not Constituting Part of the CONNUM

Petitioner also asks that the respondents report five other criteria as part of their submissions.  These characteristics will not form part of the CONNUM and it is not clear what the purpose is for collecting the data.  What is clear is that the collection of the data would be extremely burdensome to companies, in a case which is already extremely complex due to its scope.  In addition, much of the information is plainly duplicative of information already being collected.  Petitioners propose that respondents report product volume in Field 3.2, but then ask for product width, height and depth in Field Numbers 3.9 through 3.11, duplicating the same factors also being taken into account.   No justification is provided for adding in reporting on hardware and soft close hinges if the information is not going to be used for calculations.  In short, the respondents should not be burdened with reporting on any of these criteria.

Please contact us if you have any questions regarding this submission, or require any additional information.

Respectfully submitted,

HUSCH BLACKWELL LLP


Jeffrey S. Neeley
Nithya Nagarajan
Stephen W. Brophy

5

APPX001010

Barcode:3821508-01 A-570-106 INV - Investigation -

# HUSCH BLACKWELL

Jeffrey S. Neeley
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

## REPRESENTATIVE CERTIFICATION

I, **Jeffrey S. Neeley,** with **Husch Blackwell LLP,** counsel to **Dalian Meisen Woodworking Co., Ltd.,** certify that I have read the attached submission of **Wooden Cabinets and Vanities from the People's Republic of China: Rebuttal Comments on Product Characteristics, due on April 25, 2019,** pursuant to the **Antidumping Duty Investigation on Wooden Cabinets and Vanities from the People's Republic of China (A-570-106).** In my capacity as a counsel, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to  the U.S. Department of Commerce and that I will retain the original for a five-year period  commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature:_____

Date:_____4/25/19_____

APPX001011

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 4/25/19 11:00 AM, Submission Status: Approved

## COMPANY CERTIFICATION

I, **Zheng Meiying, the President,** currently employed by **Dalian Meisen Woodworking Co., Ltd.,** certify that I prepared or otherwise supervised the preparation of the attached submission of **Wooden Cabinets and Vanities from the People's Republic of China: Rebuttal Comments on Product Characteristics, due on April 25, 2019**, pursuant to the **Antidumping Duty Investigation of Wooden Cabinets and Vanities from the People's Republic of China (A-570-106)**. I certify that the public information and any business proprietary information of **Dalian Meisen Woodworking Co., Ltd.** contained in the submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C.1001) imposes criminal sanction on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.


Signature: _MEI PING ZHENG_

Date: _____ April 25, 2019 _____

Barcode:3825164-01 A-570-106 INV - Investigation   -

## PUBLIC SERVICE LIST

**Wooden Cabinets and Vanities from the People's Republic of China
Case No. A-570-106
Investigation**

I, Jeffrey S. Neeley, hereby certify that a copy of the foregoing submission was served in accordance with the Public Service List, published by the U.S. Department of Commerce on April 17, 2019. Service was made on the following parties on April 25, 2019 via electronic mail.

Timothy C. Brightbill, Esq.
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

Bruce M. Mitchell, Esq.
Grunfeld Desiderio Lebowitz Silverman
Klestadt, LLP
1201 New York Avenue NW, STE 650
Washington DC 20005

Matthew R. Nicely, Esq.
Hughes Hubbard & Reed LLP
1775 I Street, NW
Suite 600
Washington, DC 20006-2401

Gregory S. Menegaz, Esq.
deKieffer & Horgan
1090 Vermont Avenue, NW Suite 410
Washington, DC 20005

Kristin H. Mowry, Esq.
Mowry & Grimson PLLC
5335 Wisconsin Avenue, NW Suite 810
Washington, DC 20015

Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW Suite 300
Washington, DC 20036

Jiaxi Jiang
Jurisino Law Group
Global Finance & News Center, 2nd Floor,
Tower B, 1A Xuanwumenwai Avenue,
Xicheng District, Beijing
100052, China

Jaehong David Park, Esq.
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001

Matthew T. McGrath, Esq.
Barnes Richardson & Colburn
1200 New Hampshire Ave., NW Suite 725-B
Washington, DC 20036

Kristen Smith, Esq.
Sandler, Travis & Rosenberg, P.A.
1300 Pennsylvania Avenue, NW Suite 400
Washington, DC 20004-3002

Mark Ludwikowski, Esq.
Clark Hill PLC
1001 Pennsylvania Ave., NW
Suite 1300 South
Washington, DC 20004

Adams Lee, Esq.
Harris Bricken McVay Sliwoski, LLP
600 Stewart Street, Suite 1200
Seattle, WA 98101

Peggy A. Clarke, Esq.
Law Offices of Peggy A. Clarke
1325 G Street, NW Suite 500
Washington, DC 20005

Gregory Ewing
CKR Law LLP
700 12th Street NW Suite 700
Washington, DC 20005

George Tuttle
Law Offices of George R. Tuttle
1100 larkspur Landing Circle Suite 385
Larkspur, CA 94939

Husch Blackwell LLP

Chunlian Yang, Esq.
Alston & Bird, LLP
950 F Street, NW
Washington, DC 20004-1404

Robert George Gosselink, Esq.
Trade Pacific PLLC
660 Pennsylvania Avenue, SE Suite 401
Washington, DC 20002

Matthew J. McConkey, Esq.
Mayer Brown, LLP
1999 K Street, NW
Washington, DC 20006-1101

Rosa S. Jeong, Esq.
Greenberg Traurig, LLP
2101 L Street NW
Suite 1000
Washington DC 20037

Richard F. O'Neill
Neville Peterson LLP
500 Yale Ave. N., Suite 221
Seattle, WA 98109

Hui Han
Beijing Chang An Law Firm
F9/10, Zhongjian Building, No. 18
Xibahe Dongli, Chaoyang District,
Beijing, China


       /s/Jeffrey S. Neeley
         Jeffrey S. Neeley

Husch Blackwell LLP

# EXHIBIT 1

C-8

"04"… Height $\geq$ 36 inches to < 42 inches
"05"… Height $\geq$ 42 inches to < 48 inches
"06"… Height $\geq$ 48 inches to < 54 inches
"07"… Height $\geq$ 54 inches to < 60 inches
"08"… Height $\geq$ 60 inches to < 66 inches
"09"… Height $\geq$ 66 inches to < 72 inches
"10"… Height $\geq$ 72 inches to < 78 inches
"11"… Height $\geq$ 78

**FIELD NUMBER 3.7:**      **Primary Construction Material (by volume)**

FIELD NAME:       PMATU

DESCRIPTION:      "A"…  Solid wood (no veneer)
"B"…  Solid wood with wood veneer
"C"…  Fiberboard
"D"…  Particle board
"E"…  Plywood
"F-n"  Other (specify)

**FIELD NUMBER 3.8:**      **Type of Primary Exposed Surface[20] Solid Wood**

FIELD NAME:       PSURSOLU

DESCRIPTION:      "00"…Not applicable (*i.e.*, no exposed surface solid wood)
"01"…Alder (*Alnus*)
"02"…Ash, Black (*Fraxinus nigra*)
"03"…Ash, White (*Fraxinus quadrangulata, F. pennsylvanica, F. Americana*)
"04"…Beech (*Fagus*)
"05"…Birch (*Betula*)
"06"…Box Elder (*Acer negundo*)
"07"…Cherry (*Prunus*)
"08"…Cypress (*Taxodium*)
"09"…Elm, Rock (*Ulmus crassifolia, U. thomasii, U. serotina, U. alata*)
"10"…Elm, Soft (*Ulmus americana, U. rubra*)
"11"…Gum (*Liquidambar*)
"12"…Hickory (*Carya*)

---

[20] "Exposed surfaces" means those parts and surfaces exposed to view when furniture is placed in the generally accepted position for use. Included in this definition are visible interior backs of such items of furniture as open bookcases, hutches, etc. Additionally, report the type of wood for both Field 3.8 solid wood and Field 3.9 wood veneer, printed or paper laminates if the exposed surface of the piece includes both characteristics.

Filed By: Patrick Oconnor, Filed Date: 6/20/18 4:49 PM, Submission Status: Approved

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 4/25/19 11:00 AM, Submission Status: Approved

C-9

"13"…Larch (*Larix*)
"14"…Mahogany (*Swietenia*)
"15"…Mahogany, African (*Khaya*)
"16"…Maple, Hard (*Acer nigrum, A. saccharum*)
"17"…Maple, Soft (*Acer rubrum, A. saccharinum*)
"18"…Meranti (*Shorea*)
"19"…Oak, Red (*Quercus velutina, Q. marilandica, Q. kelloggi, Q. falcata var. pagodaefolia, Q. laurifolia, Q. ellipsoidalis, Q. rubra, Q. nuttallii, Q. palustris, Q. coccinea, Q. shumardii, Q. falcata, Q. laevis, Q. phellos*)
"20"…Oak, White (*Quercus arizonica, Q. douglasii, Q. macrocarpa, Q. lobata, Q. prinus,Q. muehlenbergii, Q. emoryi, Q. gambelii, Q. oblongifolia, Q. virginiana, Q. garryana, Q. lyrata, Q. stellata, Q. michauxii, Q. bicolor, Q. alba*)
"21"…Okoume (*Aucoumea*)
"22"…Pecan (*Carya*)
"23"…Pine, Eastern White (*Pinus strobus*)
"24"…Pine, Lodgepole (*Pinus contorta*)
"25"…Pine, Ponderosa (*Pinus ponderosa*)
"26"…Pine, Other (*Pinus muricata, P. coulteri, P. sabibiana, P. attenuata, P. monticola, P. banksiana, P. jeffreyi, P. flexillis, P. palustris, P. elliottii, P. resinosa, P. rigida, P. echinata, P. radiata, P. lambertiana, P. albicaulis, P. taeda, P. elliottii, P. serotina, P. clausa, P. glabra, P. virginiana*)
"27"…Poplar (*Liriodendron*)
"28"…Rosewood (*Delbergia*)
"29"…Rubberwood (*Hevea*)
"30"… Sapele (*Entandrophrangma*)
"31"…Teak (*Tectona*)
"32"…Walnut (*Juglans*)
"33-n"…Other (Specify commercial name and scientific name)[21]

**FIELD NUMBER 3.9:**    **Type Of Primary Exposed Surface[22] Wood Veneer, Printed or Paper Laminates[23]**

---

[21] If the commercial name and scientific name for a particular wood is not included in the above list then specify commercial name and scientific name.

[22] "Exposed surfaces" means those parts and surfaces exposed to view when furniture is placed in the generally accepted position for use. Included in this definition are visible interior backs of such items of furniture as open bookcases, hutches, etc. Additionally, report the type of wood for both Field 3.8 solid wood and Field 3.9 wood veneer, printed or paper laminates if the exposed surface of the piece includes both characteristics.

[23] If the primary exposed surface is a printed or paper laminate only report "33." do not report the type of wood the printed or paper laminate simulates.

FIELD NAME:          PSURVENU

DESCRIPTION:          "00"…Not applicable (*i.e.*, no wood veneer, printed or paper
laminates)
"01"…Alder (*Alnus*)
"02"…Ash, Black (*Fraxinus nigra*)
"03"…Ash, White (*Fraxinus quadrangulata, F. pennsylvanica, F.
Americana*)
"04"…Beech (*Fagus*)
"05"…Birch (*Betula*)
"06"…Box Elder (*Acer negundo*)
"07"…Cherry (*Prunus*)
"08"…Cypress (*Taxodium*)
"09"…Elm, Rock (*Ulmus crassifolia, U. thomasii, U. serotina, U.
alata*)
"10"…Elm, Soft (*Ulmus americana, U. rubra*)
"11"…Gum (*Liquidambar*)
"12"…Hickory (*Carya*)
"13"…Larch (*Larix*)
"14"…Mahogany (*Swietenia*)
"15"…Mahogany, African (*Khaya*)
"16"…Maple, Hard (*Acer nigrum, A. saccharum*)
"17"…Maple, Soft (*Acer rubrum, A. saccharinum*)
"18"…Meranti (*Shorea*)
"19"…Oak, Red (*Quercus velutina, Q. marilandica, Q. kelloggi,
Q. falcata var. pagodaefolia, Q. laurifolia, Q. ellipsoidalis,
Q. rubra, Q. nuttallii, Q. palustris, Q. coccinea, Q.
shumardii, Q. falcata, Q. laevis, Q. phellos*)
"20"…Oak, White (*Quercus arizonica, Q. douglasii, Q.
macrocarpa, Q. lobata, Q. prinus, Q. muehlenbergii, Q.
emoryi, Q. gambelii, Q. oblongifolia, Q. virginiana, Q.
garryana, Q. lyrata, Q. stellata, Q. michauxii, Q. bicolor,
Q. alba*)
"21"…Okoume (*Aucoumea*)
"22"…Pecan (*Carya*)
"23"…Pine, Eastern White (*Pinus strobus*)
"24"…Pine, Lodgepole (*Pinus contorta*)
"25"…Pine, Ponderosa (*Pinus ponderosa*)
"26"…Pine, Other (*Pinus muricata, P. coulteri, P. sabibiana, P.
attenuata, P. monticola, P. banksiana, P. jeffreyi, P.
flexillis, P. palustris, P. elliottii, P. resinosa, P. rigida, P.
echinata, P. radiata, P. lambertiana, P. albicaulis, P.*

C-11

*taeda, P. elliottii, P. serotina, P. clausa, P. glabra, P. virginiana*)
"27"...Poplar (*Liriodendron*)
"28"...Rosewood (*Delbergia*)
"29"...Rubberwood (*Hevea*)
"30"...Sapele (*Entandrophrangma*)
"31"...Teak (*Tectona*)
"32"...Walnut (*Juglans*)
"33"...Printed or paper laminate
"34-n" Other (Specify commercial name and scientific name)[24]

| Fields 4 and 5 |
|---|
| Report the information requested concerning the sale type and customer for the merchandise. |

**FIELD NUMBER 4.0:**      **Sale Type**

    FIELD NAME:        SALEU

    DESCRIPTION:      Identify the sale as either "EP" (export price) or "CEP" (constructed export price).

**FIELD NUMBER 5.0:**      **Customer Code**

    FIELD NAME:        CUSCODU

    DESCRIPTION:      Report the name of the customer or the internal accounting code designating the customer.

    NARRATIVE:        Provide a list of customer names and codes as an attachment to your narrative response.

| Fields 6 through 12 |
|---|
| Report the information requested concerning the terms of delivery and payment and the dates of the specified events of each sale.  Please be sure to report dates in the specified eight-digit format.  The Glossary of Terms at Appendix I describes the Department's criteria for determining the date of sale.  The criteria used by the Department to determine the date of sale may be different from the criteria you use in your accounting system; please contact the official in charge if, after reviewing the Department's criteria, you are uncertain when a sale has occurred. |

---

[24] If the commercial name and scientific name for a particular wood is not included in the above list then specify the commercial name and scientific name.

Filed By: Patrick Oconnor, Filed Date: 6/20/18 4:49 PM, Submission Status: Approved
Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 4/25/19 11:00 AM, Submission Status: Approved

Barcode:3825164-01 A-570-106 INV - Investigation    -

Barcode:3720316-01 A-570-970 REV - Admin Review 12/1/16 - 11/30/17

C-5

**FIELD NUMBER 1.0:**         **Complete Product Code**

    FIELD NAME:         PRODCODU

    DESCRIPTION:      Report the commercial product code assigned by your company in the normal course of business to the specific product sold in the United States.  If the product sold is further manufactured in the United States, report the product code of the product sold, not the product imported.

    NARRATIVE:       The product code should be described in response to question 6b in section A of this questionnaire.

**FIELD NUMBER 2.0:**         **Matching Control Number**

    FIELD NAME:         CONNUMU

    DESCRIPTION:      Assign a control number to each unique product reported in the section C sales data file.  Identical products should be assigned the same control number in each record in every file in which the product is referenced.  Each unique combination of product characteristics based only on fields 3.1 - 3.n should be assigned a unique control number.

                  If the product sold is further manufactured in the United States, report the control number of the product imported, not the product sold.

    NARRATIVE:       List all CONNUMS, and indicate to which products they have been assigned.  Include CONNUMs for all products described in Appendix III of the questionnaire, regardless of market destination

**FIELD NUMBER 3.1:**         **Face (Veneer) Species**

    FIELD NAME:         VENEERSP

    DESCRIPTION:      Indicate the type of wood used in the face (or veneer) layer of the final product.

        "00"…Not applicable
        "01"…Alder (*Alnus*)
        "02"…Ash, Black (*Fraxinus nigra*)
        "03"…Ash, White (*Fraxinus quadrangulata, F. pennsylvanica, F. Americana*)
        "04"…Beech (*Fagus*)

C-6

"05"…Birch (*Betula*)
"06"…Box Elder (*Acer negundo*)
"07"…Cherry (*Prunus*)
"08"…Cypress (*Taxodium*)
"09"…Elm, Rock (*Ulmus crassifolia, U. thomasii, U. serotina, U. alata*)
"10"…Elm, Soft (*Ulmus americana, U. rubra*)
"11"…Gum (*Liquidambar*)
"12"…Hickory (*Carya*)
"13"…Larch (*Larix*)
"14"…Mahogany (*Swietenia*)
"15"…Mahogany, African (*Khaya*)
"16"…Maple, Hard (*Acer nigrum, A. saccharum*)
"17"…Maple, Soft (*Acer rubrum, A. saccharinum*)
"18"…Meranti (*Shorea*)
"19"…Oak, Red (*Quercus veluntia, Q. marilandica, Q. kelloggi, Q. falcate var. pagodaefolia, Q. laurifolia, Q. ellipsoidalis, Q. rubra, Q. nuttallii, Q. palustris, Q. coccinea, Q. shumardii, Q. falcate, Q. laevis, Q. phellos*)
"20"…Oak, White (*Quercus arizonica, Q. douglasii, Q. macrocarpa, Q. lobata, Q. prinus, Q. muehlenbergii, Q. emoryi, Q. gambelii, Q. oblongifolia, Q. virginiana, Q. garryana, Q. lyrata, Q. stellata, Q. michauxii, Q. bicolor, Q. alba*)
"21"…Okoume (*Aucoumea*)
"22"…Pecan (*Carya*)
"23"…Pine, Eastern White (*Pinus strobes*)
"24"…Pine, Lodgepole (*Pinus contorta*)
"25"…Pine, Ponderosa (*Pinus ponderosa*)
"26"…Pine, Other (*Pinus muricata, P. coulteri, P. sabibiana, P. attenuate, P. monticola, P. banksiana, P. jeffreyi, P. flexillis, P. palustris, P. elliottii, P. resinosa, P. rigida, P. echinata, P. radiate, P. lambertiana, P. albicaulis, P. taeda, P. elliottii, P. serotina, P. clausa, P. glabra, P. virginiana*)
"27"…Poplar (*Liriodendron*)
"28"…Rosewood (*Delbergia*)
"29"…Rubberwood (*Hevea*)
"30"…Sapele (*Entandrophrangma*)
"31"…Teak (*Tectona*)
"32"…Walnut (*Juglans*)
"33-n"…Other (Specific commercial name and scientific name)

**FIELD NUMBER 3.2:**     **Face (Veneer) Thickness**

FIELD NAME:     VENEERTH

DESCRIPTION:     Indicate the thickness of the face (or veneer) layer of the product.

# EXHIBIT 2

Multilayered Wood Flooring from China - A-570-970
2016-2017 Administrative Review

Surrogate Values from Romania

| FOP Name | FOP Variable | HTS Number | Source | Classification of Product as Reported in the Source | Time Period | Per-Unit Price | Currency | Unit of Measure (in which downloaded) | Conversion Factor | Per-Unit Price | Currency | Unit of Measure (On Database) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIRECT MATERIAL** | | | | | | | | | | | | |
| Acacia log | ACACIA_SV | 44039995 | GTA | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other | 12/2016 - 11/2017 | 142.99 | EUR | M3 | 1 | 142.99 | EUR | M3 |
| Birch log | BIRCH_SV | 44039959 | GTA | Birch, In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Sawlogs; Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote: Other | 12/2016 - 11/2017 | 37.76 | EUR | M3 | 1 | 37.76 | EUR | M3 |
| Chinese maple log | CNMAP_SV | 44039995 | GTA | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other | 12/2016 - 11/2017 | 142.99 | EUR | M3 | 1 | 142.99 | EUR | M3 |
| European oak log | EUROAK_SV | 44039110 | GTA | Sawlogs Of Oak 'Quercus Spp.', Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared | 12/2016 - 11/2017 | 677.62 | EUR | M3 | 1 | 677.62 | EUR | M3 |
| Hard maple log | HARDMAP_SV | 44039995 | GTA | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other | 12/2016 - 11/2017 | 142.99 | EUR | M3 | 1 | 142.99 | EUR | M3 |
| Hickory log | HICKY_SV | 44039995 | GTA | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other | 12/2016 - 11/2017 | 142.99 | EUR | M3 | 1 | 142.99 | EUR | M3 |
| Jatoba lumber | JATOBA_SV | 44039995 | GTA | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other | 12/2016 - 11/2017 | 142.99 | EUR | M3 | 1 | 142.99 | EUR | M3 |
| Red oak log | REDOAK_SV | 44039110 | GTA | Sawlogs Of Oak 'Quercus Spp.', Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared | 12/2016 - 11/2017 | 677.62 | EUR | M3 | 1 | 677.62 | EUR | M3 |
| Tigerwood lumber | TIGWOD_SV | 44079998 | GTA | Wood, Sawn Or Chipped Lengthwise, Sliced Or Peeled, Of A Thickness Of > 6 Mm (Excl. Planed, Sanded Or End-Jointed, And Tropical Wood, Coniferous Wood, Oak 'Quercus Spp.', Beech 'Fagus Spp.', Maple 'Acer Spp.', Cherry 'Prunus Spp.', Ash 'Fraxinus Spp. | 12/2016 - 11/2017 | 698.40 | EUR | M3 | 1 | 698.40 | EUR | M3 |
| Walnut log | WLNT_SV | 44039995 | GTA | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote | 12/2016 - 11/2017 | 142.99 | EUR | M3 | 1 | 142.99 | EUR | M3 |
| Cotton wood log | COTWOD_SV | 44039995 | GTA | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote | 12/2016 - 11/2017 | 142.99 | EUR | M3 | 1 | 142.99 | EUR | M3 |
| HDF | HDF_SV | 44111310 | GTA | Medium Density Fibreboard 'Mdf' Of Wood, Of A Thickness > 5Mm But <= 9Mm, Not Mechanically Worked Or Surface-Covered | 12/2016 - 11/2017 | 253.22 | EUR | M3 | 1 | 253.22 | EUR | M3 |
| MDF | MDF_SV | 44111310 | GTA | Medium Density Fibreboard 'Mdf' Of Wood, Of A Thickness > 5Mm But <= 9Mm, Not Mechanically Worked Or Surface-Covered | 12/2016 - 11/2017 | 253.22 | EUR | M3 | 1 | 253.22 | EUR | M3 |
| Plywood | PLYWOOD_SV | 441232 | GTA | Plywood Consisting Solely Of Sheets Of Wood (Exc Bamboo), Each Ply Not Exceeding 6 Mm In Thickness, Nonconiferous, Nesoi | 12/2016 - 11/2017 | 413.69 | EUR | M3 | 1 | 413.69 | EUR | M3 |
| Fixing glue (Polyester adhesive) | FXGLUE_SV | 35069100 | GTA | Adhesives Based On Polymers Of Heading 3901 To 3913 Or On Rubber (Excl. Products Suitable For Use As Glues Or Adhesives Put Up For Retail Sale As Glues Or Adhesives, With A Net Weight Of <= 1 Kg) | 12/2016 - 11/2017 | 2,446.10 | EUR | MT | 0.001 | 2.45 | EUR | KG |
| UV paint | UVPNT_SV | 32082090 | GTA | Paints And Varnishes, Incl. Enamels And Lacquers, Based On Acrylic Or Vinyl Polymers, Dispersed Or Dissolved In A Non-Aqueous Medium | 12/2016 - 11/2017 | 5,128.78 | EUR | MT | 0.001 | 5.13 | EUR | KG |
| Overlaying glue | GLUE_SV | 35069100 | GTA | Adhesives Based On Polymers Of Heading 3901 To 3913 Or On Rubber (Excl. Products Suitable For Use As Glues Or Adhesives Put Up For Retail Sale As Glues Or Adhesives, With A Net Weight Of <= 1 Kg) | 12/2016 - 11/2017 | 2,446.10 | EUR | MT | 0.001 | 2.45 | EUR | KG |
| Wax | WAX_SV | 27122090 | GTA | Paraffin Wax Containing < 0.75% By Weight Of Oil (Excl. Synthetic Paraffin Wax Of A Molecular Weight Of >= 460 But <= 1,560) | 12/2016 - 11/2017 | 1,134.68 | EUR | MT | 0.001 | 1.13 | EUR | KG |
| Flour | FLOUR_SV | 11010015 | GTA | Flour Of Common Wheat And Spelt | 12/2016 - 11/2017 | 244.59 | EUR | MT | 0.001 | 0.24 | EUR | KG |
| Paint | PAINT_SV | 32082090 | GTA | Paints And Varnishes, Incl. Enamels And Lacquers, Based On Acrylic Or Vinyl Polymers, Dispersed Or Dissolved In A Non-Aqueous Medium | 12/2016 - 11/2017 | 5,128.78 | EUR | MT | 0.001 | 5.13 | EUR | KG |
| Pigment | PGMET_SV | 32041700 | GTA | Synthetic Organic Pigments; Preparations Based On Synthetic Organic Pigments Of A Kind Used To Dye Fabrics Or Produce Colorant Preparations (Excl. Preparations Of Heading 3207, 3208, 3209, 3210, 3213 And 3215) | 12/2016 - 11/2017 | 4,567.70 | EUR | MT | 0.001 | 4.57 | EUR | KG |

Barcode:3825164-01 A-570-106 INV - Investigation  -

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sand paper | SANDPA_SV | 68052000 | GTA | Natural Or Artificial Abrasive Powder Or Grain, On A Base Of Paper Or Paperboard Only, Whether Or Not Cut To Shape, Sewn Or Otherwise Made Up | 12/2016 - 11/2017 | 9,531.75 | EUR | MT | 0.001 | 9.53 | EUR | KG |
| Water paint | WTRPNT_SV | 32091000 | GTA | Paints And Varnishes, Incl. Enamels And Lacquers, Based On Acrylic Or Vinyl Polymers, Dispersed Or Dissolved In An Aqueous Medium | 12/2016 - 11/2017 | 1,299.87 | EUR | MT | 0.001 | 1.30 | EUR | KG |

| PACKING | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tape | TAPE_SV | 39201025 | GTA | Plates, sheets, film, foil and strip, of non-cellular polyethylene, printed, not reinforced, laminated, supported or similarly combined with other materials: Of polymers of ethylene: Other | 12/2016 - 11/2017 | 2,281.41 | EUR | MT | 0.001 | 2.28 | EUR | KG |
| Hot Shrink film | HSFILM_SV | 39202029 | GTA | Plates, Film, Foil And Strip, Of Non-Cellular Polymers Of Propylene, Not Reinforced, Laminated, Supported Or Similarly Combined With Other Materials, Not Further Worked Or Only Surface-Worked And Not Cut To Shapes Other Than Rectangular | 12/2016 - 11/2017 | 3,090.29 | EUR | MT | 0.001 | 3.09 | EUR | KG |
| Paper | PAPER_SV | 480269 | GTA | Uncoated Paper And Paperboard, Of A Kind Used For Writing, Printing Or Other Graphic Purposes, And Non-Perforated Punchcards And Punch-Tape Paper, In Square Or Rectangular Sheets, of any size, other than paper of heading 4801 or 4803; handmade paper and paperboard: other | 12/2016 - 11/2017 | 1,299.56 | EUR | MT | 0.001 | 1.30 | EUR | KG |
| Foam sheet | FMSHET_SV | 39211900 | GTA | Plates, Sheets, Film, Foil And Strip, Of Cellular Plastic, Unworked Or Merely Surface-Worked Or Merely Cut Into Squares Or Rectangles (Excl.Those Of Polymers Of Styrene, Vinyl Chloride, Polyurethanes And Regenerated Cellulose, Self-Adhesive Products, | 12/2016 - 11/2017 | 2,650.65 | EUR | MT | 0.001 | 2.65 | EUR | KG |
| Cardboard corner | CORNER_SV | 48237090 | GTA | Moulded Or Pressed Articles Of Paper Pulp, N.E.S. | 12/2016 - 11/2017 | 1,280.80 | EUR | MT | 0.001 | 1.28 | EUR | KG |
| Carton | CARTON_SV | 48191000 | GTA | Cartons, Boxes And Cases, Of Corrugated Paper Or Paperboard | 12/2016 - 11/2017 | 1,407.34 | EUR | MT | 0.001 | 1.41 | EUR | KG |
| Plywood-pallet | PLWDPLT_SV | 441232 | GTA | Plywood Consisting Solely Of Sheets Of Wood (Exc Bamboo), Each Ply Not Exceeding 6 Mm In Thickness, Nonconiferous, Nesoi | 12/2016 - 11/2017 | 413.69 | EUR | M3 | 1 | 413.69 | EUR | M3 |
| Film | FILM_SV | 39201025 | GTA | Plates, sheets, film, foil and strip, of non-cellular polyethylene, printed, not reinforced, laminated, supported or similarly combined with other materials: Of polymers of ethylene: Other | 12/2016 - 11/2017 | 2,281.41 | EUR | MT | 0.001 | 2.28 | EUR | KG |
| Plastic strip | PLSTRP_SV | 39239000 | GTA | Articles For The Conveyance Or Packaging Of Goods, Of Plastics (Excl. Boxes, Cases, Crates And Similar Articles; Sacks And Bags, Incl. Cones; Carboys, Bottles, Flasks And Similar Articles; Spools, Spindles, Bobbins And Similar Supports; Stoppers, Lid | 12/2016 - 11/2017 | 2,644.60 | EUR | MT | 0.001 | 2.64 | EUR | KG |
| Buckle | BUKL_SV | 73269098 | GTA | Articles Of Iron Or Steel, N.E.S. | 12/2016 - 11/2017 | 4,220.95 | EUR | MT | 0.001 | 4.22 | EUR | KG |
| Wooden-pallet | WDPLT_SV | 44152020 | GTA | Pallets And Pallet Collars, Of Wood | 12/2016 - 11/2017 | 326.02 | EUR | MT | 0.001 | 0.33 | EUR | KG |

| BY-PRODUCT | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Wood scraps | WDSCP_SV | 44012200 | GTA | Wood In Chips Or Particles (Excl. Those Of A Kind Used Principally For Dying Or Tanning Purposes, And Coniferous Wood) | 12/2016 - 11/2017 | 63.08 | EUR | MT | 1 | 63.08 | EUR | MT |

| LABOR | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Labor | DIRLAB_SV | | | Naft Institute for Statistics | 12/2016 - 11/2017 | 8.29 | RON | Hour | 1 | 8.29 | RON | Hour |
| Indirect Labor | INDLAB_SV | | | Naft Institute for Statistics | 12/2016 - 11/2017 | 8.29 | RON | Hour | 1 | 8.29 | RON | Hour |
| Packing Labor | PACKLAB_SV | | | Naft Institute for Statistics | 12/2016 - 11/2017 | 8.29 | RON | Hour | 1 | 8.29 | RON | Hour |

| ENERGY | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Water | WATER_SV | | Apa Nova Bucuresti | Industrial Water Supply | 12/2016 - 11/2017 | 0.465 | RON | M3 | 1 | 0.465 | RON | MT |
| Electricity | ELECTRIC_SV | | Eurostat | Average Electricity Price by End-Use Sector | 2017 | 0.0649 | EURO | KWH | 1 | 0.0649 | EUR | KWH |

| TRANSPORTATION | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Domestic Inland Freight | TRUCK_SV | | Doing Business 2017 | Domestic Transport Cost - Truck | Through 6/2016 | 0.000071 | USD | KG/KM | 1.000 | 0.00007 | USD | KG/KM |
| Domestic B&H | DBROKU_SV | | Doing Business 2017 | Brokerage & Handling - Cost to Export | Through 6/2016 | 0.0204 | USD | KG | 1.000 | 0.02040 | USD | KG |

| FINANCIAL RATIOS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Overhead | OVRHD_SV | | Sigstrat | % of MLE | 2017 | 7.36% | | | | 0.074 | | |
| SG&A | SGA_SV | | Sigstrat | % of MLE & OH | 2017 | 19.73% | | | | 0.197 | | |
| Profit | PROFT_SV | | Sigstrat | % of MLE, OH and SG&A | 2017 | 0.26% | | | | 0.003 | | |

Barcode:3825164-01 A-570-106 INV - Investigation  -

**Multilayered Wood Flooring (2016-2017 administrative review)**

| Logs | EUR/M3 | | |
|---|---|---|---|
| Acacia log | 142.99 | not listed | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other |
| Birch log | 37.76 | common | Birch, In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Sawlogs; Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote; Other |
| Chinese maple log | 142.99 | Mid-grade | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other |
| European oak log | 677.62 | Mid-grade | Sawlogs Of Oak 'Quercus Spp.', Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared |
| Hard maple log | 142.99 | Mid-grade | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other |
| Hickory log | 142.99 | premium | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other |
| Jatoba lumber | 142.99 | not listed | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other |
| Red oak log | 677.62 | Mid-grade | Sawlogs Of Oak 'Quercus Spp.', Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared |
| Tigerwood lumber | 698.4 | not listed | Wood, Sawn Or Chipped Lengthwise, Sliced Or Peeled, Of A Thickness Of > 6 Mm (Excl. Planed, Sanded Or End-Jointed, And Tropical Wood, Coniferous Wood, Oak 'Quercus Spp.', Beech 'Fagus Spp.', Maple 'Acer Spp.', Cherry 'Prunus Spp.', Ash 'Fraxinus Spp. |
| Walnut log | 142.99 | premium | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other |
| Cotton wood log | 142.99 | common | Wood In The Rough, Whether Or Not Stripped Of Bark Or Sapwood, Or Roughly Squared (Excl. Rough-Cut Wood For Walking Sticks, Umbrellas, Tool Shafts And The Like; Wood Cut Into Boards Or Beams, Etc.; Wood Treated With Paint, Stains, Creosote Or Other |

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 4/25/19 11:00 AM, Submission Status: Approved

| | | | |
|---|---|---|---|
| Decision Memorandum for the Preliminary Affirmative Determination of Sales at Less Than Fair Value (October 2, 2019) | | P.R. 1407 | APPX001026-APPX001093 |

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
POI: 07/01/2018-12/31/2018
**Public Document**
E&C/OV: Team

October 2, 2019

| | |
|---|---|
| **MEMORANDUM TO:** | P. Lee Smith<br>Deputy Assistant Secretary<br> for Policy and Negotiations<br>Enforcement and Compliance |
| **FROM:** | Scot T. Fullerton<br>Director, Office VI<br> Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Decision Memorandum for the Preliminary Affirmative Determination of Sales at Less Than Fair Value |

## I.   SUMMARY

The Department of Commerce (Commerce) preliminarily determines that imports of wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the People's Republic of China (China) are being, or are likely to be, sold in the United States at less than fair value (LTFV), as provided in section 733 of the Tariff Act of 1930, as amended (the Act). The preliminary estimated weighted-average dumping margins are shown in the "Preliminary Determination" section of the accompanying *Federal Register* notice.

## II.   BACKGROUND

On March 6, 2019, we received an antidumping duty (AD) petition covering imports of wooden cabinets and vanities from China,[1] which was filed in proper form on behalf of the American Kitchen Cabinet Alliance (the petitioner). On March 26, 2019, Commerce initiated this investigation.[2]

---

[1] *See* Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Wooden Cabinets and Vanities from the People's Republic of China," dated March 6, 2019 (the Petition); *see also* Memorandum, "Phone Call with Counsel to the Petitioner," dated March 26, 2019.
[2] *See* Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation, 84 FR 12587 (April 2, 2019) (*Initiation Notice*).



INTERNATIONAL
T R A D E
ADMINISTRATION

In the "Respondent Selection" section of the *Initiation Notice*, Commerce stated that, after considering the large number of producers and exporters identified in the Petition,[3] and considering the resources required to mail quantity and value (Q&V) questionnaires to all 727 companies named in the Petition, Commerce intended to limit the number of Q&V questionnaires based on the U.S. Customs and Border Protection (CBP) data for entries of wooden cabinets and vanities from China under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 9403.40.9060, 9403.60.8081, and 9403.90.7080 during the period of investigation (POI).[4]  On March 26, 2019, and April 2, 2019, Commerce released CBP data to all interested parties under an administrative protective order, and requested comments regarding the data and respondent selection.[5]  On April 8, 2019, Commerce issued Q&V questionnaires to the top 30 exporters/producers identified in the CBP data and that were also identified with complete contact information by the petitioner in the Petition.[6]  Additionally, Commerce posted the Q&V questionnaire, along with filing instructions, on the Enforcement and Compliance (E&C) website.[7]  On or before April 22, 2019, the deadline for submission of the Q&V questionnaires, Commerce received timely filed responses from 231 exporters/producers.[8]  Of the 30 companies that were sent Q&V questionnaires, three companies did not respond to the questionnaire.[9]

In the *Initiation Notice*, Commerce notified parties of an opportunity to comment on the scope of the investigations, as well as the appropriate physical characteristics of wooden cabinets and vanities to be reported in response to Commerce's AD questionnaire.[10]  We received comments and rebuttal comments from interested parties concerning the scope of the investigations.[11]  We also received comments and rebuttal comments regarding the appropriate physical characteristics to be used for the purpose of reporting sales of the subject merchandise.[12]

---

[3] *See* Petition Volume I at Exhibit I–9; *see also* Petitioner's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Petitioner's Responses to Supplemental Questions Regarding Petition Volume I Injury," dated March 12, 2019, at Exhibit I–Supp–1.

[4] *See Initiation Notice*, 84 FR at 12590.

[5] *See* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities from China:  Release of U.S. Customs and Border Protection Data," dated March 26, 2019; *see also* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from China:  Release of U.S. Customs and Border Protection Data," dated April 2, 2019.

[6] *See* Memorandum, "Parties Required to Respond to the Q&V Questionnaire," dated April 8, 2019; *see also* Petition at Volume I, Exhibit I-9.

[7] *See* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Respondent Selection," dated June 4, 2019 (Respondent Selection Memo) at "Background."

[8] *Id.*

[9] *See* Memorandum, "Delivery of Q&V Questionnaires," dated April 17, 2019.

[10] *See Initiation Notice*, 84 FR at 12587-88.

[11] For a detailed discussion, *see* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Scope Comments Decision Memorandum for the Preliminary Determinations," dated October 2, 2019 (Preliminary Scope Decision Memorandum).

[12] *See* Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Comments on Model Match and Physical Characteristics," dated April 15, 2019; Dalian Meisen Woodworking Co., Ltd. (Meisen) Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Comments on Product Characteristics," dated April 15, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Rebuttal Comments on Model Match and Physical Characteristics," dated April 25, 2019; Meisen's Letter, "Wooden Cabinets and Vanities from the

On April 22, 2019, the U.S. International Trade Commission (ITC) preliminarily determined that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of wooden cabinets and vanities from China.[13]

Commerce timely received a separate rate application (SRA) from 221 companies, including those selected for individual examination.[14]  Commerce provided all interested parties the opportunity to comment on any punctuation, spacing, or grammatical issues on a provisional list of company names and combination rates.[15]

On June 17, 2019, we placed on the record a list of potential surrogate countries and we invited interested parties to comment on the selection of the primary surrogate country and provide surrogate value (SV) information.[16]  We received comments and rebuttal comments on the selection of the primary surrogate country and SVs from the petitioner,[17] The Ancientree Cabinet

---

People's Republic of China:  Rebuttal Comments on Product Characteristics," dated April 25, 2019.

[13] *See Wooden Cabinets and Vanities from China*, 84 FR 17890 (April 26, 2019), and Wooden Cabinets and Vanities from China:  Investigation Nos. 701-TA-620 and 731-TA-1445 (April 2019) (Preliminary ITC Report).

[14] *See* Memorandum, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Complete List of Separate Rate Applicants," dated September 19, 2019.

[15] *Id.*

[16] *See* Letter to All Interested Parties, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated April 15, 2019 (Surrogate Country Letter).

[17] *See* Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Surrogate Country Comments," dated July 16, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components, Thereof from the People's Republic of China:  Petitioner's Initial Surrogate Value Comments," dated August 7, 2019 (Petitioner SV Comments); Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Initial Rebuttal Surrogate Value Comments," dated August 19, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Final Surrogate Value Comments," dated September 3, 2019 (Petitioner's Pre-prelim SV Comments); and Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Comments on Respondents' Final Surrogate Value Comments," dated September 13, 2019 (Petitioner Pre-prelim SV Rebuttal Comments).

Co., Ltd (Ancientree),[18] Meisen,[19] Rizhao Foremost Woodwork Manufacturing Company Ltd. (Foremost),[20] and Shanghai Wen Bo Industries Co., Ltd (Wen Bo).[21]

We received comments in advance of the preliminary determination from the petitioner and Ancientree.[22]

Commerce is conducting this investigation in accordance with section 733(b) of the Act.

## III.    PERIOD OF INVESTIGATION

The POI is July 1, 2018 through December 31, 2018.  This period corresponds to the two most recent fiscal quarters prior to the month of the filing of the Petition, which was March 2019.[23]

---

[18] See Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Surrogate Country Comments," dated July 16, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Preliminary Surrogate Value Submission," dated August 7, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Rebuttal Preliminary Surrogate Value Submission," dated August 19, 2019 (Ancientree Rebuttal SV Comments); and Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Final Surrogate Value Submission," September 3, 2019 (Ancientree Pre-prelim SV Comments).

[19] See Meisen's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Surrogate Country Comments," dated July 5, 2019 (Meisen SC Comments); Meisen's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Surrogate Value Comments," dated August 7, 2019 (Meisen SV Comments); and Meisen's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Rebuttal Surrogate Value Comments," dated August 19, 2019.

[20] See Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Surrogate Country Selection Comments," dated July 16, 2019; Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Affirmative Surrogate Value Submission," dated August 7, 2019; Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Rebuttal Surrogate Value Submission," dated August 19, 2019; and Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Final Surrogate Value Submission," dated September 3, 2019 (Foremost Pre-prelim SV Comments).

[21] See Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Surrogate Country Comments," dated July 16, 2019; Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Surrogate Value Selection Comments," dated August 7, 2019; Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Surrogate Value Selection Rebuttal Comments," dated August 19, 2019 (Wen Bo Rebuttal SV Comments); and Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Factual Information to Value Factors of Production," dated September 3, 2019 (Wen Bo Pre-prelim SV Comments).

[22] See Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Pre-Preliminary Comments," dated September 19, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:  Petitioner's Pre-Preliminary Determination Comments Regarding Kunshan Baiyulan's and Shanghai Baiyulan's Separate Rate Applications," dated September 18, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof From the People' Republic of China:  Petitioner's Pre-Preliminary Determination Comments Regarding Surrogate Values and Foremost," dated September 26, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Pre-Preliminary Comments for Meisen," dated September 26, 2019.  We have taken these comments under consideration to the extent practicable given the close proximity of the submission of these comments to this preliminary determination.

[23] See 19 CFR 351.204(b)(1).

## IV.    SCOPE COMMENTS

In accordance with the *Preamble* to Commerce's regulations,[24] we set aside a period of time until April 15, 2019, for parties to comment on product coverage (*i.e.*, the scope of this investigation) and encouraged all parties to submit comments within 20 calendar days of publication of the *Initiation Notice*.[25]  We received comments concerning the scope of the AD and countervailing duty (CVD) investigations of wooden cabinets and vanities.  For a summary of the product coverage comments and rebuttal responses submitted on the record of this investigation, and accompanying discussion and analysis of all comments timely received, *see* the Preliminary Scope Decision Memorandum.

Based on our analysis of the comments received, we have preliminarily modified the scope of the investigations.[26]  For a full description of the scope of this investigation, *see* the accompanying *Federal Register* notice at Appendix I.

## V.    PRODUCT CHARACTERISTICS

In the *Initiation Notice*, we set aside a period of time for parties to raise issues regarding product characteristics.[27]  The petitioner and Meisen provided comments and rebuttal comments,[28] which we took into consideration in determining the physical characteristics outlined in the AD questionnaire.[29]

## VI.    SELECTION OF RESPONDENTS

In the *Initiation Notice*, Commerce stated its intent to base respondent selection on the responses to Q&V questionnaires.[30]  On April 8, 2019, Commerce issued Q&V questionnaires to the top 30 exporters/producers identified in the CBP data and that were also identified with complete contact information by the petitioner in the Petition.[31]  Of these 30 companies, nine received the Q&V questionnaire through E&C's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS), while the remaining 21 companies received the

---

[24] *See Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27323 (May 19, 1997) (*Preamble*).

[25] *See Initiation Notice*, 84 FR at 12587-88.

[26] *See* Preliminary Scope Decision Memorandum.

[27] *See Initiation Notice*, 84 FR at 12588.

[28] *See* Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Comments on Model Match and Physical Characteristics," dated April 15, 2019; Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Comments on Product Characteristics," dated April 15, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:  Petitioner's Rebuttal Comments on Model Match and Physical Characteristics," dated April 25, 2019; Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Rebuttal Comments on Product Characteristics," dated April 25, 2019.

[29] *See* Commerce's Letter, Antidumping Duty Questionnaire, dated June 5, 2019.

[30] *See Initiation Notice*, 84 FR at 12590.

[31] *See* Memorandum, "Parties Required to Respond to the Q&V Questionnaire," dated April 8, 2019; *see also* Petition at Volume I, Exhibit I-9.

questionnaire via FedEx shipment.[32]  Additionally, Commerce posted the Q&V questionnaire, along with filing instructions, on the E&C website.[33]  On April 17, 2019, Commerce confirmed that all 30 Q&V questionnaires were delivered to their intended recipients.[34]  On or before April 22, 2019, the deadline for submission of the Q&V questionnaires, Commerce received timely filed responses from 231 exporters/producers.[35]  Of the 30 companies that were sent Q&V questionnaires, three companies did not respond to the questionnaire.[36]

On June 4, 2019, in accordance with section 777A(c)(2)(B) of the Act, we selected the three exporters accounting for the largest volume of wooden cabinets and vanities from China during the POI, *i.e.*, Ancientree, Foremost, and Meisen, for individual examination.[37]  On June 5, 2019, we issued the AD questionnaire to Ancientree, Foremost, and Meisen.[38]  We received questionnaire responses from Ancientree,[39] Foremost,[40] and Meisen.[41]  Between July 2019, and September 2019, we issued supplemental questionnaires to Ancientree, Foremost, and Meisen, and received responses to those supplemental questionnaires between August 2019, and

---

[32] *See* Memorandum, "Delivery of Quantity and Value Questionnaires," dated April 17, 2019 (Q&V Delivery Confirmation Memo).

[33] *See* Respondent Selection Memo at "Background."

[34] *See* Q&V Delivery Confirmation Memo.

[35] *See* Respondent Selection Memo, at "Background."

[36] *Id*.

[37] *Id.*

[38] *See* the AD questionnaires to Ancientree, Foremost, and Meisen, dated June 5, 2019.

[39] *See* Ancientree's section A questionnaire response, dated July 3, 2019 (Ancientree AQR); Ancientree's section C and D questionnaire response, dated July 19, 2019 (Ancientree CDQR).

[40] *See* Foremost's section A questionnaire response, dated July 3, 2019 (Foremost AQR); Foremost's section C and D questionnaire response, dated July 22, 2019 (Foremost CDQR).

[41] *See* Meisen's section A questionnaire response, dated July 3, 2019 (Meisen AQR); Meisen's section C and D questionnaire responses, dated July 19, 2019 (Meisen CQR, Meisen DQR); and Meisen's section E questionnaire response, dated July 22, 2019.

6

September 2019.[42]  The petitioner submitted comments with respect to the responses submitted by Ancientree, Foremost, and Meisen.[43]

## VII.   DETERMINATION NOT TO SELECT WEN BO AS A VOLUNTARY RESPONDENT

On March 26, 2019, we received a request for treatment as a voluntary respondent from Wen Bo in the event that it was not selected as a mandatory respondent.[44]  Wen Bo timely filed its questionnaire responses by the deadlines established for the mandatory respondents.[45]

Section 777A(c)(1) of the Act directs Commerce to calculate an individual weighted-average dumping margin for each known exporter or producer of the subject merchandise.  However, section 777A(c)(2) of the Act gives Commerce the discretion to limit its examination to a reasonable number of exporters and producers if it is not practicable to make individual weighted-average dumping margin determinations because of the large number of exporters and producers involved in the investigation.  When Commerce limits the number of exporters or producers examined in an investigation pursuant to section 777A(c)(2) of the Act, section 782(a)(1) of the Act directs Commerce to calculate individual weighted-average dumping

---

[42] *See* Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Section A Supplemental Questionnaire Response," dated August 7, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Response to Second Supplemental Questionnaire (Sales Reconciliation Supplemental)," dated August 21, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Response to Third Supplemental Questionnaire," dated September 6, 2019; Ancientree's Letter "Wooden Cabinets and Vanities from the People's Republic of China:  Response to Fourth Supplemental Questionnaire," dated September 18, 2019; Foremost's Letter, "Foremost's Section A Supplemental Questionnaire Response," dated August 15, 2019; Foremost's Letter, "Foremost's FWW Organization Response," dated August 28, 2019 (Foremost Org Structure Supp); Foremost's Letter, "Foremost's Price Reporting Supplemental Response – Part 1," dated September 16, 2019; Foremost's Letter, "Foremost's Supplemental Section C Questionnaire Response," dated September 17, 2019 (Foremost SCQR); Foremost's Letter, "Foremost's Supplemental Section D Questionnaire Response," dated September 23, 2019 (Foremost SDQR); Foremost's Letter, "Foremost's Price Reporting Supplemental Questionnaire Response (Part 2)," dated September 24, 2019; Foremost's Letter, "Foremost's Second Section D Supplemental Questionnaire Response," dated September 25, 2019; Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Supplemental Section A Questionnaire Response," dated August 13, 2019 (Meisen SuppA); Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Supplemental Section C Questionnaire Response," dated August 27, 2019 (Meisen SuppC); Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Supplemental Section D-E Questionnaire Response," dated September 16, 2019.
[43] *See* Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:  Comments on Ancientree's Section A Response," dated July 17, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:  Comments on Ancientree's Sections C-D Responses," dated August 8, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Comments on Ancientree's Section A Supplemental Response," dated August 19, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:  Deficiency Comments on Meisen's Section A Response," dated July 17, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:  Deficiency Comments on Meisen's Sections C-D Responses," dated August 8, 2019.
[44] *See* Wen Bo's Letter, "Wooden Cabinets and Vanities From People Republic of China – Entry Of Appearance; Request To Be Voluntary Respondent," dated March 26, 2019.
[45] *See* Wen Bo's section A questionnaire response dated July 3, 2019; Wen Bo's section D questionnaire response, dated July 19, 2019; Wen Bo's section C and E questionnaire response, dated July 22, 2019.

margins for companies not initially selected for individual examination that voluntarily provide the information requested of the mandatory respondents if:  1) the information is submitted by the due date specified for exporters or producers initially selected for examination; and 2) the number of companies subject to the investigation is not so large that any additional individual examination of companies that have voluntarily provided information would be unduly burdensome and inhibit the timely completion of the investigation.

Under section 782(a)(2) of the Act, in determining whether it would be unduly burdensome to examine a voluntary respondent, Commerce may consider:  1) the complexity of the issues or information presented in the proceeding, including questionnaires and any responses thereto; 2) any prior experience of Commerce in the same or similar proceedings; 3) the total number of investigations or reviews being conducted by Commerce; and 4) such other factors relating to the timely completion of those investigations and reviews.  In *Grobest*, the U.S. Court of International Trade (CIT) remanded to Commerce its decision not to review a voluntary respondent in light of the administrative burden associated with reviewing the number of mandatory respondents selected.[46]  The CIT held that "Commerce {must} separately determine whether reviewing the voluntary respondents would be unduly burdensome and inhibit the timely completion of the investigation."[47]

Commerce has considered the criteria in section 782(a)(2) of the Act to determine whether it would be unduly burdensome to review a voluntary respondent.  Pursuant to section 782(a) of the Act, we determine that examining Wen Bo as a voluntary respondent would be unduly burdensome and would inhibit the timely completion of the investigation.  In coming to our determination, we considered the following factors:  (1) the complexity of the issues or information presented in this investigation; (2) any prior experience of Commerce in the same or similar proceedings; (3) the total number of investigations or reviews being conducted by Commerce; and (4) such other factors relating to the timely completion of those investigations and reviews.[48]  Based on these criteria, Commerce determines that, because of the complexity of the information presented in this proceeding, the ongoing participation of three mandatory respondents, and the total number of investigations and reviews being conducted as of the date of the determination, it only has sufficient resources to examine the three current mandatory respondents.  Thus, consistent with section 782(a) of the Act, Commerce has not considered Wen Bo's unsolicited questionnaire responses and has not selected Wen Bo as a voluntary respondent.

---

[46] *See Grobest & I-Mei Industrial (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1362 (CIT 2012) (*Grobest*).
[47] *Id*. (citation omitted).
[48] *See* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities from the People's Republic of China:  Selection of Voluntary Respondent," dated October 2, 2019.

8

## VIII.  DISCUSSION OF THE METHODOLOGY

### A.  Non-Market Economy Country

Commerce considers China to be a non-market economy (NME) country.[49]  In accordance with section 771(18)(C)(i) of the Act, any determination that a foreign country is an NME country shall remain in effect until revoked by Commerce.  Therefore, we continue to treat China as an NME country for purposes of this preliminary determination.

### B.  Surrogate Country

When Commerce is investigating imports from an NME country, section 773(c)(1) of the Act directs it to base normal value (NV), in most circumstances, on the NME producer's factors of production (FOPs), valued in a surrogate market economy (ME) country or countries considered to be appropriate by Commerce.  Specifically, in accordance with section 773(c)(4) of the Act, in valuing the FOPs, Commerce shall utilize, "to the extent possible, the prices or costs of {FOPs} in one or more ME countries that are:  (A) at a level of economic development comparable to that of the {NME} country; and (B) significant producers of comparable merchandise."[50]  As a general rule, Commerce selects a surrogate country that is at the same level of economic development as the NME, unless it is determined that none of the countries are viable options because they either:  (a) are not significant producers of comparable merchandise, (b) do not provide sufficient reliable sources of publicly available SV data, or (c) are not suitable for use based on other reasons.  Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.  To determine which countries are at the same level of economic development as the NME, Commerce generally relies on per capita gross national income (GNI) data from the World Bank's World Development Report.[51]  Further, Commerce normally values all FOPs in a single surrogate country.[52]

On June 17, 2019, Commerce identified Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia as countries that are at the same level of economic development as China based on per capita 2017 GNI data, and issued a letter to interested parties soliciting comments regarding the appropriate surrogate country and SVs for use in the preliminary determination.[53]  In response,

---

[49] *See Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China:  Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination,* 82 FR 50858, 50861 (November 2, 2017) and accompanying Preliminary Decision Memorandum (PDM) (citing Memorandum, "China's Status as a Non-Market Economy," dated October 26, 2017), unchanged in *Certain Aluminum Foil from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value,* 83 FR 9282 (March 5, 2018).

[50] For a description of our practice, *see* Policy Bulletin No. 04.1:  Non-Market Economy Surrogate Country Selection Process (March 1, 2004) (Policy Bulletin 04.1) available on Commerce's website at http://enforcement.trade.gov/policy/bull04-1.html.

[51] *Id.*

[52] *See* 19 CFR 351.408(c)(2).

[53] *See* Surrogate Country Letter.

9

APPX001034

Ancientree, Foremost, Meisen, and Wen Bo argued that Malaysia should be selected as the primary surrogate country,[54] while the petitioner argued that Romania should be selected as the primary surrogate country in this investigation.[55]

*Economic Comparability*

Consistent with our practice, and section 773(c)(4)(A) of the Act, and as stated above, we identified Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia as countries at the same level of economic development as China based on the per capita GNI data from the World Bank's World Development Report.[56]  Therefore, we consider all six countries as having met this prong of the surrogate country selection criteria.  The countries identified are not ranked and are considered equivalent in terms of economic comparability.

*Significant Producer of Comparable Merchandise*

Section 773(c)(4)(B) of the Act requires Commerce, to the extent possible, to value FOPs in a surrogate country that is a significant producer of comparable merchandise.  Neither the statute nor Commerce's regulations provide further guidance on what may be considered comparable merchandise.  Given the absence of any definition in the statute or regulations, Commerce looks to other sources such as Policy Bulletin 04.1 for guidance on defining comparable merchandise.  Policy Bulletin 04.1 states that "in all cases, if identical merchandise is produced, the country qualifies as a producer of comparable merchandise."[57]  Conversely, if identical merchandise is not produced, then a country producing comparable merchandise is sufficient in selecting a surrogate country.[58]  Further, when selecting a surrogate country, the statute requires Commerce to consider the comparability of the merchandise, not the comparability of the industry.[59]  "In cases where the identical merchandise is not produced, Commerce must determine if other merchandise that is comparable is produced.  How Commerce does this depends on the subject merchandise."[60]  In this regard, Commerce recognizes that any analysis of comparable merchandise must be done on a case-by-case basis:

> In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products,

---

[54] *See* Ancientree Pre-Prelim SV Comments; Foremost Pre-prelim SV Comments; Meisen SV Comments; and Wen Bo Pre-prelim SV Comments.

[55] *See* Petitioner's Pre-prelim SV Comments.

[56] *See* Surrogate Country Letter, at Attachment.

[57] *See* Policy Bulletin 04.1 at 2.

[58] Policy Bulletin 04.1 also states that "if considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise."  *Id.* at note 6.

[59] *See Sebacic Acid from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 62 FR 65674, 65675-76 (December 15, 1997) ("{T}o impose a requirement that merchandise must be produced by the same process and share the same end uses to be considered comparable would be contrary to the intent of the statute.").

[60] *See* Policy Bulletin 04.1 at 2.

10

comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.[61]

Further, the statute grants Commerce discretion to examine various data sources for determining the best available information.[62]  Moreover, while the legislative history provides that the term "significant producer" includes any country that is a significant "net exporter,"[63] it does not preclude reliance on additional or alternative metrics.  It is Commerce's practice to evaluate whether production is significant based on characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics).[64]

A comparison of production quantities of the comparable merchandise from each potential surrogate country in relation to world production was not possible because the record does not contain production quantities of comparable merchandise from each potential surrogate country. Thus, we sought evidence of production of comparable merchandise in the form of exports of comparable merchandise from the six potential surrogate countries identified above, as a proxy for production data.  Export data is one of the sources of data Commerce will consider in determining whether a country is a significant producer of comparable merchandise.  Based on trade data submitted on the record for HTS numbers identified in the scope of this investigation,[65] all six potential surrogate countries reported export volumes of comparable merchandise during the POI.  Therefore, we find that all six potential surrogate countries meet the "significant producer" requirement of section 773(c)(4) of the Act.

*Data Availability*

If more than one potential surrogate country satisfies the statutory requirements for selection as a surrogate country, Commerce selects the primary surrogate country based on data availability and reliability.[66]  When evaluating SV data, Commerce considers several criteria including whether the SV data are publicly available, contemporaneous with the period under consideration, broad-market averages, tax and duty-exclusive, and specific to the inputs being valued.[67]  There is no hierarchy among these criteria.[68]  Commerce's preference is to satisfy the

---

[61] *Id.*, at 3.
[62] *See* section 773(c) of the Act.  *See also Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1990).
[63] *See* Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, at 590 (1988).
[64] *See Xanthan Gum from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 78 FR 2252 (January 10, 2013) and accompanying PDM at 4-7, unchanged in *Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33350 (June 4, 2013).
[65] *See* Meisen SC Comments at Exhibit 1 (reflecting import/export data for HS 9403.40 -Wooden Furniture (Except Seats) Of A Kind Used In The Kitchen; HS 9403.60 - Wooden Furniture, Nesoi; and HS 9403.90 - Parts Of Furniture, Nesoi).
[66] *See* Policy Bulletin 04.1; *see also* section 773(c)(1) of the Act.
[67] *See* Policy Bulletin 04.1
[68] *See, e.g., Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006) (*Mushrooms China*) and accompanying Issues and Decision Memorandum (IDM) at Comment 1.

11

breadth of these aforementioned selection criteria.[69]  Moreover, it is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis of valuing the FOPs.[70]  Commerce must weigh the available information with respect to each input value and make a product-specific and case-specific decision as to what constitutes the "best" available SV for each input.[71]  Additionally, pursuant to 19 CFR 351.408(c)(2), Commerce has a preference for valuing all FOPs in a single surrogate country.

As an initial matter, we preliminarily determine that we only have complete and usable SV data on the record for Romania and Malaysia that are publicly available, contemporaneous with the POI, and generally include tax-exclusive broad market average prices.[72]  Accordingly, because we did not have complete and usable data from the other countries found to be economically comparable to China, we did not consider whether suitable data for valuation of FOPs is available for the other countries found to be economically comparable to China (*i.e.*, Brazil, Kazakhstan, Mexico, and Russia).

Wen Bo argues that we should select Malaysia as the primary surrogate country because "Malaysia is superior to Romania in terms of significant production of comparable merchandise and data quality."[73]  However, as explained above, we consider all countries on the surrogate country list to be significant exporters of comparable merchandise and it is not our practice to weigh relative degrees of significance in evaluating whether a country is a significant exporter. Moreover, the record indicates that Malaysia and Romania had exports valued at 487 million U.S. dollars (USD) and 289 million USD, respectively, which are both significantly high values of exports.[74]

With respect to the Romanian data, Ancientree argues that the import values submitted by the petitioner for birch and poplar woods were based on an "insignificant and uncommercial quantity" and compares those import volumes to purchase quantities of respondents and the Malaysia import quantity to demonstrate that they are not based on commercial quantities.[75]  In response, the petitioner provided documentation indicating that the Romanian import values for birch and poplar fit within the band of average unit values of imports into other proximate European Union (EU) countries (*i.e.*, Austria, Bulgaria, the Czech Republic, Greece, Slovakia, and Slovenia).[76]  We find that Ancientree has not established that the Romanian import values are not usable in our calculation.  Notably, Ancientree merely asserts that the Romanian import values are based on insignificant and non-commercial quantities, but does not identify a basis for evaluating when an import volume becomes an insignificant or no longer commercial quantity.

---

[69] *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 2010-2011, 78 FR 17350 (March 21, 2013) and accompanying IDM at Comment I(C).

[70] *See Mushrooms China* and accompanying IDM at Comment 1.

[71] *Id.*

[72] *See* Petitioner Pre-prelim SV Comments; Ancientree Pre-prelim SV Comments; Foremost Pre-prelim SV Comments; Meisen SV Comments; and Wen Bo Pre-prelim SV Comments.

[73] *See* Wen Bo Rebuttal SV Comments, at 2.  Although Wen Bo claimed that the petitioner failed to provide SV data for several of Foremost's FOPs, the petitioner submitted those SVs in its Pre-prelim SV comments.

[74] *See* Meisen SC Comments, at Exhibit 1.  Even if we were to consider net exports, Malaysia and Romania reported significant values of exports, 375 million USD and 112 million USD, respectively, during the POI.

[75] *See* Ancientree Rebuttal SV Comments, at 2.

[76] *See* Petitioner Pre-prelim SV Rebuttal Comments, at 2-3 and Exhibit 1.

12

Barcode:3896591-01 A-570-106 INV - Investigation  -

Moreover, Ancientree's claim is based solely on a comparison of the Romanian and Malaysian import quantities and values to each other, an analysis, which alone, we find to be of limited probative value.  Although the petitioner provided certain documentation regarding the average unit values of imports into other EU countries, we find this information to have little probative value in assessing whether the Romanian import values are aberrational.  In accordance with section 773(c)(4) of the Act, Commerce's preference is to value FOPs using data from an ME country that is at a level of economic development comparable to the NME country; as such, information on the import quantities or values for other countries on the surrogate country list would be more probative.  However, no parties submitted such data for Commerce to evaluate. In light of the above, we find there is no basis to conclude that the Romanian import values are aberrational or otherwise not usable in our calculation.  Furthermore, because the record contains the EU HTS and descriptions for these inputs, the record supports finding that birch and poplar wood inputs can be valued using the six-digit level HTS subheadings with higher import volumes but without sacrificing any apparent specificity to the inputs being valued.[77]

Interested parties have submitted ten financial statements from Malaysia, and the petitioner has submitted one set of financial statements from Romania.  With respect to the Malaysian financial statements, we note that the statements of Jay Corp Berhad,[78] Latitude Tree Holdings Berhad,[79] Poh Huat Resources Holdings Berhad,[80] and Sern Kou Resources Berhad,[81] each represent large holding/investment companies with numerous subsidiaries engaged in various activities that would not necessarily reflect the cost structure of a manufacturer of wood products.  Moreover, the statements of Sern Kou Resources Berhad and Latitude Tree Holdings Berhad are not contemporaneous with our POI.[82]  Of the remaining six Malaysian financial statements, we note that the statements of CT Heng Furniture Sdn. Bhd.,[83] Latitude Tree Furniture Sdn. Bhd.,[84] and Sin Heng Furniture Industries Sdn. Bhd.[85] are for the year-ending June 30, 2018, and, therefore, are also not contemporaneous with our POI.  Because the preceding seven financial statements from Malaysia are unsuitable for purposes of valuing respondents' financial ratios, there are only three remaining financial statements on the record for Malaysia that are contemporaneous with the POI from manufacturers of comparable merchandise: Lii Hen Industries Bhd,[86] Poh Huat Furniture Industries Sdn Bhd,[87] and Yeo Aik Wood Sdn. Bhd.[88]  However, each of these financial statements suffer from the same deficiency.  Specifically, none of the aforementioned statements specifically break out energy costs from other manufacturing costs.  When Commerce is unable to segregate and, therefore, exclude energy costs from the calculation of the surrogate financial ratios, as is the case with these financial statements, it is Commerce's practice to

---

[77] *See, e.g.,* Petitioner SV Comments, at Exhibit 3.

[78] *See* Foremost Pre-prelim SV Comments, at Exhibit FSV-2-b.

[79] *Id.* at Exhibit FSV-4-b.

[80] *Id.* at Exhibit FSV-5-b; *see also* Ancientree Pre-prelim SV Comments, at Exhibit SV2-4.

[81] *See* Ancientree Pre-prelim SV Comments, at Exhibit FSV-3-b.

[82] *See* Foremost Pre-prelim SV Comments, at Exhibit FSV-4-b; Ancientree Pre-prelim SV Comments, at Exhibit FSV-3-b.

[83] *See* Ancientree Pre-prelim SV Comments, at Exhibit SV2-6.

[84] *Id.* at Exhibit SV2-8.

[85] *See* Ancientree SV Comments, at Exhibit SV-9.

[86] *See* Ancientree Pre-prelim SV Comments, at Exhibit SV2-3.

[87] *Id.* at Exhibit SV2-5.

[88] *Id.* at Exhibit SV2-7.

Filed By: Kabir Archuletta, Filed Date: 10/3/19 11:08 AM, Submission Status: Approved

disregard the respondent's energy inputs in the calculation of NV in order to avoid double-counting energy costs which have necessarily been captured in the surrogate financial ratios.[89] Although this deficiency does not preclude Commerce from calculating financial ratios using these statements, and disregarding the respondents' energy FOPs, the record contains a financial statement that separately identifies energy costs.  Specifically, the financial statements of S.C. Sigstrat S.A. (Sigstrat) represent the financial position of a profitable Romanian producer of comparable wooden products (*i.e.*, plywood, chairs, tables) that explicitly identify energy costs, are contemporaneous and cover the entire POI, and contain no evidence of countervailable subsidies.[90]  Moreover, the Sigstrat financial statements have been used by Commerce in other proceedings involving wooden products.[91]

Given the above factors, we have preliminarily selected Romania as the primary surrogate country for this investigation.  Romania is at the same level of economic development as China, is a significant producer of comparable merchandise, and has reliable and usable SV data, including financial statements from a producer of comparable merchandise (*i.e.*, wooden furniture and wood products) that also separately identifies energy expenses.  A detailed description of the SVs selected by Commerce is provided in the "Factor Valuation Methodology" section and the Preliminary SV Memorandum.[92]

C.  Separate Rates

In proceedings involving NME countries, Commerce maintains a rebuttable presumption that all companies within the country are subject to government control and, therefore, should be assessed a single weighted-average dumping margin.[93]  In the *Initiation Notice*, Commerce notified parties of the application process by which exporters may obtain separate rate status in this investigation.[94]  The process requires exporters to submit an SRA and to demonstrate an

---

[89] *See, e.g., Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 74 FR 16838, 16839 (April 13, 2009), and accompanying IDM at Comment 2; *see also Certain Frozen Warmwater Shrimp from the People's Republic of China:  Preliminary Results, Partial Rescission, Extension of Time Limits for the Final Results, and Intent to Revoke, in Part, of the Sixth Antidumping Duty Administrative Review*, 77 FR 12801, 12809 (March 2, 2012), unchanged in *Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China:  Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 77 FR 53856 (September 4, 2012).

[90] *See* Petitioner SV Comments, at Exhibit 10B

[91] *See, e.g., Multilayered Wood Flooring From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 25766 (June 5, 2017) and accompanying IDM at Comment 1; *Certain Hardwood Plywood Products From the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part*, 82 FR 28629 (June 23, 2017) and accompanying PDM at 37-38, unchanged in *Certain Hardwood Plywood Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 FR 53460 (November 16, 2017).

[92] *See* Memorandum, "Surrogate Value Memorandum for the Preliminary Determination," dated October 2, 2019 (Preliminary SV Memorandum).

[93] *See, e.g., Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FR 55039, 55040 (September 24, 2008).

[94] *See Initiation Notice*, 84 FR at 12590.

absence of both *de jure* and *de facto* government control over their export activities.  In the *Initiation Notice*, Commerce required that "respondents submit a response to both the Q&V questionnaire and the separate-rate application by their respective deadlines in order to receive consideration for separate-rate status."[95]

Commerce's policy is to assign all exporters of merchandise under consideration that are in an NME country a single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.[96]  Commerce analyzes whether each entity exporting the merchandise under consideration is sufficiently independent under a test established in *Sparklers*[97] and further developed in *Silicon Carbide*.[98]  According to this separate rate test, Commerce will assign a separate rate in NME proceedings if a respondent can demonstrate the absence of both *de jure* and *de facto* government control over its export activities.  If, however, Commerce determines that a company is wholly foreign-owned, then a separate rate analysis is not necessary to determine whether that company is independent from government control and eligible for a separate rate.

Commerce continues to evaluate its practice with regard to the separate rate analysis in light of the diamond sawblades from China AD proceeding, and its determinations therein.[99]  In particular, in litigation involving the diamond sawblades from China proceeding, the CIT found Commerce's existing separate rate analysis deficient in light of the circumstances of that case, in which a government-owned and controlled entity exercised control over the respondent exporter.[100]  Following the CIT's reasoning, in recent proceedings, we have concluded that where a government entity holds a majority equity ownership, either directly or indirectly, in the respondent exporter, this interest in and of itself means that the government exercises or has the

---

[95] *Id.*

[96] *See Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991) (*Sparklers*).

[97] *Id.*

[98] *See Notice of Final Determination of Sales at Less Than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994) (*Silicon Carbide*).

[99] *See* Final Results of Redetermination pursuant to *Advanced Technology & Materials Co., Ltd., et al. v. United States,* 885 F. Supp. 2d 1343 (CIT 2012) (*Advanced Technology I*), and available at http://enforcement.trade.gov/remands/12-147.pdf, aff'd *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd *Advanced Technology & Materials Co., Ltd., et al. v. United States*, Case No. 2014-1154 (Fed. Cir. 2014) (*Advanced Technology II*).  *See also Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 77098 (December 20, 2013) and accompanying PDM at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014), and accompanying IDM at Comment 1.

[100] *See, e.g., Advanced Technology I*, 885 F. Supp. 2d at 1351 ("Further substantial evidence of record does not support the inference that SASAC's {state-owned assets supervision and administration commission} 'management' of its 'state-owned assets' is restricted to the kind of passive-investor de jure 'separation' that Commerce concludes.") (footnotes omitted); *id.* at 1355 ("The point here is that 'governmental control' in the context of the separate rate test appears to be a fuzzy concept, at least to this court, since a 'degree' of it can obviously be traced from the controlling shareholder, to the board, to the general manager, and so on along the chain to 'day-to-day decisions of export operations,' including terms, financing, and inputs into finished product for export."); *id.* at 1357 ("AT&M itself identifies its 'controlling shareholder' as CISRI {owned by SASAC} in its financial statements and the power to veto nomination does not equilibrate the power of control over nomination.") (footnotes omitted).

15

potential to exercise control over the company's operations generally.[101]  This may include control over, for example, the selection of board members and management, key factors in determining whether a company has sufficient independence in its export activities to merit a separate rate.  Consistent with normal business practices, we would expect that a majority shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company.  Accordingly, we have considered the level of government ownership, where necessary.

In the *Initiation Notice*, we stated that SRAs would be due 30 days after publication of the notice, *i.e.*, May 2, 2019.  We received timely filed SRAs from 221 companies, including those selected for individual examination.

> 1.  Separate Rate Analysis

We are preliminarily granting the companies identified in Appendix I of this memorandum a separate rate, as explained below.

> a.  Wholly Foreign Owned

Certain companies identified in Appendix I.a reported that they are wholly owned by market-economy companies located in market economy countries.  Therefore, as there is no Chinese ownership of these companies, and because Commerce has no evidence otherwise indicating that these companies are under the control of the Chinese government, further analyses of the *de jure* and *de facto* criteria are not necessary to determine whether they are independent from government control of their export activities.[102]  Therefore, we preliminarily determine that these companies are eligible for separate rates.[103]

> b.  Absence of *De Jure* Control

Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate:  (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) legislative enactments decentralizing control over export activities of the companies; and (3) other formal measures by the government decentralizing control over export activities of companies.[104]

---

[101] *See Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Preliminary Affirmative Determination of Critical Circumstances, in Part*, 79 FR 53169 (September 8, 2014), and accompanying PDM at 5-9.

[102] *See, e.g., Brake Rotors from the People's Republic of China:  Preliminary Results and Partial Rescission of the Fourth New Shipper Review and Rescission of the Third Antidumping Duty Administrative Review*, 66 FR 1303, 1306 (January 8, 2001), unchanged in *Brake Rotors from the People's Republic of China:  Final Results and Partial Rescission of Fourth New Shipper Review and Rescission of Third Antidumping Duty Administrative Review*, 66 FR 27063 (May 16, 2001); *Notice of Final Determination of Sales at Less Than Fair Value:  Creatine Monohydrate from the People's Republic of China*, 64 FR 71104, 71104-05 (December 20, 1999).

[103] *See* Appendix I.a., at "Wholly Foreign Owned Companies."

[104] *See Sparklers*, 56 FR at 20589.

The evidence placed on the record of this investigation with respect to the companies identified in Appendix I.b. supports a preliminary finding of an absence of *de jure* government control for each of these companies based on the following:  (1) an absence of restrictive stipulations associated with the individual exporter's business and export licenses; (2) the existence of applicable legislative enactments decentralizing control of companies; and (3) the implementation of formal measures by the government decentralizing control of Chinese companies.[105]

c.   Absence of *De Facto* Control

Typically, Commerce considers four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions:  (1) whether the prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.[106]  Commerce has determined that an analysis of *de facto* control is critical in determining whether respondents are, in fact, subject to a degree of government control which would preclude Commerce from assigning separate rates.

The evidence placed on the record of this investigation with respect to the wholly or partially Chinese-owned companies listed in Appendix I.b. supports a preliminary finding of an absence of *de facto* government control based on record statements and supporting documentation showing that the companies:  (1) set their own prices independent of the government and without the approval of a government authority; (2) have the authority to negotiate and sign contracts and other agreements; (3) maintain autonomy from the government in making decisions regarding the selection of management; and (4) retain the proceeds of their respective export sales and make independent decisions regarding disposition of profits or financing of losses.[107]

Therefore, the evidence placed on the record of this investigation with respect to the companies identified in Appendix I.b. demonstrates an absence of *de jure* and *de facto* government control under the criteria identified in *Sparklers* and *Silicon Carbide*.  Accordingly, we preliminarily grant separate rates to the separate rate applicants identified in Appendix I.b.

d.   Companies Not Receiving a Separate Rate

Companies preliminarily not receiving a separate rate in this investigation fall under four categories.[108]

---

[105] *See* Appendix I.b., at "Absence of De Jure and De Facto Control."
[106] *See Silicon Carbide*, 59 FR at 22586-87, and *Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol from the People's Republic of China*, 60 FR 22544, 22545 (May 8, 1995).
[107] *See* Appendix I.b.
[108] *See* Appendix I.c.

17

i.  Companies that failed to cooperate include Brentridge Holding Co., Ltd. and
    Harbin Hongsen Wood Co., Ltd., each of whom were requested to submit
    information related to their application for separate rate status but failed to do
    so, including a request to publicly identify the producers for which they are
    requesting combination rates,[109] as identified in Appendix I.c.[110]

ii.  Companies owned by the Chinese government:  As explained above, where a
    government entity holds a majority equity ownership, either directly or
    indirectly, in the respondent exporter, this interest in and of itself means that
    the government exercises or has the potential to exercise control over the
    company's operations generally.  Accordingly, companies identified in
    Appendix I.c. that reported a majority state ownership are considered part of
    the China-wide entity and are not eligible for a separate rate.

iii.  Companies that did not separately submit an application:  The SRA posted on
    E&C's website states that "Each applicant seeking separate rate status must
    submit a separate and complete individual application regardless of any
    common ownership or affiliation between firms and regardless of foreign
    ownership.  Each firm must apply for a separate rate by submitting an
    individual application.  Only one firm per application is permitted."[111]
    Accordingly, companies identified in Appendix I.c. that responded to
    Commerce's requests for information but failed to separately submit a
    complete application for itself are not eligible for a separate rate.

iv.  Certain companies identified "also known as" or "formerly known as" trade
    names:  In order for Commerce to recognize these designations, companies
    are requested to "Please note that the applicant must provide documentary
    evidence that the trade name or d.b.a. name was used during the relevant
    period."[112]  Because these companies were not able to document that the trade
    names were in use during the relevant period to sell subject merchandise,
    these trade names are not eligible for a separate rate.[113]

---

[109] *See* Memorandum, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof
from the People's Republic of China:  Separate Rate Application Supplemental Questionnaire," dated August 22,
2019; *see also* Memorandum, "Extension for Separate Rate Application (SRA) Supplemental Questionnaire," dated
August 26, 2019.
[110] *See* Memorandum, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof
from the People's Republic of China:  Separate Rate Application Supplemental Questionnaire," dated August 22,
2019.
[111] *See*, "Separate Rate Application," available at *https://enforcement.trade.gov/nme/nme-sep-rate.html*.
[112] *Id.*
[113] These include an also known as name for Dorbest Ltd.'s producer, and a formerly known as name for Huisen
Furniture (Long Nan) Co., Ltd.

18

2.   Dumping Margin for the Separate Rate Companies

Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for separate rate respondents that we did not individually examine.  Section 735(c)(5)(A) of the Act articulates a preference that we not calculate an all-others rate using rates that are zero, *de minimis* or based entirely on facts available.  Accordingly, Commerce's usual practice has been to average the weighted-average dumping margins for the individually examined companies, excluding rates that are zero, *de minimis*, or based entirely on facts available.[114]  Section 735(c)(5)(B) of the Act also provides that, where the estimated dumping margins for all exporters and producers individually investigated are zero or *de minimis* margins or are determined entirely under section 776 of the Act, Commerce may use any reasonable method to establish the rate for exporters and producers not individually examined.[115]

In this investigation, we calculated rates for Ancientree and Foremost that are not zero, *de minimis*, or based entirely on facts available.  Therefore, the rates calculated for Ancientree and Foremost are applicable to companies not selected for individual examination and eligible for a separate rate.  In order to strike a balance between our duty to safeguard parties' business proprietary information and our attempt to adhere to the guidance set forth in section 735(c)(5)(A) of the Act, we calculated a weighted-average margin for non-selected separate rate respondents using the publicly available, ranged total U.S. sales values of the selected respondents, compared the resulting public, weighted-average margin to the simple average of the antidumping duty margins, and used the amount which is closer to the actual weighted-average margin of the selected respondents as the margin for the non-selected respondents.[116]  Accordingly, for the preliminary determination of this investigation, we are assigning the weighted average of Ancientree and Foremost's rates based on their publicly available, ranged U.S. sales values and dumping margins to eligible non-selected respondents.  The separate rate for the eligible non-selected respondents is 39.25 percent.[117]

D.   Combination Rates

Consistent with the *Initiation Notice*, we calculated combination rates for the respondents that are eligible for a separate rate in this investigation.[118]  This practice is described in Policy Bulletin 05.1.

---

[114] *See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom:  Final Results of Antidumping Duty Administrative Reviews and Rescission of Reviews in Part*, 73 FR 52823, 52824 (September 11, 2008), and accompanying IDM at Comment 16.
[115] *See* the Statement of Administrative Action, H.R. Rep. No. 103-316, Vol. 1 (1994) (SAA) at 870-873.
[116] *See Ball Bearings and Parts Thereof from France, et al.:  Final Results of Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part*, 75 FR 53661, 53662 (September 1, 2010), and the accompanying IDM at Comment 1.
[117] *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Calculation of Separate Rate for Eligible Non-Selected Respondents," dated October 2, 2019.
[118] *See Initiation Notice*, 84 FR at 12590-91.

E.   China-Wide Entity

As discussed above, certain companies did not respond to our Q&V, and other companies failed to submit requested information or failed to submit requested information in the form or manner requested, and, therefore did not establish their eligibility for a separate rate.  Because the companies identified in Appendix I.c. have not demonstrated that they are eligible for separate rate status, Commerce considers them part of the China-wide entity.  Furthermore, as explained below, we preliminarily determine to calculate the China-wide rate based on adverse facts available (AFA).  In addition, as explained below, we are preliminarily assigning a rate based entirely on AFA to Meisen and a rate based partially on facts available to Foremost.

1.   Application of Facts Available and Adverse Inferences

Section 776(a)(1) and (2) of the Act provides that, if necessary information is missing from the record, or if an interested party:  (A) withholds information that has been requested by Commerce, (B) fails to provide such information in a timely manner or in the form or manner requested, subject to subsections 782(c)(1) and (e) of the Act, (C) significantly impedes a proceeding under the statute, or (D) provides such information but the information cannot be verified, Commerce shall, subject to subsection 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency.  If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  In doing so, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.  Further, section 776(b)(2) states that an adverse inference may include reliance on information derived from the petition, the final determination from the AD investigation, a previous administrative review, or other information placed on the record.

Section 776(c) of the Act provides that, in general, when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[119] Further, Commerce is not required to estimate what the dumping margin would have been if the

---

[119] *See* SAA at 870.

interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[120]


2.   Use of Facts Available

Foremost reports that it has three unaffiliated suppliers, and requested that it be exempt from reporting the sales and FOPs for the sales of subject merchandise produced by its suppliers. Commerce granted Foremost's request, with the exception of the unaffiliated producer that supplied the largest percentage of subject merchandise during the POI.[121]   In its questionnaire responses, Foremost reported that this supplier was unwilling to provide its FOP database and provided documentation to support its claim.[122]

According to section 776(a)(1) the Act, where information necessary to calculate a respondent's dumping margin is not available on the record, Commerce applies facts otherwise available in place of missing information.

a.   Application of Facts Available: Foremost

The U.S. Court of Appeals for the Federal Circuit (CAFC), in *Mueller*, held that Commerce may, under certain circumstances, apply AFA in calculating a cooperative respondent's antidumping margin where it finds that the respondent could have induced an uncooperative supplier's cooperation.[123]   Subsequently, in *Canadian Solar*, the CIT held, based on the facts in the administrative review at issue, that the respondent failed to show that it had the type of long-standing relationship with its suppliers that would give it leverage in the marketplace, in order to justify relying on partial adverse facts available.[124]

Commerce examined Foremost's relationship with its uncooperative unaffiliated supplier and notes that it provided both subject merchandise and raw material inputs to Foremost during the POI.[125]   Additionally, this supplier was one of several suppliers, and Foremost's sales of this supplier's subject merchandise represent a small share of Foremost's overall POI sales to the United States.[126]   Foremost reports that this supplier is unaffiliated, and nothing on the record contradicts this assertion or indicates that Foremost and the supplier have been doing business for a long period of time.  The record also includes correspondence by Foremost demonstrating its earnest attempt to obtain the requested information from the supplier.[127]

---

[120] *See* sections 776(d)(3)(A) and (B) of the Act.

[121] *See* Memorandum, "Reporting Exemption Request," dated June 26, 2019 (Foremost Exemption Request).

[122] *See* Foremost CDQR at Section D pages 3-4; *see also* Foremost SDQR at SD-2-SD-4 and Exhibit SD-4.

[123] *See Mueller Comercial de Mexico S. De R.L. de C.V. v. United States*, 753 F.3d 1227, 1233-34 (Fed. Cir. 2014) (*Mueller*).

[124] *See Canadian Solar International et al. and Shanghai Byd Co. Ltd. et al. v. United States*, Slip Op. 19-47 (April 16, 2019) (*Canadian Solar*) at 46.

[125] *See* Foremost CDQR, at section D page 3 and Exhibit D-11.

[126] *See* Memorandum, "Preliminary Results Analysis Memorandum for Rizhao Foremost Woodwork Company Ltd.," dated October 2, 2019 (Foremost Prelim Analysis Memo); Foremost Exemption Request.

[127] *See* Foremost SDQR at Exhibit SD-4.

Based on this information, we preliminarily find that Foremost was not in the position to induce the cooperation of its supplier and that Foremost has cooperated to the best of its ability. Accordingly, because necessary FOP information is not available on the record, we determine that facts available is warranted, pursuant to section 776(a)(1) of the Act, and are preliminarily applying facts available to value the unreported FOPs for the U.S. sales of subject merchandise produced by Foremost's uncooperative supplier.[128]  Commerce will continue to examine this issue and subsequently verify any additional information gathered before the planned verification of Foremost and its supplier.

### b.  Application of Facts Available: China-wide Entity

Furthermore, we preliminarily find that the China-wide entity, which includes certain China exporters and/or producers that did not respond to, or properly comply with, our requests for information, withheld information requested and significantly impeded this proceeding by not submitting the requested information.  Specifically, three companies that we preliminarily consider to be part of the China-wide entity failed to respond to our request for Q&V information.[129]  Additionally, the companies identified at Appendix I.c. failed to provide supplemental information Commerce requested or failed to provide such information in the form or manner requested.[130]  Thus, necessary information is not on the record and the China-wide entity, which encompasses the parties that failed to respond to the request for Q&V information and the companies listed in Appendix I.c., has withheld requested information, failed to provide such information in a timely manner or in the form or manner requested, and significantly impeded the proceeding.  Therefore, we preliminarily determine that the use of facts available is warranted in determining the rate of the China-wide entity, pursuant to sections 776(a)(1) and (a)(2)(A)-(C) of the Act.[131]

### 3.  Application of Facts Available with an Adverse Inference

Section 776(b) of the Act provides that in selecting from among the facts otherwise available, Commerce may use an inference that is adverse to the interests of a party if that party has failed to cooperate by not acting to the best of its ability to comply with a request for information.

### a.  Application of AFA: China-wide Entity

Commerce finds that the China-wide entity's failure to submit Q&V information, and to provide requested information, constitutes circumstances under which it is appropriate to conclude that the China-wide entity failed to cooperate to the best of its ability to comply with Commerce's

---

[128] See Foremost Prelim Analysis Memo for a discussion of the facts available calculation.

[129] See Q&V Delivery Confirmation Memo.  See also Respondent Selection Memo at 2.

[130] See "Companies Not Receiving a Separate Rate" section, above, and Appendix I.c.

[131] See, e.g., Notice of Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances and Postponement of Final Determination:  Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 68 FR 4986, 4991 (January 31, 2003), unchanged in Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances:  Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 68 FR 37116 (June 23, 2003).

22

requests for information.[132]  With respect to the missing information, the China-wide entity did not file any document indicating difficulty providing the information or any request to allow the information to be submitted in an alternate form.  Therefore, we preliminarily find that an adverse inference is warranted in selecting from among the facts otherwise available with respect to the China-wide entity, in accordance with section 776(b) of the Act and 19 CFR 351.308(a).[133]

### b.  Application of AFA: Meisen

Commerce preliminarily determines, based on information indicating that Meisen did not accurately represent and report the FOPs it consumed in the production of merchandise under consideration and thus failed to cooperate to the best of its ability, the application of total AFA is appropriate.

In its initial section D response, Meisen reported that during the POI, "Meisen produced the subject merchandise using birch boards and plywood board"[134] and the only reported solid wood FOP was "Sawn birch wood boards (cut timber)."[135]  Moreover, Meisen stated that for the production of cabinet faces the "primary input is sawn birch wood boards."[136]  In a supplemental questionnaire response, Meisen continued to report birch as the only solid wood consumed in the production of merchandise under consideration.[137]  In that supplemental questionnaire, Commerce also asked Meisen to "confirm that Meisen only consumed birch boards during the POI and did not consume any other species of boards."[138]  In response, Meisen confirmed that "it only consumed birch boards in the production of the {merchandise under consideration} during the POI and did not consume any other species of boards."[139]  Meisen also reported that the "species of the outer veneer of plywood used by Meisen during the POI is birch which is a hardwood."[140]  We requested that Meisen submit documentation supporting its consumption of birch wood for August 2018 and Meisen provided untranslated material withdrawal slips on which the word "birch" cannot be identified.[141]

On September 26, 2019, the petitioner submitted comments and documentation alleging that Meisen failed to accurately report its FOPs because Meisen marketed its cabinets as being made of solid maple wood before, during, and after the POI, but only reported to Commerce that it consumed birch wood.[142]  In support of these allegations, the petitioner submitted marketing

---

[132] *See Nippon Steel Corporation v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003) (noting that Commerce need not show intentional conduct existed on the part of the respondent, but merely that a "failure to cooperate to the best of a respondent's ability" existed (*i.e.*, information was not provided "under circumstances in which it is reasonable to conclude that less than full cooperation has been shown.")).

[133] *Id.*

[134] *See* Meisen DQR, at 14.

[135] *Id.* at 12 and Exhibits 1 and 2.

[136] *Id.* at 5.

[137] *See* Meisen supplemental Section D questionnaire response, dated September 16, 2019, at 7.

[138] *Id.* at 15.

[139] *Id.*

[140] *Id.* at 20.

[141] *Id.* at Exhibit 14.1.

[142] *See* Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Pre-Preliminary Comments for Meisen," dated September 26, 2019 (Petitioner Meisen Pre-prelim

materials obtained directly from Meisen's affiliated U.S. companies, J&K Companies,[143] that repeatedly described their cabinet doors and drawers as made of solid maple wood.[144]  Notably, Meisen reported that "J&K Companies do not sell the merchandise to any resellers and do not purchase the merchandise under investigation from any company other than {Meisen}."[145]  In addition to excerpts of J&K Companies' websites, the petitioner submitted product catalogs and online brochures that describe the J&K Companies' cabinets as being made of maple since at least 2013 and describe the characteristics and grain of maple wood, and that advertise Meisen's production as starting with solid maple wood.[146]  In addition, the petitioner submitted a sworn affidavit from an individual with extensive experience in the wooden cabinets and vanities industry who, through direct discussions and information provided on the J&K Companies' websites, alleged that the merchandise in question was represented to be made from solid maple wood.[147]  The petitioner concluded by arguing that the documentation demonstrates that Meisen uses maple in its production process and it failed to report that FOP to Commerce, and such failure merits the application of total AFA.[148]

We have reviewed the petitioner's submission, and Meisen's questionnaire responses, and have preliminarily determined based on this information that Meisen did not accurately report its FOPs, and that this failure to cooperate to the best of its ability warrants the use of AFA in determining Meisen's antidumping duty margin for this preliminary determination.  Specifically, we preliminarily determine that the record information indicates that Meisen marketed and had sales of merchandise under consideration during the POI that were produced using maple wood, a primary raw material that Meisen failed to report.  For example, Meisen submitted product brochures that stated its cabinets are made from "the finest solid maple wood,"[149] price lists that indicated that maple was a material used,[150] and commercial invoices that suggested that cabinets constructed of maple wood were sold during the POI.[151]  Further discussion of the business proprietary information related to this issue can be found in the Meisen Prelim Decision Memo.[152]

Because the record indicated that Meisen failed to provide complete and accurate information regarding its production process and FOPs, withheld information, failed to provide information in the form or manner requested, and significantly impeded this investigation, we conclude that the application of facts available is warranted for Meisen, pursuant to sections 776(a)(2)(A)-(C) of the Act.  Moreover, we preliminarily determine that Meisen failed to cooperate by not acting to the best of its ability to comply with our requests for information regarding its inputs, pursuant to section 776(b) of the Act.  Consequently, an adverse inference is warranted in the application

---

Comments), at 2.
[143] Meisen reported 16 affiliated U.S. resellers.  *See* Meisen AQR, at 18.
[144] *See* Petitioner Meisen Pre-prelim Comments, at 5-7 and Exhibits 1-5.
[145] *See* Meisen AQR, at 19.
[146] *See* Petitioner Meisen Pre-prelim Comments, at 2.
[147] *Id.* at Exhibit 7.
[148] *Id.* at 7-8.
[149] *See* Meisen SuppA, at Exhibit 41, J&K Cabinetry Catalog 2019 Edition, at 63, July 2019 Product Specifications, at 4.
[150] *See* Meisen AQR, at Exhibit 3.
[151] *See*, *e.g.*, Meisen SuppA at Exhibit A-10; Meisen SuppC, at Exhibits 3, 4, 7, 10, 12, 13, 15, and 18.
[152] *See* Memorandum, "Meisen Preliminary Decision Memorandum," dated October 2, 2019.

Filed By: Kabir Archuletta, Filed Date: 10/3/19 11:08 AM, Submission Status: Approved

Barcode:3896591-01 A-570-106 INV - Investigation  -

of facts available pursuant to section 776(b) of the Act.  We have determined that it would be inappropriate to rely upon the FOP data submitted by Meisen to calculate NV, because Meisen's response only includes FOP data for the consumption of birch wood.  A complete and accurate accounting of all FOPs used in the production of the merchandise under consideration is required for the calculation of NV, and so we cannot calculate NV.  Because NV is in turn required for the calculation of an AD margin, we also cannot calculate Meisen's weighted-average dumping margin using the data it reported.  Accordingly, as AFA and because we preliminarily determine that Meisen demonstrated an absence of *de facto* and *de jure* control, we are preliminarily assigning to Meisen a margin based on total AFA.  However, due to the proximity to the preliminary determination that this issue was raised in the investigation, we will continue to consider the application of AFA to Meisen based on any rebuttal factual information provided by Meisen and, if appropriate, any further information requested by Commerce after the issuance of this preliminary determination.[153]

### 4.  Selection and Corroboration of the AFA Rate

In applying an adverse inference, Commerce may rely on information derived from the petition, the final determination in the investigation, any previous review, or any other information placed on the record.[154]  In selecting an AFA rate, Commerce selects a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[155]  Consistent with sections 776(b)(2) and 776(d)(2) of the Act, in an investigation, Commerce's practice with respect to the assignment of an AFA rate is to select the higher of:  (1) the highest dumping margin alleged in the petition; or (2) the highest calculated dumping margin of any respondent in the investigation.[156]  In this case the higher margin is the highest dumping margin alleged in the petition, 262.18 percent.

Based on the information on the record, we are able to corroborate the 262.18 percent rate. In attempting to corroborate that rate, we compared the highest petition rate of 262.18 percent to the individually-investigated respondents' highest CONNUM-specific dumping margins (*see* section J.2 below) and found that both Foremost and Ancientree's highest calculated CONNUM-specific dumping margins exceed the highest petition rate.[157]  Because we were able to corroborate the highest dumping margin contained in the Petition, we assigned to the China-wide entity, and to Meisen, a dumping margin of 262.18 percent.

---

[153] In addition to our concerns regarding Meisen's failure to disclose all of its FOPs, we continue to have strong reservations regarding the quality and accuracy of Meisen's reported data, generally.  Specifically, we note that Meisen's initial Section C response was replete with clerical errors and omissions that required significant revisions in its supplemental response.  Moreover, Meisen's initial section D response adopted a woefully inaccurate methodology that also required wholesale revision.  Accordingly, Commerce was hindered from conducting a meaningful analysis of any data until close to this preliminary determination.

[154] *See* section 776(b) of the Act.

[155] *See* SAA at 870.

[156] *See*, *e.g.*, *Certain Uncoated Paper from Indonesia:  Final Determination of Sales at Less Than Fair Value*, 81 FR 3101 (January 20, 2016).

[157] *See* Foremost Prelim Analysis Memo; *see also* Memorandum, "Preliminary Results Analysis Memorandum for The Ancientree Cabinet Co., Ltd," dated October 2, 2019 (Ancientree Prelim Analysis Memo).

25

F.   Affiliation and Collapsing

We have considered the evidence on the record and preliminarily determine that affiliation exists between Foremost Worldwide Company Limited (Foremost Worldwide), a trader of subject merchandise, and Foremost, the wholly-owned subsidiary of Foremost Worldwide and producer of subject merchandise.[158]  Based on the record evidence, we also preliminarily determine that affiliation does not exist among Ancientree, a producer of subject merchandise, and Jiangsu Hongjia Wood Co., Ltd. (Jiangsu Hongjia), a trader of wood inputs.[159]

1.   Affiliation

Section 771(33) of the Act provides that the following persons shall be considered to be "affiliated" or "affiliated persons":

(A)      Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants;

(B)      Any officer or director of an organization and such organization;

(C)      Partners;

(D)      Employer and employee;

(E)      Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization;

(F)      Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; or,

(G)      Any person who controls any other person and such other person.

The Act further states that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."[160] "Person" is defined to include "any interested party as well as any other individual, enterprise, or entity, as appropriate."[161]

The Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreement Act states the following:

The traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm 'operationally in a position to exercise restraint or direction' over another in the absence of an equity relationship. A company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchise or joint

---

[158] *See* Foremost AQR, at 6 and Exhibit Q3A.
[159] *See* Ancientree AQR, at A-4.
[160] *See* section 771(33) of the Act.
[161] *See* 19 CFR 351.102(b)(37).

venture agreements, debt financing, or close supplier relationships
in which the supplier or buyer becomes reliant upon the other.[162]

Section 351.102(b)(3) of Commerce's regulations defines affiliated persons and affiliated parties
as having the same meaning as in section 771(33) of the Act.  In determining whether control
over another person exists, within the meaning of section 771(33) of the Act, Commerce will
consider the following factors, among others:  corporate or family groupings; franchise or joint
venture agreements; debt financing; and close supplier relationships.  Commerce will not find
that control exists on the basis of these factors unless the relationship has the potential to impact
decisions concerning the production, pricing, or cost of the subject merchandise or foreign like
product.  Commerce will consider the temporal aspect of a relationship in determining whether
control exists; normally, temporary circumstances will not suffice as evidence of control.[163]

Section 771(33)(E) of the Act considers affiliated entities to be any person, directly or indirectly
owning, controlling, or holding with power to vote, five percent or more of the outstanding
voting stock or shares of any organization and such organization.  Section 771(33)(F) of the Act
considers entities affiliated if they are directly or indirectly controlling, controlled, by, or under
common control with, any person.  Section 771(33)(G) of the Act considers affiliated entities to
be any person who controls any other person and such other person.  For purposes of statutory
construction, the term "person" can be construed in the singular or plural and can include a
corporate entity or group.[164]  Moreover, the statute does not require evidence of actual control; it
is the ability to control that is dispositive.[165]  A company may be in a position to exercise
restraint or direction, for example, through "corporate . . . groupings {and} . . . joint venture
agreements."[166]  Additionally, Commerce will not consider control to exist unless the
relationship has the potential to impact decisions concerning production, pricing, or cost of the
subject merchandise or foreign like product.[167]

*Foremost*

In Foremost's separate rate application, submitted collectively for Foremost and Foremost
Worldwide, Foremost explained that Foremost Worldwide and Foremost are "both subsidiaries
of Foremost Groups, Ltd…and {Foremost Worldwide} purchased subject merchandise from its
affiliate, {Foremost.}"[168]  On July 3, 2019, Foremost submitted its response to the section A
questionnaire, in which it identified its ownership/corporate structure and the various affiliates
that play roles in the sale, marketing, and production of the subject merchandise.[169]  In
Foremost's AQR, Foremost reported that it is the wholly owned subsidiary of Foremost

---

[162] *See* SAA, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) (SAA) at 838.

[163] *See* 19 CFR 351.102(b)(3).

[164] *See Dongkuk Steel Mill Co. v. United States*, 29 CIT 724 (June 22, 2005) (*Dongkuk*).

[165] *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27297-98 (May 19, 1997)
(*Preamble*).

[166] *See* SAA at 838; *see also* 19 CFR 351.102(b)(3).

[167] *See* 19 CFR 351.102(b)(3); *see also Certain Welded Carbon Standard Steel Pipe and Tubes from India; Final
Results of New Shippers Antidumping Duty Administrative Review*, 62 FR 47632, 47638 (September 10, 1997).

[168] *See* Foremost's May 14, 2019 separate rate application (Foremost SRA) at 1 and 4.

[169] *See* Foremost AQR, at 4-12 and Exhibit Q3A.

27

Worldwide.[170]  On August 28, 2019, Foremost and Foremost Worldwide submitted a response regarding the companies' organizational structure, in which Foremost states that "Foremost Worldwide has four main locations…all involved in various capacities in the production, sale, distribution or development of subject merchandise{.}"[171]  The record does not indicate that Foremost Worldwide produces or is able to produce subject merchandise.

Based on the evidence on the record, we preliminarily find that Foremost and Foremost Worldwide are affiliated within the meaning of sections 771(33)(E), (F) and (G) of the Act. Because during the POI Foremost was a wholly owned subsidiary of Foremost Worldwide, Foremost Worldwide directly owns more than five percent of Foremost and the companies are therefore affiliated pursuant to section 771(33)(E) of the Act.  Because Foremost and Foremost Worldwide are both wholly-owned  subsidiaries of Foremost Groups, Ltd., they are under the common control of the same entity and therefore affiliated pursuant to section 771(33)(F) of the Act.  Furthermore, Foremost Worldwide is in a position to control Foremost, via its ownership of 100 percent of the shares in Foremost, and thus the companies are affiliated pursuant to section 771(33)(G) of the Act.

*Ancientree*

We do not find that Ancientree and Jiangsu Hongjia are affiliated parties within the meaning of section 771(33) of the Act.[172]

2.   Collapsing

Section 351.401(f) of Commerce's regulations, which outlines the criteria for treating affiliated producers as a single entity for purposes of AD proceedings, states:

(1)  In general. In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.
(2)  Significant potential for manipulation. In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:
    (i)      The level of common ownership;
    (ii)     The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
    (iii)    Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing

---

[170] *Id.* at 8.
[171] *See* Foremost Org Structure Supp at 1.
[172] For further details, including a discussion of the relevant business proprietary information, Ancientree Prelim Analysis Memo.

of facilities or employees, or significant transactions between the affiliated producers.[173]

The *Preamble* to Commerce's regulations clarifies how Commerce should apply this section in its collapsing analysis, explaining that this list of factors is "non-exhaustive."[174]  The *Preamble* also states that "{Commerce} has not adopted the suggestion that it will collapse only in 'extraordinary' circumstances.  A determination of whether to collapse should be based upon an evaluation of the factors listed in paragraph (f), and not upon whether fact patterns calling for collapsing are commonly or rarely encountered."[175]  The *Preamble* states, however, that Commerce must still find that the potential for manipulation of price and production is significant.[176]

Commerce's determination in *Colombian Flowers* details Commerce's practice of collapsing affiliates:[177]

> Because {Commerce} calculates margins on a company-by-company basis, it must ensure that it reviews the entire producer or reseller, not merely part of it.  {Commerce} reviews the entire entity due to its concerns regarding price and cost manipulation.  Because of this concern, {Commerce} normally examines the question of whether reviewed companies "constitute separate manufacturers or exporters for purposes of the dumping law."[178]

---

[173] *See* 19 CFR 351.401(f).

[174] *See Preamble*, 62 FR at 27345.

[175] *Id.*

[176] *Id.* at 27345-46.  Commerce's practice is consistent with the statement in the *Preamble* that the "significant potential" criteria provided in section 351.401(f) are non-exhaustive.  For instance, in *Certain Welded Carbon Standard Steel Pipes and Tubes from India; Final Results of New Shippers Antidumping Duty Administration Review*, 62 FR 47632, 47638 (September 10, 1997), Commerce stated that "{n}ot all of these criteria must be met in a particular case; the requirement is that {Commerce} determine that the affiliated companies are sufficiently related to create the potential of price or production manipulation."  Similarly, in *Notice of Final Determination of Sales at Less Than Fair Value:  Collated Roofing Nails from Taiwan*, 62 FR 51427, 51436 (October 1, 1997), while it addressed the section 351.401(f) criteria, Commerce made its determination to collapse based on the "totality of the circumstances":
> The totality of the circumstances presented by these facts indicate that the two companies operate under common control of the same individual/family with respect to sales and production decisions.  Although both S&J's General Manager and New Lan Luang's Chairman {a father and son} are only minority shareholders in both companies, we conclude that their positions of legal and operational control in their respective companies create a significant potential for price or production manipulation.  We therefore have treated S&J and New Lan Luang as a single entity for purposes of calculating a dumping margin in this investigation.

[177] *See Certain Fresh Cut Flowers from Colombia; Final Results of Antidumping Duty Administrative Reviews*, 61 FR 42833, 42853 (August 19, 1996) (*Colombian Flowers*).

[178] *See Certain Fresh Cut Flowers from Colombia; Final Results of Antidumping Duty Administrative Reviews,* 61 FR 42833, 42853 (August 19, 1996) (*Colombian Flowers*) (citing *Final Determination of Sales at Less than Fair Value; Certain Granite Products from Spain*, 53 FR 24335, 24337 (June 28, 1988)).  While 19 CFR 351.401(f) uses the term "producers," Commerce's practice is to apply this regulation to resellers and other affiliated companies, as well.  *See, e.g.*, *Colombian Flowers*, 61 FR at 42853 (citing *Final Determination of Sales at Less than Fair Value; Certain Granite Products from Spain*, 53 FR 24335, 24337 (June 28, 1988)); *see also Hontex Enters. v. United States*, 342 F. Supp. 2d 1225, 1234 (CIT 2004) (*Hontex II*) (upholding Commerce's analysis going beyond the

29

In proceedings involving NME countries, Commerce begins with the rebuttable presumption that all companies within the country are subject to government control.[179] Companies subject to government control are treated as part of the NME entity and assigned the same weighted-average dumping margin.[180]  Commerce, however, has recognized that NME companies separate from the NME entity may be connected and such connections could provide a potential for manipulation affecting dumping margins.[181]  Thus, to the extent that section 771(33) of the Act does not conflict with Commerce's application of separate rates and the enforcement of the NME provision of section 773(c) of the Act, Commerce may determine that affiliated exporters and/or producers should be treated as a single entity if the facts of the case support such a finding.[182] The CIT has upheld Commerce's practice of determining whether to treat two or more companies as a single entity for antidumping purposes based on a consideration of whether there exists a significant potential for manipulation of prices and/or export decisions.[183]

Furthermore, Commerce notes that the factors listed in 19 CFR 351.401(f)(2) are not exhaustive, and in the context of an NME investigation, other factors unique to the relationship of business entities in the NME may lead Commerce to determine that collapsing is either warranted or unwarranted, depending on the facts of the case.[184]  Further, in *Hontex II*, the CIT affirmed Commerce's ability to expand the market-economy inquiry into the potential for manipulation to include NME exporters' export decisions, rather than simply relying on whether or not the companies share production facilities.[185]

The CIT has recognized that when determining whether there is a significant potential for manipulation 19 CFR 351.401(f)(2)(i), (ii), and (iii) are considered by Commerce in light of the

---

traditional regulatory analysis to address significant potential for manipulation through other means, such as collapsing exporters, other than those listed in the regulations).

[179] *See, e.g., Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485, 40487 (July 15, 2008) (citing *Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588 (may 6, 1991), as amplified by *Notice of Final Determination of Sales at Less Than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994)).

[180] *Id.*

[181] *See Certain Steel Nails from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances and Postponement of Final Determination*, 73 FR 3928, 3932 (January 23, 2008) (unchanged in *Certain Steel Nails from the People's Republic of China:  Amended Preliminary Determination of Sales at Less Than Fair Value*, 73 FR 7254 (February 7, 2008)), and *Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008).

[182] *See Certain Preserved Mushrooms from the People's Republic of China:  Preliminary Results of Sixth New Shipper Review and Preliminary Results and Partial Rescission of Fourth Antidumping Duty Administrative Review*, 69 FR 10410, 10413 (March 5, 2004) (*Mushrooms*), unchanged in *Final Results and Final Rescission, in Part, of Antidumping Duty Administrative Review:  Certain Preserved Mushrooms from the People's Republic of China*, 70 FR 54361 (September 14, 2005).

[183] *See Hontex II*, 342 F. Supp. 2d 1225, 1230-34.

[184] *See Mushrooms*, 69 FR at 10413, 10414 (citing *Hontex Enterprises v. United States*, 248 F. Supp. 2d 1323, 1342-43 (CIT 2003) (*Hontex*) (noting that the application of collapsing in the NME context may differ from the standard factors listed in the regulation)).

[185] *See Hontex II*, 342 F. Supp. 2d at 1233-1234.

totality of the circumstances; no one factor is dispositive in determining whether to collapse the producers.[186]

Additionally, Commerce looks for "relatively unusual situations, where the type and degree of relationship is so significant that {it} finds that there is a strong possibility of price manipulation."[187]  The CIT has upheld Commerce's practice of taking into account one such unique factor, namely export decisions, in applying the collapsing provisions in NME proceedings.[188]  Thus, although Commerce's regulations do not address the treatment of non-producing entities (*e.g.*, exporters), where non-producing entities are affiliated, and there exists a significant potential for manipulation of prices and/or export decisions, Commerce has considered such entities, as well as other affiliated entities (where appropriate), as a single entity.[189]  Moreover, in examining these factors as they pertain to a significant potential for manipulation, Commerce considers both actual manipulation in the past and the possibility of future manipulation.[190]  The *Preamble* underscores the importance of considering the possibility of future manipulation:  "a standard based on the potential for manipulation focuses on what may transpire in the future."[191]  We have therefore, in accordance with 19 CFR 351.401(f)(2), examined all three factors with respect to the potential for future manipulation.

Commerce thus interprets 19 CFR 351.401(f) to include three criteria for a collapsing analysis: (1) whether two or more producers affiliated; (2) whether they have similar production facilities that would not require substantial retooling in order to restructure manufacturing priorities; and (3) whether there is a significant potential for manipulation of price or production.

        *a)*    *Affiliation*

As analyzed above, we find that Foremost and Foremost Worldwide are affiliated with each other because during the POI they were indirectly owned and/or controlled by the same entity, Foremost was a wholly owned subsidiary of Foremost Worldwide, and Foremost Worldwide is

---

[186] *See Koyo Seiko Co., Ltd. v. United States*, 516 F. Supp. 2d 1323, 1346 (CIT 2007) (citing *Light Walled Rectangular Pipe and Tube from Turkey; Notice of Final Determination of Sales at Less Than Fair Value*, 69 FR 53675 (September 2, 2004) and accompanying Issues and Decision Memorandum (IDM) at Comment 10).

[187] *See Koyo Seiko citing Nihon Cement Co. v. United States*, 17 C.I.T. 400, 426 (CIT 1993) (quoting *Final Determination of Sales at Less than Fair Value:  Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany*, 54 FR 18992, 19089 (May 3, 1989)).

[188] *See Hontex II*, 342 F. Supp. 2d at 1230-34 (in which the CIT affirmed Commerce's ability to expand the market-economy inquiry into the potential for manipulation to include NME exporters' export decisions, rather than whether or not the companies share production facilities).

[189] *See*, *e.g.*, *Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil; Notice of Final Determination at Sales at Less Than Fair Value*, 65 FR 5554 (February 4, 2000); *Certain Welded Carbon Steel Pipes and Tubes from Thailand:  Final Results of Antidumping Duty Administrative Review*, 63 FR 55578 (October 16, 1998) and accompanying IDM at Comment 2; *Automotive Replacement Glass Windshields from the People's Republic of China; Preliminary Results of Antidumping Duty Administrative Review*, 69 FR 25545 (May 7, 2004); *Automotive Replacement Glass Windshields from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 69 FR 61790 (October 21, 2004); and *Mushrooms* and accompanying IDM at Comment 1; *see also Hontex*, 248 F. Supp. 2d at 1343.

[190] *See Preamble*, 62 FR 27296, 27346.

[191] *Id*.

31

in a position to control Foremost, via its ownership of 100 percent of the shares in Foremost. Consequently, the first collapsing criterion has been satisfied.

### b) Similarity of Production Facilities and Substantial Retooling

The second collapsing criterion in 19 CFR 351.401(f)(1) requires that the affiliated producers have "production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities." Foremost states that it is a producer and exporter of subject merchandise, while Foremost Worldwide functions as a non-producing exporter.[192]

Neither the statute nor the regulations contain specific guidelines for determining when two or more exporters should receive the same antidumping duty rate. Commerce's practice of collapsing companies recognizes that it is appropriate to treat certain groups of companies as a single entity, and to determine a single weighted-average margin for that entity, in order to determine margins accurately and to prevent manipulation that would undermine the effectiveness of the antidumping duty law.[193] With respect to Foremost Worldwide, Commerce finds that it is an exporter, and thus similarity of production facilities and whether substantial retooling is required are inapplicable to Commerce's analysis.

### c) Significant Potential for Manipulation of Price or Production

With respect to the final criterion of the collapsing analysis, 19 CFR 351.401(f)(2) provides a non-exhaustive list of three factors that Commerce may consider in determining whether a significant potential for manipulation of price or production exists: (i) the level of common ownership; (ii) the extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and (iii) whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers. We consider the totality of the circumstances particular to the case at hand in analyzing the factors, as no one factor is more important than another and not all three factors listed in the regulations are required.[194]

### i. Level of Common Ownership

We analyzed the level of common ownership in the affiliation section above. As noted above, Foremost and Foremost Worldwide are wholly owned by Foremost Groups, Ltd. Because these

---

[192] *See* Foremost's May 14, 2019 separate rate application (Foremost SRA) at 1 and 4.
[193] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp from Brazil,* 69 FR 76910 (December 23, 2004), and accompanying IDM at Comment 5.
[194] *See Final Determination of Less-Than-Fair Value Investigation: Steel Concrete Reinforcing Bars from the Republic of Korea,* 69 FR 19399 (April 13, 2004), and accompanying IDM*; see also, e.g., Final Determination of Sales at Less Than Fair Value; Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil*, 64 FR 38756, 38778 (July 19, 1999) (*Hot-Rolled Steel from Brazil*)*; see also Dongkuk*, 29 CIT at 733-35.

32

companies are owned by the same company, we find that there was significant common ownership between Foremost and Foremost Worldwide during the POI.

        ii.      Interlocking Board and Managers

Foremost provided a list of management for both Foremost and Foremost Worldwide, showing overlap between the two entities.[195]  Commerce finds that the boards and managers of these two entities are significantly interlocked.[196]

        iii.     Intertwined operations

Section 351.401(f)(2)(iii) of Commerce's regulations directs Commerce to consider whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

Information on the record shows that there is significant intertwining of operations between Foremost and Foremost Worldwide and that Foremost does not operate independently from Foremost Worldwide.  Throughout Foremost's questionnaire responses, Foremost noted that certain expenses related to the production and movement of subject merchandise and its inputs were arranged for, resold through, and/or and paid by Foremost Worldwide.[197]

Although Foremost Worldwide is not a producer, we nonetheless find that there exists a significant potential for manipulation of prices pursuant to 19 CFR 351.401(f)(2).  Specifically, as detailed above, Foremost and Foremost Worldwide are under common ownership, have interlocking boards and managers, and intertwined operations.  The result is that Foremost Worldwide not only acts as a conduit for sales, but the potential exists for Foremost and Foremost Worldwide to collectively determine prices, negotiate with customers, and manage the sales and distribution process and to otherwise act in unison with one another.  Thus, while Foremost Worldwide is not a producer, Commerce's practice is to extend this analysis to resellers and other affiliated parties, where applicable.[198]  After analyzing all of the record evidence, we find that Foremost Worldwide is an affiliated reseller acting in coordination with the primary producer (who is also an exporter).  Therefore, we find that there exists a significant potential between the two entities to manipulate price.

Thus, because we have found that Foremost and Foremost Worldwide are affiliated and the record evidence demonstrates a significant potential for the manipulation of price or production, the criteria outlined in 19 CFR 351.401(f) have been met and we are preliminarily collapsing Foremost and Foremost Worldwide.

---

[195] *See* Foremost SAQR at Exhibit SA-4.
[196] *See* Foremost Prelim Analysis for further discussion on the intertwined boards and managers of Foremost and Foremost Worldwide.
[197] *See e.g.*, Foremost CDQR at section C page 4-5; Foremost SDQR at SD-17.
[198] *See Colombian Flowers*, 62 FR at 42853; *Hontex II*, 342 F. Supp. 2d at 1234.  *See also* SAA at 838.

F. Date of Sale

In identifying the date of sale of the subject merchandise, Commerce normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business.[199]  Additionally, Commerce may use a date other than the date of invoice if it is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[200]  Furthermore, we have a long-standing practice of finding that, where shipment date precedes invoice date, shipment date better reflects the date on which the material terms of sale are established.[201]

Ancientree reported the earlier of the sales invoice date or the date of shipment as the date of sale for its U.S. sales.[202]  Ancientree explained that "{o}n occasion, the company generated commercial invoices slightly later than the date of shipment" and, "during the POI, there were no circumstances in which the material terms of sale changed after the shipment."[203]

Foremost reported the earlier of the sales invoice date or the date of shipment as the date of sale for its U.S. sales.[204]  Foremost reported that the material terms of sale may change after the issuance of a purchase order and that in "the vast majority of cases shipment and invoice dates are identical."[205]  Foremost also acknowledged that in a small number of cases the difference between invoice data and shipment date may differ by one or two days.  As such, in accordance with Commerce's practice, we are preliminarily using the earlier of invoice date or date of shipment as the date of sale.

Consistent with 19 CFR 351.401(i), we preliminarily determine to use the earlier of the sales invoice date or the date of shipment as the date of sale for all POI sales by Ancientree and Foremost.

G. Comparisons to Fair Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether the respondents' sales of the subject merchandise from China to the United States were made at less than fair value, Commerce compared the export price (EP) or constructed export price (CEP) to the NV as described in the "Export Price" and "Normal Value" sections of this memorandum.

---

[199] *See* 19 CFR 351.401(i).
[200] *Id.  See also Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090-92 (CIT 2001) (*Allied Tube & Conduit Corp.*) ("As elaborated by Department practice, a date other than invoice date 'better reflects' the date when 'material terms of sale' are established if the party shows that the 'material terms of sale' undergo no meaningful change (and are not subject to meaningful change) between the proposed date and the invoice date.").
[201] *See, e.g., Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 10670 (March 12, 2018), and accompanying PDM at 6-7, unchanged in *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 32629 (July 13, 2018).
[202] *See* Ancientree CDQR, at C-14.
[203] *Id.; See also* Ancientree's section A supplemental questionnaire response, dated August 7, 2019, at 9.
[204] *See* Foremost SCQR at 8.
[205] *See* Foremost SAQR at 12.

1.   Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing weighted-average NVs to weighted-average EPs (or CEPs) (*i.e.*, the average-to-average method) unless the Secretary determines that another method is appropriate in a particular situation.  In AD investigations, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the average-to-transaction method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In recent investigations, Commerce has applied a "differential pricing" analysis for determining whether application of the average-to-transaction method is appropriate in a particular situation pursuant to 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[206]  Commerce finds that the differential pricing analysis used in recent investigations may be instructive for purposes of examining whether to apply an alternative comparison method in this investigation.  Commerce will continue to develop its approach in this area based on comments received in this and other proceedings, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the average-to-average method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used in this preliminary determination examines whether there exists a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all export sales by purchasers, regions and time periods to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported customer codes.  Regions are defined using the reported destination code (*i.e.*, zip code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the period of investigation based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region and time period, that Commerce uses in making comparisons between export price (or constructed export price) and normal value for the individual dumping margins.

---

[206] *See, e.g., Polyethylene Terephthalate Resin from Taiwan:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 83 FR 19696 (May 4, 2018), unchanged in *Polyethylene Terephthalate Resin from Taiwan:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part,* 83 FR 48287 (September 24, 2018); *Large Diameter Welded Pipe from Canada: Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 83 FR 43649 (August 27, 2018), unchanged in *Large Diameter Welded Pipe from Canada:  Final Affirmative Determination of Sales at Less Than Fair Value,* 84 FR 6378 (February 27, 2019); and *Cast Iron Soil Pipe from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 83 FR 44567 (August 31, 2018), unchanged in *Cast Iron Soil Pipe from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value,* 84 FR 6767 (February 28, 2019).

35

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group.  First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise.  Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices to the particular purchaser, region or time period differ significantly from the prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test:  small, medium or large (0.2, 0.5 and 0.8, respectively).  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's *d* test.  If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the average-to-average method.

If both tests in the first stage (*i.e.,* the Cohen's *d* test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can appropriately account for such differences.  In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only.  If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if 1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold, or 2) the resulting

36

weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold.

Interested parties may present arguments and justifications in relation to the above-described differential pricing approach used in these preliminary results, including arguments for modifying the group definitions used in this proceeding.[207]

### 2.   Results of the Differential Pricing Analysis

For  Foremost, based on the results of the differential pricing analysis, Commerce preliminarily finds that 47.10 percent of the value of U.S. sales pass the Cohen's d test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce preliminarily determines that there is no meaningful difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's d test and the average-to-average method to those sales which did not pass the Cohen's d test.  Thus, for this preliminary determination, Commerce is applying the average-to-average method for all U.S. sales to calculate the weighted-average dumping margin for Foremost.[208]

For Ancientree, based on the results of the differential pricing analysis, Commerce preliminarily finds that 33.80 percent of the value of U.S. sales pass the Cohen's *d* test, which confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce preliminarily determines that the average-to-average method cannot account for such differences because there is a 25 percent relative change between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test.  Thus, for this preliminary determination, Commerce is applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test to calculate the weighted-average dumping margin for Ancientree.[209]

### H.  U.S. Prices

For all sales made by Ancientree and certain of Foremost's sales, we used EP methodology, in accordance with section 772(a) of the Act, because the subject merchandise was sold to the first unaffiliated purchaser in the United States prior to importation and CEP methodology was not otherwise warranted based on the facts on the record.  For the remainder of Foremost's sales, we used CEP methodology, in accordance with section 772(b) of the Act, because the subject

---

[207] The Court of Appeals for the Federal Circuit (CAFC) has affirmed much of Commerce's differential pricing methodology.  *See, e.g.*, *Apex Frozen Foods v. United States*, 862 F.3d 1322 (Fed. Cir. 2017).  We ask that interested parties present only arguments on issues which have not already been decided by the CAFC.
[208] *See* Foremost Prelim Analysis Memo.
[209] *See* Ancientree Prelim Analysis Memo.

Filed By: Kabir Archuletta, Filed Date: 10/3/19 11:08 AM, Submission Status: Approved

merchandise was sold in the United States by a U.S. seller affiliated with the respondent and EP methodology was not otherwise warranted.

### 1. Ancientree

For Ancientree's reported sales, in accordance with section 772(a) of the Act, we based the U.S. price of subject merchandise on EP. We calculated EP based on the prices at which subject merchandise was sold to unaffiliated purchasers in the United States. We made deductions, as appropriate, from the reported U.S. price for movement expenses for Ancientree, *e.g.*, foreign inland freight expenses and foreign brokerage and handling expenses.[210] We based movement expenses on SVs where the service was purchased from a company located in a country considered to be an NME.[211] Ancientree recoded sales as non-subject merchandise in a supplemental response, claiming that they were aftermarket accessory items or separately sold, thereby excluded from the scope of the investigation.[212] However, Ancientree did not provide documentation to support its claim. For the preliminary determination, Commerce is treating these sales as subject merchandise.[213]

### 2. Foremost

For Foremost's EP sales, we calculated EPs based on the sales price to the unaffiliated purchaser(s) in the United States. In accordance with section 772(c)(2)(A) of the Act, as appropriate, Commerce deducted from the sales price certain foreign inland freight, brokerage and handling (B&H), and international movement costs. Because the inland freight and B&H services were either provided by an NME vendor or paid for using an NME currency, Commerce based the deduction of these charges on SVs.[214] For the international freight provided by an ME provider and paid in U.S. dollars, Commerce used the reported expense.[215]

For Foremost's CEP sales, we calculated CEP based on prices to unaffiliated purchasers in the United States. In accordance with sections 772(c)(2)(A) and 772(d)(1) and of the Act, Commerce made deductions from the starting price (gross unit price) for foreign movement expenses, international movement expenses, and U.S. movement expenses. Where foreign movement expenses, international movement expenses, or U.S. movement expenses were provided by NME service providers or paid for in an NME currency, Commerce valued these services using SVs.[216] For those expenses that were provided by an ME provider and paid for in an ME currency, Commerce used the reported expense, or a weighted average of the SV and ME price where the ME purchases do not represent substantially all of the input.[217] In accordance

---

[210] *See* section 772(c)(2)(A) of the Act.

[211] *See* "Factor Valuation Methodology" section.

[212] *See* letter from Ancientree, "Response to Third Supplemental Questionnaire," dated September 6, 2019, at 5-9.

[213] *See* Ancientree Prelim Analysis Memo.

[214] *See* Foremost SCQR at *22; see also* Prelim Surrogate Value Memo for details regarding the SVs for movement expenses.

[215] *See* Foremost CDQR at section C pages 28-29; *see also* Foremost Prelim Analysis Memo for further information related to calculation of movement expenses.

[216] *See* Prelim Surrogate Value Memo.

[217] *See Use of Market Economy Input Prices in Nonmarket Economy Proceedings*, 78 FR 46799 (August 2, 2013).

with section 772(d)(1) of the Act, Commerce also deducted those selling expenses associated with economic activities occurring in the United States.  Commerce deducted, where appropriate, commissions, inventory carrying costs, interest revenue, credit expenses, warranty expenses, and indirect selling expenses.

Foremost reported that some sales included non-subject components such as faucets, countertops, sinks, and/or sink bowls (which Foremost refers to as "combination kits").[218]  For all of Foremost's combination kits, we calculated an adjusted price, in order to only include the price of subject merchandise in our analysis.[219]

### 3.  Value-Added Tax

Commerce's recent practice in NME cases is to adjust EP (or the CEP) for the amount of any unrefunded, (herein irrecoverable) value-added tax (VAT) in certain non-market economies in accordance with section 772(c)(2)(B) of the Act.[220]  In changing the practice, Commerce explained that, when an NME government imposes an export tax, duty, or other charges on subject merchandise, or on inputs used to produce subject merchandise, from which the respondent was not exempted, Commerce will reduce the respondent's EP and CEP prices accordingly, by the amount of the tax, duty or charge paid, but not rebated.[221]  Where the irrecoverable VAT is a fixed percentage of EP or CEP, Commerce explained that the final step in arriving at a tax neutral dumping comparison is to reduce the U.S. EP or CEP downward by this same percentage.[222]

VAT is an indirect, *ad valorem* consumption tax imposed on the purchase (sale) of goods.  It is levied on the purchase (sale) price of the good, *i.e.*, it is paid by the buyer and collected by the seller.  For example, if the purchase price is $100 and the VAT rate is 15 percent, the buyer pays $115 to the seller, $100 for the good and $15 in VAT.  VAT is typically imposed at every stage of production.  Thus, under a typical VAT system, firms:  (1) pay VAT on their purchases of production inputs and raw materials ("input VAT") as well as (2) collect VAT on sales of their output ("output VAT").

Firms calculate input VAT and output VAT for tax purposes on a company-wide (not transaction-specific) basis, *i.e.*, in the case of input VAT, on the basis of *all input purchases* regardless of whether used in the production of goods for export or domestic consumption, and in the case of output VAT, on the basis of *all sales to all markets*, foreign and domestic.  Thus, a firm might pay the equivalent of $60 million in total input VAT across all input purchases and collect $100 million in total output VAT across all sales.  In this situation, however, the firm would remit to the government only $40 million of the $100 million in output VAT collected on

---

[218] *See* Foremost CDQR at section C pages 22-23 and Exhibit C-14.1.

[219] Further information related to the calculation of the adjusted price of combination kits can be found in Foremost's Prelim Analysis Memo.

[220] *See Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481 (June 19, 2012).

[221] *Id.*; *see also Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 4875 (January 30, 2014), and accompanying IDM at Comment 5.A.

[222] *Id.*

its sales because of a $60 million credit for input VAT paid that the firm can claim against output VAT.[223]  As result, the firm bears no "VAT burden (cost)":  the firm through the credit is refunded or recovers <u>all</u> of the $60 million in input VAT it paid, and the $40 million remittance to the government is simply a transfer to the government of VAT paid by (collected from) the buyer with the firm acting only as an intermediary.  Thus, the cost of output VAT falls on the buyer or the good, not on the firm.

This would describe the situation under Chinese law except that producers in China, in most cases, do not recover (*i.e.*, are not refunded) the total input VAT they paid.  Instead, Chinese tax law requires a *reduction in or offset to* the input VAT that can be credited against output VAT.  This formula for this reduction/offset is provided in Article 5 of the 2012 Chinese government tax regulation, *Circular on Value-Added Tax and Consumption Tax Policies on Exported Goods and Services* (*2012 VAT Notice*):[224]

$$\textbf{Reduction/Offset} = \textbf{(P} - \textbf{c)} \text{ x } \textbf{(T}_1 - \textbf{T}_2\textbf{),}$$

where,
P = (VAT-free) FOB value of export sales;
c = value of bonded (duty- and VAT-free) imports of inputs used in the production of goods for export;
$T_1$ = VAT rate; and,
$T_2$ = refund rate specific to the export good.
Using the example above, if P = $200 million, c = 0, $T_1$ = 17% and $T_2$ = 10%, then the reduction/offset = ($200 million - $0) x (17% - 10%) = $200 million x 7% = $14 million.  Chinese law then requires that the firm in this example calculate creditable input VAT by subtracting the $14 million from total input VAT, as specified in Article 5.1(1) of the *2012 VAT Notice*:

$$\textbf{Creditable input VAT} = \textbf{Total input VAT} - \textbf{Reduction/Offset}$$

Using again the example above, the firm can credit only $60 million – $14 million = $46 million of the $60 million in input VAT against output VAT.  Since the $14 million is not creditable (legally recoverable), it is not refunded to the firm.  Thus, the firm incurs a cost equal to $14 million, which is calculated on the basis of FOB export value at the *ad valorem* rate of $T_1 - T_2$.  This cost therefore functions as an "export tax, duty, or other charge" because the firm does not incur it *but for* exportation of the subject merchandise, and under Chinese law must be recorded as a cost of exported goods.[225]  It is for this "export tax, duty, or other charge" that Commerce makes a downward adjustment to U.S. price under section 772(c) of the Act.[226]

---

[223] The credit, if not exhausted in the current period, can be carried forward.

[224] *See, e.g.*, Meisen's supplemental section C questionnaire Response, dated May 31, 2019 at Exhibit 32 (*2012 VAT Notice*).

[225] Article 5(3) of the *2012 VAT Notice* states:  "If the tax refund rate is lower than the applicable tax rate, the tax for the difference calculated accordingly shall be included in the cost of exported goods and labor services."

[226] Because the $14 million is the amount of input VAT that is not refunded to the firm, it is sometimes referred to as "irrecoverable input VAT."  However, that phrase is perhaps misleading because the $14 million is not a fraction or percentage of the VAT the firm paid on purchases of inputs used in the production of exports.  If that were the case,

It is important to note that under Chinese law, the reduction/offset described above is defined in terms of, and applies to, total (company-wide) input VAT across purchases of all inputs, whether used in the production of goods for export or domestic consumption.  The reduction/offset does not distinguish the VAT treatment of export sales from the VAT treatment of domestic sales from an input VAT recovery standpoint for the simple reason that such treatment under Chinese law applies to the company as a whole, not specific markets or sales.  At the same time, however, the reduction/offset is calculated on the basis of the FOB value of exported goods, so it can be thought of as a tax on the company (*i.e.*, a reduction in the input VAT credit) that the company would not incur but for the export sales it makes, a tax fully allocable to export sales because the firm under Chinese law must book it as cost of exported goods.

The VAT treatment under Chinese law of exports of goods described above concerns only export sales that are *not* subject to output VAT, the situation where the firm collects no VAT from the buyer, which applies to most exports from China.  However, the *2012 VAT Notice* provides for a limited exception in which export sales of certain goods are, under Chinese law, deemed domestic sales for tax purposes and are thus subject to output VAT at the full rate.[227]  The formulas discussed above from Article 5 of the *2012 VAT Notice* do not apply to firms that export these goods, and there is therefore no reduction in or offset to their creditable input VAT.  For these firms creditable input VAT = total input VAT, *i.e.*, these firms recover all of their input VAT.  At the same time, export sales of these firms are subject to an explicit output VAT at the full rate, $T_1$.[228]  Commerce must therefore deduct this tax from U.S. price[229] under section 772(c) of the Act to ensure tax-neutral dumping margin calculations.[230]

As such, in the initial questionnaires, Commerce instructed mandatory respondents to report VAT on the subject merchandise sold to the United States during the POI and to identify which taxes are unrefunded upon export.[231]  Information placed on the record of this investigation indicates that according to China VAT schedule, the standard VAT levy during the period July 1, 2018, through December 31, 2018, was 16 percent and the rebate rates for the subject merchandise were 15 percent before November 1, 2018, and sixteen percent on or after November 1, 2018, respectively.[232]  Consistent with our standard methodology, for purposes of

---

the value of production inputs, not FOB export value, would appear somewhere in the formula in Article 5 of the *2012 VAT Notice* as the tax basis for the calculation.  The value of production inputs does not appear in the formula.  Instead, as explained above, the $14 million is simply a cost imposed on firms that is tied to export sales, as evidenced by the formula's reliance on the FOB export value as the tax basis for the calculation.  The $14 million is a reduction in or offset to what is essentially a tax credit, and it is calculated based on and is proportional to the value of a company's export sales.  Thus, "irrecoverable input VAT" is in fact, despite its name, an export tax within the meaning of section 772(c) of the Act.

[227] *See 2012 VAT Notice*, Article 7.  For these goods, the VAT refund rate on export is zero.

[228] *See 2012 VAT Notice*, Article 7.2(1).

[229] Commerce will divide the VAT-inclusive export price by (1 + T), where T is the applicable VAT rate.

[230] Pursuant to sections 772(c) and 773(c) of the Act, the calculation of normal value based on factors of production in NME antidumping cases is calculated on a VAT-exclusive basis, so U.S. price must also be calculated on a VAT-exclusive basis to ensure tax neutrality.

[231]*See* AD questionnaires to Ancientree and Foremost dated June 5, 2019.

[232] *See* Ancientree CDQR, at C-30 and Exhibit C-4 ; *see also* Foremost CDQR, at section D pages 45-46 and Exhibits C-45-4 and C-45-5.

41

this preliminary determination we based the calculation of irrecoverable VAT on the difference between those standard rates, applied to a free-on-board price at the time of exportation.[233]  Thus, because the VAT levy and VAT rebate rates on exports are different for a portion of the POI, we adjusted Anientree and Foremost's U.S. sales for irrecoverable VAT.

### I.   Normal Value

Section 773(c)(1) of the Act provides that Commerce shall determine NV using the FOP methodology if the merchandise is exported from an NME and the information does not permit the calculation of NV using home market prices, third-country prices, or constructed value under section 773(a) of the Act.  Commerce bases NV on FOPs because the presence of government controls on various aspects of NMEs renders price comparisons and the calculation of production costs invalid under Commerce's normal methodologies.[234]  Therefore, in accordance with sections 773(c)(3) and (4) of the Act and 19 CFR 351.408(c), we calculated NV based on FOPs. Under section 773(c)(3) of the Act, FOPs include, but are not limited to:  (1) hours of labor required; (2) quantities of raw materials used; (3) amounts of energy and other utilities consumed; and (4) representative capital costs.[235]

### J.   Factor Valuation Methodology

In accordance with section 773(c) of the Act, we calculated NV based on FOP data reported by Anientree and Foremost.  To calculate NV, we multiplied the reported per-unit FOP consumption rates by publicly available SVs.  When selecting SVs, we considered, among other factors, the quality, specificity, and contemporaneity of the SV data.[236]  As appropriate, we adjusted FOP costs by including freight costs to make them delivered values.  Specifically, we added a surrogate freight cost, where appropriate, to surrogate input values using the shorter of the reported distance from the domestic supplier to the respondent's factory or the distance from the nearest seaport to the respondent's factory.[237]  A detailed description of the SVs used can be found in the Preliminary SV Memorandum.

### 1.   Direct and Packing Materials

For the preliminary determination, we used Romanian import data, as published by the GTA, and other publicly available sources from Romania to calculate SVs for FOPs.  In accordance with

---

[233] See, e.g., Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2012-2013, 80 FR 33241 (June 11, 2015), and accompanying IDM at Comment 5.
[234] See, e.g., Preliminary Determination of Sales at Less Than Fair Value, Affirmative Critical Circumstances, In Part, and Postponement of Final Determination:  Certain Lined Paper Products from the People's Republic of China, 71 FR 19695, 19703 (April 17, 2006), unchanged in Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part:  Certain Lined Paper Products from the People's Republic of China, 71 FR 53079 (September 8, 2006).
[235] See section 773(c)(3)(A)-(D) of the Act.
[236] See, e.g., Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 FR 40485 (July 15, 2008), and accompanying IDM at Comment 9.
[237] See Sigma Corp. v. United States, 117 F.3d 1401, 1407-08 (Fed. Cir. 1997) (Sigma Corp.).

42

Barcode:3896591-01 A-570-106 INV - Investigation  -

section 773(c)(1) of the Act, we used the best available information for valuing FOPs by selecting, to the extent practicable, SVs which are:  (1) broad market averages, (2) product-specific, (3) tax-exclusive, non-export average values, and (4) contemporaneous with, or closest in time to the POI.[238]

As noted in the "Surrogate Country" section, the parties made several submissions regarding the appropriate surrogate valuation of the respondents' reported material FOPs.  In instances where the parties disagree with respect to the particular HTS subheading under which a particular material input should be valued, we used an HTS subheading selection method based on the best match between the reported physical description and function of the input and the HTS subheading description.[239]

Pursuant to 19 CFR 351.408(c)(1), where a factor is produced in one or more market economy countries, purchased from one or more market economy suppliers and paid for in a market economy currency, Commerce normally will use the prices paid to the market economy suppliers if substantially all (*i.e.*, 85 percent or more) of the total volume of the factor is purchased from the market economy suppliers.  Alternatively, when the volume of an NME firm's purchases of an input from ME suppliers during the period is below 85 percent of its total volume of purchases of the input during the period, Commerce will weight-average the ME purchase price with an appropriate SV, according to their respective shares of the total volume of purchases. When a firm has made ME input purchases that may have been dumped or subsidized, are not *bona fide*, or are otherwise not acceptable for use in a dumping calculation, Commerce will exclude them from the numerator of the ratio to ensure a fair determination of whether valid ME purchases meet the 85 percent threshold.[240]  Only Foremost had raw material ME purchases, although none of those purchases met the 85 percent threshold.  In accordance with 19 CFR 351.408(c)(1), because Foremost had less than 85 percent of its raw material purchases from ME suppliers, Commerce weight-averaged Foremost's raw material ME purchase prices with its raw material NME purchase price in calculating the SVs for the raw material inputs purchased from ME sources.[241]

The record shows that for the remaining inputs, Romanian import data obtained through GTA, are broad market averages, product-specific, tax and duty-exclusive, and contemporaneous with the POI.[242]

Pursuant to section 773(c)(5) of the Act and Commerce's long-standing practice, Commerce disregards SVs if it has a reason to believe or suspect the source data may comprise dumped or

---

[238] *See, e.g.*, *Notice of Preliminary Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances and Postponement of Final Determination:  Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam*, 69 FR 42672, 42682 (July 16, 2004), unchanged in *Final Determination of Sales at Less Than Fair Value:  Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam*, 69 FR 71005 (December 8, 2004).
[239] *See* Preliminary SV Memorandum for further discussion.
[240] *See Market Economy Input Prices in NME Proceedings.*
[241] *See* Foremost Prelim Analysis Memo for a proprietary discussion of Foremost's raw material ME purchases.
[242] *See* Preliminary SV Memorandum.

Filed By: Kabir Archuletta, Filed Date: 10/3/19 11:08 AM, Submission Status: Approved

subsidized prices.[243]  In this regard, Commerce has previously found that it is appropriate to disregard such prices from India, Indonesia, South Korea, and Thailand because we have determined that these countries maintain broadly available, non-industry specific export subsidies.[244]  Based on the existence of the subsidy programs that were generally available to all exporters and producers in these countries at the time of the POI, Commerce finds that it is reasonable to infer that all exporters from India, Indonesia, South Korea, and Thailand may have benefitted from these subsidies.  Therefore, we have not used prices from these four countries in calculating the Romanian import-based SVs.

Additionally, we disregarded data from NME countries when calculating Romanian import-based per-unit SVs.  We also excluded from the calculation of Romanian import-based per-unit SVs imports labeled as originating from an "unidentified" country because we could not be certain that these imports were not from either an NME country or a country with generally available export subsidies.[245]

　　2.  Energy

We preliminarily valued electricity at the utility cost of 0.0925 Euro per kWh based on the POI data from Eurostat.[246]  Because the electricity data are contemporaneous with the POI, we did not adjust the data for inflation.

We preliminarily valued natural gas using the POI data from Eurostat.  The preliminary SV is 0.20463 Euro per cubic meter (m3).[247]

We preliminarily valued water at 3.808 Lei per m$^3$ based on data from ANRSC, the Romanian National Authority for the Regulation of Public Utility Community Services, using rates applicable during the POI.[248]

---

[243] *See* section 773(c)(5) of the Act; *see also Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 FR 46793, 46795 (August 6, 2015).

[244] *See, e.g., Certain Frozen Warmwater Shrimp from India:  Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination; 2011-2012*, 78 FR 42492 (July 16, 2013), and accompanying IDM at 7-19; *see also Certain Lined Paper Products from Indonesia:  Final Results of the Expedited Sunset Review of the Countervailing Duty Order*, 76 FR 73592 (November 29, 2011), and accompanying IDM at 1, *Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2012*, 79 FR 46770 (August 11, 2014), and accompanying IDM at 4, *Certain Frozen Warmwater Shrimp from Thailand:  Final Negative Countervailing Duty Determination*, 78 FR 50379 (August 19, 2013), and accompanying IDM at IV.

[245] *See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Chlorinated Isocyanurates from the People's Republic of China*, 69 FR 75294, 75301 (December 16, 2004), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value:  Chlorinated Isocyanurates from the People's Republic of China*, 70 FR 24502 (May 10, 2005).

[246] *See* Preliminary SV Memorandum, at Attachments 1 and 2.  *See also* Petitioner SV Comments, at Exhibits 1 and 4.

[247] *See* Preliminary SV Memorandum, at Attachment 2. *See also* Petitioner Pre-prelim SV Comments, at Exhibits 1 and 3.

[248] *See* Preliminary SV Memorandum, at Exhibits 1 and 2.  *See also* Petitioner Pre-prelim SV Comments, at Exhibits 1 and 6.

We preliminarily valued steam at 0.03 Euro per m³.[249]  To value steam, Commerce calculated 14.52 percent of the SV of natural gas (obtained as described above), consistent with prior practice.[250]

### 3. Movement Expenses

As appropriate, we added freight costs to SVs.  Specifically, we added surrogate inland freight costs to import values used as SVs.  We calculated freight SVs using the shorter of the reported distance from the domestic supplier to the factory that produced the subject merchandise or the distance from the nearest port to the factory that produced the subject merchandise, where appropriate.[251]

We valued brokerage and handling and inland freight expenses using data from the World Bank Group's *Doing Business – Romania* (*Doing Business*).[252]  The value for truck freight in *Doing Business* is publicly available and current as of 2018.[253]

### 4. Labor

We calculated an hourly labor rate using industry-specific data from the primary surrogate country, Romania.  In particular, we relied on manufacturing-specific labor data from the website Trading Economics.[254]  We calculated a manufacturing-specific labor cost rate of 20.97 Lei per hour.

### 5. Financial Ratios

According to 19 CFR 351.408(c)(4), Commerce is directed to value overhead, selling, general and administrative (SG&A) expenses, and profit using non-proprietary information gathered from producers of merchandise that is identical or comparable to the merchandise under consideration in the primary surrogate country.  Commerce's preference is to derive surrogate overhead expenses, SG&A expenses, and profit using financial statements covering a period that is contemporaneous with the POI, that show a profit, from companies with a production experience similar to the respondents' production experience, and that are not distorted or

---

[249] *See* Preliminary SV Memorandum, at Attachment 1.  *See also* Petitioner Pre-prelim SV Comments, at Exhibits 1 and 5.
[250] *See Certain Steel Wheels from the People's Republic of China:  Notice of Preliminary Determination of Sales at Less Than Fair Value, Partial Affirmative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 76 FR 67703, 67714 (November 2, 2011), unchanged in *Certain Steel Wheels From the People's Republic of China: Notice of Final Determination of Sales at Less Than Fair Value and Partial Affirmative Final Determination of Critical Circumstances*, 77 FR 17021 (March 23, 2012).
[251] *See Sigma Corp.*, 117 F.3d at 1407-08.
[252] *See* Preliminary SV Memorandum, at Attachments 1 and 2.
[253] *Id.*
[254] *See* Preliminary SV Memorandum, at Attachments 1 and 2.  *See also* Wen Bo Rebuttal SV Comments, at Exhibit 1.

otherwise unreliable, such as financial statements that indicate the company received subsidies.[255]

To value factory overhead, SG&A, and profit, we used the 2018 audited public financial statements of S.C. Sigstrat S.A.  We preliminarily determine that this company best satisfies Commerce's criteria for selection of financial statements by which to value respondents' financial ratios because it represents the only record financial statements for a producer of wooden products and furniture that are contemporaneous, profitable, contain no evidence of countervailable subsidies, and specifically break out energy as a production expense.[256]

> 6. By-Product Offset

Commerce's practice is to grant respondents an offset to reported FOPs for by-product generated during the production of the subject merchandise if evidence is provided that such by-product has commercial value.[257]  We valued the respondent's reported by-product offsets using Romanian import statistics.[258]

## IX.   CURRENCY CONVERSION

Where appropriate, we made currency conversions into U.S. dollars, in accordance with section 773A(a) of the Act and 19 CFR 351.415, based on the exchange rates in effect on the dates of the U.S. sales, as certified by the Federal Reserve Bank.

## X.   ADJUSTMENT UNDER SECTION 777A(F) OF THE ACT

In applying section 777A(f)(1) of the Act, Commerce examines:  (A) whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise; (B) whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period; and (C) whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of NV determined pursuant to section 773(c) of the Act, has increased the weighted-average dumping margin for the class or kind of merchandise.[259]  As part of its analysis under section 777A(f)(1)(C) of the Act, Commerce examines whether the

---

[255] *See Hand Trucks and Certain Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*; 2010-2011, 78 FR 28801 (May 16, 2013), and accompanying IDM at Comment 2; *Certain Kitchen Appliance Shelving and Racks from the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 78 FR 5414 (January 25, 2013), and accompanying IDM at Comment 1.
[256] *See* Preliminary SV Memorandum at Attachments 1, 2, and 11.  *See also* Petitioner SV Comments, at Attachment 10B.
[257] *See Forged Steel Fittings from the People's Republic of China:  Affirmative Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 83 FR 22948 (May 17, 2018), and accompanying PDM at "Factor Valuation Methodology."  *See also Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Reviews and Final Rescission and Partial Rescission of Antidumping Duty Administrative Reviews*, 70 FR 54897 (September 19, 2005), and accompanying IDM at "Scrap Offset."
[258] *See* Preliminary SV Memorandum.
[259] *See* section 777A(f)(1)(A)-(C) of the Act.

46

respondent demonstrated:  (1) a subsidies-to-cost link, *e.g.*, subsidy impact on cost of manufacture (COM); and (2) a cost-to-price link, *e.g.*, respondent's prices changed as a result of changes in the COM.[260]  For a subsidy meeting these criteria, the statute requires Commerce to reduce the AD rate by the estimated amount of the increase in the weighted-average dumping margin subject to a specified cap.[261]

In conducting this analysis, Commerce has not concluded that concurrent application of NME dumping duties and countervailing duties necessarily and automatically results in overlapping remedies.  Rather, a finding that there is an overlap in remedies, and any resulting adjustment, is based on a case-by-case analysis of the totality of facts on the administrative record for that segment of the proceeding as required by the statute.[262]

As a result of our analysis, Commerce is preliminarily not making any adjustments to the calculation of the cash deposit rate for antidumping duties for Ancientree and Foremost and companies that are not being individually examined but preliminarily are being granted separate-rate status in this investigation, pursuant to section 777A(f) of the Act, in the manner described below.

In order to examine the effects of concurrent countervailable subsidies in calculating margins for Ancientree and Foremost, Commerce provided the respondent with an opportunity to submit information with respect to subsidies relevant to their eligibility for an adjustment to the calculated weighted-average dumping margins.[263]  Ancientree and Foremost timely submitted their double remedy questionnaire responses.[264]  A finding that there is an overlap in remedies and any resulting adjustments are based on a case-by-case analysis of the totality of facts on the administrative record for that segment of the proceeding as required by the statute.[265]

As discussed above, section 777A(f)(1)(B) of the Act requires consideration of whether the countervailable subsidy programs noted above have been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period.  In *Passenger Vehicle and Light Truck Tires from China*, we examined the preliminary report issued by the ITC in order to conduct an analysis under section 777A(f)(1)(B) of the Act and found

---

[260] *See, e.g.*, *Certain Iron Mechanical Transfer Drive Components from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 36876 (June 8, 2016), and accompanying PDM at 36, unchanged in *Certain Iron Mechanical Transfer Drive Components from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 81 FR 75032 (October 28, 2016).
[261] *See* section 777A(f)(1)-(2) of the Act.
[262] *See Drawn Stainless Steel Sinks from the People's Republic of China:  Final Results of the Antidumping Duty Administrative Review; 2012-2014,* 80 FR 26227 (May 7, 2015) and accompanying PDM.
[263] *See* Letters to Ancientree, Foremost, and Meisen, dated August 16, 2019.
[264] *See* Ancientree's domestic subsidy response, dated August 26, 2019 (Ancientree DS Response); Foremost's domestic subsidy response, dated August 29, 2019 (Foremost DS Response).
[265] *See, e.g.*, *Certain Hardwood Plywood Products from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part*, 82 FR 28629 (June 23, 2017), and accompanying PDM at 43.

47

prices of imports of the class or kind of merchandise decreased during the relevant period.[266]  In *Steel Racks from China*, we also examined U.S. import data in the preliminary report issued by the ITC and did not find a decrease in import prices during the relevant period.[267]  Thus, we have examined the preliminary report issued by the ITC to determine whether section 777A(f)(1)(B) of the Act has been satisfied.[268]

The preliminary report issued by the ITC concluded that prices for U.S. imports from China of five of six types of wooden cabinets and vanities decreased by between seven percent and 37.2 percent from 2016 to 2018.[269]  Based on this information, Commerce preliminarily finds that import prices of the class or kind of merchandise at issue during that relevant period decreased. Accordingly, we preliminarily find that the requirement under section 777A(f)(1)(B) of the Act has been met.

In accordance with section 777A(f)(1)(C) of the Act, Commerce examined whether Ancientree, and Foremost demonstrated:  (1) a subsidies-to-cost link, *i.e.*, a subsidy effect on the COM of the merchandise under consideration; and (2) a cost-to-price link, *i.e.*, respondent's prices were dependent on changes in the COM.  With respect to the subsidies-to-cost link, Ancientree and Foremost reported that they consumed electricity, water, plywood, veneers, urea, and/or sawn wood in the production of subject merchandise.  However, the mandatory respondents failed to demonstrate that the subsidies received resulted in a change to their COM during the relevant period and that a change in their COM during the relevant period resulted in a change to the prices charged to their customers.

Ancientree only provided charts with the monthly prices of electricity and plywood.[270] However, no additional documents were provided, such as company accounting records, to demonstrate a connection between subsidies received and COM.  Moreover, Ancientree reported if there is a "{s}ignificant change… in costs of manufacturing, the company would adjust and offer a new selling prices with its customers for the new purchase orders."[271]

---

[266] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value; Preliminary Affirmative Determination of Critical Circumstances; In Part and Postponement of Final Determination*, 80 FR 4250 (January 27, 2015) and accompanying PDM at 33, unchanged in *Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part*, 80 FR 34893 (June 18, 2015) and accompanying IDM; *see also Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part*, 80 FR 34893 (June 18, 2015) and accompanying IDM.

[267] *See Certain Steel Racks and Parts Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 84 FR 35595 (July 24, 2019) and accompanying IDM at Comment 5.

[268] *See, e.g., Forged Steel Fittings from the People's Republic of China:  Affirmative Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 83 FR 22948 (May 17, 2018), and accompanying PDM at "IX. Adjustment Under Section 777A(f) of the Act," unchanged in *Forged Steel Fittings from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 50339 (October 5, 2018).

[269] *See* Preliminary ITC Report, at Table V-18.

[270] *See* Ancientree DS Response.

[271] *See* Ancientree DS Response, at 6.

48

However, they did not demonstrate that this occurred during the POI.  Therefore, Ancientree has not satisfied the subsidies-to-cost linkage for this preliminary determination.  Additionally, because Ancientree failed to identify a subsidies-to-cost link, it also failed to identify a cost-to-price linkage, as no price fluctuations were shown to result from a change in cost during the relevant period.  Accordingly, Commerce is not making any adjustment under section 777A(f) of the Act for this preliminary determination with respect to Ancientree.

Foremost provided several charts and tables with the monthly prices of electricity, water, plywood, and veneers.[272]  Foremost also provided a chart and table with the monthly "AUSP."[273]  These tables do not indicate or demonstrate any connection between price, the cost of the inputs, and any subsidies the company received.  Foremost provided no explanation as to how these tables/charts would demonstrate a subsidies-to-cost link.  Commerce notes that in the tables provided by Foremost for plywood and veneers, the changes in prices contrast the changes in costs, while the tables for water and electricity demonstrate no fluctuation in cost at all.[274]  Moreover, in its efforts to demonstrate that changes in COM could impact changes in price, Foremost provided e-mails discussing the changes in price that resulted from tariffs, which Commerce finds is not a demonstration of a subsidy-to-cost linkage.  Ultimately, in support of Commerce's interpretation of the documentation provided by Foremost, it states, "there are no recent examples of Foremost lowering its prices in response to a decrease in an input cost or the overall cost of manufacturing."[275]  Accordingly, Commerce is not making any adjustment under section 777A(f) of the Act for this preliminary determination with respect to Foremost.

## XI.     ADJUSTMENT TO CASH DEPOSIT RATE FOR EXPORT SUBSIDIES

In AD investigations where there is a concurrent CVD investigation, it is Commerce's normal practice to calculate the cash deposit rate for each respondent by adjusting the respondent's weighted-average dumping margin to account for export subsidies found for each respective respondent in the concurrent CVD investigation.  Doing so is in accordance with section 772(c)(1)(C) of the Act, which states that U.S. price "shall be increased by the amount of any countervailing duty imposed on the subject merchandise… to offset an export subsidy."[276]

Commerce determined in the preliminary determination of the companion CVD investigation that Ancientree and Foremost each benefitted from certain subsidy programs contingent on exports totaling 10.54 percent.[277]  With respect to the separate rate companies, we find that an average of the export subsidy adjustment of 10.54 percent for Ancientree and Foremost is

---

[272] *See* Foremost DS Response at DS-9a.

[273] *Id.*  Commerce notes that Foremost did not define AUSP but based on the source of the AUSP table, AUSP is presumed to mean "price."

[274] *Id.*

[275] *See* Foremost DS Response at 7.

[276] *See Carbazole Violet Pigment 23 from India:  Final Results of Antidumping Duty Administrative Review*, 75 FR 38076, 38077 (July 1, 2010), and accompanying IDM at Comment 1.

[277] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty* Determination, 84 FR 39798 (August 12, 2019) and accompanying PDM at 45-46 relating to the Export Buyer's Credit Program.

warranted because this is the export subsidy rate included in the CVD all-others rate, to which the separate rate companies are subject in the companion CVD proceeding.  For the China-wide entity, Commerce has adjusted the China-wide entity's AD cash deposit rate by the only export subsidy rate determined for any party in the companion CVD proceeding, which is the 10.54 percent rate applicable to Ancientree and Foremost.

## XII.    RECOMMENDATION

We recommend applying the above methodology for this preliminary determination.

☒                              ☐

_____          _____
Agree                          Disagree

10/2/2019

X _____

Signed by: PRENTISS SMITH

_____
P. Lee Smith
Deputy Assistant Secretary
 for Policy and Negotations
Enforcement and Compliance

50

**Appendix I.a.**

**Wholly Foreign Owned Companies**

| Exporter | Producer |
|---|---|
| China Friend Limited | Dongming Sanxin Wood Industry Co., Ltd. |
| Dalian Jiaye Wood Products Co., Ltd. | Dalian Jiaye Wood Products Co., Ltd. |
| DEHK LIMITED | DIAM DISPLAY (CHINA) CO., LTD. |
| Foremost Worldwide Company Limited | Rizhao Foremost Woodwork Manufacturing Company, Ltd. |
| Foremost Worldwide Company Limited | Henan AiDiJia Furniture Co., Ltd. |
| Foremost Worldwide Company Limited | Suzhou Weiye Furniture Co., Ltd. |
| Foremost Worldwide Company Limited | Changsha Minwan Furniture Manufacturing Co., Ltd. |
| Fuzhou Minlian Wood Industry Co., Ltd | Fuzhou Minlian Wood Industry Co., Ltd |
| GAOMI HONGTAI HOME FURNITURE CO., LTD | GAOMI HONGTAI HOME FURNITURE CO., LTD |
| Haiyang Kunlun Wood Co.,Ltd | Haiyang Kunlun Wood Co.,Ltd |
| HUIZHOU MANDARIN FURNITURE CO., LTD. | HUIZHOU MANDARIN FURNITURE CO., LTD. |
| Jiangsu Roc Furniture Industrial Co., Ltd. | Jiangsu Roc Furniture Industrial Co., Ltd. |
| Jiangsu Xiangsheng Bedtime Furniture Co., Ltd. | Jiangsu Xiangsheng Bedtime Furniture Co., Ltd. |
| King's Group Furniture (Enterprises) Co., Ltd. | Zhongshan King's Group Furniture (ENTERPRISES) Co., Ltd. |
| Liu Shu Woods Product (Huizhou) Co., Ltd also known as Liu Shu Wood Products Co., Ltd (trade name) and Liu Shu Woods Product Co., Ltd (trade name) | Liu Shu Woods Product (Huizhou) Co., Ltd |
| Master Door & Cabinet Co.,Ltd. | Master Door & Cabinet Co.,Ltd. |
| Masterwork Cabinetry Company Limited | Shandong Compete Wood Co., Ltd. |
| Masterwork Cabinetry Company Limited | Linyi Zhongsheng Jiaju Zhuangshi Co., Ltd |

Barcode:3896591-01 A-570-106 INV - Investigation  -

| MEILIN WOOD PRODUCTS(DALIAN)CO.,LTD | MEILIN WOOD PRODUCTS(DALIAN)CO.,LTD |
|---|---|
| MJB Supply (Dalian) Co., Ltd | Mulin City Baimiantong Linyeju Jisen Wood |
| Pneuma Asia Sourcing & Trading Co. LIMITED | Dalian Tianxin Home Product Co., Ltd. |
| Pneuma Asia Sourcing & Trading Co. LIMITED | Qingdao Haiyan Drouot Household Co., Ltd. |
| Ronbow Hong Kong Limited | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. |
| Shanghai Jiang Feng Furniture Co., Ltd. | Shanghai Jiang Feng Furniture Co., Ltd. |
| Silver Stone Group Co., Ltd | QINGDAO FAMILY CRAFTS CO., LTD |
| Silver Stone Group Co., Ltd | QingDao XiuZhen Furniture Co., Ltd. |
| Smart Gift International | Anhui GeLun Wood Industry Co., Ltd. |
| Smart Gift International | Ning'an City Jiude Wood Co., Ltd. |
| Smart Gift International | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. |
| Smart Gift International | Dalian Ruiyu Mountain Wood Co., Ltd. |
| Smart Gift International | Jiamusi City Quanhong Wood Industry Co., Ltd. |
| Smart Gift International | Dalian Chunyao Wood Industry Co., Ltd. |
| Supree (Fuijian) Wood Co., Ltd. | Supree (Fuijian) Wood Co., Ltd. |
| Supree (Fujian) Construction Materials Co., Ltd | Supree (Fujian) Construction Materials Co., Ltd |
| The Frame Manufacturing Co. Ltd | HUIZHOU DIWEIXIN JIATINGYONGPIN CO., LTD |
| Top Goal International Group Ltd.(Hong Kong) | Dongguan City Top Goal Furniture Co., Ltd. |
| Tradewinds Furniture Ltd. | Tradewinds Furniture Ltd. |
| Wa Fok Art Craft Furniture (MACAO) Co., Ltd | Zhongshan Huafu Art Craft Furniture Co., Ltd |
| WEIFANG KITCHINET CORPORATION | WEIFANG KITCHINET CORPORATION |
| Weifang Yuanlin Woodenware Co., Ltd | Weifang Yuanlin Woodenware Co., Ltd |

Filed By: Kabir Archuletta, Filed Date: 10/3/19 11:08 AM, Submission Status: Approved

APPX001077

| | |
|---|---|
| Weihai Adornus Cabinetry Manufacturing Co., Ltd | Weihai Adornus Cabinetry Manufacturing Co., Ltd |
| WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD | WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD |
| Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. |
| Xiamen Sintop Display Fixtures Co., Ltd. | Xiamen Sintop Display Fixtures Co., Ltd. |
| XINGZHI INTERNATIONAL TRADE LIMITED | XUZHOU YIHE WOOD CO., LTD. |
| Zhaoqing Centech Decorative Material Company Ltd | Zhaoqing Centech Decorative Material Company Ltd |
| Zhongshan Fookyik Furniture Co., Ltd. | Zhongshan Fookyik Furniture Co., Ltd. |
| ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED | ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED |
| Zhongshan King's Group Furniture (ENTERPRISES) Co., Ltd. | Zhongshan King's Group Furniture (ENTERPRISES) Co., Ltd. |

53

**Appendix I.b.**

**Absence of De Jure and De Facto Control**

| Exporter | Producer |
|---|---|
| ANHUI JIANLIAN WOOD PRODUCTS CO.,LTD | ANHUI JIANLIAN WOOD PRODUCTS CO.,LTD |
| Anhui Swanch Cabinetry Co., Ltd. | Anhui Swanch Cabinetry Co., Ltd. |
| ANHUI XINYUANDA CUPBOARD CO., LTD. | ANHUI XINYUANDA CUPBOARD CO., LTD. |
| Beijing Oulu Jinxin International Trade Co., Ltd. | Beijing Oulu Jinxin International Trade Co., Ltd. |
| Boloni Smart Home Decor (Beijing) Co., LTD | Boloni Smart Home Decor (Beijing) Co., LTD |
| Caoxian Brothers Hengxin Wood Industry Co., Ltd | Caoxian Brothers Hengxin Wood Industry Co., Ltd |
| Changyi Zhengheng Woodwork Co., Ltd | Changyi Zhengheng Woodwork Co., Ltd |
| CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD | CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD |
| Dalian Meisen Woodworking Co., Ltd. | Dalian Meisen Woodworking Co., Ltd. |
| Dalian Xingsen Wooden Products Co.,Ltd | Dalian Xingsen Wooden Products Co.,Ltd |
| Dandong City Anmin Wooden Products Group Co., Ltd | Dandong City Anmin Wooden Products Group Co., Ltd |
| Dandong Laroyal Cabinetry Co., Ltd. | Dandong Laroyal Cabinetry Co., Ltd. |
| Deqing China-Africa Foreign Trade Port Co., Ltd. | Suqian Welcomewood Products Co., Ltd. |
| Dewell Wooden Products Haian Co., Ltd. | Dewell Wooden Products Haian Co., Ltd. |
| Dongguan American Parts Supplier Co., Ltd | Dongguan American Parts Supplier Co., Ltd |
| Dongguan Niusaiqu Wood Industry Co., Ltd | Dongguan Niusaiqu Wood Industry Co., Ltd |
| Dongguan Unique Life Furniture Co., Ltd. also known as Unique Life Furniture Co., Ltd (trade name) | Dongguan Unique Life Furniture Co., Ltd. |
| Dorbest Ltd. | Rui Feng Woodwork (Dongguan) Co., Ltd. |

| | |
|---|---|
| EZIDONE DISPLAY CORPORATION LTD | EZIDONE DISPLAY CORPORATION LTD |
| EZIDONE DISPLAY CORPORATION LTD | EZIDONE DISPLAY INC |
| Forcer International Limited | QUFU XINYU FURNITURE CO., LTD. |
| Forcer International Limited | LINYI RUNKANG CABINET CO., LTD |
| Forcer International Limited | BEIJING OULU JINXIN INTERNATIONAL TRADE CO., LTD |
| Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name) | Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name) |
| Foshan Liansu building material Trading Co., Ltd. | Guangdong Lesso Home Furnishing Co., Ltd. |
| FOSHAN NANHAI HONGZHOU WOOD CO., LTD | FOSHAN NANHAI HONGZHOU WOOD CO., LTD |
| Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd. | Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd. |
| FOSHAN SOURCEVER (CN) CO., LIMITED | FOSHAN DIBIAO BATHROOM CO., LTD |
| FOSHAN SOURCEVER (CN) CO., LIMITED | FOSHAN MK HOME FURISHING CO., LTD. |
| FOSHAN SOURCEVER (CN) CO., LIMITED | PROUDER INDUSTRIAL LIMITED. |
| FOSHAN SOURCEVER (CN) CO., LIMITED | FOSHAN DEMAX SANITARY WARE CO., LTD. |
| FOSHAN SOURCEVER (CN) CO., LIMITED | HEBEI SHUANGLI FURNITURE CO., LTD. |
| FOSHAN SOURCEVER (CN) CO., LIMITED | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. |
| FOSHAN SOURCEVER (CN) CO., LIMITED | SHOUGUANG FUSHI WOOD  CO., LTD. |
| FOSHAN SOURCEVER (CN) CO., LIMITED | Foshan Virtu Bathroom Furniture Ltd. |
| FOSHAN SOURCEVER (CN) CO., LIMITED | Guangdong Purefine Kitchen & Bath Technology Co., LTD. |
| FOSHAN SOURCEVER (CN) CO., LIMITED | KAIPING HONGITARYWARE TECHNOLOGY LTD. |
| Foshan Sourcever Company Limited | FOSHAN DIBIAO BATHROOM CO., LTD |
| Foshan Sourcever Company Limited | FOSHAN MK HOME FURISHING CO., LTD. |

| | |
|---|---|
| Foshan Sourcever Company Limited | PROUDER INDUSTRIAL LIMITED. |
| Foshan Sourcever Company Limited | FOSHAN DEMAX SANITARY WARE CO., LTD. |
| Foshan Sourcever Company Limited | HEBEI SHUANGLI FURNITURE CO., LTD. |
| Foshan Sourcever Company Limited | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. |
| Foshan Sourcever Company Limited | SHOUGUANG FUSHI WOOD  CO., LTD. |
| Foshan Sourcever Company Limited | Foshan Virtu Bathroom Furniture Ltd. |
| Foshan Sourcever Company Limited | Guangdong Purefine Kitchen & Bath Technology Co., LTD. |
| Foshan Sourcever Company Limited | KAIPING HONGITARYWARE TECHNOLOGY LTD. |
| Foshan Xinzhongwei Economic & Trade Co., Ltd. | Foshan Lihong Furniture Sanitary Ware Co., Ltd |
| FUJIAN DUSHI WOODEN INDUSTRY CO., LTD. | FUJIAN DUSHI WOODEN INDUSTRY CO., LTD. |
| FUJIAN LEIFENG CABINETRY CO., LTD. | FUJIAN LEIFENG CABINETRY CO., LTD. |
| Fujian Panda Home Furnishing Co., Ltd | Fujian Panda Home Furnishing Co., Ltd |
| Fujian Senyi Kitchen Cabinet Co., Ltd | Fujian Senyi Kitchen Cabinet Co., Ltd |
| Fuzhou Biquan Trading Co., Ltd. | Biquan (Fujian) Group Co., Ltd. |
| Fuzhou CBM Import & Export Co., Ltd. | Fuzhou CBM Import & Export Co., Ltd. |
| Fuzhou Desource Home Décor Co., Ltd. | Fuzhou Desource Home Decor Co., Ltd. |
| FUZHOU LIMIN STONE PRODUCTS CO., LTD. | Fuzhou YST Cabinet Co., Ltd. |
| FUZHOU MASTONE IMPORT & EXPORT CO.,LTD | Fuzhou Yuansentai Cabinet Co., Ltd |
| FUZHOU SUNRISING HOME DECO MANUFACTURING CO., LTD. | FUZHOU SUNRISING HOME DECO MANUFACTURING CO., LTD. |
| FUZHOU XINRUI CABINET CO., LTD | FUZHOU XINRUI CABINET CO., LTD |
| Gaomi City Haitian Wooden Ware Co., Ltd | Gaomi City Haitian Wooden Ware Co., Ltd |
| Guangde Bozhong Trade Company, Ltd. | Guangde Bozhong Trade Company, Ltd. |

| GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD | GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD |
|---|---|
| Guangdong G-Top Import and Export Co., Ltd. | Foshan Shunde Rongao Furniture CO., LTD |
| Guangzhou Nuolande Import and Export Co., Ltd. | Guangzhou Nuolande Import and Export Co., Ltd. |
| Hangzhou Bestcraft Sanitary Equipments Co., Ltd. | Hangzhou Bestcraft Sanitary Equipments Co., Ltd. |
| Hangzhou Entop Houseware Co., Ltd. | Jinhua Aonika Sanitary Ware Co., Ltd. |
| Hangzhou Entop Houseware Co., Ltd. | Hangzhou Bestcraft Sanitary Equipments Co., Ltd. |
| Hangzhou Hansen Sanitary Ware Co., Ltd | Hangzhou Hansen Sanitary Ware Co., Ltd |
| Hangzhou Hoca Kitchen & Bath Products Co., Ltd. | Hangzhou Hoca Kitchen & Bath Products Co., Ltd. |
| Hangzhou Home Dee Sanitary Ware Co., Ltd. | Hangzhou Home Dee Sanitary Ware Co., Ltd. |
| Hangzhou Oulang Bathroom Equipment Co., Ltd | Hangzhou Oulang Bathroom Equipment Co., Ltd |
| Hangzhou Royo Import & Export Co., Ltd. | Jinhua Aonika Sanitary Ware Co., Ltd. |
| Hangzhou Royo Import & Export Co., Ltd. | Hangzhou Yuxin Sanitary Ware Co., Ltd. |
| Hangzhou Royo Import & Export Co., Ltd. | Hangzhou Fuyang Beautiful Sanitary Ware Co., Ltd. |
| Hangzhou Sunlight Sanitary Co., Ltd | Hangzhou Sunlight Sanitary Co., Ltd |
| Hangzhou Weinuo Sanitary Ware Co., Ltd. | PINGHU AIPA SANITARY WARE CO., LTD |
| Hangzhou Weinuo Sanitary Ware Co., Ltd. | HANGZHOU QILONG SANITARY WARE CO., LTD |
| Hangzhou Xinhai Sanitary Ware Co., Ltd | Hangzhou Xinhai Sanitary Ware Co., Ltd |
| Hangzhou Yewlong Import&Export Co., Ltd | Hangzhou Yewlong Industry Co., Ltd |
| Hangzhou Zhuangyu Import & Export Co., Ltd | Hangzhou Zhuangyu Import & Export Co., Ltd |
| Henan Aotin Home Furnishing Co., Ltd. | Henan Aotin Home Furnishing Co., Ltd. |
| Heyond Cabinet Co.,Ltd. | Heyond Cabinet Co.,Ltd. |
| Homestar Corporation | Homestar Corporation |

| | |
|---|---|
| HONG KONG JIAN CHENG TRADING CO., LIMITED | ZHONGSHAN YAYUE FURNITURE CO., LTD. |
| Honsoar New Building Material Co., Ltd | Shandong Honsoar Cabinet Materials Co., Ltd |
| Hua Yin Trading Development Co., Ltd of Jiangmen City | Jianfa Wooden Co., Ltd |
| Hua Yin Trading Development Co., Ltd of Jiangmen City | Heshan Yingmei Cabinets Co., Ltd |
| Hua Yin Trading Development Co., Ltd of Jiangmen City | Hesha Feiqiu Cabinet Co., Ltd |
| Huimin Hanlong Furniture Co., Ltd. | Huimin Hanlong Furniture Co., Ltd. |
| HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. |
| Jiang Su Rongxin Cabinets Ltd | Jiang Su Rongxin Cabinets Ltd |
| Jiangmen Kinwai Furniture Decoration Co., Ltd. | Jiangmen Kinwai Furniture Decoration Co., Ltd. |
| Jiangmen Kinwai International Furniture Co., Ltd. | Jiangmen Kinwai International Furniture Co., Ltd. |
| Jiangsu Beichen Wood Co., Ltd | Jiangsu Beichen Wood Co., Ltd |
| Jiangsu Meijun Intelligent Home Co., Ltd | Jiangsu Meijun Intelligent Home Co., Ltd |
| Jiangsu Pusite Furniture Co., Ltd. | Jiangsu Pusite Furniture Co., Ltd. |
| JIANGSU SUNWELL CABINETRY CO.,LTD. | JIANGSU SUNWELL CABINETRY CO.,LTD. |
| JIANGSU WEISEN HOUSEWARE CO .,LTD | JIANGSU WEISEN HOUSEWARE CO .,LTD |
| Jiayuan (Xiamen) Industrial Co., Ltd | Jiayuan (Xiamen) Industrial Co., Ltd |
| JINJIANG PERFECT GENERATION IMP.&EXP. CO.,LTD | Homebi Technology Co., LTD. |
| KM Cabinetry Co., Limited | Zhongshan KM Cabinetry Co., Ltd |
| Kunshan Baiyulan Furniture Co., Ltd. | Kunshan Baiyulan Furniture Co., Ltd. |
| Kunshan Home Right Trade Corporation | Kunshan Fangs Furniture Co., Ltd |
| LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. |

58

Barcode:3896591-01 A-570-106 INV - Investigation  -

| | |
|---|---|
| Linshu Meibang Furniture Co., Ltd. | Linshu Meibang Furniture Co., Ltd. |
| Linyi Bomei Furniture Co., Ltd | Linyi Bomei Furniture Co., Ltd |
| LINYI BONN FLOORING MANUFACTURING CO.,LTD. | LINYI BONN FLOORING MANUFACTURING CO.,LTD. |
| Linyi Kaipu Furniture Co., Ltd. | Linyi Kaipu Furniture Co., Ltd. |
| Linyi Runkang Cabinet Co., Ltd. | Linyi Runkang Cabinet Co., Ltd. |
| Minhou Beite Home Decor Co., Ltd. | Minhou Beite Home Decor Co., Ltd. |
| MOREWOOD CABINETRY CO.,LTD | MOREWOOD CABINETRY CO.,LTD |
| Nanjing Kaylang Co., Ltd | Nanjing Kaylang Co., Ltd |
| Nantong Aershin Cabinets Co., Ltd | Nantong Aershin Cabinets Co., Ltd |
| Nantong Ouming Wood Co., Ltd. | Nantong Ouming Wood Co., Ltd. |
| NANTONG YANGZI FURNITURE CO., LTD. | NANTONG YANGZI FURNITURE CO., LTD. |
| NINGBO KINGWOOD FURNITURE CO., LTD. | NINGBO KINGWOOD FURNITURE CO., LTD. |
| NINGBO ROVSA HOME FURNISHING CO., LTD. | NINGBO ROVSA HOME FURNISHING CO., LTD. |
| Ojans Company Limited | Foshan Shunde Ojans Intelligent Sanitary Ware Co., Ltd. |
| Oppein Home Group Inc. | Oppein Home Group Inc. |
| PIZHOU OUYME IMPORT&EXPORT TRADE CO., LTD | XUZHOU OUMEC WOOD-BASED PANEL CO.,LTD |
| Putian Jinggong Furniture Co.,Ltd | Putian Jinggong Furniture Co.,Ltd |
| Qingdao Coomex Sources Co., Ltd. also known as Coomex Sources Co., Ltd. | Nantong Aershin Cabinets Co., Ltd |
| Qingdao Haiyan Drouot Household Co., Ltd. | Qingdao Haiyan Drouot Household Co., Ltd. |
| Qingdao Liangmu Hongye Co., Ltd. | Qingdao Liangmu Hongye Co., Ltd. |
| Qingdao Liangmu Jinshan Woodwork Co., Ltd. | Qingdao Liangmu Jinshan Woodwork Co., Ltd. |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Lankao Sanqiang Wooden Products Co., Ltd. |

Filed By: Kabir Archuletta, Filed Date: 10/3/19 11:08 AM, Submission Status: Approved

Barcode:3896591-01 A-570-106 INV - Investigation  -

| | |
|---|---|
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Lanshan Chengxinli Woods Co., Ltd. |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Shouguang Shi Qifeng Woods Co., Ltd. |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Mingzhu Woods Co., Ltd. |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Yichun Senhai Woods Industry Co., Ltd. |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Jinde Arts&Crafts Co., Ltd. |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Qingdao Ruirong Woods Co., Ltd. |
| Qingdao Shousheng Industry Co., Ltd | Qingdao Shousheng Industry Co., Ltd |
| Qingdao Yimei Wood Work Co.,Ltd | Qingdao Yimei Wood Work Co.,Ltd |
| QINGDAOHONGXINCHENGDA WOOD INDUSTRY CO., LTD. | QINGDAOHONGXINCHENGDA WOOD INDUSTRY CO., LTD. |
| QUFU XINYU FURNITURE CO., LTD. | QUFU XINYU FURNITURE CO., LTD. |
| Sagarit Bathroom Manufacturer Limited | Shouguang Fushi Wood Co., Ltd. |
| Sagarit Bathroom Manufacturer Limited | Zhangzhou Guohui Industrial & Trade Co., Ltd |
| Sagarit Bathroom Manufacturer Limited | Qingdao Runpeng Wood Industrial Co., Ltd |
| Sankok Arts Co., Ltd. | Sankok Arts Co., Ltd. |
| Senke Manufacturing Company | Qindao Yimei Wood Work Co., Ltd. |
| Senke Manufacturing Company | Linyi Kaipu Furniture Co.,Ltd. |
| Senke Manufacturing Company | Shandon Honsoar Cabinetry Co., Ltd. |
| Senke Manufacturing Company | Huimin Hanlong Furniture Co, Ltd. |
| Shandong Cubic Alpha Timber Co.,Ltd. | Shandong Cubic Alpha Timber Co.,Ltd. |
| Shandong Fusheng Wood Co., Ltd | Shandong Fusheng Wood Co., Ltd |
| Shandong Huanmei Wood Co., Ltd | Shandong Huanmei Wood Co., Ltd |
| SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD | SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD |

Filed By: Kabir Archuletta, Filed Date: 10/3/19 11:08 AM, Submission Status: Approved

| | |
|---|---|
| Shandong Longsen Woods Co., Ltd. | Shandong Longsen Woods Co., Ltd. |
| Shandong Sanfortune Home and Furniture Co., Ltd | Shandong Sanfortune Home and Furniture Co., Ltd |
| Shanghai Aiwood Home Supplies Co., Ltd. | Jiangsu Gangxing Kitchen Cabinet Co., Ltd. |
| Shanghai Aiwood Home Supplies Co., Ltd. | Shanghai Homebase SanSheng Household Product Co., Ltd. |
| Shanghai Baiyulan Furniture Co., Ltd. | Kunshan Baiyulan Furniture Co., Ltd. |
| Shanghai Beautystar Cabinetry Co., Ltd. | Jiangsu Sunwell Cabinetry Co., Ltd. |
| Shanghai Beautystar Cabinetry Co., Ltd. | Nantong Jiegao Furniture Co., Ltd. |
| SHANGHAI LINE KING INTERNATIONAL TRADING CO.,LTD. | SHANGHAI YAZHI WOODEN INDUSTRY CO.,LTD. |
| Shanghai Mebo Industry Co. Ltd. | Shanghai Mebo Industry Co. Ltd. |
| Shanghai Qingzhou Woodenware Co., Ltd. | Shanghai Qingzhou Woodenware Co., Ltd. |
| Shanghai S&M Trade Co., Ltd. | Anhui GeLun Wood Industry Co., Ltd. |
| Shanghai S&M Trade Co., Ltd. | Ning'an City Jiude Wood Co., Ltd. |
| Shanghai S&M Trade Co., Ltd. | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. |
| Shanghai S&M Trade Co., Ltd. | Dalian Ruiyu Mountain Wood Co., Ltd. |
| Shanghai S&M Trade Co., Ltd. | Linshu Meibang Furniture Co., Ltd. |
| Shanghai S&M Trade Co., Ltd. | Jiamusi City Quanhong Wood Industry Co., Ltd. |
| Shanghai S&M Trade Co., Ltd. | Kunshan Fangs Furniture Co., Ltd. |
| Shanghai S&M Trade Co., Ltd. | Dalian Chunyao Wood Industry Co., Ltd. |
| Shanghai S&M Trade Co., Ltd. | Anhui Juxin Wood Industry Co., Ltd. |
| Shanghai Wang Lei Industries- Taicang Branch | Shanghai Wang Lei Industries- Taicang Branch |
| Shanghai Wen Bo Industries Co. Ltd. | Shanghai Yinbo Manufacturing Co. Ltd. |
| Shanghai Wen Bo Industries Co. Ltd. | Dalian Jiaye Wood Products Co., Ltd. |

Filed By: Kabir Archuletta, Filed Date: 10/3/19 11:08 AM, Submission Status: Approved

| | |
|---|---|
| Shanghai Wen Bo Industries Co. Ltd. | Shanghai Baiyulan Furniture Co., Ltd |
| Shanghai Xietong (Group) Co., Ltd. | Nantong Jiegao Furniture Co., Ltd. |
| Shanghai Xietong (Group) Co., Ltd. | Jiangsu Senwei Smart Home Co., Ltd. |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD | SHANDONG GAINVAST WOODEN PRODUCTS CO., LTD |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD | SHANGHAI WENYI WOODEN CO., LTD |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD | NAN TONG DI LIN FURNITURE CO., LTD |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD | JIANGSU YANAN WOODEN CO., LTD |
| Sheen Lead International Trading (Shanghai)Co.,Ltd. | SHANGHAI RUIYING FURNITURE CO.,LTD. |
| Shouguang Fushi Wood Co., Ltd | Shouguang Fushi Wood Co., Ltd |
| Shouguang Honsoar Imp. & Exp. Trading Co., Ltd | Shouguang Honsoar Imp. & Exp. Trading Co., Ltd |
| SHOUGUANG JIAXIU WOOD CO., LTD | SHOUGUANG JIAXIU WOOD CO., LTD |
| SHOUGUANG JIAXIU WOOD CO., LTD | SHOUGUANG JIAXIU WOOD CO., LTD |
| Shouguang Jinxiangyuan Home Furnishing Co., Ltd | Shouguang Jinxiangyuan Home Furnishing Co., Ltd |
| Shouguang Sanyang Wood Industry Co., Ltd | Shouguang Sanyang Wood Industry Co., Ltd |
| SUNCO TIMBER(KUNSHAN) CO., LTD. | SUNCO TIMBER(KUNSHAN) CO., LTD. |
| SUZHOU BAOCHENG INDUSTRIES CO., LTD. | WALLBEYOND (SHUYANG) HOME DECOR CO., LTD. |
| Suzhou Five Cubic Wood Co., Ltd. | Suzhou Geda Office Equipment Manufacturing Co., Ltd. |
| Suzhou Oriental Dragon Import and Export Co., Ltd. also known as Suzhou Oriental Dragon Import and Export Corp., Ltd. | Lingbi Xianghe Wood Co., Ltd |
| Tai Yuan Trading Co., Ltd also known as Heshan Tai Yuan Trading Co., Ltd | Heshan Yingmei Cabinet Co., Ltd |
| Taishan Changfa Wood Industry Co., Ltd | Taishan Changfa Wood Industry Co., Ltd |
| TAISHAN HONGXIANG TRADING CO., LTD. | Chang He Xing Wood Manufacturer Co., Ltd. |
| TAISHAN HONGXIANG TRADING CO., LTD. | Heshan Yingmei Cabinets Co., Ltd |

62

| | |
|---|---|
| TAISHAN HONGXIANG TRADING CO., LTD. | Heshan Feiqiu Cabinet Co., Ltd. |
| TAISHAN HONGXIANG TRADING CO., LTD. | Yuanwang Wood Product Factory Dajiang Taishan |
| TAISHAN HONGXIANG TRADING CO., LTD. | Can-Am Cabinet Ltd. |
| Taishan Hongzhou Cabinet Co., Ltd | Taishan Hongzhou Cabinet Co., Ltd |
| Taishan Jiahong Trade Co., Ltd. | Taishan Dajiang Town Dutou Wood Furniture Factory |
| Taishan Jiahong Trade Co., Ltd. | Foshan Nanhai Jinwei Cabinet Furniture Co., Ltd. |
| Taishan Jiahong Trade Co., Ltd. | Taishan Huali Kitchen Cabinet Co., Ltd. |
| Taishan Jiahong Trade Co., Ltd. | Taishan Empire Wood Co.,Ltd |
| TAISHAN OVERSEA TRADING COMPANY LTD. | TAISHAN GANHUI STONE KITCHEN CO., LTD. |
| TAISHAN OVERSEA TRADING COMPANY LTD. | Can-Am Cabinet Ltd. |
| TAISHAN OVERSEA TRADING COMPANY LTD. | TAISHAN QUANMEI KITCHEN WARE CO., LTD |
| TAISHAN OVERSEA TRADING COMPANY LTD. | TAISHAN JIAFU CABINET CO., LTD. |
| TAISHAN OVERSEA TRADING COMPANY LTD. | TAISHAN DAJIANG TOWN DUTOU FURNITURE FACTORY |
| TAISHAN OVERSEA TRADING COMPANY LTD. | Feiteng Kitchen Cabinets Taishan Corporation |
| Taizhou Overseas Int'l Ltd. | Zhejiang Royal Home Co., Ltd. |
| TANGSHAN BAOZHU FURNITURE CO., LTD. | TANGSHAN BAOZHU FURNITURE CO., LTD. |
| Tech Forest Cabinetry Co., Ltd | Tech Forest Cabinetry Co., Ltd |
| The Ancientree Cabinet Co., Ltd | The Ancientree Cabinet Co., Ltd |
| Weifang Fuxing Wood Co., Ltd. | Weifang Fuxing Wood Co., Ltd. |
| Weifang Lan Gu Wood Industry Co., Ltd. | Weifang Lan Gu Wood Industry Co., Ltd. |
| Weifang Master Wood Industry Co., Ltd | Weifang Master Wood Industry Co., Ltd |
| Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. |

| | |
|---|---|
| Wenzhou Youbo Industrial Co., Ltd | Wenzhou Youbo Industrial Co., Ltd |
| Wuxi Yushea Furniture Co., Ltd | Wuxi Yushea Furniture Co., Ltd |
| Xiamen Adler Cabinetry Co., Ltd. | Xiamen Adler Cabinetry Co., Ltd. |
| XIAMEN GOFOR STONE CO., LTD. | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. |
| XIAMEN GOLDEN HUANAN IMP.& EXP. CO., LTD. | Changtai Guanjia Industrial Co., Ltd. |
| XIAMEN GOLDENHOME CO., LTD | XIAMEN GOLDENHOME CO., LTD |
| Xiamen Honglei Imp.&Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Changtai Guanjia Industry & Trade Company Co., Ltd. |
| Xiamen Honglei Imp.&Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Zhangzhou Huihua Industry and Trade Co., Ltd. |
| Xiamen Honglei Imp.&Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Fujian Xinanlong Wood Industry Co., Ltd. |
| XIAMEN KAICHENG TRADING LIMITED COMPANY | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. |
| XUZHOU JIA LI DUO IMPORT&EXPORT CO.,LTD | XUZHOU OUMEC WOOD-BASED PANEL CO.,LTD |
| XUZHOU YIHE WOOD CO., LTD. | XUZHOU YIHE WOOD CO., LTD. |
| YEKALON INDUSTRY, INC. | DONGGUAN TODA FURNITURE CO., LTD. |
| YEKALON INDUSTRY, INC. | GUANGZHOUSHI BAISEN DECORATIVE MATERIALS COMPANY LIMITED |
| YEKALON INDUSTRY, INC. | DONGGUAN FANYANUO FURNITURE CO., LTD. |
| YEKALON INDUSTRY, INC. | DONGGUANSHI ANKE BUILDING MATERIALS CO., LTD. |
| YEKALON INDUSTRY, INC. | Oriental Chic Furniture Company Limited |
| YEKALON INDUSTRY, INC. | DONGGUAN FRANCISS FURNITURE CO., LTD. |
| YEKALON INDUSTRY, INC. | SHANGHAI YUANYANG WOODEN CO., LTD. |
| Yi Sen Wood Industry Limited Company of Ning An City | Yi Sen Wood Industry Limited Company of Ning An City |
| Yichun Dongmeng Wood Co., Ltd | Yichun Dongmeng Wood Co., Ltd |

64

| | |
|---|---|
| Yichun Dongmeng Wood Co., Ltd | Qingdao Dimei Wood Co., Ltd |
| Yichun Sunshine Wood Products Co., Ltd. | Yichun Sunshine Wood Products Co., Ltd. |
| Yixing Pengjia Cabinetry Co. Ltd | Yixing Pengjia Cabinetry Co. Ltd |
| Zhangjiagang Daye Hotel Furniture Co., Ltd. | Zhangjiagang Daye Hotel Furniture Co., Ltd. |
| ZHANGJIAGANG PRO-FIXTURE CO., LTD. | Zhangjiagang Yuanjiahe Home Furniture Co., Ltd. |
| ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. |
| Zhangzhou Guohui Industrial & Trade Co., Ltd. | Zhangzhou Guohui Industrial & Trade Co., Ltd. |
| Zhangzhou OCA Furniture Co., Ltd | Zhangzhou OCA Furniture Co., Ltd |
| Zhejiang Jindi Holding Group Co., Ltd. | Zhejiang Jindi Holding Group Co., Ltd. |
| Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd | Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd |
| Zhong Shan Yue Qin Imp. & Exp. Co., Ltd | Zhongshan Jinpeng Furniture Co., Ltd |
| Zhongshan City Shenwan Meiting Furniture Factory | Zhongshan City Shenwan Meiting Furniture Factory |
| ZHONGSHAN GAINWELL FURNITURE CO., LTD. | ZHONGSHAN GAINWELL FURNITURE CO., LTD. |
| Zhongshan Guanda Furniture Manufacturing Co., Ltd also known as Guanda Furniture Co., Ltd | Zhongshan Guanda Furniture Manufacturing Co., Ltd |
| Zhoushan For-strong Wood Co., Ltd. | Zhoushan For-strong Wood Co., Ltd. |
| Zhoushan For-strong Wood Co., Ltd. | Shanghai Wanmuda Furniture Co., Ltd. |
| Zhucheng Tonghe Woodworks Co., ltd | Zhucheng Tonghe Woodworks Co., ltd |
| Zhuhai Seagull Kitchen and Bath Products Co., Ltd. | Zhuhai Seagull Kitchen and Bath Products Co., Ltd. |
| ZIEL INTERNATIONAL CO., LIMITED | DONGGUAN FANG CHENG FURNITURE LTD |
| ZIEL INTERNATIONAL CO., LIMITED | ZhongShan PRO-YEARN Crafts Product Co., Ltd. |
| ZIEL INTERNATIONAL CO., LIMITED | FUJIAN NEWMARK INDUSTRIAL CO.,LTD |
| ZIEL INTERNATIONAL CO., LIMITED | Fuzhou Zhonghe Houseware CO., LTD. |

65

Barcode:3896591-01 A-570-106 INV - Investigation  -

| ZIEL INTERNATIONAL CO., LIMITED | MING LIANG FURNITURE PRODUCT CO.,LTD |
| ZIEL INTERNATIONAL CO., LIMITED | XIANJU JUNYANG HOUSEHOLD PRODUCTS CO., LTD |
| ZIEL INTERNATIONAL CO., LIMITED | DongGuan HeTai Homewares CO., LTD |
| ZIEL INTERNATIONAL CO., LIMITED | CHENG TONG HARDWARE RPODUCT LTD |
| ZIEL INTERNATIONAL CO., LIMITED | Nantong Jon Ergonomic office Co.,Ltd |

Filed By: Kabir Archuletta, Filed Date: 10/3/19 11:08 AM, Submission Status: Approved

APPX001091

**Appendix I.c.**

**Companies Not Receiving a Separate Rate**

| Exporter | Producer | Reason for Denial |
|---|---|---|
| BRENTRIDGE HOLDING CO., LTD. | | Companies that failed to cooperate |
| Harbin Hongsen Wood Co., Ltd. | | Companies that failed to cooperate |
| SAICG International Trading Co., Ltd | KUNSHAN BAIYULAN FURNITURE CO., LTD | Companies owned by the Chinese government |
| SAICG International Trading Co., Ltd | GANGXING JIANGSU KITCHEN CABINET CO.,LTD. | Companies owned by the Chinese government |
| SAICG International Trading Co., Ltd | SHANGHAI SENBAI CABINET CO.,LTD. | Companies owned by the Chinese government |
| SAICG International Trading Co., Ltd | HUZHOU BAI SI JIE FURNITURE CO.,LTD | Companies owned by the Chinese government |
| Shanghai East Best Foreign Trade Co., Ltd. | Shanghai Jiesheng Wood Industry Limited Company | Companies owned by the Chinese government |
| Shanghai East Best Foreign Trade Co., Ltd. | Woodworth (Nantong) Cabinetry Co., Ltd. | Companies owned by the Chinese government |
| Shanghai East Best Foreign Trade Co., Ltd. | Aershin Cabinet Co., Ltd. | Companies owned by the Chinese government |
| Shanghai East Best Foreign Trade Co., Ltd. | Aershin Cabinet Co., Ltd. | Companies owned by the Chinese government |
| Shanghai East Best Foreign Trade Co., Ltd. | Shanghai Shuang Jiao Wood Products Co., Ltd. | Companies owned by the Chinese government |
| Shanghai East Best Foreign Trade Co., Ltd. | Kunshan Shuangjiao Wooden Co., Ltd. | Companies owned by the Chinese government |
| SHANGHAI TIMBER IMPORT& EXPORT CORP. | ANHUI BOHUA WOOD CO., LTD | Companies owned by the Chinese government |
| SHANGHAI TIMBER IMPORT& EXPORT CORP. | DEWELL WOODEN PRODUCTS, HAIAN CO., LTD | Companies owned by the Chinese government |
| SHANGHAI TIMBER IMPORT& EXPORT CORP. | JIANGSU SUNWELL CABINETRY CO., LTD | Companies owned by the Chinese government |
| SHANGHAI TIMBER IMPORT& EXPORT CORP. | Suzhou Geda Office Equipment Manufacturing Co., Ltd. | Companies owned by the Chinese government |
| SHANGHAI TIMBER IMPORT& EXPORT CORP. | SHANGHAI ZHANGTAI FURNITURE | Companies owned by the Chinese government |

| | MANUFACTURING CO.,LTD | |
|---|---|---|
| ZHONG SHAN KING YUANDUN WOOD PRODUCTS CO., LTD. also known as CHIN-SHU WOODEN LTD | ZHONG SHAN KING YUANDUN WOOD PRODUCTS CO., LTD. also known as CHIN-SHU WOODEN LTD | Companies that did not separately submit an application |

68

| | | |
|---|---|---|
| Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures, 84 Fed. Reg. 54,106 (Dep't of Commerce Oct. 9, 2019) | P.R. 1426 | APPX001094-APPX001102 |

Dated: October 3, 2019.

**Joan Nagielski,**

*Human Resources Specialist, Office of Employment and Compensation, Department of Commerce Human Capital Client Services, Office of Human Resources Management, Office of the Secretary, Department of Commerce.*

[FR Doc. 2019–21987 Filed 10–8–19; 8:45 am]

**BILLING CODE 3510–24–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–106]

### Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) preliminarily determines that wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the People's Republic of China (China) are being, or are likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is July 1, 2018 through December 31, 2018. Interested parties are invited to comment on this preliminary determination.

**DATES:** Applicable October 9, 2019.

**FOR FURTHER INFORMATION CONTACT:** Kabir Archuletta, Rachel Greenberg, or Eliza Siordia, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2593, (202) 482–0652, or (202) 482–3878, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

This preliminary determination is made in accordance with section 733(b) of the Tariff Act of 1930, as amended (the Act). Commerce published the notice of initiation of this investigation

on April 2, 2019.[1] On August 5, 2019, Commerce postponed the preliminary determination of this investigation and the revised deadline is now October 2, 2019.[2] For a complete description of the events that followed the initiation of this investigation, *see* the Preliminary Decision Memorandum.[3] A list of topics included in the Preliminary Decision Memorandum is included as Appendix II to this notice. The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov,* and to all parties in the Central Records Unit, room B8024 of the main Commerce building. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/.* The signed and the electronic versions of the Preliminary Decision Memorandum are identical in content.

### Scope of the Investigation

The product covered by this investigation is wooden cabinets and vanities from China. For a complete description of the scope of this investigation, *see* Appendix I.

### Scope Comments

In accordance with the preamble to Commerce's regulations,[4] the *Initiation Notice* set aside a period of time for parties to raise issues regarding product coverage (scope).[5] Certain interested parties commented on the scope of the investigation as it appeared in the *Initiation Notice.* For a summary of the

product coverage comments and rebuttal responses submitted to the record for this investigation, and accompanying discussion and analysis of all comments timely received, *see* the Preliminary Scope Decision Memorandum.[6] Commerce is preliminarily modifying the scope language as it appeared in the *Initiation Notice. See* the revised scope in Appendix I to this notice.

### Methodology

Commerce is conducting this investigation in accordance with section 731 of the Act. Commerce has calculated export prices in accordance with section 772(a) of the Act. Because China is a non-market economy, within the meaning of section 771(18) of the Act, Commerce has calculated normal value (NV) in accordance with section 773(c) of the Act. In addition, pursuant to section 776(a) and (b) of the Act, Commerce preliminarily has relied on facts otherwise available, with adverse inferences, for Dalian Meisen Woodworking Co., Ltd. (Meisen), certain separate rate applicants, and the China-wide entity. For a full description of the methodology underlying Commerce's preliminary determination, *see* the Preliminary Decision Memorandum.

### Combination Rates

In the *Initiation Notice,*[7] Commerce stated that it would calculate producer/exporter combination rates for the respondents that are eligible for a separate rate in this investigation. Policy Bulletin 05.1 describes this practice.[8] In this investigation, we calculated producer/exporter combination rates for respondents eligible for separate rates.

### Preliminary Determination

Commerce preliminarily determines that the following estimated weighted-average dumping margins exist:

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation,* 84 FR 12587 (April 2, 2019) (*Initiation Notice*).

[2] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Postponement of Preliminary Determination in the Less-Than-Fair-Value Investigation,* 84 FR 37988 (August 5, 2019).

[3] *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Decision Memorandum for Preliminary Affirmative Determination of Sales at Less-Than-Fair Value," dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

[4] *See Antidumping Duties; Countervailing Duties, Final Rule,* 62 FR 27296, 27323 (May 19, 1997).

[5] *See Initiation Notice.*

[6] *See* Memorandum, "Certain Hardwood Plywood Products from the People's Republic of China: Scope Comments Decision Memorandum for the Preliminary Determinations," dated October 2, 2019 (Preliminary Scope Decision Memorandum).

[7] *See Initiation Notice,* 84 FR at 12590–91.

[8] *See* Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries," dated April 5, 2005 (Policy Bulletin 05.1), available on Commerce's website at *http://enforcement.trade.gov/policy/bull05-1.pdf.*

**Federal Register** / Vol. 84, No. 196 / Wednesday, October 9, 2019 / Notices **54107**

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| The Ancientree Cabinet Co., Ltd ................................... | The Ancientree Cabinet Co., Ltd ................................... | 4.49 | 0.00 |
| Dalian Meisen Woodworking Co., Ltd ........................... | Dalian Meisen Woodworking Co., Ltd ........................... | 262.18 | 251.64 |
| Foremost Worldwide Company Limited ......................... | Rizhao Foremost Woodwork Manufacturing Company, Ltd. | 80.96 | 70.42 |
| Foremost Worldwide Company Limited ......................... | Henan AiDiJia Furniture Co., Ltd ................................. | 80.96 | 70.42 |
| Foremost Worldwide Company Limited ......................... | Suzhou Weiye Furniture Co., Ltd ................................. | 80.96 | 70.4 |
| Foremost Worldwide Company Limited ......................... | Changsha Minwan Furniture Manufacturing Co., Ltd .. | 80.96 | 70.4 |
| ANHUI JIANLIAN WOOD PRODUCTS CO., LTD ......... | ANHUI JIANLIAN WOOD PRODUCTS CO., LTD& ... | 39.25 | 28.7 |
| Anhui Swanch Cabinetry Co., Ltd ................................. | Anhui Swanch Cabinetry Co., Ltd ................................. | 39.25 | 28.71 |
| ANHUI XINYUANDA CUPBOARD CO., LTD ................ | ANHUI XINYUANDA CUPBOARD CO., LTD ................ | 39.25 | 28.71 |
| Beijing Oulu Jinxin International Trade Co., Ltd .......... | Beijing Oulu Jinxin International Trade Co., Ltd .......... | 39.25 | 28.71 |
| Boloni Smart Home Decor (Beijing) Co., LTD ............. | Boloni Smart Home Decor (Beijing) Co., LTD ............. | 39.25 | 28.71 |
| Caoxian Brothers Hengxin Wood Industry Co., Ltd ..... | Caoxian Brothers Hengxin Wood Industry Co., Ltd ..... | 39.25 | 28.71 |
| Changyi Zhengheng Woodwork Co., Ltd ...................... | Changyi Zhengheng Woodwork Co., Ltd ...................... | 39.25 | 28.71 |
| CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | 39.25 | 28.71 |
| China Friend Limited ..................................................... | Dongming Sanxin Wood Industry Co., Ltd ................... | 39.25 | 28.71 |
| Dalian Jiaye Wood Products Co., Ltd ........................... | Dalian Jiaye Wood Products Co., Ltd ........................... | 39.25 | 28.71 |
| Dalian Xingsen Wooden Products Co., Ltd .................. | Dalian Xingsen Wooden Products Co., Ltd .................. | 39.25 | 28.71 |
| Dandong City Anmin Wooden Products Group Co., Ltd. | Dandong City Anmin Wooden Products Group Co., Ltd. | 39.25 | 28.71 |
| Dandong Laroyal Cabinetry Co., Ltd ............................ | Dandong Laroyal Cabinetry Co., Ltd ............................ | 39.25 | 28.71 |
| DEHK LIMITED ............................................................. | DIAM DISPLAY (CHINA) CO., LTD ............................ | 39.25 | 28.71 |
| Deqing China-Africa Foreign Trade Port Co., Ltd ........ | Suqian Welcomewood Products Co., Ltd ...................... | 39.25 | 28.71 |
| Dewell Wooden Products Haian Co., Ltd ...................... | Dewell Wooden Products Haian Co., Ltd ...................... | 39.25 | 28.71 |
| Dongguan American Parts Supplier Co., Ltd ................. | Dongguan American Parts Supplier Co., Ltd ................. | 39.25 | 28.71 |
| Dongguan Niusaiqu Wood Industry Co., Ltd ................ | Dongguan Niusaiqu Wood Industry Co., Ltd ................ | 39.25 | 28.71 |
| Dongguan Unique Life Furniture Co., Ltd. also known as Unique Life Furniture Co., Ltd (trade name). | Dongguan Unique Life Furniture Co., Ltd ..................... | 39.25 | 28.71 |
| Dorbest Ltd .................................................................... | Rui Feng Woodwork (Dongguan) Co., Ltd ................... | 39.25 | 28.71 |
| EZIDONE DISPLAY CORPORATION LTD ................ | EZIDONE DISPLAY CORPORATION LTD ................ | 39.25 | 28.71 |
| EZIDONE DISPLAY CORPORATION LTD ................ | EZIDONE DISPLAY INC ............................................. | 39.25 | 28.71 |
| Forcer International Limited .......................................... | QUFU XINYU FURNITURE CO., LTD ...................... | 39.25 | 28.71 |
| Forcer International Limited .......................................... | LINYI RUNKANG CABINET CO., LTD ...................... | 39.25 | 28.71 |
| Forcer International Limited .......................................... | BEIJING OULU JINXIN INTERNATIONAL TRADE CO., LTD. | 39.25 | 28.71 |
| Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name). | Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name). | 39.25 | 28.71 |
| Foshan Liansu building material Trading Co., Ltd ......... | Guangdong Lesso Home Furnishing Co., Ltd .............. | 39.25 | 28.71 |
| FOSHAN NANHAI HONGZHOU WOOD CO., LTD ... | FOSHAN NANHAI HONGZHOU WOOD CO., LTD .... | 39.25 | 28.71 |
| Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd ......... | Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd ......... | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | FOSHAN DIBIAO BATHROOM CO., LTD ................... | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | FOSHAN MK HOME FURISHING CO., LTD ................ | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | PROUDER INDUSTRIAL LIMITED ............................. | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | FOSHAN DEMAX SANITARY WARE CO., LTD ......... | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | HEBEI SHUANGLI FURNITURE CO., LTD ................. | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | SHOUGUANG FUSHI WOOD CO., LTD ................... | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | Foshan Virtu Bathroom Furniture Ltd ......................... | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 39.25 | 28.71 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ............. | KAIPING HONGITARYWARE TECHNOLOGY LTD ... | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | FOSHAN DIBIAO BATHROOM CO., LTD ................... | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | FOSHAN MK HOME FURISHING CO., LTD .............. | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | PROUDER INDUSTRIAL LIMITED ............................. | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | FOSHAN DEMAX SANITARY WARE CO., LTD ......... | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | HEBEI SHUANGLI FURNITURE CO., LTD ................. | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | SHOUGUANG FUSHI WOOD CO., LTD ................... | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | Foshan Virtu Bathroom Furniture Ltd ......................... | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 39.25 | 28.71 |
| Foshan Sourcever Company Limited ............................. | KAIPING HONGITARYWARE TECHNOLOGY LTD ... | 39.25 | 28.71 |
| Foshan Xinzhongwei Economic & Trade Co., Ltd ........ | Foshan Lihong Furniture Sanitary Ware Co., Ltd ........ | 39.25 | 28.71 |
| FUJIAN DUSHI WOODEN INDUSTRY CO., LTD ...... | FUJIAN DUSHI WOODEN INDUSTRY CO., LTD ...... | 39.25 | 28.71 |
| FUJIAN LEIFENG CABINETRY CO., LTD. ................ | FUJIAN LEIFENG CABINETRY CO., LTD. ................ | 39.25 | 28.71 |
| Fujian Panda Home Furnishing Co., Ltd ....................... | Fujian Panda Home Furnishing Co., Ltd ....................... | 39.25 | 28.71 |

Filed By: Eliza Siordia, Filed Date: 10/19/19 10:06 AM, Submission Status: Approved

Barcode:3898836-01 A-570-106 INV - Investigation -

**54108**    **Federal Register** / Vol. 84, No. 196 / Wednesday, October 9, 2019 / Notices

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Fujian Senyi Kitchen Cabinet Co., Ltd ........................ | Fujian Senyi Kitchen Cabinet Co., Ltd ........................ | 39.25 | 28.71 |
| Fuzhou Biquan Trading Co., Ltd ................................. | Biquan (Fujian) Group Co., Ltd ................................... | 39.25 | 28.71 |
| Fuzhou CBM Import & Export Co., Ltd ........................ | Fuzhou CBM Import & Export Co., Ltd ........................ | 39.25 | 28.71 |
| Fuzhou Desource Home Décor Co., Ltd ....................... | Fuzhou Desource Home Decor Co., Ltd ....................... | 39.25 | 28.71 |
| FUZHOU LIMIN STONE PRODUCTS CO., LTD ....... | Fuzhou YST Cabinet Co., Ltd ..................................... | 39.25 | 28.71 |
| FUZHOU MASTONE IMPORT & EXPORT CO., LTD | Fuzhou Yuansentai Cabinet Co., Ltd ........................... | 39.25 | 28.71 |
| Fuzhou Minlian Wood Industry Co., Ltd ...................... | Fuzhou Minlian Wood Industry Co., Ltd ...................... | 39.25 | 28.71 |
| FUZHOU SUNRISING HOME DECO MANUFAC- TURING CO., LTD. | FUZHOU SUNRISING HOME DECO MANUFAC- TURING CO., LTD. | 39.25 | 28.71 |
| FUZHOU XINRUI CABINET CO., LTD ...................... | FUZHOU XINRUI CABINET CO., LTD ...................... | 39.25 | 28.71 |
| Gaomi City Haitian Wooden Ware Co., Ltd ................. | Gaomi City Haitian Wooden Ware Co., Ltd ................. | 39.25 | 28.71 |
| GAOMI HONGTAI HOME FURNITURE CO., LTD ...... | GAOMI HONGTAI HOME FURNITURE CO., LTD ...... | 39.25 | 28.71 |
| Guangde Bozhong Trade Company, Ltd ...................... | Guangde Bozhong Trade Company, Ltd ...................... | 39.25 | 28.71 |
| GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | 39.25 | 28.71 |
| Guangdong G-Top Import and Export Co., Ltd ............. | Foshan Shunde Rongao Furniture Co., LTD ................. | 39.25 | 28.71 |
| Guangzhou Nuolande Import and Export Co., Ltd ....... | Guangzhou Nuolande Import and Export Co., Ltd ...... | 39.25 | 28.71 |
| Haiyang Kunlun Wood Co., Ltd .................................. | Haiyang Kunlun Wood Co., Ltd .................................. | 39.25 | 28.71 |
| Hangzhou Bestcraft Sanitary Equipments Co., Ltd ..... | Hangzhou Bestcraft Sanitary Equipments Co., Ltd ..... | 39.25 | 28.71 |
| Hangzhou Entop Houseware Co., Ltd .......................... | Jinhua Aonika Sanitary Ware Co., Ltd ....................... | 39.25 | 28.71 |
| Hangzhou Entop Houseware Co., Ltd .......................... | Hangzhou Bestcraft Sanitary Equipments Co., Ltd ..... | 39.25 | 28.71 |
| Hangzhou Hansen Sanitary Ware Co., Ltd .................. | Hangzhou Hansen Sanitary Ware Co., Ltd .................. | 39.25 | 28.71 |
| Hangzhou Hoca Kitchen & Bath Products Co., Ltd ..... | Hangzhou Hoca Kitchen & Bath Products Co., Ltd ..... | 39.25 | 28.71 |
| Hangzhou Home Dee Sanitary Ware Co., Ltd ............. | Hangzhou Home Dee Sanitary Ware Co., Ltd ............. | 39.25 | 28.71 |
| Hangzhou Oulang Bathroom Equipment Co., Ltd ........ | Hangzhou Oulang Bathroom Equipment Co., Ltd ........ | 39.25 | 28.71 |
| Hangzhou Royo Import & Export Co., Ltd ................... | Jinhua Aonika Sanitary Ware Co., Ltd ....................... | 39.25 | 28.71 |
| Hangzhou Royo Import & Export Co., Ltd ................... | Hangzhou Yuxin Sanitary Ware Co., Ltd .................... | 39.25 | 28.71 |
| Hangzhou Royo Import & Export Co., Ltd ................... | Hangzhou Fuyang Beautiful Sanitary Ware Co., Ltd ... | 39.25 | 28.71 |
| Hangzhou Sunlight Sanitary Co., Ltd .......................... | Hangzhou Sunlight Sanitary Co., Ltd .......................... | 39.25 | 28.71 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd .................. | PINGHU AIPA SANITARY WARE CO., LTD ............... | 39.25 | 28.71 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd .................. | HANGZHOU QILONG SANITARY WARE CO., LTD .. | 39.25 | 28.71 |
| Hangzhou Xinhai Sanitary Ware Co., Ltd .................... | Hangzhou Xinhai Sanitary Ware Co., Ltd .................... | 39.25 | 28.71 |
| Hangzhou Yewlong Import&Export Co., Ltd ................ | Hangzhou Yewlong Industry Co., Ltd .......................... | 39.25 | 28.71 |
| Hangzhou Zhuangyu Import & Export Co., Ltd ........... | Hangzhou Zhuangyu Import & Export Co., Ltd ........... | 39.25 | 28.71 |
| Henan Aotin Home Furnishing Co., Ltd ...................... | Henan Aotin Home Furnishing Co., Ltd ...................... | 39.25 | 28.71 |
| Heyond Cabinet Co., Ltd ............................................ | Heyond Cabinet Co., Ltd ............................................ | 39.25 | 28.71 |
| Homestar Corporation ................................................ | Homestar Corporation ................................................ | 39.25 | 28.71 |
| HONG KONG JIAN CHENG TRADING CO., LIMITED | ZHONGSHAN YAYUE FURNITURE CO., LTD ........... | 39.25 | 28.71 |
| Xiamen Honglei Imp.&Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Changtai Guanjia Industry & Trade Company Co., Ltd | 39.25 | 28.71 |
| Xiamen Honglei Imp.&Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Zhangzhou Huihua Industry and Trade Co., Ltd ......... | 39.25 | 28.71 |
| Xiamen Honglei Imp.&Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Fujian Xinanlong Wood Industry Co., Ltd ................... | 39.25 | 28.71 |
| Honsoar New Building Material Co., Ltd ..................... | Shandong Honsoar Cabinet Materials Co., Ltd ........... | 39.25 | 28.71 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Jianfa Wooden Co., Ltd ............................................. | 39.25 | 28.71 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Heshan Yingmei Cabinets Co., Ltd ............................. | 39.25 | 28.71 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Hesha Feiqiu Cabinet Co., Ltd ................................... | 39.25 | 28.71 |
| Huimin Hanlong Furniture Co., Ltd ............................. | Huimin Hanlong Furniture Co., Ltd ............................. | 39.25 | 28.71 |
| HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | 39.25 | 28.71 |
| HUIZHOU MANDARIN FURNITURE CO., LTD .......... | HUIZHOU MANDARIN FURNITURE CO., LTD .......... | 39.25 | 28.71 |
| Jiang Su Rongxin Cabinets Ltd ................................... | Jiang Su Rongxin Cabinets Ltd ................................... | 39.25 | 28.71 |
| Jiangmen Kinwai Furniture Decoration Co., Ltd .......... | Jiangmen Kinwai Furniture Decoration Co., Ltd .......... | 39.25 | 28.71 |
| Jiangmen Kinwai International Furniture Co., Ltd ........ | Jiangmen Kinwai International Furniture Co., Ltd ........ | 39.25 | 28.71 |
| Jiangsu Beichen Wood Co., Ltd .................................. | Jiangsu Beichen Wood Co., Ltd .................................. | 39.25 | 28.71 |
| Jiangsu Meijun Intelligent Home Co., Ltd .................. | Jiangsu Meijun Intelligent Home Co., Ltd .................. | 39.25 | 28.71 |
| Jiangsu Pusite Furniture Co., Ltd .............................. | Jiangsu Pusite Furniture Co., Ltd .............................. | 39.25 | 28.71 |
| Jiangsu Roc Furniture Industrial Co., Ltd ................... | Jiangsu Roc Furniture Industrial Co., Ltd ................... | 39.25 | 28.71 |
| JIANGSU SUNWELL CABINETRY CO., LTD ............ | JIANGSU SUNWELL CABINETRY CO., LTD ............ | 39.25 | 28.71 |
| JIANGSU WEISEN HOUSEWARE CO., LTD ............. | JIANGSU WEISEN HOUSEWARE CO., LTD ............. | 39.25 | 28.71 |
| Jiangsu Xiangsheng Bedtime Furniture Co., Ltd ......... | Jiangsu Xiangsheng Bedtime Furniture Co., Ltd ......... | 39.25 | 28.71 |
| Jiayuan (Xiamen) Industrial Co., Ltd .......................... | Jiayuan (Xiamen) Industrial Co., Ltd .......................... | 39.25 | 28.71 |
| JINJIANG PERFECT GENERATION IMP. & EXP. CO., LTD. | Homebi Technology Co., LTD .................................... | 39.25 | 28.71 |

APPX001096

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| King's Group Furniture (Enterprises) Co., Ltd | Zhongshan King's Group Furniture (ENTERPRISES) Co., Ltd. | 39.25 | 28.71 |
| KM Cabinetry Co., Limited | Zhongshan KM Cabinetry Co., Ltd | 39.25 | 28.71 |
| Kunshan Baiyulan Furniture Co., Ltd | Kunshan Baiyulan Furniture Co., Ltd | 39.25 | 28.71 |
| Kunshan Home Right Trade Corporation | Kunshan Fangs Furniture Co., Ltd | 39.25 | 28.71 |
| LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | 39.25 | 28.71 |
| Linshu Meibang Furniture Co., Ltd | Linshu Meibang Furniture Co., Ltd | 39.25 | 28.71 |
| Linyi Bomei Furniture Co., Ltd | Linyi Bomei Furniture Co., Ltd | 39.25 | 28.7 |
| LINYI BONN FLOORING MANUFACTURING CO., LTD. | LINYI BONN FLOORING MANUFACTURING CO., LTD. | 39.25 | 28.71 |
| Linyi Kaipu Furniture Co., Ltd | Linyi Kaipu Furniture Co., Ltd | 39.25 | 28.71 |
| Linyi Runkang Cabinet Co., Ltd | Linyi Runkang Cabinet Co., Ltd | 39.25 | 28.71 |
| Liu Shu Woods Product (Huizhou) Co., Ltd also known as Liu Shu Wood Products Co., Ltd (trade name) and Liu Shu Woods Product Co., Ltd (trade name). | Liu Shu Woods Product (Huizhou) Co., Ltd | 39.25 | 28.71 |
| Master Door & Cabinet Co., Ltd | Master Door & Cabinet Co., Ltd | 39.25 | 28.7 |
| Masterwork Cabinetry Company Limited | Shandong Compete Wood Co., Ltd | 39.25 | 28.71 |
| Masterwork Cabinetry Company Limited | Linyi Zhongsheng Jiaju Zhuangshi Co., Ltd | 39.25 | 28.71 |
| MEILIN WOOD PRODUCTS(DALIAN)CO., LTD | MEILIN WOOD PRODUCTS(DALIAN)CO., LTD | 39.25 | 28.71 |
| Minhou Beite Home Decor Co., Ltd | Minhou Beite Home Decor Co., Ltd | 39.25 | 28.71 |
| MJB Supply (Dalian) Co., Ltd | Mulin City Baimiantong Linyeju Jisen Wood | 39.25 | 28.71 |
| MOREWOOD CABINETRY CO., LTD | MOREWOOD CABINETRY CO., LTD | 39.25 | 28.71 |
| Nanjing Kaylang Co., Ltd | Nanjing Kaylang Co., Ltd | 39.25 | 28.71 |
| Nantong Aershin Cabinets Co., Ltd | Nantong Aershin Cabinets Co., Ltd | 39.25 | 28.71 |
| Nantong Ouming Wood Co., Ltd. | Nantong Ouming Wood Co., Ltd. | 39.25 | 28.71 |
| NANTONG YANGZI FURNITURE CO., LTD | NANTONG YANGZI FURNITURE CO., LTD | 39.25 | 28.71 |
| NINGBO KINGWOOD FURNITURE CO., LTD | NINGBO KINGWOOD FURNITURE CO., LTD | 39.25 | 28.71 |
| NINGBO ROVSA HOME FURNISHING CO., LTD | NINGBO ROVSA HOME FURNISHING CO., LTD | 39.25 | 28.71 |
| Ojans Company Limited | Foshan Shunde Ojans Intelligent Sanitary Ware Co., Ltd. | 39.25 | 28.71 |
| Oppein Home Group Inc | Oppein Home Group Inc | 39.25 | 28.71 |
| PIZHOU OUYME IMPORT & EXPORT TRADE CO., LTD. | XUZHOU OUMEC WOOD–BASED PANEL CO., LTD | 39.25 | 28.71 |
| Pneuma Asia Sourcing & Trading Co. LIMITED | Dalian Tianxin Home Product Co., Ltd | 39.25 | 28.71 |
| Pneuma Asia Sourcing & Trading Co. LIMITED | Qingdao Haiyan Drouot Household Co., Ltd | 39.25 | 28.71 |
| Putian Jinggong Furniture Co., Ltd | Putian Jinggong Furniture Co., Ltd | 39.25 | 28.71 |
| Qingdao Coomex Sources Co., Ltd. also known as Coomex Sources Co., Ltd. | Nantong Aershin Cabinets Co., Ltd | 39.25 | 28.71 |
| Qingdao Haiyan Drouot Household Co., Ltd | Qingdao Haiyan Drouot Household Co., Ltd | 39.25 | 28.71 |
| Qingdao Liangmu Hongye Co., Ltd | Qingdao Liangmu Hongye Co., Ltd | 39.25 | 28.71 |
| Qingdao Liangmu Jinshan Woodwork Co., Ltd | Qingdao Liangmu Jinshan Woodwork Co., Ltd | 39.25 | 28.71 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Lankao Sanqiang Wooden Products Co., Ltd | 39.25 | 28.71 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Lanshan Chengxinli Woods Co., Ltd | 39.25 | 28.71 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Shouguang Shi Qifeng Woods Co., Ltd | 39.25 | 28.71 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Mingzhu Woods Co., Ltd | 39.25 | 28.71 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Yichun Senhai Woods Industry Co., Ltd | 39.25 | 28.71 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Jinde Arts & Crafts Co., Ltd | 39.25 | 28.71 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Qingdao Ruirong Woods Co., Ltd | 39.25 | 28.71 |
| Qingdao Shousheng Industry Co., Ltd | Qingdao Shousheng Industry Co., Ltd | 39.25 | 28.71 |
| Qingdao Yimei Wood Work Co., Ltd | Qingdao Yimei Wood Work Co., Ltd | 39.25 | 28.71 |
| QINGDAOHONGXINCHENGDA WOOD INDUSTRY CO., LTD. | QINGDAOHONGXINCHENGDA WOOD INDUSTRY CO., LTD. | 39.25 | 28.71 |
| QUFU XINYU FURNITURE CO., LTD | QUFU XINYU FURNITURE CO., LTD | 39.25 | 28.71 |
| Ronbow Hong Kong Limited | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd | 39.25 | 28.71 |
| Sagarit Bathroom Manufacturer Limited | Shouguang Fushi Wood Co., Ltd | 39.25 | 28.71 |
| Sagarit Bathroom Manufacturer Limited | Zhangzhou Guohui Industrial & Trade Co., Ltd | 39.25 | 28.71 |
| Sagarit Bathroom Manufacturer Limited | Qingdao Runpeng Wood Industrial Co., Ltd | 39.25 | 28.71 |
| Sankok Arts Co., Ltd | Sankok Arts Co., Ltd | 39.25 | 28.71 |
| Senke Manufacturing Company | Qindao Yimei Wood Work Co., Ltd | 39.25 | 28.71 |
| Senke Manufacturing Company | Linyi Kaipu Furniture Co., Ltd | 39.25 | 28.71 |
| Senke Manufacturing Company | Shandon Honsoar Cabinetry Co., Ltd | 39.25 | 28.71 |

Barcode:3898836-01 A-570-106 INV - Investigation -

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Senke Manufacturing Company ................................. | Huimin Hanlong Furniture Co, Ltd ............................... | 39.25 | 28.71 |
| Shandong Cubic Alpha Timber Co., Ltd ..................... | Shandong Cubic Alpha Timber Co., Ltd ..................... | 39.25 | 28.71 |
| Shandong Fusheng Wood Co., Ltd ............................. | Shandong Fusheng Wood Co., Ltd ............................. | 39.25 | 28.71 |
| Shandong Huanmei Wood Co., Ltd ............................ | Shandong Huanmei Wood Co., Ltd ............................ | 39.25 | 28.71 |
| SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | 39.25 | 28.71 |
| Shandong Longsen Woods Co., Ltd ........................... | Shandong Longsen Woods Co., Ltd ........................... | 39.25 | 28.71 |
| Shandong Sanfortune Home and Furniture Co., Ltd ... | Shandong Sanfortune Home and Furniture Co., Ltd ... | 39.25 | 28.7 |
| Shanghai Aiwood Home Supplies Co., Ltd ................. | Jiangsu Gangxing Kitchen Cabinet Co., Ltd ............... | 39.25 | 28.71 |
| Shanghai Aiwood Home Supplies Co., Ltd ................. | Shanghai Homebase SanSheng Household Product Co., Ltd. | 39.25 | 28.71 |
| Shanghai Baiyulan Furniture Co., Ltd ........................ | Kunshan Baiyulan Furniture Co., Ltd ........................ | 39.25 | 28.71 |
| Shanghai Beautystar Cabinetry Co., Ltd ................... | Jiangsu Sunwell Cabinetry Co., Ltd .......................... | 39.25 | 28.71 |
| Shanghai Beautystar Cabinetry Co., Ltd ................... | Nantong Jiegao Furniture Co., Ltd ............................ | 39.25 | 28.71 |
| Shanghai Jiang Feng Furniture Co., Ltd ................... | Shanghai Jiang Feng Furniture Co., Ltd ................... | 39.25 | 28.71 |
| SHANGHAI LINE KING INTERNATIONAL TRADING CO., LTD. | SHANGHAI YAZHI WOODEN INDUSTRY CO., LTD | 39.25 | 28.71 |
| Shanghai Mebo Industry Co. Ltd ............................... | Shanghai Mebo Industry Co. Ltd ............................... | 39.25 | 28.71 |
| Shanghai Qingzhou Woodenware Co., Ltd ................. | Shanghai Qingzhou Woodenware Co., Ltd ................. | 39.25 | 28.71 |
| Shanghai S&M Trade Co., Ltd ................................... | Anhui GeLun Wood Industry Co., Ltd ........................ | 39.25 | 28.71 |
| Shanghai S&M Trade Co., Ltd ................................... | Ning'an City Jiude Wood Co., Ltd ............................. | 39.25 | 28.71 |
| Shanghai S&M Trade Co., Ltd ................................... | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 39.25 | 28.71 |
| Shanghai S&M Trade Co., Ltd ................................... | Dalian Ruiyu Mountain Wood Co., Ltd ...................... | 39.25 | 28.71 |
| Shanghai S&M Trade Co., Ltd ................................... | Linshu Meibang Furniture Co., Ltd ........................... | 39.25 | 28.71 |
| Shanghai S&M Trade Co., Ltd ................................... | Jiamusi City Quanhong Wood Industry Co., Ltd ......... | 39.25 | 28.71 |
| Shanghai S&M Trade Co., Ltd ................................... | Kunshan Fangs Furniture Co., Ltd ............................ | 39.25 | 28.71 |
| Shanghai S&M Trade Co., Ltd ................................... | Dalian Chunyao Wood Industry Co., Ltd ................... | 39.25 | 28.71 |
| Shanghai S&M Trade Co., Ltd ................................... | Anhui Juxin Wood Industry Co., Ltd ......................... | 39.25 | 28.71 |
| Shanghai Wang Lei Industries—Taicang Branch ........ | Shanghai Wang Lei Industries—Taicang Branch ........ | 39.25 | 28.71 |
| Shanghai Wen Bo Industries Co. Ltd ........................ | Shanghai Yinbo Manufacturing Co. Ltd .................... | 39.25 | 28.71 |
| Shanghai Wen Bo Industries Co. Ltd ........................ | Dalian Jiaye Wood Products Co., Ltd ........................ | 39.25 | 28.71 |
| Shanghai Wen Bo Industries Co. Ltd ........................ | Shanghai Baiyulan Furniture Co., Ltd ...................... | 39.25 | 28.71 |
| Shanghai Xietong (Group) Co., Ltd ........................... | Nantong Jiegao Furniture Co., Ltd ........................... | 39.25 | 28.71 |
| Shanghai Xietong (Group) Co., Ltd ........................... | Jiangsu Senwei Smart Home Co., Ltd ...................... | 39.25 | 28.71 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANDONG GAINVAST WOODEN PRODUCTS CO., LTD. | 39.25 | 28.71 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANGHAI WENYI WOODEN CO., LTD | 39.25 | 28.71 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | NAN TONG DI LIN FURNITURE CO., LTD ................ | 39.25 | 28.71 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | JIANGSU YANAN WOODEN CO., LTD ..................... | 39.25 | 28.71 |
| Sheen Lead International Trading (Shanghai)Co., Ltd | SHANGHAI RUIYING FURNITURE CO., LTD ............ | 39.25 | 28.71 |
| Shouguang Fushi Wood Co., Ltd ............................... | Shouguang Fushi Wood Co., Ltd ............................... | 39.25 | 28.71 |
| Shouguang Honsoar Imp. & Exp. Trading Co., Ltd ..... | Shouguang Honsoar Imp. & Exp. Trading Co., Ltd ..... | 39.25 | 28.71 |
| SHOUGUANG JIAXIU WOOD CO., LTD ................... | SHOUGUANG JIAXIU WOOD CO., LTD ................... | 39.25 | 28.71 |
| SHOUGUANG JIAXIU WOOD CO., LTD ................... | SHOUGUANG JIAXIU WOOD CO., LTD ................... | 39.25 | 28.71 |
| Shouguang Jinxiangyuan Home Furnishing Co., Ltd .. | Shouguang Jinxiangyuan Home Furnishing Co., Ltd .. | 39.25 | 28.71 |
| Shouguang Sanyang Wood Industry Co., Ltd ............. | Shouguang Sanyang Wood Industry Co., Ltd ............. | 39.25 | 28.71 |
| Silver Stone Group Co., Ltd ...................................... | QINGDAO FAMILY CRAFTS CO., LTD ..................... | 39.25 | 28.71 |
| Silver Stone Group Co., Ltd ...................................... | QingDao XiuZhen Furniture Co., Ltd ........................ | 39.25 | 28.71 |
| Smart Gift International .............................................. | Anhui GeLun Wood Industry Co., Ltd ........................ | 39.25 | 28.71 |
| Smart Gift International .............................................. | Ning'an City Jiude Wood Co., Ltd ............................. | 39.25 | 28.71 |
| Smart Gift International .............................................. | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 39.25 | 28.71 |
| Smart Gift International .............................................. | Dalian Ruiyu Mountain Wood Co., Ltd ...................... | 39.25 | 28.71 |
| Smart Gift International .............................................. | Jiamusi City Quanhong Wood Industry Co., Ltd ......... | 39.25 | 28.71 |
| Smart Gift International .............................................. | Dalian Chunyao Wood Industry Co., Ltd ................... | 39.25 | 28.71 |
| SUNCO TIMBER(KUNSHAN) CO., LTD ................... | SUNCO TIMBER(KUNSHAN) CO., LTD ................... | 39.25 | 28.71 |
| Supree (Fuijian) Wood Co., Ltd ................................ | Supree (Fuijian) Wood Co., Ltd ................................ | 39.25 | 28.71 |
| Supree (Fujian) Construction Materials Co., Ltd ........ | Supree (Fujian) Construction Materials Co., Ltd ........ | 39.25 | 28.71 |
| SUZHOU BAOCHENG INDUSTRIES CO., LTD ......... | WALLBEYOND (SHUYANG) HOME DECOR CO., LTD. | 39.25 | 28.71 |
| Suzhou Five Cubic Wood Co., Ltd ............................. | Suzhou Geda Office Equipment Manufacturing Co., Ltd. | 39.25 | 28.71 |
| Suzhou Oriental Dragon Import and Export Co., Ltd. also known as Suzhou Oriental Dragon Import and Export Corp., Ltd. | Lingbi Xianghe Wood Co., Ltd .................................... | 39.25 | 28.71 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Tai Yuan Trading Co., Ltd also known as Heshan Tai Yuan Trading Co., Ltd. | Heshan Yingmei Cabinet Co., Ltd | 39.25 | 28.71 |
| Taishan Changfa Wood Industry Co., Ltd | Taishan Changfa Wood Industry Co., Ltd | 39.25 | 28.71 |
| TAISHAN HONGXIANG TRADING CO., LTD | Chang He Xing Wood Manufacturer Co., Ltd | 39.25 | 28.71 |
| TAISHAN HONGXIANG TRADING CO., LTD | Heshan Yingmei Cabinets Co., Ltd | 39.25 | 28.71 |
| TAISHAN HONGXIANG TRADING CO., LTD | Heshan Feiqiu Cabinet Co., Ltd | 39.25 | 28.71 |
| TAISHAN HONGXIANG TRADING CO., LTD | Yuanwang Wood Product Factory Dajiang Taishan | 39.25 | 28.71 |
| TAISHAN HONGXIANG TRADING CO., LTD | Can-Am Cabinet Ltd | 39.25 | 28.71 |
| Taishan Hongzhou Cabinet Co., Ltd | Taishan Hongzhou Cabinet Co., Ltd | 39.25 | 28.71 |
| Taishan Jiahong Trade Co., Ltd | Taishan Dajiang Town Dutou Wood Furniture Factory | 39.25 | 28.71 |
| Taishan Jiahong Trade Co., Ltd | Foshan Nanhai Jinwei Cabinet Furniture Co., Ltd | 39.25 | 28.71 |
| Taishan Jiahong Trade Co., Ltd | Taishan Huali Kitchen Cabinet Co., Ltd | 39.25 | 28.71 |
| Taishan Jiahong Trade Co., Ltd | Taishan Empire Wood Co., Ltd | 39.25 | 28.71 |
| TAISHAN OVERSEA TRADING COMPANY LTD | TAISHAN GANHUI STONE KITCHEN CO., LTD | 39.25 | 28.71 |
| TAISHAN OVERSEA TRADING COMPANY LTD | Can-Am Cabinet Ltd | 39.25 | 28.71 |
| TAISHAN OVERSEA TRADING COMPANY LTD | TAISHAN QUANMEI KITCHEN WARE CO., LTD | 39.25 | 28.71 |
| TAISHAN OVERSEA TRADING COMPANY LTD | TAISHAN JIAFU CABINET CO., LTD | 39.25 | 28.71 |
| TAISHAN OVERSEA TRADING COMPANY LTD | TAISHAN DAJIANG TOWN DUTOU FURNITURE FACTORY. | 39.25 | 28.71 |
| TAISHAN OVERSEA TRADING COMPANY LTD | Feiteng Kitchen Cabinets Taishan Corporation | 39.25 | 28.71 |
| Taizhou Overseas Int'l Ltd | Zhejiang Royal Home Co., Ltd | 39.25 | 28.71 |
| TANGSHAN BAOZHU FURNITURE CO., LTD | TANGSHAN BAOZHU FURNITURE CO., LTD | 39.25 | 28.71 |
| Tech Forest Cabinetry Co., Ltd | Tech Forest Cabinetry Co., Ltd | 39.25 | 28.71 |
| The Frame Manufacturing Co. Ltd | HUIZHOU DIWEIXIN JIATINGYONGPIN CO., LTD | 39.25 | 28.71 |
| Top Goal International Group Ltd. (Hong Kong) | Dongguan City Top Goal Furniture Co., Ltd | 39.25 | 28.71 |
| Tradewinds Furniture Ltd | Tradewinds Furniture Ltd | 39.25 | 28.71 |
| Wa Fok Art Craft Furniture (MACAO) Co., Ltd | Zhongshan Huafu Art Craft Furniture Co., Ltd | 39.25 | 28.71 |
| Weifang Fuxing Wood Co., Ltd | Weifang Fuxing Wood Co., Ltd | 39.25 | 28.71 |
| WEIFANG KITCHINET CORPORATION | WEIFANG KITCHINET CORPORATION | 39.25 | 28.71 |
| Weifang Lan Gu Wood Industry Co., Ltd | Weifang Lan Gu Wood Industry Co., Ltd | 39.25 | 28.71 |
| Weifang Master Wood Industry Co., Ltd | Weifang Master Wood Industry Co., Ltd | 39.25 | 28.71 |
| Weifang Yuanlin Woodenware Co., Ltd | Weifang Yuanlin Woodenware Co., Ltd | 39.25 | 28.71 |
| Weihai Adornus Cabinetry Manufacturing Co., Ltd | Weihai Adornus Cabinetry Manufacturing Co., Ltd | 39.25 | 28.71 |
| WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | 39.25 | 28.71 |
| Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | 39.25 | 28.71 |
| Wenzhou Youbo Industrial Co., Ltd | Wenzhou Youbo Industrial Co., Ltd | 39.25 | 28.71 |
| Wuxi Yushea Furniture Co., Ltd | Wuxi Yushea Furniture Co., Ltd | 39.25 | 28.71 |
| Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd | 39.25 | 28.71 |
| Xiamen Adler Cabinetry Co., Ltd | Xiamen Adler Cabinetry Co., Ltd | 39.25 | 28.71 |
| XIAMEN GOFOR STONE CO., LTD | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD | 39.25 | 28.71 |
| XIAMEN GOLDEN HUANAN IMP. & EXP. CO., LTD | Changtai Guanjia Industrial Co., Ltd | 39.25 | 28.71 |
| XIAMEN GOLDENHOME CO., LTD | XIAMEN GOLDENHOME CO., LTD | 39.25 | 28.71 |
| XIAMEN KAICHENG TRADING LIMITED COMPANY | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD | 39.25 | 28.71 |
| Xiamen Sintop Display Fixtures Co., Ltd | Xiamen Sintop Display Fixtures Co., Ltd | 39.25 | 28.71 |
| XINGZHI INTERNATIONAL TRADE LIMITED | XUZHOU YIHE WOOD CO., LTD | 39.25 | 28.71 |
| XUZHOU JIA LI DUO IMPORT&EXPORT CO., LTD | XUZHOU OUMEC WOOD–BASED PANEL CO., LTD | 39.25 | 28.71 |
| XUZHOU YIHE WOOD CO., LTD | XUZHOU YIHE WOOD CO., LTD | 39.25 | 28.71 |
| YEKALON INDUSTRY, INC | DONGGUAN TODA FURNITURE CO., LTD | 39.25 | 28.71 |
| YEKALON INDUSTRY, INC | GUANGZHOUSHI BAISEN DECORATIVE MATERIALS COMPANY LIMITED. | 39.25 | 28.71 |
| YEKALON INDUSTRY, INC | DONGGUAN FANYANUO FURNITURE CO., LTD | 39.25 | 28.71 |
| YEKALON INDUSTRY, INC | DONGGUANSHI ANKE BUILDING MATERIALS CO., LTD. | 39.25 | 28.71 |
| YEKALON INDUSTRY, INC | Oriental Chic Furniture Company Limited | 39.25 | 28.71 |
| YEKALON INDUSTRY, INC | DONGGUAN FRANCISS FURNITURE CO., LTD | 39.25 | 28.71 |
| YEKALON INDUSTRY, INC | SHANGHAI YUANYANG WOODEN CO., LTD | 39.25 | 28.71 |
| Yi Sen Wood Industry Limited Company of Ning An City. | Yi Sen Wood Industry Limited Company of Ning An City. | 39.25 | 28.71 |
| Yichun Dongmeng Wood Co., Ltd | Yichun Dongmeng Wood Co., Ltd | 39.25 | 28.71 |
| Yichun Dongmeng Wood Co., Ltd | Qingdao Dimei Wood Co., Ltd | 39.25 | 28.71 |
| Yichun Sunshine Wood Products Co., Ltd | Yichun Sunshine Wood Products Co., Ltd | 39.25 | 28.71 |
| Yixing Pengjia Cabinetry Co. Ltd | Yixing Pengjia Cabinetry Co. Ltd | 39.25 | 28.71 |
| Zhangjiagang Daye Hotel Furniture Co., Ltd | Zhangjiagang Daye Hotel Furniture Co., Ltd | 39.25 | 28.71 |
| ZHANGJIAGANG PRO-FIXTURE CO., LTD | Zhangjiagang Yuanjiahe Home Furniture Co., Ltd | 39.25 | 28.71 |
| ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | 39.25 | 28.71 |
| Zhangzhou Guohui Industrial & Trade Co., Ltd | Zhangzhou Guohui Industrial & Trade Co., Ltd | 39.25 | 28.71 |
| Zhangzhou OCA Furniture Co., Ltd | Zhangzhou OCA Furniture Co., Ltd | 39.25 | 28.71 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Zhaoqing Centech Decorative Material Company Ltd | Zhaoqing Centech Decorative Material Company Ltd | 39.25 | 28.71 |
| Zhejiang Jindi Holding Group Co., Ltd | Zhejiang Jindi Holding Group Co., Ltd | 39.25 | 28.71 |
| Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | 39.25 | 28.71 |
| Zhong Shan Yue Qin Imp. & Exp. Co., Ltd | Zhongshan Jinpeng Furniture Co., Ltd | 39.25 | 28.71 |
| Zhongshan City Shenwan Meiting Furniture Factory | Zhongshan City Shenwan Meiting Furniture Factory | 39.25 | 28.71 |
| Zhongshan Fookyik Furniture Co., Ltd | Zhongshan Fookyik Furniture Co., Ltd | 39.25 | 28.71 |
| ZHONGSHAN GAINWELL FURNITURE CO., LTD | ZHONGSHAN GAINWELL FURNITURE CO., LTD | 39.25 | 28.71 |
| Zhongshan Guanda Furniture Manufacturing Co., Ltd also known as Guanda Furniture Co., Ltd. | Zhongshan Guanda Furniture Manufacturing Co., Ltd | 39.25 | 28.71 |
| ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | 39.25 | 28.71 |
| Zhongshan King's Group Furniture (ENTERPRISES) Co., Ltd. | Zhongshan King's Group Furniture (ENTERPRISES) Co., Ltd. | 39.25 | 28.71 |
| Zhoushan For-strong Wood Co., Ltd | Zhoushan For-strong Wood Co., Ltd | 39.25 | 28.71 |
| Zhoushan For-strong Wood Co., Ltd | Shanghai Wanmuda Furniture Co., Ltd | 39.25 | 28.71 |
| Zhucheng Tonghe Woodworks Co., ltd | Zhucheng Tonghe Woodworks Co., ltd | 39.25 | 28.71 |
| Zhuhai Seagull Kitchen and Bath Products Co., Ltd | Zhuhai Seagull Kitchen and Bath Products Co., Ltd | 39.25 | 28.71 |
| ZIEL INTERNATIONAL CO., LIMITED | DONGGUAN FANG CHENG FURNITURE LTD | 39.25 | 28.71 |
| ZIEL INTERNATIONAL CO., LIMITED | ZhongShan PRO–YEARN Crafts Product Co., Ltd | 39.25 | 28.71 |
| ZIEL INTERNATIONAL CO., LIMITED | FUJIAN NEWMARK INDUSTRIAL CO., LTD | 39.25 | 28.71 |
| ZIEL INTERNATIONAL CO., LIMITED | Fuzhou Zhonghe Houseware CO., LTD | 39.25 | 28.71 |
| ZIEL INTERNATIONAL CO., LIMITED | MING LIANG FURNITURE PRODUCT CO., LTD | 39.25 | 28.71 |
| ZIEL INTERNATIONAL CO., LIMITED | XIANJU JUNYANG HOUSEHOLD PRODUCTS CO., LTD. | 39.25 | 28.71 |
| ZIEL INTERNATIONAL CO., LIMITED | DongGuan HeTai Homewares CO., LTD | 39.25 | 28.71 |
| ZIEL INTERNATIONAL CO., LIMITED | CHENG TONG HARDWARE RPODUCT LTD | 39.25 | 28.71 |
| ZIEL INTERNATIONAL CO., LIMITED | Nantong Jon Ergonomic office Co., Ltd | 39.25 | 28.71 |
| China-Wide Entity [9] | | 262.18 | 251.64 |

## Suspension of Liquidation

In accordance with section 733(d)(2) [9] of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to suspend liquidation of entries of subject merchandise as described in Appendix I, entered, or withdrawn from warehouse, for consumption on or after the date of publication of this notice in the **Federal Register**, as discussed below.

Further, pursuant to section 733(d)(1)(B) of the Act and 19 CFR 351.205(d), Commerce will instruct CBP to require a cash deposit equal to the estimated weighted average amount by which normal value exceeds U.S. price, as indicated in the chart above as follows: (1) For the producer/exporter combinations listed in the table above, the cash deposit rate is equal to the estimated weighted-average dumping margin listed for that combination in the table; (2) for all combinations of Chinese producers/exporters of merchandise under consideration that have not established eligibility for their own separate rates, the cash deposit rate will be equal to the estimated weighted-average dumping margin established for the China-wide entity; and (3) for all third-country exporters of merchandise under consideration not listed in the table above, the cash deposit rate is the cash deposit rate applicable to the Chinese producer/exporter combination (or the China-wide entity) that supplied that third-country exporter.

To determine the cash deposit rate, Commerce normally adjusts the estimated weighted-average dumping margin by the amount of domestic subsidy pass-through and export subsidies determined in a companion countervailing duty (CVD) proceeding when CVD provisional measures are in effect. Accordingly, Commerce has made a preliminary affirmative determination for an export subsidy adjustment; however, Commerce has not made a preliminary affirmative determination for a domestic subsidy pass-through adjustment in this investigation. [10] Commerce has offset the calculated estimated weighted-average dumping margin by the appropriate rate(s). Any such adjusted rates may be found in the chart of estimated weighted-average dumping margins in the Preliminary Determination section above.

Should provisional measures in the companion CVD investigation expire prior to the expiration of provisional measures in this LTFV investigation, Commerce will direct CBP to begin collecting cash deposits at a rate equal to the estimated weighted-average dumping margins calculated in this preliminary determination unadjusted for the export subsidies at the time the CVD provisional measures expire.

These suspension of liquidation instructions will remain in effect until further notice.

## Disclosure

Commerce intends to disclose to interested parties the calculations performed in connection with this preliminary determination within five days of its public announcement or, if there is no public announcement, within five days of the date of publication of this notice in the **Federal**

---

[9] Commerce preliminarily determined that BRENTRIDGE HOLDING CO., LTD., Harbin Hongsen Wood Co., Ltd., SAICG International Trading Co., Ltd, Shanghai East Best Foreign Trade Co., Ltd., SHANGHAI TIMBER IMPORT & EXPORT CORP., and ZHONG SHAN KING YUANDUN WOOD PRODUCTS CO., LTD. also known as CHIN–SHU WOODEN LTD each failed to establish their eligibility for a separate rate and, therefore, we preliminarily determined that these companies are part of the China-wide entity. *See* Preliminary Decision Memorandum.

[10] *See* sections titled, "Adjustment Under Section 777A(F) of the Act" and "Adjustment to Cash Deposit Rate for Export Subsidies" in the Preliminary Decision Memorandum.

**Register**, in accordance with 19 CFR 351.224(b).

## Verification

As provided in section 782(i)(1) of the Act, Commerce intends to verify certain information relied upon in making its final determination.

## Public Comment

Case briefs or other written comments may be submitted to the Assistant Secretary for Enforcement and Compliance no later than seven days after the date on which the last final verification report is issued in this investigation. Rebuttal briefs, limited to issues raised in case briefs, may be submitted no later than five days after the deadline date for case briefs.[11] Pursuant to 19 CFR 351.309(c)(2) and (d)(2), parties who submit case briefs or rebuttal briefs in this investigation are encouraged to submit with each argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, within 30 days after the date of publication of this notice. Requests should contain the party's name, address, and telephone number, the number of participants, whether any participant is a foreign national, and a list of the issues to be discussed. If a request for a hearing is made, Commerce intends to hold the hearing at the U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC, 20230, at a time and date to be determined. Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date.

## Postponement of Final Determination and Extension of Provisional Measures

Section 735(a)(2) of the Act provides that a final determination may be postponed until not later than 135 days after the date of the publication of the preliminary determination if, in the event of an affirmative preliminary determination, a request for such postponement is made by exporters who account for a significant proportion of exports of the subject merchandise, or in the event of a negative preliminary determination, a request for such postponement is made by the

petitioners. Pursuant to 19 CFR 351.210(e)(2), Commerce requires that requests by respondents for postponement of a final antidumping determination be accompanied by a request for extension of provisional measures from a four-month period to a period not more than six months in duration.

Pursuant to 19 CFR 351.210(e), The Ancientree Cabinet Co., Ltd., Dalian Meisen Woodworking Co., Ltd., and Rizhao Foremost Woodwork Manufacturing Company Ltd. requested that Commerce postpone the final determination and that provisional measures be extended to a period not to exceed six months.[12] In accordance with section 735(a)(2)(A) of the Act and 19 CFR 351.210(b)(2)(ii), because (1) the preliminary determination is affirmative; (2) the requesting exporters account for a significant proportion of exports of the subject merchandise; and (3) no compelling reasons for denial exist, Commerce is postponing the final determination and extending the provisional measures from a four-month period to a period not greater than six months. Accordingly, Commerce's final determination will be issued no later than 135 days after the date of publication of this preliminary determination.

## International Trade Commission Notification

In accordance with section 733(f) of the Act, Commerce will notify the International Trade Commission (ITC) of its preliminary determination of sales at LTFV. If the final determination is affirmative, the ITC will determine before the later of 120 days after the date of this preliminary determination or 45 days after the final determination whether these imports of the subject merchandise are materially injuring, or threaten material injury to, the U.S. industry.

## Notification to Interested Parties

This determination is issued and published in accordance with sections 733(f) and 777(i)(1) of the Act and 19 CFR 351.205(c).

Dated: October 2, 2019.

**P. Lee Smith,**
*Deputy Assistant Secretary for Policy and Negotiations, Enforcement and Compliance.*

## Appendix I

### Scope of the Investigation

The merchandise subject to this investigation consists of wooden cabinets and vanities that are for permanent installation (including floor mounted, wall mounted, ceiling hung or by attachment of plumbing), and wooden components thereof. Wooden cabinets and vanities and wooden components are made substantially of wood products, including solid wood and engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo. Wooden cabinets and vanities consist of a cabinet box (which typically includes a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves) and may or may not include a frame, door, drawers and/ or shelves. Subject merchandise includes wooden cabinets and vanities with or without wood veneers, wood, paper or other overlays, or laminates, with or without non-wood components or trim such as metal, marble, glass, plastic, or other resins, whether or not surface finished or unfinished, and whether or not completed.

Wooden cabinets and vanities are covered by the investigation whether or not they are imported attached to, or in conjunction with, faucets, metal plumbing, sinks and/or sink bowls, or countertops. If wooden cabinets or vanities are imported attached to, or in conjunction with, such merchandise, only the wooden cabinet or vanity is covered by the scope.

Subject merchandise includes the following wooden component parts of cabinets and vanities: (1) Wooden cabinet and vanity frames (2) wooden cabinet and vanity boxes (which typically include a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves), (3) wooden cabinet or vanity doors, (4) wooden cabinet or vanity drawers and drawer components (which typically include sides, backs, bottoms, and faces), (5) back panels and end panels, (6) and desks, shelves, and tables that are attached to or incorporated in the subject merchandise.

Subject merchandise includes all unassembled, assembled and/or ''ready to assemble'' (RTA) wooden cabinets and vanities, also commonly known as ''flat packs,'' except to the extent such merchandise is already covered by the scope of antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR 513 (January 4, 2018). RTA wooden cabinets and vanities are defined as cabinets or

---

[11] *See* 19 CFR 351.309; *see also* 19 CFR 351.303 (for general filing requirements).

[12] *See* Letter from The Ancientree Cabinet Co., Ltd., ''Wooden Cabinets and Vanities from China: Ancientree Request to Extend Final Determination,'' dated September 13, 2019; *see also* Letter from Dalian Meisen Woodworking Co., Ltd., ''Wooden Cabinets and Vanities from the People's Republic of China: Request for Postponement of the Final Determination,'' dated September 12, 2019; Letter from Rizhao Foremost Woodwork Manufacturing Company Ltd., ''Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Request to Postpone Final Determination and Extend Provisional Measures,'' dated September 17, 2019.

vanities packaged so that at the time of importation they may include: (1) Wooden components required to assemble a cabinet or vanity (including drawer faces and doors); and (2) parts (*e.g.,* screws, washers, dowels, nails, handles, knobs, adhesive glues) required to assemble a cabinet or vanity. RTAs may enter the United States in one or in multiple packages.

Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following: Trimming, cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope product.

Excluded from the scope of this investigation, if entered separate from a wooden cabinet or vanity are:

(1) Aftermarket accessory items which may be added to or installed into an interior of a cabinet and which are not considered a structural or core component of a wooden cabinet or vanity. Aftermarket accessory items may be made of wood, metal, plastic, composite material, or a combination thereof that can be inserted into a cabinet and which are utilized in the function of organization/accessibility on the interior of a cabinet; and include:

• Inserts or dividers which are placed into drawer boxes with the purpose of organizing or dividing the internal portion of the drawer into multiple areas for the purpose of containing smaller items such as cutlery, utensils, bathroom essentials, etc.

• Round or oblong inserts that rotate internally in a cabinet for the purpose of accessibility to foodstuffs, dishware, general supplies, etc.

(2) Solid wooden accessories including corbels and rosettes, which serve the primary purpose of decoration and personalization.

(3) Non-wooden cabinet hardware components including metal hinges, brackets, catches, locks, drawer slides, fasteners (nails, screws, tacks, staples), handles, and knobs.

(4) Medicine cabinets that meet all of the following five criteria are excluded from the scope: (1) Wall mounted; (2) assembled at the time of entry into the United States; (3) contain one or more mirrors; (4) be packaged for retail sale at time of entry; and (5) have a maximum depth of seven inches.

Also excluded from the scope of this investigation are:

(1) All products covered by the scope of the antidumping duty order on *Wooden Bedroom Furniture from the People's Republic of China. See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture from the People's Republic of China,* 70 FR 329 (January 4, 2005).

(2) All products covered by the scope of the antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR. 513 (January 4, 2018).

Imports of subject merchandise are classified under Harmonized Tariff Schedule of the United States (HTSUS) statistical numbers 9403.40.9060 and 9403.60.8081. The subject component parts of wooden cabinets and vanities may be entered into the United States under HTSUS statistical number 9403.90.7080. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.

## Appendix II

### List of Topics Discussed in the Preliminary Decision Memorandum

I. Summary
II. Background
III. Period of Investigation
IV. Scope Comments
V. Product Characteristics
VI. Selection of Respondents
VII. Determination Not to Select Wen Bo As A Voluntary Respondent
VIII. Discussion of the Methodology
IX. Currency Conversion
X. Adjustment Under Section 777(A)(f) of the Act
XI. Adjustments to Cash Deposit Rates for Export Subsidies
XII. Recommendation

[FR Doc. 2019–21998 Filed 10–8–19; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–588–869]**

### Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Continuation of Antidumping Order

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** As a result of the determinations by the Department of Commerce (Commerce) and the International Trade Commission (ITC) that revocation of the antidumping duty (AD) order on diffusion-annealed, nickel-plated flat-rolled steel products from Japan would lead to continuation or recurrence of dumping and material injury to an industry in the United States, Commerce is publishing a notice of continuation of this AD order.

**DATES:** Applicable October 9, 2019.

**FOR FURTHER INFORMATION CONTACT:** Ian Hamilton, Office II, AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–4798.

**SUPPLEMENTARY INFORMATION:**

### Background

On May 29, 2014, Commerce published its antidumping duty order on diffusion-annealed, nickel-plated flat-rolled steel products from Japan in the **Federal Register**.[1] On April 1, 2019, the ITC instituted,[2] and Commerce initiated,[3] the first sunset review of the antidumping duty order on diffusion-annealed, nickel-plated flat-rolled steel products from Japan, pursuant to section 751(c) of the Tariff Act of 1930, as amended (the Act). As a result of its review, Commerce determined that revocation of the *Order* on diffusion-annealed, nickel-plated flat-rolled steel products from Japan would likely lead to continuation or recurrence of dumping and notified the ITC of the magnitude of the margins of dumping likely to prevail were the orders revoked.[4]

On October 2, 2019, the ITC published its determination, pursuant to sections 751(c) and 752(a) of the Act, that revocation of the *Order* would likely lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[5]

### Scope of the Order

The diffusion-annealed, nickel-plated flat-rolled steel products included in this order are flat-rolled, cold-reduced steel products, regardless of chemistry; whether or not in coils; either plated or coated with nickel or nickel-based alloys and subsequently annealed (*i.e.,* "diffusion-annealed"); whether or not painted, varnished or coated with plastics or other metallic or nonmetallic substances; and less than or equal to 2.0 mm in nominal thickness. For purposes

---

[1] *See Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Antidumping Duty Order,* 79 FR 30816 (May 29, 2014) (*Order*).

[2] *See Diffusion-Annealed Nickel-Plated Flat-Rolled Steel Products from Japan: Institution of Five-Year Review,* 84 FR 12282 (April 1, 2019).

[3] *See Initiation of Five-Year (Sunset) Review,* 84 FR 12227 (April 1, 2019).

[4] *See Diffusion-Annealed Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Expedited First Five-Year Sunset Review of the Antidumping Duty Order,* 84 FR 38001 (August 5, 2019), and accompanying Issues and Decision Memorandum.

[5] *See Diffusion-Annealed Nickel-Plated Flat-Rolled Steel Products from Japan (Inv. No. 731–TA–1206 (Review)),* 84 FR 52534 (October 2, 2019); *see also Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan (Inv. No. 731–TA–1206 (Review)),* USITC Publication 4971, September 2019).

| | | |
|---|---|---|
| Memorandum to the File, Verification of the Questionnaire Responses of Dalian Meisen Woodworking Co. Ltd. (October 18, 2019) | P.R. 1437 | APPX001103 |

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
**Public Document**
E&C/V:  KJA

October 18, 2019

**MEMORANDUM TO:**    The File

**FROM:**    Kabir Archuletta
Senior International Trade Analyst
Enforcement & Compliance, Office V

**RE:**    Antidumping Duty Investigation of Wooden Cabinets and
Vanities and Components Thereof from the People's Republic of
China

**SUBJECT:**    Verification of the Questionnaire Responses of Dalian Meisen
Woodworking Co. Ltd

Between October 8, 2019, and October 17, 2019, Dalian Meisen Woodworking Co., Ltd.
(Meisen) and the petitioner, the American Kitchen Cabinet Alliance, submitted comments
regarding the Department of Commerce's preliminary determination in the above-referenced
investigation.  Commerce is considering comments from interested parties and as such, is
suspending the planned verification of Meisen's sales and FOP data, currently scheduled to begin
on October 28, 2019.  However, Meisen is hereby notified that Commerce may seek to
reschedule the verification at a later date.



| | | | |
|---|---|---|---|
| Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Amended Preliminary Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 61,875 (Dep't of Commerce Nov. 14, 2019) | | P.R. 1485 | APPX001104-APPX001106 |

has been exported from the United States;

D. Obtain from the Denied Person in the United States any item subject to the Regulations with knowledge or reason to know that the item will be, or is intended to be, exported from the United States, or

E. Engage in any transaction to service any item subject to the Regulations that has been or will be exported from the United States and which is owned, possessed or controlled by the Denied Person, or service any item, of whatever origin, that is owned, possessed or controlled by the Denied Person if such service involves the use of any item subject to the Regulations that has been or will be exported from the United States. For purposes of this paragraph, servicing means installation, maintenance, repair, modification or testing.

*Third,* any licenses issued under the Regulations in which Arrowtronic has an interest as of the date of this Order shall be revoked by BIS.

*Fourth,* after notice and opportunity for comment as provided in Section 766.23 of the Regulations, any person, firm, corporation, or business organization related to the Denied Person by affiliation, ownership, control, or position of responsibility in the conduct of trade or related services may also be made subject to the provisions of this Order.

*Fifth,* Arrowtronic shall not take any action or make or permit to be made any public statement, directly or indirectly, denying the allegations in the Charging Letter or this Order.

*Sixth,* the Charging Letter, the Settlement Agreement, and this Order shall be made available to the public.

*Seventh,* this Order shall be served on Arrowtronic and shall be published in the **Federal Register**.

This *order,* which constitutes the final agency action in this matter related to Arrowtronic, is effective immediately.

Issued this 30th day of October, 2019.

**Douglas R. Hassebrock,**
*Director, Office of Export Enforcement, performing the non-exclusive functions and duties of the Assistant Secretary of Commerce for Export Enforcement.*

[FR Doc. 2019–24741 Filed 11–13–19; 8:45 am]

**BILLING CODE P**

# DEPARTMENT OF COMMERCE

## International Trade Administration

### [A–570–106]

### Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Amended Preliminary Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) is amending the preliminary determination of the less-than-fair-value investigation of wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the People's Republic of China (China) to correct significant ministerial errors.

**DATES:** Applicable November 14, 2019.

**FOR FURTHER INFORMATION CONTACT:** Kabir Archuletta, Rachel Greenberg, or Eliza Siordia, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2593, (202) 482–0652, or (202) 482–3878, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

On October 9, 2019, Commerce published in the **Federal Register** the *Preliminary Determination,*[1] and completed the disclosure of all calculation materials to interested parties. On October 8, 2019, MJB Supply (Dalian) Co., Ltd, Shouguang Honsoar Imp. & Exp. Trading Co., Ltd, and Nantong Ouming Wood Co., Ltd. (collectively, D&H SRA Companies), and Zhong Shan King Yuandun Wood Products Co., Ltd. (Zhong Shan) timely filed ministerial error allegations regarding the *Preliminary Determination.*[2]

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination and Extension of Provisional Measures,* 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See* D&H SRA Companies' Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Ministerial Error Comments to Correct Spelling of Company Names," dated October 8, 2019; *see also* Zhong Shan's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Ministerial Error Comments—Prelim Determination," dated October 8, 2019.

## Period of Investigation

The period of investigation is July 1, 2018 through December 31, 2018.

## Scope of Investigation

The product covered by this investigation is wooden cabinets and vanities from China. For a complete description of the scope of this investigation, *see* the appendix to this notice.

## Legal Authority

Commerce will analyze any comments received and, if appropriate, correct any significant ministerial error by amending the preliminary determination according to 19 CFR 351.224(e). A ministerial error is defined in 19 CFR 351.224(f) as "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial."[3] A significant ministerial error is defined as a ministerial error, the correction of which, either singly or in combination with other errors, would result in: (1) A change of at least five absolute percentage points in, but not less than 25 percent of, the weighted-average dumping margin calculated in the original (erroneous) preliminary determination; or (2) a difference between a weighted-average dumping margin of zero or *de minimis* and a weighted-average dumping margin of greater than *de minimis* or vice versa.[4]

## Analysis of Ministerial Error Allegation

On October 8, 2019, certain separate rate respondents submitted ministerial error allegations. The respondents claim that Commerce should have granted Zhong Shan a separate rate; that clerical errors were made with respect to the names of the producers for exporters MJB Supply (Dalian) Co., Ltd, and Shouguang Honsoar Imp. & Exp. Trading Co., Ltd; and an "also known as" company name for the exporter/ producer combination Nantong Ouming Wood Co., Ltd should have been included. Commerce has reviewed the record and finds that Zhong Shan's allegation is not ministerial in nature as the *Preliminary Determination* demonstrates our intent and our reasoning as to why Zhong Shan was not eligible for a separate rate.[5] However, we do agree that we made certain clerical errors on the producer/

---

[3] *See also* section 735(e) of the Tariff Act of 1930, as amended (the Act).

[4] *See* 19 CFR 351.224(g).

[5] *See Preliminary Determination* PDM at 17–19.

exporter list for separate rate recipients constituting significant ministerial errors within the meaning of 19 CFR 351.224(f) and (g).[6] These errors are significant because the rate applicable to these separate rate respondents, as a result of the errors, is the China-wide rate of 262.18 percent, rather than the separate rate of 39.25 percent. The difference in these two rates exceeds the significant ministerial error threshold established in 19 CFR 351.224(g)(1) because correction of these errors results in a change of at least five absolute percentage points.

## Amended Preliminary Determination

Commerce preliminarily determines that the following amended weighted-average dumping margins exist for the period July 1, 2018 through December 31, 2018:

| Exporter | Producer | Estimated weighted average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| MJB Supply (Dalian) Co., Ltd ............................... | Mulin City Bamiantong Linyeju Jisen Wood .......... | 39.25 | 28.71 |
| Shouguang Honsoar Imp. & Exp. Trading Co., Ltd | Shandong Honsoar Cabinet Materials Co., Ltd ..... | 39.25 | 28.71 |
| Nantong Ouming Wood Co., Ltd., also known as Nantong Ouming Wood Industry Co., Ltd. | Nantong Ouming Wood Co., Ltd., also known as Nantong Ouming Wood Industry Co., Ltd. | 39.25 | 28.71 |

## Amended Cash Deposits and Suspension of Liquidation

The collection of cash deposits and suspension of liquidation will be revised according to the rates calculated in this amended preliminary determination, in accordance with sections 733(d) and (f) of the Act, and 19 CFR 351.224. Because the rates are decreasing from the *Preliminary Determination,* the amended cash deposit rates will be effective retroactively to October 9, 2019, the date of publication of the *Preliminary Determination.* Parties will be notified of this determination, in accordance with sections 733(d) and (f) of the Act.

## International Trade Commission Notification

In accordance with section 733(f) of the Act, we will notify the International Trade Commission of our amended preliminary determination.

## Notification to Interested Parties

This amended preliminary determination is issued and published in accordance with sections 733(f) and 777(i)(1) of the Act and 19 CFR 351.224(e).

Dated: November 6, 2019.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix

### Scope of the Investigation

The merchandise subject to this investigation consists of wooden cabinets and vanities that are for permanent installation (including floor mounted, wall mounted, ceiling hung or by attachment of plumbing), and wooden components thereof.

Wooden cabinets and vanities and wooden components are made substantially of wood products, including solid wood and engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo. Wooden cabinets and vanities consist of a cabinet box (which typically includes a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves) and may or may not include a frame, door, drawers and/or shelves. Subject merchandise includes wooden cabinets and vanities with or without wood veneers, wood, paper or other overlays, or laminates, with or without non-wood components or trim such as metal, marble, glass, plastic, or other resins, whether or not surface finished or unfinished, and whether or not completed.

Wooden cabinets and vanities are covered by the investigation whether or not they are imported attached to, or in conjunction with, faucets, metal plumbing, sinks and/or sink bowls, or countertops. If wooden cabinets or vanities are imported attached to, or in conjunction with, such merchandise, only the wooden cabinet or vanity is covered by the scope.

Subject merchandise includes the following wooden component parts of cabinets and vanities: (1) Wooden cabinet and vanity frames (2) wooden cabinet and vanity boxes (which typically include a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves), (3) wooden cabinet or vanity doors, (4) wooden cabinet or vanity drawers and drawer components (which typically include sides, backs, bottoms, and faces), (5) back panels and end panels, (6) and desks, shelves, and tables that are attached to or incorporated in the subject merchandise.

Subject merchandise includes all unassembled, assembled and/or "ready to assemble" (RTA) wooden cabinets and vanities, also commonly known as "flat packs," except to the extent such

merchandise is already covered by the scope of antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR 513 (January 4, 2018). RTA wooden cabinets and vanities are defined as cabinets or vanities packaged so that at the time of importation they may include: (1) Wooden components required to assemble a cabinet or vanity (including drawer faces and doors); and (2) parts (*e.g.,* screws, washers, dowels, nails, handles, knobs, adhesive glues) required to assemble a cabinet or vanity. RTAs may enter the United States in one or in multiple packages.

Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following: Trimming, cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope product.

Excluded from the scope of this investigation, if entered separate from a wooden cabinet or vanity are:

(1) Aftermarket accessory items which may be added to or installed into an interior of a cabinet and which are not considered a structural or core component of a wooden cabinet or vanity. Aftermarket accessory items may be made of wood, metal, plastic, composite material, or a combination thereof that can be inserted into a cabinet and which are utilized in the function of organization/accessibility on the interior of a cabinet; and include:

• Inserts or dividers which are placed into drawer boxes with the purpose of organizing

---

[6] *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's

Republic of China: Ministerial Error Allegations in

the Preliminary Determination," dated concurrently with this notice (Ministerial Error Memorandum).

Filed By: Nicolas Mayora, Filed Date: 11/14/19 9:46 AM, Submission Status: Approved

or dividing the internal portion of the drawer into multiple areas for the purpose of containing smaller items such as cutlery, utensils, bathroom essentials, *etc.*

• Round or oblong inserts that rotate internally in a cabinet for the purpose of accessibility to foodstuffs, dishware, general supplies, *etc.*

(2) Solid wooden accessories including corbels and rosettes, which serve the primary purpose of decoration and personalization.

(3) Non-wooden cabinet hardware components including metal hinges, brackets, catches, locks, drawer slides, fasteners (nails, screws, tacks, staples), handles, and knobs.

(4) Medicine cabinets that meet all of the following five criteria are excluded from the scope: (1) Wall mounted; (2) assembled at the time of entry into the United States; (3) contain one or more mirrors; (4) be packaged for retail sale at time of entry; and (5) have a maximum depth of seven inches.

Also excluded from the scope of this investigation are:

(1) All products covered by the scope of the antidumping duty order on *Wooden Bedroom Furniture from the People's Republic of China. See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture from the People's Republic of China,* 70 FR 329 (January 4, 2005).

(2) All products covered by the scope of the antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR 513 (January 4, 2018).

Imports of subject merchandise are classified under Harmonized Tariff Schedule of the United States (HTSUS) statistical numbers 9403.40.9060 and 9403.60.8081. The subject component parts of wooden cabinets and vanities may be entered into the United States under HTSUS statistical number 9403.90.7080. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.

[FR Doc. 2019–24732 Filed 11–13–19; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–570–108]**

### Ceramic Tile From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, and Postponement of Final Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) preliminarily determines that ceramic tile from the People's Republic of China (China) is being, or is likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is October 1, 2018 through March 31, 2019. Interested parties are invited to comment on this preliminary determination.

**DATES:** Applicable November 14, 2019.

**FOR FURTHER INFORMATION CONTACT:** Heather Lui or Paul Walker, AD/CVD Operations, Office VI, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0016 or (202) 482–0413, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

This preliminary determination is made in accordance with section 733(b) of the Tariff Act of 1930, as amended (the Act). Commerce published the notice of initiation of this investigation on May 8, 2019.[1] On September 5, 2019, Commerce postponed the preliminary determination of this investigation and the revised deadline is now November 6, 2019.[2] For a complete description of the events that followed the initiation of this investigation, *see* the Preliminary Decision Memorandum.[3] A list of topics included in the Preliminary Decision Memorandum is included as Appendix II to this notice. The Preliminary

---

[1] *See Ceramic Tile from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation,* 84 FR 20093 (May 8, 2019) (*Initiation Notice*).

[2] *See Ceramic Tile from the People's Republic of China: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations,* 84 FR 46711 (September 5, 2019).

[3] *See* Memorandum, "Decision Memorandum for the Preliminary Determination in the Less Than Fair Value Investigation of Ceramic Tile from the People's Republic of China," dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

---

Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov*, and to all parties in the Central Records Unit, room B8024 of the main Commerce building. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/*.

### Scope of the Investigation

The product covered by this investigation is ceramic tile from China. For a complete description of the scope of this investigation, *see* Appendix I.

### Scope Comments

In accordance with the preamble to Commerce's regulations,[4] the *Initiation Notice* set aside a period of time for parties to raise issues regarding product coverage (*i.e.,* scope).[5] Certain interested parties commented on the scope of the investigation as it appeared in the *Initiation Notice.* For a summary of the product coverage comments and rebuttal responses submitted to the record for this investigation, *see* the Preliminary Scope Decision Memorandum.[6] The scope case briefs were due on October 15, 2019, 30 days after the publication of the *Ceramic Tile from China Preliminary CVD Determination.*[7] There will be no further opportunity for comments on scope-related issues.[8]

---

[4] *See Antidumping Duties; Countervailing Duties, Final Rule,* 62 FR 27296, 27323 (May 19, 1997).

[5] *See Initiation Notice.*

[6] *See* Memorandum, "Ceramic Tile from the People's Republic of China: Scope Comments Decision Memorandum for the Preliminary Determinations," dated September 6, 2019 (Preliminary Scope Decision Memorandum).

[7] The scope case briefs were due 30 days after the publication of *Ceramic Tile from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Negative Critical Circumstances Determination, and Alignment of Final Determination with Final Antidumping Duty Determination,* 84 FR 48125 (September 12, 2019) (*Ceramic Tile from China Preliminary CVD Determination*). See the Preliminary Scope Decision Memorandum at 3. In accordance with Commerce's practice, where a deadline falls on a weekend or federal holiday, the appropriate deadline is the next business day. *See Notice of Clarification: Application of "Next Business Day" Rule for Administrative Determination Deadlines Pursuant to the Tariff Act of 2930, As Amended,* 70 FR 24533 (May 10, 2005).

[8] Parties were already permitted the opportunity to file scope case briefs. Case briefs, other written comments, and rebuttal briefs should not include scope-related issues. *See* Preliminary Scope Decision Memorandum at 3.

| | | | |
|---|---|---|---|
| Letter re: Verification (December 27, 2019) | | P.R. 1524 | APPX001107-APPX001108 |

Barcode:3924680-01 A-570-106 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
POI: 07/01/2018 – 12/31/2018
**Public Document**
E&C/OV: KJA

December 27, 2019

**Dalian Meisen Woodworking Co. Ltd.**
c/o Jeffrey S. Neeley
Husch Blackwell
750 17th St. N.W. Suite 900
Washington, DC 20006

RE:     Investigation of Wooden Cabinets and Vanities and Components Thereof from the
People's Republic of China:  Verification

Dear Mr. Neeley,

On October 18, 2019, the Department of Commerce (Commerce) notified interested parties via a
memorandum to the file that it was suspending the planned sales and factors of production
verification of Dalian Meisen Woodworking Co. Ltd. (Meisen) in order to consider comments
from interested parties.[1]  Specifically, comments submitted in response to Meisen's supplemental
questionnaire response by the petitioner,[2] to which Meisen did not respond within the regulatory
timeframe to submit rebuttal factual information,[3] and Meisen's belated request after the
preliminary determination for Commerce to allow Meisen to clarify the record.[4]  Subsequent to
the suspension of verification, Commerce issued, and Meisen responded, to two detailed
supplemental questionnaires that targeted the misrepresentations made by Meisen to its
customers regarding the actual species of wood used to produce its cabinets.[5]  The dissonance
between what Meisen marketed to its customers and what Meisen reported to Commerce was
information that Meisen had in its possession and could have voluntarily presented to Commerce
early in the investigation.  Instead, Meisen chose not to disclose this information until after the
petitioner raised it in its comments and Commerce issued an adverse preliminary determination,
suspended verification, and expended considerable time and resources to issue multiple
supplemental questionnaires and review thousands of pages of documentation in response to
those questionnaires.

Commerce has reviewed your post-preliminary determination questionnaire responses and
determines that it will not conduct verification of the questionnaire responses submitted by
Meisen in this less-than-fair-value investigation, and that it continues to find that the application

---

[1] See Memorandum, "Verification of the Questionnaire Responses of Dalian Meisen Woodworking Co. Ltd.," dated
October 18, 2019.
[2] The petitioner is the American Kitchen Cabinet Alliance.  See the Petitioner's Letter, "Pre-Preliminary Comments
for Meisen," dated September 26, 2019.
[3] See 19 CFR 351.301(c)(1)(v).
[4] See Meisen's Letter, "Meisen Preliminary Determination Rebuttal Letter," dated October 8, 2019.
[5] See Meisen's November 6, 2019, Post-Prelim Supplemental Questionnaire Response, Meisen's November 21,
2019, 2nd Post-Prelim Supplemental Questionnaire Response.

of adverse facts available is warranted for Meisen, pursuant to section 776(a) and (b) of the Tariff Act of 1930, as amended.  Specifically, the admission that Meisen marketed and sold its cabinets as maple cabinets when, in fact, Meisen claims that they were made of birch,[6] highlights continued concerns regarding the data reported in the control numbers for the normal value and the reported U.S. prices.

Accordingly, we intend to identify the briefing deadlines for comments related to this matter in a separate memorandum.  If you have any questions, please contact Kabir Archuletta (202) 482-2593.

Sincerely,

Alex Villanueva
Senior Director
AD/CVD Operations, Office V

---

[6] *Id.*

2

| Issues and Decision Memorandum (February 21, 2019) | | P.R. 1554 | APPX001109-APPX001201 |

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
POI: 07/01/2018-12/31/2018
**Public Document**
E&C/OV: RG/KA/ES

February 21, 2020

| | |
|---|---|
| **MEMORANDUM TO:** | Jeffrey I. Kessler<br>Assistant Secretary<br>  for Enforcement and Compliance |
| **FROM:** | James Maeder<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value |

## I.    SUMMARY

The Department of Commerce (Commerce) finds that wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the People's Republic of China (China) are being, or are likely to be, sold in the United States at less than fair value (LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act).  The mandatory respondents subject to this investigation are The Ancientree Cabinet Co., Ltd (Ancientree), Rizhao Foremost Woodwork Manufacturing Company Ltd. (Foremost Woodwork), and Dalian Meisen Woodworking Co., Ltd (Meisen).

After analyzing the comments submitted by interested parties, and based on our verification findings, we have made certain changes to the margin calculation programs of Ancientree and Foremost Woodwork.  In addition, we have continued to assign a margin to Meisen based on adverse facts available (AFA).  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.

Below is a complete list of the issues in this investigation on which we received comments from interested parties.

General Comments

Comment 1:   Initiation of the Investigation
Comment 2:   Respondent Selection
            A.  Mandatory Respondent Selection Methodology

B.  Voluntary Respondents

Comment 3:    Separate Rate Applicants

      A.  Brentridge Holding Co., Ltd. (Brentridge) and Harbin Hongsen Wood Co., Ltd. (Harbin)

      B.  ZHONG SHAN KING YUANDUN WOOD PRODUCTS CO., LTD. (Zhong Shan)

Comment 4:    Company Name for Supree (Fujian) Wood Co., Ltd. (Supree)

Comment 5:    Calculation of the Separate Rate Assigned to Non-Selected Companies

Surrogate Value (SV) Comments

Comment 6:    Surrogate Country
Comment 7:    SVs for Birch and Poplar
Comment 8:    Calculation of Financial Ratios
Comment 9:    Labor Rate Calculation

Company-Specific Comments

*Ancientree*

Comment 10:   Whether to Apply AFA to Ancientree
      A.  Usage Rates
      B.  Wood Veneer
Comment 11:   Treatment of Jiangsu Hongjia Wood Ltd. (Jiangsu Hongjia) as an Affiliate
Comment 12:   SV Selections
      A.  Glue
      B.  Medium Density Fiberboard (MDF)
      C.  Paint
      D.  Particleboard

*Foremost*

Comment 13:   Combination Kits
Comment 14:   Exempted Sales
Comment 15:   Early Payment Discounts
Comment 16:   Section 301 Duties
Comment 17:   Foremost's U.S. Inland Freight Charges from the Port to the Warehouse
Comment 18:   Foremost's U.S. Inland Freight Charges to the Customer
Comment 19:   FGI's Acquisition Costs
Comment 20:   Labor Hours
Comment 21:   Calculation and Programing Revisions

*Meisen*

Comment 22:   Total AFA for Meisen

2

Barcode:3946193-01 A-570-106 INV - Investigation  -

## II.    BACKGROUND

On October 9, 2019, Commerce published the *Preliminary Determination* of sales in the LTFV investigation of wooden cabinets and vanities from China.[1]  Also in October 2019, we received timely allegations that Commerce had made significant ministerial errors in the *Preliminary Determination* from a number of companies requesting separate rates in this investigation,[2] and in November 2019, we determined that the allegations raised by the SRA Companies were significant ministerial errors within the meaning of 19 CFR 351.224(g), while the allegation raised by Zhong Shan was not.  On November 14, 2019, Commerce published the *Amended Preliminary Determination*.[3]

From October 2019 through December 2019, we conducted verification of the sales and factors of production (FOP) data reported by Ancientree,[4] as well as the sales and FOP information reported by Foremost Woodwork and its affiliates, Foremost Worldwide Company Ltd. (Foremost Worldwide) and Foremost Groups Inc (FGI) (collectively, Foremost),[5] in accordance with section 782(i) of the Act.  During this same time period, we notified interested parties that we had suspended the verification of Meisen's reported data in order to consider comments from interested parties;[6] we subsequently informed Meisen that we would not verify its questionnaire responses.[7]

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM), as corrected by *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 56420 (October 22, 2019).

[2] These companies are:  MJB Supply (Dalian) Co., Ltd, Shouguang Honsoar Imp. & Exp. Trading Co., Ltd, and Nantong Ouming Wood Co., Ltd. (collectively, SRA Companies), and Zhong Shan.  *See* SRA Companies' Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Ministerial Error Comments to Correct Spelling of Company Names," dated October 8, 2019; and Zhong Shan's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Ministerial Error Comments -  Prelim Determination," dated October 8, 2019.

[3] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Amended Preliminary Determination of Sales at Less Than Fair Value*, 84 FR 61875 (November 14, 2019) (*Amended Preliminary Determination*).

[4] *See* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Verification of the Export Price Sales and Factors of Production Response of The Ancientree Cabinet Co., Ltd," dated December 10, 2019 (Ancientree Verification Report).

[5] *See* Memoranda, "Verification of the Responses of Foremost Worldwide Company Ltd. In the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020 (Foremost Worldwide Verification Report); "Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020 (Foremost Woodwork Verification Report); and "Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020 (FGI Verification Report).

[6] *See* Memorandum, "Verification of the Questionnaire Responses of Dalian Meisen Woodworking Co. Ltd.," dated October 18, 2019 (Meisen Verification Memo).

[7] *See* Commerce's Letter, "Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Verification," dated December 27, 2019.

3

From November 2019 through January 2020, we received timely case and rebuttal briefs from numerous interested parties.  At the request of certain of these parties, Commerce held a public hearing on February 6, 2020, to discuss the issues raised in the case briefs.[8]

Based on our analysis of the comments received, as well as our verification findings, we revised our calculations of the weighted-average dumping margins for Ancientree and Foremost.[9]

## III.    PERIOD OF INVESTIGATION

The period of investigation (POI) is July 1, 2018 through December 31, 2018.  This corresponds to the two most recent fiscal quarters prior to the month of the filing of the Petition,[10] which was March 2019.[11]

## IV.    SCOPE OF THE INVESTIGATION

The products covered by this investigation are wooden cabinets and vanities from China.  For a complete description of the scope of this investigation, *see* Appendix I of the accompanying *Federal Register* notice.

## V.    SCOPE COMMENTS

During the course of this investigation and the concurrent countervailing duty (CVD) investigation of wooden cabinets and vanities from China, Commerce received scope comments from interested parties.  Commerce issued a Preliminary Scope Memorandum to address these comments and set aside a period of time for parties to address scope issues in case and rebuttal

---

[8] *See* Hearing Transcript, "Public Hearing in the Matter of:  Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated February 6, 2020.

[9] *See* Memoranda, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Analysis Memorandum for The Ancientree Cabinet Co., Ltd.," dated concurrently with this memorandum (Ancientree Final Analysis Memorandum); and "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Analysis Memorandum for Rizhao Foremost Woodwork Manufacturing Company Ltd.," dated concurrently with this memorandum (Foremost Final Analysis Memorandum).

[10] *See* Petitioner's Letters, "Petitions for the Imposition of Antidumping and Countervailing Duties on Wooden Cabinets and Vanities from the People's Republic of China," dated March 6, 2019; "Petitioner's Responses to Supplemental Questions Regarding Petitioner Volume I Injury," dated March 12, 2019; "Petitioner's Responses to Supplemental Questions Regarding Petition Volume II China AD," dated March 12, 2019; and "Second Supplemental Responses – Volume I Injury," dated March 20, 2019; Petitioner's Letter, "Second Supplemental Responses – Volume II China AD Petition," dated March 20, 2019 (collectively, the Petition).  The Petition was filed by The American Kitchen Cabinet Alliance and its individual members, who include:  ACProducts, Inc., American Woodmark Corporation, Bellmont Cabinet Co., Bertch Cabinet Manufacturing, The Corsi Group, Crystal Cabinet Works, Inc., Dura Supreme Cabinetry, Jim Bishop Cabinets, Inc., Kitchen Kompact Inc., Koch & Co., Inc., Kountry Wood Products, LLC, Lanz Cabinets Incorporated, Leedo Cabinetry, Marsh Furniture Company, Master Woodcraft Cabinetry LLC, MasterBrand Cabinets, Inc., Nation's Cabinetry, Showplace Wood Products, Inc., Smart Cabinetry, Tru Cabinetry, Wellborn Cabinet, Inc., Wellborn Forest Products, Inc., Woodland Cabinetry, Inc., Woodmont Cabinetry, and W.W. Wood Products Inc. (collectively, the petitioner).

[11] *See* 19 CFR 351.204(b)(1).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Barcode:3946193-01 A-570-106 INV - Investigation  -

briefs.[12]  We received comments from interested parties on the Preliminary Scope Memorandum, which we address in the Final Scope Memorandum.[13]  For this final determination, we have made no changes to the scope of this investigation, as published in the *Preliminary Determination*.[14]

## VI.    USE OF ADVERSE FACTS AVAILABLE

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act, provide that if necessary information is not available on the record or if an interested party:  (A) withholds information that has been requested by Commerce; (B) fails to provide such information in a timely manner or in the form or manner requested subject to section 782(c)(1) and (e) of the Act; (C) significantly impedes a proceeding under the antidumping statute; or (D) provides such information but the information cannot be verified as provided for in section 782(i) of the Act, Commerce shall, subject to subsection 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Section 782(c)(1) of the Act provides that if an interested party "promptly after receiving a request from {Commerce} for information, notifies {Commerce} that such party is unable to submit the information requested in the requested form and manner," Commerce shall consider the ability of the interested party and may modify the requirements to avoid imposing an unreasonable burden on that party.

Section 782(d) of the Act provides that, if Commerce determines that a response to a request for information does not comply with the request, Commerce shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person an opportunity to remedy or explain the deficiency.  If that person submits further information that continues to be unsatisfactory, or this information is not submitted within the applicable time limits, Commerce may, subject to section 782(e), disregard all or part of the original and subsequent responses, as appropriate.

Section 782(e) of the Act states that Commerce shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority if:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

---

[12] *See* Memorandum, "Wooden Cabinets and Vanities and Components thereof from the People's Republic of China:  Scope Comments Decision Memorandum for the Preliminary Determinations," dated October 3, 2019 (Preliminary Scope Memorandum).

[13] *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Scope Comments Decision Memorandum," dated concurrently with this memorandum (Final Scope Memorandum).

[14] *See Preliminary Determination*, 84 FR at 54113.

5

Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.[15]  In doing so, Commerce is not required to determine, or make any adjustments to, a weighted average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.  Section 776(b)(2) provides that an adverse inference may include reliance on information derived from the petition, the final determination from the investigation, a previous administrative review, or other information placed on the record.  In addition, the SAA accompanying the URAA explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[16]

In *Nippon Steel*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that, while the statute does not provide an express definition of the "failure to act to the best of its ability" standard, the ordinary meaning of "best" is "one's maximum effort."[17]  Thus, according to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.  The Federal Circuit indicated that inadequate responses to an agency's inquiries would suffice to find that a respondent did not act to the best of its ability.  While the Federal Circuit noted that the "best of its ability" standard does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[18]  The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[19]  Moreover, further, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[20]

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[21]  Further, Commerce is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.

---

[15] *See* section 776(b)(1)(B) of the Act.

[16] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (URAA), H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 870.

[17] *See Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*).

[18] *Id.*, 377 F. 3d at 1382.

[19] *Id.*

[20] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); *Antidumping Duties; Countervailing Duties:  Final Rule*, 62 FR 27296, 27340 (May 19, 1997); and *Nippon Steel*, 337 F. 3d at 1382-83.

[21] *See* SAA at 870.

Finally, under section 776(d) of the Act, Commerce may use any dumping margin from any segment of a proceeding under an antidumping duty (AD) order when applying an adverse inference, including the highest of such margins.  When selecting an AFA margin, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.

*Application of Partial AFA:  Foremost*

As explained in more detail at Comments 13, 15, and 17, and 20, we find that the application of partial AFA to Foremost is appropriate for this final determination.  Specifically, we determine that Foremost withheld information, failed to provide information in a timely manner, significantly impeded the investigation, and/or provided information that could not be verified, pursuant to section 776(a)(2)(A)-(D) of the Act.  In particular, we found that Foremost failed to report certain U.S. sales, discounts, and product information, and its responses contained contradictory, and difficult for Commerce to locate, information with respect to one inland freight expense.  Because the missing information was within Foremost's possession and it was within Foremost's ability to report and/or present its data accurately, pursuant to section 776(b) of the Act, we find that Foremost failed to cooperate by not acting to the best of its ability.  Thus, we find that an adverse inference is warranted in selecting from the facts available with the respect to the information in question.

*Application of Total AFA:  Meisen*

As explained in more detail at Comment 22, below, we continue to find that the application of total AFA to Meisen is appropriate for this final determination.  Specifically, we determine that Meisen withheld information, failed to provide such information in a timely manner, and significantly impeded the investigation, pursuant to section 776(a)(2)(A)-(C) of the Act.  This was information that Meisen had in its possession and could have voluntarily presented to Commerce; however, instead, Meisen chose not to disclose essential information until after the *Preliminary Determination* and only after Commerce had suspended verification.  Accordingly, we find that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference is warranted in selecting from the facts available.  As a result, we are assigning a final margin to Meisen based on total AFA, in accordance with section 776(a)-(b) of the Act.

*Application of AFA:  China-wide Entity*

In the *Preliminary Determination*, we found that the China-wide entity did not respond to Commerce's requests for information, withheld information requested by Commerce, failed to provide information in a timely manner, and significantly impeded this proceeding by not submitting the requested information.[22]  We further determined that because non-responsive Chinese companies had not demonstrated their eligibility for separate rate status, Commerce considered them part of the China-wide entity.  Because this information was within the China-wide entity's possession, we continue to assign a China-wide rate based on the facts otherwise

---

[22] *See Preliminary Determination* PDM at 22-23.

available, pursuant to sections 776(a)(1) and (a)(2)(A)-(C) of the Act, using an adverse inference, pursuant to 776(b) of the Act.

*Selection and Corroboration of the China-Wide and Meisen AFA Rate*

As discussed above, when using facts otherwise available, section 776(c) of the Act provides that, where Commerce relies on secondary information (such as the Petition) rather than information obtained in the course of an investigation, it must corroborate, to the extent practicable, information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the Petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[23]  The SAA clarifies that "corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value,[24] although Commerce is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.[25]  To corroborate secondary information, Commerce will, to the extent practicable, examine the reliability and relevance of the information to be used, although Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[26]

In selecting an AFA rate, Commerce selects a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[27]  In an investigation, Commerce's practice with respect to the assignment of an AFA rate is to select the higher of:  (1) the highest dumping margin alleged in the Petition; or (2) the highest calculated dumping margin of any respondent in the investigation.[28]

In the *Preliminary Determination*, when selecting an appropriate rate to apply as AFA, we found that we were able to corroborate the highest dumping margin found in the Petition.  Based on the information on the record, we continue to corroborate the 262.18 percent rate in this final determination.  In corroborating this rate, we compared the highest petition rate of 262.18 percent to the individually-investigated respondents' highest control number (CONNUM)-specific dumping margins and found that both Foremost's and Ancientree's highest calculated

---

[23] *See* SAA at 870.

[24] *Id.*; *see also* 19 CFR 351.308(d).

[25] *See* section 776(c)(2) of the Act.

[26] *See* section 776(d)(3) of the Act; *see also, e.g.*, *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 FR 57391, 57392 (November 6, 1996), unchanged in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan; Final Results of Antidumping Duty Administrative Reviews and Termination in Part*, 62 FR 11825 (March 13, 1997).

[27] *Id.*

[28] *See, e.g.*, *Certain Uncoated Paper from Indonesia:  Final Determination of Sales at Less Than Fair Value*, 81 FR 3101 (January 20, 2016), and accompanying Issues and Decision Memorandum (IDM) at Comment 1; *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015), and accompanying IDM at Comment 20.

CONNUM-specific dumping margins exceed the highest petition rate.[29]  Because we were able to corroborate the highest dumping margin contained in the Petition, we assigned to the China-wide entity, and to Meisen, a dumping margin of 262.18 percent.  We continue to do so for this final determination.

## VII.    CHANGES SINCE THE PRELIMINARY DETERMINATION

We calculated constructed export price (CEP), export price (EP), and normal value (NV) for the respondents using the same methodology as stated in the *Preliminary Determination*,[30] except as follows:[31]

*Ancientree:*

- We made adjustments to Ancientree's electricity consumption to incorporate the total electricity quantity provided as a minor correction at verification.[32]

- We based the SV for brokerage and handling (B&H) expenses on Malaysian data.  *See* Comment 6.

*Foremost:*

- We revised our calculations based on our findings at verification.[33]

- We based the SV for B&H expenses on Malaysian data.  *See* Comment 6.

- We adjusted the reported sales and expense data for Foremost's sales of combination kits to account for certain unreported non-subject components, using partial AFA, and to remove overhead expenses from the ratio used to allocate these data to subject merchandise.  We made similar adjustments to the data reported for sales of products that Commerce discovered at verification were combination kits.  *See* Comment 13.

- We made adjustments for early payment discounts, inland freight expenses to the U.S. warehouse, and section 301 duties.  *See* Comments 15, 16, and 17.

- We recalculated the following values and expenses for all combination kits to remove the portion of the value/expense related to the non-subject components:  entered value, bank charges, direct selling expenses, commissions, early payment discounts, and other discounts.  *See* Comment 21.

---

[29] *See* Ancientree Final Analysis Memorandum and Foremost Final Analysis Memorandum.
[30] *See Preliminary Determination* PDM at 34-46; *see also* Memorandum, "Preliminary Results Analysis Memorandum for Rizhao Foremost Woodwork Manufacturing Company Ltd.," dated October 2, 2019 (Foremost Prelim Analysis Memo); and Memorandum, "Preliminary Determination Analysis Memorandum for the Ancientree Cabinet Co., Ltd.," dated October 2, 2019.
[31] *See* Ancientree Final Analysis Memorandum; and Foremost Final Analysis Memorandum.
[32] *See* Ancientree Final Analysis Memorandum.
[33] *See* Foremost Worldwide Verification Report; *see also* Foremost Woodwork Verification Report; FGI Verification Report; and Comment 21.

9

- We recalculated U.S. customs duties (USDUTYU) as a percentage of entered value, rather than as of gross unit price.  *See* Comment 21.

- We revised our conversion of Foremost's glass inputs by converting the input from kilograms (kg) to square meters ($M^2$).  *See* comment 21.

## VIII.   ADJUSTMENT UNDER SECTION 777A(f) OF THE ACT

As discussed in the *Preliminary Determination*,[34] in applying section 777A(f) of the Act, Commerce examines:  (1) whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise; (2) whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period; and (3) whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of NV determined pursuant to section 773(c) of the Act, has increased the weighted-average dumping margin for the class or kind of merchandise.[35]  For a subsidy meeting these criteria, the statute requires Commerce to reduce the dumping margin by the estimated amount of the increase in the weighted-average dumping margin due to a countervailable subsidy, subject to a specified cap.[36]  In conducting this analysis, Commerce has not concluded that concurrent application of non-market economy (NME) dumping duties and countervailing duties necessarily and automatically results in overlapping remedies.  Rather, a finding that there is an overlap in remedies, and any resulting adjustment, is based on a case-by-case analysis of the totality of facts on the administrative record for that segment of the proceeding as required by the statute.[37]

In our *Preliminary Determination*, upon consideration of the responses from Ancientree and Foremost and the relevant statutory criteria, we concluded that an adjustment under section 777A(f) of the Act was not warranted in this investigation.[38]  No party challenged Commerce's preliminary determination not to grant an offset to parties' cash deposit rates.  Therefore, consistent with our *Preliminary Determination*, we have not made any adjustment under section 777A(f) of the Act to the rates assigned to any of the mandatory respondents, the separate rate respondents, or the China-wide entity in this final determination.

## IX.   ADJUSTMENTS TO CASH DEPOSIT RATES FOR EXPORT SUBSIDIES

As we stated in the *Preliminary Determination*, in an LTFV investigation, where there is a concurrent CVD investigation, it is Commerce's normal practice to calculate the cash deposit rate for each respondent by adjusting the respondent's estimated weighted-average dumping margin to account for export subsidies found for each respective respondent in the concurrent

---

[34] *See Preliminary Determination* PDM at 46-49.
[35] *See* sections 777A(f)(1)(A)-(C) of the Act.
[36] *See* sections 777A(f)(1)-(2) of the Act.
[37] *See, e.g.*, *Fine Denier Polyester Staple Fiber from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24740 (May 30, 2018), and accompanying IDM at Comment 2.
[38] *See Preliminary Determination* PDM at 48-49.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

CVD investigation.[39]  Doing so is in accordance with section 772(c)(1)(C) of the Act, which states that U.S. price "shall be increased by the amount of any countervailing duty imposed on the subject merchandise … to offset an export subsidy."

Commerce determined in the final determination of the concurrent CVD investigation that two of the mandatory respondents (*i.e.*, Foremost and Ancientree), the non-selected respondents (*i.e.*, the "All Others" companies), and the companies receiving subsidy rates based upon total AFA, each benefitted from the Export Buyer's Credit subsidy program, which is export contingent, and whose subsidy rate equals 10.54 percent.[40]  Accordingly, in order to avoid a double remedy as a result of export subsidies which are collected as part of the companion CVD proceeding, and pursuant to section 772(c)(1)(C) of the Act, we must adjust the estimated weighted-average dumping margins by the amount of export subsidies that are countervailed as a result of the companion CVD proceeding.  Therefore, we are adjusting each of the estimated weighted-average dumping margins for this final determination by 10.54 percent to determine the cash deposit rate for the mandatory respondents, the non-examined companies which are eligible for a separate rate, and the China-wide entity.

## X.    DISCUSSION OF THE ISSUES

General Comments

## Comment 1:  Initiation of the Investigation

*Fabuwood Case Brief* [41]
- Commerce improperly initiated this investigation, based on an improper finding that the Petition has adequate industry support.
- The petitioner's estimated U.S. market size fails to adequately capture all U.S. shipments of residential and non-residential wooden cabinets and vanities that are covered by the scope of the investigation.  Commerce relied on the petitioner's faulty methodology and underestimated the size of the U.S. market, while improperly rejecting Fabuwood's proposed alternative market size.  The petitioner's numbers distorted the measure of industry support required to initiate an investigation.
- The shipment numbers provided by the petitioners included shipments of non-subject merchandise and imported cabinets or parts resold by domestic producers; thus, the shipment numbers were overvalued.  This further distorted industry support.
- Although the petitioner adjusted its U.S. domestic market measurement to exclude subject merchandise and imports, it performed no such adjustment for the shipment numbers of its members, thereby dramatically inflating the shipments that were supportive of the Petition.

---

[39] *Id*. at 49-50.
[40] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, dated concurrently with this notice, and accompanying IDM.
[41] *See* Fabuwood's Case Brief, "Case Brief of Fabuwood (General Issues)," dated December 18, 2019 (Fabuwood Case Brief).

- Because of the distortion, Commerce was required under the Act to conduct its own analysis of industry support. However, Commerce neglected its statutory duty and initiated an investigation based on a legally-insufficient petition. Thus, the investigation was initiated under improper circumstances and should be terminated.

*Petitioner Rebuttal Brief*[42]

- Commerce already found that the petitioner has standing as an interested party, and it met the required domestic industry support to file the petition.[43] Many of Fabuwood's arguments are the same arguments Commerce rejected in its decision to initiate this investigation.[44]
- Fabuwood entirely ignores section 732(c)(4)(E) of the Act, which provides that, once Commerce makes a decision regarding industry support, the agency's determination cannot be reconsidered.[45]
- Commerce's regulations also prohibit Commerce from reconsidering industry support after the initiation of an investigation.[46] Commerce maintains significant discretion in determining industry support, and it exercised this discretion based on substantial record evidence in this case.[47]
- The International Trade Commission (ITC) determined in its accompanying investigation that a total value of U.S. shipments of subject merchandise was closer to the petitioner's estimate than Fabuwood's, and, thus, the petitioner's market estimate was reasonable.[48]

**Commerce's Position**: Section 732(c)(4)(E) of the Act directs Commerce as follows regarding the consideration of comments with respect to industry support:

> Before the administering authority makes a determination with respect to initiating an investigation, any person who would qualify as an interested party under section 771(9) if an investigation were initiated, may submit comments or information on the issue of industry support. <u>After the administering authority makes a determination with respect to initiating an investigation, the determination regarding industry support shall not be reconsidered.</u>[49]

---

[42] *See* Petitioner's Rebuttal Brief, "Rebuttal Brief Regarding General and Ancientree-Specific Issues," dated December 26, 2019 (Petitioner December 26 Rebuttal Brief).

[43] *Id.* at 30 (citing "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," March 26, 2019 (Initiation Checklist) at Attachment II, 6-20).

[44] *Id.*

[45] *See* section 732(c)(4)(E) of the Act.

[46] *See* Petitioner December 26 Rebuttal Brief at 32 (citing *PT Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d 1310, 1323 (CIT 2012)).

[47] *Id.* at 32 (citing Initiation Checklist at Attachment II: Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China).

[48] *Id.* at 38 (citing *Wooden Cabinets and Vanities from China*, Inv. Nos 701-TA-620 and 731-TA-1445, USITC Pub 4891 (April 2019) at I-3 (USITC Pub 4891)).

[49] *See* section 732(c)(4)(E) of the Act (emphasis added).

12

Therefore, Commerce is statutorily precluded from reconsidering its industry support determination at this stage of the investigation.[50]  As a result, we continue to rely on our determination of industry support provided in the Initiation Checklist.[51]

Based on information provided in the Petition, the share of total estimated U.S. production of the domestic like product in calendar year 2018 represented by the petitioner was more than 50 percent of the production of the domestic like product.[52]  Pursuant to section 732(c)(4)(D)(i) of the Act, if the petition does not establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product, Commerce is required to poll the industry or rely on other information to determine industry support.  However, because at the time of the filing of the Petition, we determined that the Petition did establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product, we found no need to poll the U.S. industry to establish industry support.[53]  Thus, we reiterate below our analysis from the Initiation Checklist.

> The petitioner has provided, with extensive supporting documentation, a reasonable estimate of total 2018 production of wooden cabinets and vanities in the United States, starting with U.S. demand and making adjustments for annual U.S. market segment and overall market growth, U.S. demand in non-residential/commercial applications, imports and exports.  We further note that the petitioner provided a detailed explanation of the methodology used to estimate total U.S. production in 2018 and provided supporting declarations from an individual …{producer of} wooden cabinets and vanities in the United States.  {…}In addition, we note that the petitioner's methodology considers annual growth in the replace and remodel market segment and new construction segment, demand for nonresidential/commercial applications, U.S. imports of wooden cabinets and vanities, U.S. exports of wooden cabinets and vanities and components thereof, and annual growth for the overall U.S. cabinet market.  {…}Accordingly, we conclude that the petitioner's estimate using data on U.S. cabinet demand {from a business proprietary source} as the starting point is reasonable.
>
> While Fabuwood contends that the NKBA data it provided on the U.S. market for residential kitchen and bathroom cabinetry for the new residential and remodeling segments should be used as the denominator, we agree with the petitioner that the NKBA data on the record do not represent the value of production or shipments of wooden cabinets and vanities.  Based on information on the record, the NKBA data reflect retail values and installed values of kitchen and bathroom cabinets, which include built-in costs for commissions, delivery fees, {…certain other fees}, and customized treatments, and which have been sold once or twice before being sold{…}.  Accordingly, we find that the petitioner has provided a reasonable estimate of total U.S. production that accounts for all production of the domestic like product.  As a result, the petitioner has demonstrated that

---

[50] *See PT Pindo Deli Pulp*, 825 F. Supp. 2d at 1323 ("Commerce is prohibited from reconsidering industry support after the initiation of an investigation").
[51] *See* Initiation Checklist at Attachment II.
[52] *Id.* at Attachment II at 9.
[53] *Id.* at Attachment II at 18.

13

it has adequate industry support for initiating the investigations; therefore, it is unnecessary to poll the industry to determine support for the Petitions.[54]

## Comment 2:  Respondent Selection

### A.  Mandatory Respondent Selection Methodology

*Wen Bo Case Brief*[55]
- Commerce should have relied on import value, rather than volume, data for mandatory respondent selection.
- Both the petitioner and U.S. Customs and Border Protection (CBP) collected import data on a value, not a volume, basis to calculate industry support.[56]  This demonstrates value as a reliable metric.
- Commerce unreasonably used an unreliable metric and ignored the fact that CBP's data and the Petition itself relied on value.[57]

*Petitioner Rebuttal Brief*[58]
- Commerce correctly determined its mandatory respondent selection using import volumes.
- Wen Bo fails to provide any additional reasoning supporting its argument that import values would have been a "reliable metric" and Commerce previously specifically addressed and rejected the same argument.
- Regardless of the metric utilized by Commerce, the mandatory respondents selected would remain representative of the Chinese industry.

**Commerce's Position:**  We disagree with Wen Bo's claim that Commerce should have based respondent selection on import values, rather than import volume, during the POI.  There is no evidence on the record to demonstrate that values are more accurate or consistent than reported volumes.[59]  Commerce's longstanding practice is to find that volume provides a consistent and reliable metric by which to rank the largest exporters during the POI.[60]  Indeed, the statute indicates that, where we limit our examination of respondents in an investigation, we may limit our examination to "exporters and producers accounting for the largest *volume* of the subject merchandise from the exporting country that can be reasonably examined."[61]

---

[54] *See* Initiation Checklist at Attachment II at 17-18 (footnotes omitted).
[55] *See* Shanghai Wen Bo Industries Co., Ltd.'s (Wen Bo's) and Dalian Jiaye Wood Products Co. Ltd.'s (JY's) Case Brief, "Case Brief," dated December 17, 2019 (Wen Bo Case Brief).
[56] *Id.* at 2.
[57] *Id.* (citing Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Respondent Selection," dated June 4, 2019 (Respondent Selection Memo) at 6-7).
[58] *See* Petitioner December 26 Rebuttal Brief at 27.
[59] *See* Respondent Selection Memo at 6.
[60] *See Hardwood and Decorative Plywood from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 58273 (September 23, 2013) (*Decorative Plywood*), and accompanying IDM at Comment 2.
[61] *See* section 777A(c)(2)(B) of the Act (emphasis added).

14

We further note that Wen Bo did not cite any precedent to support the proposition that Commerce should adjust its respondent selection methodology.  Further, Wen Bo failed to demonstrate that the mandatory respondents selected on the basis of import volume are unrepresentative of the Chinese wooden cabinet and vanity industry.[62]  Therefore, we continue to find Wen Bo's argument to be without merit.

## B.  Voluntary Respondents

On June 4, 2019, we selected the three largest exporters/producers of subject merchandise by volume, Ancientree, Foremost, and Meisen, for individual examination as mandatory respondents.[63]  Wen Bo requested to participate in this investigation as a voluntary respondent,[64] and it submitted timely responses to Commerce's AD questionnaire by the due dates specified for the mandatory respondents.[65]  On October 2, 2019, we determined not to select Wen Bo as a voluntary respondent because doing so would continue to be unduly burdensome and would inhibit the timely completion of this investigation.[66]

*Wen Bo Case Brief*[67]
- Commerce stated it would consider any request for voluntary respondent status, yet it declined Wen Bo's voluntary respondent request.
- Meisen's uncooperativeness opened a spot for Wen Bo to be selected as a voluntary respondent.  Thus, to meet the targeted three mandatory respondent companies, Commerce should examine Wen Bo's response.
- In LTFV investigations, Commerce is under the obligation to calculate dumping margins as accurately as possible.[68]
- Representativeness plays a central role in calculating the all-others rate.  In *National Knitwear,* the Court of International Trade (CIT) upheld Commerce's decision to exclude a mandatory respondent from the calculation of the all others rate on the grounds that the rate was not "representative of the pricing practices of the non-investigated companies."[69]

---

[62] Indeed, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) stated that "the very fact that the statute contemplates using data from the largest volume of exporters suggests an assumption that those data can be viewed as representative of all exporters."  *See Albemarle Corp v. United States*, 821 F. 3d 1345, 1353 (Fed. Cir. 2016) (*Albemarle*).

[63] *Id.* at 1.

[64] *See* Wen Bo's Letter, "Wooden Cabinets and Vanities From People Republic of China:  Entry of Appearance; Request to Be a Voluntary Respondent," dated March 26, 2019.

[65] *See* Wen Bo's Letter, "Section A Questionnaire Response," dated July 3, 2019; Wen Bo's Letter, "Section D Questionnaire Response," dated July 19, 2019; and Wen Bo's Letter, "Section C and E Questionnaire Responses," dated July 22, 2019.

[66] *See* Memorandum, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Selection of Voluntary Respondent," dated October 2, 2019 (Voluntary Respondent Memo); *see also Preliminary Determination* PDM at 7-8.

[67] *See* Wen Bo Case Brief.

[68] *Id.* at 4 (citing *Lasko Metal Prods. v United States*, 43 F. 3d 1442, 1446 (Fed. Cir. 1994) (quoting *Rhone-Poulenc Inc. v United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990)); *Albemarle*, 821 F. 3d at 1354; and *Mueller Commercial de Mexico v. United States*, 753 F. 3d 1227, 1235 (Fed. Cir. 2014) (*Mueller*)).

[69] *Id.* at 4-5 (citing *National Knitwear & Sportswear Ass'n v. United States*, 15 CIT 548 (1991) (*National Knitwear*)).

15

The timely, complete response provided by Wen Bo would yield an "all others rate" based on record evidence rather than AFA.

- Because Wen Bo requested voluntary treatment and timely submitted a complete questionnaire response, it cannot be said that an "all others rate" calculated on other respondents' rates is representative of Wen Bo's own rate.
- With respect to Wen Bo's own rate, Commerce does not have a basis to assume Wen Bo engaged in unfair pricing. Thus, if Commerce does not analyze Wen Bo's voluntary response, Commerce should assign Wen Bo a zero percent margin and exclude it from the order.

*Petitioner Rebuttal Brief* [70]

- Commerce appropriately declined to investigate voluntary respondent Wen Bo and the company failed to demonstrate that Commerce was unreasonable in declining its examination.
- Wen Bo is mistaken in its presumption that Commerce has the resources to investigate Wen Bo because of its preliminary decision to base Meisen's dumping margin on AFA. Commerce has conducted a full investigation of Meisen, including issuing multiple supplemental questionnaires and evaluating all comments raised by interested parties.
- Ancientree and Foremost account for a significant Chinese production volume for which Commerce could individually calculate dumping margins. Essentially, neither Wen Bo nor other Chinese respondents would be unfairly treated if Commerce continued to use Ancientree's and Foremost's experience as the basis for the separate rate.

**Commerce's Position:**  We disagree that we should have selected Wen Bo as a voluntary respondent in this investigation because it timely submitted voluntary questionnaire responses. On June 4, 2019, we selected the three largest exporters/producers of subject merchandise by volume, Ancientree, Foremost, and Meisen, for individual examination as mandatory respondents.[71]  In the Respondent Selection Memo, we stated that we would reevaluate resource constraints during the course of this investigation and that, if exporters submitted voluntary responses in accordance with the deadlines and other criteria set forth in section 782(a) of the Act, and 19 CFR 351.204(d), we would consider whether resources existed to examine those exporters as voluntary respondents.[72]  In the Voluntary Respondent Memo that accompanied the *Preliminary Determination*, Commerce revisited Wen Bo's request and explained that examining a voluntary respondent would have been an undue burden and would have inhibited the timely completion of this investigation.[73]

Wen Bo itself acknowledges that, after the completion of the *Preliminary Determination*, Commerce delayed verification of mandatory respondent Meisen and issued multiple supplemental questionnaires to it.[74]  Further, Meisen submitted a case brief containing arguments which must be considered and addressed in this final determination.  Thus, contrary to Wen Bo's

---

[70] *See* Petitioner December 26 Rebuttal Brief.
[71] *See* Respondent Selection Memo at 1.
[72] *Id.* at 9-10.
[73] *See* Voluntary Respondent Memo at 3-4.
[74] *See* Wen Bo Case Brief at 3-4.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

assertions, the assignment of AFA to Meisen in the *Preliminary Determination* did not end the administrative burden placed on Commerce when we selected it as a mandatory respondent. While we agree with Wen Bo that Commerce should accept voluntary respondents when we have the resources to do so, in this case, those resources simply did not – and still do not – exist. Under these circumstances, analyzing Wen Bo's voluntary response "would be unduly burdensome and inhibit the timely completion of the investigation."[75]

With respect to Commerce's current resource constraints, it is important to note that the issues presented in this investigation are complex, and the information submitted by the mandatory respondents and other interested parties has been voluminous.  For example, Commerce received 221 applications from companies seeking to qualify for separate rates, an extraordinarily large number by any measure, and we expended considerable resources in reviewing each of these applications to ensure that it met Commerce's standards.  Further, Meisen and the other respondents submitted thousands of pages of documentation in response to Commerce's questionnaires, all of which had to be analyzed and acted upon within the statutory deadlines set forth in the Act.  In addition, this was the first time that any of the examined companies were investigated as mandatory respondents before Commerce and, thus we had to expend additional resources to become familiar with these companies' corporate structures, record-keeping, and business practices.  Indeed, we issued multiple supplemental questionnaires to the mandatory respondents, which included numerous questions concerning their FOP and sales reporting methodologies, their costing and selling practices, and the multitude of individual calculations performed when presenting their reported data.  We also encountered numerous issues during the verifications conducted for these respondents, giving rise to a large number of comments to be addressed in this final determination.

Equally significant, interested parties have raised numerous issues related to the scope of this investigation, many of which are novel and highly complex.  For this reason, and the reasons stated above, we find that this case already requires the devotion of significant resources by Commerce, which prohibits the examination of an additional respondent.  Accepting Wen Bo as a voluntary respondent would have required additional resources not currently at our disposal in order to review and analyze its questionnaire responses, issue potential multiple additional supplemental questionnaires, and conduct verification of those questionnaire responses.  Further, a full examination of Wen Bo would have required the preparation of an additional margin program specific to Wen Bo, as well as analysis memoranda and verification reports.  Moreover, the uncertain nature of any investigation allows for the possibility that additional complex situations may have arisen, requiring even more time for the case team to analyze and address novel issues.  We further note that Commerce was conducting numerous investigations and

---

[75] *See* section 782(a)(1) of the Act.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

reviews during the preliminary phase of this investigation,[76] and the number of new
administrative segments has only increased since then.[77]

Notwithstanding the issues described above, we disagree with Wen Bo that Commerce, in the
alternative, should assign it a final margin of zero percent and exclude it from any potential order
since Commerce declined its review.  First, contrary to Wen Bo's assumption, Commerce has
not included Meisen's AFA rate in the calculation of the rate assigned to the non-selected
companies eligible for separate rates.[78]

Second, our decision to assign Wen Bo a separate rate based on a weight-average of the
mandatory respondents' rates that were not zero, *de minimis*, or based entirely on facts available,
is consistent with our past practice.[79]  Further, we disagree with Wen Bo that this rate is not
representative of Wen Bo's own rate.  While Wen Bo argues that Meisen's assigned AFA rate is
not usable for purposes of calculating the rate for separate rate companies, Wen Bo failed to
explain why the rate that Commerce did assign to the separate rate companies is not
representative of Wen Bo's rate.  The rate assigned to the separate rate companies is a weighted
average of the dumping margins calculated for two of the largest Chinese subject merchandise
producers, using the publicly-ranged quantities of each producer, whose rates are not zero, *de
minimis*, or based entirely on facts available.[80]  Our use of these rates to determine the separate
rate for non-selected respondents in this investigation is consistent with long-standing Commerce

---

[76] *See* Voluntary Respondent Memo at 4, noting in the preliminary phase of this investigation, Office V was also
assigned to the following investigations and reviews:  AD and CVD investigations of wooden cabinets and vanities
from the People's Republic of China; AD and CVD investigation of carbon and alloy steel threaded rod from India;
AD changed circumstances review and administrative review of certain steel nails from China; AD investigation of
carbon and alloy steel threaded rod from Thailand; AD administrative review of certain frozen fish fillets from
Vietnam; AD administrative review of magnesia carbon bricks from China; AD and CVD administrative reviews of
1-Hydroxyethylidene-1, 1-Diphosphonic Acid from China; AD administrative review of hot-rolled steel flat
products from Australia and South Korea; AD administrative review of uncoated paper from Portugal and Brazil;
AD administrative review of honey from China; CVD administrative review of cold drawn mechanical tubing from
India; AD administrative review of uncovered innerspring units from China; AD administrative review of certain
frozen warmwater shrimp from China; AD administrative review of steel wire garment hangers from China; AD
administrative review of ESB rubber from Korea; AD administrative review of circular welded steel pipe and tubes
from Taiwan; AD administrative review of certain cut-to-length plate from China; AD and CVD administrative
reviews of hardwood plywood products from China; AD and CVD circumvention inquiries of certain uncoated
paper from Australia, Brazil, China, Indonesia, and Portugal; and AD and CVD circumvention inquiries of
hardwood plywood products from China.
[77] Since the date of the *Preliminary Determination*, Commerce has initiated AD and/or CVD investigations on at
least four different products covering numerous countries, in addition to receiving multiple new anti-circumvention
inquiries, scope inquires, and initiating multiple new administrative reviews.  *See http://enforcement.trade.gove/ia-
highlights-and-news.html*.
[78] *See* Memorandum, "Final Determination of the Investigation of Wooden Cabinets and Vanities and Components
Thereof from the People's Republic of China:  Calculation of the Final Margin for Separate Rate Companies," dated
concurrently with this memorandum.
[79] *See, e.g.*, *Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative
Determination of Sales at Less Than Fair Value*, 85 FR 5376, 5378 (January 30, 2020), and accompanying IDM.
[80] *See* Memorandum, "Preliminary Determination of the Investigation of Wooden Cabinets and Vanities and
Components Thereof from the People's Republic of China:  Calculation of the Preliminary Margin for Separate Rate
Companies," dated October 2, 2019.

practice in NME LTFV investigations,[81] in which we look to section 735(c)(5) of the Act, which pertains to the calculation of the all others rate in market economy LTFV investigations.[82] Wen Bo made no attempt in its arguments to explain how these two other subject merchandise producers are not representative of the dumping that is occurring beyond stating that "where WB and JY have requested voluntary treatment and submitted a complete questionnaire response on a timely basis, it cannot be said that a rate calculated based on other respondents' rates is representative of WB and JY."[83] Wen Bo provides no further elaboration on why the rate assigned to it is not representative of its own.  Indeed, Wen Bo notes that the Federal Circuit has elaborated on what is required of Commerce in calculating antidumping rates, and the separate rate, or all-others rate, in particular. "{A}ccuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters."[84]  As explained above in Comment 1(A), when we determine to limit respondents, section 735(c)(5)(A) of the Act – which, again, we look to for guidance in determining the separate rate for non-selected companies such as Wen Bo in NME AD investigations – "contemplates using data from the largest volume exporters suggestions an assumption that those data can be viewed as representative of all exporters."[85]  Therefore, Wen Bo's contention that Commerce should assign a zero percent margin to Wen Bo and exclude it from the AD Order is unreasonable and unsupported by the record evidence or any precedent.[86]

For the reasons discussed in the Voluntary Respondent Memo, and reiterated above, we continue to find that we did not have sufficient resources, or time, to individually examine Wen Bo in this investigation.  Consequently, we continue to assign Wen Bo the separate rate margin determined in this final determination.

**Comment 3:  Separate Rate Applicants**

### A.  Brentridge and Harbin

In the *Preliminary Determination*, we found that both Brentridge and Harbin failed to cooperate by not providing information requested from them related to their application for separate rate status, including a request to publicly identify the producers for which they are requesting combination rates.[87]

---

[81] *See, e.g.*, *Cast Iron Soil Pipe Fittings from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination and Extension of Provisional Measures*, 83 FR 7145 (February 20, 2018), and accompanying PDM at 13-14, unchanged *Cast Iron Soil Pipe Fittings from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 83 FR 33205 (July 17, 2018), and accompanying IDM.

[82] *Id.*  Separately, we disagree with Wen Bo's reference to an "all others rate" in its case brief.  Commerce does not calculate an "all others rate" in NME LTFV investigations.  Rather, where Commerce determines to limit its examination to particular respondents, it determines a rate for non-selected respondents who demonstrate that they are entitled to a "separate rate."

[83] *See* Wen Bo Case Brief at 5.

[84] *See* Wen Bo Case Brief at 4 (citing *Albemarle*, 821 F. 3d at 1354).

[85] *See Albemarle*, 821 F. 3d at 1353.

[86] *See* Wen Bo Case Brief at 5.

[87] *See Preliminary Determination* PDM at 18.

19

*Brentridge Case Brief*[88]

- Brentridge timely filed a full and complete separate rate application (SRA) but did not file an entry of appearance.  Therefore, Brentridge is not an interested party in this investigation.
- Although Commerce issued a supplemental questionnaire to "Interested Parties,"[89] this questionnaire did not cover Brentridge nor did Commerce specifically name Brentridge in the supplemental questionnaire.
- The first question of the August SRA Supplemental requested an excel file from "Interested Parties," but did not request any information that was not already in Brentridge's SRA.
- Since the *Preliminary Determination*, Brentridge has publicly identified its producer for which it is requesting a combination rate.[90]

*Harbin Case Brief*[91]

- This is Harbin's first time participating in a proceeding and the company has no experience with ACCESS.  It was not until Harbin saw Commerce's *Preliminary Determination* that it realized there was a supplemental questionnaire that required its attention.
- Because the Public Release Digest email message and ACCESS website did not identify Harbin's name, the company believed the supplemental was irrelevant to Harbin.
- The August SRA Supplemental did not request any new information not already in Harbin's timely SRA or information in Harbin's possession.

*Petitioner Rebuttal Brief*[92]

- Both Brentridge and Harbin should have been aware that a supplemental questionnaire regarding their SRA submissions would be applicable to them.
- The August SRA Supplemental clearly applied to all "Interested Parties" and only certain attachments applied to specific applicants.
- Despite the argument by both companies that any information submitted would not have been of use to Commerce, that is not justification for failing to submit any response and it is not for respective parties to decide what information is required and which companies necessitate questionnaire response submissions.
- The use of AFA does not require a finding of intent on behalf of an interested party, and may be applied where a party's failure is based on inadvertence or neglect.  Therefore, Commerce should continue denying a separate rate to these companies.[93]

---

[88] *See* Brentridge's Case Brief, "Brentridge Case Brief," dated November 8, 2019 (Brentridge Case Brief) at 1.
[89] *See* Memorandum, "Separate Rate Application Supplemental Questionnaire," dated August 22, 2019 (August SRA Supplemental).
[90] *See* Brentridge Case Brief at Attachment.
[91] *See* Harbin's Case Brief, "Case Brief," dated December 16, 2019 (Harbin Case Brief) at 2.
[92] *See* Petitioner December 26 Rebuttal Brief at 25-27.
[93] *Id.* (citing *Nippon Steel*, 337 F. 3d 1373, 1382-83).

20

**Commerce's Position:** We disagree with Brentridge and Harbin that their respective SRA filings were full and complete. With respect to Brentridge, Commerce preliminarily found that this exporter was ineligible for a separate rate because it failed in its SRA to disclose publicly the name of the entity that supplied it with subject merchandise. The public disclosure of this information is essential to the proper administration of this proceeding because the identity of exporter-producer combinations requested by Commerce in separate rate applications must be publicly published in the *Federal Register*. However, since the *Preliminary Determination*, Brentridge has publicly identified its producer,[94] such that Commerce is now able to publicly publish the exporter-producer combination for Brentridge. Therefore, because this deficiency has been remedied, and Brentridge's SRA otherwise meets our requirements for granting a separate rate, we are granting Brentridge a separate rate in this final determination.

We disagree with Harbin that it should be considered eligible for a separate rate despite its failure to respond to the August SRA Supplemental, which it concedes it was aware of but disregarded. In its case brief, Harbin described working with Commerce employees to register for the ACCESS system,[95] suggesting that Harbin was aware that Commerce had resources available to provide Harbin technical assistance with its filings if Harbin required clarification. Further, Commerce identified deficiencies in Harbin's SRA that required Harbin's attention on three out of three requested action lists in the August SRA Supplemental.[96] Specifically Harbin's SRA did not identify its ultimate owners, it did not provide a U.S. Customs Form 7501, and it did not provide a business license with an accompanying English language version.[97] With respect to the first of these deficiencies, Harbin claimed in its case brief that exhibits 7 and 9 of its SRA showed the names of its individual shareholders and their percentages owned;[98] however, those documents are Chinese-language documents with no accompanying English-language translations,[99] and, thus, Harbin failed to comply with the requirements of 19 CFR 351.303(e) in submitting them.[100] With respect to the second deficiency, Harbin claimed in its case brief that it did not have a Form 7501;[101] however, it stated in its SRA that it was submitting the U.S. Customs 7501 Entry Summary in exhibit 4.[102] Even if this statement were in error and Harbin did not have the Form 7501 in its possession, it was required by the SRA to submit an explanation as to why submission of that document was not possible.[103] Finally, with respect to the third deficiency, Harbin argues in its case brief that it provided a business license in exhibit 5 of its SRA, and an English translation of its export certificate of approval in exhibit 6, where "{t}he basic content of exhibit 6 such as company name, address and company nature are similar to that of business license";[104] however, Harbin failed to submit a translated copy of its most fundamental of documents, its business license, again in violation of 19 CFR 351.303(e).

---

[94] *See* Brentridge Case Brief at 2.
[95] *See* Harbin Case Brief at 2.
[96] *See* August SRA Supplemental at Appendices I, II, and III.
[97] *See* Harbin's Letter, "Separate Rate Application," dated May 10, 2019 (Harbin SRA).
[98] *See* Harbin Case Brief at 3.
[99] *See* Harbin SRA at Exhibits 7 and 9.
[100] *See* August SRA Supplemental at Appendices I, II, and III.
[101] *See* Harbin Case Brief at 3-4.
[102] *See* Harbin SRA at 7.
[103] *Id.* at 6, fn. 7.
[104] *See* Harbin Case Brief at 3-4.

21

We are sympathetic to the position of small companies that are unfamiliar with our process, and in particular that of *pro se* companies.  However, in this instance, Harbin's case brief raises additional concerns regarding the potential for serious misrepresentations of its reported information.  Specifically, Harbin notes that its filings were all completed by itself and it wrote a law firm's name on those files because "we saw other companies also wrote a law firm's name in their files" and because "Heilongjiang ShanXing Law Firm is a local law firm in Harbin" that "generally gives legal advices (*sic*) to our company about other Chinese law matters."[105]  However, the cover letter of Harbin's SRA is signed by "GuXiangGuo," purportedly of "Heilongjiang ShanXing Law Firm," and the "Representative Certification" is purportedly completed and signed by the same counsel at exhibit 3 of the SRA.  Thus, Harbin either misstates the facts of its representation in its case brief or committed severe misrepresentations in its SRA by claiming to have secured representation and fraudulently completing a representative certification by said counsel.

The SRA itself provides the following:

> If the applicant does not provide the required documentation in the appropriately required form or is unable or unwilling to make the requested certifications, the applicant will not have demonstrated its eligibility for a separate rate.  If necessary, {Commerce} will issue questionnaires for the purpose of clarifying fully responsive answers.  {Commerce} retains the right to require additional information concerning the representations made in your firm's application.  All information submitted and representations made by applicants are subject to verification.[106]

Accordingly, we continue to find that Harbin did not provide the requested information that was required of it to be considered eligible for a separate rate and it is, therefore, ineligible for a separate rate in this final determination.

### B.  Zhong Shan

In the *Preliminary Determination*, we did not grant Zhong Shan a separate rate because we found that it did not separately submit an application for each company included in its application.[107]

*Zhong Shan Case Brief*[108]
- In its initial SRA response, Zhong Shan reported its own name as the exporter and producer, indicating it applied for a separate rate only on its own behalf.
- After not receiving the separate rate in the *Preliminary Determination*, Zhong Shan filed preliminary ministerial error comments definitively proving Zhong Shan's sale to an unaffiliated U.S. customer.

---

[105] *Id.* at 2.
[106] *See* Commerce's Letter, "People's Republic of China Separate Rate Application and Required Supporting Documentation," available on Enforcement and Compliance's website at *https://enforcement.trade.gov/nme/nme-sep-rate.html* (SRA Template).
[107] *See Preliminary Determination* PDM at 18.
[108] *See* Zhong Shan's Case Brief, "Case Brief," dated November 28, 2019 (Zhong Shan Case Brief).

Barcode:3946193-01 A-570-106 INV - Investigation  -

- Chin-Shu Wooden is a paper company registered in the market economy Samoa.  It did not apply for a separate rate nor is it seeking one.
- Commerce's mistaking Chin-Shu Wooden as a company requiring its own separate rate submission, and subsequent denial of Zhong Shan's separate rate, constitutes an abuse of discretion and must be corrected.

No other interested party provided comments on this issue.

**Commerce's Position:**  We continue to disagree with Zhong Shan that the record evidence clearly supports its qualification for a separate rate.  In the *Preliminary Determination*, we stated:

> The SRA posted on E&C's website states that "Each applicant seeking separate rate status must submit a separate and complete individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership.  Each firm must apply for a separate rate by submitting an individual application.  Only one firm per application is permitted."[109]

In its SRA, Zhong Shan noted in certain places that it was also known as (or "AKA") Chin-Shu Wooden, but it did not identify this AKA name in other places.[110]  The SRA instructed companies to:

> Ensure that each applicant seeking separate rate status is submitting a separate and complete individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership.  Your response to this question should have only one company name.[111]

The SRA also stated:

> Trade names are other names under which the company does business.  It does not include product brand names or the names of any other entities in the applicant's "group," affiliated or otherwise.  If your firm is assigned separate rate status, your firm will only be able to ship under your separate rate under names that are included on your business license/registration documents, or are otherwise permitted, as explained in your response to this question.[112]

Despite the above instructions, Zhong Shan did not consistently indicate that Chin-Shu Wooden was actually an AKA name and its assertions that it is so now are belied by the record.  Zhong Shan answered "no" when asked if the disregard the instructions under Section II requesting; "applicant identified by any other names, such a trade names or 'doing-business-as.' ('d.b.a.') names, as a legal matter in the home market, in third countries or in the United States'." [113]

---

[109] *See Preliminary Determination* PDM at 18.
[110] *See* Zhong Shan SRA at 10-11.
[111] *Id*. at 10.
[112] *Id.*
[113] *See* SRA Template at 10.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Barcode:3946193-01 A-570-106 INV - Investigation  -

Arguably, this question affords applicants the opportunity to distinguish any "AKA" and provide documentation demonstrating the AKA. Although Zhong Shan erroneously addresses its AKA within the context of its selling practices, none of Zhong Shan's underlying documentation indicates that this company is an AKA company. We reviewed Zhong Shan's business license, articles of association, capital verification report and financial statements, and none of these documents indicated that Chin-Shu wooden is an AKA of Zhong Shan.[114] Furthermore, later in the SRA, Zhong Shan states that Chin-Shu wooden is actually a close affiliated company.[115] Because the record does not support Zhong Shan's claim that Chin-Shu Wooden is an "AKA" company, and instead indicates that Chin-Shu Wooden is a company distinct from Zhong Shan, we find that Chin-Shu Wooden is not an AKA company of Zhong Shan, and therefore, it was required to file a separate and complete application in order to be considered eligible for a separate rate. Because Chin-Shu Wooden did not file an SRA, we are continuing to not grant Chin-Shu Wooden a separate rate.

In light of our finding that Chin-Shu Wooden was a distinct company, and that the SRA was for Zhong Shan, and not Chin-Shu Wooden, in the *Preliminary Determination*, we did not grant Zhong Shan a separate rate given that its application was for two companies.[116] However, even if we examined the SRA filed on behalf of Zhong Shan only, we would reach the same conclusion that Zhong Shan is not eligible for a separate rate. Zhong Shan noted that "all subject merchandise exported to the United States were (*sic*) produced by Zhong Shan King Yuandun itself."[117] In its SRA, Zhong Shan noted that "Chin-Shu Wooden issued the sales documents such as invoice and packing list to the unaffiliated US customer and received payment from it."[118] Zhong Shan then provided a commercial invoice, packing list, bill of lading, and bank notice of payment receipt purportedly demonstrating one of its sales of subject merchandise to the United States.[119] None of the underlying documentation supported Zhong Shan's claim that it had produced or exported subject merchandise to the United States. Indeed, the documentation clearly indicated that its self-identified affiliated company Chin-Shu Wooden was actually the company that made the sale.[120] However, as discussed above, Chin-Shu Wooden did not, either separately or in Zhong Shan's SRA, request separate rate status.

We find Zhong Shan's argument that Commerce's separate rate denial constitutes an abuse of discretion to be misplaced. As explained above, Zhong Shan's SRA contained substantial inconsistencies. The record evidence simply does not support that Zhong Shan is the exporter, nor do we have verifiable information on which to rely to confirm its eligibility for a separate rate. Zhong Shan's SRA ambiguity, combined with evidence demonstrating Chin-Shu as the exporter, forecloses our ability to grant Zhong Shan a separate rate. We continue finding Zhong Shan ineligible for a separate rate and we, therefore, continue to find that it is part of the China-wide entity. Moreover, to the extent Zhong Shan is arguing that Chin-Shu Wooden is located in a market economy, we require an SRA providing ultimate ownership information in NME

---

[114] *Id*. at Exhibits 2, and 4-7.
[115] *Id*. at 12.
[116] *See Preliminary Determination* PDM at 18.
[117] *See* Zhong Shan SRA at 14.
[118] *Id*. at 13.
[119] *Id*. at Exhibit 1.
[120] *Id*.

24

proceedings.[121]  In any case, Zhong Shan omitted documentation supporting Chin Shu's Samoan domicile.[122]

## Comment 4:  Company Name for Supree

*Supree Case Brief*[123]
- Commerce granted Supree a separate rate using the name reported by Supree in response to the August SRA Supplemental.  However, Commerce should instead grant Supree a separate rate under the name "Supree (Fujian) Wood Co., Ltd.," which was provided in the company's SRA filing.
- It is Commerce's practice to correct errors in original information submitted by a respondent where the error is obvious from the administrative record.  Supree spelled its name correctly in both its SRA and quantity and value response.
- The spelling, "Fuijian," is obviously a misspelling of the Chinese province Fujian.

No other interested party provided comments on this issue.

**Commerce's Position:**  We have examined the information on the record and agree that we should grant Supree a separate rate under the name Supree (Fujian) Wood Co., Ltd., as stated in its SRA and quantity and value submissions.  We have corrected the company's name in our final determination.

## Comment 5:  Calculation of the Separate Rate Assigned to Non-Selected Companies

*Separate Rate Respondents Case Briefs*[124]
- If Commerce reduces the mandatory respondents' rates, it should also recalculate and reduce the separate rate companies' rate.
- If Meisen receives an AFA rate in the final determination, that AFA rate should be excluded from the separate rate calculation in continuance with the *Preliminary Determination*.

**Commerce's Position**:  We made changes to the margins calculated for Ancientree and Foremost for purposes of this final determination.  Because the dumping margin assigned to the companies who have received separate rates in this investigation is based on the weighted-average of these rates (excluding any rates based on AFA), we have also recalculated the margin assigned to the separate rates companies in accordance with our practice.[125]

---

[121] *See* SRA Template at 3.
[122] *See* Zhong Shan SRA at Exhibit 2.
[123] *See* Supree's Case Brief, "General Issues Case Brief," dated December 17, 2019, at 1-4.
[124] *See* Weihai Adornus Cabinetry Manufacturing Co., Ltd., *et. al.*,'s Letter, "Letter in Lieu of Brief," dated December 17, 2019; and Ronbow Hong Kong Limited's and Wuxi YuSheng Kitchen Bathroom Equipment Co., Ltd.'s Case Brief, "Case Brief," dated December 17, 2019.
[125] *See Decorative Plywood* IDM at Comment 1.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

SV Comments

## Comment 6:  Surrogate Country

In the *Preliminary Determination*, we selected Romania as the primary surrogate country on the basis that Romania is at the same level of economic development as China, is a significant producer of comparable merchandise, and has reliable and useable SV data.[126]  In making this determination, we relied, in part, on the fact that the record contains financial statements from a producer of wooden furniture and wood products that separately identify energy expenses.[127]  These financial statements are from a Romanian company, S.C. Sigstrat S.A.  (Sigstrat).

*Ancientree Case Brief*[128]
- Commerce erred in its selection of Romania as the primary surrogate country in this investigation.  For purposes of the final determination, Commerce should rely on SVs from Malaysia instead.
- Commerce chose Romania as the surrogate country solely because Sigstrat's financial statements separately identify energy costs.  In so doing, Commerce failed to properly weigh other – even more important – factors, such as the fact that the record contains multiple financial statements from Malaysian producers of identical merchandise, higher import volumes into Malaysia for two of the most significant raw material inputs, and more specific SVs for labor costs and B&H expenses.
- With respect to the ten Malaysian financial statements on the record, Commerce declined to rely on four because they were from large investment companies involved in a variety of activities.  However, in the past, Commerce has relied on financial statements from companies with even more variety in their activities; therefore, Commerce can rely upon the statements from the four investment companies here.[129]
- Commerce declined to rely on three financial statements because they do not break out energy costs.  Given that Commerce often relies on financial statements which do not separately break out energy, Commerce's reasoning again was flawed.[130]  Commerce's decision was also unreasonable because the financial statements were from producers of identical merchandise (wooden furniture) or of products with very similar production

---

[126] *See Preliminary Determination* PDM at 14.

[127] *Id*.

[128] *See* Ancientree's Letter, "Case Brief, "dated December 17, 2019 (Ancientree Case Brief) at 1-11.

[129] *Id*. at 2-3 (citing *Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 4852 (January 17, 2017) (*2014-2015 Chlorinated Isos*), and accompanying IDM at Comment 2; and *Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 5053 (February 20, 2019) (*2016-2017 Chlorinated Isos*), and accompanying IDM at Comment 3).

[130] *See* Ancientree Case Brief at 1-2 (citing *Refillable Stainless Steel Kegs from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 FR 57010 (October 24, 2019); *see also Mattresses from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 FR 56761 (October 23, 2019); *Fine Denier PSF; Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 17781 (April 26, 2019); and *Xanthan Gum Final from the People's Republic of China:  Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 6513 (February 14, 2018)).

processes (wooden table sets or beds).  In contrast, the information on the record shows that Sigstrat's primary activity is the manufacturing of plywood and veneer.

- There is substantial other evidence on the record to show that Malaysia is a significant producer of identical merchandise.  On the other hand, the record contains no information showing that Romania produces more than comparable merchandise, given that Sigstrat's financial statements are only for comparable products and the Romanian export data on the record are for a basket HTS category covering wooden furniture.

- With respect to raw materials, Romania's imports of birch and poplar sawn wood (two main inputs into the production of subject merchandise) were of uncommercial quantities, given that they were only 196 cubic meters ($M^3$) and 320 $M^3$, respectively.  These quantities are particularly low when considered in relation to both a containerload and Ancientree's own consumption.  Specifically, Ancientree consumed approximately 248 percent and 1,078 percent as much poplar and birch, respectively, during the POI than was imported into all of Romania, whereas Malaysia imported 691 percent and 369 percent more.  The CIT found in *Juancheng Kangtai* that Commerce must consider the respondent's actual purchasing and consumption in surrogate country selection.[131]

- To remedy lack of commercial import quantities of poplar and birch sawn wood into Romania, Commerce resorted to the use of imports under a six-digit level for the same HTS categories.  This was an inappropriate fix because it sacrificed specificity, the most critical factor in Commerce's analysis.[132]

- With respect to labor, the record contains only a general overall manufacturing rate in Romania, whereas the Malaysian labor rate on the record is for a "manufacturer of wooden and cane furniture."  Similarly, the record contains no information on Romanian B&H expenses, and, thus, Commerce relied on B&H values from "Europe and Central Asia" (countries that were not economically comparable to China).  Thus, the Malaysian data on the record are clearly superior.

*Foremost Case Brief*[133]

- Commerce should reconsider its selection of Romania as the primary surrogate country because it is not the source of best available information within the meaning of section 773(c)(1) of the Act.  Commerce should instead select Malaysia as the primary surrogate country.

- The record contains only one set of Romanian financial statements, from Sigstrat, a producer of plywood and molded wood products (neither of which is comparable merchandise).  Nothing on the record suggests that producers of plywood or molded wood have operations, capital structures, overhead, or expected profits similar to the experience of companies in the cabinets industry.

---

[131] *Id*. at 6-7 (citing *Juancheng Kantai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (CIT 2015) (*Juancheng Kangtai*).

[132] *Id*. at 8-9 (citing *Taian Food Co. v. United States*, 783 F. Supp. 2d, 1292, 1330 (CIT 2011); *Qingdao Sea-Line*, 766 F. 3d at 1386 (Fed. Cir. 2014); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F. 3d 1316, 1320 (Fed. Cir. 2010); and *Certain Steel Threaded Rod; Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 83800 (November 22, 2016), and accompanying IDM at 8.

[133] *See* Foremost's General Case Brief, "Foremost's General Issues Brief," dated December 17, 2019, at 1.

27

- The Malaysian financial statements are usable.  The petitioner acknowledges that the record contains financial statements from one Malaysian producer of identical merchandise (*i.e.*, Sin Heng Furniture Industries Sdn. Bhd. (Sin Heng)), and the fact that these financial statements are slightly outside the POI does not render them obsolete.[134]
- Commerce's practice is to consider the physical characteristics, end uses, and production processes of the various products when making a comparability determination.  Because assembly is required, the respondents' production process for subject merchandise is more similar to that of furniture than it is to the production process for plywood.
- The level of vertical integration and whether the financial statements allow Commerce to segregate indirect production expenses and the "production experience" are not material to Commerce's analysis, given that Commerce is not required to duplicate the exact production experience of the respondent or undertake an "item-by-item" analysis when computing factory overhead.[135]

*Petitioner Rebuttal Brief*[136]
- Commerce properly chose Romania as the primary surrogate country because it offered the best financial statements for calculating financial ratios. The Malaysian financial statements have serious flaws which render them unusable.
- Importantly, the Malaysian financial statements do not permit Commerce to calculate an accurate factory overhead ratio because they provide no breakout for any overhead expenses except depreciation.  Similarly, the Malaysian financial statements also do not separately identify energy costs, so Commerce would also have to disregard the respondents' energy FOPs.  This latter point alone renders the Malaysian financial statements inferior to Sigstrat's.
- Commerce correctly disregarded certain non-contemporaneous Malaysian financial statements because the record contained contemporaneous financial statements.  *Fish Fillets* is not on point, given that Commerce rejected non-contemporaneous financial statements, in preference for contemporaneous ones, in that case.
- Commerce correctly disregarded the Malaysian financial statements from large holding/investment companies.  *2014–2015 Chlorinated Isos* and *2016–2017 Chlorinated Isos* are also not on point, because Commerce did not consider the producers' level of integration in those cases but instead looked to whether the financial statements were the best available information overall.  Further, Commerce has a strong preference not to use financial statements from consolidated companies which reflect production of numerous non-comparable products.[137]
- There is no evidence indicating that any of the other Malaysian financial statements are for producers of identical merchandise, despite the respondents' claims to the contrary.  Rather, the Malaysian producers make only comparable merchandise, which Commerce

---

[134] *Id*. at 4 (citing *Certain Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper Reviews; 2010-2011*, 78 FR 38002 (March 21, 2013) (*Fish Fillets*), and accompanying IDM at Comment 2).
[135] *Id*. at 5 (citing *Fish Fillets* IDM at Comment II).
[136] *See* Petitioner December 26 Rebuttal Brief at 4.
[137] *Id*. at 10-12 (citing *Pure Magnesium from the People's Republic of China:  Final Results of Antidumping Duty Review*, 73 FR 76336 (December 16, 2008) (*Pure Magnesium*), and accompanying IDM at Comment 6).

28

defined in the *Preliminary Determination* as "wooden furniture and wood products" as well as plywood and veneers.

- The record also shows that Sigstrat produces a large volume of wooden furniture, and not just plywood.  Therefore, even under the respondents' definition, Sigstrat also produces comparable merchandise.

- Commerce's determination that plywood and veneers are comparable merchandise is supported by Foremost's own production, because Foremost reported that it performs its own veneering.  Sigstrat's and Foremost's production processes are remarkably similar.

- There is no basis to conclude that furniture is more comparable to wooden cabinets than is plywood.  Wooden furniture covers a wide range of products, a large number of which (unlike cabinets) are complex and require special tooling to produce.  Further, many cabinets producers (including Foremost) also produce plywood.  It is immaterial that Foremost consumes the plywood as an input instead of selling it.[138]

- The Malaysian financial statements appear to cover a wide range of business operations, including all types of wooden furniture, such that there would be little correlation between the profit experience of the respondents and the Malaysian producers.  Further, Ancientree and Foremost have different levels of integration, which makes integration level a less important factor to consider; that said, Foremost's level of integration appears to be similar to Sigstrat's.[139]

- With respect to raw materials, Malaysia is incapable of producing almost all of the wood inputs used by respondents to make subject merchandise because these wood species cannot grow in the tropics (as they can in Romania).  This renders Romania's SVs for wood more of a broad-market average because Romania's imports compete with domestic production (whereas Malaysia's imports cannot).  The lack of domestic competition in Malaysia undoubtedly affects the pricing and availability of the inputs.

- Finally, the Romanian import values for birch and poplar sawn wood are comparable to the values into Malaysia, and Commerce correctly found in its *Preliminary Determination* that their import quantities were commercial.  Because Ancientree has offered no new facts, Commerce should continue to disregard this argument.[140]

**Commerce's Position:**  In the *Preliminary Determination*, we selected Romania as the primary surrogate country.  As detailed below, we continue to find that Romania is the appropriate surrogate country by which to value the respondents' FOPs in this investigation.

As explained in the *Preliminary Determination*,[141] when Commerce is investigating imports from an NME country, section 773(c)(1) of the Act directs it to base NV, in most circumstances, on the NME producer's FOPs, valued in a surrogate market economy (ME) country or countries considered to be appropriate by Commerce.  Specifically, in accordance with section 773(c)(4) of the Act, in valuing the FOPs, Commerce shall utilize, "to the extent possible, the prices or costs of FOPs in one or more {ME} countries that are:  (A) at level of economic development comparable to that of the {NME} country; and (B) significant producers of comparable

---

[138] *Id*. at 14.
[139] *Id*. at 14-15.
[140] *Id*. at 8.
[141] *See Preliminary Determination* PDM at 9.

29

merchandise."[142]   As a general rule, Commerce selects a surrogate country that is at the same level of economic development as the NME unless it is determined that none of the countries are viable options because:  (a) they either are not significant producers of comparable merchandise; (b) do not provide sufficiently reliable sources of publicly available SV data; or (c) are not suitable for use based on other reasons.[143]   Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.  To determine which countries are at a similar level of economic development, Commerce generally relies solely on per capita Gross National Income (GNI) from the World Bank's World Development Report.[144]   In addition, if more than one country satisfies the two criteria noted above, Commerce narrows the field of potential surrogate countries to a single country (pursuant to 19 CFR 351.408(c)(2), Commerce "normally will value all factors in a single surrogate country") based on data availability and quality.

Consistent with our practice, and section 773(c)(4)(A) of the Act, we determined that Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia were countries at the same level of economic development as China, based on the most current annual issue of World Development Report.[145]   No party asserts that we should use a country not on this list.

Section 773(c)(4)(B) of the Act requires Commerce, to the extent possible, to value FOPs in a surrogate country that is a significant producer of comparable merchandise.  Neither the Act nor Commerce's regulations provide further guidance on what may be considered comparable merchandise.  Among the factors we consider in determining whether a country is a significant producer of comparable merchandise is whether the country is an exporter of comparable merchandise.[146]   In order to determine whether the above-referenced countries are significant producers of comparable merchandise, we examined which countries on the surrogate country list exported merchandise comparable to the subject merchandise.[147]   Consistent with our *Preliminary Determination*, we continue to find that information on the record indicates that all of the six countries listed above are significant exporters of merchandise covered by the HTSUS categories identified in the scope of this investigation, and are, thus, significant exporters of

---

[142] *See* Policy Bulletin 04.1:  Non-Market Economy Surrogate Country Selection Process (March 1, 2004) (Policy Bulletin 04.1) available on Commerce's website at *http://enforcement.trade.gov/policy/bull04-1.html*.

[143] *See, e.g.*, *Certain Quartz Surface Products from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 FR 23767 (May 23, 2019), and accompanying IDM at Comment 8.

[144] *See* Policy Bulletin 04.1.

[145] *See Preliminary Determination* PDM at 9; *see also* Commerce's Letter to All Interested Parties, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated June 17, 2019, which contains the Memorandum, "List of Surrogate Countries for Antidumping Investigations and Reviews from the People's Republic of China ('China')," dated August 2, 2018 (*i.e.*, the surrogate country list).

[146] *See, e.g.*, *Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 5376 (January 30, 2020), and accompanying IDM at Comment 2.

[147] *See Preliminary Determination* PDM at 11.

comparable merchandise.[148]  Accordingly, consistent with our *Preliminary Determination*, we find that Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia meet the significant producer of comparable merchandise prong of the surrogate country selection criteria, as provided in section 773(c)(4)(B) of the Act.[149]

If more than one potential surrogate country satisfy the statutory requirements for selection as a surrogate country, Commerce selects the primary surrogate country based on data availability and reliability.[150]  When evaluating SV data, Commerce considers several factors, including whether the SVs are publicly available, contemporaneous with the POI, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs being valued.[151]  There is no hierarchy among these criteria.[152]  It is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis.[153]

In the *Preliminary Determination*, we found that parties placed complete data for Malaysia and Romania on the record;[154] and that no party provided complete SV information for the other

---

[148] *Id*.; *see also* Memorandum, "Surrogate Value Memorandum for the Preliminary Determination," dated October 2, 2019 (Preliminary SV Memorandum) at Attachment 4.

[149] *See Preliminary Determination* PDM at 11.

[150] *See* Policy Bulletin 04.1; *see also*, *e.g.*, *Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 77323 (December 14, 2015).

[151] *See* Policy Bulletin 04.1; *see also SolarWorld Americas, Inc. v. United States*, 910 F. 3d 1216, 1222 (Fed. Cir. 2018) *citing Qingdao Sea-Line Trading Co. v. United States*, 766 F. 3d 1378, 1386 (Fed. Cir. 2014) (*Qingdao Sea-Line*).

[152] *See, e.g.*, *Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1.

[153] *See* Policy Bulletin 04.1.

[154] *See Preliminary Determination* PDM at 12; *see also* Petitioner's Letter, "Wooden Cabinets and Vanities and Components, Thereof from the People's Republic of China:  Petitioner's Initial Surrogate Value Comments," dated August 7, 2019 (Petitioner SV Comments); Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Initial Rebuttal Surrogate Value Comments," dated August 19, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Final Surrogate Value Comments," dated September 3, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Comments on Respondents' Final Surrogate Value Comments," dated September 13, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Preliminary Surrogate Value Submission," dated August 7, 2019 (Ancientree SV Comments); Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Rebuttal Preliminary Surrogate Value Submission," dated August 19, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Final Surrogate Value Submission," September 3, 2019 (Ancientree Pre-prelim SV Comments); Meisen's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Surrogate Value Comments," dated August 7, 2019; Meisen's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Rebuttal Surrogate Value Comments," dated August 19, 2019; Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Affirmative Surrogate Value Submission," dated August 7, 2019; Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Rebuttal Surrogate Value Submission," dated August 19, 2019 (Foremost Rebuttal SV Comments); Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Final Surrogate Value Submission," dated September 3, 2019 (Foremost Pre-prelim SV Comments); Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Surrogate Value Selection Comments," dated August 7, 2019; Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Surrogate Value Selection Rebuttal

31

countries on the list (*i.e.*, for Brazil, Kazakhstan, or Russia), or argued in favor of using SV information for any of the other countries.

In the *Preliminary Determination*, we found that the Romanian data constitutes the best available data for valuing respondents' FOPs because:  (1) we have complete, contemporaneous Romanian Global Trade Atlas (GTA) data for each input used by the respondents; and (2) the Romanian surrogate financial statements on the record are preferable to the Malaysian financial statements because these statements specifically break out energy costs from other manufacturing costs. Further, these statements are from a producer of wooden furniture (*i.e.*, chairs and tables), which is merchandise comparable to the merchandise under consideration in this investigation, and other wooden products (*i.e.*, plywood).[155]  Therefore, because complete SV information is available from Romania and the financial statements from Romania are reliable and more detailed than the Malaysian statements, we determined that the Romanian data are the best available source of SV data.[156]  The factual record in this case has not changed.  Nor have parties pointed to record evidence which is contrary to our findings for the *Preliminary Determination*. Therefore, we continue to find that Romania meets the criteria in section 773(c)(4) of the Act as being:  (1) at a similar level of economic development to China; and (2) a significant producer of comparable merchandise.  Furthermore, we find that Romania has the best data availability. Thus, we continue to find that Romania is the best choice for the surrogate country in this investigation.

We disagree with Ancientree and Foremost that Malaysia is a more suitable surrogate country because record evidence shows that it is a producer of identical merchandise.  Issues of contemporaneity and diversity of activities aside, while certain Malaysian financial statements cover the production and sale of wooden furniture (which is comparable to wooden cabinets and vanities), none of these financial statements, or any other record information, explicitly identify financial data for production or sales of in-scope wooden cabinets or vanities (the identical product).  For example, the website of Lii Hen Industries Bhd. (Lii Hen) contains images of items such as bed frames, nightstands, and dressers (items that appear to meet the description of the scope of the wooden bedroom furniture order instead),[157] and television stands.[158]  Similarly, the website of Poh Huat Resources Holdings Berhad (Poh Huat Resources) also contains images of wooden bedroom furniture and standalone tables and television stands that appear to contain as much metal as they do wood components.[159]  The website of Sin Heng clearly states that it specializes in "flat packed furniture such as Wardrobe, bedroom set, computer table, bookcase, office table, shoes rack and *etc.*"[160]  The website of CT Heng Furniture Sdn., Bhd. (CT Heng) contains numerous images of the very types of furniture produced by the Romanian company,

---

[155] *See Preliminary Determination* PDM at 14; *see also* Petitioner SV Comments at Exhibit 10B.

[156] *Id*.

[157] *See, e.g.*, *Wooden Bedroom Furniture from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments in Part; 2017*, 84 FR 24749 (May 29, 2019), and accompanying IDM.

[158] *See* Ancientree Pre-prelim SV Comments at Exhibit 3.

[159] *Id.* at Exhibit 4.

[160] *See* Ancientree SV Comments at Exhibit 10.

Comments," dated August 19, 2019; and Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Factual Information to Value Factors of Production," dated September 3, 2019.

32

tables and chairs, in addition to bed frames,[161] as do the websites of Yeo Aik Wood Sdn. Bhd. (Yeo Aik) and Latitude Tree Furniture Sdn. Bhd (Latitude).[162]  For these latter three companies, in addition to the absence of any record evidence that they produce identical merchandise, the lack of contemporaneity further detracts from their suitability as potential sources of surrogate financial ratios.  Indeed, the only information provided by Ancientree for companies that could potentially represent Malaysian producers of kitchen cabinets is limited to website information for those companies, rather than their financial statements.[163]  Thus, contrary to Ancientree's claims that the financial statements from Malaysia demonstrate that Malaysia is a significant producer of identical merchandise, none of the financial statements submitted by Ancientree appear to support its claim.  To the contrary, the Malaysian financial statements merely demonstrate that the Malaysian producers in question make wooden furniture such as tables and chairs, the very products produced by Sigstrat, and those products are comparable merchandise. As a consequence, we find that none of the financial statements on the record are from producers of identical merchandise and all of these financial statements are, therefore, of equal suitability in terms of comparability of products produced.

Given that the record does not support the claim that the Malaysian financial statements are from producers of identical merchandise, and notwithstanding Ancientree's apparent concession that wooden tables and chairs represent comparable merchandise,[164] we look to the record information regarding Sigstrat to determine whether its statements continue to be a suitable source for valuation of the financial ratios in this investigation.  In the *Preliminary Determination*, Commerce stated that Sigstrat's financial statements represent the financial position of a profitable Romanian producer of comparable wooden products (*i.e.*, wooden furniture) that explicitly identify energy costs, are contemporaneous and cover the entire POI, and contain no evidence of countervailable subsidies.[165]

While the record does contain three contemporaneous financial statements from Malaysian producers of comparable merchandise, we find that Sigstrat's financial statements offer a higher level of data quality than do the Malaysian statements.  Significantly, Sigstrat's financial statements completely segregate two costs important to Commerce's analysis – energy and manufacturing overhead – whereas the Malaysian financial statements do not.

Although we agree with Ancientree that we have relied on financial statements that do not separately break out energy,[166] in instances where the record contains a usable set of SVs from one country, including financial statements that break out energy FOPs, and a comparably useable set of SVs from another country, but with financial statements that do not break out

---

[161] *Id.* at Exhibit 6.
[162] *Id.* at Exhibits 7 and 8.
[163] *Id.* at Exhibit 9.
[164] *See, e.g.*, Ancientree Case Brief at 4 (arguing the "much higher comparability of the Malaysian producers and noting the fact that "Yeo Aik Wood lists its principal activities as manufacturing and selling of furniture, in particularly (*sic*) wooden table sets and beds."); *see also* Ancientree Pre-prelim SV Comments at 1 ("Exhibits SV2-3 through SV2-8 contains financial statements from six Malaysian producers of comparable or identical merchandise." Product information for four of the six companies indicate production/sale of tables and chairs).
[165] *See Preliminary Determination* PDM at 14.
[166] *See* Ancientree Case Brief at 1-2.

energy costs, Commerce prefers to select the surrogate country that contains financial statements that break out energy.[167]  When Commerce is unable to segregate and, therefore, exclude energy costs from the calculation of the surrogate financial ratios, as is the case with the Malaysian financial statements on this record, it is Commerce's practice to disregard the respondents' energy inputs in the calculation of NV in order to avoid double counting energy costs which have necessarily been captured in the surrogate financial ratios.[168]  Disregarding the Romanian set of SVs and financial statements that break out energy would require that we sacrifice the accuracy of our calculations by not separately valuing multiple energy FOPs reported by respondents, and that were verified by Commerce, simply because we cannot determine where those energy FOPs are accounted for in the financial statements.  Thus, disregarding the respondents' actual energy FOPs would introduce uncertainty into our calculations.

With respect to manufacturing overhead, as noted by the petitioner, the Malaysian financial statements contain a level of detail that severely limits our ability to confidently calculate accurate financial ratios.[169]  As explained below in Comment 8, the Romanian financial statements contain a single item for production overhead, which represents all manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operations of the company.  Because those statements also contain an itemized expense for energy costs, we are able to reduce the total amount of production overhead expenses by the value of Sigstrat's energy costs,[170] a calculation we cannot make using the Malaysian financial statements.  By contrast, not only do the Malaysian financial statements lack a detailed breakout of energy, but the manufacturing overhead they do identify is extremely limited, which raises the question of where energy and other indirect expenses are accounted for at all.  For example, the financial statements of Lii Hen only account for "Land and Buildings" and "Plant, machinery and equipment," and none of the other itemized expenses could conceivably include the cost of energy and other manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operation of the company.[171]  Similarly, the financial statements of Yeo Aik only identify depreciation and rental expenses as overhead items and none of the other line-items appear to be related to indirect production expenses.[172]  The financial statements of Poh Huat

---

[167] *See, e.g.*, *Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part*, 80 FR 34893 (June 18, 2015), and accompanying IDM at Comment 9 ("The Department's practice is to reject those financial statements that are not sufficiently detailed, and specifically, that do not contain a breakout for energy costs, when there are alternative financial statements on the record that contain a line item for energy costs.").

[168] *See, e.g.*, *Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 74 FR 16838, 16839 (April 13, 2009), and accompanying IDM at Comment 2; *see also Certain Frozen Warmwater Shrimp from the People's Republic of China:  Preliminary Results, Partial Rescission, Extension of Time Limits for the Final Results, and Intent to Revoke, in Part, of the Sixth Antidumping Duty Administrative Review*, 77 FR 12801, 12809 (March 2, 2012), unchanged in *Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China:  Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 77 FR 53856 (September 4, 2012).

[169] *See, e.g.*, Ancientree Pre-prelim SV Comments at Exhibits 3-8; Foremost Pre-prelim SV Comments at Exhibits 1-5.

[170] *See* Preliminary SV Memorandum.

[171] *See* Foremost Pre-prelim SV Comments at Exhibit 1.

[172] *See* Ancientree Pre-prelim SV Comments at Exhibit 7.

Furniture Industries Sdn Bhd (Poh Huat Furniture) only contain overhead items identified as "depreciation of property, plant and equipment," "direct operating expenses on investment properties," and "loss on disposal of property, plant, and equipment."[173]  Accordingly, we cannot determine whether all of the manufacturing overhead expenses are accounted for in these financial statements, or where those expenses are reflected in the financial ratios calculated by interested parties.  Thus, we find that reliance on the Malaysian financial statements to value manufacturing overhead would result in the undercounting of these costs.

We disagree with Ancientree that Commerce should disregard Sigstrat's financial statements because Sigstrat's primary activity may be the manufacturing of plywood and veneer.  Sigstrat's financial statements indicate that the company produces wood plywood, veneering, seats and backrests, chairs, tables, and other wooden products.[174]  As explained below, it is unclear whether Sigstrat's production is primarily wooden furniture or plywood, but the record indicates that wooden furniture has been the increasing focus of the company.  In addition, Foremost's production process includes elements that are very similar to Sigstrat's plywood, veneering, and wooden furniture processes.[175]

Accordingly, Sigstat's financial statements are at least an equally valid source of SV information as the Malaysian statements.  First, all parties recognize that Sigstrat is a significant producer of wooden furniture, making its financial statements a legitimate source of financial ratios on this point alone.  Second, while it is true that 50 percent of Sigstrat's sales in 2018 were of plywood and 47.3 percent of its sales were of molded products (*i.e.*, chairs, tables, *etc.*),[176] those figures represent a proportion of sales rather than costs.  Accordingly, we cannot determine whether a majority of Sigstrat's production was of plywood products or wooden furniture.  However, Sigstrat's financial statements also state that the "objectives of the company continue to focus on the (*sic*) increasing the share of the production of molded elements in the total production."[177]  Indeed, the statements indicate that the relative share of furniture products has increased year over year since 2016 and that Sigstrat's development strategy is mainly based on increasing the production capacity and expanding production of wooden furniture.[178]  By contrast, of the Malaysian financial statements that are contemporaneous and are not from large conglomerates with diversified operations (*i.e.*, for Lii Hen, Poh Huat Resources, and Yeo Aik), the record contains no information regarding the relative production amounts by product for either Yeo Aik or Poh Huat Furniture.  In fact, the financial statements of Poh Huat Furniture state that it is "principally engaged in the businesses of manufacturing and sale of furniture and investment holding,"[179] but there is no breakdown in the statements regarding the costs and revenues of these different business units.  Similarly, the financial statements of Lii Hen state that "{t}here are six major subsidiary companies that are involved in the manufacture of a vast range of wood

---

[173] *Id.* at Exhibit 5.
[174] *See* Petitioner SV Comments at Exhibit 10B (Sigstrat Statements) at 1.1.a and 1.1.2.
[175] *See, e.g.*, Foremost's September 23, 2019 Supplemental Section D Questionnaire Response (Foremost September 23, 2019 SDQR) at 20 (noting labor hours for veneering related to "pasting veneers onto wooden board and semi-finished parts").
[176] *Id.* at 1.1.4. and Note 10.
[177] *Id.* at 1.1.2.a.
[178] *Id.* at 1.1.2.b.
[179] *See* Ancientree Pre-prelim SV Comments at Exhibit 5, page 1.

based products, namely bedroom sets, solid dinettes, office furniture, upholstery sofa set, utilities shelves, occasional items and kiln drying timber processing,"[180] but the statements do not indicate what proportion of production or sales is related to upholstered furniture, utility shelves, and office furniture, products that may or may not be considered comparable.  The statements also indicate that Lii Hen, in addition to furniture manufacturing, is also engaged in cultivation of rubber trees and investments, which could have further effects on the cost structure of the company that would adversely affect their suitability for calculating financial ratios in this investigation.[181]  Accordingly, although the Sigstrat statements identify the relative proportion of revenue earned in 2018 by product type, we do not find that those proportions necessarily render the statements any less appropriate for valuing surrogate financial ratios than the Malaysian statements, given that:  (1) we cannot determine based on the record whether Sigstrat primarily produced furniture or plywood; and (2) none of the Malaysian statements offer a superior level of detail.

We also disagree with Foremost that Sigstrat's financial statements are unsuitable because the respondents' production process for subject merchandise is more similar to that of furniture than to the production process for plywood.  As noted by the petitioner, Foremost's production process includes stages that are comparable to plywood production, indicating that the mix of products manufactured by Sigstrat involves a reasonably-comparable production process to the mandatory respondents.

Further, we disagree that we improperly disregarded each of the financial statements of the Malaysian producers, in preference to those of Sigstrat, a profitable Romanian producer of comparable wooden products (*i.e.*, chairs and tables).  As stated in the *Preliminary Determination*, four of these financial statements (*i.e.*, for Jay Corp Berhad, Latitude, Poh Huat Resources, and Sern Kou Resources Berhad) were from large holding/investment companies with numerous subsidiaries engaged in various activities that would not necessarily reflect the cost structure of a manufacturer of wood products.[182]  Further, an additional three financial statements (*i.e.*, for CT Heng, Latitude, and Sin Heng) are for periods prior to the POI.[183]  It is Commerce's practice to reject such financial statements, where other, more preferable, contemporaneous financial statements are on the record.[184]  Ancientree argues that Sin Heng is a producer of identical merchandise, and Commerce should accord this fact more weight than whether its financial statements cover the POI.  However, as explained above, there is nothing on the record to support the claim that any of the Malaysian financial statements are for companies that produce identical merchandise.

---

[180] *See* Ancientree Pre-prelim SV Comments at Exhibit 3, p 2.

[181] *Id.* at note 37.

[182] *See Preliminary Determination* PDM at 13; *see also Pure Magnesium* IDM at Comment 6 ('We agree with Petitioner and Datuhe that it is inappropriate to use Sterlite's audited financial statements to determine the surrogate financial ratios in this review.  Sterlite is a multinational corporation with operations in a number of countries.  It is the Department's practice to reject such financial statements, where other viable financial statements are on the record").

[183] *See Preliminary Determination* PDM at 13.

[184] *See, e.g.*, *Pure Magnesium* IDM at Comment 6 ("The Department also selects surrogate financial statements that are publicly available, comparable to the respondent's experience, and contemporaneous with the review period or period of investigation"); *see also* Policy Bulletin 04.1 ("In assessing data and data sources, it is the Department's stated practice to use,,, prices that are contemporaneous with the period of investigation or review").

36

Barcode:3946193-01 A-570-106 INV - Investigation   -

With respect to the remaining three Malaysian financial statements on the record (*i.e.*, for Lii Hen, Poh Huat Furniture, and Yeo Aik),[185] while these financial statements could be potentially valid sources of information for surrogate financial ratios absent any other more preferable statements on the record, as noted above, we continue to have concerns regarding the manufacturing overhead expenses reported in these statements. Although we agree in principle that it is our preference to rely on multiple financial statements to determine the surrogate financial ratios in NME cases,[186] section 773(c)(1)(B) of the Act requires Commerce to value FOPs based "on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." Because the record contains a set of financial statements that are contemporaneous, profitable, from a producer of comparable merchandise that identify the relative sales by product, and that do not suffer the same deficiencies regarding manufacturing overhead, and also break out energy, we do not find it preferable to resort to the Malaysian statements merely because there are more statements from Malaysian companies than there are from Romanian ones. Instead, based on the foregoing, we find that Sigstrat's financial statements represent the best available information by which to value financial ratios in this investigation, in accordance with section 773(c)(1) of the Act.

We also disagree with the respondents that the remaining Malaysian SV data on the record are necessarily better than the Romanian SV data. While Ancientree argues that the Malaysian GTA data for wood is more robust than the Romanian data, this argument hinges on the premise that small quantities are by definition "uncommercial" (and by implication unrepresentative or distortive). However, neither the record in this case, nor Commerce's practice in general, supports this premise. In making its argument, Ancientree fails to connect the <u>quantity</u> of the imports in question to their average unit <u>value</u> (AUV). Absent such a connection, Ancientree's argument is not meaningful. It is of no moment that Ancientree itself purchases wood in greater quantities. In the *Preliminary Determination*, we stated that Ancientree's claim is based solely on a comparison of the Romanian and Malaysian import quantities, an analysis, which alone, we find to be of limited value, and that "information on the import quantities or values for other countries on the surrogate country list would be more probative."[187] We further stated that no parties submitted such data for us to evaluate.[188] In light of the complete lack of evidence in this regard, as also discussed in Comment 7, below, Commerce has no basis to conclude that the AUVs computed using those quantities are unreliable.

---

[185] *See Preliminary Determination* PDM at 13.

[186] *See, e.g.*, *Pure Magnesium* IDM at Comment 6 ("We agree in principal with Petitioner that it is our preference to rely on multiple financial statements to determine the surrogate financial ratios in NME cases. (citation omitted) However, section 773(c)(1)(B) of the Act requires the Department to value FOPs based 'on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.'").

[187] *See Preliminary Determination* PDM at 13.

[188] *Id.*

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Further, Commerce does not use quantity *per se* to determine whether a small import quantity necessarily results in an aberrational import value.[189]  When Commerce undertakes an analysis as to whether certain SVs are aberrational or unreliable for purposes of calculating an AD margin, it applies certain criteria in making a decision.  First, Commerce's practice is to compare the SVs in question to the GTA AUVs calculated for the same period using data from the other potential surrogate countries on the surrogate country list, to the extent that such data are available.[190]  Commerce has also examined data from the same HTS subheading for the surrogate country over multiple years to determine if the current data appear aberrational with respect to historical values.[191]  The record of this investigation contains SV data for Malaysia and Romania, but no data for the other countries on the surrogate country list, Brazil, Kazakhstan, Mexico, and Russia.[192]  Nor did interested parties submit any data for any of the potential surrogate countries for any period outside of the POI.  Accordingly, a comparison between two data points, Malaysia and Romania import values, only during the POI, without any historical context, does not allow us to conclude that the import values associated with the import quantities for Romania are aberrational values or otherwise unusable.  In any dataset there will inevitably be a highest and lowest value, but pointing to the lowest value in a dataset alone is insufficient grounds to conclude that the value is somehow distortive or unreasonable.[193]  No parties submitted wood import data for the POI for Brazil, Kazakhstan, Mexico, or Russia, which prevents us from determining whether the Malaysian AUV is within the range of AUVs from those countries or whether it is an outlier relative to those AUVs.  Similarly, absent any historical context for the AUVs from Romania, or any of the other countries on the surrogate country list, we cannot determine whether there was a sharp drop in the Romanian data during the POI that could impugn the reliability of the POI data.  For those same reasons, we cannot draw any conclusions as to the commercial significance of the Romanian import quantities relative to any country other than Malaysia, which, as a single data point, is too limited to permit a meaningful analysis.

Although Ancientree points to *Juancheng Kangtai* for the proposition that Commerce must consider the respondent's actual purchasing and consumption in surrogate country selection,[194] we disagree that the decision in *Juancheng Kangtai* compels a one-dimensional comparison between a respondent's consumption and the import quantities under consideration.  Specifically,

---

[189] *See, e.g.*, *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 485, 59 F. Supp. 2d 1354, 1360 (CIT 1999).

[190] *See, e.g.*, *Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Administrative Review*, 75 FR 36630 (June 28, 2010) (*Carbazole Violet Pigment*), and accompanying IDM at Comment 4, and *Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part:  Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079 (September 8, 2006) (*Lined Paper Products*), and accompanying IDM at Comment 5.

[191] *See, e.g.*, *Lightweight Thermal Paper from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FR 57329 (October 2, 2008) (*Lightweight Thermal Paper*), and accompanying IDM at Comment 10; and *Saccharin from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 71 FR 7515 (February 13, 2006) (*Saccharin*), and accompanying IDM at Comment 5.

[192] *See Preliminary Determination* PDM at 12.

[193] *See Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351, 1356 (CIT 2017) ("First, Farmlady focuses on the data for Indian imports of packaging tape from Nepal, asserting broadly that this data was 'aberrational and low' because it reflects a value that is lower than the average value.  But merely showing that a price is low is not enough").

[194] *See* Ancientree Case Brief at 6-9.

38

the record in *Juancheng Kangtai* included comprehensive data regarding various AUVs for each country on the surrogate country list in the underlying review, which allowed a detailed discussion and analysis of the prices and quantities traded among countries on the surrogate country list.[195]  Importantly, those facts allowed Commerce to analyze whether an allegedly non-commercial quantity was consistent with other import volumes and whether the input in question was often traded in smaller quantities.[196]  On remand, Commerce was able to conclude, based on a detailed analysis of price and quantity, that transactions are made at commercial quantities when they are competitive commercial transactions, either large or small, and that a finding that import volumes are commercial is not exclusively tied to a respondent's consumption levels.[197]  The CIT ultimately sustained Commerce's conclusion in *Juancheng Kangtai II* that an allegedly small quantity was, in fact, a commercial quantity, but Ancientree has failed to provide the requisite data for Commerce to conduct such an analysis.[198]  Accordingly, and as further discussed below at Comment 7, Ancientree's claim that the Romanian import values for birch and poplar are associated with commercially insignificant quantities and somehow not reliable SVs by which to value FOPs in this investigation is not supported by the record and does not persuade us that Romania is a less suitable primary surrogate country than Malaysia.

Ancientree also contends that valuing birch and poplar sawn wood using the Romanian six-digit level HTS subheading sacrifices specificity, which is a crucial factor in our analysis.[199]  As explained below at Comment 7, however, the record does, in fact, support the valuation of birch and poplar using the Romanian six-digit level HTS without sacrificing specificity (*i.e.*, the SV is specific to the input consumed by the respondents, birch and poplar sawn wood).

Finally, with respect to Ancientree's argument that the Malaysian data are superior to that of Romania because the labor rate is for "manufacture of wooden and cane furniture"[200] and because the brokerage and handling SV is more specific, we disagree that the selection of the primary surrogate country in this investigation is most appropriately decided by the suitability of these two factors.  With respect to labor, we note that Ancientree's suggested SV is for "manufacture of wooden and cane furniture," but Ancientree did not provide a definition of "cane furniture" and the source data does not provide any information as to the relative proportion that "cane furniture" comprises of the overall industry.  Thus, it is unclear that this SV

---

[195] *See Juancheng Kangtai*, 2015 CIT LEXIS 94, *66-69 ("Kangtai lists the import data for each country on the OP list (Indonesia, Costa Rica, the Philippines, Colombia, South Africa, and Thailand), the total US$ value and total quantities in kilograms, the AUV, and the percentage out of total kilograms for all listed country's import data. Of those, the Philippines' AUV is the lowest at US$0.21/kg (or US$210 per metric ton), while Indonesia and Costa Rica, with total imports in metric tons of 2,305.6 and 1,887.2, respectively, both show AUVs of US$0.54/kg (US$ 540 per metric ton).  Colombia, South Africa, and Thailand, with total imports in metric tons of 84.0 9.7 and 3.0, respectively, display AUVs of US$0.50, US$ 3.54, and US$ 3.40, respectively.").

[196] *See Juancheng Kangtai Chem. Co. v. United States*, 2017 CIT LEXIS 3, *26-31 (CIT 2017) (*Juancheng Kangtai II*) ("Commerce explained that transactions are made at 'commercial quant{ities}' when they 'reflect market values', '*i.e.*, competitive commercial transactions, either large or small.'", ". . . these examples indicated that the chemical was commercially traded in quantities smaller than Kangtai's annual consumption.").

[197] *Id.*

[198] *See, e.g., QVD Food v. United States*, 658 F. 3d 1318, 1324 (Fed. Cir. 2011) (*QVD Food*) ("{T}he burden of creating an adequate record lies with {interested parties} and not with Commerce.").

[199] *See* Ancientree Case Brief at 8-9.

[200] *See* Ancientree Case Brief at 9; *see also* Ancientree SV Comments at Exhibit 4.

is more representative of the respondents' own labor rates than the Romanian SV, based on general manufacturing operations.  (For example, cane furniture may represent a woven product that is manufactured without the various hardware components required to produce the subject merchandise.)  Although it is true that the labor rate used in the *Preliminary Determination* was for manufacturing generally,[201] the record also contains a Romanian labor rate for wages in general.[202]  It is evident that the manufacturing wage rate is lower than the general wage rate and there is no evidence on the record that would suggest a wage rate specific to furniture manufacturing would necessarily be any more precise, or that the Romanian manufacturing wage rate is any less specific to labor associated with merchandise under consideration than a wage rate for "cane furniture."

With regard to the Malaysian SV for brokerage and handling, we agree with Ancientree that the Romanian SV used in the *Preliminary Determination* was not specific to Romania and, therefore, the Malaysian SV is superior to the Romanian SV.  While it is true that we have a regulatory preference for valuing all FOPs in a single surrogate country,[203] the CIT has held that such a preference must still yield to reason and the sourcing of particular SVs from outside the primary surrogate country.[204]  Accordingly, we have used the Malaysian SV for B&H for this final determination.[205]  However, based on the totality of circumstances, and in consideration of the analysis of record information related to financial ratios, birch and poplar wood inputs, and labor, above, we do not find that the superiority of an SV for B&H warrants a departure from our conclusion in the *Preliminary Determination* that Romania is the superior selection as the primary surrogate country for this final determination.

**Comment 7:  SVs for Birch and Poplar**

Prior to the *Preliminary Determination*, Ancientree argued that Romanian imports for birch and poplar sawn wood, its primary inputs, were based on insignificant and uncommercial quantities for purposes of use as surrogate values.[206]  Commerce acknowledged this, and in response, "noted that Ancientree merely asserted the import volume was insignificant and non-commercial rather than identifying a basis of this evaluation."[207]  We then relied on the Romanian GTA data for imports of birch and poplar sawn wood, at the HTS six-digit (for Ancientree) or eight-digit (for Foremost) level, in our margin calculations.

---

[201] *See* Preliminary SV Memorandum.

[202] *See* Petitioner SV Comments at exhibit 5.

[203] *See* 19 CFR 351.408(c)(2).

[204] *See, e.g.*, *Juancheng Kangtai*, 2015 CIT LEXIS 94, *71.

[205] *See* Ancientree SV Comments at Exhibit 7, page 44; *see also* Memorandum, "Surrogate Value Memorandum for the Final Determination," dated February 21, 2020 (Final SV Memorandum).

[206] *See* Ancientree Case Brief at 6 (citing Ancientree's Letter, "Pre-Preliminary Comments," dated September 19, 2019 (Ancientree Pre-Preliminary Comments).

[207] *See* Ancientree Case Brief at 6 (citing *Preliminary Determination* PDM at 12).

*Petitioner Case and Rebuttal Briefs*[208]

- There does not appear to be a reason why Commerce used the six-digit HTS code to value Ancientree's birch and poplar inputs since all other inputs were valued at the HTS eight-digit level.
- Commerce used the eight-digit categories to value birch and poplar reported by Foremost; there is no reason to treat the respondents differently.
- The Malaysian and Romanian import statistics for the wood inputs are equivalent, except that the Romanian data represent broad-market averages, whereas the Malaysian data do not. In particular, Malaysia lacks domestic production for the temperate-climate hardwoods consumed by respondents, resulting in import values that do not compete with a domestic industry.[209]
- Even though there are HTS values for these wood inputs from Malaysia, they must be considered inferior in terms of their availability and reliability in comparison with Romania, which has vast forests located in the growing region of these wood species.
- The Romania HTS values are comparable to the Malaysian HTS for birch and poplar and constitute commercial quantities.

*Ancientree Case and Rebuttal Brief*[210]

- Commerce should base the SV for birch and poplar sawn wood on Malaysia GTA data for the final determination. The Romanian values are insignificant and uncommercial when viewed in the context of a common commercial quantity of a container load and Ancientree's own commercial consumption and purchasing.[211]
- Commerce sacrificed specificity in resorting to the six-digit level, as the categories cover "wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed." This is dissimilar to Ancientree's consumed sawn wood. However, the Malaysian HTS numbers at the eight-digit level specifically cover "Other than Planed, sanded or end-jointed: Other than Sawn lengthwise and sliced or peeled" and are more specific to the inputs that Ancientree consumes.[212]
- The quantities for the SVs at the Romanian six-digit level are still too small to be reliable.[213] Ancientree consumed 1,072 percent as much birch sawn wood during the POI than was imported by Romania overall.[214]
- While Ancientree agrees specificity is a critical component in SV selection, Commerce chose not to rely on the Romanian eight-digit HTS category because it considered the import volume too small to be commercial.
- Commerce should not rely upon the eight-digit HTS category suggested by the petitioner as it contains an even a smaller volume than the six-digit category. If Commerce must

---

[208] *See* Petitioner's Case Brief, "Case Brief Regarding General and Ancientree-Specific Issues," dated December 17, 2019 (Petitioner December 17 Case Brief) at 33; *see also* Petitioner's December 26 Rebuttal Brief at 5-8.

[209] *See* Petitioner December 26 Rebuttal Brief at 8.

[210] *See* Ancientree Case Brief at 1-10; and Ancientree's Rebuttal Brief, "Rebuttal Brief," dated December 26, 2019 (Ancientree Rebuttal Brief).

[211] *See* Ancientree Case Brief (citing Ancientree Pre-Preliminary Comments at 5).

[212] *Id.* at 8.

[213] *See* Ancientree Case Brief at 7 (citing Preliminary SV Memorandum at 3e).

[214] *See* Ancientree Case Brief at 7 (citing Ancientree's Letter, "Section C & D Questionnaire Response," dated July 19, 2019 (Ancientree July 19, 2019 DQR) at exhibit D-2.1).

41

Barcode:3946193-01 A-570-106 INV - Investigation  -

rely upon Romanian values, it must proceed with the six-digit HTS level due to the import quantity.

**Commerce's Position**:  We agree with the petitioner that there is no basis for using different SVs for the mandatory respondents in this proceeding to value the same input.  However, we note that we inadvertently valued the birch and poplar inputs for Foremost at the eight-digit level when we stated in the *Preliminary Determination* that we intended to value poplar and birch sawn wood inputs at the six-digit level.[215]  We have corrected this error for the final determination.

As explained above in Comment 6, Commerce applies certain criteria in determining whether certain SVs are aberrational or unreliable for purposes of calculating an AD margin.  Specifically, our practice is to compare the SVs in question to the GTA AUVs calculated for the same period in other potential surrogate countries, to the extent that such data are available, and also to examine data from the same HTS category for the surrogate country over multiple years to assess whether the data are aberrational in a historical context.[216]  No interested party provided such data so that we may undertake an informed and reasonable analysis of the reliability of these particular Romanian SVs.  Furthermore, the CIT has held that, "…when faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information."[217]  Accordingly, we cannot conclude that the Romanian import values are aberrational or otherwise unusable for this final determination.  Consequently, when presented with these two choices (Romania or Malaysia data to value the FOP), we find it appropriate to select the option from our primary surrogate country, which is Romania.

In the *Preliminary Determination*, we stated that "Ancientree merely asserts that the Romanian import values are based on insignificant and non-commercial quantities, but does not identify a basis for evaluating when an import volume becomes an insignificant or no longer commercial quantity."[218]  In its case brief, Ancientree averred that in its pre-preliminary comments it "also explained that the import volume into Romania was non-commercial (1) based on the common commercial quantity of a container load and (2) based on its own commercial consumption and purchasing."[219]  However, Ancientree's pre-preliminary comments were based on the quantities suggested by the petitioner at the eight-digit HTS subheading and not the six-digit level that we used in the *Preliminary Determination*.  Moreover, merely pointing to the relative difference between an import quantity and an interested party's own consumption or the common commercial quantity of a standard container load does not necessarily make a quantity commercially insignificant, nor does it speak to the reliability of such an import value.[220]

---

[215] *See Preliminary Determination* PDM at 13.

[216] *See, e.g.*, *Carbazole Violet Pigment* IDM at Comment 4; *Lined Paper Products* IDM at Comment 5; *Lightweight Thermal Paper* IDM at Comment 10; and *Saccharin* IDM at Comment 5.

[217] *See CS Wind Vietnam Co., Ltd. and CS Wind Corporation v. United States*, Slip Op. 14-33 at 26 (CIT 2014) (citing *Dorbest Ltd. v. United States*, 30 CIT 1671, 1687, 462 F. Supp. 2d 1262, 1277 (CIT 2006)).

[218] *See Preliminary Determination* PDM at 12.

[219] *See* Ancientree Case Brief at 6 (citing Ancientree Pre-Preliminary Comments at 5).

[220] *See, e.g.*, *Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Results of Administrative Review; 2011-2012*, 78 FR 56209 (September 12, 2013), and accompanying IDM at Comment 4; and

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Although Ancientree points to *Juancheng Kangtai* for the proposition that Commerce must consider the respondent's actual purchasing and consumption in surrogate country selection,[221] as explained above in Comment 6, we disagree that the decision in *Juancheng Kangtai* compels a one-dimensional comparison between a respondent's consumption and the import quantities under consideration.  Rather, the record in *Juancheng Kangtai* allowed Commerce to conduct a detailed analysis of the quantities, and AUVs, in other countries on the surrogate country list,[222] and the CIT ultimately sustained Commerce's conclusion in *Juancheng Kangtai II* that an allegedly small quantity was, in fact, a commercial quantity.[223]

We acknowledge Ancientree's argument that valuing birch and poplar at the Romanian HTS six-digit level does not cure the perceived problem because the import quantities at that level remain small.[224]  However, using the average wood densities of birch and poplar reported by Ancientree,[225] the Romanian quantities at the six-digit level for birch and poplar were equal to 173,530 kg and 137,700 kg, respectively, which do not appear to be immaterial, nor has Ancientree explained by what metric, other than relative to its own consumption, such volumes would be considered insignificant.  In the *Preliminary Determination*, we stated that Ancientree's claim is based solely on a comparison of the Romanian and Malaysian import quantities, an analysis, which alone, we find to be of limited value, and that "information on the import quantities or values for other countries on the surrogate country list would be more probative."[226]  We further stated that no parties submitted such data for us to evaluate.[227]  In light of the complete lack of evidence in this regard, Commerce has no basis to conclude that the AUVs computed using those quantities are unreliable.  That said, it is important to recognize that Commerce does not directly use the import quantities at issue in its SV calculations, other than as the denominators when computing per-unit values.  As noted above, Ancientree has not argued, nor has it provided any reason for Commerce to believe, that the values associated with those quantities are in any way unrepresentative of the prices that Ancientree itself would pay, were it located in an ME country at a comparable level of economic development to China.

Finally, Ancientree argues that Commerce sacrificed specificity in resorting to the six-digit level HTS subheading because such subheadings include wood that is "sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed of a thickness exceeding 6 mm."[228]  However, after examining the data on the record, we disagree.  Although Ancientree asserts that its "wood inputs are not planed or end-jointed" (and, therefore, reliance on such HTS subheadings includes dissimilar wood products)[229] Ancientree cites to no record evidence to support this claim, nor does the record appear to describe Ancientree's wood inputs in any detail

---

*Certain Preserved Mushrooms from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 55808 (September 11, 2012), and accompanying IDM at Comment 3.
[221] *See* Ancientree Case Brief at 6-9.
[222] *See Juancheng Kangtai*, 2015 CIT LEXIS 94, *66-69.
[223] *See Juancheng Kangtai II*, 2017 CIT LEXIS 3, *26-31.
[224] *See* Ancientree Case Brief at 6-7.
[225] *See* Ancientree's September 6, 2019 Supplemental Questionnaire Response (Ancientree's September 6, 2019 SQR) at Exhibit 15.
[226] *See Preliminary Determination* PDM at 13.
[227] *Id.*
[228] *See* Ancientree Case Brief at 8.
[229] *Id.*

greater than "birch sawnwood" or "poplar sawnwood."[230]  In any event, there is no requirement that Commerce needs to perfectly replicate a NME respondent's production experience.[231]  Given the lack of detail provided by Ancientree in its questionnaire responses regarding the physical characteristics of its wood inputs, the record lacks support for Ancientree's assertions and there is no basis for Commerce to rely on them here.  The burden to develop the record lies with the respondent,[232] and to accept Ancientree's claim as to the description of its wood input at face value without any support at this late stage would be inappropriate.  On the other hand, Foremost reported that it purchased both poplar sawnwood and semi-finished wood components (*e.g.*, cut-to-length poplar),[233] and it provided no additional detail regarding its birch sawnwood input.  Therefore, we find that the six-digit level poplar HTS subheading is, in fact, the most appropriate subheading by which to value Foremost's poplar input and, absent any additional detail, we cannot conclude that an eight-digit level HTS subheading would be any more specific or appropriate than the six-digit HTS subheading level for Foremost.

Accordingly, we are making no changes to the valuation of wood inputs at the six-digit level as stated in *Preliminary Determination*.  However, because we inadvertently valued Foremost's birch and poplar inputs using the eight-digit HTS numbers, we are revising the valuation of Foremost's birch and poplar inputs to conform with our decision in the *Preliminary Determination* for this final determination.[234]

## Comment 8:  Calculation of Financial Ratios

In the *Preliminary Determination* we valued the respondents' financial ratios using the audited financial statements of Sigstrat because we found its statements to "represent the financial position of a profitable Romanian producer of comparable wooden products (*i.e.*, plywood, chairs, tables) that explicitly identify energy costs, are contemporaneous and cover the entire POI, and contain no evidence of countervailable subsidies."[235]  In order to segregate energy costs, and thereby ensure that we did not double count when valuing the respondents' energy FOPs, we deducted energy expenses identified in Sigstrat's profit and loss statement from its indirect production expenses identified in Note 7 to the statements.[236]

*Petitioner Case Brief*[237]
- Commerce should not have deducted "Other outside expenses (with energy and water)" of 1,534,472 Romanian lei from the factory overhead category.

---

[230] *See, e.g.*, Ancientree's September 18, 2019 Supplemental Questionnaire Response at Exhibit 12; and Ancientree July 19, 2019 DQR at Exhibits 3 (production flowchart) and 4 (FOP Spreadsheet).
[231] *See Juancheng Kangtai II*, 2017 Ct. Intl. Trade LEXIS 3, at 31 (citing *Nation Ford Chem. v. United States*, 166 F. 3d 1373, 1378 (Fed. Cir. 1999)).
[232] *See, e.g.*, *QVD Food*, 658 F. 3d at 1324 ("{T}he burden of maintaining an adequate record lies with {interested parties} and not with Commerce.").
[233] *See* Foremost July 22, 2019 CDQR, section D, at 14-15.
[234] *See* Final SV Memorandum.
[235] *See Preliminary Determination* PDM at 13-14.
[236] *See* Preliminary SV Memorandum at Attachment 12; *see also* Sigstrat Statements.
[237] *See* Petitioner December 17 Case Brief at 32-33.

44

- There is no reason to assume that energy costs formed part of "Indirect Production Costs" because these two categories of expenses came from different calculations in the statements.
- "Indirect Production Costs" are identified in Note 7, while "Other outside expenses (with energy and water)" are located in the profit and loss statement.
- Based on the category name, "Other outside expenses (with energy and water)" seem to include other costs in addition to energy and water.

No other interested party provided comments on this issue.

**Commerce's Position:** We disagree with the petitioner and continue to find that we calculated the financial ratios used in the *Preliminary Determination* correctly and that we appropriately reduced "Indirect Production Costs" by an amount for energy expenses.[238]

Although the petitioner argues that our adjustment was inappropriate because the energy costs in question did not come from the same schedule in Sigstrat's financial statements as the indirect production expenses (*i.e.*, energy was identified in the profit and loss statement while indirect production expenses were in note 7),[239] our calculations are nearly identical to those proposed by the petitioner but for the deduction of energy costs from indirect production costs.[240]  However, because the petitioner's own calculation utilized data from the profit and loss statement, the balance sheet, and Note 7 of the Sigstrat statements, the fact that we deducted energy expenses identified in the profit and loss statement from indirect production expenses identified in a note to the statements in and of itself does not render the calculation inappropriate.

The petitioner appears to argue against our adjustment simply on the grounds that we deducted one value from the profit and loss statement from a value located in a separate note to the financial statements.  However, the petitioner ignores the fact that its own calculations also incorporated values from various schedules of the statements.  In order to determine how Sigstrat presented these expenses and how they should be treated in our calculation, we examined the statements as a whole, a process also used by the petitioner when it pulled data from various schedules in order to calculate financial ratios.  The only difference between the petitioner's calculation and Commerce's calculation is the treatment of energy expenses.

Specifically, a line item described as "Other outside expenses (with energy and water)" is set forth in Note 7 of the financial statements.  These expenses are also identified in the same amount elsewhere in the statements specifically as "Energy costs."[241]  Accordingly, we disagree with the petitioner that this expense item necessarily includes costs other than energy because the cash flow statement explicitly identifies this item as "Energy costs."  Moreover, the amount identified as "Indirect Production Costs" from which we deducted the energy costs is also identified elsewhere in the statements in the same amount as "Production overheads."[242]  Accordingly, record evidence indicates that we appropriately categorized indirect production

---

[238] *See* Preliminary SV Memorandum.
[239] *See* Sigstrat Statements.
[240] *Id.* at Exhibit 10A; compare to Preliminary SV Memorandum at Attachment 12.
[241] *See* Sigstrat Statements at 12 (Situation of Cash Flows).
[242] *Id.* at Exhibit page 64 (Note 4, Operating Result Analysis).

Barcode:3946193-01 A-570-106 INV - Investigation  -

expenses as manufacturing overhead, which represent all manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operation of the company, and appropriately reduced that amount by Sigstrat's energy costs.  Therefore, we are not making any changes to our calculation of the financial ratios for this final determination.

## Comment 9:  Labor Rate Calculation

In our *Preliminary Determination*, we calculated the hourly labor rate using manufacturing-specific data from Romania.[243]  We relied on manufacturing-specific labor data from the website Trading Economics.  We calculated a manufacturing-specific labor rate of 20.97 Lei per hour.

*Petitioner Case Brief*[244]
- In order to calculate an hourly labor rate in the *Preliminary Determination*, Commerce divided the monthly wages reported for Romania on the website Trading Economics by 24 days and eight hours per day.
- Data submitted from the Organization for Economic Cooperation and Development (OECD) data indicate that the actual number of hours worked in Romania is much less.
- Commerce's calculation overestimates the average number of hours worked per month because it does not account for vacation days, sick days, idle time, or holidays.
- Commerce should revise its labor calculation using the number of hours worked reported by the OECD.

*Anciantree Rebuttal Brief*[245]
- It is not Commerce's practice to use a secondary, unrelated source to determine an hourly conversion.  Commerce should not depart from its established practice of using the typical working hours of 24 days a month and eight hours day.
- The proposed OECD annual labor hours are not specific to Romania; instead, they are from a basket category of OECD countries.
- Relying on the OECD source would be inaccurate and imprecise.

**Commerce's Position:**  Our labor rate calculation was appropriate and in accordance with our normal practice.  In *Labor Methodologies*, Commerce announced a change in our methodology for valuing the cost of labor in NME cases.[246]  Although Commerce stated a preference for data from the International Labor Organization, it did not preclude reliance on data from another source.[247]  Notably, Commerce explained that "{w}here data is not available on a per-hour basis, {Commerce} converts that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month."[248]  Accordingly, in the *Preliminary Determination*, we divided the monthly manufacturing labor rate in Romania by 24

---

[243] *See* Preliminary SV Memorandum at 4.
[244] *See* Petitioner December 17 Case Brief at 30-32.
[245] *See* Anciantree Rebuttal Brief at 14-15.
[246] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor*, 76 FR 36092 (June 21, 2011) (*Labor Methodologies*).
[247] *Id.*
[248] *Id.* at 36094, fn. 11.

Barcode:3946193-01 A-570-106 INV - Investigation  -

days and eight hours per day, in accordance with our practice.[249]  Using the OECD data suggested by the petitioner for "countries not otherwise mentioned" would substitute our methodology for a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor.  In *Labor Methodologies*, Commerce announced a change in our methodology for valuing the cost of labor in NME cases.[250] Although Commerce stated a preference for data from the International Labor Organization, it did not preclude reliance on data from another source.[251]  Notably, Commerce explained that "{w}here data is not available on a per-hour basis, {Commerce} converts that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month."[252]  Accordingly, in the *Preliminary Determination*, we divided the monthly manufacturing labor rate in Romania by 24 days and eight hours per day, in accordance with our practice.[253]  Using the OECD data suggested by the petitioner for "countries not otherwise mentioned"[254] would substitute our methodology for a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor.  Furthermore, the petitioner has not demonstrated that the labor rate reported by Trading Economics does not account for vacation days, sick days, or holidays, or that workers are not paid for such days.

Therefore, we continue to find that our calculation of the hourly labor rate applied in the *Preliminary Determination* using monthly manufacturing labor data published by Trading Economics was the appropriate calculation and in accordance with our normal practice. Accordingly, we are not making any changes to our labor rate calculation for this final determination.

---

[249] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 35616 (July 27, 2018), and accompanying IDM at Comment 11.

[250] *See Labor Methodologies*.

[251] *Id.*

[252] *Id.* at 36094, fn. 11.

[253] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 35616 (July 27, 2018), and accompanying IDM at Comment 11.

[254] Although the petitioner claims that the number of hours worked is on the record of this investigation, it cites to data for "OECD countries not individually mentioned," not to data specific to Romania and no data exist for Romania in the petitioner's cited comments.  *See* Petitioner December 17 Case Brief at 31; *see also* Petitioner SV Comments at Exhibit 5C.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

<u>Company-Specific Comments</u>

*Ancientree*

**Comment 10: Whether to Apply AFA to Ancientree**

**A. Usage Rates**

*Petitioner Case Brief*[255]
- The stark differences between the NVs calculated for Ancientree and Foremost – especially with respect to labor and wood input usage rates – demonstrate that Ancientree failed to provide complete and accurate information.
- It is unclear how Ancientree produces cabinets and vanities using the reported number of labor hours. The marked disparity between Foremost's and Ancientree's reported per-unit labor hours holds consistent at comparable production stages of completeness.
- Similarly, Ancientree's solid wood input usage is strikingly different when compared to Foremost's solid wood input usage at comparable production completeness levels.
- Ancientree's misrepresentation of its production process and material inputs warrants the application of total AFA, consistent with Commerce's established practice.[256]

*Ancientree Rebuttal Brief*[257]
- The petitioner's argument is fundamentally flawed because Ancientree and Foremost reported FOP consumption on a per piece basis. Thus, comparing the products produced by Ancientree and Foremost merely demonstrates the differing input consumption levels for their respectively different products.
- Ancientree primarily produces parts or components or small ready-to-assemble kits instead of fully assembled large cabinets. Foremost primarily produces fully-assembled bathroom vanities, a highly labor-intensive activity. Foremost's vanities are much larger, more decorative, and complicated than Ancientree's. The inclusion of decorative parts adds correspondingly more labor hours.
- Foremost's consumption of veneers required a separate, time-consuming production process. Ancientree purchased veneered plywood so it did not have this step.[258]
- Commerce observed that Ancientree's production process was mostly automatic, with the extensive reliance on production equipment. Laborers primarily direct materials through the machinery rather than manually adding parts or decorative pieces.
- At verification, Commerce found no discrepancies or concerns with Ancientree's labor consumption and Commerce examined all source documentation for direct and indirect labor.

---

[255] *See* Petitioner December 17 Case Brief.
[256] *Id.* at 7 (citing *Certain Kitchen Appliance Shelving and Racks from the People's Republic of China*, 74 FR 36656 (July 24, 2009) (*Kitchen Racks from China*), and accompanying IDM).
[257] *See* Ancientree Rebuttal Brief at 2-5.
[258] *Id.* at 4.

**Commerce's Position**: We disagree with the petitioner. Although the petitioner and Ancientree agree that the record demonstrates marked differences between Ancientree's and Foremost's usage rates and processes,[259] these companies have distinct production processes and end products.[260] As a result, such differences are to be expected. The fundamental question before Commerce is whether Ancientree's FOP reporting understates the consumption of its labor and wood inputs. In this regard, the record does not support the petitioner's claim.

The record shows that Ancientree reported its material input consumption on a net weight basis of finished goods.[261] Ancientree also reported FOPs for a substantial number of ready-to-assemble products, which by definition, do not require full assembly by Ancientree.[262] We conducted a comprehensive on-site facility visit and found that Ancientree had accurately described its factory layout and production stages in its questionnaire responses.[263] Further, Commerce verified Ancientree's allocation of material inputs to subject merchandise,[264] as well as its reported FOPs for plywood and birch sawn wood used to produce various individual products. During this exercise, we found no discrepancies between the source documentation examined at verification and the information Ancientree had reported to Commerce.[265]

We disagree that the facts in *Kitchen Racks from China* are analogous. In that case, Commerce found inconsistencies with the respondent's bills of materials and production note reporting at verification.[266] In this investigation, we found no inconsistencies at verification that lead us to believe the application of AFA is similarly warranted.

As discussed above, it is unsurprising that Ancientree and Foremost reported differences in their material and labor FOPs, given their differing production processes. Because the petitioner provides no record evidence to contradict Ancientree's reported FOP consumption, we find that AFA is not warranted here.

### B. Wood Veneer

*Petitioner Case Brief*[267]
- Ancientree failed to report the usage of wood veneer in its production process and this omission could explain the outlying labor and wood usage rates. Ancientree also failed to report any usage of veneered MDF.
- Commerce verified the delivery state of Ancientree's plywood. This observation contradicts Ancientree's questionnaire responses reporting the use of plywood, not plywood with specific finished face veneers. Sales documentation also supports the non-reporting of veneered inputs.

---

[259] *Id.* at 2-5; *see also* Petitioner December 17 Case Brief at 9-16.
[260] *See* Ancientree Verification Report at 8; *see also* Foremost Woodwork Verification Report at 11 and Exhibit 13.
[261] *See* Ancientree September 6, 2019 SQR at 22.
[262] *See* Ancientree September 6, 2019 SQR at Exhibit SQ3-1.1.
[263] *See* Ancientree Verification Report at 8.
[264] *Id.* at 18.
[265] *Id.* at 15.
[266] *See Kitchen Racks from China* IDM at Comment 16.A.
[267] *See* Petitioner December 17 Case Brief at 17-27.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- The cost for a wood product varies considerably by the species of the wood input.[268] Ancientree's failure to separately report the cost of wood veneers prevents Commerce from accounting for the substantial differences across wood veneer species by selecting an appropriate SV.
- In the event that total AFA is not applied to Ancientree, Commerce should use facts available and adjust the NV calculation to include wood veneer as an input.  This adjustment to Ancientree's SVs will properly account for the used veneered inputs separately from plywood or MDF.

*Ancientree Rebuttal Brief*[269]
- Plywood is defined as a generally flat, multilayered plywood or other veneered panel, consisting of two or more layers or plys of wood veneers and a core, with the face and/or back veneer made of wood.  The veneers, along with the core, may be glued or otherwise bonded together.[270]
- Ancientree purchased plywood (including some veneer plywood and some veneered MDF); it did not purchase plywood and apply veneers to that plywood.  Contrary to the petitioner's argument that Ancientree failed to separately report veneered MDF, Ancientree reported veneered MDF as plywood.
- To argue that Ancientree necessarily consumes wood veneer in order to sell a veneer-finished product is the same as arguing that a company selling galvanized steel products must consume galvanized powder (instead of already galvanized steel).  Similarly, Ancientree purchased and consumed plywood with a face veneer when the merchandise required a veneer finish.[271]
- The petitioner misinterprets the definition of plywood; there is no distinction between plywood and veneered plywood.  Plywood normally contains a face and back veneer, with a core in the middle.
- Heading HTS 4412 includes "plywood, veneered panels and similar laminated wood," and Commerce applied the SV including plywood with an outside veneer of various species of wood including birch, poplar or walnut.
- Contrary to the petitioner's argument that Ancientree failed to separately report veneered MDF, Ancientree reported veneered MDF as plywood.

**Commerce's Position**:  We are not adjusting Ancientree's FOPs to account for veneers separately from plywood or MDF.  The petitioner alleges that Ancientree failed to report that it uses "wood veneer" as an input in its production process.  However, the record contains no evidence that Ancientree purchased veneers separately from its purchases of plywood as alleged

---

[268] *See* Petitioner December 17 Case Brief at 20 (citing Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Pre-Preliminary Comments for Meisen," dated September 26, 2019 (Petitioner Meisen Pre-prelim Comments) at Exhibit 7).
[268] *Id.* (citing Exhibit 7).
[269] *See* Ancientree Rebuttal Brief at 6.
[270] *Id.* (citing *Certain Hardwood Plywood Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in part*, 82 FR 53460 (November 16, 2017) (*Certain Hardwood Plywood Products*), and accompanying IDM at 3).
[271] *Id.*

by the petitioner.  The record also does not support the petitioner's claim that Ancientree's manufacturing process involves a veneering procedure.

In its response, Ancientree indicated it used plywood of a type that could be imported under HTS category 4412.33.[272]  In its initial, and various supplemental, questionnaire responses, Ancientree consistently reported its plywood FOP without separately indicating that it used veneers in its production process.[273]  The SV used to value Ancientree's plywood FOP in the *Preliminary Determination*, taken from HTS category 4412.33.00, was suggested by the petitioner.[274]  The heading for this HTS reads, "Plywood, veneered panels, and similar laminated wood."[275]  Thus, the definition of plywood in the HTS includes veneers as an integral characteristic of plywood.[276] That the petitioner would request Commerce to separately value Ancientree's veneers, which are by definition part of the plywood input it purchases, is not supported by the record or the definition of plywood in the applicable HTS category.

During verification, we carefully reviewed Ancientree's production process; we found no evidence that Ancientree adds veneers separately to its plywood input during the production process of subject merchandise.[277]  Further, during our review of Ancientree's FOP consumption at verification, we reviewed documentation supporting Ancientree's September 2018 plywood purchases, as well as Ancientree's consumption of plywood in August 2018.[278]  We similarly found no evidence that Ancientree separately purchased or consumed veneers during the POI.

The petitioner argues that the species of veneer is an integral part of cost, and Ancientree's failure to separately report wood veneers prevents Commerce from capturing substantial differences across wood veneer species in its analysis.  However, HTS category 4412.33.00, the category suggested by the petitioner to value Ancientree's plywood FOPs, is described as "Other, with at least one outer ply of non-coniferous wood of the species alder (Alnus spp.), ash (Fraxinus spp.), beech (Fiigus spp.), birch (Betula spp.), cherry (Prunus spp.) chestnut (Castintea spp.), elm (Uhnus spp.), eucalyptus (Eucalyptus spp.), hickory (Carya spp.), horse chestnut (Aesculus spp.), lime (Tilia spp.), maple (Acer spp.) oak (Quercus spp.), plane tree (Platitnu,c spp.), poplar and aspen (Populus spp.) robinia (Robinia spp.) tulipwood (Liriodendron spp.) or walnut (Juglans Slip.)."[279]  This HTS subheading matches the description of Ancientree's plywood inputs on its source documentation; this documentation provides the wood species of the veneer used on the plywood.[280]  Therefore, contrary to the petitioner's arguments, the wood

---

[272] *See* Ancientree September 18, 2019 SDQR at Exhibit SQ 4-12.

[273] *Id.* at SQ4-10 and Exhibit SQ4-12; *see also* Ancientree Rebuttal Brief at 5-10.

[274] *See* Petitioner SV Comments at exhibit 1.

[275] *See* Petitioner SV Comments at exhibit 3.

[276] This definition is also consistent with the definition adopted by Commerce in *Certain Hardwood Plywood Products*.  *See Certain Hardwood Plywood Products* IDM at 6-7, which states that "the face veneer of hardwood plywood may be sanded; smoothed, or given a "distressed" appearance through such methods as hand-scraping or wire brushing."  *See also Certain Hardwood Plywood Products*, 82 FR at 53470.

[277] *See* Ancientree Verification Report at 8.

[278] *Id.* at 15 and 18.

[279] *See* Petitioner SV Comments at exhibit 3.

[280] *See* Ancientree September 6, 2019 SQR at exhibit SQ3-1.1.

51

species of the veneered plywood is taken into account by Commerce's reliance on this HTS subheading.[281]

For the final determination, we find that the record evidence does not support that Ancientree omitted consuming wood veneer separately from plywood.  Therefore, we have accepted Ancientree's FOPs for this input as reported.

## Comment 11: Treatment of Jiangsu Hongjia as an Affiliate

*Petitioner Case Brief*[282]
- Commerce found a close relationship between Ancientree and Jiangsu Hongjia, the entity from which Ancientree rents its facility and production equipment and purchases wood materials, and with whom Ancientree shares management.
- Ancientree self-describes its relationship with Jiangsu Hongjia as "closely affiliated companies."  Ancientree filed company certifications on behalf of all of its affiliated companies including Jiangsu Hongjia.
- It appears that Jiangsu Hongjia simply purchases wood materials and hands them over to Ancientree.  This arrangement could exist to hide Ancientree's purchases of inputs from ME countries.
- Commerce erred in preliminarily determining that Ancientree and Jiangsu Hongjia are not affiliated and should reverse its decision, consistent with section 771(33) of the Act.

No other interested party commented on this issue.

**Commerce's Position**:  We have reconsidered the evidence on the record and find that affiliation exists between Ancientree and Jiangsu Hongjia.  Section 771(33) of the Act provides that the following persons shall be considered to be "affiliated" or "affiliated persons":

(A)   Members of a family, including brothers and sisters (whether by the whole or half-blood), spouse, ancestors, and lineal descendants;

(B)   Any officer or director of an organization and such organization;

(C)   Partners;

(D)   Employer and employee;

(E)   Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization;

(F)   Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; or,

(G)   Any person who controls any other person and such other person.

The Act further states that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."[283]

---

[281] *See* Petitioner December 17 Case Brief at 18-20.
[282] *Id.* at 27-30.
[283] *See* section 771(33) of the Act.

52

"Person" is defined to include "any interested party as well as any other individual, enterprise, or entity, as appropriate."[284]

The SAA states the following:

> The traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm 'operationally in a position to exercise restraint or direction' over another in the absence of an equity relationship. A company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchise or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other.[285]

Section 351.102(b)(3) of Commerce's regulations defines affiliated persons and affiliated parties as having the same meaning as in section 771(33) of the Act.  In determining whether control over another person exists, within the meaning of section 771(33) of the Act, Commerce will consider the following factors, among others:  corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships.  Commerce will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.  Commerce will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control.[286]

As an initial matter, we note that we based our *Preliminary Determination* on record evidence at the time.[287]  On October 10, 2019, after the *Preliminary Determination*, we issued a supplemental questionnaire to Anciertree requesting further information regarding the familial relationship between Anciertree and Jiangsu Hongjia.[288]  In its response, Anciertree provided further details on the familial relationship between the owners and managers of Anciertree and Jiangsu Hongjia.[289]  The CIT has upheld Commerce's interpretation of "any person" in section 771(33)(A) of the Act as encompassing "family," and the position that "family" is not limited to the roles enumerated in section 771(33)(A) of the Act, but rather is subject to Commerce's interpretation.[290]  Commerce may interpret the definition of "family" in section 771(33)(A) of

---

[284] *See* 19 CFR 351.102(b)(37).
[285] *See* SAA at 838.
[286] *See* 19 CFR 351.102(b)(3).
[287] *See Preliminary Determination* PDM at 26-27.
[288] *See* Commerce's Letter, "Supplemental Questionnaire," dated October 10, 2019.
[289] *See* Anciertree's October 17, 2019 Fifth Questionnaire Response (Anciertree October 17, 2019 Response) at 1-3. The details of the familial relationship are considered business proprietary in nature.  For further discussion *see* Anciertree Final Analysis Memorandum.
[290] *See Ferro Union Inc. v. United States*, 44 F. Supp. 2d 1310, 1325-1326 (CIT 1999) (*Ferro Union*) ("The intent of {section 771(33) of the Act} was to identify control exercised through 'corporate' or 'family' groupings.  By interpreting 'family' as a control person {Commerce} was giving effect to that intent."); *see also Dongkuk Steel Mill Co., v. United States*, 29 C.I.T. 724, 731 (CIT 2005).

53

the Act in a reasonable manner.[291]  For this final determination, we find that the record of this investigation, developed since the *Preliminary Determination*, shows that due to a close familial relationship, Ancientree and Jiangsu Hongjia are affiliated pursuant to section 771(33)(A) of the Act.[292]

Given that we did not find the companies to be affiliated parties until this final determination, the record does not contain information on Jiangsu Hongjia's purchases of raw materials, including the source of those materials.  However, if an AD order is issued in this proceeding and Ancientree is involved in subsequent reviews of this order, we intend to collect such information and evaluate it within the context of Commerce's NME practice.

## Comment 12:  SV Selections

### A.  Glue

*Ancientree Case Brief*[293]
- In the *Preliminary Determination*, Commerce valued Ancientree's glue input based on Romanian import prices entered under HTS 3506.10.00, a value for glue sold at the retail level, not exceeding a net weight of 1 kg.  Valuing glue used for industrial purposes using an HTS category specific to retail is inherently illogical.  Commerce observed Ancientree's industrial glue consumption during verification and saw that its consumption of glue was over 1 kg.
- Commerce should value its glue input using HTS category 3506.91.90, covering glues not otherwise specified, *i.e.* glue not for retail sale and in quantities larger than 1 kg.
- Commerce used HTS category 3506.91.90 to value Foremost's glue input used in its assembly operations, yet Foremost consumes this glue in the same manner as Ancientree.

No other interested party provided comments on this issue.

**Commerce's Position**:  We have relied on Romanian GTA data under subcategory HTS 3506.91.90 to value Ancientree's glue input because the data in this HTS subcategory represents the best available information on the record.  Specifically, Ancientree's suggested subheading HTS 3506.91 is specific to "adhesives based on polymers of headings 3901 to 3913 or on rubber."[294]  The notes to chapter 39 of the HTS state that:

3. Headings 3901 to 3911 apply only to goods of a kind produced by chemical synthesis, falling in the following categories: a) liquid synthetic polyolefins of which less than 60

---

[291] *See Ferro Union*, 44 F. Supp. 2d 1310,1325 ("The word 'including' in section (A) of 19 U.S.C. § 1677(33) is an indication that Congress did not intend to limit the definition of 'family' to the members listed in this section.  Had Congress intended this list to be definitive, it would have chosen different wording.  The wording it did choose evinces an illustrative intent. Commerce's interpretation of this section is reasonable and therefore not subject to reversal by the court.").

[292] Given that the particular familial relationship constitutes business proprietary information, we discuss this separately in the Ancientree Final Analysis Memorandum.  *See* Ancientree Final Analysis Memorandum.

[293] *See* Ancientree Case Brief at 12-13.

[294] *See* Petitioner SV Comments at Exhibit 3.

% by volume distils at 300 °C, after conversion to 1 013 mbar when a reduced pressure distillation method is used (headings 3901 and 3902); (b) resins, not highly polymerised, of the coumarone-indene type (heading 3911); (c) other synthetic polymers with an average of at least five monomer units; (d) silicones (heading 3910); (e) resols (heading 3909) and other prepolymers.[295]

Therefore, based on the information provided by Ancientree on its glue input, and the SV data on the record, we find that the record supports changing the SV to value Ancientree's glue input using HTS subheading 3506.91.90.

However, we disagree with Ancientree that we should rely on this HTS category simply because we valued Foremost's glue input.[296]  As discussed in Comment 10.A above, Ancientree and Foremost have different production process and produce different products.  Ancientree provided no record evidence that the glue it uses is the same glue used by Foremost.  Our basis for changing the HTS subheading to value Ancientree's glue is based on Ancientree's production process only and the information provided with respect to Ancientree.

### B.  MDF

*Ancientree Case Brief*[297]
- Commerce relied on HTS category 4411.14.90 to value Ancientree's MDF input.  This category is the basket "other" category covering MDF, not specified earlier under HTS category 4411.14.
- The HTS more specific to Ancientree's input, and which Commerce should use to value its MDF input, is HTS category 4411.14.10, covering "medium density fiberboard of wood, of a thickness > 9 Mm, not mechanically worked or surface-covered."  Ancientree consumes unworked or merely surface covered MDF that undergoes further processing during its production process.  The HTS category 4411.14.90 technically excludes Ancientree's MDF since it covers those not already specified.
- Foremost also provided the same HTS category, 4411.14.10, indicating this is a normal industry standard.

*Petitioner Rebuttal Brief*[298]
- Ancientree fails to cite to source documentation on the record supporting its assertion that its MDF is unprocessed at the time of acquisition.
- Ancientree's product brochure indicates that its MDF cabinets include a "matching laminate exterior."[299]  If this laminate overlay exists, then the assumption is that fiberboard and MDF are sold in a laminated state to Ancientree.  Thus, Commerce's use

---

[295] *Id*. at Chapter 39, note 3.
[296] *See* Ancientree Case Brief at 13.
[297] *Id.*
[298] *See* Petitioner December 26 Rebuttal Brief at 18-21.
[299] *Id.* at 20 (citing Ancientree's July 3, 2019 Section A Questionnaire Response (Ancientree July 3, 2019 AQR) at Exhibit A-5).

55

of the Romanian HTS category 4411.14.90 is appropriate since it covers products which have had processing imparted to them.

**Commerce's Position:**  An examination of the record does not support Ancientree's argument that HTS category 4411.14.10 is the most accurate HTS category with which to value Ancientree's MDF input.  Ancientree reported that its MDF input falls under HTS category 4411.14.[300]  Ancientree claims that the MDF consumed during the production of subject merchandise is unworked or merely surface covered, and that it undergoes further processing.[301] Ancientree concedes that the MDF it consumes in the production of subject merchandise *is* surfaced covered.[302]  Therefore, the HTS category Ancientree is suggesting, which specifically excludes MDF that is surface-covered, is not the appropriate HTS category to value Ancientree's MDF input.  Ancientree failed to provide documentation demonstrating that HTS category 4411.14.10 specifically applies to the MDF input it consumes (*i.e.*, through input descriptions, purchase invoices, or photographs of the input on the record).

Furthermore, as noted in Comment 12.A above, it would be inappropriate to change the HTS category for Ancientree's MDF inputs based on the fact that Foremost provided the same HTS category to value its own MDF inputs, given that the production process for these two companies is dissimilar.[303]  Because the record does not provide further detail on Ancientree's MDF input characteristics, and because the record indicates that Ancientree's MDF inputs have "had processing imparted to them," we have continued using HTS category 4411.14.90 for our final determination.

### C.  Paint

*Ancientree Case Brief*[304]

- In the *Preliminary Determination*, Commerce relied on data under HTS 3208.10.90, covering paints and varnishes dispersed or dissolved in a non-aqueous medium, to value Ancientree's paint inputs.
- Since Ancientree consumed paint that is dissolved in an aqueous medium, its paint input should be valued using HTS 3209.10, covering paints and varnishes "dispersed or dissolve in an aqueous medium."
- While conducting verification, Commerce observed Ancientree's paint type and also verified purchase invoices for "water-based paint."[305]

*Petitioner Rebuttal Brief*[306]

- The exhibit Ancientree cites to does not exclusively support Ancientree's claim that it uses water-based paint.

---

[300] *See* Ancientree September 18, 2019 SDQR at Exhibit SQ 4-12.
[301] *See* Ancientree Case Brief at 12.
[302] *Id.*
[303] *See* Foremost July 22, 2019 CDQR, at section D, Exhibits D-1 and D-6.1.
[304] *See* Ancientree Case Brief at 13.
[305] *Id.* (citing Ancientree's Verification Report at Exhibit 15).
[306] *See* Petitioner December 26 Rebuttal Brief at 21-22.  The Ancientree Final Analysis Memorandum provides the specifics of this argument, which rely on Ancientree's proprietary information.

- The totality of evidence should support Commerce's continued use of HTS 3208.10.90 in the final determination to value Ancientree's paint input.

**Commerce's Position:**  We are continuing to value Ancientree's paint input using HTS category 3208.10.90.  At verification, we tied the painting materials worksheet provided in Ancientree's response to the Ancientree's accounting ledgers and corresponding vouchers for September 2018.[307]  We found no discrepancies between the information Ancientree had reported in its responses and the source documentation reviewed at verification.  However, during verification, we did not observe any third-party source documentation or any other documentation regarding the chemical composition for Ancientree's paint input (*e.g.*, ingredient lists).  The documentation on the record, specifically the translated portions, do not indicate which proportion, if any, of Ancientree's paint is water-based.[308]  Therefore, because the record does not support Ancientree's claim that its paint is water based, we continue to find HTS category 3208.10.90 is the most appropriate HTS category to value Ancientree's paint input.

### D.  Particleboard

*Ancientree Case Brief*[309]
- The SV used for Ancientree's particleboard input for the *Preliminary Determination*, HTS category 4410.11.90, represents the "other" category covering particleboard not specified earlier under HTS category 4410.11.[310]
- The more specific HTS category is actually 4410.11.10, covering, "Particle Board Of Wood, Whether Or Not Agglomerated With Resins Or Other Organic Binding Substances, Unworked Or Not Further Worked Than Sanded (Excl. Oriented Strand Board And Waferboard, Fiberboard And Cellular Wood Panels)."[311]
- Foremost also provided HTS category 4410.11.10 as specific to its consumed particleboard, indicating the HTS is an industry standard.
- Commerce should value Ancientree's particleboard using Romanian HTS category 4410.11.10 in its final determination.

*Petitioner Rebuttal Brief*[312]
- Ancientree does not cite to record source documentation to support its argument that HTS category 4410.11.10 is more appropriate for its particleboard input, given its assertion that particleboard is not processed at the time of acquisition.
- The particleboard input Ancientree uses may have a laminate overlay, which creates the assumption that the product input is more advanced than Ancientree alleges.[313]

---

[307] *See* Ancientree Verification Report at 18.
[308] *Id.* at Exhibit 15.
[309] *See* Ancientree Case Brief at 11.
[310] *Id.* (citing Preliminary SV Memorandum at Attachment 3b)
[311] *See* Ancientree Case Brief at 11 (citing Foremost Rebuttal SV Comments)).
[312] *See* Petitioner December 26 Rebuttal Brief at 18-21.
[313] *Id.* at 20 (citing Ancientree July 3, 2019 AQR at Exhibit A-5).

57

**Commerce's Position:**  The record evidence does not support valuing Ancientree's particleboard using HTS category 4410.11.10.  Ancientree did not cite record documentation supporting HTS 4410.10.10 as the category most specific to the input it used in its production process.  The proposed HTS category, 4410.11.10, "unworked or not further worked than sanded,"[314] is inappropriate, in light of Ancientree's statement that a characteristic of its particleboard is that it has a laminate overlay.[315]  Finally, as noted previously, it is immaterial that Commerce used a different HTS category to value Foremost's particleboard FOPs, given its different production process and product mix.[316]  Accordingly, we have continued to value Ancientree's particleboard using the Romanian GTA data for HTS category 4410.11.10.

*Foremost*

## Comment 13:  Combination Kits

Foremost reported that it sold "combination kits" in the United States during the POI.  Combination kits are wooden cabinets and vanities that include components that are explicitly excluded from the scope of this investigation (such as sinks, quartz countertops, *etc.*).  In the *Preliminary Determination*, we removed the portion of the price related to the non-subject components from our analysis using the relative material costs of the subject and non-subject components (also known as the "RATIO").[317]

At verification, we found that Foremost had made a number of mistakes when calculating the RATIO,[318] and it also failed to identify certain reported U.S. sales as combination kits.[319]

*Petitioner Case and Rebuttal Briefs*[320]
- Foremost failed to accurately calculate the price of combination kits because it:  (1) reversed the labels of its non-subject and subject components in the calculation worksheet used to compute the RATIO; (2) included subject components in its calculation of the non-subject component costs; (3) calculated the RATIO using total cost of manufacturing, not total cost of material inputs (as Commerce had requested in its supplemental questionnaire); and (4) failed to include all non-subject component parts in its calculations.  These errors are significant and demonstrate that the submitted data are unreliable.
- Due to the serious and pervasive nature of the issues, the information reported for combination kits cannot be considered verified.  Though Commerce did not observe errors when verifying transactions from the corrected worksheet at verification, it can be

---

[314] *See* Petitioner SV Comments at Exhibit 3.

[315] *See* Ancientree July 3, 2019 AQR at Exhibit A-5.

[316] *See* Foremost July 22, 2019 CDQR, at section D, Exhibits D-1 and D-6.1.

[317] For example, if Foremost sold a combination kit consisting of a vanity and a sink for $100, with the vanity materials costing $30 and the sink costing $10, we would use a price for the vanity in our analysis of $75 (or 100*30/40).

[318] *See* Foremost Woodwork Verification Report at 19-20.

[319] *See* Foremost Worldwide Verification Report at 9-10.

[320] *See* Petitioner's Case Brief, "Case Brief Regarding Foremost," dated January 20, 2020 (Petitioner January 20 Case Brief) at 3-10; and Petitioner's Rebuttal Brief, "Petitioner's Rebuttal Brief Regarding Foremost," dated January 27, 2020 (Petitioner January 27 Rebuttal Brief) at 8-12.

assumed that the corrected worksheet contains errors in the combination kit data not selected for examination.

- Further, reviewing only two products in a new worksheet provided at verification does not establish that all costs in the new worksheet are accurate because the dataset is permeated with errors.  Thus, the record does not indicate that Commerce verified the completeness and accuracy of the cost data and ratios for combination kits.

- In fact, Commerce should not accept the new worksheet provided at verification because it amounts to new factual information.  Additionally, it is not clear that the new worksheet corrected all of the errors identified at verification, *i.e.*, that not all non-subject components were included in the calculations, or that the ratio was calculated using total manufacturing costs and not just total raw material input costs.

- Commerce should base the margin for all sales of combination kits, including the ones identified for the first time as combination kits at verification, on AFA.  As AFA, Commerce should apply the highest dumping margin to all sales of combination kits in the U.S. sales database.  Foremost did not put forth its maximum effort in reporting combination kits and it should not benefit from its failure to cooperate.

- Commerce should reject the new methodologies provided by Foremost in its brief for calculating RATIO for EP sales (*see* below).

*Foremost Case and Rebuttal Briefs*[321]

- Commerce's initial questionnaire did not provide instructions for reporting pricing data for combination kits.  Even so, Foremost provided three potential methodologies for Commerce to use to determine the prices of combination kits.

- All of the errors Commerce found with respect to combination kits were minor, and Commerce verified both the complete list of combination kit product codes and the completeness and accuracy of the cost data used to calculate the RATIO for all CEP combination kits.  Commerce has all of the information it needs on the record to adjust its calculations to account for these errors.

- At verification, Foremost discovered that it had erroneously reported certain EP sales as non-combination kits.  In its final determination, Commerce should apply an average RATIO to the combination kits sold to EP customers.

- Commerce may only use FA to fill gaps in the record and there are no gaps in the record for Commerce to fill, much less to fill with adverse information.

- Commerce may only apply AFA when it is applying FA and the respondent has not cooperated to the best of its ability.  Foremost cooperated to the best of its ability throughout this investigation with respect to combination kit reporting.

- The best of its ability standard "does not condone inattentiveness, carelessness, or inadequate record keeping," but it also "does not require perfection."[322]

- This was Foremost's first time participating in an AD/CVD proceeding.  It had to provide responses with very little time while simultaneously participating in the parallel CVD investigation, and it had to coordinate between three separate entities.

---

[321] *See* Foremost's Case Brief, "Case Brief of Foremost," dated January 17, 2020 (Foremost Case Brief) at 2-6 and Foremost's Rebuttal Brief, "Rebuttal Brief of Foremost," dated January 24, 2020 (Foremost Rebuttal Brief) at 4-8.
[322] *See* Foremost Rebuttal Brief at 6 (citing *Nippon Steel*, 377 F. 3d at 1382).

Barcode:3946193-01 A-570-106 INV - Investigation  -

**Commerce's Position**:  For the final determination, we find the revised combination kit worksheet provided by Foremost at verification to be reliable and verified.  Foremost's calculation worksheet corrects for a labeling error, as well as the inadvertent inclusion of subject inputs in the non-subject input calculations.  Foremost included overhead expenses and labor in its calculation of subject inputs; however, and consistent with the *Preliminary Determination*, we find that we must revise Foremost calculations of total subject inputs to these expenses.  Finally, we are adjusting Foremost's reported data using AFA to account for:  (1) unreported backsplashes (*i.e.*, non-subject inputs) sold in combination kits; and (2) EP sales of combination kits which Foremost incorrectly identified as non-combination kits.

Errors in Foremost's Combination Kit RATIO Data

At verification, Commerce found that Foremost's combination kit data, as reported in Foremost Price Supp Part 2, contained several issues.[323]  First, we noted that Foremost's calculation worksheet contained the columns which were mislabeled, so that the cost of subject inputs was reported as the cost of non-subject inputs, and vice versa.[324]  At verification, we found this error clerical and minor and requested that Foremost correct it in a revised calculation worksheet.[325]  The steps Foremost took to reverse the labels did not involve reporting new information because all of the input costs were already on the record.

We also noted at verification that Foremost included Foremost Worldwide's cost of purchasing subject inputs from Foremost Woodwork in its calculation of Foremost Worldwide's non-subject input costs.  At verification, Commerce requested that Foremost additionally revise its worksheet to recalculate non-subject input costs.  Foremost provided this calculation worksheet with both the revised cost of non-subject inputs and corrected labels, as discussed above.  Commerce selected product codes from this calculation worksheet and verified the accuracy of the data reported.

The petitioner argues that this calculation worksheet contains new factual information, and, therefore, Commerce should reject it.  However, Commerce's regulations at 19 CFR 351.301(a) state that, "the Secretary may request any person to submit factual information at any time during a proceeding."  In addition, all of the verification outlines placed on the record of this investigation notified interested parties that "{n}ew information will be accepted at verification when…the information makes minor corrections to information already on the record."[326]  At verification, Commerce found these errors to be minor, and, as such, properly exercised its discretion in requesting that Foremost provide revised calculations of the combination kit ratios to remove subject input costs from the non-subject input costs and to label the columns correctly.  Commerce's ability to accept information at verification has been upheld by the CIT.[327]

---

[323] *See* Foremost's September 24, 2019 price reporting supplemental questionnaire response (part 2) (Foremost Price Supp Part 2) at Exhibit SCAP2-3.
[324] *See* Foremost Letter, "Verification Exhibits from FWM Verification," dated November 8, 2019, at VE-21.
[325] *Id.* at VE-28
[326] *See, e.g.*, Commerce's Letter, "Verification Agenda," dated October 16, 2019.
[327] *See, e.g.*, *Maui Pineapple Co. v. United States*, 264 F. Supp. 2d 1244, 1257 (CIT 2003) (where the CIT found that Commerce properly accepted sales data as minor corrections because Commerce "enjoys very broad…discretion with regard to the propriety of its use of facts available.").

Additionally, the petitioner suggests that Foremost's corrected worksheet is not verified because Commerce only reviewed a small number of transactions in the corrected worksheet, and the large number of errors in the original worksheet implies that the corrected worksheet contained still more errors. However, Commerce verified Foremost's worksheet in the same manner it verified all of the other information reported by Foremost, and the minor errors initially found in Foremost's calculations of combination kits do not detract from this fact. In *Schafer*, the CIT confirmed that verification is a "spot check" and that Commerce has the discretion to accept the credibility of documentation:

> A verification is a spot check and is not intended to be an exhaustive examination of the respondent's business. Commerce has considerable latitude in picking and choosing which items it will examine in detail...In the absence of evidence in the record suggesting that the need to examine further the supporting evidence itself, the agency may accept the credibility of the document at face value. To conclude otherwise would leave every verification effort vulnerable to successive subsequent attacks, no matter how credible the evidence and no how burdensome on the agency further inquiry would be.[328]

The Federal Circuit has held that the "basic purpose of the statute:...{is} determining current margins as accurately as possible."[329] Given this basic purpose and in light of the specific circumstances of this case, our acceptance of Foremost's corrections is appropriate.

Finally, the petitioner asserts that it is unclear as to which corrections are included in this worksheet. However, each of the corrections is discussed above. That said, we agree with the petitioner that the data on the worksheet does not account for all necessary adjustments. These additional adjustments are noted further below.

<u>Total Cost of Manufacturing Included in Foremost's RATIO Calculations</u>

In a supplemental questionnaire, Commerce requested that Foremost, "calculate the total cost of subject inputs for each combination kit and the total cost of non-subject inputs for each combination kit...then calculate the ratio of the cost of subject merchandise to the total cost of the combination kit."[330] Commerce provided a table as an example and the column for the requested calculated ratio was labeled "Ratio (cost of subject inputs/total cost of inputs)" as an attachment to the supplemental questionnaire.[331]

In the *Preliminary Determination*, because the combination kit data for all combination kits were submitted too close to the issuance of the *Preliminary Determination*, we used the RATIOs calculated for the three combination kits that represented the highest values of the U.S. sales database to calculate RATIOs for the remaining combination kits reported in the U.S. sales database, and to adjust all combination kits to remove non-subject inputs from the

---

[328] *See Fag Kugelfischer Georg Schafer Ag. v. United States*, 25 CIT 74, 105 (*Schafer*).
[329] *See Rhone-Poulec*, 899 F. 2d at 1191.
[330] *See* Commerce's Letter, "Adjusted Gross United Price Supplemental Questionnaire," dated September 9, 2019.
[331] *Id*. at Attachment 1.

prices/expenses associated with these sales.[332]  For the *Preliminary Determination*, we recalculated Foremost's reported RATIO for the three combination kits because Foremost included total cost of manufacturing in its "total cost of subject inputs," which was not what Commerce intended.[333]  Foremost provided all of the required information necessary in order to recalculate RATIO for the three combination kits.[334]  At verification, we determined that Foremost's combination kit data, that included a table for all combination kit RATIO calculations, included overhead and labor expenses in Foremost's calculations of total subject inputs for all combination kits.[335]

For the final determination, we are modifying the way we calculate the RATIOs to remove Foremost's overhead and labor expenses from the total cost of inputs it reported.  Accordingly, for all combination kits other than the three reported with Foremost Price Supp Part 1, we have adjusted all of Foremost's "total cost of subject inputs" by an average of the percentage differences between Foremost's reported total material costs and reported total cost of manufacturing of the three combination kits reported at Foremost Price Supp Part 1, as facts available under section 776(a)(1) of the Act.[336]

Unreported Non-Subject Inputs

During verification, Commerce found that Foremost sold a combination kit with a backsplash. Therefore, Commerce requested that Foremost explain how it accounted for backsplashes in its calculation of non-subject inputs, to which Foremost responded that backsplashes were not accounted for.[337]  As noted above, Commerce included in its analysis only the portion of the combination kits related to subject products.  Thus, we find that Foremost's failure to properly segregate the subject and non-subject components of the kits renders its RATIO calculations inaccurate, potentially resulting in the overstatement of U.S. prices.  Further, unlike the above issues which can be resolved by record information, the record in this case lacks information on the number of combination kits with backsplashes or the cost of those backsplashes.[338]  This makes it impossible for Commerce to ascertain the impact of Foremost's omission or to determine the amount by which Foremost under-reported its non-subject inputs or over-reported its subject inputs.

In accordance with sections 776(a)(2)(B)-(D) of the Act, because Foremost failed to report all non-subject inputs in calculating its combination kit ratios, we must apply facts otherwise available for our final determination.  Specifically, because Foremost failed to include backsplashes in its RATIO calculations, Foremost withheld necessary information, significantly

---

[332] *See* Foremost Prelim Analysis Memo at 6.
[333] *Id*. at 5.
[334] *See* Foremost's September 17, 2019 price reporting supplemental questionnaire response (part 1) at Exhibit SCAP1-2.
[335] *See* Foremost Woodwork Verification Report at 19.
[336] *See* Foremost's Price Supp Part 1 at Exhibits SCAP1-1 and SCAP1-2; *see also* Foremost Final Analysis Memorandum for a complete description of our calculation of RATIO for combination kits.
[337] *See* Foremost Woodwork Verification Report at 10; and Foremost Verification Exhibits at VE-3.
[338] We note that Foremost did not address this error nor provide Commerce with any suggestion on how to calculate accurate combination kit ratios that include Foremost's unreported backsplashes.  *See* Foremost Rebuttal Brief.

impeded this investigation by preventing Commerce from performing accurate margin calculations, and provided incomplete information that could not be verified.

Foremost argues that Commerce should not apply AFA with respect to its combination kits because "{t}he best of its ability standard, of course, 'does not condone inattentiveness, carelessness, or inadequate record keeping,' but it also 'does not require perfection.'"[339] Foremost then discusses the two-step analysis that Commerce must apply when determining whether a respondent has acted to the best of its ability:  whether the respondent failed "to keep and maintain all required records" or failed "to put forth its maximum efforts to investigate and obtain the requested information from its records."[340]

We agree with Foremost that Commerce does not require respondents to submit data that are perfect in all respects.  Indeed, Commerce's acceptance of the corrections discussed above demonstrates that Commerce did not hold Foremost to such a standard in this investigation. However, Commerce's willingness to correct Foremost's errors is not unbounded, and in this instance, Foremost's failure to investigate its own records and obtain the information requested by Commerce impacts the dumping margin computed for Foremost in a manner which is potentially significant.  At verification, Foremost confirmed that it did not include the cost of backsplashes in reported non-subject inputs, despite the fact that it possessed the records to have done so.[341]  Therefore, Foremost possessed the information Commerce requested on non-subject inputs, but did not provide it to Commerce.  Accordingly, we find that Foremost failed to put forth its maximum efforts to obtain the requested information from its records."[342]

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, it may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available.  Such an adverse inference may include drawing from any information placed on the record.  As discussed above, in this case, we find that Foremost did not act to the best of its ability in reporting its non-subject input costs because the information necessary to report backsplashes was in Foremost's possession, but it did not report this information to Commerce. Therefore, Commerce finds that facts available with an adverse inference are warranted to account for Foremost's omission.

We note that the only information on the record providing guidance to Commerce as to which sales of combination kits could contain a backsplash is Commerce's verification of the FOPs for particular CONNUMs at Foremost Woodwork, where Commerce noted that a vanity, with a countertop and sink, had a backsplash.  Accordingly, in applying AFA to Foremost's combination kits, Commerce is assigning the lowest calculated RATIO, after making the adjustment described above, to all combination kits that are described in their product descriptions as vanities and reported with Foremost Worldwide sink costs included on Foremost's ratio calculation worksheet, which indicate the vanity may have a backsplash.[343]

---

[339] *See* Foremost Rebuttal Brief at 6 (citing *Nippon Steel*, 377 F. 3d at 1382).
[340] *Id*. at 6-7.
[341] *See* Foremost Woodwork Verification Report at 10.
[342] *See Nippon Steel*, 377 F. 3d at 1382.
[343] *See* Foremost Verification Exhibits at VE-28; *see also* Foremost Final Analysis Memorandum for complete description of our calculation of RATIO for combination kits.

<u>Unreported Combination Kits</u>

At verification, we found that Foremost sold 14 combination kit products to EP customers during the POI.  Foremost claimed that this was an inadvertent error, stating that the company mistakenly assumed that it only made CEP sales of combination kits.  Foremost provided a list of the product codes that could be found in the U.S. sales database for EP sales, but were reported as non-combination kits (*i.e.*, the RATIO equaled 100 percent subject inputs).[344]

Foremost did not sell any of the misreported product codes to CEP customers, and, thus, the record does not contain RATIO calculations for them.  Therefore, we find that Commerce must resort to facts available for the missing RATIO information.  In accordance with sections 776(a)(2)(B),(C) and D of the act, we find that Foremost failed to provide information requested within the deadline prescribed by Commerce and that it impeded this investigation by not providing the information necessary to calculate accurate RATIOs for these products.[345]

As noted above, section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available.  Such adverse inference may include any information placed on the record.  In this case, we find that Foremost did not act to the best of its ability to comply with Commerce's requests.  For example, in a supplemental questionnaire, Commerce requested a list of all components within combination kits that Foremost sold to the United States during the POI.[346]  In reporting this information, Foremost had the opportunity to review its records and determine that it had failed to identify certain products as combination kits, but it did not do so.[347]  Foremost had ample opportunity to assess its records, rather than make assumptions, and to determine that many sales were incorrectly reported.

For the final determination, we are applying facts available, with an adverse inference, to Foremost's EP sales of combination kits.  To adjust Foremost's combination kits that were reported as non-combination kits, we are applying the lowest RATIO to calculate an adjusted gross unit price.[348]

In sum, Commerce will continue to accept Foremost's revised calculation worksheet, which corrected for Foremost's labeling error and Foremost's inclusion of subject inputs in its calculation of non-subject inputs.  Commerce is applying facts otherwise available to Foremost's calculations of total inputs to adjust for Foremost's inclusion of overhead and labor expenses when calculating the RATIOs.  Finally, Commerce is applying facts otherwise available, with

---

[344] *See* Foremost's Letter, "Verification Exhibits from FWW Verification," dated November 1, 2019, at VE-12.
[345] *See* Commerce's Letter, "Section C Supplemental Questionnaire," dated August 30, 2019, at 8.
[346] *Id*. at 8.
[347] *See* Foremost's September 17, 2019 supplemental section C questionnaire response (Foremost September 17, 2019 SCQR) at Exhibit SC-22a-A.
[348] *See* Foremost Final Analysis Memorandum for a complete description of our calculation of RATIO for combination kits.

adverse inference to Foremost's sales combination kits that could have contained a backsplash as well as Foremost's sales of EP sale combination kits.

## Comment 14:  Exempted Sales

*Petitioner Case Brief*[349]

- Commerce should apply partial AFA to Foremost's sales of custom kitchens and merchandise produced by certain unaffiliated suppliers because the information in Foremost's request to not report these sales was inaccurate and misleading.[350]

- In particular, Foremost's initial section D response references a higher number of custom kitchen projects than Foremost reported in its exemption request.  Foremost later explained that the difference between the figures in the exemption request and questionnaire response was due to the fact that Foremost had produced a higher number of custom kitchens than it sold during the POI.

- During the verification at Foremost Woodwork, Foremost reported that it sold yet another number of custom kitchen projects.  Foremost provided no documentation to support its explanations of the inconsistencies.

- Further, after receiving the exemption, Foremost disclosed that sales of kitchen projects involved a large number of pieces of subject merchandise.  Thus, by citing only projects in its exemption request, Foremost misled Commerce as to the actual magnitude of the exemption.

- With respect to unaffiliated suppliers, Commerce found at verification that Foremost sold several hundred more units of merchandise produced by these companies than the quantity reported in Foremost's exemption request.

- Foremost was required to submit sales data and FOPs for merchandise produced by one unaffiliated supplier but stated that it was unable to compel it to participate.  That Foremost purchased several material inputs from this supplier, in addition to subject merchandise, suggests that Foremost had more ability to induce cooperation than it claimed.

- In the 2018 administrative review of *Stainless Steel Bar from India*, Commerce applied AFA to a respondent because it failed to demonstrate that it lacked the power to induce cooperation from non-responding parties.  Commerce based this decision on the fact that the respondent's communications with the unresponsive entity did not indicate a "robust refusal to do business in the future."[351]

- The application of partial AFA to the missing unaffiliated supplier's FOP data will encourage the cooperation of the unaffiliated supplier and companies in future proceedings.

---

[349] *See* Petitioner January 20 Case Brief at 11-18.

[350] *Id.* at 12 (citing Foremost's Letter, "Notice of Reporting Difficulties and Reporting Exemption Request," dated June 19, 2019 (Foremost's Exemption Request)).

[351] *Id*. at 17 (citing *Stainless Steel Bar from India:  Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 15582 (April 16, 2019), unchanged in *Stainless Steel Bar from India:  Final Results of Administrative Review of the Antidumping Duty Order; 2017-2018*, 84 FR 56179 (October 21, 2019) (*Stainless Steel Bar from India*), and accompanying IDM).

65

Barcode:3946193-01 A-570-106 INV - Investigation  -

*Foremost Rebuttal Brief*[352]
- Foremost has been clear throughout this proceeding that a project may contain any number of units and that the units that make up a project may not be subject merchandise.
- The error with respect to the number of units produced by the unaffiliated supplier is harmless. The quantity of pieces was still small and the reason for the request remains: Reporting FOPs for subject merchandise sold as part of custom kitchens would unnecessarily burden both Foremost and Commerce.

**Commerce's Position**: We disagree that Commerce was misled by the information in Foremost's exemption request. While the record contains several sales figures related to custom kitchens and products produced by unaffiliated suppliers, the differences are not significant. Further, the facts underlying Commerce's decision to grant these exemptions remain: requiring Foremost to report sales of subject merchandise made as part of custom kitchen projects would have been burdensome – not only in terms of data collection for Foremost, but also in terms of analysis time for Commerce – and this burden would have been heightened by the strict statutory time constraints of this investigation.

In addition, the verified number of pieces of merchandise produced by the exempted unaffiliated supplier is relatively small in comparison to the total number of pieces sold in the United States during the POI. With respect to the other unaffiliated supplier, we continue to find that Foremost made significant efforts to compel that company to provide the necessary information. Thus, the use of AFA is not appropriate for any of the unreported information.

<u>Custom Kitchens</u>

In Foremost's Exemption Request, Foremost described the complexities involved in reporting its sales of subject merchandise made as part of custom kitchen projects.[353] It explained that "each kitchen is a separate project, containing a combination of products that is different from every other kitchen…customized kitchen projects {may contain a} myriad {of} different combinations{.}"[354] In Commerce's response to Foremost's exemption request, with respect to custom kitchens, we noted, "Foremost cites to the burdens of reporting the FOPs of custom kitchens" and then explained that "{f}or the reasons detailed in Foremost's request," and we granted this request.[355]

We note that, throughout the proceeding, Foremost provided more information about its custom kitchens at Commerce's request, including the number of pieces that make up a project, and the fact that the number of custom kitchens produced, sold, and "booked" did not exactly tie to the exemption request.[356] Specifically the quantity sold as reported in Foremost's exemption request

---

[352] *See* Foremost Rebuttal Brief at 8-9.
[353] *See* Foremost's Exemption Request at 2-3.
[354] *Id*. at 3.
[355] *See* Memorandum, "Reporting Exemption Request," dated June 26, 2019.
[356] *See* Foremost's July 22, 2019 sections C and D questionnaire response (Foremost July 22, 2019 CDQR) at 7-8; and Foremost September 24, 2019 SDQR at 5-6; *see also* FGI Verification Report at 8; and Foremost Woodwork Verification Report at 12.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

and reviewed at verification differed by under fifty projects, and projects, in general, contain various quantities of subject and non-subject components.[357]

However, the reasons for Commerce's decision to grant the exemption remain and were supported at verification.  At verification, Foremost demonstrated how each custom kitchen project unit in its system "represented an entire custom kitchen project (with an unknown number of cabinets making up each project)."[358]  Foremost explained that the only way to determine the actual quantity of each unit would be to look at individual invoices, and we confirmed this explanation, stating that "FGI's system only reported the quantity of custom kitchen order, and not the number of cabinets each order was comprised of."[359]  Our verification findings support our initial decision to exempt Foremost from reporting subject cabinets sold in custom kitchens, given the complexity of the projects, the short time both Commerce and Foremost had to develop a method for reporting these sales, and the relatively small number of sales that these cabinets represented compared to the total sales in the U.S. sales database.[360]

<u>Unaffiliated Supplier Sales and FOPs</u>

In Foremost's Exemption Request, Foremost also asked that Commerce permit it to not report the sales of subject merchandise produced by several unaffiliated suppliers and the suppliers' corresponding FOPs.  In making this request, Foremost stated, that it "has no ability to compel these unaffiliated suppliers to provide all of the required factors of production or otherwise participate in the Department's proceeding."[361]  In Commerce's response to Foremost's exemption request with respect to unaffiliated suppliers, we noted how Foremost, "cite{d} its inability to coerce suppliers to comply with Commerce's investigation" and then explained that "{f}or the reasons detailed in Foremost's request," and we granted this request.[362]

At verification, Commerce found that, for one of the exempted unaffiliated suppliers of subject merchandise, Foremost had underreported the quantity of merchandise supplied.[363]  While the quantity of subject merchandise produced by this unaffiliated supplier was not correctly provided in the exemption request, the underlying reason for Commerce's decision to exempt these sales and FOPs from reporting remains.  Foremost was exempted from reporting the sales and FOPs for two out of the three of its unaffiliated suppliers because the total quantity of these sales was less than five percent of the U.S. sales database.[364]  The minor discrepancies found at verification with respect to the figures initially reported does not change this reasoning, and the total quantity of sales of merchandise for both unaffiliated suppliers exempted from reporting remains at less than five percent, which we find to be small.

---

[357] *See* Foremost's Exemption Request at 3.
[358] *See* FGI Verification Report at 8.
[359] *Id*.
[360] *See* Foremost September 24, 2019 SDQR at SD-6.
[361] *See* Foremost's Exemption Request at 5.
[362] *See* Memorandum, "Reporting Exemption Request," dated June 26, 2019.
[363] Foremost Woodwork Verification Report at 12.
[364] *See* Foremost's Exemption Request at 5.

In *Pure Magnesium from the Russian Federation*, Commerce stated that it "is not required to examine all sales transactions in the United States.  For this reason, our practice has been to disregard unusual transactions when they represent a small percentage (*i.e.*, typically less than five percent) of a respondent's total sales."[365]  In *Color Television Receivers from China*, Commerce also excluded sales because the represented less than give percent of the respondent's total sales.[366]  In this case, the sales exempted either represent less than five percent of the respondent's total sales, or as discussed above represent unusual transactions.  Despite small variations between the information in Foremost's Exemption Request and our verification findings, these unaffiliated supplier sales represent a small, less than five percent, amount of Foremost's total U.S. sales during the POI.

Commerce did require Foremost to report the sales and FOPs from the unaffiliated supplier who provided the highest quantity of subject merchandise in Foremost's exemption request.[367]  However, Foremost provided documentation to show that it was unable to compel this supplier to provide its FOPs, despite its efforts to do so.  For the *Preliminary Determination*, Commerce examined Foremost's relationship with its uncooperative unaffiliated supplier and noted several facts:  Foremost is a major exporter of subject merchandise from China; the record does not indicate that Foremost is affiliated with this supplier; and the supplier supplied raw material inputs in addition to subject merchandise to Foremost.[368]  These facts remain unchanged for this final determination, and their relevance is explained below.

The Federal Circuit, in *Mueller*, held that Commerce may, under certain circumstances, apply AFA in calculating a cooperative respondent's AD margin where it finds that the respondent could have induced an uncooperative supplier's cooperation.[369]  While the petitioner makes the argument that Foremost had the ability to compel its supplier to provide the information, the record does not support this assertion.  In contrast, the record demonstrates that Foremost attempted to collect and report the information but was prevented by the supplier's refusal to provide it.[370]

In *Canadian Solar*, the CIT held, based on the facts in the administrative review at issue, that the Commerce failed to show that the respondent had the type of long-standing relationship with its suppliers that would give it leverage in the marketplace to compel its suppliers to provide the information requested, in order to justify relying on partial AFA.[371]  With respect to Foremost's relationship with its supplier, the record remains the same since the *Preliminary Determination*.  As discussed in Foremost Prelim Analysis Memo, the communications between Foremost and its

---

[365] *See Notice of Final Determination of Sales at Not Less Than Fair Value:  Pure Magnesium from the Russian Federation*, 66 FR 49347 (September 21, 2001) (*Pure Magnesium from the Russian Federation*), and accompanying IDM at Comment 10.

[366] *See Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:  Certain Color Television Receivers from the People's Republic of China*, 69 FR 20594 (April 16, 2004) (*Color Television Receivers from China*), and accompanying IDM at Comment 27.

[367] *Id.*

[368] *See* Foremost July 22, 2019 CDQR at section D, page 3 and Exhibit D-11.

[369] *See Mueller*, 753 F. 3d at 1233-34.

[370] *See* Foremost September 23, 2019 SDQR at Exhibit SD-4.

[371] *See Canadian Solar International et al. and Shanghai Byd Co. Ltd. et al. v. United States*, 378 F. Supp. 3d 1292, 1320 (CIT 2019) (*Canadian Solar*).

supplier showed no evidence that Foremost had any leverage over its supplier.[372]  Commerce continues to find, as it did in the *Preliminary Determination*, that the supplier's responses to Foremost's outreach indicate that Foremost did not have a long-standing relationship with this supplier and that Foremost was unable to induce its supplier's cooperation.[373]

We disagree with the petitioner that the facts in *Stainless Steel Bar from India* are analogous here.  In *Stainless Steel Bar from India*, Commerce found that the documentation provided by the respondent failed to meet Commerce's standard for demonstrating the inability of a company to compel its supplier to provide information.[374]  In that case, the respondent had many years of experience in being a respondent in AD cases, and all of its suppliers for which it was unable to report FOPs for were known exporters of merchandise subject to the order.[375]  Given those circumstances, Commerce found that the respondent understood its responsibilities as an exporter, and as a respondent, to collect costs from its suppliers, and, therefore, the documentation it provided Commerce failed to demonstrate that it had done everything in its power to compel its suppliers to provide those costs.

In contrast, in this investigation, Foremost is a first-time respondent and we find on this record that it has provided sufficient documentation to demonstrate that it acted to the best of its ability to compel its supplier to supply the missing FOPs.[376]  However, we note that Commerce has the same expectations of Foremost for wooden cabinets and vanities from China as it did of the respondent in *Stainless Steel Bar from India*, in that Foremost is now aware of its responsibility to collect the FOPs from all of its suppliers, and respondents in this case have been placed on notice about the importance of reporting FOPs for all of the subject merchandise sold in the United States.

The petitioner also argues that applying partial AFA is a way to discourage non-cooperation on the part of suppliers in the future, and we agree with this premise, as does the law.[377]  While we agree that the application of AFA is a tool used to induce cooperation from respondents and their suppliers, we find that the facts of this record do not support making such a determination in this segment of the proceeding, as discussed above.

Accordingly, because necessary FOP information is not available on the record, we continue to determine that facts available is warranted, pursuant to section 776(a)(1) of the Act, and for the final determination we have continued to use Foremost's reported FOPs for all of Foremost's sales of merchandise produced by its uncooperative supplier.[378]

---

[372] *See* Foremost Prelim Analysis Memo at 4-5.
[373] *See Preliminary Determination* PDM at 21.
[374] *See* Petitioner January 20 Case Brief at 17.
[375] *See Stainless Steel Bar from India* IDM at Comment 2.
[376] *See* Foremost September 24, 2019 SDQR at Exhibit SD-4.
[377] *See* SAA at 870.
[378] *See* Foremost Prelim Analysis Memo for a discussion of the facts available calculation.

**Comment 15:  Early Payment Discounts**

*Petitioner Case and Rebuttal Briefs*[379]
- Foremost did not report an early payment discount granted to a customer during the POI for the sale of subject merchandise.  Foremost conceded that it could not determine whether this was a customer-specific issue, and that it could not identify on which transactions it may have incurred early payment discounts.  It is not possible for Commerce to confirm which sales had early payment discounts incorrectly reported.
- Foremost stated that even customers who did not qualify for early payment discounts could have taken one.
- The solution offered by Foremost (*see* below) is inadequate.  Foremost's suggestion would not even include one of the transactions Commerce found as an example of Foremost's early payment omission, *i.e.*, at verification, Commerce identified a customer with missing early payment discounts, but this customer was not in Foremost's proposed universe of customers that may have taken this discount.
- Foremost admits that there may be an undefined number of additional unreported early payment discounts.
- Commerce should apply an early payment discount to all sales where one was not reported.

*Foremost Case and Rebuttal Briefs*[380]
- Foremost did not have a mechanism in place to track certain early payment discounts on a transaction-specific basis, and therefore, it overlooked reporting early payment discounts taken when they were not earned.
- In the U.S. sales database, Foremost identified customers who had qualified for discounts and reported early payment discount by customer.  Commerce confirmed that Foremost correctly reported early payment discounts for the three customers reported with this discount in the U.S. sales database.
- Commerce did not identify early payment discounts for customers who were not offered such discounts.  Commerce should apply the percentage reported under PAYTERMU (*i.e.* two percent of GRSUPRU for a sale reported with "2% 15 days") for the customers with payment terms that contain early payment incentives.
- There is no gap in the record that Commerce would need to fill with AFA.  The complete universe of customers that may have taken unauthorized discounts is in the U.S. sales database (*i.e.*, CEP customers of inventory merchandise where PAYTERMU contains a percentage of a discount).
- Foremost provided programming language and its suggestion is conservative.

**Commerce's Position**:  We find that Foremost failed to report all early payment discounts as Commerce requested, and we find that this error warrants the application of facts otherwise available, with an adverse inference, to all sales with early payment incentives where no early

---

[379] *See* Petitioner January 20 Case Brief at 19-20; and Petitioner January 27 Rebuttal Brief at 15-18.
[380] *See* Foremost Case Brief at 7-9; and Foremost Rebuttal Brief at 9-11.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

payment discount was reported (and where Commerce did not verify that early payment discounts were not granted).

In Foremost's July 22, 2019 CDQR, Foremost asserted that it "did not grant any early payment discounts in the U.S. market during the POI."[381]  In Foremost's September 17, 2019 SCQR, Foremost stated that it had "reviewed its records and made an error with respect to sales to {certain customers}."[382]  As such, Foremost revised its U.S. sales database to report early payment discounts for these specific customers.

At verification, we found that Foremost had failed to report early payment discounts for certain sales.[383]  Foremost explained that it reported early payment discounts by reviewing its records for customers that had qualified for an early payment discount (including those that had qualified but had not taken one).  Foremost admitted, though, that it had not checked its records for customers who had taken an early payment discount, despite not qualifying for it.  As a result, Foremost acknowledged that it had not reported all early payment discounts taken during the POI, and that it had no method of determining which customers and sales in the U.S. sales database this impacted.

Foremost states that Commerce "may use facts otherwise available only 'to fill gaps when Commerce must rely on other sources of information to complete the factual record.'"[384]  Foremost then asserts that there is no gap in the record with respect to the early payments taken during the POI.  We disagree with the claim that there is no gap for Commerce to fill in ensuring we accurately account for Foremost's early payment discounts.  As Commerce noted its verification report, "FGI stated that it could not determine whether this {early payment issue} was a customer specific issue, and that it could not identify which transactions may have incurred early payment discounts that had not been reported in the U.S. sales database."[385]  Therefore, it is not possible for Commerce to specifically identify the sales impacted by this reporting error.  Moreover, while Foremost attempted to fill this gap with its suggestion,[386] this suggestion fails to remedy all sales where Foremost may not have reported an early discount, as evidenced by the fact that its list did not include the sales Commerce found at verification with this issue.  Additionally, as discussed below, we disagree with Foremost's assertion that its early payment discount reporting failure does not amount to the situation set forth by section 776(b) of the Act.[387]

---

[381] *See* Foremost July 22, 2019 CDQR, section C, at 23-24.

[382] *See* Foremost September 17, 2019 SCQR at 16.

[383] *See* FGI Verification Report at 10.

[384] *See* Foremost Rebuttal Brief at 10 (quoting *Zhejiang DunAn Heitan Metal Co. v. United States*, 652 F. 3d 1333, 1346 (Fed. Cir. 2011).

[385] *See* FGI Verification Report at 10.

[386] *See* Foremost Case Brief at 8 (Foremost provided a list of customers and payment terms and stated, "the following customers represents the universe of customers that may have taken unauthorized early payment discounts.").

[387] *See* Foremost Rebuttal Brief at 10 (citing *JSW Steel Ltd. v. United States*, No. 16-00165, slip op. at 5 (CIT May 9, 2018).

71

In *CORE from Italy*, Commerce applied partial AFA because Commerce discovered at verification that the respondent failed to report complete information regarding its sales, as requested by Commerce in its questionnaire responses, and this information was not discovered until verification.[388]  Similarly, we find that Foremost did not report the complete information regarding its early payment discounts and Commerce only found this information as a result of selecting certain sales for examination at verification.  Foremost failed to report all early payment discounts in its questionnaire responses,[389] and they were discovered by Commerce during verification, as described in the verification report.[390]  At verification, Foremost acknowledged that it had failed to review all of its U.S. sales for early payment discounts, and as a result it did not identify all sales where an early payment discount was taken.[391]  Accordingly, for the final determination, we are applying facts available, with an adverse inference, to Foremost's sales where the customer had payment terms with an early payment incentive, but no reported early payment discount.  Therefore, pursuant to section 776(a)(2)(B) and (C) of the Act, we are applying facts available to Foremost's sales reported without early payment discounts.

Under such circumstances, the Federal Circuit has upheld Commerce's ability to make an adverse inference in selecting from the facts available, stating that Commerce:

> assumes that importers are familiar with the rules and regulations that apply to the import activities and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries:  (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; …(b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records{.} [392]

Accordingly, pursuant to section 776(b) of the Act, we are applying facts available with an adverse inference, because Foremost did not act to the best of its ability when reporting its early payment discounts.  As the petitioner correctly notes and Commerce addressed above, Foremost provides a methodology to adjust for this reporting failure, which identifies sales by customer and then by payment terms,[393] but this methodology does not account for all sales reported in the U.S. sales database with a payment incentive.[394]  As such, we will not use the methodology proposed by Foremost, and instead, for the final determination, for all sales unexamined at verification where Foremost did not report an early payment discount and where Foremost's payment terms with that customer included a payment incentive, we will apply the highest early payment discount Foremost granted that is on the record.

---

[388] *See Certain Corrosion-Resistant Steel Products from Italy:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, in Part, 81 FR 35320 (June 2, 2016) (*CORE from Italy*), and accompanying IDM at Comment 3
[389] *See* Foremost July 22, 2019 CDQR, section C, at 23-24; and Foremost September 17, 2019 SCQR at 16.
[390] *See* FGI Verification Report at 10.
[391] *Id.*
[392] *See Nippon Steel*, 337 F. 3d at 1382.
[393] *See* Petitioner January 27 Rebuttal Brief at 17.
[394] *See* Foremost Case Brief at 8.

72

Barcode:3946193-01 A-570-106 INV - Investigation  -

**Comment 16:  Section 301 Duties**

*Petitioner Case and Rebuttal Briefs*[395]
- The methodology employed by Foremost results in its reporting section 301 duties on none of its inventory sales in its U.S. sales database.  Foremost has not provided support for its assertion that it did not incur section 301 duties on the majority of its CEP inventory sales.
- Commerce found evidence of subject merchandise sold out of inventory on which FGI incurred section 301 duties, and, therefore, Commerce's findings raise questions as to whether reporting section 301 duties using an estimated entry date for CEP (that uses average inventory days) is accurate and reasonable.  It is improper to estimate what duties were incurred on a product based on inventory turnover calculations.
- Commerce should take the total amount of section 301 duties paid by Foremost during the POI and allocate that amount across all U.S. inventory sales.
- Foremost's reporting was inaccurate, regardless of whether the inaccuracy was intentional.

*Foremost Case and Rebuttal Briefs*[396]
- Section 301 duties were imposed for the first time on September 21, 2018; therefore, it was impossible for Foremost to incur these duties on any sale that occurred prior to September 21, 2018.  Foremost did not incur section 301 duties on the vast majority of its CEP inventory sales.
- Commerce found a single unit sold in late December 2018 on which Foremost incurred section 301 duties.  This does not detract from the reasonableness of Foremost's reporting methodology; Commerce verified that inventory products remain there for a period of time.
- If Commerce needs to adjust CEP inventory sales to account for section 301 duties, it should only do so for sales that occurred on or after the date the unit Commerce found at verification was sold.
- The petitioner's suggestion is equivalent to partial AFA.

**Commerce's Position**:  For the final determination, we are changing our calculation of Foremost's section 301 duties for CEP inventory sales.[397]  CBP began collecting section 301 duties on September 24, 2018, during the POI.[398]  Foremost explained that it does not track the entry dates of its inventory sales, and, as a consequence, it was unable to report section 301 duties on a transaction-specific basis.  However, because Foremost's average inventory carrying

---

[395] *See* Petitioner January 20 Case Brief at 21-22; and Petitioner January 27 Rebuttal Brief at 22-24.

[396] *See* Foremost Case Brief at 12-13; and Foremost Rebuttal Brief at 11-12.

[397] *See* Foremost July 22, 2019 CDQR, section C, at 34.

[398] *See Notice of Modification in Section 301 Action:  China Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 FR 47974 (September 21, 2018) (effective as of September 24, 2018).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Barcode:3946193-01 A-570-106 INV - Investigation  -

period was 131 days,[399]  Foremost concluded that it had no CEP inventory sales with section 301 duties.[400]

At verification at FGI, we confirmed the accuracy of Foremost's reported average inventory carrying days and that entry date cannot be tracked in FGI's accounting system.[401]  However, we also noted that FGI booked a sale toward the end of the POI on which it incurred these duties. Therefore, we find that Foremost's methodology did not completely capture all section 301 duties on FGI's reported U.S. sales.  To account for this potential underreporting, for the final determination, we are changing the amount of section 301 duties calculated for Foremost's CEP inventory sales, from zero to ten percent of entered value, when the date of sale is equal to, or after, the "booking" date of the inventory sale with section 301 duties found at verification.[402]

We disagree with the petitioner that it is appropriate to allocate all section 301 duties that FGI incurred during the POI to the reported sales.  Foremost could not have incurred section 301 duties prior to September 21, 2018 (the date the duties were imposed), and, therefore, calculating section 301 duties for sales with sale dates prior to September 21, 2018, is not warranted. Additionally, we verified Foremost's inventory carrying days and confirmed that, on average, Foremost's merchandise was in inventory for more than four months prior to sale.  Therefore, the section 301 duties that FGI paid during the POI should apply overwhelmingly to sales made from inventory after the POI.  As a result, we find using the earliest date on the record where Foremost incurred these duties is reasonable, for purposes of adjusting CEP under section 772(c)(2)(A) of the Act.

**Comment 17:  Foremost's U.S. Inland Freight Charges from the Port to the Warehouse**

*Petitioner Case and Rebuttal Briefs*[403]
- At verification, Commerce determined that Foremost did not include U.S. inland freight, from port to warehouse, in its U.S. sales database for its CEP inventory sales.
- Although Foremost claimed that it had intended to include this expense in its calculation of international freight, it did not do so.
- Commerce did not verify the U.S. inland freight that Foremost included in its exhibit.
- Commerce should account for these freight expenses by applying the highest inland freight reported and applying it to all inventory sales, instead of relying on unverified information.
- Alternatively, Commerce should use the ratio calculated that combined international freight and inland freight for Foremost's delivered, duty paid (DDP) sales for calculating a new freight expense for Foremost's CEP inventory sales.

---

[399] *Id*. at 33-34.
[400] *Id*. at 34.
[401] *Id*. at 12-13.
[402] We note that the SALEDATU is different from the date in which the sale was booked in Foremost's electronic records system (ERP).  For this change, we are using the booking date in Foremost's ERP because this was the date the sale was entered into Foremost's system and recorded as having incurred this expense.
[403] *See* Petitioner January 20 Case Brief at 24; and Petitioner January 27 Rebuttal Brief at 20-21.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

*Foremost Case and Rebuttal Briefs*[404]
- Foremost prepared separate worksheets to calculate and report international freight expense ratios for CEP DDP and CEP inventory sales.  These worksheets were structured identically and include both international freight expenses and movement expenses associated with moving products from the U.S. port to the U.S. warehouse.
- In the CEP worksheet, Foremost inadvertently referenced only the international freight costs in the international freight formula.  As a result, Foremost omitted port to warehouse freight expenses for CEP inventory sales from its U.S sales listing.
- Commerce has the information necessary to calculate the relevant freight amount.  Specifically, Commerce can adjust international freight (INTNFRU) or calculate a new inland freight variable (INLFPWU) by applying a ratio calculated by dividing the total amount of the inadvertently-omitted expense by the total value of Kitchen and Bath Division sales.

**Commerce's Position**:  For the final determination, because Foremost failed to cooperate to the best of its ability with respect to these expenses, we are basing the amount of the expenses for all of Foremost's CEP inventory sales on AFA.

In Foremost's questionnaire response, Foremost stated that "international freight fees include delivery to Foremost's U.S. warehouse."[405]  Along with its narrative response, Foremost provided two worksheets to demonstrate its calculation of international freight expenses, one for sales made out of inventory, and the other for Foremost's DDP sales, or in other words, sales where Foremost was responsible for freight expenses, but the merchandise did not go through inventory.[406]  Despite Foremost's assertion that it "structured the two worksheets identically,"[407] in Foremost's worksheet for DDP sales, Foremost calculated INTNFRU so that it included both ocean and inland freight; however, in Foremost's worksheet of inventory sales, it reported freight in two separate fields:  "Ocean Freight" and "Inland Freight," where the former represents the amount Foremost reported as INTNFRU, and the latter field is not incorporated into the U.S sales listing.  Foremost never explained why it provided "Inland Freight" as a separate amount in its worksheet instead of including the amount in INTNFRU (as it had clearly stated in its narrative).

At verification, Commerce was reviewing Foremost's method for determining its vendors for completeness when it requested that Foremost discuss the transactions booked under a particular freight vendor.  During this exercise, Commerce learned that Foremost booked payments to this company for port to warehouse inland freight (INLFPWU) for inventory sales,[408] which directly contradicted its prior claim that it incurred these expenses as part of international freight.  The verification report discussed this finding as follows:

> During completeness test #1, we noted that FGI had paid for freight services to move merchandise from Chicago to its warehouse in Indiana.  We asked FGI officials whether

---

[404] *See* Foremost Case Brief at 9-11; and Foremost Rebuttal Brief at 13.
[405] *See* Foremost July 22, 2019 CDQR, section C, at 31.
[406] *Id*. at Exhibits C-20.1(A) and (B).
[407] *See* Foremost Case Brief at 10.
[408] *See* FGI Verification Report at 8-9.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

subject merchandise was ever shipped using {this company}, to which they said yes, but that it is hard for them to identify which specific sales because the merchandise is tracked by container, which makes it harder to track in its system.

In reviewing the record and freight documentation provided, FGI concluded that its U.S. sales database did not include inland freight from the port to the warehouse for its inventory sales, but that it had intended to include the expense in its calculation of international freight.  FGI pointed to Exhibit C-20.1 of its section C questionnaire response, dated July 22, 2019 (CQR), where it provided the inland freight expense for each purchase order, but explained that it accidentally did not end up including it in its calculations of international freight.  We did not verify the U.S. inland freight reported at Exhibit C-20.1.[409]

Foremost did not reference the freight exhibit when discussing U.S. inland freight expenses in the narrative portion of its response and the information Foremost pointed to was buried in this exhibit attached to its response.  Because Commerce was unaware, prior to verification, that Foremost included data related to these expenses in an exhibit, we were faced with the choice of reviewing them for the first time at verification or deciding not to examine them further.  Ultimately, Commerce decided not to verify this information because we found that Foremost had not provided sufficient notification to Commerce regarding the U.S. inland freight expenses for its CEP inventory sales.  Prior to verification, as mentioned above, Foremost specifically stated its CEP inventory sales' "international freight fees include delivery to Foremost's U.S. warehouse."[410]  Accordingly, Commerce accepted Foremost's narrative response at face value.

In similar situations, Commerce has acted similarly.  For example, in *HFCs from China*, the respondent buried information material to Commerce's analysis in exhibits attached to a response and Commerce was unaware, until verification, that a problem existed.[411]  In its final determination, Commerce found that the mere fact that the information existed on the record was insufficient notification to Commerce about the specifics of the problem.[412]  Similarly, at verification, Commerce discovered for the first time that, for its CEP inventory sales, Foremost had not reported international freight expenses inclusive of U.S. inland freight to the warehouse.  Consistent with Commerce's practice in *HFCs from China*, and because Foremost provided affirmative statements to the contrary, we find this exhibit to provide insufficient notification to Commerce that Foremost separately incurred the U.S inland freight expenses in question.

Section 776(a)(2)(B) of the Act states that if an interested party fails to provide information in the manner requested, Commerce may use facts otherwise available in reaching its determination.  Further, section 776(a)(2)(C) states that Commerce may also resort to facts available if an interested party significantly impedes a proceeding.  In this case, Commerce requested that Foremost report all inland freight expenses in its U.S. sales database, but it did

---

[409] *Id.* at 11-12.
[410] *See* Foremost July 22, 2019 CDQR, section C, at 31.
[411] *See Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016) (*HFCs from China*), and accompanying IDM at Comment 13.
[412] *Id.*

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Barcode:3946193-01 A-570-106 INV - Investigation  -

not, despite its assertions to the contrary.  Moreover, section 782(d) of the Act states that if Commerce "determines that a response to a request for information under this title does not comply with the request {Commerce} shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency…"  In this case, as Commerce found in *HFCs from China*,[413] because we were unaware that a problem existed prior to verification, we find that we were not obligated under section 782(d) of the Act to notify Foremost of this issue prior to our final determination. [414]

Foremost's narrative response was incorrect and misleading because Foremost unequivocally stated in its section C questionnaire response that its international freight fees for CEP inventory sales included delivery to the U.S. warehouse.  In other words, that Foremost used a different vendor for its port to warehouse freight, was completely new information found at verification, and that Foremost's reported INTNFRU for its CEP inventory sales did not include inland delivery to the port was also new information discovered at verification.  As a result of Foremost's characterization of these expenses, Commerce was unable to analyze the information pertaining to INLFPWU prior to verification, and it also did not calculate an accurate preliminary dumping margin.

The Federal Circuit held in *Nippon Steel* that "the best of its ability" requires the respondent to do the maximum it is able to do[415] and clarified that adverse inferences should be applied when "under circumstances {when} …it is reasonable for Commerce to expect that more forthcoming responses should have been made."  The Federal Circuit also discusses intent with respect to the application of adverse inference:  "the statute does not contain an intent element.  'Inadequate inquiries' may suffice."[416]  Though Foremost stated that its omission was inadvertent, it made factually incorrect statements, which it failed to correct until Commerce discovered contradictory information at verification.

Accordingly, pursuant to section 776(b) of the Act, we find that Foremost failed to act to the best of its ability because Foremost failed to include inland freight from port to warehouse expenses for inventory sales in its U.S. sales database, and we are applying facts available, with adverse inference, to all U.S. inventory sales.  For the final determination, we are applying the highest ratio, on the record, of Foremost's reported CEP inventory freight expense to inventory value to calculate a new INLFPWU variable.  The only other U.S. inland freight expense information on the record is from the port to the customer for direct CEP and EP sales, and we find that using this information would not be reasonable or an accurate replacement for inland freight from the port to warehouse.

---

[413] *Id.*

[414] *See Certain Hot-Rolled Carbon Steel Flat Products from Thailand:  Final Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review*, 73 FR 33396 (June 12, 2008), and accompanying IDM at Comment 1.

[415] *See Nippon Steel*, 337 F. 3d at 1382.

[416] *Id.* at 1383.

77

**Comment 18:  Foremost's U.S. Inland Freight Charges to the Customer**

*Petitioner Case and Rebuttal Briefs*[417]
- Foremost's method of calculating the distance component of this freight expense resulted in distorted freight expenses because Foremost used the same distance for sales shipped to Maine, Florida, and New York.

*Foremost Case and Rebuttal Briefs*[418]
- Commerce's verification report suggests that Foremost's methodology for determining distance when reporting inland freight expenses, from the warehouse to the customer (INLFWCU), was distortive.  However, freight rates are impacted by a number of various factors, so given the circumstances, Foremost's methodology was accurate and reasonable.
- Commerce tested the accuracy of Foremost's reporting and did not find any errors.

**Commerce's Position**:  For the final determination we find that Foremost's methodology for reporting INLFWCU is reasonable, and as such, are not making a change to this expense for our final determination.  In particular, while the method Foremost used is not necessarily exact, there is no record information to suggest that Foremost's methodology is clearly distortive.  Specifically, while the methodology for calculating the distances Foremost used in its calculation of INLFWCU potentially results in disparate locations with the same delivery costs per kilogram, the record does not provide any insight into whether this calculation is distortive, nor does any party point to an example of how this distance calculation distorts Foremost's calculation of inland freight.  Further, Foremost computed this expense in response to a request from Commerce, and we did not require Foremost to adjust this expense.[419]

We recognize the petitioner's concerns with respect to this methodology, and we agree that it requires further consideration.  However, we disagree that the information is unusable in this segment of the proceeding or that any of the conditions for facts available (much less AFA) have been met here.  As discussed above, Commerce requested that Foremost "recalculate {its} movement expenses so that they are based on weight of the transaction {and}…so that distance is considered."  Foremost timely responded to Commerce's request in the form and manner requested, and Commerce verified that information.  Further, Foremost's actions did not impede this investigation.  Additionally, while it is true that Foremost's inland freight expense calculation incorporates the same distance for cities geographically far apart, the record does not indicate that the results of this calculation are unrepresentative of Foremost's actual freight expense.  Accordingly, we are not making any changes for the final determination with respect to INLFWCU, but we will carefully review this methodology in an administrative review, should

---

[417] *See* Petitioner January 27 Rebuttal Brief at 18-20.
[418] *See* Foremost Case Brief at 9-10.
[419] *See* Foremost September 17, 2019 SCQR at 30 (citing Commerce's instruction, which stated:
    Please recalculate your movement expenses so that they are based on weight of the transaction.
    Please also revise your INLFWCU expense so that distance is considered or explain why distance
    is not relevant to the actual inland freight expense you incurred during the POI).

78

Commerce issue an AD order in this proceeding, and should such a review be requested of Foremost.

## Comment 19:  FGI's Acquisition Cost

*Foremost Case Brief*[420]
- Commerce should calculate FGI's acquisition costs where it is not reported, or where it needs to be revised, by adding Foremost Worldwide's standard markup to its acquisition price, so that it can recalculate entered value where necessary.

*Petitioner Rebuttal Brief*[421]
- Commerce should use the formula provided by Foremost to calculate FGI's acquisition costs as necessary.

**Commerce's Position**:  We agree that Commerce should recalculate FGI's acquisition costs (which are used to derive Foremost's entered values), where possible.[422]  Accordingly, for the final determination we are recalculating FGI's acquisition cost to equal Foremost Worldwide's purchase price plus Foremost Worldwide's standard mark up.

We note that both Foremost and the petitioner proposed a formula where Commerce would calculate FGI's acquisition price by adding Foremost Worldwide's standard markup to it.[423] However, we find this calculation mathematically infeasible, considering that Foremost did not report FGIACQU for all applicable sales.[424]  Accordingly, we are determining these costs using the methodology above instead.[425]

## Comment 20:  Labor Hours

*Foremost Case Brief*[426]
- In response to a supplemental questionnaire, Foremost updated its calculation of its direct labor hours, but inadvertently did not incorporate the update into its FOP database.
- This error was minor and resulted in Foremost overstating the direct labor hours. Commerce can reasonably disregard this discrepancy.
- If Commerce chooses to make an adjustment for this error, Commerce can use information on the record to reduce Foremost's reported labor hours.

---

[420] *See* Foremost Rebuttal Brief at 11-12.
[421] *See* Petitioner January 27 Rebuttal Brief at 21-22.
[422] *See* FGI Verification Report at 3; *see also* Foremost's Letter, "Minor Corrections Presented at Foremost's CEP Sales Verification," dated December 18, 2019 (FGI Minor Corrections) at 2.
[423] *See* Foremost Case Brief at 11.
[424] *Id*.
[425] *See* Foremost Final Analysis Memorandum.
[426] *See* Foremost Case Brief at 13-14.

*Petitioner Rebuttal Brief*[427]

- The petitioner agrees that Foremost's error was minor and that Foremost's reported labor data do not need to be adjusted.

**Commerce's Position:**  At verification, Commerce learned that Foremost corrected its direct labor hours in response to a supplemental questionnaire but did not update its reported FOPs.[428] We agree with both the petitioner and Foremost that this error was minor and, consistent with section 777A(a)(2) of the Act, we are not making any changes to Foremost's direct labor FOP for the final determination.

## Comment 21:  Calculation and Programing Revisions

*Foremost Case and Rebuttal Briefs*[429]

- Commerce should make the minor corrections presented at verification.[430]
- Commerce should disregard one unreported U.S. sale because the error is so minor.  If Commerce does incorporate this sale into the analysis, Commerce should apply the average margin it calculates for other transactions.
- Commerce should calculate VATTAX using entered value and not gross unit price.
- Commerce should adjust the following variables to remove the portion of the value/expenses attributable to non-subject inputs from its calculations:  ENTVALU (and then Commerce should recalculate USDUTYU), BANKCHARU, DIRSELU, COMMU, EARLYPYU, and OTHDIS4U.
- Commerce should convert the glass SV to the units reported in Foremost's FOP file, *i.e.*, from kg/unit to M$^2$/Unit.
- Commerce should reject the petitioner's suggestion (*see* below) that an unreported quality claim referenced in Commerce's verification report should be allocated across all of one customer's sales.  Commerce found no issues with this claim at verification.

*Petitioner Case and Rebuttal Briefs*[431]

- Commerce should make the minor corrections submitted by Foremost at verification.[432]
- Foremost failed to report one sale of subject merchandise because it was sold to a "sales rep."  Commerce should add this sale to Foremost's U.S. sales database and use the average sales adjustments from other U.S. sales.  Alternatively, Commerce should apply AFA to this one sale to be consistent with Commerce's practice.[433]

---

[427] *See* Petitioner January 27 Rebuttal Brief at 24-25.

[428] *See* Foremost September 24, 2019 SDQR at Exhibit SD-27c; *see also* Foremost Woodwork Verification Report at 22.

[429] *See* Foremost Case Brief at 7 and 14-17.

[430] *See* Foremost Case Brief at 12 (citing Foremost Woodwork Verification Report at 2-3; Foremost Worldwide Verification Report at 3; and FGI Verification Report at 2-3)).

[431] *See* Petitioner January 20 Case Brief at 23-24; and Petitioner January 27 Rebuttal Brief at 15.

[432] *See* Petitioner January 20 Case Brief at 23 (citing FGI Minor Corrections; Foremost Woodwork Minor Corrections; and Foremost Worldwide Minor Corrections).

[433] *See* Petitioner January 27 Rebuttal Brief at 15 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 2019 (April 15, 2015), and accompanying IDM at Comment 5; and *Final Determination of Sales at Less Than Fair*

80

Barcode:3946193-01 A-570-106 INV - Investigation  -

- Commerce only relied on Foremost Worldwide's short-term interest rate in the *Preliminary Determination*, but for the final determination, Commerce should use FGI's short-term interest rate.
- Foremost was unable to provide documentation to support its claim that it reduced the payment for one transaction to compensate for a quality issue related to a non-subject sale. Commerce should allocate this payment reduction across all of this customer's sales as a warranty expense.

**Commerce's Position**: For the final determination, we have made the corrections presented at the start of Foremost's verifications. We are also changing certain parts of the calculation for Foremost's U.S. price. We are removing the portion of the value/expenses related to non-subject inputs when sales are combination kits for the following variables: ENTVALU, BANKCHARU, DIRSELU, COMMU, EARLYPYU, and OTHDIS4U, and we are revising our calculation of VATTAX to base it on a percentage of ENTVALU, and not of gross unit price. We have used the revised ENTVALU to calculate both VATTAX and USDUTYU.[434]

With respect to calculating NV, Foremost notified Commerce that the correct conversion for its glass FOPs was from kg to $M^2$, but Commerce inadvertently did not convert these FOPs.[435] Accordingly, for the final determination we are converting Foremost's glass FOPs (HW3MMGLS, HW5MMGSL, HW8MMGLS) from kg/unit to $M^2$/unit.

With respect to the short-term interest rate used in calculating CREDITU, we are revising our calculation to use FGI's short-term interest rate for CEP sales, in accordance with our practice to use the U.S. interest rate as outlined in Policy Bulletin 98.2.[436] It is Commerce's practice to calculate the U.S. credit expense using a short-term interest rate tied to the currency in which the sales are denominated and this interest rate should be based on the respondent's weighted-average short-term borrowing experience in the currency of the transaction. Additionally, Policy Bulletin 98.2 states, "{t}he short-term borrowing rate realized by the respondent in the relevant currency is the best measure of the time value of money and the cost incurred by the respondent in extending credit to its customers."[437] With respect to Foremost's CEP sales, FGI is the company incurring the cost by extending credit to its customers, as it is the U.S. affiliate making these sales. Accordingly, because it is Commerce's practice to calculate credit expenses using a short-term interest rate tied to the currency in which the sales are denominated and to use the interest rate incurred by the respondent in extending credit to its customers, Commerce is

---

*Value: Silica Bricks and Shapes from the People's Republic of China*, 78 FR 70918 (November 27, 2013), and accompanying IDM at Comment 7).

[434] *See* Foremost Final Analysis Memorandum for a detailed description of the changes made for the final determination.

[435] *See* Foremost September 24, 2019 SDQR at 27.

[436] *See* Import Administration Bulletin 98.2: Imputed Credit Expenses and Interest Rate (February 23, 1998) (Policy Bulletin 98.2); *see also Certain Tapered Roller Bearings from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 83 FR 29092 (June 22, 2018), and accompanying IDM at Comment 19.

[437] *See* Policy Bulletin 98.2.

81

revising its calculation of CREDITU for all CEP sales to use FGI's short-term interest rate, consistent with its practice.[438]

We are not making any adjustments with respect to the petitioner's suggestion for the sale Commerce examined at verification with a quality claim. We find that Foremost provided all of the information requested by Commerce, and the record does not contradict Foremost's assertion that its adjustment was for a sale of non-subject merchandise.[439]

In accordance with section 776(a)(2)(A) of the Act, we are applying facts otherwise available to Foremost's one unreported sale because it withheld information requested by Commerce. Specifically, we found at verification that Foremost had made one U.S. sale to a "sales rep," but Foremost chose not to report it.[440] Foremost was not able to explain why it did not report this sale. Moreover, pursuant to section 776(b)(1) of the Act, we find that Foremost failed to cooperate to the best of its ability in reporting this sale, because it simply chose not to report it.[441] Accordingly, we are applying facts available, with adverse inference, to Foremost's sale of subject merchandise at issue. Although Foremost had the necessary information in its possession, it failed to report this sale in its U.S. sales database, and it provided no reasonable explanation as to why it chose to not report this sale. Therefore, for the final determination, we are basing the dumping margin for this sale on the highest non-aberrational margin computed for any reported U.S. transaction.

## Comment 22: Total AFA for Meisen

*Meisen Case Brief*[442]
- In the *Preliminary Determination*, Commerce accurately noted that Meisen only reported consumption of birch in its production and Commerce confirmed that point in a supplemental response. There was no evidence on the record that Meisen ever produced or sold maple products.
- Because Commerce's conclusion in the *Preliminary Determination* that Meisen failed to provide complete and accurate information about its production process and FOPs was based only on marketing materials, that finding lacked any connection to the record.
- Instead of proceeding to verification in order to test the accuracy of Meisen's statements, Commerce issued two supplemental questionnaires. In its responses, Meisen reiterated that its FOPs had been reported correctly and provided detailed documentation and other data to support its claims.

---

[438] *See Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 74 FR 40167 (August 11, 2009), and accompanying IDM at Comment 12 (stating that "we find that {the U.S. affiliate's} borrowings more closely measure the opportunity cost associated with extending credit to CNA's U.S. customers").

[439] *See* Foremost Worldwide Verification Report at 13.

[440] *See* FGI Verification Report at 7; *see also* FGI Verification Exhibits at VE-6.

[441] *See Nippon Steel*, 337 F. 3d at 1382 (explaining that "the best of its ability" standard in section 776(b) of the Act "does not condone inattentiveness, carelessness, or inadequate record keeping").

[442] *See* Meisen's Case Brief, "Wooden Cabinets and Vanities from the People's Republic of China: Case Brief," dated January 9, 2020 (Meisen Case Brief).

- When Commerce cancelled verification in its December 27 Letter, it noted a difference between the marketing materials and the record information establishing the use of only birch as inputs and the absence of maple but did not identify any inaccurate statement by Meisen regarding its FOPs or misrepresentation regarding its reported sales.[443]
- Although verification is the part of the investigation process in which any continuing concerns are to be addressed, the December 27 Letter offered no explanation why cancelling verification was the appropriate response to any concerns Commerce continued to have.
- Meisen has consistently reported that it does not use any wood input other than birch and that it does not sell merchandise to the United States using any other input.
- Commerce faults Meisen for not immediately responding to the petitioner's pre-preliminary comments but neglects to consider that Meisen already reported that it did not use any other inputs. The claim that Meisen failed to reply to the petitioner's comments is not a valid basis for resorting to AFA, and it is tantamount to delegating Commerce's fact-finding authority to the petitioner.
- Commerce's claim that it expended considerable time and resources to issue multiple questionnaires and review thousands of pages of documentation is ironic given that it was Commerce, not Meisen, that chose to delay verification and issue supplemental questionnaires. Commerce cannot complain on one hand that it had too little information on the maple-birch issue, then complain that it had too much information, while also refusing to verify the information.
- The regulations are unambiguous that, in the investigation phase of a case, verifications will be conducted. To the extent that Commerce is not certain whether information is accurate, the verification process becomes more important, not less.
- In the parallel CVD investigation, Meisen was assigned a calculated rate, not a rate based on AFA, and Commerce conducted a verification. Because the information received in that parallel case is relevant to the usage of birch or maple, and the use of AFA, Commerce should place the full verification outline and report on the record of this investigation and allow parties to comment.
- None of the statutory provisions for application of AFA applies to Meisen; it has met the deadlines set by Commerce and there is ample information on the record showing that Meisen did not use anything other than birch to produce the products sold, it answered every supplemental request fully and completely, and because Commerce decided to cancel verification there has been no failure of Meisen to verify its information.[444]
- Commerce must calculate a dumping margin for Meisen based on information it submitted and must treat all such information as if it had been verified.

*Petitioner Rebuttal Brief*[445]
- Commerce's decision to cancel verification and apply total AFA is supported by the record and consistent with its regulations and established practice.

---

[443] *Id.* at 5 (citing Commerce's Letter, "Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Verification," dated December 27, 2019 (December 27 Letter)).
[444] Although Meisen referred to AFA in making this argument, we understand that Meisen is referencing section 776(a)(2) of the Act.
[445] *See* Petitioner's Meisen Rebuttal Brief, "Rebuttal Brief Regarding Meisen-Specific Issues," dated January 14, 2020, at 3-22.

Barcode:3946193-01 A-570-106 INV - Investigation  -

- The record shows definitively that Meisen produces subject cabinets and vanities using birch wood yet markets those cabinets and vanities in the United States as maple.  Meisen does not deny this fundamental discrepancy and attempts to shift focus to the narrow question of whether Meisen accurately reported the species of its wood FOPs.

- The inconsistency between Meisen's reported FOPs and the merchandise priced, marketed, and sold in the United States, causes the reported cost and sales information to be wholly unreliable and, thus, it is not possible to calculate an accurate dumping margin.  This inconsistency could not be resolved at verification.

- Even if Meisen's reported information were verified as accurate, Meisen's cost and sales information would continue to be unreliable.  Meisen asks Commerce to set aside this contradiction and to believe that all other information is accurate.  However, the fact that Meisen submitted such false and contradictory information itself renders the remaining information submitted unreliable.

- Despite being afforded multiple opportunities to address the discrepancy between the FOPs reported and the species marketed in the United States, Meisen has not provided any argument that explains this fundamental flaw.  Instead, Meisen acknowledges that it marketed and sold cabinets as being made of maple yet maintains that all such cabinets were actually made of birch.

- Given the importance of wood species to the production of cabinets and vanities, Commerce properly concluded that Meisen's cost and sales reporting was so unreliable that it must rely on total AFA.  Because maple wood is substantially more expensive than birch wood, Meisen is not only misleading its customers, it is distorting its U.S. sales information and preventing an apples-to-apples comparison of costs and prices.

- If the alleged birch cabinets were sold as birch cabinets, then they would be sold at much lower prices; thus, Meisen's U.S. prices are artificially high and using such data would result in a margin that significantly underestimates the actual amount of dumping.

- Meisen submitted significant amounts of information that it knew was inaccurate and falsely described the cabinets sold in the United States, but it made no effort to explain the discrepancy until it was raised by the petitioner and Commerce, despite being afforded multiple opportunities to do so.

- Meisen attempted to explain its marketing materials by claiming that those materials refer to the "look" of the cabinets, but an overwhelming amount of evidence indicates the materials refer specifically to the wood used to produce the cabinets.

- Meisen later claimed that it marketed its cabinets as made of solid maple because there is no optical difference in the finished good between maple and birch, thereby undermining its claim that maple refers to the "look" of the cabinets.

- Meisen's reporting in this investigation falls squarely within the legal framework for total AFA because Meisen routinely provided contradictory information that calls into question the veracity of all the information provided.

- In similar situations where the respondent provided contradictory information to Commerce and to its customers, Commerce has applied total AFA because reliable information necessary to calculate a margin was not available on the record.[446]

---

[446] *Id.* at 20-22 (citing *Certain Steel Grating from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 75 FR 32366 (June 8, 2010), and accompanying IDM at 11; *see also Certain Oil Country*

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- In other cases, Commerce has found certain deficiencies in the respondent's reporting to be significant enough to render their reported sales information entirely unreliable.[447]
- Meisen argues that it has been forthcoming and answered all of Commerce's questions, but it ignores the fact that it knew that the information it provided to its customers contradicted the information provided to Commerce and it did not inform Commerce of that fact. Further, Meisen failed to explain why this inconsistency does not distort the reported sales information.
- Commerce's practice in *Certain Hardwood Plywood Products*, *Galvanized Steel Wire*, and *OCTG* establishes that where a respondent has failed to provide cost and sales information that can be reliably compared, Commerce must apply total AFA.
- Commerce is under no obligation to verify the information provided by Meisen in light of the unreliability of Meisen's information. No information Meisen could have provided at verification would have resolved the flaws in Meisen's reported data; further, verification is not an opportunity for the respondent to fill gaps or cure deficiencies in its responses, but rather its purpose is to verify the information already submitted.
- Meisen's claim that verification is not optional is false, and Commerce has a consistent practice of not conducting verification of a respondent's data where failures of the respondent warrant application of total AFA.[448]

**Commerce's Position:** We disagree with Meisen that Commerce erred in its decision to apply AFA in the *Preliminary Determination* and, consequently, delay and, ultimately, cancel verification. We also disagree with Meisen that the continued application of total AFA to Meisen is not warranted for this final determination.

In the *Preliminary Determination*, we found that Meisen did not accurately represent and report the FOPs it consumed in the production of merchandise under consideration, it withheld information, failed to provide information in the form or manner requested, and significantly impeded this investigation. Further, because the missing information was within Meisen's possession and also because Meisen had the ability not to misrepresent its reported data, it failed to cooperate to the best of its ability and, thus, the application of total AFA was appropriate.[449] These findings were based largely on record information indicating that Meisen marketed and had sales of merchandise under consideration during the POI that were produced using maple wood, a primary raw material that Meisen failed to report.[450] The finding was also based on information submitted by the petitioner, including online and print marketing materials, and a sworn affidavit from an individual with extensive experience in the wooden cabinets and vanities industry who, through direct discussions and information provided on the J&K Companies'

---

*Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping*, 75 FR 20335 (April 19, 2010) (*OCTG*), and accompanying IDM at Comment 30).

[447] *Id.* at 23-24 (citing *Certain Hardwood Plywood Products* IDM at 13-16).

[448] *Id.* at 30-31 (citing *Certain Hardwood Plywood Products*; and *Galvanized Steel Wire from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 17430 (March 26, 2012) (*Galvanized Steel Wire*), and accompanying IDM at 10).

[449] *See Preliminary Determination* PDM at 23-24.

[450] *Id.* at 24.

websites,[451] stated that the merchandise in question was represented to him to be made from solid maple wood.[452]  However, we also stated in the *Preliminary Determination* that, due to the fact that the issue was raised in close proximity to the *Preliminary Determination*, we would continue to consider whether the application of AFA to Meisen was warranted in light of any rebuttal factual information provided by Meisen and, if appropriate, any further information requested by Commerce after the issuance of the preliminary determination.[453]

Between October 8, 2019, and October 17, 2019, Meisen and the petitioner submitted comments regarding Commerce's *Preliminary Determination*.[454]  On October 18, 2019, Commerce notified parties that, in order to consider the comments submitted, it was suspending the planned verification of Meisen but that it might have sought to reschedule the verification at a later date.[455]  On October 25, 2019, Commerce issued Meisen a supplemental questionnaire,[456] to which Meisen responded on November 6, 2019.[457]  On November 18, 2019, Commerce issued an additional supplemental questionnaire to Meisen,[458] to which Meisen responded on November 21, 2019.[459]  On December 27, 2019, Commerce notified Meisen that it would not conduct verification and continued to find that the application of AFA was warranted for Meisen because the "admission that Meisen marketed and sold its cabinets as maple cabinets when, in fact, Meisen claims that they were made of birch, highlights continued concerns regarding the data reported in the CONNUMs for the normal value and the reported U.S. prices."[460]  In its letter, Commerce also noted the following:

> The dissonance between what Meisen marketed to its customers and what Meisen reported to Commerce was information that Meisen had in its possession and could have voluntarily presented to Commerce early in the investigation.  Instead, Meisen chose not to disclose this information until after the petitioner raised it in its comments and Commerce issued an adverse preliminary determination, suspended verification, and expended considerable time and resources to issue multiple supplemental questionnaires and review thousands of pages of documentation in response to those questionnaires.[461]

---

[451] Meisen reported 16 affiliated U.S. resellers (collectively, the "J&K Companies").  *See Preliminary Determination* PDM at 24, fn. 143.

[452] *See* Petitioner Meisen Pre-prelim Comments at Exhibit 7.

[453] *See Preliminary Determination* PDM at 25.

[454] *See* Meisen's Letter, "Meisen Preliminary Determination Rebuttal Letter," dated October 8, 2019 (Meisen Post-prelim Rebuttal Letter); *see also* Petitioner's Letter, "Petitioner's Response to Meisen's October 8th Letter," dated October 15, 2019.

[455] *See* Meisen Verification Memo.

[456] *See* Commerce's Letter, "Post-Prelim Supplemental Questionnaire," dated October 24, 2019.

[457] *See* Meisen's November 7, 2019 Post-Prelim Supplemental Questionnaire Response (Meisen November 7, 2019, PPQR).

[458] *See* Commerce's Letter, "Second Post-Prelim Supplemental Questionnaire," dated November 18, 2019 (Second Post-Prelim Questionnaire).

[459] *See* Meisen's November 21, 2019 Second Post-Prelim Supplemental Questionnaire Response, dated November 21, 2019.

[460] *See* December 27 Letter.

[461] *Id.*

To determine whether subject merchandise is being, or is likely to be, sold in the United States at LTFV, Commerce must make an appropriate comparison between the export price or constructed export price and NV.[462]  Where the subject merchandise is exported from an NME country, Commerce is directed by statute to calculate NV on the basis of the value of the FOPs utilized in producing the merchandise.[463]  In order to make such a comparison, a CONNUM is assigned to each unique product reported in the U.S. sales database based on a set of physical characteristics and matched to a corresponding CONNUM in the FOP database.  Accordingly, Commerce set aside a period of time after the initiation of this investigation for interested parties to comment on the appropriate physical characteristics of wooden cabinets and vanities to be reported in response to Commerce's AD questionnaire.[464]  We further stated that the comments solicited from interested parties would be used to identify the key physical characteristics of the subject merchandise in order to report the relevant FOPs accurately, as well as to develop appropriate product-comparison criteria.[465]

In its comments, Meisen opposed the petitioner's proposal to group wood species used as the face material in broad groupings of solid wood products, stating that the "reporting of the type of wood used as the face material is plainly an important characteristic, and thus must be reported precisely."[466]  Meisen argued that the petitioner's "suggestion to report a vague grouping of products is not tenable as it will allow for manipulation and distortion of surrogate values," and that the petitioner's proposal, "rather than collecting data based on the individual species themselves," is contrary to the way {Commerce} has collected data on wood species . . . and would result in a less accurate margin calculation than if {Commerce} followed its prior practice."[467]  Specifically, Meisen advocated for "collecting data based on individual wood species rather than broad categories of species," because the petitioner's proposal would create a "commingled reporting hierarchy which would result in an 'apples-to-oranges' comparison."[468]  In other words, Meisen argued, at the early stages of this investigation, that failure to compare the exact species sold in the U.S. market with the exact species used in production would result in an unfair comparison.  As explained below, the data that Meisen reported resulted in the same unfair "apples-to-oranges" comparison between CEP and NV as the one Meisen cautioned against in its comments.

Commerce ultimately issued the AD questionnaire with instructions for mandatory respondents to construct the CONNUM using codes for wood species grouped into general categories of "Solid wood – common-grade hardwood species" and "Solid wood – mid-grade hardwood species," where common grade (Code 4)  included "Birch (Betula)" and mid-grade (Code 5) included "Maple (all varieties)."[469]  Given these facts, there is absolutely no scenario where a U.S. sale priced for maple wood could ever be compared to the NV of a product made with birch

---

[462] *See* 19 CFR 351.401(a).

[463] *See* section 773(c) of the Act.

[464] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Initiation of Less-Than-Fair-Value Investigation*, 84 FR 12587, 12588 (April 2, 2019).

[465] *Id.*

[466] *See* Meisen's Letter, "Rebuttal Comments on Product Characteristics," dated April 25, 2019, at 3.

[467] *Id.* at 3-4.

[468] *Id.* at 4-5.

[469] *See, e.g.*, Commerce's Letter, "Antidumping Duty Questionnaire," dated June 5, 2019.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

wood, a comparison Meisen argues that Commerce should now make.  We note that this would also have been the case had we followed Meisen's recommendation of separately coding each wood species out of a concern for perfectly identical matching criteria.

In a post-preliminary questionnaire response, Meisen reiterated that it "only sold cabinets produced from birch," that "the J&K Companies only sold the cabinets produced by Meisen," and that "{t}herefore, by extension the J&K Companies only sold cabinets that were produced by Meisen using birch wood."[470]  In its second post-preliminary questionnaire response, Meisen clarified that the price lists that were a source of concern in the *Preliminary Determination* are simply generic and basic price lists that are used as pricing guides for the sales persons and do not include the final descriptions.[471]  Meisen went on to compare such price lists to a brochure a sales person might present to a purchaser at a home improvement store with basic descriptions that serve as the starting point.[472]  The implicit admission is that, in Meisen's scenario, the customer would have seen the description in the price list and would have a reasonable basis to assume that the wood species and price listed in that document was the starting point and, even if the dimensions were adjusted slightly for the final design, the species of wood presented would be the species provided, which, in this case, was maple.  Meisen's online and print marketing materials are so replete with references to its cabinets being made of solid maple wood, and completely devoid of any reference to the alleged actual species of wood, birch, that its customers would have no reason to believe that the cabinets they purchased were made from any wood species other than maple wood.[473]  In other words, Meisen's customers would have clearly believed that the products they were purchasing were made of solid maple wood, a species of wood that is considered to be of more premium value than common grade birch wood, as a result of online and print marketing, and in-store price lists presented by Meisen's sales people.

Meisen's attempts to alternatively construe any references to maple as a reference to the "look" of the cabinets because Meisen's birch cabinets look like maple, and then on the same page claim that it advertises its cabinets as solid maple wood because "there is no optical difference in the finished good between maple and birch once the cabinet is finished,"[474] is a disingenuous and illogical rationalization as to why Meisen exclusively markets its cabinets as "the finest solid maple."[475]  Indeed, given the wealth of online and print marketing materials on the record, as well as Meisen's own statements identifying Meisen's cabinets as solid maple cabinets,[476] and Meisen's admission that it does not advertise any birch products, there can be no question that Meisen is intentionally misleading its customers into believing they are purchasing maple cabinets and that Meisen's customers believe they are paying for products made of maple wood.

Evidence on the record of this investigation indicates that maple is significantly more expensive than birch, showing that maple solid wood or veneers can be as much as twice as expensive as

---

[470] *See* Meisen November 7, 2019 PPQR at 2.
[471] *See* Meisen November 21, 2019 PPQR2 at 2.
[472] *Id.*
[473] *See* Second Post-Prelim Questionnaire at 4 and Attachment II.
[474] *Id*.
[475] *See* Meisen November 21, 2019 PPQR2 at 2-3.
[476] *See, e.g.*, Meisen November 7, 2019 PQR at 1-2; and Post-Prelim Questionnaire at 3-5 and Attachment II.

birch.[477]  Indeed, the SV used to value maple and birch in the *Preliminary Determination* was 912 Euros and 622 Euros, respectively.[478]  Given that both parties acknowledge the importance of wood species in the production of cabinets, and that the SVs are significantly different, it is reasonable to infer that higher costs lead to higher selling prices when the cabinets are produced using maple rather than birch and that cabinets sold as maple products would command a higher price than cabinets made of birch.  This is implicit in Meisen's product characteristics comments in which it proposed breaking out wood species for Commerce's CONNUMs.

A consequence of Meisen's misrepresentations is the potential masking of dumped sales.  The question before Commerce is simple:  what is the "fair" value of the products Meisen sold in the United States during the POI?  By comparing Meisen's cabinets that are priced as though they were produced with maple, (and which may or may not have been sold at prices below NV for maple cabinets) to an NV based on a non-maple wood species, the degree to which Meisen may be selling at LTFV is effectively obscured.  The purpose of soliciting comments and making a reasoned decision on how respondents are to report physical characteristics in construction of the CONNUM is to avoid the very scenario we are presented with here.  Commerce intentionally separated certain species by grade into separate codes in order to match similar prices to similar costs.  Meisen has subverted Commerce's intent and process by misrepresenting the product being sold, thereby distorting the comparison that Commerce is tasked with making.

Although Meisen provided significant amounts of documentation supporting its reported FOPs,[479] its U.S. sales database is comprised of sales of merchandise priced under CONNUMs that are not included in its FOP database.  Moreover, Meisen's U.S. CONNUMs do not represent the maple cabinets it purported to sell and the record does not contain FOP data for the products Meisen represented selling in the U.S. market.  As a result, U.S. prices for purported maple cabinets and NV for birch cabinets introduces a significant mismatch between the two pillars of our AD margin calculation.  Given the above, we cannot calculate an accurate dumping margin with the data reported by Meisen, nor would verification of the accuracy of Meisen's reported data resolve the discrepancy such that the distortion could be remedied.  Accordingly, we conclude that the rejection of Meisen's data is appropriate for this final determination.

Meisen argues that because the record developed in the companion CVD investigation is relevant to the usage of birch or maple, and the use of AFA, Commerce should place the full CVD verification outline and report on the record of this investigation and allow parties to comment.  As an initial matter, the record of this investigation, and that of the CVD investigation, are separate records.[480]  Moreover, it is not clear how information from the CVD investigation would shed any light on the deficiencies in Meisen's reported information in this AD investigation.  Meisen itself admits that it represented its products to U.S. customers as products made from maple but claims that its products were actually produced using birch wood.  Accordingly, we do

---

[477] *See* Petitioner Meisen Pre-prelim Comments at Exhibit 7.
[478] *See* Preliminary SV Memorandum.
[479] *See* Meisen November 7, 2019, PPQR at Exhibits 2, 3, 8, and 9.
[480] *See, e.g.*, *Tri Union Frozen Prods. v. United States*, 163 F. Supp. 3d 1255, 1274 n.14 (CIT 2016) (explaining that "the agency must make its determinations based on the record before it.  Each of Commerce's proceedings are treated 'as independent proceedings with separate records that lead to independent determinations'") (quoting *E.I. Du Pont de Nemours & Co. v. United States*, 22 C.I.T. 19 (CIT 1998)).

89

not find that placing information from the CVD investigation on the record of this AD investigation would serve any purpose at this stage of this investigation.

With regard to Meisen's contention that Commerce is required to verify the information it submitted; we disagree.  According to section 782(i)(1) of the Act and 19 CFR 351.307(b)(1)(i), Commerce will verify factual information upon which the Secretary relies in, *inter alia*, a final determination in an AD investigation.  However, for the reasons described herein, we are not relying upon any of Meisen's reported information for this final determination and, therefore, there is no information that must be verified.  Moreover, as a result of the dissonance between Meisen's reported U.S. sales data and its FOP data, its questionnaire responses contain fundamental discrepancies that were not directly addressed until well after the *Preliminary Determination* and that remain unresolved even after Meisen's belated attempt at clarification.  When a party submits substantially deficient responses, Commerce is under no obligation to use this information.[481]  Under these circumstances, there is no requirement to verify the information.[482]  If a respondent provides substantially incomplete questionnaire responses and Commerce must then base the company's rate entirely on facts available, as in this case, then verification is "meaningless."[483]

As discussed above, section 776(a)(1) and (2) of the Act provides that, if necessary information is missing from the record, or if an interested party:  (A) withholds information that has been requested by Commerce, (B) fails to provide such information in a timely manner or in the form or manner requested, subject to subsections 782(c)(1) and (e) of the Act, (C) significantly impedes a proceeding under the statute, or (D) provides such information but the information cannot be verified, Commerce shall, subject to subsection 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency.  If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  In doing so, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.  Further, section 776(b)(2) states that an adverse inference may include reliance on information derived from the petition, the final determination from the AD investigation, a previous administrative review, or other information placed on the record.

---

[481] *See* section 782(e) of the Act which provides that Commerce should use information submitted by interested parties even if the information does not meet all applicable requirements but only when, *inter alia*, "the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination …."
[482] *See Galvanized Steel Wire* IDM at 11.
[483] *Id.*

Section 776(c) of the Act provides that, in general, when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[484] Further, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[485]

Commerce first became aware of the discrepancy between Meisen's reported U.S. sales and its marketing materials on September 26, 2019,[486] which was less than two weeks prior to the *Preliminary Determination*.[487]  Given the proximity to the *Preliminary Determination*, we based our preliminary decision for Meisen based on total AFA but announced that we intended to continue to examine the issue after the *Preliminary Determination*.[488]  Meisen's claims that Commerce faulted Meisen for not responding to the petitioner's allegations or that Meisen's lack of response was our basis for AFA are misplaced.[489]  Instead, our decision was rooted firmly in the record of this investigation, as it had been developed at the time of the *Preliminary Determination*, and in no way was the result of mere allegations or a lack of response from Meisen.[490]  However, given the importance of the information to Commerce's analysis and gravity of the evidence cited in the petitioner's September 26 letter,[491] it is notable that Meisen had the opportunity to respond with factual information and explanation of its own but chose not to and, instead, waited until after the *Preliminary Determination* to request that Commerce allow Meisen to clarify the record.[492]

Although it is true that Meisen had previously reported to Commerce on more than one occasion that it did not consume any wood species other than birch,[493] the discrepancies cited in the *Preliminary Determination* were not limited to the type of wood that Meisen consumed but also were related to the manner in which Meisen's products were marketed and sold in the United States.[494]  If Meisen believed that it had already addressed the matter of wood species consumed in its production, it still had an obligation to explain to Commerce the numerous instances of marketing materials, and a sworn affidavit, that identified its products as being made of solid maple.  Instead Meisen was utterly silent regarding the discrepancy between its wood consumption and its marketing materials that appeared to directly contradict its consumption

---

[484] *See* SAA at 870.

[485] *See* sections 776(d)(3)(A) and (B) of the Act.

[486] *See* Petitioner Meisen Pre-prelim Comments.

[487] *See Preliminary Determination*.

[488] *See Preliminary Determination* PDM at 23-25.

[489] *See* Meisen Case Brief at 6.

[490] *See Preliminary Determination* PDM at 23-25.

[491] *See* Petitioner Meisen Pre-prelim Comments.

[492] *See* Meisen Post-prelim Rebuttal Letter.

[493] *See* Meisen's section D questionnaire response, dated July 19, 2019, at 12, 14, and Exhibits 1 and 2; and Meisen's supplemental Section D questionnaire response, dated September 16, 2019, at 7.

[494] *See Preliminary Determination* PDM at 23-25.

claims.  As a result of Meisen's failure to clarify the record, Commerce was forced to delay verification and issue two supplemental questionnaires before Meisen directly addressed the issue.[495]  However, even in its second post-preliminary questionnaire response, Meisen gave conflicting and unconvincing reasons as to why its marketing materials misrepresented the species of wood used in its cabinets.[496]

Accordingly, we determine that Meisen withheld information, failed to provide such information in a timely manner, and significantly impeded the investigation, pursuant to section 776(a)(2)(A)-(C) of the Act.  Meisen could have raised the issue of the discrepancies between the products that it marketed to its customers and those it reported to Commerce early in the investigation, especially given Meisen's concerns of properly capturing the wood species in the CONNUM and how it could affect product matches and, ultimately, the dumping margin.  This was information that Meisen had in its possession and could have voluntarily presented to Commerce.  Instead, Meisen chose not to disclose this information until after the *Preliminary Determination* and only after Commerce suspended verification and expended considerable time and resources to issue multiple supplemental questionnaires and review thousands of pages of documentation in response to those questionnaires.  Accordingly, we also find that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference is warranted is assigning a final margin to Meisen, in accordance with section 776(b) of the Act.  We recognize the petitioner's concerns that the record of this investigation indicates that Meisen is engaged in advertising and selling its materials in an untruthful manner to consumers in the United States.  Such business practices fall within the expertise of the U.S. Federal Trade Commission, and we have therefore shared relevant public information with that agency for further investigation and, if appropriate, enforcement action.

---

[495] *See* Meisen November 21, 2019 PPQR2 at 2-5.

[496] *Id.* at 3 ("The marketing materials are not a reflection of the actual material used in the production of the wooden cabinets during the POI but rather a reflection of the 'look' of the cabinets.  They have been marketed as maple because they look like maple), 5 ("The J&K companies advertise their cabinets as solid maple wood as there is no optical difference in the finished good between maple and birch once the cabinet is finished"), and Attachment II ("all our cabinets are made of solid maple wood door and frames with plywood constructed box" . . . "solid maple wood is the main wood species we use for cabinet door, frames, molding decoration parts, and drawers.").

92

## XI.    RECOMMENDATION

We recommend approving all the above positions.  If these positions are accepted, we will publish the final determination in the *Federal Register* and will notify the ITC of our determination.

☒                              ☐

_____        _____

Agree                         Disagree

2/21/2020

X  *[signature]*
_____

Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

93

| | | |
|---|---|---|
| Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, 85 Fed. Reg. 11,953 (Dep't of Commerce Feb. 28, 2020) | P.R. 1559 | APPX001202-APPX001211 |


identified by CBP as an importer in the covered merchandise referral (referenced above) are exempt from the additional filing requirements for importers pursuant to 19 CFR 351.305(d).

Dated: February 24, 2020.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

### Appendix

#### Scope of the Order

The products covered by the order are all finished circular sawblades, whether slotted or not, with a working part that is comprised of a diamond segment or segments, and parts thereof, regardless of specification or size, except as specifically excluded below. Within the scope of the order are semi-finished diamond sawblades, including diamond sawblade cores and diamond sawblade segments. Diamond sawblade cores are circular steel plates, whether or not attached to non-steel plates, with slots. Diamond sawblade cores are manufactured principally, but not exclusively, from alloy steel. A diamond sawblade segment consists of a mixture of diamonds (whether natural or synthetic, and regardless of the quantity of diamonds) and metal powders (including, but not limited to, iron, cobalt, nickel, tungsten carbide) that are formed together into a solid shape (from generally, but not limited to, a heating and pressing process).

Sawblades with diamonds directly attached to the core with a resin or electroplated bond, which thereby do not contain a diamond segment, are not included within the scope of the order. Diamond sawblades and/or sawblade cores with a thickness of less than 0.025 inches, or with a thickness greater than 1.1 inches, are excluded from the scope of the order. Circular steel plates that have a cutting edge of non-diamond material, such as external teeth that protrude from the outer diameter of the plate, whether or not finished, are excluded from the scope of the order. Diamond sawblade cores with a Rockwell C hardness of less than 25 are excluded from the scope of the order. Diamond sawblades and/or diamond segment(s) with diamonds that predominantly have a mesh size number greater than 240 (such as 250 or 260) are excluded from the scope of the order.

Merchandise subject to the order is typically imported under heading 8202.39.00.00 of the Harmonized Tariff Schedule of the United States (HTSUS). When packaged together as a set for retail sale with an item that is separately classified under headings 8202 to 8205 of the HTSUS, diamond sawblades or parts thereof may be imported under heading 8206.00.00.00 of the HTSUS. On October 11, 2011, Commerce included the 6804.21.00.00 HTSUS classification number to the customs case reference file, pursuant to a request by U.S. Customs and Border Protection.[8] Pursuant to

requests by CBP, Commerce included to the customs case reference file the following HTSUS classification numbers: 8202.39.0040 and 8202.39.0070 on January 22, 2015, and 6804.21.0010 and 6804.21.0080 on January 26, 2015.[9]

The tariff classification is provided for convenience and customs purposes; however, the written description of the scope of the order is dispositive.

[FR Doc. 2020–04118 Filed 2–27–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–106]**

### Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the People's Republic of China (China) are being, or are likely to be, sold in the United States at less than fair value (LTFV). The final weighted-average dumping margins are listed in the "Final Determination Margins" section of this notice.

**DATES:** Applicable February 28, 2020.

**FOR FURTHER INFORMATION CONTACT:** Kabir Archuletta, Rachel Greenberg, or Eliza Siordia, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2593, (202) 482–0652, or (202) 482–3878, respectively.

**SUPPLEMENTARY INFORMATION:**

#### Background

On October 9, 2019, Commerce published the *Preliminary Determination* in this investigation.[1] On

November 14, 2019, Commerce published the *Amended Preliminary Determination*.[2] The petitioner is the American Kitchen Cabinet Alliance. The mandatory respondents in this investigation are The Ancientree Cabinet Co., Ltd. (Ancientree), Dalian Meisen Woodworking Co., Ltd. (Meisen), and Rizhao Foremost Woodwork Manufacturing Co., Ltd. (Foremost).

A summary of the events that occurred since Commerce published the *Amended Preliminary Determination,* as well as a full discussion of the issues raised by parties for this final determination, are discussed in the Issues and Decision Memorandum.[3] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov,* and to all parties in the Central Records Unit, Room B8024 of the main Commerce building. In addition, a complete version of the Issues and Decision Memorandum is available at *http://enforcement.trade.gov/frn/index.html.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

#### Period of Investigation

The period of investigation is July 1, 2018 through December 31, 2018.

#### Scope of the Investigation

The scope of the investigation covers wooden cabinets and vanities from China. For a complete description of the scope of the investigation, *see* Appendix I.

#### Scope Comments

On October 2, 2019, Commerce issued a Preliminary Scope Decision

---

[8] *See Diamond Sawblades and Parts Thereof from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review,* 76 FR 76128 (December 6, 2011).

[9] *See Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016–2017,* 83 FR 64331 (December 14, 2018) and accompanying Issues and Decision Memorandum at 3.

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures,* 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum, as corrected by

---

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures,* 84 FR 56420 (October 22, 2019).

[2] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Amended Preliminary Determination of Sales at Less Than Fair Value,* 84 FR 61875 (November 14, 2019) (*Amended Preliminary Determination*).

[3] *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

Memorandum.[4] Several interested parties submitted case and rebuttal briefs concerning the scope of this investigation. For a summary of the product coverage comments and rebuttal comments submitted to the record for this final determination, and accompanying discussion and analysis of all comments timely received, *see* the Final Scope Decision Memorandum.[5] Based on the comments received, Commerce is not modifying the scope language as it appeared in the *Preliminary Determination.* The scope in Appendix I remains unchanged from that which appeared in the *Preliminary Determination.*

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs by parties in this investigation are discussed in the Issues and Decision Memorandum. A list of the issues that parties raised in the Issues and Decision Memorandum is attached to this notice as Appendix II.

### Verification

As provided in section 782(i) of the Tariff Act of 1930, as amended (the Act), Commerce conducted verification of the information submitted by Ancientree and Foremost for use in the final determination. We used standard verification procedures, including an examination of relevant accounting records and original source documents provided by the respondents.[6]

Commerce did not verify the information submitted by Meisen.[7]

### Changes Since the Preliminary Determination

Based on our review and analysis of the comments received from parties, minor corrections presented at verification, and our verification findings, we have made certain changes to the margin calculations for Ancientree and Foremost. For a discussion of these changes, *see* the "Changes Since the Preliminary Determination" section of the Issues and Decision Memorandum and the Final Calculation Memoranda.[8]

### Adverse Facts Available

In determining Meisen's dumping margin, we find that the application of facts available with an adverse inference under sections 776(a)(2)(A) through (C) and 776(b) of the Act as discussed in the Issues and Decision Memorandum.[9] Therefore, as adverse facts available (AFA), we have assigned Meisen the rate of 262.18 percent, which is the highest petition rate.[10]

For the reasons explained in the *Preliminary Determination,* we continue to find that the use of AFA, pursuant to sections 776(a) and (b) of the Act, is warranted in determining the rate for the China-wide entity.[11] In selecting the AFA rate for the China-wide entity, Commerce's practice is to select a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[12] For the final

determination, we are also assigning the China-wide entity, as AFA, the rate of 262.18 percent, which is the highest petition rate.[13]

### Separate Rates

Generally, Commerce looks to section 735(c)(5)(A) of the Act, which provides instructions for calculating the all-others rate in a market economy antidumping duty (AD) investigation, for guidance when calculating the rate for separate rate respondents that we did not individually examine in a non-market economy AD investigation. Section 735(c)(5)(A) of the Act states that the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely on the basis of facts available.[14]

In this final determination, Commerce has calculated rates for Ancientree and Foremost that are not zero, *de minimis,* or based entirely on facts available. Thus, looking to section 735(c)(5)(A) of the Act for guidance, and consistent with our practice,[15] based on publicly ranged sales data, we are assigning the weighted-average of these mandatory respondents' rates as the rate for non-individually examined companies that have qualified for a separate rate, other than Meisen, whose rate is based entirely on section 776 of the Act as discussed above.

### Final Determination

The final estimated weighted-average dumping margins are as follows:

---

[4] *See* Memorandum, "Certain Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Scope Comments Decision Memorandum for the Preliminary Determinations," dated October 2, 2019 (Preliminary Scope Decision Memorandum).

[5] *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Scope Comments Decision Memorandum," dated concurrently with this notice (Final Scope Decision Memorandum).

[6] *See* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Verification of the Export Price Sales and Factors of Production Response of The Ancientree Cabinet Co., Ltd," dated December 10, 2019; Memorandum, "Verification of the Responses of Foremost Worldwide Company Ltd. In the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020; Memorandum "Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020; and "Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and

Components Thereof from the People's Republic of China," dated January 10, 2020.

[7] *See* Commerce's Letter, "Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Verification," dated December 27, 2019.

[8] *See* Memoranda, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Analysis Memorandum for The Ancientree Cabinet Co., Ltd.," and "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Analysis Memorandum for Rizhao Foremost Woodwork Manufacturing Company Ltd.," both dated concurrently with this notice (collectively, Final Calculation Memoranda).

[9] *See* Issues and Decision Memorandum at Comment 22.

[10] *Id.*

[11] *See Preliminary Determination,* 84 FR at 54106.

[12] *See, e.g., Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Purified Carboxymethyl Cellulose from Finland,* 69 FR 77216 (December 27,

2004), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value: Purified Carboxymethyl Cellulose from Finland,* 70 FR 28279 (May 17, 2005).

[13] *See* Issues and Decision Memorandum at "Use of Adverse Facts Available."

[14] *See, e.g., Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Rescission of Reviews in Part,* 73 FR 52823, 52824 (September 11, 2008), and accompanying Issues and Decision Memorandum at Comment 16.

[15] *See, e.g., Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China,* 71 FR 77373, 77377 (December 26, 2006), unchanged in *Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China,* 72 FR 19690 (April 19, 2007).

**Federal Register** / Vol. 85, No. 40 / Friday, February 28, 2020 / Notices          **11955**

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| The Ancientree Cabinet Co., Ltd ............................ | The Ancientree Cabinet Co., Ltd ............................ | 4.37 | 0.00 |
| Dalian Meisen Woodworking Co., Ltd ..................... | Dalian Meisen Woodworking Co., Ltd ..................... | 262.18 | 251.64 |
| Foremost Worldwide Company Limited ................... | Rizhao Foremost Woodwork Manufacturing Company, Ltd. | 101.46 | 90.92 |
| Foremost Worldwide Company Limited ................... | Henan AiDiJia Furniture Co., Ltd ........................... | 101.46 | 90.92 |
| Foremost Worldwide Company Limited ................... | Suzhou Weiye Furniture Co., Ltd ........................... | 101.46 | 90.92 |
| Foremost Worldwide Company Limited ................... | Changsha Minwan Furniture Manufacturing Co., Ltd. | 101.46 | 90.92 |
| ANHUI JIANLIAN WOOD PRODUCTS CO., LTD ... | ANHUI JIANLIAN WOOD PRODUCTS CO., LTD .. | 48.50 | 37.96 |
| Anhui Swanch Cabinetry Co., Ltd .......................... | Anhui Swanch Cabinetry Co., Ltd .......................... | 48.50 | 37.96 |
| ANHUI XINYUANDA CUPBOARD CO., LTD ........... | ANHUI XINYUANDA CUPBOARD CO., LTD ........... | 48.50 | 37.96 |
| Beijing Oulu Jinxin International Trade Co., Ltd ...... | Beijing Oulu Jinxin International Trade Co., Ltd ...... | 48.50 | 37.96 |
| Boloni Smart Home Decor (Beijing) Co., LTD ......... | Boloni Smart Home Decor (Beijing) Co., LTD ......... | 48.50 | 37.96 |
| BRENTRIDGE HOLDING CO., LTD ........................ | ZHOUSHAN FOR-STRONG WOOD CO., LTD ...... | 48.50 | 37.96 |
| Caoxian Brothers Hengxin Wood Industry Co., Ltd | Caoxian Brothers Hengxin Wood Industry Co., Ltd | 48.50 | 37.96 |
| Changyi Zhengheng Woodwork Co., Ltd ................ | Changyi Zhengheng Woodwork Co., Ltd ................ | 48.50 | 37.96 |
| CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | 48.50 | 37.96 |
| China Friend Limited ............................................. | Dongming Sanxin Wood Industry Co., Ltd .............. | 48.50 | 37.96 |
| Dalian Jiaye Wood Products Co., Ltd .................... | Dalian Jiaye Wood Products Co., Ltd .................... | 48.50 | 37.96 |
| Dalian Xingsen Wooden Products Co., Ltd ............ | Dalian Xingsen Wooden Products Co., Ltd ............ | 48.50 | 37.96 |
| Dandong City Anmin Wooden Products Group Co., Ltd. | Dandong City Anmin Wooden Products Group Co., Ltd. | 48.50 | 37.96 |
| Dandong Laroyal Cabinetry Co., Ltd ..................... | Dandong Laroyal Cabinetry Co., Ltd ..................... | 48.50 | 37.96 |
| DEHK LIMITED ..................................................... | DIAM DISPLAY (CHINA) CO., LTD ........................ | 48.50 | 37.96 |
| Deqing China-Africa Foreign Trade Port Co., Ltd .... | Suqian Welcomewood Products Co., Ltd ................ | 48.50 | 37.96 |
| Dewell Wooden Products Haian Co., Ltd ............... | Dewell Wooden Products Haian Co., Ltd ............... | 48.50 | 37.96 |
| Dongguan American Parts Supplier Co., Ltd .......... | Dongguan American Parts Supplier Co., Ltd .......... | 48.50 | 37.96 |
| Dongguan Niusaiqu Wood Industry Co., Ltd .......... | Dongguan Niusaiqu Wood Industry Co., Ltd .......... | 48.50 | 37.96 |
| Dongguan Unique Life Furniture Co., Ltd. also known as Unique Life Furniture Co., Ltd (trade name). | Dongguan Unique Life Furniture Co., Ltd .............. | 48.50 | 37.96 |
| Dorbest Ltd .......................................................... | Rui Feng Woodwork (Dongguan) Co., Ltd ............. | 48.50 | 37.96 |
| EZIDONE DISPLAY CORPORATION LTD .............. | EZIDONE DISPLAY CORPORATION LTD .............. | 48.50 | 37.96 |
| EZIDONE DISPLAY CORPORATION LTD .............. | EZIDONE DISPLAY INC .................................... | 48.50 | 37.96 |
| Forcer International Limited ................................... | QUFU XINYU FURNITURE CO., LTD .................... | 48.50 | 37.96 |
| Forcer International Limited ................................... | LINYI RUNKANG CABINET CO., LTD .................... | 48.50 | 37.96 |
| Forcer International Limited ................................... | BEIJING OULU JINXIN INTERNATIONAL TRADE CO., LTD. | 48.50 | 37.96 |
| Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name). | Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name). | 48.50 | 37.96 |
| Foshan Liansu building material trading Co., Ltd .... | Guangdong Lesso Home Furnishing Co., Ltd ........ | 48.50 | 37.96 |
| FOSHAN NANHAI HONGZHOU WOOD LTD | FOSHAN NANHAI HONGZHOU WOOD LTD | 48.50 | 37.96 |
| Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd .... | Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd ... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | FOSHAN DIBIAO BATHROOM CO., LTD .............. | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | FOSHAN MK HOME FURISHING CO., LTD .......... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | PROUDER INDUSTRIAL LIMITED ....................... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | FOSHAN DEMAX SANITARY WARE CO., LTD ...... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | HEBEI SHUANGLI FURNITURE CO., LTD ............ | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | SHOUGUANG FUSHI WOOD CO., LTD ............... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | Foshan Virtu Bathroom Furniture Ltd .................... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ......... | KAIPING HONGITARYWARE TECHNOLOGY LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | FOSHAN DIBIAO BATHROOM CO., LTD .............. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | FOSHAN MK HOME FURISHING CO., LTD .......... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | PROUDER INDUSTRIAL LIMITED ....................... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | FOSHAN DEMAX SANITARY WARE CO., LTD ...... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | HEBEI SHUANGLI FURNITURE CO., LTD ............ | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | SHOUGUANG FUSHI WOOD CO., LTD ............... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | Foshan Virtu Bathroom Furniture Ltd .................... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ..................... | KAIPING HONGITARYWARE TECHNOLOGY LTD | 48.50 | 37.96 |
| Foshan Xinzhongwei Economic & Trade Co., Ltd .... | Foshan Lihong Furniture Sanitary Ware Co., Ltd ... | 48.50 | 37.96 |

APPX001204

Barcode:3948567-01 A-570-106 INV - Investigation -

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| FUJIAN DUSHI WOODEN INDUSTRY CO., LTD ... | FUJIAN DUSHI WOODEN INDUSTRY CO., LTD .. | 48.50 | 37.96 |
| FUJIAN LEIFENG CABINETRY CO., LTD ............... | FUJIAN LEIFENG CABINETRY CO., LTD ............... | 48.50 | 37.96 |
| Fujian Panda Home Furnishing Co., Ltd ................. | Fujian Panda Home Furnishing Co., Ltd ................. | 48.50 | 37.96 |
| Fujian Senyi Kitchen Cabinet Co., Ltd .................. | Fujian Senyi Kitchen Cabinet Co., Ltd .................. | 48.50 | 37.96 |
| Fuzhou Biquan Trading Co., Ltd .......................... | Biquan (Fujian) Group Co., Ltd ............................ | 48.50 | 37.96 |
| Fuzhou CBM Import & Export Co., Ltd ................ | Fuzhou CBM Import & Export Co., Ltd ................ | 48.50 | 37.96 |
| Fuzhou Desource Home Décor Co., Ltd ............. | Fuzhou Desource Home Decor Co., Ltd ............. | 48.50 | 37.96 |
| FUZHOU LIMIN STONE PRODUCTS CO., LTD ..... | Fuzhou YST Cabinet Co., Ltd .............................. | 48.50 | 37.96 |
| FUZHOU MASTONE IMPORT & EXPORT CO., LTD. | Fuzhou Yuansentai Cabinet Co., Ltd .................... | 48.50 | 37.96 |
| Fuzhou Minlian Wood Industry Co., Ltd ............... | Fuzhou Minlian Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| FUZHOU SUNRISING HOME DECO MANUFAC-TURING CO., LTD. | FUZHOU SUNRISING HOME DECO MANUFAC-TURING CO., LTD. | 48.50 | 37.96 |
| FUZHOU XINRUI CABINET CO., LTD ................... | FUZHOU XINRUI CABINET CO., LTD ................... | 48.50 | 37.96 |
| Gaomi City Haitian Wooden Ware Co., Ltd .......... | Gaomi City Haitian Wooden Ware Co., Ltd .......... | 48.50 | 37.96 |
| GAOMI HONGTAI HOME FURNITURE CO., LTD .. | GAOMI HONGTAI HOME FURNITURE CO., LTD | 48.50 | 37.96 |
| Guangde Bozhong Trade Company, Ltd ................ | Guangde Bozhong Trade Company, Ltd ................ | 48.50 | 37.96 |
| GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | 48.50 | 37.96 |
| Guangdong G-Top Import and Export Co., Ltd ...... | Foshan Shunde Rongao Furniture CO., LTD ......... | 48.50 | 37.96 |
| Guangzhou Nuolande Import and Export Co., Ltd ... | Guangzhou Nuolande Import and Export Co., Ltd .. | 48.50 | 37.96 |
| Haiyang Kunlun Wood Co., Ltd ............................ | Haiyang Kunlun Wood Co., Ltd ............................ | 48.50 | 37.96 |
| Hangzhou Bestcraft Sanitary Equipments Co., Ltd .. | Hangzhou Bestcraft Sanitary Equipments Co., Ltd | 48.50 | 37.96 |
| Hangzhou Entop Houseware Co., Ltd .................. | Jinhua Aonika Sanitary Ware Co., Ltd ................. | 48.50 | 37.96 |
| Hangzhou Entop Houseware Co., Ltd .................. | Hangzhou Bestcraft Sanitary Equipments Co., Ltd | 48.50 | 37.96 |
| Hangzhou Hansen Sanitary Ware Co., Ltd ............ | Hangzhou Hansen Sanitary Ware Co., Ltd ............ | 48.50 | 37.96 |
| Hangzhou Hoca Kitchen & Bath Products Co., Ltd .. | Hangzhou Hoca Kitchen & Bath Products Co., Ltd | 48.50 | 37.96 |
| Hangzhou Home Dee Sanitary Ware Co., Ltd ....... | Hangzhou Home Dee Sanitary Ware Co., Ltd ....... | 48.50 | 37.96 |
| Hangzhou Oulang Bathroom Equipment Co., Ltd .... | Hangzhou Oulang Bathroom Equipment Co., Ltd ... | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............. | Jinhua Aonika Sanitary Ware Co., Ltd ................. | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............. | Hangzhou Yuxin Sanitary Ware Co., Ltd .............. | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............. | Hangzhou Fuyang Beautiful Sanitary Ware Co., Ltd | 48.50 | 37.96 |
| Hangzhou Sunlight Sanitary Co., Ltd ................... | Hangzhou Sunlight Sanitary Co., Ltd ................... | 48.50 | 37.96 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd ............ | PINGHU AIPA SANITARY WARE CO., LTD .......... | 48.50 | 37.96 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd ............ | HANGZHOU QILONG SANITARY WARE CO., LTD. | 48.50 | 37.96 |
| Hangzhou Xinhai Sanitary Ware Co., Ltd ............. | Hangzhou Xinhai Sanitary Ware Co., Ltd ............. | 48.50 | 37.96 |
| Hangzhou Yewlong Import & Export Co., Ltd ........ | Hangzhou Yewlong Industry Co., Ltd ................... | 48.50 | 37.96 |
| Hangzhou Zhuangyu Import & Export Co., Ltd ...... | Hangzhou Zhuangyu Import & Export Co., Ltd ...... | 48.50 | 37.96 |
| Henan Aotin Home Furnishing Co., Ltd ................ | Henan Aotin Home Furnishing Co., Ltd ................ | 48.50 | 37.96 |
| Heyond Cabinet Co., Ltd ................................... | Heyond Cabinet Co., Ltd ................................... | 48.50 | 37.96 |
| Homestar Corporation ....................................... | Homestar Corporation ....................................... | 48.50 | 37.96 |
| HONG KONG JIAN CHENG TRADING CO., LIM-ITED. | ZHONGSHAN YAYUE FURNITURE CO., LTD ...... | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Changtai Guanjia Industry & Trade Company Co., Ltd. | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Zhangzhou Huihua Industry and Trade Co., Ltd ..... | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Fujian Xinanlong Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| Honsoar New Building Material Co., Ltd ............... | Shandong Honsoar Cabinet Materials Co., Ltd ....... | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Jianfa Wooden Co., Ltd ...................................... | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Heshan Yingmei Cabinets Co., Ltd ....................... | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Hesha Feiqiu Cabinet Co., Ltd ............................ | 48.50 | 37.96 |
| Huimin Hanlong Furniture Co., Ltd ...................... | Huimin Hanlong Furniture Co., Ltd ...................... | 48.50 | 37.96 |
| HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | 48.50 | 37.96 |
| HUIZHOU MANDARIN FURNITURE CO., LTD ...... | HUIZHOU MANDARIN FURNITURE CO., LTD ...... | 48.50 | 37.96 |
| Jiang Su Rongxin Cabinets Ltd ........................... | Jiang Su Rongxin Cabinets Ltd ........................... | 48.50 | 37.96 |
| Jiangmen Kinwai Furniture Decoration Co., Ltd ....... | Jiangmen Kinwai Furniture Decoration Co., Ltd ...... | 48.50 | 37.96 |
| Jiangmen Kinwai International Furniture Co., Ltd .... | Jiangmen Kinwai International Furniture Co., Ltd ... | 48.50 | 37.96 |
| Jiangsu Beichen Wood Co., Ltd .......................... | Jiangsu Beichen Wood Co., Ltd .......................... | 48.50 | 37.96 |
| Jiangsu Meijun Intelligent Home Co., Ltd ............. | Jiangsu Meijun Intelligent Home Co., Ltd ............. | 48.50 | 37.96 |
| Jiangsu Pusite Furniture Co., Ltd ........................ | Jiangsu Pusite Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| Jiangsu Roc Furniture Industrial Co., Ltd ............. | Jiangsu Roc Furniture Industrial Co., Ltd ............. | 48.50 | 37.96 |
| JIANGSU SUNWELL CABINETRY CO., LTD ......... | JIANGSU SUNWELL CABINETRY CO., LTD ......... | 48.50 | 37.96 |

**Federal Register** / Vol. 85, No. 40 / Friday, February 28, 2020 / Notices    **11957**

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| JIANGSU WEISEN HOUSEWARE CO., LTD .......... | JIANGSU WEISEN HOUSEWARE CO., LTD .......... | 48.50 | 37.96 |
| Jiangsu Xiangsheng Bedtime Furniture Co., Ltd ...... | Jiangsu Xiangsheng Bedtime Furniture Co., Ltd ..... | 48.50 | 37.96 |
| Jiayuan (Xiamen) Industrial Co., Ltd ...................... | Jiayuan (Xiamen) Industrial Co., Ltd ...................... | 48.50 | 37.96 |
| JINJIANG PERFECT GENERATION IMP. & EXP. CO., LTD. | Homebi Technology Co., LTD ................................ | 48.50 | 37.96 |
| King's Group Furniture (Enterprises) Co., Ltd .......... | Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | 48.50 | 37.96 |
| KM Cabinetry Co., Limited ...................................... | Zhongshan KM Cabinetry Co., Ltd ......................... | 48.50 | 37.96 |
| Kunshan Baiyulan Furniture Co., Ltd ...................... | Kunshan Baiyulan Furniture Co., Ltd ...................... | 48.50 | 37.96 |
| Kunshan Home Right Trade Corporation ................. | Kunshan Fangs Furniture Co., Ltd ......................... | 48.50 | 37.96 |
| LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | 48.50 | 37.96 |
| Linshu Meibang Furniture Co., Ltd ......................... | Linshu Meibang Furniture Co., Ltd ......................... | 48.50 | 37.96 |
| Linyi Bomei Furniture Co., Ltd ............................... | Linyi Bomei Furniture Co., Ltd ............................... | 48.50 | 37.96 |
| LINYI BONN FLOORING MANUFACTURING CO., LTD. | LINYI BONN FLOORING MANUFACTURING CO., LTD. | 48.50 | 37.96 |
| Linyi Kaipu Furniture Co., Ltd ................................ | Linyi Kaipu Furniture Co., Ltd ................................ | 48.50 | 37.96 |
| Linyi Runkang Cabinet Co., Ltd ............................. | Linyi Runkang Cabinet Co., Ltd ............................. | 48.50 | 37.96 |
| Liu Shu Woods Product (Huizhou) Co., Ltd also known as Liu Shu Wood Products Co., Ltd (trade name) and Liu Shu Woods Product Co., Ltd (trade name). | Liu Shu Woods Product (Huizhou) Co., Ltd ............ | 48.50 | 37.96 |
| Master Door & Cabinet Co., Ltd ............................ | Master Door & Cabinet Co., Ltd ............................ | 48.50 | 37.96 |
| Masterwork Cabinetry Company Limited .................. | Shandong Compete Wood Co., Ltd ........................ | 48.50 | 37.96 |
| Masterwork Cabinetry Company Limited .................. | Linyi Zhongsheng Jiaju Zhuangshi Co., Ltd ........... | 48.50 | 37.96 |
| MEILIN WOOD PRODUCTS(DALIAN)CO., LTD ...... | MEILIN WOOD PRODUCTS(DALIAN)CO., LTD .... | 48.50 | 37.96 |
| Minhou Beite Home Decor Co., Ltd ........................ | Minhou Beite Home Decor Co., Ltd ........................ | 48.50 | 37.96 |
| MJB Supply (Dalian) Co., Ltd ................................ | Mulin City Bamiantong Linyeju Jisen Wood ............ | 48.50 | 37.96 |
| MOREWOOD CABINETRY CO., LTD ..................... | MOREWOOD CABINETRY CO., LTD ..................... | 48.50 | 37.96 |
| Nanjing Kaylang Co., Ltd ....................................... | Nanjing Kaylang Co., Ltd ....................................... | 48.50 | 37.96 |
| Nantong Aershin Cabinets Co., Ltd ........................ | Nantong Aershin Cabinets Co., Ltd ........................ | 48.50 | 37.96 |
| Nantong Ouming Wood Co., ................................... | Nantong Ouming Wood Co., ................................... | 48.50 | 37.96 |
| Ltd., also known as Nantong Ouming Wood Indus-try Co., Ltd. | Ltd., also known as Nantong Ouming Wood Indus-try Co., Ltd. | | |
| NANTONG YANGZI FURNITURE CO., LTD ........... | NANTONG YANGZI FURNITURE CO., LTD ........... | 48.50 | 37.96 |
| NINGBO KINGWOOD FURNITURE CO., LTD ........ | NINGBO KINGWOOD FURNITURE CO., LTD ....... | 48.50 | 37.96 |
| NINGBO ROVSA HOME FURNISHING CO., LTD .. | NINGBO ROVSA HOME FURNISHING CO., LTD .. | 48.50 | 37.96 |
| Ojans Company Limited ......................................... | Foshan Shunde Ojans Intelligent Sanitary Ware Co., Ltd. | 48.50 | 37.96 |
| Oppein Home Group Inc. ....................................... | Oppein Home Group Inc. ....................................... | 48.50 | 37.96 |
| PIZHOU OUYME IMPORT & EXPORT TRADE CO., LTD. | XUZHOU WOOD-BASED PANEL CO., LTD. | 48.50 | 37.96 |
| Pneuma Asia Sourcing & Trading Co. LIMITED ...... | Dalian Tianxin Home Product Co., Ltd .................... | 48.50 | 37.96 |
| Pneuma Asia Sourcing & Trading Co. LIMITED ...... | Qingdao Haiyan Drouot Household Co., Ltd ............ | 48.50 | 37.96 |
| Putian Jinggong Furniture Co., Ltd ........................ | Putian Jinggong Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| Qingdao Coomex Sources Co., Ltd. also known as Coomex Sources Co., Ltd. | Nantong Aershin Cabinets Co., Ltd ........................ | 48.50 | 37.96 |
| Qingdao Haiyan Drouot Household Co., Ltd ............ | Qingdao Haiyan Drouot Household Co., Ltd ............ | 48.50 | 37.96 |
| Qingdao Liangmu Hongye Co., Ltd ........................ | Qingdao Liangmu Hongye Co., Ltd ........................ | 48.50 | 37.96 |
| Qingdao Liangmu Jinshan Woodwork Co., Ltd ........ | Qingdao Liangmu Jinshan Woodwork Co., Ltd ....... | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Lankao Sanqiang Wooden Products Co., Ltd .......... | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Lanshan Chengxinli Woods Co., Ltd .............. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Shouguang Shi Qifeng Woods Co., Ltd .................. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Mingzhu Woods Co., Ltd ............................... | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Yichun Senhai Woods Industry Co., Ltd ................. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Jinde Arts & Crafts Co., Ltd ......................... | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Qingdao Ruirong Woods Co., Ltd ........................... | 48.50 | 37.96 |
| Qingdao Shousheng Industry Co., Ltd .................... | Qingdao Shousheng Industry Co., Ltd .................... | 48.50 | 37.96 |
| Qingdao Yimei Wood Work Co., Ltd ....................... | Qingdao Yimei Wood Work Co., Ltd ....................... | 48.50 | 37.96 |
| QINGDAOHONGXINCHENGDA WOOD INDUS-TRY CO., LTD. | QINGDAOHONGXINCHENGDA WOOD INDUS-TRY CO., LTD. | 48.50 | 37.96 |
| QUFU XINYU FURNITURE CO., LTD ..................... | QUFU XINYU FURNITURE CO., LTD ..................... | 48.50 | 37.96 |
| Ronbow Hong Kong Limited ................................... | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd | 48.50 | 37.96 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Sagarit Bathroom Manufacturer Limited ................. | Shouguang Fushi Wood Co., Ltd ........................... | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited ................. | Zhangzhou Guohui Industrial & Trade Co., Ltd ...... | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited ................. | Qingdao Runpeng Wood Industrial Co., Ltd ........... | 48.50 | 37.96 |
| Sankok Arts Co., Ltd ............................................. | Sankok Arts Co., Ltd ............................................. | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Qindao Yimei Wood Work Co., Ltd ........................ | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Linyi Kaipu Furniture Co., Ltd ............................... | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Shandon Honsoar Cabinetry Co., Ltd ................... | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Huimin Hanlong Furniture Co, Ltd ......................... | 48.50 | 37.96 |
| Shandong Cubic Alpha Timber Co., Ltd ................. | Shandong Cubic Alpha Timber Co., Ltd ................. | 48.50 | 37.96 |
| Shandong Fusheng Wood Co., Ltd ........................ | Shandong Fusheng Wood Co., Ltd ........................ | 48.50 | 37.96 |
| Shandong Huanmei Wood Co., Ltd ....................... | Shandong Huanmei Wood Co., Ltd ....................... | 48.50 | 37.96 |
| SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | 48.50 | 37.96 |
| Shandong Longsen Woods Co., Ltd ...................... | Shandong Longsen Woods Co., Ltd ...................... | 48.50 | 37.96 |
| Shandong Sanfortune Home and Furniture Co., Ltd | Shandong Sanfortune Home and Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai Aiwood Home Supplies Co., Ltd ............. | Jiangsu Gangxing Kitchen Cabinet Co., Ltd .......... | 48.50 | 37.96 |
| Shanghai Aiwood Home Supplies Co., Ltd ............. | Shanghai Homebase SanSheng Household Product Co., Ltd. | 48.50 | 37.96 |
| Shanghai Baiyulan Furniture Co., Ltd .................... | Kunshan Baiyulan Furniture Co., Ltd .................... | 48.50 | 37.96 |
| Shanghai Beautystar Cabinetry Co., Ltd ............... | Jiangsu Sunwell Cabinetry Co., Ltd ...................... | 48.50 | 37.96 |
| Shanghai Beautystar Cabinetry Co., Ltd ............... | Nantong Jiegao Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| Shanghai Jiang Feng Furniture Co., Ltd ................ | Shanghai Jiang Feng Furniture Co., Ltd ................ | 48.50 | 37.96 |
| SHANGHAI LINE KING INTERNATIONAL TRADING CO., LTD. | SHANGHAI YAZHI WOODEN INDUSTRY CO., LTD. | 48.50 | 37.96 |
| Shanghai Mebo Industry Co. Ltd ........................... | Shanghai Mebo Industry Co. Ltd ........................... | 48.50 | 37.96 |
| Shanghai Qingzhou Woodenware Co., Ltd ............. | Shanghai Qingzhou Woodenware Co., Ltd ............. | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Anhui GeLun Wood Industry Co., Ltd ................... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Ning'an City Jiude Wood Co., Ltd ......................... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Dalian Ruiyu Mountain Wood Co., Ltd .................. | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Linshu Meibang Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Jiamusi City Quanhong Wood Industry Co., Ltd .... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Kunshan Fangs Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Dalian Chunyao Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Anhui Juxin Wood Industry Co., Ltd ..................... | 48.50 | 37.96 |
| Shanghai Wang Lei Industries- Taicang Branch ...... | Shanghai Wang Lei Industries- Taicang Branch ..... | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd ..................... | Shanghai Yinbo Manufacturing Co. Ltd ................. | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd ..................... | Dalian Jiaye Wood Products Co., Ltd ................... | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd ..................... | Shanghai Baiyulan Furniture Co., Ltd ................... | 48.50 | 37.96 |
| Shanghai Xietong (Group) Co., Ltd ....................... | Nantong Jiegao Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| Shanghai Xietong (Group) Co., Ltd ....................... | Jiangsu Senwei Smart Home Co., Ltd .................. | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANDONG GAINVAST WOODEN PRODUCTS CO., LTD. | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANGHAI WENYI WOODEN CO., LTD .............. | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | NAN TONG DI LIN FURNITURE CO., LTD ........... | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | JIANGSU YANAN WOODEN CO., LTD ................ | 48.50 | 37.96 |
| Sheen Lead International Trading (Shanghai) Co., Ltd. | SHANGHAI RUIYING FURNITURE CO., LTD ....... | 48.50 | 37.96 |
| Shouguang Fushi Wood Co., Ltd ........................... | Shouguang Fushi Wood Co., Ltd ........................... | 48.50 | 37.96 |
| Shouguang Honsoar Imp. & Exp. Trading Co., Ltd .. | Shandong Honsoar Cabinet Materials Co., Ltd ...... | 48.50 | 37.96 |
| SHOUGUANG JIAXIU WOOD CO., LTD ............... | SHOUGUANG JIAXIU WOOD CO., LTD ............... | 48.50 | 37.96 |
| SHOUGUANG JIAXIU WOOD CO., LTD ............... | SHOUGUANG JIAXIU WOOD CO., LTD ............... | 48.50 | 37.96 |
| Shouguang Jinxiangyuan Home Furnishing Co., Ltd | Shouguang Jinxiangyuan Home Furnishing Co., Ltd. | 48.50 | 37.96 |
| Shouguang Sanyang Wood Industry Co., Ltd .......... | Shouguang Sanyang Wood Industry Co., Ltd .......... | 48.50 | 37.96 |
| Silver Stone Group Co., Ltd .................................. | QINGDAO FAMILY CRAFTS CO., LTD ................. | 48.50 | 37.96 |
| Silver Stone Group Co., Ltd .................................. | QingDao XiuZhen Furniture Co., Ltd .................... | 48.50 | 37.96 |
| Smart Gift International ......................................... | Anhui GeLun Wood Industry Co., Ltd ................... | 48.50 | 37.96 |
| Smart Gift International ......................................... | Ning'an City Jiude Wood Co., Ltd ......................... | 48.50 | 37.96 |
| Smart Gift International ......................................... | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 48.50 | 37.96 |
| Smart Gift International ......................................... | Dalian Ruiyu Mountain Wood Co., Ltd .................. | 48.50 | 37.96 |
| Smart Gift International ......................................... | Jiamusi City Quanhong Wood Industry Co., Ltd .... | 48.50 | 37.96 |
| Smart Gift International ......................................... | Dalian Chunyao Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| SUNCO TIMBER(KUNSHAN) CO., LTD ............... | SUNCO TIMBER(KUNSHAN) CO., LTD ............... | 48.50 | 37.96 |
| Supree (Fujian) Co., Ltd ...................................... | Supree (Fujian) Wood Co., Ltd ............................. | 48.50 | 37.96 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Supree (Fujian) Construction Materials Co., Ltd ...... | Supree (Fujian) Construction Materials Co., Ltd ..... | 48.50 | 37.96 |
| SUZHOU BAOCHENG INDUSTRIES CO., LTD ...... | WALLBEYOND (SHUYANG) HOME DECOR CO., LTD. | 48.50 | 37.96 |
| Suzhou Five Cubic Wood Co., Ltd ........................... | Suzhou Geda Office Equipment Manufacturing Co., Ltd. | 48.50 | 37.96 |
| Suzhou Oriental Dragon Import and Export Co., Ltd. also known as Suzhou Oriental Dragon Import and Export Corp., Ltd. | Lingbi Xianghe Wood Co., Ltd ................................. | 48.50 | 37.96 |
| Tai Yuan Trading Co., Ltd also known as Heshan Tai Yuan Trading Co., Ltd. | Heshan Yingmei Cabinet Co., Ltd ........................... | 48.50 | 37.96 |
| Taishan Changfa Wood Industry Co., Ltd ............... | Taishan Changfa Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Chang He Xing Wood Manufacturer Co., Ltd ......... | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Heshan Yingmei Cabinets Co., Ltd ........................ | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Heshan Feiqiu Cabinet Co., Ltd ............................. | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Yuanwang Wood Product Factory Dajiang Taishan | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Can-am Cabinet Ltd ............................................... | 48.50 | 37.96 |
| Taishan Hongzhou Cabinet Co., Ltd ...................... | Taishan Hongzhou Cabinet Co., Ltd ...................... | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd ............................. | Taishan Dajiang Town Dutou Wood Furniture Factory. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd ............................. | Foshan Nanhai Jinwei Cabinet Furniture Co., Ltd .. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd ............................. | Taishan Huali Kitchen Cabinet Co., Ltd ................. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd ............................. | Taishan Empire Wood Co., Ltd .............................. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN GANHUI STONE KITCHEN CO., LTD ... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | Can-am Cabinet Ltd ............................................... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN QUANMEI KITCHEN WARE CO., LTD .. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN JIAFU CABINET CO., LTD ...................... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN DAJIANG TOWN DUTOU FURNITURE FACTORY. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | Feiteng Kitchen Cabinets Taishan Corporation ....... | 48.50 | 37.96 |
| Taizhou Overseas Int'l Ltd ...................................... | Zhejiang Royal Home Co., Ltd ............................... | 48.50 | 37.96 |
| TANGSHAN BAOZHU FURNITURE CO., LTD ........ | TANGSHAN BAOZHU FURNITURE CO., LTD ....... | 48.50 | 37.96 |
| Tech Forest Cabinetry Co., Ltd .............................. | Tech Forest Cabinetry Co., Ltd ............................. | 48.50 | 37.96 |
| The Frame Manufacturing Co. Ltd .......................... | HUIZHOU DIWEIXIN JIATINGYONGPIN CO., LTD | 48.50 | 37.96 |
| Top Goal International Group Ltd. (Hong Kong) ...... | Dongguan City Top Goal Furniture Co., Ltd ........... | 48.50 | 37.96 |
| Tradewinds Furniture Ltd ....................................... | Tradewinds Furniture Ltd ....................................... | 48.50 | 37.96 |
| Wa Fok Art Craft Furniture (MACAO) Co., Ltd ....... | Zhongshan Huafu Art Craft Furniture Co., Ltd ........ | 48.50 | 37.96 |
| Weifang Fuxing Wood Co., Ltd ............................... | Weifang Fuxing Wood Co., Ltd ............................... | 48.50 | 37.96 |
| WEIFANG KITCHINET CORPORATION ................. | WEIFANG KITCHINET CORPORATION ................. | 48.50 | 37.96 |
| Weifang Lan Gu Wood Industry Co., Ltd ................ | Weifang Lan Gu Wood Industry Co., Ltd ................ | 48.50 | 37.96 |
| Weifang Master Wood Industry Co., Ltd ................. | Weifang Master Wood Industry Co., Ltd ................. | 48.50 | 37.96 |
| Weifang Yuanlin Woodenware Co., Ltd ................... | Weifang Yuanlin Woodenware Co., Ltd ................... | 48.50 | 37.96 |
| Weihai Adornus Cabinetry Manufacturing Co., Ltd .. | Weihai Adornus Cabinetry Manufacturing Co., Ltd | 48.50 | 37.96 |
| WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | 48.50 | 37.96 |
| Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | | |
| Wenzhou Youbo Industrial Co., Ltd ........................ | Wenzhou Youbo Industrial Co., Ltd ........................ | 48.50 | 37.96 |
| Wuxi Yushea Furniture Co., Ltd ............................. | Wuxi Yushea Furniture Co., Ltd ............................. | 48.50 | 37.96 |
| Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | 48.50 | 37.96 |
| Xiamen Adler Cabinetry Co., Ltd ........................... | Xiamen Adler Cabinetry Co., Ltd ........................... | 48.50 | 37.96 |
| XIAMEN GOFOR STONE CO., LTD ...................... | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. | 48.50 | 37.96 |
| XIAMEN GOLDEN HUANAN IMP. & EXP. CO., LTD. | Changtai Guanjia Industrial Co., Ltd ...................... | 48.50 | 37.96 |
| XIAMEN GOLDENHOME CO., LTD ........................ | XIAMEN GOLDENHOME CO., LTD ........................ | 48.50 | 37.96 |
| XIAMEN KAICHENG TRADING LIMITED COMPANY. | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. | 48.50 | 37.96 |
| Xiamen Sintop Display Fixtures Co., Ltd ................. | Xiamen Sintop Display Fixtures Co., Ltd ................. | 48.50 | 37.96 |
| XINGZHI INTERNATIONAL TRADE LIMITED ......... | XUZHOU YIHE WOOD CO., LTD ........................... | 48.50 | 37.96 |
| XUZHOU JIA LI DUO IMPORT & EXPORT CO., LTD. | XUZHOU OUMEC WOOD-BASED PANEL CO., LTD. | 48.50 | 37.96 |
| XUZHOU YIHE WOOD CO., LTD ........................... | XUZHOU YIHE WOOD CO., LTD ........................... | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | DONGGUAN TODA FURNITURE CO., LTD .......... | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | GUANGZHOUSHI BAISEN DECORATIVE MATERIALS COMPANY LIMITED. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | DONGGUAN FANYANUO FURNITURE CO., LTD | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | DONGGUANSHI ANKE BUILDING MATERIALS CO., LTD. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | Oriental Chic Furniture Company Limited ............... | 48.50 | 37.96 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| YEKALON INDUSTRY, INC .................................... | DONGGUAN FRANCISS FURNITURE CO., LTD .. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC .................................... | SHANGHAI YUANYANG WOODEN CO., LTD ....... | 48.50 | 37.96 |
| Yi Sen Wood Industry Limited Company of Ning An City. | Yi Sen Wood Industry Limited Company of Ning An City. | 48.50 | 37.96 |
| Yichun Dongmeng Wood Co., Ltd ............................ | Yichun Dongmeng Wood Co., Ltd ............................ | 48.50 | 37.96 |
| Yichun Dongmeng Wood Co., Ltd ............................ | Qingdao Dimei Wood Co., Ltd ................................. | 48.50 | 37.96 |
| Yichun Sunshine Wood Products Co., Ltd ............... | Yichun Sunshine Wood Products Co., Ltd ............... | 48.50 | 37.96 |
| Yixing Pengjia Cabinetry Co. Ltd ............................ | Yixing Pengjia Cabinetry Co. Ltd ............................ | 48.50 | 37.96 |
| Zhangjiagang Daye Hotel Furniture Co., Ltd ............ | Zhangjiagang Daye Hotel Furniture Co., Ltd ............ | 48.50 | 37.96 |
| ZHANGJIAGANG PRO-FIXTURE CO., LTD ............. | Zhangjiagang Yuanjiahe Home Furniture Co., Ltd .. | 48.50 | 37.96 |
| ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | 48.50 | 37.96 |
| Zhangzhou Guohui Industrial & Trade Co., Ltd ........ | Zhangzhou Guohui Industrial & Trade Co., Ltd ...... | 48.50 | 37.96 |
| Zhangzhou OCA Furniture Co., Ltd ......................... | Zhangzhou OCA Furniture Co., Ltd ......................... | 48.50 | 37.96 |
| Zhaoqing Centech Decorative Material Company Ltd. | Zhaoqing Centech Decorative Material Company Ltd. | 48.50 | 37.96 |
| Zhejiang Jindi Holding Group Co., Ltd ..................... | Zhejiang Jindi Holding Group Co., Ltd ..................... | 48.50 | 37.96 |
| Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | 48.50 | 37.96 |
| Zhong Shan Yue Qin Imp. & Exp. Co., Ltd ............. | Zhongshan Jinpeng Furniture Co., Ltd ................... | 48.50 | 37.96 |
| Zhongshan City Shenwan Meiting Furniture Factory | Zhongshan City Shenwan Meiting Furniture Factory. | 48.50 | 37.96 |
| Zhongshan Fookyik Furniture Co., Ltd .................... | Zhongshan Fookyik Furniture Co., Ltd .................... | 48.50 | 37.96 |
| ZHONGSHAN GAINWELL FURNITURE CO., LTD | ZHONGSHAN GAINWELL FURNITURE CO., LTD | 48.50 | 37.96 |
| Zhongshan Guanda Furniture Manufacturing Co., Ltd also known as Guanda Furniture Co., Ltd. | Zhongshan Guanda Furniture Manufacturing Co., Ltd. | 48.50 | 37.96 |
| ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | 48.50 | 37.96 |
| Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | 48.50 | 37.96 |
| Zhoushan For-strong Wood Co., Ltd ...................... | Zhoushan For-strong Wood Co., Ltd ...................... | 48.50 | 37.96 |
| Zhoushan For-strong Wood Co., Ltd ...................... | Shanghai Wanmuda Furniture Co., Ltd ................... | 48.50 | 37.96 |
| Zhucheng Tonghe Woodworks Co., Ltd .................. | Zhucheng Tonghe Woodworks Co., ltd ................... | 48.50 | 37.96 |
| Zhuhai Seagull Kitchen and Bath Products Co., Ltd | Zhuhai Seagull Kitchen and Bath Products Co., Ltd | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | DONGGUAN FANG CHENG FURNITURE LTD ..... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | ZhongShan PRO-YEARN Crafts Product Co., Ltd .. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | FUJIAN NEWMARK INDUSTRIAL CO., LTD ......... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | Fuzhou Zhonghe Houseware CO., LTD .................. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | MING LIANG FURNITURE PRODUCT CO., LTD .. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | XIANJU JUNYANG HOUSEHOLD PRODUCTS CO., LTD. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | DongGuan HeTai Homewares CO., LTD ................ | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | CHENG TONG HARDWARE RPODUCT LTD ........ | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | Nantong Jon Ergonomic office Co., Ltd ................. | 48.50 | 37.96 |
| China-Wide Entity [16] ............................................. | ....................................................................... | 262.18 | 251.64 |

## Disclosure

We intend to disclose to parties the calculations performed in this proceeding within five days of any public announcement of this notice in accordance with 19 CFR 351.224(b).

## Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, we will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all entries of wooden cabinets and vanities from China, as described in the ''Scope of the Investigation'' section, entered, or withdrawn from warehouse, for consumption on or after October 9, 2019, the date of publication of the *Preliminary Determination* notice in the **Federal Register**.

Pursuant to section 735(c)(1)(B)(ii) of the Act, Commerce will instruct CBP to require a cash deposit [17] equal to the weighted-average amount by which normal value exceeds U.S. price as follows: (1) The cash deposit rate for the exporter/producer combination listed in the table above will be the rate identified for that combination in the table; (2) for all combinations of China exporters/producers of merchandise under consideration that have not received their own separate rate above,

---

[16] Commerce preliminarily determined that BRENTRIDGE HOLDING CO., LTD., Harbin Hongsen Wood Co., Ltd., SAICG International Trading Co., Ltd, Shanghai East Best Foreign Trade Co., Ltd., SHANGHAI TIMBER IMPORT & EXPORT CORP., and ZHONG SHAN KING YUANDUN WOOD PRODUCTS CO., LTD. also known as CHIN-SHU WOODEN LTD each failed to establish their eligibility for a separate rate and, therefore, we preliminarily determined that these companies are part of the China-wide entity. *See* Preliminary Decision Memorandum. We continue to find these entities, except for BRENTRIDGE HOLDING CO., LTD., as ineligible for separate rate status for our final determination. *See* Issues and Decision Memorandum at Comment 3. For this final determination, except for BRENTRIDGE HOLDING CO., LTD., we continue to find that these companies are part of the China-wide entity. For further discussion with respect to certain of these companies, *see* the Issues and Decision Memorandum accompanying this notice at Comment 3.

[17] *See* Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

the cash-deposit rate will be the cash deposit rate established for the China-wide entity; and (3) for all non-China exporters of the merchandise under consideration which have not received their own separate rate above, the cash-deposit rate will be the cash deposit rate applicable to the China exporter/producer combination that supplied that non-China exporter. These suspension of liquidation instructions will remain in effect until further notice.

We normally adjust AD cash deposit rates by the amount of export subsidies, where appropriate. In the companion countervailing duty (CVD) investigation, with respect to the mandatory respondents individually examined in the CVD investigation, and the separate-rate companies, we find that an export subsidy adjustment of 10.54 percent to the cash deposit rate is warranted because this is the export subsidy rate included in the CVD all-others rate to which the separate-rate companies are subject. As part of our determination in this final determination to apply AFA the China-wide entity, Commerce has adjusted the China-wide entity's AD cash deposit rate by the lowest export subsidy rate determined for any party in the companion CVD proceeding, *i.e.,* 10.54 percent.[18][19]

Pursuant to section 777A(f) of the Act, we normally adjust cash deposit rates for estimated domestic subsidy pass-through, where appropriate. However, in this case there is no basis to grant a domestic subsidy pass-through adjustment.[20]

## International Trade Commission Notification

In accordance with section 735(d) of the Act, we notified the International Trade Commission (ITC) of the final affirmative determination of sales at LTFV. As Commerce's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will determine, within 45 days, whether the domestic industry in the United States is materially injured,

[18] *See, e.g., Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value; Preliminary Affirmative Determination of Critical Circumstances; In Part and Postponement of Final Determination,* 80 FR 4250 (January 27, 2015), and accompanying Issues and Decision Memorandum at 35.

[19] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* dated concurrently with this notice, and accompanying Issues and Decision Memorandum. The final determination in this companion CVD proceeding is being issued on the same day as this final AD determination.

[20] *See* Issues and Decision Memorandum at "Adjustment Under Section 777A(f) of the Act."

or threatened with material injury, by reason of imports of wooden cabinets and vanities for sale from China, or sales (or the likelihood of sales) for importation, of wooden cabinets and vanities from China. If the ITC determines that such injury does not exist, this proceeding will be terminated and all securities posted will be refunded or canceled. If the ITC determines that such injury does exist, Commerce will issue an antidumping duty order directing CBP to assess, upon further instruction by Commerce, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation.

## Notification Regarding Administrative Protective Orders (APO)

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to the APO of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

## Notification to Importers

This notice also serves as an initial reminder to importers of their responsibility under 19 CFR 351.402(f) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of doubled antidumping duties.

## Notification to Interested Parties

This determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Act, and 19 CFR 351.210(c).

Dated: February 21, 2020.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix I

### Scope of the Investigation

The merchandise subject to this investigation consists of wooden cabinets and vanities that are for permanent installation (including floor mounted, wall mounted, ceiling hung or by attachment of plumbing), and wooden components thereof.

Wooden cabinets and vanities and wooden components are made substantially of wood products, including solid wood and engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo. Wooden cabinets and vanities consist of a cabinet box (which typically includes a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves) and may or may not include a frame, door, drawers and/or shelves. Subject merchandise includes wooden cabinets and vanities with or without wood veneers, wood, paper or other overlays, or laminates, with or without non-wood components or trim such as metal, marble, glass, plastic, or other resins, whether or not surface finished or unfinished, and whether or not completed.

Wooden cabinets and vanities are covered by the investigation whether or not they are imported attached to, or in conjunction with, faucets, metal plumbing, sinks and/or sink bowls, or countertops. If wooden cabinets or vanities are imported attached to, or in conjunction with, such merchandise, only the wooden cabinet or vanity is covered by the scope.

Subject merchandise includes the following wooden component parts of cabinets and vanities: (1) Wooden cabinet and vanity frames (2) wooden cabinet and vanity boxes (which typically include a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves), (3) wooden cabinet or vanity doors, (4) wooden cabinet or vanity drawers and drawer components (which typically include sides, backs, bottoms, and faces), (5) back panels and end panels, (6) and desks, shelves, and tables that are attached to or incorporated in the subject merchandise.

Subject merchandise includes all unassembled, assembled and/or "ready to assemble" (RTA) wooden cabinets and vanities, also commonly known as "flat packs," except to the extent such merchandise is already covered by the scope of antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR 513 (January 4, 2018). RTA wooden cabinets and vanities are defined as cabinets or vanities packaged so that at the time of importation they may include: (1) Wooden components required to assemble a cabinet or vanity (including drawer faces and doors); and (2) parts (*e.g.,* screws, washers, dowels, nails, handles, knobs, adhesive glues) required to assemble a cabinet or vanity. RTAs may enter the United States in one or in multiple packages.

Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following: Trimming,

cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope product.

Excluded from the scope of this investigation, if entered separate from a wooden cabinet or vanity are:

(1) Aftermarket accessory items which may be added to or installed into an interior of a cabinet and which are not considered a structural or core component of a wooden cabinet or vanity. Aftermarket accessory items may be made of wood, metal, plastic, composite material, or a combination thereof that can be inserted into a cabinet and which are utilized in the function of organization/accessibility on the interior of a cabinet; and include:

• Inserts or dividers which are placed into drawer boxes with the purpose of organizing or dividing the internal portion of the drawer into multiple areas for the purpose of containing smaller items such as cutlery, utensils, bathroom essentials, *etc.etc.*

• Round or oblong inserts that rotate internally in a cabinet for the purpose of accessibility to foodstuffs, dishware, general supplies, *etc.*

(2) Solid wooden accessories including corbels and rosettes, which serve the primary purpose of decoration and personalization.

(3) Non-wooden cabinet hardware components including metal hinges, brackets, catches, locks, drawer slides, fasteners (nails, screws, tacks, staples), handles, and knobs.

(4) Medicine cabinets that meet all of the following five criteria are excluded from the scope: (1) Wall mounted; (2) assembled at the time of entry into the United States; (3) contain one or more mirrors; (4) be packaged for retail sale at time of entry; and (5) have a maximum depth of seven inches.

Also excluded from the scope of this investigation are:

(1) All products covered by the scope of the antidumping duty order on *Wooden Bedroom Furniture from the People's Republic of China. See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture from the People's Republic of China,* 70 FR 329 (January 4, 2005).

(2) All products covered by the scope of the antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR. 513 (January 4, 2018).

Imports of subject merchandise are classified under Harmonized Tariff Schedule of the United States (HTSUS) statistical numbers 9403.40.9060 and 9403.60.8081. The subject component parts of wooden cabinets and vanities may be entered into the United States under HTSUS statistical number 9403.90.7080. Although the HTSUS

subheadings are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.

## Appendix II

**Issues and Decision Memorandum**

I. Summary
II. Background
III. Period of Investigation
IV. Scope of the Investigation
V. Scope Comments
VI. Use of Adverse Facts Available
VII. Changes Since the Preliminary Determination
VIII. Adjustments Under Section 777A(f) of the Act
IX. Adjustments to Cash Deposit Rates for Export Subsidies
X. Discussion of the Issues
*General Comments*
Comment 1: Initiation of the Investigation
Comment 2: Respondent Selection
Comment 3: Separate Rate Applicants
Comment 4: Company Name for Supree (Fujian) Wood Co., Ltd. (Supree)
Comment 5: Calculation of the Separate Rate Assigned to Non-Selected Companies
*Surrogate Value (SV) Comments*
Comment 6: Surrogate Country
Comment 7: SVs for Birch and Poplar
Comment 8: Calculation of Financial Ratios
Comment 9: Labor Rate Calculation
*Company-Specific Comments*
Ancientree
Comment 10: Whether to Apply AFA to Ancientree
Comment 11: Treatment of Jiangsu Hongjia Wood Ltd. (Jiangsu Hongjia) as an Affiliate
Comment 12: SV Selections
Foremost
Comment 13: Combination Kits
Comment 14: Exempted Sales
Comment 15: Early Payment Discounts
Comment 16: Section 301 Duties
Comment 17: Foremost's U.S. Inland Freight Charges from the Port to the Warehouse
Comment 18: Foremost's U.S. Inland Freight Charges to the Customer
Comment 19: FGI's Acquisition Costs
Comment 20: Labor Hours
Comment 21: Calculation and Programing Revisions
*Meisen*
Comment 22: Total AFA for Meisen
XI. Recommendation

[FR Doc. 2020–04121 Filed 2–27–20; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

**International Trade Administration**

[C–570–107]

**Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and/or exporters of wooden cabinets and vanities and componets thereof (wooden cabinets and vanities) from the People's Republic of China (China).

**DATES:** Applicable February 28, 2020.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman or Benito Ballesteros, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0486 or (202) 482–7425, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On August 12, 2019, Commerce published the *Preliminary Determination* in this investigation.[1] The petitioner is the American Kitchen Cabinet Alliance. In addition to the Government of China (GOC), the mandatory respondents in this investigation are The Ancientree Cabinet Co., Ltd. (Ancientree), Dalian Meisen Woodworking Co., Ltd. (Meisen), and Rizhao Foremost Woodwork Manufacturing Co., Ltd. (Foremost).

A summary of the events that occurred since Commerce published the *Preliminary Determination,* as well as a full discussion of the issues raised by parties for this final determination, are discussed in the Issues and Decision Memorandum, which is hereby adopted by this notice.[2] The Issues and Decision

---

[1] *See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination,* 84 FR 39798 (August 12, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, ''Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Fabricated Structural Steel from the People's Republic of China,'' dated concurrently with, and

| | | | |
|---|---|---|---|
| Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value, 85 Fed. Reg. 17,855 (Dep't of Commerce Mar. 31, 2020) (Corrected Final Determination) | | P.R. 1575 | APPX001212-APPX001218 |

## IV. Request for Comments

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (b) the accuracy of the agency's estimate of the burden (including hours and cost) of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology.

Comments submitted in response to this notice will be summarized and/or included in the request for OMB approval of this information collection; they also will become a matter of public record.

Dated: March 25, 2020.

**Sheleen Dumas,**

*Department PRA Clearance Officer, Office of the Chief Information Officer, Commerce Department.*

[FR Doc. 2020–06597 Filed 3–30–20; 8:45 am]

**BILLING CODE 3510–13–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

[B–73–2019]

### Foreign-Trade Zone (FTZ) 18—San Jose, California; Authorization of Production Activity; Tesla, Inc. (Electric Passenger Vehicles and Components), Fremont, Livermore, and Oakland, California

On November 26, 2019, Tesla, Inc. submitted a notification of proposed production activity to the FTZ Board for its facilities within Subzone 18G, in Fremont, Livermore, and Oakland, California.

The notification was processed in accordance with the regulations of the FTZ Board (15 CFR part 400), including notice in the **Federal Register** inviting public comment (84 FR 66651, December 5, 2019). On March 25, 2020, the applicant was notified of the FTZ Board's decision that no further review of the activity is warranted at this time. The production activity described in the notification was authorized, subject to the FTZ Act and the FTZ Board's regulations, including Section 400.14.

Dated: March 25, 2020.

**Andrew McGilvray,**

*Executive Secretary.*

[FR Doc. 2020–06637 Filed 3–30–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

[Order No. 2094]

### Approval of Subzone Status; Frank's International, LLC, New Iberia and Lafayette, Louisiana

Pursuant to its authority under the Foreign-Trade Zones Act of June 18, 1934, as amended (19 U.S.C. 81a–81u), the Foreign-Trade Zones Board (the Board) adopts the following Order:

*Whereas,* the Foreign-Trade Zones (FTZ) Act provides for ''. . . the establishment . . . of foreign-trade zones in ports of entry of the United States, to expedite and encourage foreign commerce, and for other purposes,'' and authorizes the Foreign-Trade Zones Board to grant to qualified corporations the privilege of establishing foreign-trade zones in or adjacent to U.S. Customs and Border Protection ports of entry;

*Whereas,* the Board's regulations (15 CFR part 400) provide for the establishment of subzones for specific uses;

*Whereas,* the Port of South Louisiana, grantee of Foreign-Trade Zone 124, has made application to the Board for the establishment of a subzone at the facilities of Frank's International, LLC, located in New Iberia and Lafayette, Louisiana (FTZ Docket B–69–2019, docketed October 29, 2019);

*Whereas,* notice inviting public comment has been given in the **Federal Register** (84 FR 59351–59352, November 4, 2019) and the application has been processed pursuant to the FTZ Act and the Board's regulations; and,

*Whereas,* the Board adopts the findings and recommendations of the examiner's memorandum, and finds that the requirements of the FTZ Act and the Board's regulations are satisfied;

*Now, therefore,* the Board hereby approves subzone status at the facilities of Frank's International, LLC, located in New Iberia and Lafayette, Louisiana (Subzone 124U), as described in the application and **Federal Register** notice, subject to the FTZ Act and the Board's regulations, including Section 400.13.

Dated: March 25, 2020.

**Jeffrey I. Kessler,**

*Assistant Secretary for Enforcement and Compliance, Alternate Chairman, Foreign-Trade Zones Board.*

[FR Doc. 2020–06636 Filed 3–30–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–106]

### Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** On February 28, 2020, the Department of Commerce (Commerce) published its final determination in the sales at less-than-fair-value investigation of wooden cabinets and vanities and components thereof from the People's Republic of China (China). However, the notice was not printed in the **Federal Register** as Commerce intended. This notice corrects the resultant punctuation errors in company names that occurred in the publication.

**DATES:** Applicable March 31, 2020.

**FOR FURTHER INFORMATION CONTACT:** Rachel Greenberg, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0652.

**SUPPLEMENTARY INFORMATION:**

### Background

On February 28, 2020, Commerce published the *Final Determination.*[1] However, the **Federal Register** notice stating the names of the producer-exporter combination rates was not printed as Commerce intended. Various company names contained inadvertent punctuation errors. Commerce is hereby correcting the *Final Determination* to include the correct punctuation in certain company names.

### Scope of the Investigation

The scope of this investigation has not changed from that stated in the *Final Determination.*

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 85 FR 11953 (February 28, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum.

**17856**      **Federal Register** / Vol. 85, No. 62 / Tuesday, March 31, 2020 / Notices

**Correction to Final Determination**

The corrected producer-exporter combination rates are as follows:

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| The Ancientree Cabinet Co., Ltd | The Ancientree Cabinet Co., Ltd | 4.37 | 0.00 |
| Dalian Meisen Woodworking Co., Ltd | Dalian Meisen Woodworking Co., Ltd | 262.18 | 251.64 |
| Foremost Worldwide Company Limited | Rizhao Foremost Woodwork Manufacturing Company, Ltd. | 101.46 | 90.92 |
| Foremost Worldwide Company Limited | Henan AiDiJia Furniture Co., Ltd | 101.46 | 90.92 |
| Foremost Worldwide Company Limited | Suzhou Weiye Furniture Co., Ltd | 101.46 | 90.92 |
| Foremost Worldwide Company Limited | Changsha Minwan Furniture Manufacturing Co., Ltd. | 101.46 | 90.92 |
| ANHUI JIANLIAN WOOD PRODUCTS CO., LTD | ANHUI JIANLIAN WOOD PRODUCTS CO., LTD | 48.50 | 37.96 |
| Anhui Swanch Cabinetry Co., Ltd | Anhui Swanch Cabinetry Co., Ltd | 48.50 | 37.96 |
| ANHUI XINYUANDA CUPBOARD CO., LTD | ANHUI XINYUANDA CUPBOARD CO., LTD | 48.50 | 37.96 |
| Beijing Oulu Jinxin International Trade Co., Ltd | Beijing Oulu Jinxin International Trade Co., Ltd | 48.50 | 37.96 |
| Boloni Smart Home Decor (Beijing) Co., LTD | Boloni Smart Home Decor (Beijing) Co., LTD | 48.50 | 37.96 |
| BRENTRIDGE HOLDING CO., LTD | ZHOUSHAN FOR–STRONG WOOD CO., LTD | 48.50 | 37.96 |
| Caoxian Brothers Hengxin Wood Industry Co., Ltd | Caoxian Brothers Hengxin Wood Industry Co., Ltd | 48.50 | 37.96 |
| Changyi Zhengheng Woodwork Co., Ltd | Changyi Zhengheng Woodwork Co., Ltd | 48.50 | 37.96 |
| CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | 48.50 | 37.96 |
| China Friend Limited | Dongming Sanxin Wood Industry Co., Ltd | 48.50 | 37.96 |
| Dalian Jiaye Wood Products Co., Ltd | Dalian Jiaye Wood Products Co., Ltd | 48.50 | 37.96 |
| Dalian Xingsen Wooden Products Co., Ltd | Dalian Xingsen Wooden Products Co., Ltd | 48.50 | 37.96 |
| Dandong City Anmin Wooden Products Group Co., Ltd. | Dandong City Anmin Wooden Products Group Co., Ltd. | 48.50 | 37.96 |
| Dandong Laroyal Cabinetry Co., Ltd | Dandong Laroyal Cabinetry Co., Ltd | 48.50 | 37.96 |
| DEHK LIMITED | DIAM DISPLAY (CHINA) CO., LTD | 48.50 | 37.96 |
| Deqing China-Africa Foreign Trade Port Co., Ltd | Suqian Welcomewood Products Co., Ltd | 48.50 | 37.96 |
| Dewell Wooden Products Haian Co., Ltd | Dewell Wooden Products Haian Co., Ltd | 48.50 | 37.96 |
| Dongguan American Parts Supplier Co., Ltd | Dongguan American Parts Supplier Co., Ltd | 48.50 | 37.96 |
| Dongguan Niusaiqu Wood Industry Co., Ltd | Dongguan Niusaiqu Wood Industry Co., Ltd | 48.50 | 37.96 |
| Dongguan Unique Life Furniture Co., Ltd. also known as Unique Life Furniture Co., Ltd (trade name). | Dongguan Unique Life Furniture Co., Ltd | 48.50 | 37.96 |
| Dorbest Ltd | Rui Feng Woodwork (Dongguan) Co., Ltd | 48.50 | 37.96 |
| EZIDONE DISPLAY CORPORATION LTD | EZIDONE DISPLAY CORPORATION LTD | 48.50 | 37.96 |
| EZIDONE DISPLAY CORPORATION LTD | EZIDONE DISPLAY INC | 48.50 | 37.96 |
| Forcer International Limited | QUFU XINYU FURNITURE CO., LTD | 48.50 | 37.96 |
| Forcer International Limited | LINYI RUNKANG CABINET CO., LTD | 48.50 | 37.96 |
| Forcer International Limited | BEIJING OULU JINXIN INTERNATIONAL TRADE CO., LTD. | 48.50 | 37.96 |
| Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name). | Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd (trade name). | 48.50 | 37.96 |
| Foshan Liansu building material Trading Co., Ltd | Guangdong Lesso Home Furnishing Co., Ltd | 48.50 | 37.96 |
| FOSHAN NANHAI HONGZHOU WOOD., LTD | FOSHAN NANHAI HONGZHOU WOOD., LTD | 48.50 | 37.96 |
| Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd | Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | FOSHAN DIBIAO BATHROOM CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | FOSHAN MK HOME FURISHING CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | PROUDER INDUSTRIAL LIMITED | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | FOSHAN DEMAX SANITARY WARE CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | HEBEI SHUANGLI FURNITURE CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | SHOUGUANG FUSHI WOOD CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | Foshan Virtu Bathroom Furniture Ltd | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | KAIPING HONGITARYWARE TECHNOLOGY LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | FOSHAN DIBIAO BATHROOM CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | FOSHAN MK HOME FURISHING CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | PROUDER INDUSTRIAL LIMITED | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | FOSHAN DEMAX SANITARY WARE CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | HEBEI SHUANGLI FURNITURE CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | SHOUGUANG FUSHI WOOD CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | Foshan Virtu Bathroom Furniture Ltd | 48.50 | 37.96 |

Case 1:20-cv-00109-MMB   Document 62   Filed 05/26/21   Page 230 of 1902

Barcode:3959649-01 A-570-106 INV - Investigation -
**Federal Register** / Vol. 85, No. 62 / Tuesday, March 31, 2020 / Notices   **17857**

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Foshan Sourcever Company Limited ...................... | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ...................... | KAIPING HONGITARYWARE TECHNOLOGY LTD | 48.50 | 37.96 |
| Foshan Xinzhongwei Economic & Trade Co., Ltd .... | Foshan Lihong Furniture Sanitary Ware Co., Ltd  ... | 48.50 | 37.96 |
| FUJIAN DUSHI WOODEN INDUSTRY CO., LTD  ... | FUJIAN DUSHI WOODEN INDUSTRY CO., LTD  .. | 48.50 | 37.96 |
| FUJIAN LEIFENG CABINETRY CO., LTD .............. | FUJIAN LEIFENG CABINETRY CO., LTD .............. | 48.50 | 37.96 |
| Fujian Panda Home Furnishing Co., Ltd .................. | Fujian Panda Home Furnishing Co., Ltd .................. | 48.50 | 37.96 |
| Fujian Senyi Kitchen Cabinet Co., Ltd .................... | Fujian Senyi Kitchen Cabinet Co., Ltd .................... | 48.50 | 37.96 |
| Fuzhou Biquan Trading Co., Ltd ............................. | Biquan (Fujian) Group Co., Ltd .............................. | 48.50 | 37.96 |
| Fuzhou CBM Import & Export Co., Ltd .................... | Fuzhou CBM Import & Export Co., Ltd .................... | 48.50 | 37.96 |
| Fuzhou Desource Home Décor Co., Ltd .................. | Fuzhou Desource Home Decor Co., Ltd .................. | 48.50 | 37.96 |
| FUZHOU LIMIN STONE PRODUCTS CO., LTD ..... | Fuzhou YST Cabinet Co., Ltd ................................ | 48.50 | 37.96 |
| FUZHOU MASTONE IMPORT & EXPORT CO., LTD. | Fuzhou Yuansentai Cabinet Co., Ltd  ...................... | 48.50 | 37.96 |
| Fuzhou Minlian Wood Industry Co., Ltd .................. | Fuzhou Minlian Wood Industry Co., Ltd .................. | 48.50 | 37.96 |
| FUZHOU SUNRISING HOME DECO MANUFAC- TURING CO., LTD. | FUZHOU SUNRISING HOME DECO MANUFAC- TURING CO., LTD. | 48.50 | 37.96 |
| FUZHOU XINRUI CABINET CO., LTD ................... | FUZHOU XINRUI CABINET CO., LTD ................... | 48.50 | 37.96 |
| Gaomi City Haitian Wooden Ware Co., Ltd ............. | Gaomi City Haitian Wooden Ware Co., Ltd ............. | 48.50 | 37.96 |
| GAOMI HONGTAI HOME FURNITURE CO., LTD  .. | GAOMI HONGTAI HOME FURNITURE CO., LTD | 48.50 | 37.96 |
| Guangde Bozhong Trade Company, Ltd .................. | Guangde Bozhong Trade Company, Ltd .................. | 48.50 | 37.96 |
| GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | 48.50 | 37.96 |
| Guangdong G-Top Import and Export Co., Ltd ........ | Foshan Shunde Rongao Furniture CO., LTD ......... | 48.50 | 37.96 |
| Guangzhou Nuolande Import and Export Co., Ltd .... | Guangzhou Nuolande Import and Export Co., Ltd .. | 48.50 | 37.96 |
| Haiyang Kunlun Wood Co., Ltd ............................... | Haiyang Kunlun Wood Co., Ltd ............................... | 48.50 | 37.96 |
| Hangzhou Bestcraft Sanitary Equipments Co., Ltd .. | Hangzhou Bestcraft Sanitary Equipments Co., Ltd | 48.50 | 37.96 |
| Hangzhou Entop Houseware Co., Ltd ..................... | Jinhua Aonika Sanitary Ware Co., Ltd ................... | 48.50 | 37.96 |
| Hangzhou Entop Houseware Co., Ltd ..................... | Hangzhou Bestcraft Sanitary Equipments Co., Ltd | 48.50 | 37.96 |
| Hangzhou Hansen Sanitary Ware Co., Ltd ............. | Hangzhou Hansen Sanitary Ware Co., Ltd ............. | 48.50 | 37.96 |
| Hangzhou Hoca Kitchen & Bath Products Co., Ltd .. | Hangzhou Hoca Kitchen & Bath Products Co., Ltd | 48.50 | 37.96 |
| Hangzhou Home Dee Sanitary Ware Co., Ltd ........ | Hangzhou Home Dee Sanitary Ware Co., Ltd ........ | 48.50 | 37.96 |
| Hangzhou Oulang Bathroom Equipment Co., Ltd .... | Hangzhou Oulang Bathroom Equipment Co., Ltd ... | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............... | Jinhua Aonika Sanitary Ware Co., Ltd ................... | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............... | Hangzhou Yuxin Sanitary Ware Co., Ltd ................ | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............... | Hangzhou Fuyang Beautiful Sanitary Ware Co., Ltd | 48.50 | 37.96 |
| Hangzhou Sunlight Sanitary Co., Ltd ..................... | Hangzhou Sunlight Sanitary Co., Ltd ..................... | 48.50 | 37.96 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd ............. | PINGHU AIPA SANITARY WARE CO., LTD .......... | 48.50 | 37.96 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd ............. | HANGZHOU QILONG SANITARY WARE CO., LTD. | 48.50 | 37.96 |
| Hangzhou Xinhai Sanitary Ware Co., Ltd ............... | Hangzhou Xinhai Sanitary Ware Co., Ltd ............... | 48.50 | 37.96 |
| Hangzhou Yewlong Import & Export Co., Ltd .......... | Hangzhou Yewlong Industry Co., Ltd ..................... | 48.50 | 37.96 |
| Hangzhou Zhuangyu Import & Export Co., Ltd ....... | Hangzhou Zhuangyu Import & Export Co., Ltd ....... | 48.50 | 37.96 |
| Henan Aotin Home Furnishing Co., Ltd .................. | Henan Aotin Home Furnishing Co., Ltd .................. | 48.50 | 37.96 |
| Heyond Cabinet Co., Ltd ........................................ | Heyond Cabinet Co., Ltd ........................................ | 48.50 | 37.96 |
| Homestar Corporation ............................................ | Homestar Corporation ............................................ | 48.50 | 37.96 |
| HONG KONG JIAN CHENG TRADING CO., LIM- ITED. | ZHONGSHAN YAYUE FURNITURE CO., LTD ...... | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Changtai Guanjia Industry & Trade Company Co., Ltd. | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Zhangzhou Huihua Industry and Trade Co., Ltd ..... | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Fujian Xinanlong Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| Honsoar New Building Material Co., Ltd ................. | Shandong Honsoar Cabinet Materials Co., Ltd ....... | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Jianfa Wooden Co., Ltd ......................................... | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Heshan Yingmei Cabinets Co., Ltd ........................ | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Hesha Feiqiu Cabinet Co., Ltd .............................. | 48.50 | 37.96 |
| Huimin Hanlong Furniture Co., Ltd ......................... | Huimin Hanlong Furniture Co., Ltd ......................... | 48.50 | 37.96 |
| HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | 48.50 | 37.96 |
| HUIZHOU MANDARIN FURNITURE CO., LTD ..... | HUIZHOU MANDARIN FURNITURE CO., LTD ...... | 48.50 | 37.96 |
| Jiang Su Rongxin Cabinets Ltd .............................. | Jiang Su Rongxin Cabinets Ltd .............................. | 48.50 | 37.96 |
| Jiangmen Kinwai Furniture Decoration Co., Ltd ....... | Jiangmen Kinwai Furniture Decoration Co., Ltd ...... | 48.50 | 37.96 |
| Jiangmen Kinwai International Furniture Co., Ltd ..... | Jiangmen Kinwai International Furniture Co., Ltd .... | 48.50 | 37.96 |
| Jiangsu Beichen Wood Co., Ltd ............................. | Jiangsu Beichen Wood Co., Ltd ............................. | 48.50 | 37.96 |

Filed By: Rachel Greenberg, Filed Date: 3/31/20 8:37 AM, Submission Status: Approved

**17858**  **Federal Register** / Vol. 85, No. 62 / Tuesday, March 31, 2020 / Notices

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Jiangsu Meijun Intelligent Home Co., Ltd | Jiangsu Meijun Intelligent Home Co., Ltd | 48.50 | 37.96 |
| Jiangsu Pusite Furniture Co., Ltd | Jiangsu Pusite Furniture Co., Ltd | 48.50 | 37.96 |
| Jiangsu Roc Furniture Industrial Co., Ltd | Jiangsu Roc Furniture Industrial Co., Ltd | 48.50 | 37.96 |
| JIANGSU SUNWELL CABINETRY CO., LTD | JIANGSU SUNWELL CABINETRY CO., LTD | 48.50 | 37.96 |
| JIANGSU WEISEN HOUSEWARE CO., LTD | JIANGSU WEISEN HOUSEWARE CO., LTD | 48.50 | 37.96 |
| Jiangsu Xiangsheng Bedtime Furniture Co., Ltd | Jiangsu Xiangsheng Bedtime Furniture Co., Ltd | 48.50 | 37.96 |
| Jiayuan (Xiamen) Industrial Co., Ltd | Jiayuan (Xiamen) Industrial Co., Ltd | 48.50 | 37.96 |
| JINJIANG PERFECT GENERATION IMP. & EXP. CO., LTD. | Homebi Technology Co., LTD | 48.50 | 37.96 |
| King's Group Furniture (Enterprises) Co., Ltd | Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | 48.50 | 37.96 |
| KM Cabinetry Co., Limited | Zhongshan KM Cabinetry Co., Ltd | 48.50 | 37.96 |
| Kunshan Baiyulan Furniture Co., Ltd | Kunshan Baiyulan Furniture Co., Ltd | 48.50 | 37.96 |
| Kunshan Home Right Trade Corporation | Kunshan Fangs Furniture Co., Ltd | 48.50 | 37.96 |
| LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | 48.50 | 37.96 |
| Linshu Meibang Furniture Co., Ltd | Linshu Meibang Furniture Co., Ltd | 48.50 | 37.96 |
| Linyi Bomei Furniture Co., Ltd | Linyi Bomei Furniture Co., Ltd | 48.50 | 37.96 |
| LINYI BONN FLOORING MANUFACTURING CO., LTD. | LINYI BONN FLOORING MANUFACTURING CO., LTD. | 48.50 | 37.96 |
| Linyi Kaipu Furniture Co., Ltd | Linyi Kaipu Furniture Co., Ltd | 48.50 | 37.96 |
| Linyi Runkang Cabinet Co., Ltd | Linyi Runkang Cabinet Co., Ltd | 48.50 | 37.96 |
| Liu Shu Woods Product (Huizhou) Co., Ltd also known as Liu Shu Wood Products Co., Ltd (trade name) and Liu Shu Woods Product Co., Ltd (trade name). | Liu Shu Woods Product (Huizhou) Co., Ltd | 48.50 | 37.96 |
| Master Door & Cabinet Co., Ltd | Master Door & Cabinet Co., Ltd | 48.50 | 37.96 |
| Masterwork Cabinetry Company Limited | Shandong Compete Wood Co., Ltd | 48.50 | 37.96 |
| Masterwork Cabinetry Company Limited | Linyi Zhongsheng Jiaju Zhuangshi Co., Ltd | 48.50 | 37.96 |
| MEILIN WOOD PRODUCTS(DALIAN)CO., LTD | MEILIN WOOD PRODUCTS(DALIAN)CO., LTD | 48.50 | 37.96 |
| Minhou Beite Home Decor Co., Ltd | Minhou Beite Home Decor Co., Ltd | 48.50 | 37.96 |
| MJB Supply (Dalian) Co., Ltd | Mulin City Bamiantong Linyeju Jisen Wood | 48.50 | 37.96 |
| MOREWOOD CABINETRY CO., LTD | MOREWOOD CABINETRY CO., LTD | 48.50 | 37.96 |
| Nanjing Kaylang Co., Ltd | Nanjing Kaylang Co., Ltd | 48.50 | 37.96 |
| Nantong Aershin Cabinets Co., Ltd | Nantong Aershin Cabinets Co., Ltd | 48.50 | 37.96 |
| Nantong Ouming Wood Co., Ltd., also known as Nantong Ouming Wood Industry Co., Ltd. | Nantong Ouming Wood Co., Ltd., also known as Nantong Ouming Wood Industry Co., Ltd. | 48.50 | 37.96 |
| NANTONG YANGZI FURNITURE CO., LTD | NANTONG YANGZI FURNITURE CO., LTD | 48.50 | 37.96 |
| NINGBO KINGWOOD FURNITURE CO., LTD | NINGBO KINGWOOD FURNITURE CO., LTD | 48.50 | 37.96 |
| NINGBO ROVSA HOME FURNISHING CO., LTD | NINGBO ROVSA HOME FURNISHING CO., LTD | 48.50 | 37.96 |
| Ojans Company Limited | Foshan Shunde Ojans Intelligent Sanitary Ware Co., Ltd. | 48.50 | 37.96 |
| Oppein Home Group Inc | Oppein Home Group Inc | 48.50 | 37.96 |
| PIZHOU OUYME IMPORT & EXPORT TRADE CO., LTD. | XUZHOU OUMEC WOOD–BASED PANEL CO., LTD. | 48.50 | 37.96 |
| Pneuma Asia Sourcing & Trading Co. LIMITED | Dalian Tianxin Home Product Co., Ltd | 48.50 | 37.96 |
| Pneuma Asia Sourcing & Trading Co. LIMITED | Qingdao Haiyan Drouot Household Co., Ltd | 48.50 | 37.96 |
| Putian Jinggong Furniture Co., Ltd | Putian Jinggong Furniture Co., Ltd | 48.50 | 37.96 |
| Qingdao Coomex Sources Co., Ltd. also known as Coomex Sources Co., Ltd. | Nantong Aershin Cabinets Co., Ltd | 48.50 | 37.96 |
| Qingdao Haiyan Drouot Household Co., Ltd | Qingdao Haiyan Drouot Household Co., Ltd | 48.50 | 37.96 |
| Qingdao Liangmu Hongye Co., Ltd | Qingdao Liangmu Hongye Co., Ltd | 48.50 | 37.96 |
| Qingdao Liangmu Jinshan Woodwork Co., Ltd | Qingdao Liangmu Jinshan Woodwork Co., Ltd | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Lankao Sanqiang Wooden Products Co., Ltd | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Lanshan Chengxinli Woods Co., Ltd | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Shouguang Shi Qifeng Woods Co., Ltd | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Mingzhu Woods Co., Ltd | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Yichun Senhai Woods Industry Co., Ltd | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Jinde Arts&Crafts Co., Ltd | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Qingdao Ruirong Woods Co., Ltd | 48.50 | 37.96 |
| Qingdao Shousheng Industry Co., Ltd | Qingdao Shousheng Industry Co., Ltd | 48.50 | 37.96 |
| Qingdao Yimei Wood Work Co., Ltd | Qingdao Yimei Wood Work Co., Ltd | 48.50 | 37.96 |
| QINGDAOHONGXINCHENGDA WOOD INDUS-TRY CO., LTD. | QINGDAOHONGXINCHENGDA WOOD INDUS-TRY CO., LTD. | 48.50 | 37.96 |

Case 1:20-cv-00109-MMB   Document 62   Filed 05/26/21   Page 232 of 1902

Barcode:3959649-01 A-570-106 INV - Investigation -
**Federal Register** / Vol. 85, No. 62 / Tuesday, March 31, 2020 / Notices          **17859**

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| QUFU XINYU FURNITURE CO., LTD | QUFU XINYU FURNITURE CO., LTD | 48.50 | 37.96 |
| Ronbow Hong Kong Limited | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited | Shouguang Fushi Wood Co., Ltd | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited | Zhangzhou Guohui Industrial & Trade Co., Ltd | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited | Qingdao Runpeng Wood Industrial Co., Ltd | 48.50 | 37.96 |
| Sankok Arts Co., Ltd | Sankok Arts Co., Ltd | 48.50 | 37.96 |
| Senke Manufacturing Company | Qindao Yimei Wood Work Co., Ltd | 48.50 | 37.96 |
| Senke Manufacturing Company | Linyi Kaipu Furniture Co., Ltd | 48.50 | 37.96 |
| Senke Manufacturing Company | Shandon Honsoar Cabinetry Co., Ltd | 48.50 | 37.96 |
| Senke Manufacturing Company | Huimin Hanlong Furniture Co, Ltd | 48.50 | 37.96 |
| Shandong Cubic Alpha Timber Co., Ltd | Shandong Cubic Alpha Timber Co., Ltd | 48.50 | 37.96 |
| Shandong Fusheng Wood Co., Ltd | Shandong Fusheng Wood Co., Ltd | 48.50 | 37.96 |
| Shandong Huanmei Wood Co., Ltd | Shandong Huanmei Wood Co., Ltd | 48.50 | 37.96 |
| SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | | |
| Shandong Longsen Woods Co., Ltd | Shandong Longsen Woods Co., Ltd | 48.50 | 37.96 |
| Shandong Sanfortune Home and Furniture Co., Ltd | Shandong Sanfortune Home and Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai Aiwood Home Supplies Co., Ltd | Jiangsu Gangxing Kitchen Cabinet Co., Ltd | 48.50 | 37.96 |
| Shanghai Aiwood Home Supplies Co., Ltd | Shanghai Homebase SanSheng Household Product Co., Ltd. | 48.50 | 37.96 |
| Shanghai Baiyulan Furniture Co., Ltd | Kunshan Baiyulan Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai Beautystar Cabinetry Co., Ltd | Jiangsu Sunwell Cabinetry Co., Ltd | 48.50 | 37.96 |
| Shanghai Beautystar Cabinetry Co., Ltd | Nantong Jiegao Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai Jiang Feng Furniture Co., Ltd | Shanghai Jiang Feng Furniture Co., Ltd | 48.50 | 37.96 |
| SHANGHAI LINE KING INTERNATIONAL TRADING CO., LTD. | SHANGHAI YAZHI WOODEN INDUSTRY CO., LTD. | 48.50 | 37.96 |
| Shanghai Mebo Industry Co. Ltd | Shanghai Mebo Industry Co. Ltd | 48.50 | 37.96 |
| Shanghai Qingzhou Woodenware Co., Ltd | Shanghai Qingzhou Woodenware Co., Ltd | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd | Anhui GeLun Wood Industry Co., Ltd | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd | Ning'an City Jiude Wood Co., Ltd | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd | Dalian Ruiyu Mountain Wood Co., Ltd | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd | Linshu Meibang Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd | Jiamusi City Quanhong Wood Industry Co., Ltd | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd | Kunshan Fangs Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd | Dalian Chunyao Wood Industry Co., Ltd | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd | Anhui Juxin Wood Industry Co., Ltd | 48.50 | 37.96 |
| Shanghai Wang Lei Industries- Taicang Branch | Shanghai Wang Lei Industries- Taicang Branch | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd | Shanghai Yinbo Manufacturing Co. Ltd | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd | Dalian Jiaye Wood Products Co., Ltd | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd | Shanghai Baiyulan Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai Xietong (Group) Co., Ltd | Nantong Jiegao Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai Xietong (Group) Co., Ltd | Jiangsu Senwei Smart Home Co., Ltd | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANDONG GAINVAST WOODEN PRODUCTS CO., LTD. | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANGHAI WENYI WOODEN CO., LTD | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | NAN TONG DI LIN FURNITURE CO., LTD | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | JIANGSU YANAN WOODEN CO., LTD | 48.50 | 37.96 |
| Sheen Lead International Trading (Shanghai)Co., Ltd. | SHANGHAI RUIYING FURNITURE CO., LTD | 48.50 | 37.96 |
| Shouguang Fushi Wood Co., Ltd | Shouguang Fushi Wood Co., Ltd | 48.50 | 37.96 |
| Shouguang Honsoar Imp. & Exp. Trading Co., Ltd | Shandong Honsoar Cabinet Materials Co., Ltd | 48.50 | 37.96 |
| SHOUGUANG JIAXIU WOOD CO., LTD | SHOUGUANG JIAXIU WOOD CO., LTD | 48.50 | 37.96 |
| SHOUGUANG JIAXIU WOOD CO., LTD | SHOUGUANG JIAXIU WOOD CO., LTD | 48.50 | 37.96 |
| Shouguang Jinxiangyuan Home Furnishing Co., Ltd | Shouguang Jinxiangyuan Home Furnishing Co., Ltd. | 48.50 | 37.96 |
| Shouguang Sanyang Wood Industry Co., Ltd | Shouguang Sanyang Wood Industry Co., Ltd | 48.50 | 37.96 |
| Silver Stone Group Co., Ltd | QINGDAO FAMILY CRAFTS CO., LTD | 48.50 | 37.96 |
| Silver Stone Group Co., Ltd | QingDao XiuZhen Furniture Co., Ltd | 48.50 | 37.96 |
| Smart Gift International | Anhui GeLun Wood Industry Co., Ltd | 48.50 | 37.96 |
| Smart Gift International | Ning'an City Jiude Wood Co., Ltd | 48.50 | 37.96 |
| Smart Gift International | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 48.50 | 37.96 |
| Smart Gift International | Dalian Ruiyu Mountain Wood Co., Ltd | 48.50 | 37.96 |
| Smart Gift International | Jiamusi City Quanhong Wood Industry Co., Ltd | 48.50 | 37.96 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Smart Gift International ............................................ | Dalian Chunyao Wood Industry Co., Ltd ................ | 48.50 | 37.96 |
| SUNCO TIMBER(KUNSHAN) CO., LTD .................. | SUNCO TIMBER(KUNSHAN) CO., LTD .................. | 48.50 | 37.96 |
| Supree (Fujian) Wood Co., Ltd ............................... | Supree (Fujian) Wood Co., Ltd ............................... | 48.50 | 37.96 |
| Supree (Fujian) Construction Materials Co., Ltd ...... | Supree (Fujian) Construction Materials Co., Ltd ..... | 48.50 | 37.96 |
| SUZHOU BAOCHENG INDUSTRIES CO., LTD ...... | WALLBEYOND (SHUYANG) HOME DECOR CO., LTD. | 48.50 | 37.96 |
| Suzhou Five Cubic Wood Co., Ltd ........................... | Suzhou Geda Office Equipment Manufacturing Co., Ltd. | 48.50 | 37.96 |
| Suzhou Oriental Dragon Import and Export Co., Ltd. also known as Suzhou Oriental Dragon Import and Export Corp., Ltd. | Lingbi Xianghe Wood Co., Ltd ................................. | 48.50 | 37.96 |
| Tai Yuan Trading Co., Ltd also known as Heshan Tai Yuan Trading Co., Ltd. | Heshan Yingmei Cabinet Co., Ltd ........................... | 48.50 | 37.96 |
| Taishan Changfa Wood Industry Co., Ltd ................ | Taishan Changfa Wood Industry Co., Ltd ................ | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Chang He Xing Wood Manufacturer Co., Ltd .......... | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Heshan Yingmei Cabinets Co., Ltd ......................... | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Heshan Feiqiu Cabinet Co., Ltd .............................. | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Yuanwang Wood Product Factory Dajiang Taishan | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Can-Am Cabinet Ltd ............................................... | 48.50 | 37.96 |
| Taishan Hongzhou Cabinet Co., Ltd ....................... | Taishan Hongzhou Cabinet Co., Ltd ....................... | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd .............................. | Taishan Dajiang Town Dutou Wood Furniture Factory. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd .............................. | Foshan Nanhai Jinwei Cabinet Furniture Co., Ltd .. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd .............................. | Taishan Huali Kitchen Cabinet Co., Ltd .................. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd .............................. | Taishan Empire Wood Co., Ltd ............................... | 48.5 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN GANHUI STONE KITCHEN CO., LTD ... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | Can-Am Cabinet Ltd ............................................... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN QUANMEI KITCHEN WARE CO., LTD .. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN JIAFU CABINET CO., LTD ....................... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN DAJIANG TOWN DUTOU FURNITURE FACTORY. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | Feiteng Kitchen Cabinets Taishan Corporation ....... | 48.50 | 37.96 |
| Taizhou Overseas Int'l Ltd ...................................... | Zhejiang Royal Home Co., Ltd ................................ | 48.50 | 37.96 |
| TANGSHAN BAOZHU FURNITURE CO., LTD ........ | TANGSHAN BAOZHU FURNITURE CO.FF0C;LTD | 48.50 | 37.96 |
| Tech Forest Cabinetry Co., Ltd ............................... | Tech Forest Cabinetry Co., Ltd ............................... | 48.50 | 37.96 |
| The Frame Manufacturing Co. Ltd ........................... | HUIZHOU DIWEIXIN JIATINGYONGPIN CO., LTD | 48.50 | 37.96 |
| Top Goal International Group Ltd. (Hong Kong) ...... | Dongguan City Top Goal Furniture Co., Ltd ........... | 48.50 | 37.96 |
| Tradewinds Furniture Ltd ........................................ | Tradewinds Furniture Ltd ........................................ | 48.50 | 37.96 |
| Wa Fok Art Craft Furniture (MACAO) Co., Ltd ........ | Zhongshan Huafu Art Craft Furniture Co., Ltd ........ | 48.50 | 37.96 |
| Weifang Fuxing Wood Co., Ltd ................................ | Weifang Fuxing Wood Co., Ltd ................................ | 48.50 | 37.96 |
| WEIFANG KITCHINET CORPORATION .................. | WEIFANG KITCHINET CORPORATION .................. | 48.50 | 37.96 |
| Weifang Lan Gu Wood Industry Co., Ltd ................. | Weifang Lan Gu Wood Industry Co., Ltd ................. | 48.50 | 37.96 |
| Weifang Master Wood Industry Co., Ltd ................. | Weifang Master Wood Industry Co., Ltd ................. | 48.50 | 37.96 |
| Weifang Yuanlin Woodenware Co., Ltd ................... | Weifang Yuanlin Woodenware Co., Ltd ................... | 48.50 | 37.96 |
| Weihai Adornus Cabinetry Manufacturing Co., Ltd .. | Weihai Adornus Cabinetry Manufacturing Co., Ltd . | 48.50 | 37.96 |
| WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | 48.50 | 37.96 |
| Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | 48.50 | 37.96 |
| Wenzhou Youbo Industrial Co., Ltd ........................ | Wenzhou Youbo Industrial Co., Ltd ........................ | 48.50 | 37.96 |
| Wuxi Yushea Furniture Co., Ltd ............................. | Wuxi Yushea Furniture Co., Ltd ............................. | 48.50 | 37.96 |
| Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | 48.50 | 37.96 |
| Xiamen Adler Cabinetry Co., Ltd ............................ | Xiamen Adler Cabinetry Co., Ltd ............................ | 48.50 | 37.96 |
| XIAMEN GOFOR STONE CO., LTD ....................... | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. | 48.50 | 37.96 |
| XIAMEN GOLDEN HUANAN IMP.& EXP. CO., LTD | Changtai Guanjia Industrial Co., Ltd ...................... | 48.50 | 37.96 |
| XIAMEN GOLDENHOME CO., LTD ....................... | XIAMEN GOLDENHOME CO., LTD ....................... | 48.50 | 37.96 |
| XIAMEN KAICHENG TRADING LIMITED COMPANY. | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. | 48.50 | 37.96 |
| Xiamen Sintop Display Fixtures Co., Ltd ................. | Xiamen Sintop Display Fixtures Co., Ltd ................. | 48.50 | 37.96 |
| XINGZHI INTERNATIONAL TRADE LIMITED ........ | XUZHOU YIHE WOOD CO., LTD ........................... | 48.50 | 37.96 |
| XUZHOU JIA LI DUO IMPORT&EXPORT CO., LTD | XUZHOU OUMEC WOOD–BASED PANEL CO., LTD. | 48.50 | 37.96 |
| XUZHOU YIHE WOOD CO., LTD ........................... | XUZHOU YIHE WOOD CO., LTD ........................... | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ..................................... | DONGGUAN TODA FURNITURE CO., LTD ........... | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ..................................... | GUANGZHOUSHI BAISEN DECORATIVE MATERIALS COMPANY LIMITED. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ..................................... | DONGGUAN FANYANUO FURNITURE CO., LTD | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ..................................... | DONGGUANSHI ANKE BUILDING MATERIALS CO., LTD. | 48.50 | 37.96 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| YEKALON INDUSTRY, INC ................................... | Oriental Chic Furniture Company Limited ............... | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | DONGGUAN FRANCISS FURNITURE CO., LTD .. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | SHANGHAI YUANYANG WOODEN CO., LTD ....... | 48.50 | 37.96 |
| Yi Sen Wood Industry Limited Company of Ning An City. | Yi Sen Wood Industry Limited Company of Ning An City. | 48.50 | 37.96 |
| Yichun Dongmeng Wood Co., Ltd .......................... | Yichun Dongmeng Wood Co., Ltd .......................... | 48.50 | 37.96 |
| Yichun Dongmeng Wood Co., Ltd .......................... | Qingdao Dimei Wood Co., Ltd .............................. | 48.50 | 37.96 |
| Yichun Sunshine Wood Products Co., Ltd .............. | Yichun Sunshine Wood Products Co., Ltd .............. | 48.50 | 37.96 |
| Yixing Pengjia Cabinetry Co. Ltd ........................... | Yixing Pengjia Cabinetry Co. Ltd ........................... | 48.50 | 37.96 |
| Zhangjiagang Daye Hotel Furniture Co., Ltd ........... | Zhangjiagang Daye Hotel Furniture Co., Ltd ........... | 48.50 | 37.96 |
| ZHANGJIAGANG PRO–FIXTURE CO., LTD ........... | Zhangjiagang Yuanjiahe Home Furniture Co., Ltd .. | 48.50 | 37.96 |
| ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | 48.50 | 37.96 |
| Zhangzhou Guohui Industrial & Trade Co., Ltd ........ | Zhangzhou Guohui Industrial & Trade Co., Ltd ...... | 48.50 | 37.96 |
| Zhangzhou OCA Furniture Co., Ltd ........................ | Zhangzhou OCA Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| Zhaoqing Centech Decorative Material Company Ltd. | Zhaoqing Centech Decorative Material Company Ltd. | 48.50 | 37.96 |
| Zhejiang Jindi Holding Group Co., Ltd ................... | Zhejiang Jindi Holding Group Co., Ltd ................... | 48.50 | 37.96 |
| Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | 48.50 | 37.96 |
| Zhong Shan Yue Qin Imp. & Exp. Co., Ltd ............ | Zhongshan Jinpeng Furniture Co., Ltd .................. | 48.50 | 37.96 |
| Zhongshan City Shenwan Meiting Furniture Factory | Zhongshan City Shenwan Meiting Furniture Factory. | 48.50 | 37.96 |
| Zhongshan Fookyik Furniture Co., Ltd ................... | Zhongshan Fookyik Furniture Co., Ltd ................... | 48.50 | 37.96 |
| ZHONGSHAN GAINWELL FURNITURE CO., LTD | ZHONGSHAN GAINWELL FURNITURE CO., LTD | 48.50 | 37.96 |
| Zhongshan Guanda Furniture Manufacturing Co., Ltd also known as Guanda Furniture Co., Ltd. | Zhongshan Guanda Furniture Manufacturing Co., Ltd. | 48.50 | 37.96 |
| ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | 48.50 | 37.96 |
| Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | 48.50 | 37.96 |
| Zhoushan For-strong Wood Co., Ltd ....................... | Zhoushan For-strong Wood Co., Ltd ....................... | 48.50 | 37.96 |
| Zhoushan For-strong Wood Co., Ltd ....................... | Shanghai Wanmuda Furniture Co., Ltd ................... | 48.50 | 37.96 |
| Zhucheng Tonghe Woodworks Co., ltd ................... | Zhucheng Tonghe Woodworks Co., ltd ................... | 48.50 | 37.96 |
| Zhuhai Seagull Kitchen and Bath Products Co., Ltd | Zhuhai Seagull Kitchen and Bath Products Co., Ltd | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ................... | DONGGUAN FANG CHENG FURNITURE LTD ..... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ................... | ZhongShan PRO–YEARN Crafts Product Co., Ltd | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ................... | FUJIAN NEWMARK INDUSTRIAL CO., LTD .......... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ................... | Fuzhou Zhonghe Houseware CO., LTD ................... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ................... | MING LIANG FURNITURE PRODUCT CO., LTD .. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ................... | XIANJU JUNYANG HOUSEHOLD PRODUCTS CO., LTD. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ................... | DongGuan HeTai Homewares CO., LTD ................ | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ................... | CHENG TONG HARDWARE PRODUCT LTD ........ | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ................... | Nantong Jon Ergonomic Office Co., Ltd ................. | 48.50 | 37.96 |
| China-Wide Entity ................................................. | ........................................................................... | 262.18 | 251.64 |

## Suspension of Liquidation

Suspension of liquidation and cash deposit rates for all producers and exporters of subject merchandise from China may be affected by this correction notice. Refer to the *Final Determination* for the suspension instructions in effect at the time of the issuance of this notice.

## Public Comment

Commerce is not accepting public comments in response to this corrected final determination.

## International Trade Commission Notification

In accordance with section 735(d) of the Act, Commerce will notify the International Trade Commission of this correction notice.

## Notification to Interested Parties

This corrected final determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended, and 19 CFR 351.210(c).

Dated: March 25, 2020.

**Jeffrey I. Kessler,**

*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2020–06645 Filed 3–30–20; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–580–907]

### Ultra-High Molecular Weight Polyethylene From the Republic of Korea: Initiation of Less-Than-Fair-Value Investigation

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable March 24, 2020.

**FOR FURTHER INFORMATION CONTACT:** Darla Brown or Ian Hamilton, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of

| Respondent Selection Memorandum (June 4, 2019) | C.R. 948 | P.R. 838 | APPX080000-APPX080010 |
| --- | --- | --- | --- |

Barcode:3843446-01 A-570-106 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
~~Proprietary Document~~
E&C/V:  JM
**Public Version**

June 4, 2019

| | |
|---|---|
| **MEMORANDUM TO:** | James Maeder<br>Associate Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **THROUGH:** | James C. Doyle<br>Director, Office V<br>Antidumping and Countervailing Duty Operations |
| **FROM:** | Jasun Moy<br>International Trade Compliance Analyst, Office V<br>Antidumping and Countervailing Duty Operations |
| **RE:** | Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Respondent Selection |

**Summary**

For the reasons detailed below, we recommend selecting, in alphabetical order, The Ancientree Cabinet Co., Ltd. (Ancientree), Dalian Meisen Woodworking Co. Ltd. (Meisen), and Rizhao Foremost Woodwork Manufacturing Company Ltd. (Foremost) as the mandatory respondents in this less-than-fair-value (LTFV) investigation.

**Background**

On March 6, 2019, the Department of Commerce (Commerce) received an LTFV petition concerning imports of wooden cabinets and vanities and components thereof (cabinets) from the People's Republic of China (China), filed on behalf of the American Kitchen Cabinet Alliance (the petitioner).[1]  The period of investigation (POI) is July 1, 2018, through December 31, 2018.

On March 26, 2019, Commerce initiated an LTFV investigation of cabinets from China.[2]  In the "Respondent Selection" section of the *Initiation Notice*, Commerce stated that it intended to select respondents based on responses to quantity and value (Q&V) questionnaires.[3]

---

[1] *See* Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Wooden Cabinets and Vanities from the People's Republic of China," dated March 6, 2019 (Petition).
[2] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Initiation of Less-Than-Fair-Value Investigation*, 84 FR 12587 (April 2, 2019) (*Initiation Notice*).
[3] *Id*. at 12590.



On April 8, 2019, Commerce issued Q&V questionnaires to the top 30 exporters/producers identified in the U.S. Customs and Border Protection (CBP) data and that were also identified with complete contact information by the petitioner in the Petition.[4]  Additionally, Commerce posted the Q&V questionnaire, along with filing instructions, on the Enforcement and Compliance (E&C) website.[5]  On April 17, 2019, Commerce confirmed that all 30 Q&V questionnaires were delivered to their intended recipients.[6]  On or before April 22, 2019, the deadline for submission of the Q&V questionnaires, Commerce received timely filed Q&V questionnaire responses from 231 exporters/producers.[7]  Of the 30 companies that were sent Q&V questionnaires, three companies did not respond to the questionnaire.[8]  Commerce intends to address the treatment of the non-responsive companies in the preliminary determination of this investigation.

On or before May 8, 2019, we received comments from the petitioner, Ancientree, Dalian Jiaye Wood Products Co., Ltd. (Jiaye), Kunshan Baiyulan Furniture Co., Ltd (Kunshan Baiyulan), Foremost, Shanghai Baiyulan Furniture Co., Ltd. (Shanghai Baiyulan), and Shanghai Wenbo Industries Co., Ltd. (Wenbo).[9]  We address the comments below.

Four companies filed timely requests for treatment as voluntary respondents.[10]  The four companies that submitted requests for voluntary respondent treatment are:  (1) Ancientree, (2) Kunshan Baiyulan, (3) Foremost, and (4) Wenbo.

## Issue 1:  Limiting Examination to a Reasonable Number of Companies

The Petitioner's Comments:[11]

- Commerce should select three mandatory respondents to ensure the investigation is representative of the industry and to assess a substantial portion of the subject merchandise from China.

---

[4] *See* Memorandum, "Parties Required to Respond to the Q&V Questionnaire," dated April 8, 2019; *see also* the Petition at Volume I, Exhibit I-9.

[5] *See* http://trade.gov/enforcement/news.asp.

[6] *See* Memorandum, "Delivery of Q&V Questionnaires," dated April 17, 2019 (Delivery Memo).

[7] *See* Attachment.

[8] *See* Delivery Memo.

[9] *See* Petitioner's Letter, "Comments on Q&V Questionnaire Responses and Respondent Selection," dated April 29, 2019 (Petitioner's Comments); *see also* Ancientree's Letter, "Comments on Q&V Response," dated April 29, 2018 (Ancientree's Comments); Wenbo and Jiaye's Letter, "Comments on the Q&V Questionnaire Responses," dated April 29, 2019 (Wenbo and Jiaye's Comments); Kunshan Baiyulan's and Shanghai Baiyulan's Letter, "Baiyulan Comments on Q&V Submission," dated April 29, 2019 (Baiyulan's Comments); Foremost's Letter, "Foremost's Q&V Clarification," dated May 8, 2019 (Foremost's Clarification).

[10] *See* Ancientree's Letter, "Request for Treatment as Mandatory Respondent or Request for Voluntary Respondent Treatment as an Alternative," dated March 27, 2019; *see also* Kunshan Baiyulan's Letter, "Request to Appear as a Voluntary Respondent," dated March 27, 2019; Foremost's Letter, "Request for Voluntary Respondent Treatment," dated March 28, 2019; and Wenbo's Letter, "Entry of Appearance; Request to be Voluntary Respondent," dated March 26, 2019.

[11] *See* Petitioner's Comments.

Barcode:3843446-01 A-570-106 INV - Investigation  -

Kunshan Baiyulan & Shanghai Baiyulan's Comments:[12]

- Commerce should select the four largest exporters/producers as mandatory respondents.
- Selecting only two respondents has led to abnormal "all other" and "separate rate" results causing unnecessary litigation.

Ancientree's Comments:[13]

- Commerce should select three or four mandatory respondents.  This will allow Commerce to account for the large number of exporters, as well as the differences due to the variety of producers.

Applicable Statutory Provision:

Section 777A(c)(1) of the Act, directs Commerce to determine an individual weighted-average dumping margin for each known exporter and producer of the subject merchandise.  As noted above, where it is not practicable to examine all known exporters and/or producers of merchandise under consideration, section 777A(c)(2) of the Act and 19 CFR 351.204(c)(2), permits us to investigate a reasonable number of exporters and/or producers by examining (1) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or (2) exporters and producers accounting for the largest volume of the merchandise under consideration from the exporting country that the administering authority determines can be reasonably examined.

*Analysis:*

The Petition named 727 exporters and/or producers of cabinets from China.[14]  The Q&V questionnaire responses identify 231 exporters/producers of subject merchandise during the POI.[15]

Ideally, in an investigation, Commerce would examine all known exporters and producers.  However, in instances where Commerce must limit its examination due to the large number of potential respondents relative to its resource constraints, Commerce will examine as many exporters and producers as is practicable, consistent with its statutory obligation.

While section 777A(c)(2) of the Act does not define a "large number of exporters or producers," we find that the number of exporters and producers included in the petition constitutes a large number.  Accordingly, we conclude that it would not be practicable in this investigation to examine each known exporter and producer individually and determine an individual weighted-average dumping margin for each.  Examining all known exporters and producers would require

---

[12] *See* Baiyulan's Comments.
[13] *See* Ancientree's Comments.
[14] *See* the Petition.
[15] *See* Attachment.

Filed By: Jasun Moy, Filed Date: 6/4/19 2:55 PM, Submission Status: Approved

significant resources because it would require Commerce to analyze each company's corporate structure, accounting and selling practices, and production information.

In addition to this investigation, Office V is conducting numerous concurrent antidumping (AD) and countervailing duty (CVD) proceedings.[16]  Further, because this is an investigation, verification will be mandatory.[17]  The complexity of the above factors, combined with overlapping statutory deadlines of other AD and CVD proceedings, as well as Office V's additional workload, place a significant constraint on the number of analysts that can be assigned to this case and, thus, limit the number of respondents Commerce can reasonably examine. Moreover, because of the significant workload throughout all of E&C, Office V does not anticipate receiving any additional resources to devote to this investigation.

In light of the large number of known exporters and/or producers of cabinets from China, Commerce's current resource constraints and practical considerations outlined above, and after careful consideration, we find that it is not practicable to individually examine all known exporters or producers of cabinets from China as directed by section 777A(c)(1) of the Act.

*Recommendation:*

For the reasons discussed above, we recommend limiting Commerce's examination of respondents in this investigation to a reasonable number of exporters and/or producers, consistent with section 777A(c)(1) of the Act and 19 CFR 351.204(c)(2).

☒                                   ☐
_____          _____
Agree                              Disagree

## Issue 2:  Selection of Respondents by Quantity or Value

Petitioner's Comments:[18]

- Commerce should select mandatory respondents based on the methodology consistent with Commerce's typical practice, which is by volume, *i.e.*, quantity.
- Reporting quantity on a container basis is a consistent and uniform unit of measure that will most accurately identify the largest exporters/producers of subject merchandise.
- The average unit value (AUV) per container ranged from less than $10,000 per container to more than $100,000 per container.  Thus, some of the values reported appear to be aberrational.

---

[16] Examples include, but are not limited to:  the AD investigation of cast iron soil pipe from China; the AD and CVD investigations of wooden cabinets and vanities and components thereof from China; the AD and CVD investigations of steel threaded rod from India; AD and CVD administrative reviews of 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from China; AD administrative review of hot-rolled steel flat products from Australia; AD administrative review of frozen fish fillets from Vietnam; AD administrative review of uncoated paper from Portugal; CVD administrative review of cold-drawn mechanical tubing from India; AD administrative review of certain corrosion resistant steel products from India; AD administrative review of butt-weld pipe fittings from China; and AD and CVD circumvention inquiries of hardwood plywood products from China.
[17] *See* section 782(i)(1) of the Act.
[18] *See* Petitioner's Comments.

4

Barcode:3843446-01 A-570-106 INV - Investigation  -

Wenbo & Jiaye's Comments:[19]

- Commerce should select mandatory respondents based on the value reported in the Q&V responses because it is the best, and most accurate, data available.
- CBP does not require importers to report any import volumes under the Harmonized Tariff Schedule (HTS) subheadings identified in the Petition. This demonstrates the unreliability of selecting respondents based on quantity.
- Containers hold different amounts of unassembled and assembled products which would significantly alter the value of the containers. Therefore, containers do not accurately reflect the level of imports.
- Any company with an affiliated importer that further manufactures in the United States would not have container data available since shipments within the United States are not done on a container load.
- Companies may have used different conversion factors to arrive at the container equivalent and therefore make the quantity reported inaccurate.

Baiyulan's Comments:[20]

- The quantity data collected in the Q&V responses is not an accurate reflection of the total number of cabinets sold in the United States because some companies may ship in Ready-to-Assemble (RTA) condition.
- Kunshan Baiyulan ships its cabinets [                    ]. Alternatively, the top two companies, according to Q&V responses, appear to ship fully assembled cabinets—which takes up much more space in containers. If Kunshan Baiyulan reported quantity on a fully assembled basis, then combined they would have been the largest exporter.
- Commerce should ask the leading exporters/producers whether the quantities they reported were on an RTA or fully assembled basis and then compare the data.

Ancientree's Comments:[21]

- The Q&V data implies that merchandise is shipped/produced in different manners, *i.e.*, some companies' merchandise may have occupied more space in containers than others.
- Commerce should select mandatory respondents based on both the quantity and value reported in the Q&V responses.

Applicable Statutory Provision:

Where it is not practicable to examine all known exporters and/or producers of subject merchandise, section 777A(c)(2) of the Tariff Act of 1930, as amended (the Act), directs Commerce to investigate either (1) a sample of exporters, producers or types of products that is statistically valid based on the information available at the time of selection, or (2) exporters

---

[19] *See* Wenbo and Jiaye's Comments.
[20] *See* Baiyulan's Comments.
[21] *See* Ancientree's Comments.

Filed By: Jasun Moy, Filed Date: 6/4/19 2:55 PM, Submission Status: Approved
APPX080004

and/or producers accounting for the largest volume of the subject merchandise that Commerce determines can reasonably be examined.  The Act does not express a preference for either methodology.

*Analysis:*

Section 777A(c)(2) of the Act provides Commerce with two alternative methods for its respondent selection.  In this investigation, we recommend selecting respondents accounting for the largest volume of subject merchandise imports that can be reasonably examined, consistent with section 777A(c)(2)(B) of the Act.  This methodology is transparent and consistent with the methodology used in other proceedings and we find no evidence here to deviate from our normal practice.[22]  Furthermore, no party has argued that Commerce should select respondents pursuant to section 777A(c)(2)(A) of the Act (*i.e.*, based on sampling).

To determine the total and relative volume data for each potential respondent, Commerce reviewed the Q&V responses for each exporter and/or producer.  The Q&V questionnaire precisely defined a container as "one full 40-foot container" to create consistency for respondents when reporting volume.[23]  We find that there is nothing on the record to support the notion that the values reported will be more accurate or consistent than the volumes reported.

Regarding Wenbo and Jiaye's argument that Commerce should select respondents based on value, we disagree.[24]  Although Wenbo and Jiaye indicate that CBP does not require importers to report import volumes under the HTS subheadings, they provide no supporting documentation to support its claim that selecting respondents based on quantity is unreliable.  Additionally, Commerce finds the argument that containers are inaccurate because they hold different amounts of unassembled and assembled products to be without merit.  There is nothing on the record to suggest that companies reported volume on a fully assembled or RTA basis.  Commerce also provided a precise definition of a container and clear guidance on how companies should convert their quantities to match our guidelines.  Therefore, we do not find that there is sufficient evidence on the record to deviate from our normal practice.

Ancientree, Kunshan Baiyulan, and Shanghai Baiyulan argue that, in some instances, quantity was reported on a fully assembled basis, or on a basis when the cabinets took up more space, but we find this argument to be without merit.  There is nothing on the record to suggest that companies reported volume on a fully assembled basis.  Therefore, these arguments are moot.

Ancientree also indicated that Commerce should select mandatory respondents based on both the quantity and value.  However, it did not provide any methodology for doing so.  Therefore, we have disregarded its comment.

---

[22] *See, e.g.*, *Truck and Bus Tires from the People's Republic of China:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination With Final Antidumping Determination*, 81 FR 43577 (July 5, 2016), unchanged in *Truck and Bus Tires from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination, in Part*, 82 FR 8606 (January 27, 2017).
[23] Commerce Letter re: Q&V Questionnaire, dated April 8, 2019.
[24] *See* Wenbo and Jiaye's Comments.

6

Barcode:3843446-01 A-570-106 INV - Investigation  -

*Recommendation:*

For the reasons discussed above, we recommend selecting mandatory respondents using the volume reported in the Q&V data.

| ☒ | ☐ |
|---|---|
| _____ | _____ |
| Agree | Disagree |

## Issue 3:  Respondent Selection

Kunshan Baiyulan and Shanghai Baiyulan's Comments:[25]

- Merchandise sold through Kunshan Baiyulan's affiliate, Shanghai Baiyulan, to SAICG International Trading Co., Ltd. (SAICG) should be considered Kunshan Baiyulan's sales.

Ancientree's Comments:

- Commerce should not consider the sales made by Shanghai Baiyulan to SAICG, to be sales made by Kunshan Baiyulan.
- Foremost also appears to have included affiliate sales in its Q&V response and did not indicate which sales were sold by which company.  Moreover, Foremost's sales value is very low in comparison to its reported quantity.

Foremost's Comments:

- Foremost did not consolidate its Q&V response.  Foremost was the only physical exporter of all subject merchandise from China to the United States.
- Foremost invoiced its Hong Kong affiliate Foremost Worldwide Co., Ltd. (FWW). FWW in turn invoiced the products to unaffiliated U.S. customers or to the U.S. affiliate Foremost Groups, Inc.

Applicable Statutory Provision

Where it is not practicable to examine all known exporters and producers of the subject merchandise, section 777A(c)(2) of the Act permits Commerce to determine the weighted-average dumping margins for a reasonable number of exporters or producers, by limiting its examination to (1) a sample of exporters, producers, or types of products that it determines is statistically valid based on the information available to it at the time of selection, or (2) the exporters or producers accounting for the largest volume of the subject merchandise from the exporting country that Commerce determines can be reasonably examined.[26]  The Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA) interprets this

---

[25] *See* Baiyulan's Comments.
[26] *See* Section 777A(c)(2)(A) and (B) of the Act.

7

provision to mean that the authority to select respondents, whether by using a statistically valid sample or by examining respondents accounting for the largest volume of subject merchandise, rests exclusively with Commerce.[27]  Further, section 777A(c)(2) of the Act does not require Commerce to meet a minimum threshold in determining the number of mandatory respondents.

*Analysis:*

In this investigation, we recommend selecting respondents accounting for the largest volume of subject merchandise that can be reasonably examined, consistent with section 777A(c)(2)(B) of the Act.  This methodology is transparent and consistent with the methodology used in other AD proceedings.  Furthermore, no party has argued that Commerce should select respondents for limited examination pursuant to 777A(c)(2)(A) (*i.e.*, based on sampling)

To determine the total and relative volume data for each potential respondent, Commerce reviewed the Q&V questionnaire responses for each exporter and/or producer.  After carefully considering these Q&V questionnaire data, our resource constraints, as well as the complexity of the issues involved in an investigation, we find that the office responsible for this investigation has the resources to examine individually three mandatory respondents.  An individual examination of the three largest exporters and producers by volume of entries of subject merchandise during the POI will allow Commerce to capture the largest volume of exports Commerce can reasonably examine, in light of resource constraints and in compliance with the statutory requirements.  Based on our analysis of the Q&V questionnaire data submitted by exporters and producers, the three exporters and producers with the largest volume of entries of subject merchandise are, in alphabetical order:  The Ancientree Cabinet Co., Ltd., Dalian Meisen Woodworking Co. Ltd., and Rizhao Foremost Woodwork Manufacturing Company Ltd.

Regarding Kunshan Baiyulan's argument that its affiliate, Shanghai Baiyulan, should be collapsed with its sales, we disagree.  In general, Commerce has found that determinations concerning whether particular companies should be "collapsed" (*i.e.*, treated as a single entity for purposes of calculating AD rates), require a substantial amount of detailed information and analysis, which often require follow-up questions and analysis.  Accordingly, in the Q&V questionnaire, Commerce explicitly stated that we will not conduct collapsing analyses at the respondent selection phase and that companies should report quantity and value data separately for affiliates.  Therefore, we will not collapse the sales of Kunshan Baiyulan and Shanghai Baiyulan.

Regarding Ancientree's argument that Foremost was collapsing its Q&V response, Commerce requested that Foremost clarify on the record whether it had provided collapsed Q&V data.[28] According to Foremost, it was the only exporter of subject merchandise and none of Foremost Groups, Ltd.'s other affiliates and subsidiaries' exports were collapsed in Foremost's Q&V response.[29]  Based on this clarification, Commerce will consider Foremost's Q&V response as reported.

*Recommendation:*

---

[27] *See* SAA, H.R. Doc. 103-316, vol. 1 (1994) at 872.

[28] *See* Commerce Letter, "Quantity and Value Questionnaire Response Clarification Request," dated May 7, 2019.

[29] *See* Foremost's Clarification.

8

For the reasons discussed above, we recommend selecting, in alphabetical order, The Ancientree Cabinet Co., Ltd., Dalian Meisen Woodworking Co. Ltd., and Rizhao Foremost Woodwork Manufacturing Company Ltd., the three exporters or producers that account for the largest volume of subject merchandise, for individual examination as mandatory respondents in this investigation.

☒                              ☐
_____          _____
Agree                        Disagree

## Issue 4:  Voluntary Respondents

Applicable Statutory Provision:

When Commerce limits the number of exporters examined in an investigation, section 782(a) of the Act directs Commerce to calculate individual weighted average dumping margins for any exporter or producer not initially selected for individual examination that voluntarily submits the information requested from mandatory respondents, if:  1) the information is submitted by the due date specified for exporters or producers initially selected for examination; and 2) the number of exporters and producers subject to the investigation or review is not so large that any additional individual examination of such exporters and producers would be unduly burdensome and inhibit the timely completion of the investigation.[30]

*Analysis:*

Commerce, thus far, has received requests for voluntary respondent treatment from four companies.  As noted above, two of these companies have reported some of the highest volumes of imported subject merchandise during the POI, and we have recommended that they be selected as mandatory respondents.  If any company, including those which submitted voluntary respondent requests, wishes to be considered as a voluntary respondent and meets the requirements of section 782(a) of the Act and 19 CFR 351.204(d), Commerce will consider whether to examine a voluntary respondent at that time.

---

[30] *See* Section 782(a)(A) and (B) of the Act.

9

*Recommendation:*

If a voluntary response is submitted in accordance with section 782(a) of the Act and 19 CFR 351.204(d), we recommend evaluating the circumstances during the course of this investigation to determine whether Commerce may examine another respondent or respondents in addition to the three mandatory respondents identified in Issue 3, above.

⊠                          ☐
_____            _____
Agree                    Disagree

6/4/2019

X  *James Maeder*
_____

Signed by: JAMES MAEDER

_____
James Maeder
Associate Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

10

Barcode:3843446-01 A-570-106 INV - Investigation    -

# ATTACHMENT

*Business Proprietary Information Subject to an Administrative Protective Order*

1.  Exporters/Producers Total Export Quantity:  [          ] containers

2.  The following chart identifies the entry volume (%) of exports of cabinets from the top 10 China companies during the POI, in alphabetical order.

| Obs | Company Name | Total Quantity | Entry Volume (%) |
|---|---|---|---|
| 1 | The Ancientree Cabinet Co., Ltd | [          ] | ] |
| 2 | Dalian Meisen Woodworking Co. Ltd | [          | ] |
| 3 | Huizhou Mandarin Furniture Co., Ltd | [          | ] |
| 4 | Jiangsu Weisen Houseware Co., Ltd | [          | ] |
| 5 | Pizhou Ouyme Import & Export Trade Co., Ltd | [          | ] |
| 6 | Qufu Xinyu Furniture Co., Ltd | [          | ] |
| 7 | Rizhao Foremost Woodwork Manufacturing Company Ltd | [          | ] |
| 8 | Shanghai Baiyulan Furniture Co., Ltd | [          | ] |
| 9 | Shouguang Fushi Wood Co., Ltd | [          | ] |
| 10 | Shouguang Jinxiangyuan Home Furnishing Co., Ltd | [          | ] |

Filed By: Jasun Moy, Filed Date: 6/4/19 2:55 PM, Submission Status: Approved

APPX080010

| Meisen Section A Questionnaire Response (July 3, 2019) | C.R. 967-971 | P.R. 869 | APPX080011-APPX082644 |
|---|---|---|---|

**HUSCH BLACKWELL**

Jeffrey S. Neeley
Partner

750 17th St. N.W., Suite 900
Washington, DC 20006-4675
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

July 3, 2019

Case No. A-570-106
Total Pages:69
Investigation
E&C: Office VIII

**PUBLIC VERSION**
Business Proprietary Information removed from
brackets on Narrative pages 16-18 and Exhibits A-2-
A-6.

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re:**   *Wooden Cabinets and Vanities from the People's Republic of*
*China: Section A Questionnaire Response*

Dear Secretary Ross:

On behalf of Dalian Meisen Woodworking Co., Ltd., ("Meisen"), we hereby submit the

foregoing response to the Section A Questionnaire issued by the U.S. Department of Commerce

on June 5, 2019 in the above-referenced proceeding.

**REQUEST FOR PROPRIETARY TREATMENT**

Certain information contained herein is business confidential data that is proprietary.

This information is enclosed with brackets ("[ ]"). Disclosure of this information would cause

**U.S., Meisen is reporting the date of invoice as the date of sale.**

B.  Explain how you determined the ultimate customer or market for the products sold through resellers.  For these sales, explain whether you restrict the reseller's volume or  geographic area for distribution.  In addition, explain whether you provide customer lists  to or make joint sales calls with the reseller, or provide post-sales support or purchase  incentives to the reseller's customers.  Provide written sales contracts or sales terms with  these resellers.

**Response:**

**Meisen's has 16 U.S. affiliates.  See Exhibit A-1 for a list of all U.S. affiliated companies.  These companies are collectively referred to as the "J&K Companies" for purposes of this response.  The J&K Companies do not sell the merchandise to any resellers and do not purchase the merchandise under investigation from any company other than Dalian Meisen.**

C.  Describe your agreement(s) for sales in the United States (*e.g.*, long-term purchase contract, short-term purchase contract, purchase order, order confirmation).  Provide a copy of each type of agreement and all sales-related documentation generated in the sales  process (including the purchase order, internal and external order confirmation, invoice,  shipping and export documentation, and Customs entry documentation) for a sample sale  in the U.S. market during the POI.

**Response:**

**The J&K Companies sell in the United States to contractors, home builders, and cabinet installers.  While each J&K Company location has  minor variations in the sales process, generally, each of the J&K Companies provide an estimate, after which the customer confirms the order via a purchase order or other acknowledgement, an initial invoice is prepared, any necessary modifications to standard pieces or assembly are performed at the J&K Company warehouse, then the merchandise is packed and prepared for shipment, and finally the invoice is issued after the merchandise is packed and ready for shipment.**

See Exhibit A-2 for flow charts describing the sales process of each of the 16 J&K Company locations.

D.  Describe the types of changes that occur after the initial agreement that affect the terms of the sale other than delivery dates. Explain how these types of changes affected your determination of date of sale.

Response:

The changes that occur between purchase order and shipment are changes to price and quantity. In many instances, a J&K Company customer will arrive at the warehouse and due to the design of a project require additional pieces or will cancel standard size pieces. Therefore, changes can and do occur up until the merchandise is loaded for delivery and a final invoice is issued.

E.  Provide the approximate percentage of sales of the subject merchandise in the United States market made pursuant to each type of agreement listed in response to question 4.C. above.

Response:

Meisen and the J&K Companies do not sell pursuant to sales agreements, therefore it is not responding to this question.

F.  Provide copies of all price lists used in sales of the subject merchandise to the United States and identify the types of sales to which these price lists pertain. Include any discount or rebate schedules used with each price list.

Response:

See Exhibit A-3 for the price lists used by each of the individual J&K Companies.

G.  Describe the process by which your company finds its U.S. customers. Describe the roles played by all individuals or entities (within and outside your company) involved in finding U.S. customers.

**See Meisen SRA at Exhibit 18 for a company brochure that details the full**

**description of the merchandise that was sold during the POI.**

B.      Provide a key to your product codes assigned to the merchandise in the normal course of business, including an explanation of the full range of prefixes, suffixes, or other notations that identify special features.  Explain whether identical products are listed under different codes depending on whether the product is destined for the U.S. market or another market.  If so, provide a list showing how identical products are identified by product codes.

**Response:**

**There is no material difference in the product codes assigned by Meisen and the**

**product codes assigned by the J&K Companies.  The product codes are self-explanatory**

**and the full list of product codes of the merchandise exported and sold in the United States**

**are provided at Exhibit A-6.  There is no distinction in the product codes based upon the**

**destination market.**

C.      Provide all catalogs and brochures issued by your company and affiliates that include the  merchandise under consideration sold by your company in the United States.  Also provide copies of internet-based advertising by your company and its affiliates that include the merchandise under consideration sold by your company to the United States.  Indicate the relevant sites.

**Response:**

**See Meisen SRA at Exhibit 19.**

D.      Provide a listing of every intermediate party involved in the production of the merchandise (including suppliers and parties who provided tolling service).  For each party listed, also provide the merchandise produced or provided, the stage at which the  merchandise was produced or provided, and the percentage of each output produced or  provided.  Please be prepared to provide factor of production information for each party  listed, if requested by Commerce.

| | Merchandise | Stage of Production | Percentage of Output |
|---|---|---|---|
| Supplier 1 | | | |
| Supplier 2 | | | |

Barcode:3856901-01 A-570-106 INV - Investigation  -

| A-3 | Price Lists | BPI |
|-----|-------------|-----|

### *NOT SUSCEPTIBLE TO PUBLIC SUMMARY*

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

| Meisen Section D Questionnaire Response (July 19, 2019) | C.R. 989 | P.R. 908 | APPX082645-APPX082743 |
|---|---|---|---|

# HUSCH BLACKWELL

Jeffrey S. Neeley
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

July 19, 2019

Case No. A-570-106
Total Pages: 70
Investigation
E&C: Office VIII

**PUBLIC VERSION**
Business Proprietary Information removed from
brackets on Narrative Pages 7 and 24 and Exhibits D-
1 to D-4 and D-6 to D-11

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re:**   *Wooden Cabinets and Vanities from the People's Republic of
China: Section D Questionnaire Response*

Dear Secretary Ross:

On behalf of Dalian Meisen Woodworking Co., Ltd., ("Meisen"), we hereby submit the

foregoing response to the Section D Questionnaire issued by the U.S. Department of Commerce

on June 5, 2019 in the above-referenced proceeding.

## REQUEST FOR PROPRIETARY TREATMENT

Certain information contained herein is business confidential data that is proprietary.

This information is enclosed with brackets ("[ ]").  Disclosure of this information would cause

| 2.19 | Verticle gas hinge | GASHING |
|------|--------------------|---------|
| 2.20 | Glue | GLUE |
| 2.21 | Glue curing agent | GLUCUR |
| 2.22 | Hot melt adhesive | HOTGLUE |
| 2.23 | Silicone sealant | SILICONE |
| 2.24 | 502 Glue | CYANGLUE |
| 2.25 | Dowel | DOWEL |
| 2.26 | Wooden stick | WOSTICK |
| 2.27 | Plastic bumper | PLBUMP |
| 2.28 | Edge banding with nonwoven cloth | EDGBAND1 |
| 2.29 | Edge banding without nonwoven cloth | EDGBAND2 |
| 2.30 | Sand paper | SANDPAP |
| 2.31 | Filler | FILLER |
| 2.32 | Iron nails | NAIL |
| 3.1 | Direct labor | DIRLAB |
| 4.1 | Indirect labor | INDLAB |
| 5.1 | Electricity | ELECTRIC |
| 5.2 | Coal | COAL |
| 7.01 | Label sticker | LABEL |
| 7.02 | Plastic bag | PLBAG |
| 7.03 | Polystyrene board | POBOARD |
| 7.04 | Carton | CARTON |
| 7.05 | Foam paper | FOAMPAP |
| 7.06 | Paper | PAPER |
| 7.07 | Tape | TAPE |
| 8.1 | Packing labor | PCKLAB |

**FIELD NUMBER 2.01-2.39:**     **Direct materials**

FIELD NAME:     Various

DESCRIPTION:     Report each raw material used to produce a unit of the merchandise under consideration. The consumption amount must be reported on a per unit basis (e.g., per kilogram, pound, etc.)

NARRATIVE:     Describe the method used to calculate the reported amounts and provide supporting worksheets that show your calculation for each material input. If any raw material amounts are reduced because of recycled scrap, provide the names of those inputs and the reduction made. In addition, on a separate sheet, please detail the means of transport (e.g., rail, truck) and the distance each material traveled from the supplier to your factory. If you have multiple suppliers, please provide the distance from each supplier to your factory, and the percentage amount purchased from each supplier. Describe

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 7/19/19 12:22 PM, Submission Status: Approved

APPX082664

Barcode:3866096-01 A-570-106 INV - Investigation  -

| Exhibit D-5 | List of FOPs | Public |
|---|---|---|

| Variable name for the FOP | Field Name | Description of the FOP (e.g., type/grade of inputs, electricity). |
|---|---|---|
| Sawn Birch Wood Boards (cut timbe | BIRCH | Sawn Birch Wood Boards for the face of the cabinet |
| Plywood | PLYWOOD | Plywood board for cabinet |
| Paint | PAINT | Paint for the face and sides of the cabinet, mainly consisted of Butyl Alcohate, HS code: 3208 1000.90 |
| UV Paint | UVPNT | UV paint, HS code: 3208 2010.91 |
| Pigment | PGMET | Pigment and thinner, HS code: 3208 9090.90 |
| Curing agent | CURING | Used together with the paint, HS code: 3211000000 |
| Drawer slide | SLIDE | Metal part to hold the drawer |
| Hinge | HINGE | Metal part to attach the door to the cabinet |
| Plastic Box | PLBOX | Inside componet of the cabinet |
| Screw | SCREW | For assembling different parts of the cabinet |
| Shelf pin | SHEFPIN | To support and fix the position of the shelf inside cabinet |
| Door bumper | DOORBUM | Rubber pad for the anti-collision of the door |
| Magnet | MAGNET | For the closing of doors |
| Coloured zinc bracket | ZINCBRAC | Coloured zinc part to hold the boards together |
| Iron Bracket | IROBRAC | Iron part to hold the boards together |
| Glass insert pin | GLAPIN | Plastic pin to fix the position of the glass on the cabinet |
| Iron rotation plate | ROTPLAT | Iron rotation plate in the cabinet to support plastic pin |
| Mirror Hanger | MIRHANG | Metal part to fix the mirror on the wall |
| Vertical gas hinge | GASHING | To support the door when it opens |
| Glue | GLUE | Mainly consisted of polyvinyl acetate, to stick wood boards together |
| Curing agent | GLUCUR | Mainly consisted of isocyanate, use together with glue |
| Hot melt adhesive | HOTGLUE | Ethylene Vinyl Acetate Resin |
| Silicone Sealant | SILICONE | Consisted of silicone |
| 502 Glue | CYANGLUE | Mainly consisted of ethyl cyanopropionate |
| Dowel | DOWEL | Wooden tendon for assembling different piece of the face together |
| Wooden stick | WOSTICK | Wooden rod on the cabinet as plate rack |
| Plastic bumper | PLBUMP | To use as bumper between wooden parts |
| Edge banding | EDGBAND1/2 | Birch veneer, for sealing the edge of the cabinet boards, with and without nonwolven cloth attached |
| Sand paper/sand cloth | SANDPAP/SANDCLO | For sanding the wood surface |
| Filler | FILLER | For fixing the cracks on wood |
| Iron nails | NAIL | To hold different parts of the cabinet together |
| Label sticker | LABEL | Packing material |
| Plastic bag | PLBAG | Packing material |
| Polystyrene board | POBOARD | Packing material |
| Carton | CARTON | Packing material |
| Foam paper | SHEET | Packing material |
| Paper | PAPER | Packing material |
| Tape | TAPE | Packing material |

| Meisen Section C Questionnaire Response (July 19, 2019) | C.R. 1011-1015 | P.R. 910 | APPX082744-APPX083285 |
|---|---|---|---|

Barcode:3865669-01 A-570-106 INV - Investigation -

# HUSCH BLACKWELL

Jeffrey S. Neeley
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

July 19, 2019

Case No. A-570-106
Total Pages: 123
Investigation
E&C: Office VIII

**PUBLIC VERSION**
Business Proprietary Information removed from
brackets on Narrative Pages 24 and 47 and Exhibits
C-1 to C-2, C-4 to C-6, C-8, C-10 and C-11.

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re:** *Wooden Cabinets and Vanities from the People's Republic of*
*China: Section C Questionnaire Response*

Dear Secretary Ross:

On behalf of Dalian Meisen Woodworking Co., Ltd., ("Meisen"), we hereby submit the

foregoing response to the Section C Questionnaire issued by the U.S. Department of Commerce

on June 5, 2019 in the above-referenced proceeding.

**REQUEST FOR PROPRIETARY TREATMENT**

Certain information contained herein is business confidential data that is proprietary.

This information is enclosed with brackets ("[ ]").  Disclosure of this information would cause

Husch Blackwell LLP

99      Not applicable – product is a component part

**Response:**

   **J&K Companies have followed the above coding instructions to report production**

**volume in this field.**

   **FIELD NUMBER 3.3:**          **Face Type**

      FIELD NAME:          FACETYPEU

      DESCRIPTION:          Indicate the primary type of material used in the forward
                    face (including the doors and drawers) of the product.

      1      Solid wood – softwood species
      2      Solid wood – tropical hardwood species (including bamboo)
      4      Solid wood - common grade hardwood species (Ash (F. nigra,
            Fraxinus quadrangulata, F. pennsylvanica, F. Americana),
            Birch (Betula), Gum (Liquidambar), Poplar (Liriodendron))
      5      Solid wood - mid grade hardwood species (Alder (Alnus), Box
            Elder (Acer negundo), Cypress (Taxodium), Elm - Rock (Ulmus
            crassifolia, U thomasii, U serotina, U. alata), Elm - Soft  (Ulmus
            americana, U rubra), Maple (all varieties), Larch (Larix), Oak -
            White (Quercus arizonica, Q. douglasii, Q. macrocarpa, Q. lobata,
            Q. prinus, Q. muehlenbergii, Q. emoryi, Q. gambelii, Q.
            oblongifolia, Q. virginiana, Q. garryana, Q. lyrata, Q. stellata, Q.
            michauxii, Q. bicolor, Q. alba), Oak - Red (Quercus veluntia, Q.
            marilandica, Q. kelloggi, Q. falcate var., pagodaefolia, Q.
            laurifolia, Q. ellipsoidalis, Q. rubra, Q. nuttallii, Q. palustris, Q.
            coccinea. Q. shumardii, Q. falcate, Q. laevis, Q. phellos))
      6      Solid wood – premium grade hardwood species (Cherry (Prunus),
            Hickory (Carya), Pecan (Carya), Rosewood (Delbergia), Walnut
            (Juglans), *etc.*)
      10     Plywood
      11     High-density fiberboard (HDF)
      12     Medium-density fiberboard (MDF)
      15     Laminate
      18     Melamine

**Response:**

   **J&K Companies have followed the above coding instructions to report the face type**

9

Barcode:3866266-01 A-570-106 INV - Investigation  -

| Exhibit C-1 | U.S. Market Sales Database Summary | BPI |
| --- | --- | --- |

**U.S. Sales Database Summary**

General Information:

| | |
|---|---|
| Market | United States |
| Data Set Name | *(e.g.: "UGHUS03")*  DMWUS01 |
| Date Submitted  (8 digits) | __/__/20__  7/19/2019 |

**Variables in the Data Set:**

| Short  Description | Variable Name | Unit of Measure in which Reported | Unit of Measure in which Incurred | Conversion Factor (if any) | Currency |
|---|---|---|---|---|---|
| *(Sample:  Domestic  Inland Freight* | *DINLFTWU* | *lbs.* | *kilos* | *2.2046  lbs.lkilo* | *USD)* |
| Quantity | QTYU | PCS | PCS | | |
| Quantity Adjustment | QTYADJU | PCS | PCS | | |
| Gross Unit Price | GRSUPRU | PCS | PCS | | USD |
| Freight Revenue | FRTREV | PCS | PCS | | USD |
| Assembly Revenue | ASMBLREVU | PCS | PCS | | USD |
| Modification Revenue | MODREVU | PCS | PCS | | USD |
| Repacking Revenue | RPKREVU | PCS | PCS | | USD |
| Other Revenue | OTHER_REVU | PCS | PCS | | USD |
| ADJUSTMENTS, DISCOUNTS AND  REBATES | | | | | |
| Billing Adjustments | BILLADJU | PCS | PCS | | USD |
| Other Discount | OTHDISU | PCS | PCS | | USD |
| Quantity Discount | QTYDISU | PCS | PCS | | USD |
| MOVEMENT EXPENSES | | | | | |
| Inland Freight - Plant/Warehouse to Port of Exit | DINLFTPU | KM | KM | | N/A |
| International Freight | INTNFRU | PCS | PCS | | USD |
| U.S. Brokerage Expense | USBROKU | PCS | PCS | | USD |
| U.S. Inland Freight from Port to Warehouse | INLFPWU | PCS | PCS | | USD |
| U.S. Warehousing Expense | USWAREHU | PCS | PCS | | USD |
| U.S. Inland Freight from Warehouse to the Unaffiliated Customer | INLFWCU | PCS | PCS | | USD |
| Other U.S. Transportation Expense | USOTHTRU | PCS | PCS | | USD |
| U.S. Customs Duty | USDUTYU | PCS | PCS | | USD |
| U.S. Section 301 Duty | USDUTY301U | PCS | PCS | | USD |
| COMMISSIONS EXPENSE | | | | | |
| Commissions | COMMU | PCS | PCS | | USD |
| DIRECT  SELLING EXPENSES | | | | | |
| Credit Expense | CREDITU | PCS | PCS | | USD |
| Advertising Expenses | ADVERTU | PCS | PCS | | USD |
| Warranty Expense | WARRU | PCS | PCS | | USD |
| INDIRECT SELLING EXPENSES: | | | | | |
| Indirect Selling Expenses Incurred in the United States | INDIRSU | PCS | PCS | | USD |
| Inventory Carrying Costs Incurred in the United States | INVCARU | PCS | PCS | | USD |
| Repacking Cost | REPACKU | PCS | PCS | | USD |
| Irrecoverable Input Value Added Tax (VAT) | VATTAXU | PCS | PCS | | USD |
| ENTERED VALUE | ENTVALUE | PCS | PCS | | USD |

Barcode:3866266-01 A-570-106 INV - Investigation  -

U.S. Sales
Dalian Meisen Woodworking Co. Ltd.

PUBLIC VERSION
LTFV of Wooden Cabinets and Vanities and Components Thereof from China

DMWUS01

| Obs | SEQU | PRODCODU | PRODCODU1 | CONNUMU |
|---|---|---|---|---|
| 1 | . | . | | |
| 25000 | . | . | | |
| 50000 | . | . | | |
| 75000 | 72886.18 | | | |
| 100000 | 107471.48 | | | |

| Obs | COMPLETEU | PRODVOLU | FACETYPEU | DRAWERU | DOORU | DOSTYLEU | SURFCOATU | BOXMATU | PRODWIDU | PRODHEIGHU | PRODEEPU | HARDWAREU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | |
| 25000 | | | | | | | | | | | | |
| 50000 | | | | | | | | | | | | |
| 75000 | | | | | | | | | | | | |
| 100000 | | | | | | | | | | | | |

| Obs | SOFTCLOSU | SALEU | CONSIGNU | CUSCODU | SELLERU | SALINDTU | SALEDATU | INVOICU | SHIPDTU | PAYDATE1U | PAYAMT1U | PAYDATE2U |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | . | | | . |
| 25000 | | | | | | | | | . | | | . |
| 50000 | | | | | | 10/30/2015 | | | . | | | . |
| 75000 | | | | | | | | | . | | | . |
| 100000 | | | | | | | | | 10/18/2022 | | | |

| Obs | PAYAMT2U | PAYDATE3U | PAYAMT3U | PAYDATE4U | PAYAMT4U | PAYDATE5U | PAYAMT5U | PAYDATE6U | PAYAMT6U | PAYDATE7U | PAYAMT7U | PAYDATE8U |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | . | . | . | . | . | . | . | . | . | . | . | . |
| 25000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 50000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 75000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 100000 | . | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYAMT8U | PAYDATE9U | PAYAMT9U | PAYDATE10U | PAYAMT10U | PAYDATE11U | PAYAMT11U | PAYDATE12U | PAYAMT12U | PAYDATE13U | PAYAMT13U |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | . | . | . | . | . | . | . | . | . | . | . |
| 25000 | . | . | . | . | . | . | . | . | . | . | . |
| 50000 | . | . | . | . | . | . | . | . | . | . | . |
| 75000 | . | . | . | . | . | . | . | . | . | . | . |
| 100000 | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYDATE14U | PAYAMT14U | PAYDATE15U | PAYAMT15U | PAYDATE16U | PAYAMT16U | PAYDATE17U | PAYAMT17U | PAYDATE18U | PAYAMT18U | PAYDATE19U |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | . | . | . | . | . | . | . | . | . | . | . |
| 25000 | . | . | . | . | . | . | . | . | . | . | . |
| 50000 | . | . | . | . | . | . | . | . | . | . | . |
| 75000 | . | . | . | . | . | . | . | . | . | . | . |
| 100000 | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYAMT19U | PAYDATE20U | PAYAMT20U | PAYDATE21U | PAYAMT21U | PAYDATE22U | PAYAMT22U | PAYDATE23U | PAYAMT23U | SALETERU | PAYTERMU | QTYU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | . | . | . | . | . | . | . | . | . | . | | |
| 25000 | . | . | . | . | . | . | . | . | . | . | | |
| 50000 | . | . | . | . | . | . | . | . | . | . | | |
| 75000 | . | . | . | . | . | . | . | . | . | . | | |
| 100000 | . | . | . | . | . | . | . | . | . | . | | |

| Obs | QTYADJU | QTYUNITU | GRSUPRU | FRTREVU | ASMBLREVU | MODREVU | RPKREVU | OTHER_REVU | BILLADJU | OTHDISU | QTYDISU | DINLFTPU | DBROKU | INTNFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | . | . | 9.92 | . | . | . | . | . | . | . | . | . | . | . |
| 25000 | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| 50000 | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| 75000 | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| 100000 | . | . | . | . | . | . | . | . | . | . | . | . | . | . |

| Obs | EXPORTU | IMPORTU | MARNINU | USBROKU | INLFPWU | USWAREHU | INLFWCU | USOTHTRU | USDUTYU | USDUTY301U | HTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | . | . | . | . | . | . | . | . | |
| 25000 | | | . | . | . | . | . | . | . | . | |
| 50000 | | | . | . | . | . | . | . | . | . | |
| 75000 | | | . | . | . | . | . | . | . | . | |
| 100000 | | | . | . | . | . | . | . | . | . | |

| Obs | HTS_301 | DESTU | COMMU | SELAGENU | SELARELU | CREDITU | ADVERTU | WARRU | INDIRSU | INVCARU | REPACKU | VATTAXU | MFRU | ENTVALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | . | . | . | . | . | . | . | . | . | . | | . |
| 25000 | | | . | . | . | . | . | . | . | . | . | . | | . |
| 50000 | | | . | . | . | . | . | . | . | . | . | . | | . |
| 75000 | | | . | . | . | . | . | . | . | . | . | . | | . |
| 100000 | | | . | . | . | . | . | . | . | . | . | . | | . |

Submitted By:  jeffrey.neeley@huschblackwell.com, Filed Date: 7/19/19 3:22 PM, Submission Status: Approved

APPX082810

Barcode:3866266-01 A-570-106 INV - Investigation  -

U.S. Sales
Dalian Meisen Woodworking Co. Ltd.

PUBLIC VERSION
LTFV of Wooden Cabinets and Vanities and Components Thereof from China

DMWUS01

| Obs | SEQU | PRODCODU | | PRODCODU1 | | CONNUMU |
|-----|------|----------|--|-----------|--|---------|
| 125000 | . | | | | | |
| 150000 | . | | | | | |
| 175000 | . | | | | | |
| 200000 | . | | | | | |
| 225000 | . | | | | | |

| Obs | COMPLETEU | PRODVOLU | FACETYPEU | DRAWERU | DOORU | DOSTYLEU | SURFCOATU | BOXMATU | PRODWIDU | PRODHEIGHU | PRODEEPU | HARDWAREU |
|-----|-----------|----------|-----------|---------|-------|----------|-----------|---------|----------|------------|----------|-----------|
| 125000 | . | | | | | | | | | | | |
| 150000 | . | | | | | | | | | | | |
| 175000 | . | | | | | | | | | | | |
| 200000 | . | | | | | | | | | | | |
| 225000 | . | | | | | | | | | | | |

| Obs | SOFTCLOSU | SALEU | CONSIGNU | CUSCODU | SELLERU | SALINDTU | SALEDATU | INVOICU | SHIPDTU | PAYDATE1U | PAYAMT1U | PAYDATE2U |
|-----|-----------|-------|----------|---------|---------|----------|----------|---------|---------|-----------|----------|-----------|
| 125000 | . | | | | | | | | | . | | |
| 150000 | | | | | | . | 01/11/2014 | | 08/30/2023 | . | | |
| 175000 | | | | | | | | | | . | | |
| 200000 | | | | | | | | | | . | | |
| 225000 | | | | | | | | | | . | | |

| Obs | PAYAMT2U | PAYDATE3U | PAYAMT3U | PAYDATE4U | PAYAMT4U | PAYDATE5U | PAYAMT5U | PAYDATE6U | PAYAMT6U | PAYDATE7U | PAYAMT7U | PAYDATE8U |
|-----|----------|-----------|----------|-----------|----------|-----------|----------|-----------|----------|-----------|----------|-----------|
| 125000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 150000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 175000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 200000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 225000 | . | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYAMT8U | PAYDATE9U | PAYAMT9U | PAYDATE10U | PAYAMT10U | PAYDATE11U | PAYAMT11U | PAYDATE12U | PAYAMT12U | PAYDATE13U | PAYAMT13U |
|-----|----------|-----------|----------|------------|-----------|------------|-----------|------------|-----------|------------|-----------|
| 125000 | . | . | . | . | . | . | . | . | . | . | . |
| 150000 | . | . | . | . | . | . | . | . | . | . | . |
| 175000 | . | . | . | . | . | . | . | . | . | . | . |
| 200000 | . | . | . | . | . | . | . | . | . | . | . |
| 225000 | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYDATE14U | PAYAMT14U | PAYDATE15U | PAYAMT15U | PAYDATE16U | PAYAMT16U | PAYDATE17U | PAYAMT17U | PAYDATE18U | PAYAMT18U | PAYDATE19U |
|-----|------------|-----------|------------|-----------|------------|-----------|------------|-----------|------------|-----------|------------|
| 125000 | . | . | . | . | . | . | . | . | . | . | . |
| 150000 | . | . | . | . | . | . | . | . | . | . | . |
| 175000 | . | . | . | . | . | . | . | . | . | . | . |
| 200000 | . | . | . | . | . | . | . | . | . | . | . |
| 225000 | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYAMT19U | PAYDATE20U | PAYAMT20U | PAYDATE21U | PAYAMT21U | PAYDATE22U | PAYAMT22U | PAYDATE23U | PAYAMT23U | SALETERU | PAYTERMU | QTYU |
|-----|-----------|------------|-----------|------------|-----------|------------|-----------|------------|-----------|----------|----------|------|
| 125000 | . | . | . | . | . | . | . | . | . | . | | |
| 150000 | . | . | . | . | . | . | . | . | . | . | | |
| 175000 | . | . | . | . | . | . | . | . | . | . | | |
| 200000 | . | . | . | . | . | . | . | . | . | . | | |
| 225000 | . | . | . | . | . | . | . | . | . | . | | |

| Obs | QTYADJU | QTYUNITU | GRSUPRU | FRTREVU | ASMBLREVU | MODREVU | RPKREVU | OTHER_REVU | BILLADJU | OTHDISU | QTYDISU | DINLFTPU | DBROKU | INTNFRU |
|-----|---------|----------|---------|---------|-----------|---------|---------|------------|----------|---------|---------|----------|--------|---------|
| 125000 | . | . | . | . | . | . | . | . | . | . | . | 44.75 | . | . |
| 150000 | . | . | . | . | . | . | . | . | . | . | . | | . | . |
| 175000 | . | . | . | . | . | . | . | . | . | . | . | | . | . |
| 200000 | . | . | . | . | . | . | . | . | . | . | . | | . | . |
| 225000 | . | . | . | . | . | . | . | . | . | . | . | | . | . |

| Obs | EXPORTU | IMPORTU | MARNINU | USBROKU | INLFPWU | USWAREHU | INLFWCU | USOTHTRU | USDUTYU | USDUTY301U | HTS |
|-----|---------|---------|---------|---------|---------|----------|---------|----------|---------|------------|-----|
| 125000 | . | . | . | . | . | . | . | . | . | . | |
| 150000 | . | . | . | . | . | . | . | . | . | . | |
| 175000 | . | . | . | . | . | . | . | . | . | . | |
| 200000 | . | . | . | . | . | . | . | . | . | . | |
| 225000 | . | . | . | . | . | . | . | . | . | . | |

| Obs | HTS_301 | DESTU | COMMU | SELAGENU | SELARELU | CREDITU | ADVERTU | WARRU | INDIRSU | INVCARU | REPACKU | VATTAXU | MFRU | ENTVALUE |
|-----|---------|-------|-------|----------|----------|---------|---------|-------|---------|---------|---------|---------|------|----------|
| 125000 | | . | . | . | . | . | . | . | . | . | . | . | . | |
| 150000 | | . | . | . | . | . | . | . | . | . | . | . | . | 9.22 |
| 175000 | | . | . | . | . | . | . | . | . | . | . | . | . | |
| 200000 | | . | . | . | . | . | . | . | . | . | . | . | . | |
| 225000 | | . | . | . | . | . | . | . | . | . | . | . | . | |

APPX082811

Barcode:3866266-01 A-570-106 INV - Investigation  -

U.S. Sales                                                                                                          PUBLIC VERSION
Dalian Meisen Woodworking Co. Ltd.                              LTFV of Wooden Cabinets and Vanities and Components Thereof from China

DMWUS01

| Obs | SEQU | PRODCODU | PRODCODU1 | CONNUMU |
|---|---|---|---|---|
| 250000 | . | | | |
| 275000 | . | | | |
| 300000 | . | | | |
| 325000 | . | | | |
| 350000 | . | | | |

| Obs | COMPLETEU | PRODVOLU | FACETYPEU | DRAWERU | DOORU | DOSTYLEU | SURFCOATU | BOXMATU | PRODWIDU | PRODHEIGHU | PRODEEPU | HARDWAREU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 250000 | | | | | | | | | | | | |
| 275000 | | | | | | | | | | | | |
| 300000 | | | | | | | | | | | | |
| 325000 | | | | | | | | | | | | |
| 350000 | | | | | | | | | | | | |

| Obs | SOFTCLOSU | SALEU | CONSIGNU | CUSCODU | SELLERU | SALINDTU | SALEDATU | INVOICU | SHIPDTU | PAYDATE1U | PAYAMT1U | PAYDATE2U |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 250000 | | | | | | | | | . | . | . | . |
| 275000 | | | | | | | 07/23/2019 | | . | . | . | . |
| 300000 | | | | | | 10/02/2022 | | . | . | . | . | . |
| 325000 | | | | | | | | . | . | . | . | . |
| 350000 | | | | | | | | . | . | . | . | . |

| Obs | PAYAMT2U | PAYDATE3U | PAYAMT3U | PAYDATE4U | PAYAMT4U | PAYDATE5U | PAYAMT5U | PAYDATE6U | PAYAMT6U | PAYDATE7U | PAYAMT7U | PAYDATE8U |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 250000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 275000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 300000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 325000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 350000 | . | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYAMT8U | PAYDATE9U | PAYAMT9U | PAYDATE10U | PAYAMT10U | PAYDATE11U | PAYAMT11U | PAYDATE12U | PAYAMT12U | PAYDATE13U | PAYAMT13U |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 250000 | . | . | . | . | . | . | . | . | . | . | . |
| 275000 | . | . | . | . | . | . | . | . | . | . | . |
| 300000 | . | . | . | . | . | . | . | . | . | . | . |
| 325000 | . | . | . | . | . | . | . | . | . | . | . |
| 350000 | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYDATE14U | PAYAMT14U | PAYDATE15U | PAYAMT15U | PAYDATE16U | PAYAMT16U | PAYDATE17U | PAYAMT17U | PAYDATE18U | PAYAMT18U | PAYDATE19U |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 250000 | . | . | . | . | . | . | . | . | . | . | . |
| 275000 | . | . | . | . | . | . | . | . | . | . | . |
| 300000 | . | . | . | . | . | . | . | . | . | . | . |
| 325000 | . | . | . | . | . | . | . | . | . | . | . |
| 350000 | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYAMT19U | PAYDATE20U | PAYAMT20U | PAYDATE21U | PAYAMT21U | PAYDATE22U | PAYAMT22U | PAYDATE23U | PAYAMT23U | SALETERU | PAYTERMU | QTYU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 250000 | . | . | . | . | . | . | . | . | . | . | | |
| 275000 | . | . | . | . | . | . | . | . | . | . | | |
| 300000 | . | . | . | . | . | . | . | . | . | . | | |
| 325000 | . | . | . | . | . | . | . | . | . | . | | |
| 350000 | . | . | . | . | . | . | . | . | . | . | | |

| Obs | QTYADJU | QTYUNITU | GRSUPRU | FRTREVU | ASMBLREVU | MODREVU | RPKREVU | OTHER_REVU | BILLADJU | OTHDISU | QTYDISU | DINLFTPU | DBROKU | INTNFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 250000 | | | | | | | . | . | . | . | . | . | . | . |
| 275000 | | | | | | | . | . | . | . | . | . | . | . |
| 300000 | | | 1415.00 | | 32.24 | | . | . | . | . | . | . | . | . |
| 325000 | | | | | | | . | . | . | . | . | . | . | . |
| 350000 | | | | | | | . | . | . | . | . | . | . | . |

| Obs | EXPORTU | IMPORTU | MARNINU | USBROKU | INLFPWU | USWAREHU | INLFWCU | USOTHTRU | USDUTYU | USDUTY301U | HTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 250000 | | | | . | . | . | . | . | . | . | |
| 275000 | | | | . | . | . | . | . | . | . | |
| 300000 | | | | . | . | . | . | . | . | . | |
| 325000 | | | | . | . | . | . | . | . | . | |
| 350000 | | | | . | . | . | . | . | . | . | |

| Obs | HTS_301 | DESTU | COMMU | SELAGENU | SELARELU | CREDITU | ADVERTU | WARRU | INDIRSU | INVCARU | REPACKU | VATTAXU | MFRU | ENTVALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 250000 | | . | . | . | . | . | . | . | . | . | . | . | | |
| 275000 | | . | . | . | . | . | 1.61 | . | . | . | . | . | | |
| 300000 | | . | . | . | . | . | . | . | . | . | . | . | | |
| 325000 | | . | . | . | . | . | . | . | . | . | . | . | | |
| 350000 | | . | . | . | . | . | . | . | . | . | . | . | | |

Filed By:  jeffrey.neeley@huschblackwell.com, Filed Date: 7/19/19 3:22 PM, Submission Status: Approved

APPX082812

U.S. Sales                                                                                                                      PUBLIC VERSION
Dalian Meisen Woodworking Co. Ltd.                                    LTFV of Wooden Cabinets and Vanities and Components Thereof from China

DMWUS01

| Obs | SEQU | PRODCODU | | PRODCODU1 | | CONNUMU | |
|-----|------|----------|---|-----------|---|---------|---|
| 375000 | . | . | | | | . | |
| 400000 | . | . | | | | | |
| 425000 | . | . | | | | | |
| 450000 | . | . | | | | | |
| 475000 | . | . | | | | | |

| Obs | COMPLETEU | PRODVOLU | FACETYPEU | DRAWERU | DOORU | DOSTYLEU | SURFCOATU | BOXMATU | PRODWIDU | PRODHEIGHU | PRODEEPU | HARDWAREU |
|-----|-----------|----------|-----------|---------|-------|----------|-----------|---------|----------|------------|----------|-----------|
| 375000 | | | | | | | | | | | | |
| 400000 | | | | | | | | | | | | |
| 425000 | | | | | | | | | | | | |
| 450000 | | | | | | | | | | | | |
| 475000 | | | | | | | | | | | | |

| Obs | SOFTCLOSU | SALEU | CONSIGNU | CUSCODU | SELLERU | SALINDTU | SALEDATU | INVOICU | SHIPDTU | PAYDATE1U | PAYAMT1U | PAYDATE2U |
|-----|-----------|-------|----------|---------|---------|----------|----------|---------|---------|-----------|----------|-----------|
| 375000 | | | | | | . | . | . | . | . | . | . |
| 400000 | | | | | | . | . | . | . | . | . | . |
| 425000 | | | | | | . | . | . | . | . | . | . |
| 450000 | | | | | | . | . | . | . | . | . | . |
| 475000 | | | | | | . | . | . | . | . | . | . |

| Obs | PAYAMT2U | PAYDATE3U | PAYAMT3U | PAYDATE4U | PAYAMT4U | PAYDATE5U | PAYAMT5U | PAYDATE6U | PAYAMT6U | PAYDATE7U | PAYAMT7U | PAYDATE8U |
|-----|----------|-----------|----------|-----------|----------|-----------|----------|-----------|----------|-----------|----------|-----------|
| 375000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 400000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 425000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 450000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 475000 | . | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYAMT8U | PAYDATE9U | PAYAMT9U | PAYDATE10U | PAYAMT10U | PAYDATE11U | PAYAMT11U | PAYDATE12U | PAYAMT12U | PAYDATE13U | PAYAMT13U |
|-----|----------|-----------|----------|------------|-----------|------------|-----------|------------|-----------|------------|-----------|
| 375000 | . | . | . | . | . | . | . | . | . | . | . |
| 400000 | . | . | . | . | . | . | . | . | . | . | . |
| 425000 | . | . | . | . | . | . | . | . | . | . | . |
| 450000 | . | . | . | . | . | . | . | . | . | . | . |
| 475000 | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYDATE14U | PAYAMT14U | PAYDATE15U | PAYAMT15U | PAYDATE16U | PAYAMT16U | PAYDATE17U | PAYAMT17U | PAYDATE18U | PAYAMT18U | PAYDATE19U |
|-----|------------|-----------|------------|-----------|------------|-----------|------------|-----------|------------|-----------|------------|
| 375000 | . | . | . | . | . | . | . | . | . | . | . |
| 400000 | . | . | . | . | . | . | . | . | . | . | . |
| 425000 | . | . | . | . | . | . | . | . | . | . | . |
| 450000 | . | . | . | . | . | . | . | . | . | . | . |
| 475000 | . | . | . | . | . | . | . | . | . | . | . |

| Obs | PAYAMT19U | PAYDATE20U | PAYAMT20U | PAYDATE21U | PAYAMT21U | PAYDATE22U | PAYAMT22U | PAYDATE23U | PAYAMT23U | SALETERMU | PAYTERMU | QTYU |
|-----|-----------|------------|-----------|------------|-----------|------------|-----------|------------|-----------|-----------|----------|------|
| 375000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 400000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 425000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 450000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 475000 | . | . | . | . | . | . | . | . | . | . | . | . |

| Obs | QTYADJU | QTYUNITU | GRSUPRU | FRTREVU | ASMBLREVU | MODREVU | RPKREVU | OTHER_REVU | BILLADJU | OTHDISU | QTYDISU | DINLFTPU | DBROKU | INTNFRU |
|-----|---------|----------|---------|---------|-----------|---------|---------|------------|----------|---------|---------|----------|--------|---------|
| 375000 | . | . | | . | . | . | . | . | . | . | . | . | . | . |
| 400000 | . | . | | . | . | . | . | . | . | . | . | . | . | . |
| 425000 | . | . | | . | . | . | . | . | . | . | . | . | . | . |
| 450000 | . | . | 19.83 | . | . | . | . | . | . | . | . | . | . | . |
| 475000 | . | . | | . | . | . | . | . | . | 14.8 | . | . | . | . |

| Obs | EXPORTU | IMPORTU | MARNINU | USBROKU | INLFPWU | USWAREHU | INLFWCU | USOTHTRU | USDUTYU | USDUTY301U | HTS |
|-----|---------|---------|---------|---------|---------|----------|---------|----------|---------|------------|-----|
| 375000 | | | . | . | . | . | . | . | . | . | |
| 400000 | | | . | . | . | . | . | . | . | . | |
| 425000 | | | . | . | . | . | . | . | . | . | |
| 450000 | | | . | . | . | . | . | . | . | . | |
| 475000 | | | . | . | . | . | . | . | . | . | |

| Obs | HTS_301 | DESTU | COMMU | SELAGENU | SELARELU | CREDITU | ADVERTU | WARRU | INDIRSU | INVCARU | REPACKU | VATTAXU | MFRU | ENTVALUE |
|-----|---------|-------|-------|----------|----------|---------|---------|-------|---------|---------|---------|---------|------|----------|
| 375000 | | . | . | . | . | . | . | . | . | . | . | . | | . |
| 400000 | | . | . | . | . | . | . | . | . | . | . | . | | . |
| 425000 | | . | . | . | . | . | . | . | . | . | . | . | | . |
| 450000 | | . | . | . | . | . | . | . | . | . | . | . | | . |
| 475000 | | . | . | . | . | . | . | . | . | . | . | . | | . |

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 7/19/19 3:22 PM, Submission Status: Approved

APPX082813

Barcode:3866266-01 A-570-106 INV - Investigation -

U.S. Sales                                                                                                    PUBLIC VERSION
Dalian Meisen Woodworking Co. Ltd.                          LTFV of Wooden Cabinets and Vanities and Components Thereof from China

DMWUS01

| Obs | SEQU | PRODCODU | | PRODCODU1 | | | CONNUMU | |
|---|---|---|---|---|---|---|---|---|
| 500000 | . | | | | | | | |
| 525000 | . | | | | | | | |
| 543448 | . | | | | | | | |

| Obs | COMPLETEU | PRODVOLU | FACETYPEU | DRAWERU | DOORU | DOSTYLEU | SURFCOATU | BOXMATU | PRODWIDU | PRODHEIGHU | PRODEEPU | HARDWAREU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500000 | | | | | | | | | | | | |
| 525000 | | | | | | | | | | | | |
| 543448 | | | | | | | | | | | | |

| Obs | SOFTCLOSU | SALEU | CONSIGNU | CUSCODU | SELLERU | | SALINDTU | SALEDATU | INVOICU | SHIPDTU | PAYDATE1U | PAYAMT1U | PAYDATE2U |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500000 | | | | | | | 08/11/2022 | | . | . | . | . | . |
| 525000 | | | | | | | | | | | | | |
| 543448 | | | | | | | | | | | | | |

| Obs | PAYAMT2U | PAYDATE3U | PAYAMT3U | PAYDATE4U | PAYAMT4U | PAYDATE5U | PAYAMT5U | PAYDATE6U | PAYAMT6U | PAYDATE7U | PAYAMT7U | PAYDATE8U |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 525000 | | | | | | | | | | | | |
| 543448 | | | | | | | | | | | | |

| Obs | PAYAMT8U | PAYDATE9U | PAYAMT9U | PAYDATE10U | PAYAMT10U | PAYDATE11U | PAYAMT11U | PAYDATE12U | PAYAMT12U | PAYDATE13U | PAYAMT13U |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 500000 | . | . | . | . | . | . | . | . | . | . | . |
| 525000 | | | | | | | | | | | |
| 543448 | | | | | | | | | | | |

| Obs | PAYDATE14U | PAYAMT14U | PAYDATE15U | PAYAMT15U | PAYDATE16U | PAYAMT16U | PAYDATE17U | PAYAMT17U | PAYDATE18U | PAYAMT18U | PAYDATE19U |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 500000 | . | . | . | . | . | . | . | . | . | . | . |
| 525000 | | | | | | | | | | | |
| 543448 | | | | | | | | | | | |

| Obs | PAYAMT19U | PAYDATE20U | PAYAMT20U | PAYDATE21U | PAYAMT21U | PAYDATE22U | PAYAMT22U | PAYDATE23U | PAYAMT23U | SALETERU | PAYTERMU | QTYU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500000 | . | . | . | . | . | . | . | . | . | . | . | . |
| 525000 | | | | | | | | | | | | |
| 543448 | | | | | | | | | | | | |

| Obs | QTYADJU | QTYUNITU | GRSUPRU | FRTREVU | ASMBLREVU | MODREVU | RPKREVU | OTHER_REVU | BILLADJU | OTHDISU | QTYDISU | DINLFTPU | DBROKU | INTNFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500000 | . | | 12.52 | . | . | . | . | . | . | . | . | . | . | . |
| 525000 | | | 312.93 | | | | | | | | | | | |
| 543448 | | | | | | | | | | | | | | |

| Obs | EXPORTU | IMPORTU | | MARNINU | USBROKU | INLFPWU | USWAREHU | INLFWCU | USOTHTRU | USDUTYU | USDUTY301U | HTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500000 | | | | . | . | . | . | . | . | . | . | |
| 525000 | | | | | | | | | | | | |
| 543448 | | | | | | | | | | | | |

| Obs | HTS_301 | DESTU | COMMU | SELAGENU | SELARELU | CREDITU | ADVERTU | WARRU | INDIRSU | INVCARU | REPACKU | VATTAXU | MFRU | ENTVALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500000 | | | . | . | . | . | . | . | 1.49 | . | . | . | . | . |
| 525000 | | | | | | | | | | | | | | |
| 543448 | | | | | | | | | | | | | | |

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 7/19/19 3:22 PM, Submission Status: Approved

APPX082814

Barcode:3866266-01 A-570-106 INV - Investigation  -

U.S. Sales
Dalian Meisen Woodworking Co. Ltd.

LTFV of Wooden Cabinets and Vanities and Components Thereof from China

### SAS Dataset DMWUS01.SAS7BDAT  -

| Num | Field Name | Field Type | SAS Format | Description |
|-----|-----------|-----------|-----------|-------------|
| 1 | SEQU | Num | best12. | SEQU |
| 2 | PRODCODU | Char | $57. | PRODCODU |
| 3 | PRODCODU1 | Char | $57. | |
| 4 | CONNUMU | Char | $34. | CONNUM |
| 5 | COMPLETEU | Char | $3. | |
| 6 | PRODVOLU | Char | $3. | |
| 7 | FACETYPEU | Char | $3. | |
| 8 | DRAWERU | Char | $3. | |
| 9 | DOORU | Char | $3. | |
| 10 | DOSTYLEU | Char | $3. | |
| 11 | SURFCOATU | Char | $3. | |
| 12 | BOXMATU | Char | $3. | |
| 13 | PRODWIDU | Char | $3. | PRODWIDU |
| 14 | PRODHEIGHU | Char | $3. | PRODHEIGHU |
| 15 | PRODEEPU | Char | $3. | PRODEEPU |
| 16 | HARDWAREU | Char | $3. | HARDWAREU |
| 17 | SOFTCLOSU | Char | $3. | SOFTCLOSU |
| 18 | SALEU | Char | $4. | SALEU |
| 19 | CONSIGNU | Char | $3. | |
| 20 | CUSCODU | Char | $10. | CUSCODU |
| 21 | SELLERU | Char | $17. | SELLERU |
| 22 | SALINDTU | Date | mmddyy10. | SALINDTU |
| 23 | SALEDATU | Date | mmddyy10. | SALEDATU |
| 24 | INVOICU | Char | $8. | INVOICU |
| 25 | SHIPDTU | Date | mmddyy10. | SHIPDTU |
| 26 | PAYDATE1U | Date | mmddyy10. | |
| 27 | PAYAMT1U | Num | best12. | |
| 28 | PAYDATE2U | Date | mmddyy10. | |
| 29 | PAYAMT2U | Num | best12. | |
| 30 | PAYDATE3U | Date | mmddyy10. | |
| 31 | PAYAMT3U | Num | best12. | |
| 32 | PAYDATE4U | Date | mmddyy10. | |
| 33 | PAYAMT4U | Num | best12. | |
| 34 | PAYDATE5U | Date | mmddyy10. | |
| 35 | PAYAMT5U | Num | best12. | |
| 36 | PAYDATE6U | Date | mmddyy10. | |
| 37 | PAYAMT6U | Num | best12. | |
| 38 | PAYDATE7U | Date | mmddyy10. | |
| 39 | PAYAMT7U | Num | best12. | |
| 40 | PAYDATE8U | Date | mmddyy10. | |
| 41 | PAYAMT8U | Num | best12. | |
| 42 | PAYDATE9U | Date | mmddyy10. | |
| 43 | PAYAMT9U | Num | best12. | |
| 44 | PAYDATE10U | Date | mmddyy10. | |
| 45 | PAYAMT10U | Num | best12. | |
| 46 | PAYDATE11U | Date | mmddyy10. | |
| 47 | PAYAMT11U | Num | best12. | |
| 48 | PAYDATE12U | Date | mmddyy10. | |
| 49 | PAYAMT12U | Num | best12. | |
| 50 | PAYDATE13U | Date | mmddyy10. | |
| 51 | PAYAMT13U | Num | best12. | |
| 52 | PAYDATE14U | Date | mmddyy10. | |
| 53 | PAYAMT14U | Num | best12. | |
| 54 | PAYDATE15U | Date | mmddyy10. | |
| 55 | PAYAMT15U | Num | best12. | |
| 56 | PAYDATE16U | Date | mmddyy10. | |
| 57 | PAYAMT16U | Num | best12. | |
| 58 | PAYDATE17U | Date | mmddyy10. | |
| 59 | PAYAMT17U | Num | best12. | |
| 60 | PAYDATE18U | Date | mmddyy10. | |
| 61 | PAYAMT18U | Num | best12. | |
| 62 | PAYDATE19U | Date | mmddyy10. | |
| 63 | PAYAMT19U | Num | best12. | |
| 64 | PAYDATE20U | Date | mmddyy10. | |
| 65 | PAYAMT20U | Num | best12. | |
| 66 | PAYDATE21U | Date | mmddyy10. | |
| 67 | PAYAMT21U | Num | best12. | |
| 68 | PAYDATE22U | Date | mmddyy10. | |
| 69 | PAYAMT22U | Num | best12. | |
| 70 | PAYDATE23U | Date | mmddyy10. | |
| 71 | PAYAMT23U | Num | best12. | |
| 72 | SALETERU | Char | $12. | SALETERU |

7/19/2019 SUBMISSION Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 7/19/19 3:22 PM, Submission Status: Approved Page 1/2

APPX082815

U.S. Sales
Dalian Meisen Woodworking Co. Ltd.

LTFV of Wooden Cabinets and Vanities and Components Thereof from China

### SAS Dataset DMWUS01.SAS7BDAT  - 

| Num | Field Name | Field Type | SAS Format | Description |
|-----|-----------|-----------|-----------|-------------|
| 73 | PAYTERMU | Char | $5. | PAYTERMU |
| 74 | QTYU | Num | best12. | QTYU |
| 75 | QTYADJU | Num | best12. | |
| 76 | QTYUNITU | Char | $4. | |
| 77 | GRSUPRU | Num | best12. | GRSUPRU |
| 78 | FRTREVU | Num | best12. | |
| 79 | ASMBLREVU | Num | best12. | |
| 80 | MODREVU | Num | best12. | |
| 81 | RPKREVU | Num | best12. | |
| 82 | OTHER_REVU | Num | best12. | |
| 83 | BILLADJU | Num | best12. | |
| 84 | OTHDISU | Num | best12. | |
| 85 | QTYDISU | Num | best12. | |
| 86 | DINLFTPU | Num | best12. | |
| 87 | DBROKU | Char | $3. | |
| 88 | INTNFRU | Num | best12. | |
| 89 | EXPORTU | Char | $13. | |
| 90 | IMPORTU | Char | $29. | IMPORTU |
| 91 | MARNINU | Char | $4. | |
| 92 | USBROKU | Num | best12. | USBROKU |
| 93 | INLFPWU | Num | best12. | INLFPWU |
| 94 | USWAREHU | Num | best12. | USWAREHU |
| 95 | INLFWCU | Num | best12. | INLFWCU |
| 96 | USOTHTRU | Num | best12. | |
| 97 | USDUTYU | Num | best12. | USDUTYU |
| 98 | USDUTY301U | Num | best12. | |
| 99 | HTS | Char | $10. | |
| 100 | HTS_301 | Char | $10. | |
| 101 | DESTU | Char | $6. | DESTU |
| 102 | COMMU | Num | best12. | COMMU |
| 103 | SELAGENU | Char | $5. | |
| 104 | SELARELU | Char | $2. | |
| 105 | CREDITU | Num | best12. | |
| 106 | ADVERTU | Num | best12. | ADVERTU |
| 107 | WARRU | Num | best12. | WARRU |
| 108 | INDIRSU | Num | best12. | INDIRSU |
| 109 | INVCARU | Num | best12. | |
| 110 | REPACKU | Num | best12. | REPACKU |
| 111 | VATTAXU | Num | best12. | |
| 112 | MFRU | Char | $14. | MFRU |
| 113 | ENTVALUE | Num | best12. | ENTVALUE |

7/19/2019 SUBMISSION: Submitted By: jeffrey.neeley@huschblackwell.com, Filed Date: 7/19/19 3:22 PM, Submission Status: Approved    Page 2/2

APPX082816

| | | | |
|---|---|---|---|
| Meisen Supplemental Section A Questionnaire Response (August 14, 2019) | C.R. 1090-1114 | P.R. 984-988 | APPX083286-APPX085087 |

# HUSCH BLACKWELL

Jeffrey S. Neeley
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

August 13, 2019

Case No. A-570-106
Total Pages: 346
Investigation
E&C: Office VIII

**PUBLIC VERSION**
Business Proprietary Information removed from
brackets on Narrative pages 3-5, 7-15, 17-28, 30-31,
33 and Exhibits A-8-A-40, and A-43

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Re:   ***Wooden Cabinets and Vanities from the People's Republic of
China: Supplemental Section A Questionnaire Response***

Dear Secretary Ross:

On behalf of Dalian Meisen Woodworking Co., Ltd. and its affiliates, ("Meisen"), we

hereby submit the foregoing response to the Supplemental Section A Questionnaire issued by

the U.S. Department of Commerce on July 30, 2019 in the above-referenced proceeding.

## REQUEST FOR PROPRIETARY TREATMENT

Certain information contained herein is business confidential data that is proprietary.

This information is enclosed with brackets ("[ ]").  Disclosure of this information would cause

Husch Blackwell LLP

**Response:**

See Exhibit A-40 for Meisen's Chart of Accounts.  The U.S. affiliates - J&K
Companies - operate using a simplistic accounting process and do not utilize a chart of
accounts in the normal course of business.

### Sales Process

23. On page 26 of your SAQR, you stated that, for each of the 16 affiliated company
    locations, the date on which the price and quantity are set is the date of invoice. Please
    state whether the material terms of sale changed after receipt of a PO from a customer
    and before the invoice was issued during the POI. If so, please submit a PO, invoice,
    and customer communication for three such sales.

**Response:**

See Exhibit-A-10 for copies of the purchase orders and invoices demonstrating the
changes in price and quantity.

24. On page 28 of your SAQR, you stated that the price lists used by each J&K company is
    submitted in Exhibit 3.

    a.  Please confirm that these price lists were valid for the entire POI.

**Response:**

Yes we confirm that these price lists were valid for the entire POI.

    b.  For the price list for J&K – WA – Grand J&K Cabinetry Inc., please explain the
        references to "[
                        ]."

**Response:**

] are internal J&K Price Codes which are applied to all J&Ks,
not just Grand J&K Cabinetry of WA. [                                          ] which is a
particular price level that we give to those customers who do  [
], such as contractors and designers.  [                                          ]

30

PUBLIC VERSION

pronunciation spelled as "men," hence the alphabet "M" is used.  "H" is not a shorthand for any word in English either, but it simple indicates that it's a whole cabinet.  This distinction can be made clear when we compare "WM1515H" with "WM1515," where if it's without "H," it means it's just a door and not a whole cabinet.

As for the numbers "1515," the first two digits "15" typically refers to the width of the cabinet, as in "15 inches wide."  The last two digits in the "1515" typically refers to the height of the cabinet as in "15 inches tall."  Thus, when we compare "WM1515H" with "WM1530H," the number 30 means it is 30 inches tall while the number 15 means it is 15 inches tall.

More details about the J&K Company cabinet item code, specification, nomenclature, and dimensions can be found on pages 7 and 8 of the J&K Product Specifications submitted at Exhibit A-41.

26. On page 31 of your SAQR, Commerce requested that you provide "all catalogs and brochures issued by your company and affiliates that include the merchandise under consideration sold by your company in the United States.  Also provide copies of internet- based advertising by your company and its affiliates that include the merchandise under consideration sold by your company to the United States.  Indicate the relevant sites." In response you referred to your SRA at Exhibit 19. However, Exhibit 19 of your SRA contains your affiliation chart.  Although Exhibit 18 of your SRA is labeled "Brochure with J&K Affiliated Companies," it consists of one page containing cabinet face images and one page containing affiliate contact information.

   a. Please confirm that Exhibit 18 of your SRA represents all catalogs and brochures issued by your company and affiliates that include the merchandise under consideration.  If this is not the case, please submit the requested documentation.

**Response:**

See Exhibit A-41 of this response for all variations of the catalogs and brochures

32

| A-10 | Tying invoices to PO system | BPI |
|------|------------------------------|-----|

### *NOT SUSCEPTIBLE TO PUBLIC SUMMARY*

Barcode:3878690-01 A-570-106 INV - Investigation  -

| | CA-San Francisco | BPI |
|---|---|---|

***NOT SUSCEPTIBLE TO PUBLIC SUMMARY***

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

| | Massachusetts | | BPI |
|---|---|---|---|

### *NOT SUSCEPTIBLE TO PUBLIC SUMMARY*

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

Barcode:3878690-01 A-570-106 INV - Investigation  -

| | North Carolina | | BPI |
|---|---|---|---|

## *NOT SUSCEPTIBLE TO PUBLIC SUMMARY*

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

| A-41 | J&K Additional Brochures | Public |
|------|--------------------------|--------|

Barcode:3878690-01 A-570-106 INV - Investigation  -

**Catalog**

Barcode:3878690-01 A-570-106 INV - Investigation  -

2019 Edition

# J&K CABINETRY



APPX084883

Barcode:3878690-03 A-570-106 INV - Investigation  -

# Finest
# Furniture Finishes

J&K's solid wood cabinet finishes are processed thorough the following excellent craftsmanship details:



1.  The finest solid maple wood is sanded until smooth and vacuumed.

2.  An equalizer stain is applied to balance the base color of the wood.

3.  A toner is applied to establish color uniformity.

4.  A deep penetrating stain is applied to reveal the hidden beauty of the natural grain.

5.  All stained surfaces are hand-rubbed and wiped of excess stain and then slowly air-dried.

6.  A wood sealer is applied, penetrating all exposed wood surfaces for uniform protection.

7.  All surfaces are hand-sanded, providing a smooth, consistent surface.

8.  A glaze is applied by hand (if applicable).

9.  A color consistency examination is performed with additional touch-ups, if needed.

10. A final protective top coat is applied, maximizing resistance to scuffing, moisture, fading and most household chemicals.

**Notes:**
NOT Actual Product;
Image For Reference Only.

Natural Wood Characteristics:



| Arce | Burl Grain | Open Knots |

| Bird's Eye | Mineral Streaks | Heartwood |

**Note:** All solid wood may contain natural "imperfections," such as variations in color, grain, mineral streaks and knots.

**\*Note:** Natural wood characteristics such as gum pockets, streaks and pin knots may be visible, particularly with some of our light paints. These characteristics tend to be more pronounced on the rails, backs of our drawers and doors.

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 3/14/19 3:46 PM, Submission Status: Approved

# FINEST FURNITURE FINISHES

Barcode:3878690-03 A-570-106 INV - Investigation  -

■ **J&K's solid wood cabinet finishes are processed thorough the following excellent craftsmanship details:**

1. The finest solid maple wood is sanded until smooth and vacuumed.

2. An equalizer stain is applied to balance the base color of the wood.

3. A toner is applied to establish color uniformity.

4. A deep penetrating stain is applied to reveal the hidden beauty of the natural grain.

5. All stained surfaces are hand-rubbed and wiped of excess stain and then slowly air-dried.

6. A wood sealer is applied, penetrating all exposed wood surfaces for uniform protection.

7. All surfaces are hand-sanded, providing a smooth, consistent surface.

8. A glaze is applied by hand (if applicable).

9. A color consistency examination is performed with additional touch-ups, if needed.

10. A final protective top coat is applied, maximizing resistance to scuffing, moisture, fading and most household chemicals.

*Notes:*
*NOT Actual Product;*
*Image For Reference Only.*

■ **Natural Wood Characteristics:**



Arce



Burl Grain



Open Knots



Bird's Eye

Mineral Streaks



Heartwood

**Note:** All solid wood may contain natural "imperfections," such as variations in color, grain, mineral streaks and knots.

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 8/14/19 3:46 PM, Submission Status: Approved

| Meisen Supplemental Section C Questionnaire Response (August 28, 2019) | C.R. 1197-1201 | P.R. 1164 | APPX085088-APPX085511 |
| --- | --- | --- | --- |

Barcode:3883589-01    A-570-106    INV - Investigation -

# HUSCH BLACKWELL

Jeffrey S. Neeley
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

August 27, 2019

Case No. A-570-106
Total Pages: 169
Investigation
E&C: Office V

**PUBLIC VERSION**
Business Proprietary Information removed from brackets on Narrative Pages 3-8, 10-25, 27, 29, 31, 33-39, 41-42, 44-45 and Exhibits SC-1-SC-24, SC-26-SC-31, and SC-33, and the revised U.S. Sales Database.

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re:**    *Wooden Cabinets and Vanities from the People's Republic of China: Supplemental Section C Questionnaire Response*

Dear Secretary Ross:

On behalf of Dalian Meisen Woodworking Co., Ltd. ("Dalian Meisen") and its affiliates, we hereby submit the foregoing response to the Supplemental Section C Questionnaire issued by the U.S. Department of Commerce on August 12, 2019 in the above-referenced proceeding.

## REQUEST FOR PROPRIETARY TREATMENT

Certain information contained herein is business confidential data that is proprietary. This information is enclosed with brackets ("[ ]"). Disclosure of this information would cause

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 8/28/19 9:39 AM, Submission Status: Approved

    c.  Please submit documentation for invoice numbers [           ] supporting  your reported invoice date and SALEDATU.

**Response:**

    **Copies of the requested invoices are provided in Exhibit SC-3.  These invoices were generated as estimates before the POI but paid during the POI at which time J&K Georgia considered the terms of sale to be final.**

11.  Please state at what point the J&K companies record sales of merchandise under consideration in their accounting records (*e.g.*, when merchandise is shipped, invoiced, or  payment is received) and provide supporting documentation from the POI.

**Response:**

    **Below, J&K Companies have indicated at what point a transaction is recorded as a sale in the accounting records for each location:**

| J&K Location | Time of Sales Recording |
|---|---|
| Arizona | Issuance of invoice |
| Los Angeles | Issuance of invoice |
| San Francisco | Issuance of invoice |
| Colorado | Issuance of invoice |
| Miami | Receipt of payment |
| Chicago | Issuance of invoice |
| Georgia | Receipt of payment |
| Louisiana | Issuance of invoice |
| Boston | Issuance of invoice |
| North Carolina | Issuance of invoice |

8

| | |
|---|---|
| New Jersey (MS Maple) | Issuance of invoice |
| New Jersey (Zheng Holding) | Issuance of invoice |
| New York | Issuance of invoice |
| Ohio | Issuance of invoice |
| Dallas | Issuance of invoice |
| Houston | Issuance of invoice |
| Washington | Issuance of invoice |

**Supporting documentation for selected locations is provided in Exhibit SC-4.**

**FIELD NUMBER 8.0:  Sale Invoice Number**

12. On page 17 of your SCQR, you stated that all J&K companies assign sequential
    numbers for invoicing purposes.

   a. Please clarify whether the J&K companies coordinate their sales so invoices
      issued by all affiliates are sequential (*e.g.*, invoice 500 is issued by affiliate A
      and invoice 501 is issued by affiliate B) or whether each individual affiliate
      issues their own sequential invoice numbers.  If the latter, please report whether
      it is possible for multiple affiliates to issue the same invoice number during the
      POI and state whether that occurred during the POI.

**Response**:

   **Each individual J&K affiliate issues their own sequential invoice numbers. For
example, one J&K affiliate may start the invoice numbering with "1" when they created
their first sales invoice on day one, and another J&K affiliate may start with the exact
same number "1" on their day one, as these invoice numbers are automatically assigned
by the QuickBooks accounting software they use.  Therefore, it is possible for multiple
J&K affiliates to issue the same invoice number during the POI and this did occur during
the POI.**

9

    d.  Please submit documentation supporting your reported invoice dates, shipment dates, and payment dates for observation numbers [

].

**Response:**

    **The J&K Companies have provided the requested supporting documentation in Exhibit SC-7.**

**FIELD NUMBER 11.0:  Terms of Delivery**

15. On page 19 of your SCQR, you reported your terms of delivery that included "Freight/Third-party carrier/Pallet shipping," Fed-X Ground," "Overnight Express  Delivery," "UPS Ground," and "FOB China."

    a.  Please explain why you identify the carrier name for some of your codes but also have general categories such as "third party carrier" and "overnight express delivery."  Please identify the carriers that fall under the general categories.

**Response:**

    **Each individual J&K location has their own list of delivery codes used in the normal course of business.  The codes for certain locations reference FedEx or UPS as the names of these carriers are commonly used to describe the shipping method.  The general categories consist of local third-party transportation companies.**

    b.    For term of delivery FOB China, please confirm that the customer assumes the  responsibility and expense for the goods in China.  If that is the case, for any sales reported under this term of delivery for which you also reported a movement expense, please explain why or revise your allocation methodology, as appropriate (*i.e.*, to the extent that any such transactions were included in an allocation of any movement expenses, those reported per-unit expenses would be  understated and, thus, inaccurate).

13

**Exhibit List**

| Exhibit Number | Exhibit Name | BPI/Public |
|---|---|---|
| SC-1 | Supporting documentation for sample sales | BPI |
| SC-2 | Support for reported product characteristics | BPI |
| SC-3 | Copies of invoices [     ] and [     ] | BPI |
| SC-4 | Support for Recording of Sales Invoices | BPI |
| SC-5 | Support for Shipment Dates | BPI |
| SC-6 | Support for Shipment Dates | BPI |
| SC-7 | Support for Invoice, Shipment and Payment Dates | BPI |
| SC-8 | Revised Exhibit C-5: U.S. Expenses | BPI |
| SC-9 | Support for Recording of Other Revenue Items | BPI |
| SC-10 | Calculation and Support for Other Revenue Items | BPI |
| SC-11 | Calculation and Support for Other Revenue Items | BPI |
| SC-12 | Calculation and Support for Freight Revenue | BPI |
| SC-13 | Calculation and Support for Assembly Revenue | BPI |
| SC-14 | List of Modification Codes and Descriptions | BPI |
| SC-15 | Calculation and Support for Modification Revenue | BPI |
| SC-16 | J&K Ohio Discount Schedule | BPI |
| SC-17 | Calculation of Average Credit (Discount) Ratio | BPI |
| SC-18 | Calculation and Support for Other Discounts | BPI |
| SC-19 | List of Freight Forwarders | BPI |
| SC-20 | Meisen Invoices and Freight Invoices (J&K Ohio) | BPI |
| SC-21 | Calculation of International Freight | BPI |
| SC-22 | Freight Calculation Worksheets for J&K Locations | BPI |
| SC-23 | Commission Agreements | BPI |
| SC-24 | Calculation of Commissions | BPI |
| SC-25 | Interest Rate Support | Public |
| SC-26 | Imputed Credit Calculation | BPI |
| SC-27 | Calculation of Advertising Expense | BPI |
| SC-28 | Calculation of Advertising Expense Ratio | BPI |
| SC-29 | Calculation of Warranty Expense Ratios | BPI |
| SC-30 | Calculation of Warranty Expense | BPI |
| SC-31 | Repacking Costs | BPI |
| SC-32 | VAT Regulations | Public |
| SC-33 | Entered Value | BPI |
|  | Revised U.S. Sales Database | BPI |

| SC-3 | Copies of invoices [      ] and [       ] | BPI |

### *NOT SUSCEPTIBLE TO PUBLIC SUMMARY*

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

Barcode:3884657-01 A-570-106 INV - Investigation  -

| SC-4 | Support for Recording of Sales Invoices | BPI |
|------|------------------------------------------|-----|

## NOT SUSCEPTIBLE TO PUBLIC SUMMARY

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

Barcode:3884657-01 A-570-106 INV - Investigation  -

| SC-7 | Support for Invoice, Shipment and Payment Dates | BPI |
|------|--------------------------------------------------|-----|

*NOT SUSCEPTIBLE TO PUBLIC SUMMARY*

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

| Meisen Supp. D-E Response (September 17, 2019) | C.R. 1320-1323 | P.R. 1361 | APPX085512-APPX086251 |
|---|---|---|---|

Barcode:3889569-01  A-570-106  INV - Investigation  -

# HUSCH BLACKWELL

Jeffrey S. Neeley
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

September 16, 2019

Case No. A-570-106
Total Pages: 140
Investigation
E&C: Office V

**PUBLIC VERSION**
Business Proprietary Information removed from
brackets on Narrative Pages 2-15, 19-41, the Exhibit
List, Exhibits SD-1 to SD-9 and SD-11 to SD-47 and
the Databases

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Re:   *Wooden Cabinets and Vanities from the People's Republic of
China: Supplemental Section D-E Questionnaire Response*

Dear Secretary Ross:

On behalf of Dalian Meisen Woodworking Co., Ltd. ("Dalian Meisen") and its affiliates,

we hereby submit the foregoing response to the Supplemental Section D-E Questionnaire issued

by the U.S. Department of Commerce on August 28, 2019 in the above-referenced proceeding.

## REQUEST FOR PROPRIETARY TREATMENT

Certain information contained herein is business confidential data that is proprietary.

This information is enclosed with brackets ("[ ]").  Disclosure of this information would cause

Husch Blackwell LLP

**during the POI.**

    c.   Please confirm that Meisen only consumed birch boards during the POI and did not consume any other species of boards.

**Response:**

    **Meisen confirms that it only consumed birch boards in the production of the MUC during the POI and did not consume any other species of boards.**

    d.   Please confirm that you did not consume pallets in your production of merchandise under consideration.  If you did not consume pallets, please describe  how you transported finished goods.  If you did consume pallets, please report a  pallet FOP and provide a calculation worksheet and documentation supporting  your allocation methodology.

**Response:**

    **Meisen confirms that it did not consume pallets in the production of the MUC.  The MUC is placed directly into containers by Meisen employees.  No pallets are loaded in the containers during this process. A photo documenting the container loading process is provided in Exhibit SD-10.**

    e.   Please report the dimensions of the birch boards used by Meisen during the POI and submit documentation supporting your response.

**Response:**

    **The birch boards used by Meisen in the production of the MUC had [**

    **]. The width and length of the purchased birch board varies.**

    f.   Please revise your list of FOPs at Exhibit 5 to include a field that identifies in which stage of production identified in Exhibit 2 of your SDQR the input is used.

**Response:**

    **See Exhibit SD-11 for the list of FOPs including the stage of production.**

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 9/17/19 12:25 PM, Submission Status: Approved

APPX085534

| | | | |
|---|---|---|---|
| Pre-Preliminary Comments for Meisen (September 27, 2019) | C.R. 1429-1430 | P.R. 1400-1402 | APPX086252-APPX086548 |

Barcode:3894973-01 A-570-106 INV - Investigation -

**Wiley Rein LLP**

**PUBLIC VERSION**

September 26, 2019

| |
|---|
| DOC Investigation No. A-570-106 |
| Total Pages: 280 |
| Investigation |
| AD/CVD Operations, E&C Office V |
| Petitioner's Business Proprietary Information in |
| Double Brackets Removed from Exhibit 7 |
| Petitioner's Business Proprietary Information in |
| Single Brackets Removed from Pages 6, 7, Exhibit |
| List, and Exhibits 1B, 4A, 4B, and 5-7 |
| Meisen's Business Proprietary Information Removed |
| from Pages 2, 9, and 11 |
| **PUBLIC VERSION** |

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Re:   ***Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:*** Pre-Preliminary Comments for Meisen

Dear Secretary Ross:

On behalf of the American Kitchen Cabinet Alliance ("Petitioner"), we hereby submit the following pre-preliminary comments to the U.S. Department of Commerce (the "Department") related to Dalian Meisen Woodworking Co., Ltd. ("Meisen") to be considered in the preliminary determination in the above captioned proceeding.[1]  The new factual information in this submission

---

[1]      Letter from Husch Blackwell LLP to Sec'y Commerce, re: *Wooden Cabinets and Vanities from the People's Republic of China: Section C Questionnaire Response* (July 19, 2019); Letter from Husch Blackwell LLP to Sec'y Commerce, re: *Wooden Cabinets and Vanities from the People's Republic of China: Section D Questionnaire Response* (July 19, 2019) ("Meisen D IQR").

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved
APPX086252

The Honorable Wilbur L. Ross, Jr. 94973-01 A-570-106 INV - Investigation -
September 26, 2019
Page 2

**PUBLIC VERSION**

is provided in accordance with 19 C.F.R. § 351.102(b)(21)(i).[2]  This submission is timely filed.[3]
The new factual information provided in this submission is directly responsive to Meisen's section
D supplemental questionnaire response, wherein Meisen stated that it only consumed birch wood
and no other species of wood in producing subject merchandise.[4]  The information provided here
demonstrates that Meisen marketed and sold cabinet models containing maple wood before,
during, and after the period of investigation ("POI").

## I.   THE DEPARTMENT SHOULD APPLY TOTAL AFA TO MEISEN FOR FAILING TO COMPLETELY REPORT ITS FACTORS OF PRODUCTION

The Department should apply total adverse facts available ("AFA") to Meisen for its failure
to accurately report its U.S. sales and factors of production ("FOP") in its original and
supplemental questionnaire responses.  In particular, despite having [

], Meisen only reported the consumption of one type of
wood – birch – in its FOP database, which it claimed to use for all products.[5]  However, Meisen-
made cabinets were marketed in the United States before, during, and after the POI as being made
of solid maple wood.  As detailed below, Meisen's exclusive U.S. supplier marketed Meisen-made
merchandise on its websites, in its product catalogs, and in its conversations with customers as
being made of maple wood – not the birch wood that Meisen has reported in this investigation.  In

---

[2]     The information contained in **Exhibits 1-7** rebuts, clarifies, or corrects information provided in the
supplemental Sections D-E questionnaire responses submitted by Meisen.  *See generally* Letter from Husch Blackwell
LLP to Sec'y Commerce, re: *Wooden Cabinets and Vanities from the People's Republic of China: Supplemental
Section D-E Questionnaire Response* (Sept. 16, 2019) ("Meisen D-E SQR").

[3]     *See* 19 C.F.R. § 351.301(c)(1)(v) (factual information submitted to rebut, clarify, or correct a supplemental
questionnaire response is due within 10 days after the response was filed)

[4]     Meisen D-E SQR at 15 ("Meisen confirms that it only consumed birch boards in the production of the MUC
during the POI and did not consume any other species of boards.").

[5]     *See id.*

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

essence, Meisen claims that it produced subject merchandise only using birch wood, yet evidence submitted by Petitioner shows those cabinets and vanities are marketed in the United States as being made from maple wood.  This demonstrates that Meisen's FOP reporting in this proceeding is unreliable and incomplete and, thus, the Department should use total AFA to calculate Meisen's margin.

Meisen marketed cabinets made of solid maple wood in the United States during the POI, as stated on its website and in its product catalogs for 2018 and 2019, and as confirmed by those familiar with the U.S. wooden cabinets and vanities market.  Because Meisen failed to report that it sold maple cabinets in the United States, the Department should use total AFA to calculate Meisen's margin.

The law is clear that the Department shall "use the facts otherwise available" in reaching a determination where an interested party: (1) withholds information requested by the Department; (2) fails to provide information in a timely manner or in the form requested; (3) significantly impedes a proceeding; or (4) provides information that cannot be verified.[6]  Section 782(d) of the Tariff Act of 1930 (the "Act") states that, if a response "does not comply with the request {for information}, the {Department} . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this title."[7]  Furthermore, section 782(d) permits the

---

[6]      19 U.S.C. §§ 1677e(a)(2)(A-D).

[7]      Section 782(d) of the Tariff Act of 1930, *codified as amended at* 19 U.S.C. § 1677m(d) (2012) (emphasis added).

The Honorable Wilbur L. Ross, Jr. 1494973-01 A-570-106 INV - Investigation -
September 26, 2019
Page 4

**PUBLIC VERSION**

Department to "disregard all or part of the original and subsequent responses" if it finds the response is "not satisfactory."[8]

In selecting among the facts otherwise available, the Act permits the Department to use adverse inferences whenever an interested party fails to act to the best of its ability in responding to the Department's requests for information.[9]  The "statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do."[10]  In determining whether an interested party has met this standard, the Department evaluates "whether {the} respondent has put forth its maximum effort to provide {it} with full and complete answers to all inquiries in an investigation."[11]  "{A}ffirmative evidence of bad faith on the part of a respondent is not required before the Department may make an adverse inference."[12]  Indeed, the Department has discretion to apply adverse inferences to a party "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully" and should consider "the extent to which a party may benefit from its own lack of cooperation."[13]  Meisen's reporting in this investigation falls squarely within this legal framework, and, therefore, the Department must apply total AFA.

---

[8]     *Id.*

[9]     19 U.S.C. § 1677e(b).

[10]    *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

[11]    *Id.*

[12]    *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,340 (Dep't Commerce May 19, 1997) (final rule).

[13]    Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199 ("SAA").

APPX086255

The original questionnaire clearly requests that all of the FOPs required to make subject merchandise be reported.  The type of wood used to make the cabinets is the most important input used in construction, one of the key marketing components of cabinets, and obviously would be known by the manufacturer.  Yet, in its original questionnaire response, Meisen reported that it only consumed birch in the production of subject merchandise.[14]  When asked to confirm that it only used birch in the supplemental questionnaire, Meisen definitively responded, "Meisen confirms that it only consumed birch boards in the production of the MUC during the POI and did not consume any other species of boards."[15]

Petitioner has obtained numerous pieces of marketing materials directly from J&K Cabinetry and its affiliates (collectively, "J&K" or the "J&K Companies"), Meisen's affiliated exclusive U.S. seller of subject merchandise, which lists "maple" as the wood used for its U.S. products.  Meisen reported in its Section A initial questionnaire response that the respondent "has 16 U.S. affiliates . . . collectively referred to as the 'J&K Companies.' "[16]  Critically, Meisen explained that  "J&K Companies do not sell the merchandise to any resellers and do not purchase the merchandise under investigation from any company other than Dalian Meisen."[17]  That is, any subject merchandise sold by the J&K Companies is produced by Meisen.

However, there is a clear and significant discrepancy between the FOP information reported by Meisen in this proceeding and the types of cabinets sold by J&K.  Specifically, maple is the only type of wood advertised by J&K in the United States, which is in stark contrast to

---

[14]     *See generally* Meisen D IQR.

[15]     Meisen D-E SQR at 15.

[16]     Letter from Husch Blackwell LLP to Sec'y Commerce, re: *Wooden Cabinets and Vanities from the People's Republic of China: Section A Questionnaire Response* (July 3, 2019) at 4.B.

[17]     *Id.*

**PUBLIC VERSION**

Meisen's claim that it exclusively uses birch in the production of subject merchandise.   For

instance, the J&K Companies' current websites list their wooden cabinets and vanities as using

"solid maple on all sides" for its drawers and describes its doors as a "full overlay door panel, ¾"

thick solid maple doors."[18]   Furthermore, J&K's 2019 product catalog describes the door

construction on its solid wood cabinets as starting with "the finest solid maple wood."[19]  Similarly,

J&K's 2018 product catalog describes its construction in the same exact terms,[20] and J&K has

advertised its cabinets as being made of maple since at least 2013.[21]  In its 2018 "Design and Ideas"

brochure, J&K also claims that it uses maple wood in construction of its cabinets, "Natural wood,

such as the maple we use, is a strong fine-grained wood that is mainly off-white in color."[22]  The

brochure even lists the different types of natural wood characteristics and grains inherent in

"maple" wood.  It also describes the door construction on its solid wood cabinets as starting with

"the finest solid maple wood"[23] and shows that the doors for its base and wall cabinets of the

Mocha style are also maple.[24]  Therefore, in no uncertain terms, J&K itself has repeatedly and

---

[18]      J&K Cabinetry Website Excerpt, A7 – Crème Glazed Traditional, attached as **Exhibit 1A**; J&K Cabinetry Website Excerpt, [          ], attached as **Exhibit 1B**; J&K Cabinetry Website Excerpt, Craftsman Almond Maple (S2), attached as **Exhibit 1C**; J&K Cabinetry Website Excerpt, Craftsman Almond Maple (S2), attached as **Exhibit 1D**; J&K Cabinetry Website Excerpt, Mahogany Maple (J5), attached as **Exhibit 1E**.

[19]      J&K Cabinetry 2019 Product Catalog at 4, attached as **Exhibit 2**.

[20]      J&K Cabinetry 2018 Product Catalog at 49, attached as **Exhibit 3**.

[21]      J&K Cabinetry 2013 Product Catalog, attached as **Exhibit 4A**; J&K Cabinetry 2015 Product Catalog, attached as **Exhibit 4B**; J&K Cabinetry 2017 Product Catalog, attached as **Exhibit 4C**.

[22]      J&K Cabinetry 2018 Design & Ideas Online Brochure at 12, attached as **Exhibit 5** (emphasis added).

[23]      *Id.* at 13.

[24]      *Id.* at 15.

The Honorable Wilbur ~~L. Ross, Jr.~~ 94973-01 A-570-106 INV - Investigation  -
September 26, 2019
Page 7

**PUBLIC VERSION**

consistently claimed to use maple in its construction of wooden cabinets, *i.e.*, cabinets that J&K

exclusively purchases from Meisen.[25]

In addition, [                                                                    ], stating

that they were made of solid maple wood.   For example, provided as **Exhibit 7** is a declaration

from an individual with extensive experiences in the wooden cabinets and vanities industry, which

describes how [     ] has consistently represented its merchandise to be made from "solid maple

wood."[26] These representations are made through "direct discussions with [                        ]

representatives and also through information provided on [                ] websites and in [

] product catalogs," such as [                                             ].[27]

This evidence, including J&K's own documents and marketing materials throughout the

POI and a number of prior years, demonstrates that Meisen uses maple wood in its cabinetry

production, which it failed to report to the Department.[28]   There is no justification for failing to

provide this critical information requested by the Department.   Given the importance of the wood

species to the production of wooden cabinets, and the significantly higher cost of maple wood

compared to birch,[29] this omission demonstrates that Meisen did not act to the best of its ability in

reporting its FOPs and sales to the Department.   The Department should find that Meisen's failure

to report the maple FOP to the Department merits the application of total AFA.   Furthermore, such

an egregious error cannot be rectified with supplemental questionnaires or verification, especially

---

[25]     *See* J&K Cabinetry FAQ 1, attached as **Exhibit 6A**; J&K Cabinetry FAQ 2, attached as **Exhibit 6B**.

[26]     Declaration, attached as **Exhibit 7**.

[27]     *See generally* [            ].

[28]     *See* Meisen D-E SQR at 15.

[29]     *See* Declaration, attached as **Exhibit 7**.

this late in the investigation.  Consequently, the Department should assign Meisen the AFA rate for the preliminary and final determinations.

## II.   ALTERNATIVELY, THE DEPARTMENT SHOULD APPLY TOTAL AFA TO MEISEN FOR FAILING TO PROVIDE COMPLETE AND RELIABLE INFORMATION THROUGHOUT THIS INVESTIGATION

As described above, Meisen's failure to report a critical FOP in this proceeding is egregious and uncorrectable at this late stage of this investigation and, thus, total AFA should be applied to Meisen.  However, should the Department find that Meisen's failure to report maple wood as a FOP by itself does not warrant the application of total AFA, there are several additional reasons why the respondent should be assigned the AFA rate for the preliminary and final determinations. At a minimum, the Department should require additional information from Meisen in a post-preliminary determination supplemental questionnaire in order to resolve these critical issues.  The Department should also pay close attention to these issues when conducting verification and require Meisen to provide thorough explanations and documentation to address these concerns.

### A.   Meisen's Section D FOP Calculations Ignore the Product Characteristics and Assign Consumption in a Highly Arbitrary Manner

Most notably, Meisen's FOP calculation methodology is deeply flawed and cannot be used to calculate preliminary dumping margins.  Meisen completely revised its section D FOP reporting methodology in its last supplemental section D response, and that methodology cannot be reviewed and examined in time for the preliminary determination.  The Department cannot simply accept this total revision without first analyzing the information and asking supplemental questions to clarify any deficiencies.  Because such a review cannot be completed before the preliminary determination, the Department should use Meisen's original methodology for purposes of the preliminary determination.  As admitted by Meisen in its supplemental response, its first FOP

methodology is highly inaccurate and does not represent each CONNUM's true consumption of the inputs Meisen reported. Therefore, at this point in the investigation, the Department should proceed to impose AFA until such time as Meisen's entirely new methodology can be examined and evaluated for accuracy. The Department should not simply accept the response submitted 16 days before the preliminary determination and attempt to calculate a margin based on that response without any examination.

There are several reasons why Meisen's original FOP calculations are not useable. Meisen claims that it divides the total consumption quantity for each FOP during the POI by the total square meters of all merchandise under consideration produced in order to calculate the amount of the FOP used per one square meter for all MUC. Exhibit D-3 shows this calculation for all direct materials. For example, this calculation for birch boards resulted in [      ] M3 of birch board per one square meter of product. Next, Meisen merely states that the "consumption quantities calculated for each input was then divided by the number of pieces produced for each CONNUM to calculate the reported direct material FOPs."[30] However, this was not how the individual CONNUM's FOPs were calculated, and Meisen does not explain how it proceeded from the amount of birch per square meter ([      ] M3/M2 to the amount of birch per piece for each CONNUM. Meisen must have used each CONNUM's conversion ratio of square meters per piece, but this step was not explained, and this critical conversion ratio was not reported anywhere. This same methodology was used for all FOPs.

Thus, Meisen simply allocated all FOPs to CONNUMs based solely on the square meters per piece. It is unclear what the square meters for a cabinet represents, much less for subject

---

[30]     Meisen D IQR at 15.

components, and the Department could potentially ask for an explanation.  However, it is clear that FOPs were simply allocated to CONNUMs based on this factor without regard for the actual amount of inputs used.  Therefore, **Meisen assigned the same amount per square meter to all products for all FOPs, including birch, plywood, glue, labor, drawer slides, energy, hinges, etc. regardless of the amount consumed by each CONNUM**.  In other words, Meisen assigned the same consumption factor for drawer slides regardless of the number of drawers, the same amount for labor regardless of door style, the same amount of birch boards regardless of the size of the face, the same amount of paint regardless of the surface finish, and the same amount of hinges regardless of the number of doors.  The only reason the FOPs differ is because the product's square meters – whatever that may be – are different.  Therefore, Meisen's FOPs do not account for the product characteristics and are completely arbitrary.  It made no attempt to capture any differences resulting in the product characteristics, and its response to the original section D cannot be considered a legitimate attempt to comply with the Department's reporting requirements.  The Department must reject Meisen's reported FOPs entirely and assign AFA for the preliminary and final determinations.

**B.**    **Meisen Refused to Provide Conversions for FOPs Not Reported By Weight**

The Department asked for the conversion ratios for all FOPs reported in Meisen's FOP database which would allow the Department to determine the weight of each FOP in kilograms. This information is required to assign truck freight to each FOP and may also be necessary to use the surrogate values.  This information would also be important for verification.  Most importantly, the weight of each FOP is critical to calculating the weight of the final product and providing a check on the reported consumption amounts reported by Meisen for the most important FOPs.

**PUBLIC VERSION**

However, when directly asked for this information, Meisen refused to provide it and simply offered excuses that are insufficient on their face.[31]

> Meisen does not record consumption of these inputs in kilograms in the normal course of business. With respect to birch wood and plywood, calculating and relying on consumption quantities in kilograms would significantly distort the actual quantity consumed because it fails to take into account the different densities of the wood consumed. Accordingly, Meisen has continued to report these inputs in m3 per piece as this more accurately reflects the consumption of this material input.

There is no justification to withhold this critical information, and without it, the weight of Meisen's FOPs cannot be added together to determine the total weight of the finished product. Meisen's failure to provide this requested information merits the use of AFA at the preliminary determination.

### C.   Meisen Arbitrarily Used a Period of [   ] Days to Calculate Its Inventory Carrying Costs and Refused to Correct It

Meisen claimed that it was "unable to obtain from J&K's normal books and record a methodology to derive a calculated and precise inventory carrying days number."[32] Instead, it used "an average inventory period of [   ] days" "as a proxy."[33] This is not an acceptable plug for Meisen's average inventory period, and Meisen must determine an accurate inventory turnover amount. It is very likely that the average inventory period is much greater given this industry and that it sells completely from inventory. Meisen even confirmed elsewhere in its response that "there is a significant time lag between importation and the final U.S. sale to the U.S. customer."[34]

---

[31]   Meisen D-E SQR at 19.

[32]   Meisen D IQR at 46-47.

[33]   *Id.* at 47.

[34]   *Id.* at 55.

**PUBLIC VERSION**

Furthermore, Meisen indicates that obtaining this information is possible by also claiming that "in their normal course of business the J&K companies do not utilize a uniform and consistent method across all 16 J&K locations to track the time inventory is held."[35]  It is not required that all its storage facilities have the same inventory calculation method, and this is no different than all the other sales adjustments Meisen reported, which were also U.S. reseller dependent.  Moreover, every company must keep track of its inventory in some manner as it is required for taxes and necessary for normal business operations.  The Department asked Meisen to describe the factors considered by the J&K companies to derive their estimated inventory carrying period and submit documentation supporting its response."[36]  Meisen basically repeated its prior response and claimed that it operates without an "inventory management system and have tracked the time from purchase to sale based upon experience of what they physically see sitting in the warehouses."[37] This is not a valid excuse for failing to provide this requested information.  There are numerous ways Meisen could have calculated its average inventory time.  Moreover, Meisen failed to provide any documentation to support the estimated inventory carrying period it reported.  Meisen's failure to provide this relevant information is grounds for the application of AFA.

\*        \*        \*

## REQUEST FOR PROPRIETARY TREATMENT

Petitioner requests proprietary treatment for the information contained in single brackets on Pages 2, 6, 7, 9, 11, the Exhibit List, and Exhibits 1B, 4A, 4B, and 5-7 and in double brackets in Exhibit 7 of this submission.  In particular, Petitioner requests that, pursuant to 19 C.F.R.

---

[35]      *Id.* at 46.

[36]      Meisen D-E SQR at 42.

[37]      *Id.*

APPX086263

§§ 351.304(a)(1)(ii) and 351.304(b)(2)(i), the information contained in double brackets be exempt from disclosure under the terms of the Department's Administrative Protective Order ("APO"). There exists a clear and compelling need to withhold this information as the information contained in double brackets relates to the identity of an individual who has provided sensitive information regarding the U.S. and Chinese wooden cabinet and vanities markets.[38]  Petitioner and that individual believe that there is a likelihood of significant commercial harm should the identity of the individual or his/her company affiliation be revealed.  Due to this risk, Petitioner believes that a compelling reason exists for exempting the information from disclosure under the Department's APO.[39] Exempting the double-bracketed information from disclosure under administrative protective order will not limit the ability of any party to have access under APO to the single-bracketed business proprietary information contained throughout the declarations or the information in the public versions, as appropriate, and will not limit the ability of any party to comment meaningfully on the information in Exhibit 7 or otherwise participate in this proceeding. Accordingly, all double-bracketed information has been deleted from the business proprietary and public versions of this submission.

Additionally, pursuant to 19 C.F.R. § 351.304(a)(l)(i), Petitioner requests business proprietary treatment for certain information in single brackets on Pages 2, 6, 7, 9, 11, the Exhibit List, and Exhibits 1B, 4A, 4B, and 5-7.  This information is business proprietary information because it constitutes information the release of which tend to reveal other proprietary information.

---

[38]  *See* 19 C.F.R. § 351.304(b)(2)(i).

[39]  Indeed, the Omnibus Trade and Competitiveness Act of 1988 precisely contemplated this type of information as being the type of information that can be exempt from disclosure under an APO. *See, e.g.*, H.R. Rep. No. 100-576 at 623 (1988).

The Honorable Wilbur ~~Lr Ross, Jr~~ 94973-01 A-570-106 INV - Investigation   -
September 26, 2019
Page 14

**PUBLIC VERSION**

Accordingly, public disclosure of this information could cause competitive harm as foreseen by

19 C.F.R. § 351.105(c)(11).  Petitioner agrees to the release of this information to parties granted

access under the APO issued by the Department in this proceeding.

If you have any questions regarding this submission, please do not hesitate to contact us.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Jeffrey O. Frank, Esq.

*Counsel to the American Kitchen Cabinet
Alliance*

Barcode:3894973-01 A-570-106 INV - Investigation -

## COMPANY CERTIFICATION

I, Betsy Natz, currently employed as President of the American Kitchen Cabinet Alliance, certify that I prepared or otherwise supervised the preparation of the attached submission of *Pre-Preliminary Comments for Meisen*, filed on September 26, 2019, pursuant to the antidumping duty investigation of *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China* (Investigation No. A-570-106). I certify that the public information and any business proprietary information of American Kitchen Cabinet Alliance contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _Betsy Natz_

Betsy Natz

Date:  September 26, 2019

## REPRESENTATIVE CERTIFICATION

I, Timothy C. Brightbill, with Wiley Rein LLP, counsel to the American Kitchen Cabinet Alliance, certify that I have read the attached submission of *Pre-Preliminary Comments for Meisen*, filed on September 26, 2019, pursuant to the antidumping duty investigation of *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China* (Investigation No. A-570-106). In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Timothy C. Brightbill

Date: __September 26, 2019__

APPX086267

## CERTIFICATE OF SERVICE

PUBLIC SERVICE

*Wooden Cabinets and Vanities and Components Thereof from China*
A-570-106
(Investigation)

I certify that a copy of this public submission was served on the following parties, via electronic service, on September 27, 2019.

Jeffrey S. Neeley, Esq.
**Husch Blackwell LLP**
750 17th Street, NW
Suite 900
Washington, DC 20006

Bruce M. Mitchell, Esq.
**Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP**
1201 New York Avenue NW
Suite 650
Washington, DC 20005

Matthew R. Nicely, Esq.
**Hughes Hubbard & Reed LLP**
1775 I Street, NW
Suite 600
Washington, DC 20006-2401

Gregory S. Menegaz, Esq.
**deKieffer & Horgan**
1090 Vermont Avenue, NW
Suite 410
Washington, DC 20005

Kristin H. Mowry, Esq.
**Mowry & Grimson PLLC**
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015

Jaehong David Park, Esq.
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Ave., NW
Washington, DC 20001

Matthew T. McGrath, Esq.
**Barnes Richardson & Colburn**
1200 New Hampshire Ave., NW
Suite 725-B
Washington, DC 20036

Kristen Smith, Esq.
**Sandler, Travis & Rosenberg, P.A.**
1300 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004-3002

Mark Ludwikowski, Esq.
**Clark Hill PLC**
1001 Pennsylvania Ave., NW
Suite 1300 South
Washington, DC 20004

Adams Lee, Esq.
**Harris Bricken McVay Sliwoski, LLP**
600 Stewart Street
Suite 1200
Seattle, WA 98101

APPX086268

Barcode:3894973-01 A-570-106 INV - Investigation  -

Peggy A. Clarke, Esq.
**Law Offices of Peggy A. Clarke**
1325 G Street, NW
Suite 500
Washington, DC 20005

Robert George Gosselink, Esq.
**Trade Pacific PLLC**
660 Pennsylvania Avenue, SE
Suite 401
Washington, DC 20002

Rosa S. Jeong, Esq.
**Greenberg Traurig, LLP**
2101 L Street, NW
Suite 1000
Washington, DC 20037

Friederike S. Goergens, Esq.
**Arent Fox LLP**
1717 K Street, NW
Washington, DC 20006-5344

David Craven, Esq.
**Craven Trade Law LLC**
3744 N Ashland
Chicago, IL 60613

George Tuttle
**Law Offices of George R. Tuttle**
1100 larkspur Landing Circle
Suite 385
Larkspur, CA 94939

Hui Han
**Beijing Chang An Law Firm**
F9/10, Zhongjian Building,
No. 18 Xibahe Dongli, Chaoyang District,
Beijing, China

Matthew J. McConkey, Esq.
**Mayer Brown, LLP**
1999 K Street, NW
Washington, DC 20006-1101

Chunlian Yang, Esq.
**Alston & Bird, LLP**
950 F Street, NW
Washington, DC 20004-1404

Ronald M. Wisla, Esq.
**Fox Rothschild LLP**
1030 15th Street, NW
Suite 380
Washington, DC 20005

Nathan Garrett Bush, Esq.
**DLA Piper LLP (US)**
500 8th Street, NW
Washington, DC 20004

Jiaxi Jiang
**Jurisino Law Group**
Global Finance & News Center,
2nd Floor, Tower B,
1A Xuanwumenwai Avenue,
Xicheng District,
Beijing 100052, China

Richard F. O'Neill
**Neville Peterson LLP**
500 Yale Ave. N.
Suite 221
Seattle, WA 98109

Shengxing Yu
**Hiways Law Offices**
69 Dongfang Road, Tower A,
15th Floor, Eton Place
Pudong, Shanghai, 200120

Barcode:3894973-01 A-570-106 INV - Investigation  -

**PUBLIC VERSION**

| EXHIBIT LIST | | |
|---|---|---|
| **Exhibit No.** | **Description** | **Security** |
| 1A | J&K Cabinetry Website Excerpt, A7 – Crème Glazed Traditional | Public |
| 1B | J&K Cabinetry Website Excerpt, [            ] | PV |
| 1C | J&K Cabinetry Website Excerpt, Craftsman Almond Maple (S2) | Public |
| 1D | J&K Cabinetry Website Excerpt, S2 – Almond Contemporary | Public |
| 1E | J&K Cabinetry Website Excerpt, Mahogany Maple (J5) | Public |
| 2 | J&K Cabinetry 2019 Product Catalog | Public |
| 3 | J&K Cabinetry 2018 Product Catalog | Public |
| 4A | J&K Cabinetry 2013 Product Catalog | PV |
| 4B | J&K Cabinetry 2015 Product Catalog | PV |
| 4C | J&K Cabinetry 2017 Product Catalog | Public |
| 5 | J&K Cabinetry 2018 Design & Ideas Online Brochure | PV |
| 6A | J&K Cabinetry FAQ 1 | PV |
| 6B | J&K Cabinetry FAQ 2 | PV |
| 7 | Declaration | PV |

1

# EXHIBIT 1A

Barcode:3894973-01 A-570-106 INV - Investigation  -

≡ Menu  Login   **DEALER SIGN UP**

Go Back

# A7 | Creme-Glazed | Traditional

| **Specifications** | Locations | Inspiration Images | 3-D Image |

Find A Location  ‹

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086272

https://jandkcabinetry.com/cabinet/traditional-a7/                                    9/18/2019

Barcode:3894973-01 A-570-106 INV - Investigation -



☰ Menu                                         Login        **DEALER SIGN UP**



All J&K's cabinets and vanities are superiorly constructed with 100% solid wood and proudly come with the foll features:

1. **Door Panel**: 3/4"-thick solid wood; full overlay door.

2. **Door Hinge**: 6-way adjustable; soft-close metal; hidden Euro-style.

3. **Adjustable Shelf**: 3/4"-thick cabinet-grade plywood; clear coat finish on all sides and edges; with metal shelf r

4. **Drawer**: 5/8"-solid maple on all sides; full extension pull-out; dovetail construction.

5. **Drawer Guide**: full extension pull-out; soft-close metal; concealed under-mount.

6. **Plywood Box**: 1/2" to 5/8"-thick cabinet-grade plywood; clear coat finish on interior sides; matching color finis

7. **Metal Bracket**: corner bracket reinforcements in base cabinets for maximum stability.

8. **Door Bumper**: promote quiet-closing and reduce slamming for maximum durability.

## Interactive Diagram

Click on a number to see more about that feature.

Find A Location



**Wall Cabinet** with two doors in Castle Grey (S5)

**Note:** As we continue to improve our product qualities and designs, the actual functionality of Door Hinge and Drawer Glide may vary slightly between existing and newest product styles and finishes. Please check with your local J&K Cabinetry showroom or dealer for most current updates

‹ 1 / 2 ›

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved
APPX086273
https://jandkcabinetry.com/cabinet/traditional-a7/                                     9/18/2019

Barcode:3894973-01 A-570-106 INV - Investigation  -

≡ Menu    View Ebook Catalog

About                Blog              Find a Location    Login    DEALER SIGN UP    CARB 2

Cabinets             Become a Dealer   Contact

Inspiration Gallery  Warranty          Careers

Product Visualizer   Support

Terms & Conditions | Privacy Policy

Copyright © 2019 J&K International Group, LLC. All rights reserved

Find A Location

‹

Privacy - Terms

# EXHIBIT 1B

Barcode:3894973-01 A-570-106 INV - Investigation  -



# Wholesale Kitchen & Bath Cabinets, Vanities & Accessories

[                              ] Distributor of affordable high quality all wood Cabinetry for Professional's

Home     Design Gallery     Cabinets     Blog     Delivery Services     Find A Dealer

Apply For Dealer     Contact

## Cabinet Features

### J&K Kitchen & Bath Cabinets offer 10 standard features others sell as options

1.  A full overlay door panel, 3/4" thick solid maple doors
2.  6-way adjustable European hidden metal hinges with soft close standard
3.  Pre-drilled fully adjustable 3/4" shelves with metal shelf pegs
4.  5/8" thick cabinet grade all plywood sides, both sides are finished with matching stain.
5.  Dovetail drawers with solid wood sides
6.  Full extension under mounted soft close metal drawer glides
7.  Sink base "Tip Out" drawer(s) with convenient utility tray for

### leído en español

Select Language



Powered by Google Translate

## View Our Gallery

Inspirational Designs from J&K Dealers throughout

[          ]

### See The Designs

**Translate »**

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086276

[                              ]                                              9/20/2019

storage.

8.  1/2" thick all plywood box construction. (**California 93120 P2 Compliant for Formaldehyde**)

9.  Metal bracket corner reinforcements in all base cabinets for maximum durability.

10. Furniture grade finishes from the global leader in durable sustainable paints, coatings and stains, **Akzo Noble**.

**Download or view our 2018 cabinetry Designs & Ideas brochure here**

**Download or view our 2018 cabinetry Specifications book here**

Watch how our **Kitchen Cabinets in** [         ] are professionally built by our J&K Factory Trained Cabinet Makers.



# Find Your J&K Dealer

We'll Locate Your Nearest Authorized Dealer.

Find A Dealer

# Become A J&K Dealer

Apply & Start Enjoying More Sales, For Less!

Apply Here

## 🖉 Recent Posts

[         ] Cabinets Countertops Appliance Design Showroom

Cabinet Countertop Appliance Remodeling Design Showroom [         ]

[         ] Cabinets Countertop Appliance » **Translate »**

Barcode:3894973-01 A-570-106 INV - Investigation -

Remodeling Showroom Dealer

Kitchen & Bath Design Showroom for Everything Remodeling in [          ]

J&K Cabinet Countertop Appliance Design Showroom in [          ]

## Tour J&K Cabinetry Facilities



## J&K on HGTV They Love Us!



[          ]
## Professionals, Start Offering J&K Cabinetry Today!

Apply Online

📄 Our J&K Cabinetry Showroom

[

          ]
Showroom Open Mon - Fri - 8:00 - 4:30 Sat 8:30 - 4:30

Translate »

Case 1:20-cv-00109-MMB    Document 62    Filed 05/26/21    Page 408 of 1902   PUBLIC VERSION

Barcode:3894973-01 A-570-106 INV - Investigation  -

Copyright © 2019 Wholesale Kitchen & Bath Cabinets, Vanities
& Accessories. Powered by WordPress. Theme: Accelerate by
ThemeGrill.

**Translate »**

APPX086279

[                                                  ]                          9/20/2019

Barcode:3894973-01 A-570-106 INV - Investigation  -

# EXHIBIT 1C

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved.

Page 10 of 260

APPX086280



Barcode:3894973-01 A-570-106 INV - Investigation -

*Exceptional Value with Endless Possibilities*

BECOME A DEALER          DEALER ONLY          LOGIN

PRODUCTS      OUR SERVICES      OUR CLIENTS      TOOLS      CONTACT US      WHERE TO BUY

CRAFTSMAN ALMOND MAPLE (S2)

BACK

Roll-over the gallery images to display larger.



**Wood:** Maple

**Color/Door Style Name:** Craftsman Almond Maple (S2)

**Front:** Full overlay door panel, 3/4" thick door panel

**Drawer:** Dovetail drawer, 1/2" thick solid wood sides with full extension, under-mounted, soft-close, steel concealed drawer glides

**Interior:** Natural Clear Coat Finish

**Exterior:** Matching Finish *(No Finish End Panel Necessary)*

**Box:** 1/2" thick cabinet grade plywood with Metal bracket reinforcements for base cabinets

**Hardware:** 6-way adjustable European hidden metal hinges *(optional soft-close hinges)*

**Shelf:** Adjustable, 3/4 shelf, 5/8" thick cabinet-grade plywood, metal shelf rests

**Warranty:** One Year

SPECIFICATION

*Note: This specification is for reference only, please ask your local dealer for item availability!*

Like   Share   34 people like this. Be the first of your friends.

AFFILIATES & ASSOCIATION













ABOUT US ♦ EMPLOYMENT ♦ FAQ ♦ WARRANTY ♦ RETURN POLICY ♦ PRIVACY STATEMENT



© 2019 Grand J&K Corp., Grand JK Cabinetry Inc. and Grand JK&C Ltd.
All rights reserved. Designed by: Imagespring





01113890

# EXHIBIT 1D

Barcode:3894973-01 A-570-106 INV - Investigation -



≡ Menu

Login

**DEALER SIGN UP**

Go Back

# S2 | Almond | Contemporary

**Note 2:** Constructed with ALL-WOOD reversed raised panel door

| Specifications | Locations | Inspiration Images | 3-D Image |
| --- | --- | --- | --- |



All J&K's cabinets and vanities are superiorly constructed with 100% solid wood and proudly come with the following STANDARD features:

1. **Door Panel:** 3/4'-thick solid wood; full overlay door.

2. **Door Hinge:** 6-way adjustable; soft-close metal; hidden Euro-style.

3. **Adjustable Shelf:** 3/4"-thick cabinet-grade plywood; clear coat finish on all sides and edges; with metal shelf rests.

4. **Drawer:** 5/8"-solid maple on all sides; full extension pull-out; dovetail construction.

5. **Drawer Guide:** full extension pull-out; soft-close metal; concealed under-mount.

6. **Plywood Box:** 1/2" to 5/8"-thick cabinet-grade plywood; clear coat finish on interior sides; matching color finish on exterior sides.

7. **Metal Bracket:** corner bracket reinforcements in base cabinets for maximum stability.

8. **Door Bumper:** promote quiet-closing and reduce slamming for maximum durability.

## Interactive Diagram

Click on a number to see more about that feature.





**Wall Cabinet** with two doors in Castle Grey (S5)

**Note:** As we continue to improve our product qualities and designs, the actual functionality of Door Hinge and Drawer Glide may vary slightly between existing and newest product styles and finishes. Please check with your local J&K Cabinetry showroom or dealer for most current updates

< 1 / 2 >



View Ebook Catalog

About — Cabinets — Inspiration Gallery — Product Visualizer

Blog — Become a Dealer — Warranty — Support

Find a Location — Contact — Careers

Terms & Conditions | Privacy Policy

Copyright © 2019 J&K International Group, LLC. All rights reserved.



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086283

Login   DEALER SIGN UP

Menu

Find A Location

APPX086284

Barcode:3894973-01 A-570-106 INV - Investigation  -

# EXHIBIT 1E

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086285



Barcode:3894973-01 A-570-106 INV - Investigation -

*Exceptional Value with Endless Possibilities*

BECOME A DEALER    DEALER ONLY    LOGIN

PRODUCTS    OUR SERVICES    OUR CLIENTS    TOOLS    CONTACT US    WHERE TO BUY

MAHOGANY MAPLE (J5)

BACK

Roll-over the gallery images to display larger.







**Wood:** Maple

**Color/Door Style Name:** Mahogany Maple (J5)

**Front:** Full overlay door panel, 3/4" thick door panel

**Drawer:** Dovetail drawer, 1/2" thick solid wood sides with full extension, under-mounted, soft-close, steel concealed drawer glides

**Interior:** Natural Clear Coat Finish

**Exterior:** Matching Finish *(No Finish End Panel Necessary)*

**Box:** 1/2" thick cabinet grade plywood with Metal bracket reinforcements for base cabinets

**Hardware:** 6-way adjustable European hidden metal hinges *(optional soft-close hinges)*

**Shelf:** Adjustable, 3/4 shelf, 5/8" thick cabinet-grade plywood, metal shelf rests

**Warranty:** One Year

SPECIFICATION

*Note: This specification is for reference only, please ask your local dealer for item availability!*

Like  Share  34 people like this. Be the first of your friends.

AFFILIATES & ASSOCIATION

        

ABOUT US ♦ EMPLOYMENT ♦ FAQ ♦ WARRANTY ♦ RETURN POLICY ♦ PRIVACY STATEMENT

© 2019 Grand J&K Corp., Grand JK Cabinetry Inc. and Grand JK&C Ltd.
All rights reserved - Document Imaging

Barcode:389497   01-679 - Leighton Inv. Investigation   -




01113889

APPX086287

Barcode:3894973-01 A-570-106 INV - Investigation  -

# EXHIBIT 2

APPX086288

Barcode:3894973-01 A-570-106 INV - Investigation  -

2019 Edition

# J&K CABINETRY



Filed By: tanigholi@walmart.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved
APPX086289

Barcode:3894973-01 A-570-106 INV - Investigation  -





Barcode:3894973-01 A-570-106 INV - Investigation -

# J&K CABINETRY



Pear Glazed / H9

"Kitchen Is The Heart
Of Your Home"

Barcode:3894973-01 A-570-106 INV - Investigation -

8
HISTORY

10
OUR CABINETS

13
KITCHEN

52
BATHROOM

58
HIDDEN EXPRESSIONS

60
DECOR

62
ENVIRONMENTAL COMMITMENT

63
FINEST FURNITURE FINISHES

64
SUPERIOR CONSTRUCTION

65
STANDARD FEATURES

66
WARRANTY

68
MAINTENANCE & CARE

Barcode:3894973-01 A-570-106 INV - Investigation -



APPX086293

Barcode:3894973-01 A-570-106 INV - Investigation  -

# HISTORY OF
## J&K CABINETRY



Our first J&K Cabinetry company was originated in Atlanta, Georgia back in 2003, with our goal of providing our customers with the highest quality of cabinets available at an affordable price. We are also the manufacturer for our own J&K's distinctive and stylish line of kitchen cabinets and bathroom vanities.

For the past 15 years, J&K Cabinetry has been exing steadily in the east coast, through the mid-way and south, and to the west coast of the US, with m than 17 warehouses and showroom locations.

Barcode:3894973-01 A-570-106 INV - Investigation  -



J&K Cabinetry continues to grow today as a unique cabinet brand as well as a leading cabinet wholesaler in the nation. One of the keys to our continued success lies in our commitment to continually improve both the product quality and the design style with our customers needs in mind. We believe that customer satisfaction is both the reward and the guarantee to our successful accomplishment of our company goal. We value our growth and continued improvements just as our customers do.

Barcode:3894973-01 A-570-106 INV - Investigation  -

## OUR CABINETS

As the manufacturer and direct wholesaler of our own J&K's Cabinetry products, we are able to eliminate the middle-person cost and significantly reduce the product prices for our customers without losing the actual product quality and value. All of our cabinets and vanities are constructed with 100% solid wood doors and frames, 1/2" to 5/8" thick plywood boxes, soft-close metal door hinges, full-extension drawers with soft-close metal glides and more. We insist on making all these 'optional upgrades' a necessary standard, efficiently improving the overall quality, functionality, durability and value of our products without adding the burden of higher prices for our customers.

Barcode:3894973-01 A-570-106 INV - Investigation   -

All of J&K's cabinets are ready-to-assemble (RTA), ready-to-build (RTB), and semi-customizable to our customers' specific needs. As our own manufacturer we are able to maintain quality control and strict supervision over our cabinet production process through high-tech machinery and detailed hand-crafting. We also believe that by focusing on the excellent craftsmanship and unique designs of our cabinet styles, we can offer a more personalized experience for our customers and homeowners when they choose their dream kitchens with us.





Barcode:3894973-01 A-570-106 INV - Investigation -



THE *art* AND *science* OF *cabinetry*

Barcode:3894973-01 A-570-106 INV - Investigation   -

Welcome to your dream

# KITCHEN

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086299

Barcode:3894973-01 A-570-106 INV - Investigation  -



White / S8

Barcode:3894973-01 A-570-106 INV - Investigation  -

# CONTEMPORARY



**S8**
White



**S5**
Castle Grey



**S2**
Almond



**S1**
Java Coffee

*Note: Constructed with ALL-WOOD reversed raised panel door for S8, S5, S2, S1.*

**Note:** Availability for a particular product style and color may vary depending on showroom locations. Please check with your local J&K Cabinetry showroom or dealer for current availability before planning your projects.

Barcode:3894973-01 A-570-106 INV - Investigation  -



Barcode:3894973-01 A-570-106 INV - Investigation -



The simple and clean lines of shaker cabinets allows them to fit perfectly in any traditional or contemporary kitchen designs.

# S-Series

Contemporary
White / S8



Barcode:3894973-01 A-570-106 INV - Investigation   -

Contemporary | White | S8





Semi-customized drawer base cabinets for built-in mircowave

Full front overlay dishwasher door panel

Enclosed space for built-in wine cooler



Barcode:3894973-01 A-570-106 INV - Investigation -



# Contemporary cabinetry creates
## its own reflection of the time

Barcode:3894973-01 A-570-106 INV - Investigation -

# S-Series

Contemporary
Castle Grey / S5







Filed By: tbrightbill@wileyrein.com, Filed Date: 5/27/15 4:44 PM, Submission Status: Approved

20

APPX086306

Barcode:3894973-01 A-570-106 INV - Investigation   -



CABINETRY THAT ADDS A MODERN
FEEL TO YOUR HOME DECOR

Barcode:3894973-01 A-570-106 INV - Investigation  -



# Style & Elegance







APPX086308

Bates id:3894973-01 A-570-106 INV - Investigation  -

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086309

23

Barcode:3894973-01 A-570-106 INV - Investigation   -

Contemporary | Almond | S2



Almond-colored door lends an air of warmth to your home

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086310

Barcode:3894973-01 A-570-106 INV - Investigation  -







# S-Series

## Contemporary
Almond / S2





Barcode:3894973-01 A-570-106 INV - Investigation  -

# S-Series

## Contemporary
Java Coffee / S1









Barcode:3894973-01 A-570-106 INV - Investigation  -

Contemporary | Java Coffee | S1



Barcode:3894973-01 A-570-106 INV - Investigation -



*Redefine Your Expectations....*

APPX086314

Barcode:3894973-01 A-570-106 INV - Investigation -

**TRANSITIONAL**

**E1** (NEW)
Dove

**E2** (NEW)
Charcoal

**K3**
Greige

**K8**
Espresso

**H9**
Pearl Glazed

**H8**
Hazel

**H3**
Chestnut

*Note: Constructed with plywood center panel door for E1, E2.*

Filed By: cbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

**Note:** Availability for a particular product style and color may vary depending on showroom locations. Please check with your local J&K Cabinetry showroom or dealer for current availability before planning your projects.

APPX086315

Barcode:3894973-01 A-570-106 INV - Investigation  -



APPX086316

Barcode:3894973-01 A-570-106 INV - Investigation -



# H-Series

Transitional
Pearl Glazed / H9





APPX086317

31

Barcode:3894973-01 A-570-106 INV - Investigation -

Transitional | Pearl Glazed | H9



Pearl Glazed / H9

32

APPX086318

Barcode:3894373-01 1-570-106 INV - Investigation -



Tall Oven Cabinet

Decorative Molding & Filler

ELEGANT
CABINETS
THAT
COMPLEMENT
ANY HOME

APPX086319

Barcode: 3749775-01 A-570-106 INV - Investigation  -

# H-Series

### Transitional
Hazel / H8





34

APPX086320

Barcode: 894973-01 A-570-106 INV - Investigation -



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Barcode:3894973-01 A-570-106 INV - Investigation -



Exceptionally crafted cabinetry ⸺

⸺ that reflects your style ⸺

APPX086322

Barcode:3894973-01 A-570-106 INV - Investigation  -

Transitional | Hazel | H8







Filed By: tbrightbill@wileyrein.com, Filed Date: 9/19/19 1:41 PM, Submission Status: Approved

APPX086323

Barcode:3894973-01 A-570-106 INV - Investigation -



APPX086324

Barcode:3894973-01 A-570-106 INV - Investigation -



# K-Series

## Transitional
Greige / K3







Barcode:3894973-01 A-570-106 INV - Investigation -

Transitional | Greige | K3







This kitchen incorporates details and design elements that represent both ends of the design spectrum to create a look that seemlessly transitions between yesterday and today.





40



Filed By: mbrightman@mowryrein.com, Filed Date: 8/27/19 4:44 PM, Submission Status: Approved

APPX086327

Barcode:3894973-01 A-570-106 INV - Investigation   -



Crème Glazed / A7

Barcode:3894973-01 A-570-106 INV - Investigation  -

**TRADITIONAL**



**A7**
Crème Glazed



**CO66**
Cinnamon Glazed



**K10**
Mocha Glazed



**J5**
Mahogany



**M01**
Chocolate Glazed

APPX086329

Barcode:3894973-01 A-570-106 INV - Investigation  -



Barcode:3894973-01 A-570-106 INV - Investigation -



**Traditional**
Crème Glazed / A7

Barcode:3894973-01 A-570-106 INV - Investigation   -

Traditional | Crème Glazed | A7

# INSPIRED ──
## ── STYLE





Barcode:3894973-01 A-570-106 INV - Investigation  -



An elegant kitchen that stands the test of time

APPX086333

Barcode:3894973-01 A-570-106 INV - Investigation  -

Traditional
Mahogany / J5







Barcode:3894973-01 A-570-106 INV - Investigation  -

Tradititional | Mahogany | J5




Pantry cabinets with custom made refrigerator panels

Barcode:3894973-01 A-570-106 INV - Investigation  -

Traditional | Chocolate Glazed | M01



APPX086336

Barcode:3894973-01 A-570-106 INV - Investigation -



## Traditional
Chocolate Glazed / M01





Barcode:3894973-01 A-570-106 INV - Investigation  -

Welcome to your dream

# BATHROOM

APPX086338

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Barcode:3894973-01 A-570-106 INV - Investigation -



A
Perfect
Blend of
Style
& Color

Filed By: thrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086339

Barcode:3894973-01 A-570-106 INV - Investigation -



Experience
Luxury
At Home

APPX086340

Barcode:3894973-01 A-570-106 INV - Investigation -



Barcode:3894973-01 A-570-106 INV - Investigation   -



Pearl Glazed / H9

Barcode:3894973-01 A-570-106 INV - Investigation -



Find your
Vision of
The perfect
Bath

APPX086343

Barcode:3894973-01 A-570-106 INV - Investigation   -

# Hidden Expressions

APPX086344

Barcode:3894973-01 A-570-106 INV - Investigation -

Wine Rack

Roll-Out Tray



Lazy Susan

Sink Base Tilt-Out Tray

Barcode:3894973-01 A-570-106 INV - Investigation  -

Decor

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086346

Barcode:3894973-01 A-570-106 INV - Investigation  -

Acanthus Corbel

Large Acanthus Corbel







Twisted Split Turn Post

Crown Molding

Barcode:3891873-01 A-570-106 INV - Investigation -

# Environmental Commitment



We believe that a healthy environment is the backbone to the happy lives of our customers and our society. In addition to our continued effort to improve our product qualities and values, J&K Cabinetry is committed to manufacturing and selling environmental-friendly and healthy products to our customers

J&K Cabinetry's hardwood-plywood materials are compliant with California 93120, Phase 2 (CARB 2) standard for formaldehyde. We also use AkzoNoble, a leading global company in sustainable paints and coatings, for our cabinet finishes. Our products are KCMA certified (for all J&K-assembled cabinets).






Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086348

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Finest
# Furniture Finishes

J&K's solid wood cabinet finishes are processed thorough the following excellent craftsmanship details:

1. The finest solid maple wood is sanded until smooth and vacuumed.

2. An equalizer stain is applied to balance the base color of the wood.

3. A toner is applied to establish color uniformity.

4. A deep penetrating stain is applied to reveal the hidden beauty of the natural grain.

5. All stained surfaces are hand-rubbed and wiped of excess stain and then slowly air-dried.

6. A wood sealer is applied, penetrating all exposed wood surfaces for uniform protection.

7. All surfaces are hand-sanded, providing a smooth, consistent surface.

8. A glaze is applied by hand (if applicable).

9. A color consistency examination is performed with additional touch-ups, if needed.

10. A final protective top coat is applied, maximizing resistance to scuffing, moisture, fading and most household chemicals.

**Notes:**
NOT Actual Product;
Image For Reference Only.

## Natural Wood Characteristics:



Arce

Burl Grain

Open Knots

Bird's Eye

Mineral Streaks

Heartwood

**Note:** All solid wood may contain natural "imperfections," such as variations in color, grain, mineral streaks and knots.

*Note: Natural wood characteristics such as gum pockets, streaks and pin knots may be visible, particularly with some of our light paints. These characteristics tend to be more pronounced on the the backs of our drawers and doors.

APPX086349

Barcode:3894973-01 A-570-106 INV - Investigation -

# Superior
# Construction



**Wall Cabinet** with two doors in Castle Grey (S5).



**Base Cabinet** with one drawer and one door in Castle Grey (S5).

Barcode:3894973-01 A-570-106 INV - Investigation -

# Standard Features

All J&K's cabinets and vanities are superiorly constructed with 100% solid wood and proudly come with the following **STANDARD** features:

1. **DOOR PANEL** – 3/4" thick solid wood, full overlay door.

2. **DOOR HINGE** – 6-way adjustable, soft-close metal and hidden Euro-style.

3. **ADJUSTABLE SHELF** – 3/4" thick cabinet-grade plywood, clear coat finish on all sides and edges and metal shelf rests.

4. **DRAWERS** – 5/8" thick solid wood on all sides, full extension pull-out and dovetail construction.

5. **DRAWER GLIDE** – Full extension pull-out, soft-close metal and concealed under mount.

6. **PLYWOOD BOX** – 5/8" thick cabinet-grade plywood, clear coat finish on interior sides and matching color finish on exterior sides.

7. **METAL BRACKET** – Corner bracket reinforcements in base cabinets for maximum stability.

8. **DOOR BUMPER** – Promotes quiet-closing and reduces slamming for maximum durability.

Tilt-out Trays have been another upgrade and STANDARD feature in all of J&K's Kitchen Sink Base and Vanity Sink Cabinets.




**NOTE:**

As we continue to improve our product qualities and designs, the actual functionality of Door Hinges and Drawer Glides may vary slightly between existing and newest product styles and finishes. Please check with your local J&K Cabinetry showroom or dealer for the most current updates.



Barcode:3894973-01 A-570-106 INV - Investigation -

# J&K FIVE YEAR LIMITED WARRANTY

- J&K CABINETRY ("J&K") extends the following limited warranty on all cabinets manufactured and sold by J&K within the United States and Canada. This Limited Warranty is only applicable to Products sold to the original purchasing consumer on or after January 1, 2019. J&K warrants that all cabinets purchased from J&K will be free from all unnatural defects in material and workmanship in accordance with J&K quality standards sheet under normal residential use for 5 years from the date of the original purchase or as long as the original purchasing consumer owns the home in which such cabinets are installed, whichever is less. This warranty is non-transferable to subsequent owners of the home. Door hinges and all drawers glide system, including system hardware (lift system), however, are warranted for only 1 year under normal residential use from the date of the original purchase.

**THIS LIMITED WARRANTY IS SUBJECT TO ALL LIMITATIONS, EXCLUSIONS, DISCLAIMERS, AND PROCEDURES SET FORTH HEREIN.**

- The warranty does not cover defects caused by improper handling, storage, dirt, chemicals, abrasive or citrus cleaning products, installation, assembly or disassembly, transit or other intentional or negligent damage, product modifications, exposure to the extreme moisture, humidity or excessive heat or cold (temperature outside the range of 50-85°F and humidity outside the range of 30-55% are considered extreme), nor does it cover defects arising from normal wear and tear, misuse, neglect, accidents, alterations, improper use exposure to improper loads, or failure to maintain properly. Any modification to the hardware structure or finish of the original consumer purchaser's cabinetry by anyone other than those specifically authorized by J&K to do so shall void this limited liability warranty. The product must be used exclusively for its intended purpose in order to be covered by this limited liability warranty. This limited liability warranty shall become void if the cabinets or any components or parts thereof are in any way modified, improperly installed or damaged prior to or during installation, or installed or used in other than normal residential applications.

- Natural woods may vary in color, grain pattern, and characteristics and exhibit subtle changes as they age. Wood characteristics that naturally occur, such as variations in color, grain, mineral streaks and knots, are not considered defects. J&K will not be held responsible for these variations in your cabinetry. For example, painted doors, drawer fronts, and face frames may eventually have visible cracking around the joint area, and cabinet colors may darken or lighten over time. These conditions are considered a normal occurrence and are not included or covered by this limited liability warranty. A glazed finish by character is an uneven finish. Some edges and profiles will have heavier hang up than others and glazing may vary cabinet to cabinet, door to drawer and item to item. This may result in overall color variations but is not considered a defect. UV light, Sunlight, smoke, household cleaners, and other environmental conditions may also affect the color and integrity of the Product's finish or appearance over time. These variations are considered to be the nature of the material in relation to their environmental exposure and are not considered defects in material or workmanship and are not covered under this Limited Warranty.

- Mitered door joints in particular are likely to react to conditions of their environment. Gaps that may develop in door joints due to conditions of their environment are not included or covered by this limited liability warranty. This limited liability warranty does not cover or apply to hairline cracks of cabinetry; hairline cracks are unavoidable in wood cabinets given the nature of the material. Every species and grade of solid wood behaves in such a way as to eventually result in hairline cracks.

- Wood is wood and expansion and contraction still happen year after year as it compensates and adjusts to ever changing atmospheric humidity and temperature conditions. Observing shrink, expansion on center panels of doors is very common. It will return to its natural position within couple months once it has adjusted to seasonal changes. For the same reason, all door warpage greater than ¼" will be warranted. Please remove all doors and check them on a flat surface for the above stated warpage before requesting replacement.

- Warranty Performance. J&K periodically updates and makes changes to its product line and specifications. If a warranty claim is filed during the warranty period against obsolete or changed product and repair is not possible, J&K will, at its sole option, repair or replace the part under warranty with a new part of the same style or with a similar style currently offered and does not include or cover any other costs, including but not limited to any costs of service, labor, shipment, transportation, removal or installation related to the repair or replacement. J&K is not responsible for a replacement product that may not match the installed product exactly.  If a manufacturing defect occurs within this limited liability warranty's terms and conditions and J&K determines to replace the defective cabinet or component or part thereof, J&K will ship the replacement cabinet or component or part thereof to the original consumer purchaser via ground shipper or freight carrier, at J&K's sole discretion.

## DISCLAIMER OF OTHER WARRANTIES:

THIS WRITING IS THE COMPLETE AND EXCLUSIVE REMEDY FOR ANY ORIGINAL CONSUMER PURCHASER.
FOR BREACH OF WARRANTY. THE STATEMENT OF THE EXPRESS WARRANTIES PROVIDED HEREIN IS IN LIEU OF ANY AND ALL OTHER EXPRESS AND/OR STATUTORY WARRANTIES, TO THE EXTENT PROVIDED BY LAW.  IN NO EVENT SHALL J&K BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES TO ANY ORIGINAL CONSUMER PURCHASER OR A THIRD PARTY, INCLUDING BUT NOT LIMITED TO DAMAGES ARISING FROM PERSONAL INJURY, LOST PROFITS, LOSS OF BUSINESS OPPORTUNITIES, LOSS OF PROPERTY, ECONOMIC LOSS, STATUTORY OR EXEMPLARY DAMAGES, WHETHER FROM NEGLIGENCE, WARRANTY, STRICT LIABILITY OR OTHERWISE. ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, COURSE OF DEALING AND USAGE OF TRADE, AND ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE EXCLUDED AND DISCLAIMED, EXCEPTING ONLY THOSE EXPRESS WARRANTIES SPECIFICALLY SET FORTH IN THIS LIMITED LIABILITY WARRANTY. IN NO EVENT SHALL J&K BE LIABLE FOR ANY INDIRECT DAMAGES RESULTING FROM INSTALLATION, USE OR FAILURE OF ITS PRODUCTS. THIS LIMITED LIABILITY WARRANTY IS J&K'S SOLE WARRANTY, AND NO DEALER, DISTRIBUTOR OR AGENT POSSESSES ANY AUTHORITY WHATSOEVER TO MODIFY OR ENLARGE THIS WARRANTY IN ANYWAY. SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

## CLAIMS:

To file a warranty claim, first contact your locally authorized J&K builder, dealer or distributor who installed and sold the J&K product. They will obtain the information necessary to make a claim decision and forward such information in writing to J&K. A dated sales receipt as proof of purchase is also required to obtain benefits from these warranties. At its discretion, J&K may require an inspection of the allegedly defective product before repairing or replacing. If you have difficulty obtaining assistance, please write at the address noted at bottom of page, with an explanation of the defect. Please do not send the allegedly defective cabinet or component or part thereof to J&K, unless and until expressly requested to do so by our claims department. Pictures of cabinets or components or parts thereof may be requested by J&K. Making a fraudulent claim may be a crime, and violators may be prosecuted. J&K reserves the right to make all final decisions regarding warranty claims.

This limited liability warranty and its enforcement, and any and all claims or disputes arising out of, relating to or in connection with this limited liability warranty or the making, performance or interpretation of this limited liability warranty, shall be (1) governed by and construed exclusively in accordance with the laws of the State of New York, without regard to the conflicts of law or choice of law principles of the State of New York or any other jurisdiction (including but not limited to U.S. federal law) that would require the application of the law of any other jurisdiction, and (2) brought only in the United States District Court for the District of Southern District of New York or the New York Supreme Court, Nassau County.



Barcode:3894973-01 A-570-106 INV - Investigation -

# MAINTENANCE & CARE

## General Information:

- As a general rule, keep all cabinet surfaces dry at all times.
- Cabinet surfaces shall be dried immediately with a soft, lint-free cotton cloth.
- Avoid using a dish cloth or sponge. Avoid ammonia-based cleaners and soaps with dye. Harsh detergent residues may harm cabinet finishes.
- As with all wood products, quick temperature changes and excessive moisture can be harmful to the cabinet finish and
- overall cabinet stability.

## Basic Cleaning:

- To remove dust after installation and for initial cleaning, use a soft, lint-free cotton cloth to wipe down all exterior and interior surfaces.
- For regular basic cleaning, use a soft, lint-free cotton cloth dampened with a mild detergent or soap and warm water. For best results, use a blotting action rather than a wiping motion, when cleaning.
- Wipe up food spills and water spots immediately with a lint-free cotton cloth, so moisture is not absorbed into the cabinet surfaces.

## Cleaning of Glass Door Inserts:

- Use a household glass cleaner with a soft, clean cloth.
- Apply the glass cleaner directly to the cleaning cloth rather than on the glass or mirror.
- Avoid excess glass cleaner running into the cabinet joints.
- Ammonia should never be used in full strength.

## Basic Care & Things to Avoid:

- When in doubt of a cleaner's suitability, DO NOT USE.
- Never use scouring pads, steel wool, wire brushes or powdered cleansers.
- Never leave a cloth moistened with cleaner on any cabinet surface for any length of time.
- Check the areas around the sink and dishwasher to make sure that water and detergents do not dry on the cabinet surfaces.
- Avoid draping wet or damp dish towels over doors of the base cabinets.
- Do not attach towel racks to the interior of cabinet doors.
- Avoid placing small kitchen appliances where the heat or steam is directed onto cabinet surfaces.
- Do not leave printed materials (newspapers, magazines, etc.) on the cabinet surfaces, as the printing can bleed into the cabinet finish.

Barcode:3894973-01 A-570-106 INV - Investigation  -



Barcode:3894973-01 A-570-106 INV - Investigation   -

Barcode:3894973-01 A-570-106 INV - Investigation  -

# EXHIBIT 3

APPX086357

Barcode:3894973-01 A-570-106 INV - Investigation  -



# J&K CABINETRY

2018

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086358

APPX086359

Barcode:3894973-01 A-570-106 INV - Investigation  -





Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086361

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Table of Contents

Our History ................................................................................................ 5

Our Product ................................................................................................ 6

Kitchen Cabinets Gallery ............................................................................ 7

Bathroom Cabinets Gallery ........................................................................ 34

Hidden Expressions ..................................................................................... 40

Decors ......................................................................................................... 42

Door Styles & Finishes ............................................................................... 44

Environmental Commitment ....................................................................... 47

Standard Features ....................................................................................... 48

Finest Finishes ............................................................................................ 49

Warranty & Terms ...................................................................................... 50

3

2018 CATALOG |

Barcode:3894973-01 A-570-106 INV - Investigation  -





Barcode:3894973-01 A-570-106 INV - Investigation -

# Our History

Our first J&K Cabinetry company was originated in Atlanta, Georgia back in 2003, with our goal of providing to our customers the highest quality of cabinets available at an affordable price. We are also the manufacturer of our own J&K's distinctive and stylish line of kitchen cabinets and bathroom vanities. For the past 15 years, J&K Cabinetry has been expanding steadily from the East Coast, through the Mid-way North and South, and to the West Coast of the U.S., as well as in Canada, with 17 warehouse and showroom locations.

J&K Cabinetry continues to grow today as a unique cabinet brand as well as a leading cabinet wholesaler in the nation. One of the keys to our continued success lies in our commitment to continually improve both the product quality and the design style with our customers' needs in mind. For we believe that customer satisfaction is both the reward and the guarantee of our successful accomplishment of our company goal. And we value our growth and continued improvements just as our customers do.

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086364

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Our Product

As the manufacturer and direct wholesaler of our own J&K's cabinetry products, we are able to eliminate the middle-person cost and significantly reduce the product price for our customers, without losing our product quality and value. All of our cabinets and vanities are constructed with 100% solid wood doors and frames, 1/2" to 5/8"-thick plywood boxes, soft-close metal door hinges, full-extension drawer with soft-close metal glides, and more. We insist in making all these "optional upgrades" a necessary standard, efficiently improving the overall quality, functionality, durability, and value of our products, without adding the burden of higher price for our customers.

All J&K's cabinets are Ready-To-Assemble (RTA), Ready-To-Build (RTB), and Semi-Customizable to our customers' specific needs. As our own manufacturer, we are able to maintain quality control and strict supervision over our cabinet production process through high-tech machinery and detailed hand-crafting. We also believe that by focusing on the excellent craftsmanship and unique designs of our cabinet styles, we can offer a more personalized experience for our customers and homeowners when they choose their dream kitchens with us.



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: APP

APPX086365

Barcode:3894973-01 A-570-106 INV - Investigation  -



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086366

Barcode:3894973-01 A-570-106 INV - Investigation  -



2018 CATALOG | 8

Barcode:3894973-01 A-570-106 INV - Investigation  -



# Your kitchen — a personal space in the comfort of your home.

Door Style / Contemporary
Finished Color / White (S8)

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Page 98 of 260

APPX086368

Barcode:3894973-01 A-570-106 INV - Investigation  -

Door Style / Contemporary
Finished Color / White



Barcode:3894973-01 A-570-106 INV - Investigation   -



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086370

Barcode:3894973-01 A-570-106 INV - Investigation -



Filed by: sberganio@cbadesigngroup.com, Filed Date: 9/27/19 1:44 PM, Submission Status: Approved

APPX086371

Barcode:3894973-01 A-570-106 INV - Investigation  -

Door Style / Contemporary
Finished Color / Java Coffee (S1)



13

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/18 4:44 PM, Submission Status - Approved

APPX086372

Barcode:3894973-01 A-570-106 INV - Investigation  -



2018 CATALOG

14

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Your kitchen —
# the heart of
# your home
# envisioned
# in new styles.

Door Style / Transitional
Finished Color / Pearl Glazed (H9)

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/17/18 4:48 PM, Submission Status: Approved

APPX086374

Barcode:3894973-01 A-570-106 INV - Investigation  -



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086375

Barcode:3894973-01 A-570-106 INV - Investigation  -

Door Style / Transitional
Finished Color / Pearl Glazed

Double-stacked Crown Moldings



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086376

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Your kitchen — designed to be multi-functional and stylish.

Door Style / Transitional
Finished Color / Greige (K3)







Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086378

Barcode:3894973-01 A-570-106 INV - Investigation -

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086379

Barcode:3894973-01 A-570-106 INV - Investigation  -

Door Style / Transitional
Finished Color / Greige

APPX086380

Barcode:3894973-01 A-570-106 INV - Investigation -

Door Style / Transitional
Finished Color / Espresso (K8)





Filed By: theightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086581



APPX086382

Barcode:3894973-01 A-570-106 INV - Investigation   -

Door Style / Traditional
Finished Color / Creme Glazed (A7)





24

2018 CATALOG

APPX086383

Barcode:3894973-01 A-570-106 INV - Investigation   -



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086384



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086385

Barcode:3894973-01 A-570-106 INV - Investigation -



Door Style / Traditional
Finished Color / Cinnamon Glazed (CO66)

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086386

Barcode:3894973-01 A-570-106 INV - Investigation  -

Door Style / Traditional
Finished Color / Mocha Glazed (K10)



Filed By: tbrighthill@wileyrein.com, Filed Date: 3/27/19 4:44 PM, Submission Status: Approved

APPX086387

Barcode:3894973-01 A-570-106 INV - Investigation  -



29

2018 CATALOG |

Filed By: tbrightbill@wileyrein.com, Filed Date: 1/27/19 4:44 PM, Submission Status: Approved

APPX086388

Barcode:3994973-01 A-570-106 INV - Investigation   -



APPX086389

Barcode:3894973-01 A-570-106 INV - Investigation -



Door Style / Traditional
Finished Color / Mahogany (J5)

Filed By: tina.potuto@vein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086390

Barcode:3894973-01 A-570-106 INV - Investigation  -

Door Style / Traditional
Finished Color / Chocolate
Glazed (M01)



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086391

Barcode:3894973-01 A-570-106 INV - Investigation  -



Barcode:3894973-01 A-570-106 INV - Investigation  -



2018 CATALOG | 34

APPX086393

Barcode:3894973-01 A-570-106 INV - Investigation  -



# Welcome
## To Your Dream Bath

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086394

Barcode:3894973-01 A-570-106 INV - Investigation -

Vanity Cabinet Style / Transitional
Finished Color / Greige (K3)

36

APPX086395

Barcode:3894973-01 A-570-106 INV - Investigation   -



Barcode:3894973-01 A-570-106 INV - Investigation  -



2018 CATALOG

38

APPX086397

Barcode:3894973-01 A-570-106 INV - Investigation   -



Vanity Cabinet Style / Traditional
Finished Color / Cinnamon
Glazed (CO66)

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086398

Barcode:3894973-01 A-570-106 INV - Investigation -



Hidden

# Expressions



APPX086399

Barcode:3894975-01 A-570-106 INV - Investigation -



**3**

**4**

Quality, Innovation, and Passion is the key to creating our products. We offer an endless array of kitchen accessories to help you create your dream kitchen design. Custom built-ins show character and personality of your life and are a perfect form of functionality. Let us spruce up your kitchen and make it a more functional space with beauty and durability.

| 1 - 2 | Lazy Susans |
| 3 | Glass Rack |
| 4 | Wine Rack |
| 5 | Spice Pull-Outs |
| 6 | Roll-Out Tray |
| 7 | Sink Base Tilt-Out Tray |
| 8 | Waste Bin Pull-Out |



**7**

**8**

41

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086400

Barcode:3894973-01 A-570-106 INV - Investigation




1 - 2    Moldings & Fluted Fillers
3 - 4    Large Corbels
5 - 6    Small Corbels
7 - 8    Onlay Decors



Barcode:3894973-01 A-570-106 INV - Investigation -



# Decors





Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086402

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Contemporary



**S8**
White



**S5**
Castle Grey



**S2**
Almond



**S1**
Java Coffee

**NOTE** Product photography in this catalog have been reproduced as accurately as printing technologies permit. We strongly recommend you view an actual product sample for best color and wood grain representation.

44

2018 CATALOG |

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Transitional



**H9**
Pearl Glazed



**H2 — Coming soon**
Saharah



**H8**
Hazel



**H3**
Chestnut



**K3**
Greige



**K8**
Espresso

**NOTE** Not all door styles and finishes are available at each location.
Please check with your local J&K CABINETRY showroom for current availability.

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved
Page 134 of 260
APPX086404

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Traditional



**A7**
Creme Glazed



**CO66**
Cinnamon Glazed



**J5**
Mahogany



**K10**
Mocha Glazed



**M01**
Chocolate Glazed

46

2018 CATALOG |

**NOTE** Product photography in this catalog have been reproduced as accurately as printing technologies permit. We strongly recommend you view an actual product sample for best color and wood grain representation.

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Our Environmental Commitment

We believe that healthy environment is a backbone to the happy lives of our customers and our society. In addition to our continued effort to improve our product qualities and values, J&K Cabinetry is committed to manufacturing and selling environmental-friendly and healthy products for our customers. Our cabinets' hardwood-plywood materials are compliant with "California 93120 Phase 2" (CARB 2) standard for formaldehyde. And we use "AkzoNobel" — a leading global company in sustainable paints and coatings—for our cabinet finishes.




Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086406

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Standard Features

All J&K's cabinets and vanities are superiorly constructed with 100% solid wood and proudly come with the following STANDARD features:

1. **Door Panel:** 3/4"-thick solid wood; full overlay door.

2. **Door Hinge:** 6-way adjustable; soft-close metal; hidden Euro-style.

3. **Adjustable Shelf:** 5/8"-thick cabinet-grade plywood; clear coat finish on all sides and edges; with metal shelf rests.

4. **Drawer:** 1/2"-thick solid wood on all sides; full extension pull-out; dovetail construction.

5. **Drawer Glide:** full extension pull-out; soft-close metal; concealed under-mount.

6. **Plywood Box:** 1/2" to 5/8"-thick cabinet-grade plywood; clear coat finish on interior sides; matching color finish on exterior sides.

7. **Metal Bracket:** corner bracket reinforcements in base cabinets for maximum stability.

8. **Door Bumper:** promote quiet-closing and reduce slamming for maximum durability.

**NOTE** As we continue to improve our product qualities and designs, the actual functionality of Door Hinge and Drawer Glide may vary slightly between existing and newest product styles and finishes. Please check with your local J&K Cabinetry showroom or dealer for most current updates.

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Finest Furniture Finishes

Our J&K's solid wood cabinet finishes are processed through the following excellent craftsmanship details:

1. The finest solid maple wood is sanded until smooth and vacuumed.

2. An equalizer stain is applied to balance the base color of the wood.

3. A toner is applied to establish color uniformity.

4. A deep penetrating stain is applied to reveal the hidden beauty of the natural grain.

5. All stained surfaces are hand-rubbed and wiped of excess stain, and then slowly air-dried.

6. A wood sealer is applied, penetrating all exposed wood surfaces for uniform protection.

7. All surfaces are hand-sanded, providing a smooth, consistent surface.

8. A glaze is applied by hand (if applicable).

9. A color consistency examination is performed with additional touch-up if needed.

10. A final protective top coat is applied, maximizing resistance to scuffing, moisture, fading and most household chemicals.



49

2018 CATALOG |

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086408

Barcode:3894973-01 A-570-106 INV - Investigation  -

# Warranty and Terms



## J&K CABINETRY WARRANTY

J&K CABINETRY, including its direct wholesaler and/or retailer companies or corporations, business entities or groups (collectively as "J&K CABINETRY"), hereby warrants that all cabinets sold by J&K CABINETRY are free from unnatural defects in material and workmanship under normal use and proper care for the period of ONE (1) YEAR from the date of original purchase. This Warranty is expressly and exclusively limited to the repair or replacement of the defective product(s) at the sole discretion of J&K CABINETRY, and does not cover the labor cost for the repair or replacement, removal or transportation of the defective product(s). This Limited Warranty applies only to the Original Purchaser and is not transferable to any other party.

This Limited Warranty becomes void if any of the cabinet product(s) and part(s) is altered by the Original Purchaser for any reason from its original form. This Limited Warranty does not cover product damages resulting from, but not limited to, 1) improper packaging, shipping, handling, or storage; 2) self-modification or customization, self-assembling or disassembling, or self-installation or demolition; and/or 3) negligence, misuse, abuse, or lack of proper inspection, maintenance, or care of the cabinet product(s) and part(s) by the Original Purchaser.

## NATURAL OCCURRENCES AND ENVIRONMENTAL EXPOSURES NOT COVERED

By purchasing J&K CABINETRY's solid wood product(s), the Original Purchaser fully acknowledges that all solid wood materials by nature will experience certain degree of expansion and con¬traction, warping and cracking, and/or color variations; these are due to environmental factors including, but not limited to, 1) temperature and humidity changes; 2) excessive heat or cold and dryness or moisture, or the lack thereof; 3) prolonged exposure to any and all types of light sources, smokes, and household chemicals; 4) the aging of natural solid wood; and/or 5) normal wear and tear, accidents, or acts of God. These are considered natural occurrences and not defects in mate¬rial and workmanship, and are not covered under this Limited Warranty.

## UPDATED PRODUCT LINES

J&K CABINETRY periodically updates and makes changes to its product lines and specifications without notice. If a warranty claim is filed against obsolete or changed product(s) and repair is not possible, J&K CABINETRY reserves the right to replace the product(s) under warranty with the most similar item currently available. J&K CABINETRY cannot guarantee the finished color and style of the replacement product(s) will match exactly with the finished color and style of the defective product(s).

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086409

Barcode:3894973-01 A-570-106 INV - Investigation  -

## DISCLAIMERS, ADDITIONAL LIMITATIONS, AND INDEMNIFICATIONS

J&K CABINETRY makes no other warranties, and there are no implied warranties, other than those set forth herein, and/or extending beyond the terms of this Limited Warranty. In no event will J&K CABINETRY be liable for incidental or consequential damages to the Original Purchaser or to any party, including but not limited to damages arising from personal injury, lost profits, loss of business opportunity, loss of property, economic losses, or statutory or exemplary damages, whether due to negligence, warranty, strict liability or otherwise. Additionally, the Original Purchaser agrees to indemnify, defend, and hold J&K CABINETRY harmless from and against any and all claims, lawsuits, civil penalties, losses, or expenses (including attorney's fees) by any party, or entity, or class, arising from but not limited to the acts or omissions, the negligence or fault of the Original Purchaser, or its employees, representatives, agents, or contractors. This indemnification of J&K CABINETRY applies irrespective of any negligence by J&K CABINETRY, except to the extent determined in legal proceedings that the loss resulted from the sole fault or negligence of J&K CABINETRY.

## SUBMITTING A CLAIM

To submit a warranty claim on defective product(s), the Original Purchaser must contact the local J&K CABINETRY showroom or dealer from which the product(s) was originally purchased. The Original Purchaser must present a copy of the original Invoice for the product(s) as Proof of Purchase. If a return of the defective product(s) is required, the Original Purchaser must obtain a proper return authorization before sending any product back to the local J&K CABINETRY showroom or dealer. J&K CABINETRY is not responsible for any product sent by the Original Purchaser without prior approval or authorization. J&K CABINETRY, at its sole discretion, may require an inspection of the allegedly defective product(s) before a repair or replacement is issued under this Limited Warranty.

APPX086410

Barcode:3894973-01 A-570-106 INV - Investigation  -

APPX086411



APPX086412



# JANDKCABINETRY.COM

Copyrights © 2018 J&K International Group, LLC. All Rights Reserved.

APPX086413

Barcode:3894973-01 A-570-106 INV - Investigation  -

# EXHIBIT 4A

APPX086414

**J&K CABINETRY**  Barcode:3894973-02 A-570-106 INV - Investigation  -



2013

Filed By: sbcightbill@clayscin.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086415



PUBLIC VERSION

Barcode:3894973-02 A-570-106 INV - Investigation -

# About Us

## About Us
As the number one leading quality-cabinet distributors in North America, J&K Cabinetry directly imports products from our own manufacturing facility in mainland China. This enables us to stock semi-custom-all-wood cabinets in our 130,000 square foot warehouses and showrooms located in [                                        ]. Our distribution centers are located across the United States in [                                        ]. Our products are then sold through a network of distributors, retailers, builders, contractors, designers and home centers. J&K Cabinetry has been expanding steadily for the past 10 years across the US, as well as globally.

## About Our Product
Our semi-custom-all-wood/ stock kitchen and bath cabinet lines are widely recognized for distinction in cabinet style, construction, and finishes. Our constructed standard sizes come in 3" increments. Unlike other cabinet manufactures, such as KraftMaid, Diamond, etc. in the US, J&K cabinets have been standardized to include the utmost in quality. Our cabinets offer all-wood, full overlay door, cabinet-graded plywood construction (absolutely no particle board), heavy duty under-mounted soft-close drawer glides, dovetail drawer boxes, hidden hinges and much more. Not only are our cabinets semi-customable with easy assembly, we offer an extensive selection of standardized specialty cabinets and accessory items. These items can then be integrated with our cabinets to make every kitchen unique and beautiful.

## About Our Price
Since J&K Cabinetry products come directly from our own factory, it allows us to eliminate the middle-man cost. J&K Cabinetry can then offer the customer the highest industry grade cabinets at the Manufacture Suggested Retail Price (MSRP) which is a third the cost of the lowest grade cabinets offered by manufactures such as KraftMaid, Diamond, etc.
J&K Cabinetry offers price levels to our clients with or without our cabinet display showroom. We also offer extensive price levels to accommodate multi-unit projects, such as tract-homes, condos, apartments, etc.

## Our Clients
Even though our major clients are retailers, builders, contractors, designers and home centers, we encourage homeowners to visit the J&K Cabinetry retailers in their area. If you are unable to find retailers near you, you may want to locate a retailer you trust and ask that they apply for an account with J&K Cabinetry. (J&K can be found anywhere in the US and Canada)

## Our Services
J&K Cabinets can be purchased off-the-shelf. If you are unable to find the size you need, your request can be filled within days. Our products are shipped via popular freight logistic companies (FedEx, UPS, etc). We also offer assembly and semi-custom services or modification applications of cabinets to your own specifications.
Our overseas manufacturing facility offers Original Equipment Manufacturer (OEM) as an option for those interested in developing their own unique design, box construction, or place an order to their own specifications, logo or trademark. (A minimum purchase order is required.)

Barcode: 3894973-02 A-570-106 INV - Investigation  -

# TABLE OF CONTENTS

Kitchens 2

Bathroom Vanities 9

Specialty Cabinets & Semi-Custom Cabinets 14

Accessories & Moldings 15

Cabinet Door Styles 16

Construction 17

Finish 18

Planning Your Dream Kitchen 19

Getting Started 20

Maintenance  21

Specifications  22

Warranty  37





Barcode:3894973-02 A-570-106 INV - Investigation  -



Mocha stained maple wood with a rich dark glaze in a transitional style

Mocha Maple Glazed

Barcode:3894973-02 A-570-106 INV - Investigation -



Chocolate stained maple wood with a rich dark glaze in a transitional style

Chocolate Maple Glazed

Barcode:3894973-02 A-570-106 INV - Investigation  -



Crème colored maple wood with a bold bronze glaze in a transitional style

Crème Maple Glazed

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086420



Cinnamon stained maple wood with dark glaze in a transitional style

Cinnamon Maple Glazed

Barcode:3894973-02 A-570-106 INV - Investigation  -



Red mahogany stained maple wood in a refined transitional style

Mahogany Maple

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086422

Barcode:3894973-02 A-570-106 INV - Investigation -



Espresso stained maple wood in a sleek contemporary style

Espresso Maple

Barcode:3894973-02 A-570-106 INV - Investigation  -



Java stained maple wood in a contemporary shaker style



Craftsman Java Maple NEW

Barcode:3894973-02 A-570-106 INV - Investigation

# BATHROOM VANITIES



Crème Maple Glazed Vanity

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086425

# BATHROOM VANITIES



Crème Maple Glazed Vanity

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

10

APPX086426

Barcode:3894973-02 A-570-106 INV - Investigation -

BATHROOM VANITIES



Espresso Maple Vanity

# BATHROOM VANITIES

Chocolate Maple Glazed Vanity

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086428

BATHROOM VANITIES



Mocha Maple Glazed Vanity

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086429

# SPECIALTY CABINETS & SEMI-CUSTOM CABINETS

Barcode: 3895873 - 062.0 - 371306 - INT - Investigation











14

# ACCESSORIES & MOLDINGS











# CABINET DOOR STYLES & FINISHES

Barcode: 3814901102 A-570-106 INV - Investigation -




Mocha Maple Glazed (K10)



Espresso Maple (K8)



Craftsman Java Maple (S1)

*NEW*



Mahogany Maple (J5)



Chocolate Maple Glazed (M01)



Crème Maple Glazed (A7)



Cinnamon Maple Glazed (CO66)

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086432

# DOOR SUPERIOR CONSTRUCTION

Barcode: 3849478-02 A-570-106 INV - Investigation  -



1  Full overlay door panel, 3/4" thick door panel

2  6-way adjustable European hidden metal hinges (Shown optional soft-close hinges)

3  Adjustable, 3/4 shelf, 5/8" thick cabinet-grade plywood, metal shelf rests

4  Dovetail drawer, 1/2" thick solid wood sides

5  Full extension, under-mounted, soft-close, steel concealed drawer glides

6  1/2" thick cabinet grade plywood box

7  Metal bracket reinforcements for base cabinets

APPX086433

Barcode:3894973-02 A-570-106 INV - Investigation

# THE FINEST FURNITURE FINISHES

1. The finest maple wood is sanded until smooth and vacuumed.

2. An equalizer stain is applied to balance the base color of the wood.

3. A toner is then applied to establish color uniformity.

4. A deep penetrating stain is then applied to reveal the hidden beauty of the natural grain.

5. All stained surfaces are then hand-rubbed and wiped of excess stain, and then slowly air-dried.

6. A wood sealer is then applied, penetrating all exposed wood surfaces for uniform protection.

7. All surfaces are then hand-sanded, providing a smooth, consistent surface.

8. A glaze is applied by hand (if applicable).

9. A color consistency examination is performed with additional touch-up if needed.

10. A final protective top coat is applied, maximizing resistance to scuffing, moisture, fading and most household chemicals.

## THE BEAUTY OF REAL WOOD CABINETRY

Maple is a strong, fine-grained wood that is mainly off-white in color, although it may contain light hues of yellow-brown or pink. It may also contain natural imperfections which add character and uniqueness to the wood.

## WOOD CHARACTERISTICS


Arce

Burl Grain


Open Knots


Bird's Eye


Mineral Streaks


Heartwood

18

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086434

# PLANNING YOUR DREAM KITCHEN

Barcode 889667B-02A-44444-0000HV - Investigation -

## 5 Standard Kitchen Layouts

The very first step of the planning process is to determine the possible layout of your kitchen. There are five basic kitchen shapes: Straight, Galley, L-shape, U-shape, and G-shape.

## The Traditional Work Triangle

The work triangle is the standard configuration use by professionals for designing efficient kitchens. The three magical points are the areas between the refrigerator, range and sink.



The STRAIGHT configuration is good for smaller homes and apartments. It offers the least efficient kitchen plan but maximizes space.



The GALLEY configuration is efficient for up to two cooks in the kitchen. However, the shape allows little extra room for crossing household traffic.



The L-SHAPE kitchen is the most common kitchen layout in American households. It provides a good amount of continuous counter space, and the magic work triangle is executed perfectly.
This design can also allow for the inclusion of a dinining area or island.



The G-SHAPE kitchen is a step up from the U-Shape kitchen. This design adds extra cabinet and counter space. In order to avoid feeling too closed-in, this layout works best when two of the walls are open to adjacent spaces.



The U-SHAPE kitchen is ideal for the solo cook. The continous countertop and cabinets surround the cook on three sides, putting everything within reach.

APPX086435

# GETTING STARTED

## MEASURE YOUR SPACE

Accurate measurements are essential to planning your new kitchen. With these measurements your designer will be able to help you create your dream kitchen.

### FLOOR PLAN

Using the measuring procedure illustrated, carefully prepare a simple floor plan of your existing kitchen. Your completed floor plan should resemble the diagram shown. Make sure you show the exact locations of doors, windows, range hood vents, gas lines, water lines, drains, switches, outlets, light fixtures, and vents. Double-check all measurements.

### MEASURING PROCEDURE

Using a tape measure and graph paper, measure as outlined.

### Horizontal Measurement

1. Measure from wall to wall at 36" height.
2. Measure from corner to window or door opening.
3. Measure across opening from trim edge to trim edge.
4. Measure from edge of trim to far wall. Compare sum of #2, #3 and #4 measurements to step #1.
5. Mark exact locations of water line, drain, gas line and electrical outlets/switches on drawing.
6. Measure from wall to wall above window and compare to #1.

### Vertical Measurement

7. Measure from floor to window sill.
8. Measure from window sill to top of window.
9. Measure from top of window to ceiling.
10. Measure from floor to ceiling - Compare to sum of #7, #8 and #9.

### APPLIANCE / FIXTURE INFORMATION

Show desired locations of appliances on drawing. It is very important to indicate natural gas locations, 220 volt outlets, and wall mounted telephone locations (T) and cable TV outlet location (CTV).



SAMPLE LAYOUT

| | Type | Size (WxHxD) | Hinge Position (L/R) |
|---|---|---|---|
| Refridgerator | | | |
| Range | | | |
| Cooktop | | | |
| Dishwasher | | | |
| Sink | | | |
| Disposal | | | |
| Trash Compactor | | | |
| Other | | | |



WALL A          WALL B

# MAINTENANCE
Barcode:3894973-02 A-570-106 INV - Investigation -

## GENERAL INFORMATION

Keep cabinet surfaces dry.

Quick temperature changes and excessive moisture can be harmful to the cabinet finish and overall cabinet stability.

## INITIAL CLEANING AFTER INSTALLATION

To remove dust, use a soft, lint-free cotton cloth to wipe down all exterior and interior surfaces.

## BASIC CLEANING

Use a soft, lint-free cotton cloth dampened with a mild detergent or soap, and warm water.

For best results, use a "blotting" action rather than a wiping motion when cleaning.

Dry surfaces immediately with a soft, lint-free cotton cloth.

Avoid using a dish cloth or sponge - Harsh detergent residues may harm finishes.

Avoid ammonia-based cleaners and soaps with dye.

## WIPE SPILLS PROMPTLY

Food spills and grease will come off more easily if they are removed promptly.

Wipe up spills and water spots immediately with a lint-free cotton cloth so moisture is not absorbed into the cabinetry.

Check the areas around the sink and dishwasher to make sure that water and detergents do not dry on the cabinet surface.

Do not leave printed materials (newspapers, magazines, etc.) on the cabinet surface. The printing ink can bleed into the cabinet finish.

## AVOID EXCESSIVE MOISTURE & HEAT

Avoid draping wet or damp dish towels over doors of the base cabinets.

Do not attach towel racks to the interior of cabinet doors.

Use trays under potted plants to catch excess water.

Avoid placing small kitchen appliances where the heat or steam is directed onto cabinet surfaces.

Always protect wood surfaces by using hot pads under hot items.

## AVOID ABRASIVES

Never use scouring pads, steel wool, wire brushes or powdered cleaners.

Do not allow oven cleaner to touch any part of the cabinet.

Avoid sliding objects across the cabinet surface.

Be careful with knives and other sharp objects that can damage the cabinet surface.

When in doubt of a cleaner's suitability, don't use it. Harsh cleaners and detergents may scratch and penetrate the surface, allowing food or moisture to enter and cause deterioration of the finish. Never leave a cloth moistened with cleaners on a cabinet surface for any length of time.

## CARE AND CLEANING OF GLASS DOOR INSERTS

Use a household glass cleaner with a soft, clean cloth.

Apply the glass cleaner directly to a cloth rather than the glass or mirror.

Avoid excess glass cleaner running into cabinet joints.

Ammonia should never be used full strength.





Note: Style and product availability may vary slightly from those shown in this catalog due to material availability and/or improvements to our designs. Specifications are subject to change without notice. Finger joint technique is used in some of our molding and decorative items, which is acceptable in industry standard. Natural variations of wood make the possibility of the finger joints visible. There is ⅛" to ½" deviation on all vanity cabinets. Check with your sales representative for product specification before planning your projects.



**BASE CABINET WITH ONE DOOR, ONE DRAWER**

| | ITEM CODE | A7 | CO#6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Drawer: *6", 7" H<br>1 Door: 22", 23" H<br>1 Adj. Shelf<br><br>*Only A7/K10/K8/M01 Upper Drawers | B09 | A | A | A | A | A | A | A | A* | A* | 37.0 |
| | B12 | A | A | A | A | A | A | A | A* | A* | 44.0 |
| | B15 | A | A | A | A | A | A | A | A* | A* | 46.0 |
| | B18 | A | A | A | A | A | A | A | A* | A* | 51.0 |
| | B21 | A | A | A | A | A | A | A | A* | A* | 53.0 |

**BASE CABINET WITH TWO DOORS, ONE DRAWER**

| | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Drawer: *6", 7" H<br>2 Doors: 22", 23" H<br>1 Adj. Shelf<br><br>*Only A7/K10/K8/M01 Upper Drawers | B24 | A | A | A | A | A | A | A | A* | A* | 57.0 |
| | B27 | A | A | A | A | A | A | A | A* | A* | 59.0 |

**BASE CABINET WITH TWO DOORS, TWO DRAWERS**

| | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 Drawers: *6", 7" H<br>2 Doors: 22", 23" H<br>1 Adj. Shelf<br><br>*Only A7/K10/K8/M01 Upper Drawers | B30 | A | A | A | A | A | A | A | A* | A* | 75.0 |
| | B33 | A | A | A | A | A | A | A | A* | A* | 79.0 |
| | B36 | A | A | A | A | A | A | A | A* | A* | 82.5 |
| | B42 | A | A | A | A | A | A | A | A* | A* | 92.0 |

**BASE CABINET WITH THREE DRAWERS**

| | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Small Drawer: *6", 7" H<br>2 Large Drawers: 11", 11-1/2" H<br><br>*Only A7/K10/K8/M01 Drawers | DB12-3 | A | A | A | A | A | A | A | A* | A* | 64.0 |
| | DB15-3 | A | A | A | A | A | A | A | A* | A* | 68.0 |
| | DB18-3 | A | A | A | A | A | A | A | A* | A* | 74.0 |
| | DB21-3 | A | A | A | A | A | A | A | A* | A* | 79.0 |
| | DB24-3 | A | A | A | A | A | A | A | A* | A* | 84.0 |
| | DB30-3 | A | A | A | A | A | A | A | A* | A* | 95.0 |
| | DB36-3 | A | A | A | A | A | A | A | A* | A* | 101.0 |

**BASE CORNER DIAGONAL CABINET**

| | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Full Door: 14-3/4" x 29-1/4"<br>2 Wooden Round Susans | CBD36 | A | A | A | A | A | A | A | A* | A* | 77.0 |

**BASE SUPER SUSAN CABINET**

| | ITEM CODE | A7 | CO#6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 Doors: 10-1/2" W x 29-1/4" H<br><br>2 Wooden Kidney Shaped Susans | LS3612 | A | A | A | A | A | A | A | A* | A* | 77.0 |

**BASE DIAGONAL SINK CABINET**

| | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Full Door: 14-3/4" x 29-1/4"<br>No Shelf | CSB36 | A | A | A | A | A | A | A | A* | A* | 77.0 |

**BASE BLIND CORNER CABINET (L/R)**

| | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Drawer: *6", 7" H<br>1 Door: 22", 23" H<br>1 Adj. Shelf<br><br>Note: Min. 3" Pull Off of the Wall When Install<br><br>Specify Left or Right When Ordering Assembly<br><br>*Only A7/K10/K8/M01 Upper Drawers | BBC42 | A | A | A | A | A | A | A | A* | A* | 72.0 |

**SINK BASE CABINET**

| | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 Dummy Drawers: *6", 7" H<br>2 Doors: 22", 23" H<br>No Shelf<br><br>*Only A7/K10/K8/M01 Upper Drawers | SB30 | A | A | A | A | A | A | A | A* | A* | 44.0 |
| | SB33 | A | A | A | A | A | A | A | A* | A* | 46.0 |
| | SB36 | A | A | A | A | A | A | A | A* | A* | 47.0 |
| | SB42 | A | A | A | A | A | A | A | A* | A* | 48.5 |

**SPICE PULL - OUT BASE CABINET**

| | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Door: 8-3/4" W x 29-1/4" H<br>3 Wooden Shelves<br><br>Standard Ball Bearing Side Glide | SP09 | A | A | A | A | A | A | A | A* | A* | 38.5 |

QUALITY, SERVICES & PRICES are guaranteed ONLY at Grand JKC, Grand JK Corp & Grand Jr Cabinetry Inc. Visit www.GrandJK.com for more information. We ship to the USA, Canada & beyond.

22

A: Available to Order    A*: Available to Order Soon    N: Not Available    C: Call First

APPX086438

Note: Style and product availability may vary slightly from those shown in this catalog due to material availability and/or improvements to our designs. Specifications are subject to change without notice. Finger joint technique is used in some of our molding and decorative items, which is acceptable in industry standard. Natural variations of wood make the possibility of the finger joints visible. There is ¼" to ½" deviation on all vanity cabinets. Check with your sales representative for product specification before planning your projects.



### SPICE DRAWER BASE CABINET

| ITEM CODE | | A7 / CO 86 | J5 | K10 | K8 | M01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| BWRC6 | 5 Square Drawers: 5-3/4" x 5-1/2" No Glides | A | A | A | A | A | A | A* | A* | 57.0 |

### WASTE BIN BASE CABINET

| ITEM CODE | | A7 / CO 86 | J5 | K10 | K8 | M01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| BWBK18-2 | 1 Drawer: "6", 7" H 1 Door: 22", 23" H 1 Bin Cut-out  Note: Trash Bin Not Included  *Only A7/K10/K8/M01 Upper Drawers | A | A | A | A | A | A | A* | A* | 57.0 |

### BASE END CORNER CABINET

| ITEM CODE | | A7 / CO 86 | J5 | K10 | K8 | M01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| BEC24 | 2 Dummy Drawers: "6", 7" H 2 Doors: 17-3/4" W x 22", 23" H 1 Adj. Shelf  *Only A7/K10/K8/M01 Upper Drawers | A | A | A | A | A | A | A* | A* | 42.0 |

### WALL CABINET - 12" H

| ITEM CODE | | A7 / CO 86 | J5 | K10 | K8 | M01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| W3012 | 2 Doors No Shelf | A | A | A | A | A | A | A* | A* | 19.0 |
| W3612 | | A | A | A | A | A | A | A* | A* | 22.0 |

### WALL CABINET - 15" H

| ITEM CODE | | A7 / CO 86 | J5 | K10 | K8 | M01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| W3015 | 2 Doors No Shelf | A | A | A | A | A | A | A* | A* | 22.0 |
| W3615 | | A | A | A | A | A | A | A* | A* | 24.0 |

### WALL CABINET - 18" H

| ITEM | | CO 86 | J5 | K10 | K8 | M01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| W3018 | 2 Doors No Shelf | A | A | A | A | A | A | A* | A* | 24.0 |
| W3618 | | A | A | A | A | A | A | A* | A* | 26.0 |

### WALL CABINET - 21" H

| ITEM | | CO 86 | J5 | K10 | K8 | M01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| W3021 | 2 Doors No Shelf | A | A | A | A | A | A | A* | A* | 26.0 |
| W3621 | | A | A | A | A | A | A | A* | A* | 28.0 |

### WALL CABINET - 24" H

| ITEM | | CO 86 | J5 | K10 | K8 | M01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| W3024 | 2 Doors No Shelf 1 Adj. Shelf | A | A | A | A | A | A | A* | A* | 31.0 |
| W3624 | | A | A | A | A | A | A | A* | A* | 38.0 |

### WALL CABINET - 30" H

| ITEM | | CO 86 | J5 | K10 | K8 | M01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| W0930 | 9" - 21" W: 1 Door 24" - 42" W: 2 Doors 2 Adj. Shelves | A | A | A | A | A | A | A* | A* | 18.0 |
| W1230 | | A | A | A | A | A | A | A* | A* | 22.0 |
| W1530 | | A | A | A | A | A | A | A* | A* | 24.0 |
| W1830 | | A | A | A | A | A | A | A* | A* | 26.0 |
| W2130 | | A | A | A | A | A | A | A* | A* | 31.0 |
| W2430 | | A | A | A | A | A | A | A* | A* | 34.0 |
| W2730 | | A | A | A | A | A | A | A* | A* | 38.5 |
| W3030 | | A | A | A | A | A | A | A* | A* | 41.0 |
| W3330 | | A | A | A | A | A | A | A* | A* | 44.0 |
| W3630 | | A | A | A | A | A | A | A* | A* | 47.0 |
| W4230 | | A | A | A | A | A | A | A* | A* | 51.0 |

A: Available to Order   A*: Available to Order Soon   N: Not Available   C: Call First

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086439

## WALL CABINET - 36" H



9" – 21" W: 1 Door
24" – 42" W: 2 Doors
2 Adj. Shelves

| ITEM CODE | A/ | CO BG | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| W0936 | A | A | A | A | A | A | A | A* | A* | 21.0 |
| W1236 | A | A | A | A | A | A | A | A* | A* | 24.0 |
| W1536 | A | A | A | A | A | A | A | A* | A* | 27.5 |
| W1836 | A | A | A | A | A | A | A | A* | A* | 31.0 |
| W2136 | A | A | A | A | A | A | A | A* | A* | 33.0 |
| W2436 | A | A | A | A | A | A | A | A* | A* | 38.5 |
| W2736 | A | A | A | A | A | A | A | A* | A* | 43.0 |
| W3036 | A | A | A | A | A | A | A | A* | A* | 46.0 |
| W3336 | A | A | A | A | A | A | A | A* | A* | 48.0 |
| W3636 | A | A | A | A | A | A | A | A* | A* | 51.0 |
| W4236 | A | A | A | A | A | A | A | A* | A* | 55.0 |

## WALL CABINET - 42" H



9" – 21" W: 1 Door
24" – 42" W: 2 Doors
3 Adj. Shelves

| ITEM CODE | A/ | CO BG | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| W0942 | A | A | A | A | A | A | A | A* | A* | 23.0 |
| W1242 | A | A | A | A | A | A | A | A* | A* | 29.0 |
| W1542 | A | A | A | A | A | A | A | A* | A* | 32.0 |
| W1842 | A | A | A | A | A | A | A | A* | A* | 36.0 |
| W2142 | A | A | A | A | A | A | A | A* | A* | 41.0 |
| W2442 | A | A | A | A | A | A | A | A* | A* | 46.0 |
| W2742 | A | A | A | A | A | A | A | A* | A* | 51.0 |
| W3042 | A | A | A | A | A | A | A | A* | A* | 55.0 |
| W3342 | A | A | A | A | A | A | A | A* | A* | 58.0 |
| W3642 | A | A | A | A | A | A | A | A* | A* | 60.0 |
| W4242 | A | A | A | A | A | A | A | A* | A* | 64.0 |

## WALL CABINET - GLASS INSERT - READY - 30" H



15" – 18" W: 1 Door
24" – 30" W: 2 Doors
2 Adj. Shelves Not Included

Matching Color Interior

Note: Glass Shelf & Insert
Not Included

| ITEM CODE | A/ | CO BG | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| WM1530H | A | A | A | A | A | A | A | A* | A* | 18.0 |
| WM1830H | A | A | A | A | A | A | A | A* | A* | 20.0 |
| WM2430H | A | A | A | A | A | A | A | A* | A* | 28.0 |
| WM2730H | A | A | A | A | A | A | A | A* | A* | 29.0 |
| WM3030H | A | A | A | A | A | A | A | A* | A* | 30.0 |

## WALL CABINET - GLASS INSERT - READY - 36" H



15" – 18" W: 1 Door
24" – 30" W: 2 Doors
2 Adj. Shelves Not Included

Matching Color Interior

Note: Glass Shelf & Insert
Not Included

| ITEM CODE | A/ | CO BG | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| WM1536H | A | A | A | A | A | A | A | A* | A* | 21.0 |
| WM1836H | A | A | A | A | A | A | A | A* | A* | 23.3 |
| WM2436H | A | A | A | A | A | A | A | A* | A* | 32.0 |
| WM2736H | A | A | A | A | A | A | A | A* | A* | 33.0 |
| WM3036H | A | A | A | A | A | A | A | A* | A* | 34.0 |

## WALL CABINET - GLASS INSERT - READY - 42" H



15" – 18" W: 1 Door
24" – 30" W: 2 Doors
Adj. Shelves Not Included

Matching Color Interior

Note: Glass Shelf & Insert
Not Included

| ITEM CODE | A/ | CO BG | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| WM1542H | A | A | A | A | A | A | A | A* | A* | 23.0 |
| WM1842H | A | A | A | A | A | A | A | A* | A* | 24.0 |
| WM2442H | A | A | A | A | A | A | A | A* | A* | 32.0 |
| WM2742H | A | A | A | A | A | A | A | A* | A* | 38.0 |
| WM3042H | A | A | A | A | A | A | A | A* | A* | 40.0 |

## REFRIGERATOR WALL CABINET



27" Deep
2 Doors
12" – 21" High: No Shelf
24" High: 1 Adj. Shelf

| ITEM CODE | A/ | CO BG | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| W361227 | A | A | A | A | A | A | A | A* | A* | 36.0 |
| W361527 | A | A | A | A | A | A | A | A* | A* | 40.0 |
| W361827 | A | A | A | A | A | A | A | A* | A* | 44.0 |
| W362127 | A | A | A | A | A | A | A | A* | A* | 46.0 |
| W362427 | A | A | A | A | A | A | A | A* | A* | 53.0 |

A: Available to Order    A*: Available to Order Soon    N: Not Available    C: Call First

We ship to the USA, Canada & beyond. QUALITY, SERVICES & PRICES are guaranteed ONLY at Grand JKC, Grand JK Corp & Grand JK Cabinetry Inc. Visit www.GrandJK.com for more information.

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Note: Style and product availability may vary slightly from those shown in this catalog due to material availability and/or improvements to our designs. Specifications are subject to change without notice. Finger joint technique is used in some of our molding and decorative items, which is acceptable in industry standard. Natural variations of wood make the possibility of the finger joints visible. There is ¼" to ½" deviation on all vanity cabinets. Check with your sales representative for product specification before planning your projects.

## WALL BLIND CORNER CABINET - L/R



| ITEM CODE | A | CO 66 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Door | | | | | | | | | | |
| 30" & 36" H: 2 Adj. Shelves | | | | | | | | | | |
| 42" H: 3 Adj. Shelves | | | | | | | | | | |
| WCC3030 | C | C | C | C | C | C | C | C | C | 38.0 |
| WCC3036 | C | C | C | C | C | C | C | C | C | 43.0 |
| WCC3042 | C | C | C | C | C | C | C | C | C | 51.0 |

## WALL DIAGONAL CABINET



| ITEM CODE | A | CO 66 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Door: 14-3/4" W | | | | | | | | | | |
| 30" & 36" High: 2 Adj. shelves | | | | | | | | | | |
| 42" High: 3 Adj. Shelves | | | | | | | | | | |
| WDC2430 | A | A | A | A | A | A | A* | A* | | 48.0 |
| WDC2436 | A | A | A | A | A | A | A* | A* | | 51.0 |
| WDC2442 | A | A | A | A | A | A | A* | A* | | 66.0 |
| "27" Wide x 15" Deep | | | | | | | | | | |
| WDC273615* | A | A | A | A | A | A | A* | A* | | 66.0 |
| WDC274215* | A | A | A | A | A | A | A* | A* | | 76.0 |

## WALL DIAGONAL CABINET - GLASS INSERT READY



| ITEM CODE | A | CO 66 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Door: 14-3/4" W | | | | | | | | | | |
| 30" & 36" High: 2 Adj. Shelves | | | | | | | | | | |
| 42" High: 3 Adj. Shelves | | | | | | | | | | |
| WMDC2430H | A | A | A | A | A | A | A* | A* | | 35.0 |
| WMDC2436H | A | A | A | A | A | A | A* | A* | | 39.0 |
| WMDC2442H | A | A | A | A | A | A | A* | A* | | 44.0 |
| Matching Color Interior | | | | | | | | | | |
| "27" Wide x 15" Deep | | | | | | | | | | |
| WMDC273615H* | A | A | A | A | A | A | A* | A* | | 48.0 |
| WMDC274215H* | A | A | A | A | A | A | A* | A* | | 57.0 |
| Note: Glass Shelf & Glass Insert Not Included | | | | | | | | | | |

## APPLIANCE GARAGE / COUNTER TAMBOUR



| ITEM CODE | A | CO 66 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| All-wood | | | | | | | | | | |
| Standard 18" High | | | | | | | | | | |
| 24", 27" Deep | | | | | | | | | | |
| AG2418 | A | A | A | A | A | A | A* | A* | | 23.0 |
| AG2718 | A | A | A | A | A | A | A* | A* | | 25.0 |
| Use it with Wall Diagonal Cab. | | | | | | | | | | |

## WALL END CORNER CABINET



| ITEM CODE | A | CO 66 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 Doors: 8-3/4" W | | | | | | | | | | |
| 30" & 36" High: 2 Adj. Shelves | | | | | | | | | | |
| 42" High: 3 Adj. Shelves | | | | | | | | | | |
| WEC1230 | A | A | A | A | A | A | A* | A* | | 20.0 |
| WEC1236 | A | A | A | A | A | A | A* | A* | | 23.0 |
| WEC1242 | A | A | A | A | A | A | A* | A* | | 26.0 |

## MICROWAVE CABINET - OPEN SHELF



| ITEM CODE | A | CO 66 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 Doors | | | | | | | | | | |
| 1 Open Shelf | | | | | | | | | | |
| WBL2730 | A | A | A | A | A | A | A* | A* | | 35.0 |
| WBL2736 | A | A | A | A | A | A | A* | A* | | 38.0 |
| WBL2742 | A | A | A | A | A | A | A* | A* | | 43.0 |
| Opening: 24" W x 16" H | | | | | | | | | | |
| Shelf Overhang: 5-1/4" | | | | | | | | | | |

## BASE END OPEN SHELF (L/R)



| ITEM CODE | A | CO 66 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 9" W x 24" D | | | | | | | | | | |
| 3 Fixed Shelves | | | | | | | | | | |
| Matching Color Finish | | | | | | | | | | |
| BES09 | A | A | A | A | A | A | A* | A* | | 36.0 |
| Specify Left or Right When Ordering Assembly | | | | | | | | | | |

## WALL END OPEN SHELF (L/R)



| ITEM CODE | A | CO 66 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 9" W x 12" D | | | | | | | | | | |
| 30" & 36" High: 3 Fixed Shelves | | | | | | | | | | |
| WES0930 | A | A | A | A | A | A | A* | A* | | 15.0 |
| WES0936 | A | A | A | A | A | A | A* | A* | | 17.0 |
| WES0942 | A | A | A | A | A | A | A* | A* | | 20.0 |
| 42" High: 4 Fixed Shelves | | | | | | | | | | |
| Matching Color Finish | | | | | | | | | | |
| Note: Curved Molding Not Available | | | | | | | | | | |

## WALL SPICE DRAWER CABINET



| ITEM CODE | A | CO 66 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 Drawers: 5-3/4" x 5-1/2" | | | | | | | | | | |
| 30" Wide | | | | | | | | | | |
| 6" High | | | | | | | | | | |
| 12" Deep | | | | | | | | | | |
| WWRC6 | A | A | A | A | A | A | A* | A* | | 30.0 |

A: Available to Order   A*: Available to Order Soon   N: Not Available   C: Call First

APPX086441



### DECOR WOODEN HOOD

| | ITEM CODE | A7 | CO66 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 36", 42" Wide<br>24" High<br>9" Deep | RHE3624 | C | C | C | C | C | C | C | C | C | 28.5 |
| | RHE4224 | C | C | C | C | C | C | C | C | C | 36.0 |

### DECOR WOOD HEARTH HOOD PART

| | ITEM CODE | A7 | CO66 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9" Wide<br>42" High<br>21" Deep<br><br>On Countertop<br><br>RHS094221 | RHS094221 | C | C | C | C | C | C | C | C | C | 31.0 |

### DECOR WOOD HEARTH HOOD PART

| | ITEM CODE | A7 | CO66 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9" Wide<br>49" High<br>21" Deep<br><br>On the Wall<br><br>RHS094921 | RHS094921 | C | C | C | C | C | C | C | C | C | 41.0 |

### WINE RACK

| | ITEM CODE | A7 | CO66 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 15" High<br><br>30WR: 10 Compartments<br>36WR: 14 Compartments<br><br>Matching Color Finish | 30WR | A | A | A | A | A | A | A | A* | A* | 19.0 |
| | 36WR | A | A | A | A | A | A | A | A* | A* | 22.0 |

### GLASS RACK

| | ITEM CODE | A7 | CO66 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| All-wood<br>1-1/2" High<br><br>Matching Color Finish | 30GR | A | A | A | A | A | A | A | A* | A* | 4.5 |
| | 36GR | A | A | A | A | A | A | A | A* | A* | 5.0 |

### PLATE RACK CABINET

| | ITEM CODE | A7 | CO66 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| All-wood<br>18" H with 15" H Opening<br><br>WCD3018: 10 Plates<br>WCD3618: 12 Plates<br><br>Matching Color Finish | WCD3018 | A | A | A | A | A | A | A | A* | A* | 19.0 |
| | WCD3618 | A | A | A | A | A | A | A | A* | A* | 22.0 |

### KNEE DRAWER

| | ITEM CODE | A7 | CO66 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21" Deep<br>1 Drawer: *6", 7" H<br><br>7-1/2" H: A7,M01,K10,K8<br>8-1/2" H: CO66,J5,S1,S2,S8<br><br>*Only A7/K10/K8/M01 Upper<br>Drawers | FD24 | A | A | A | A | A | A | A | A* | A* | 25.0 |
| | FD30 | A | A | A | A | A | A | A | A* | A* | 27.0 |

### ROLL-OUT TRAY - STANDARD SIDE GLIDE

| | ITEM CODE | A7 | CO66 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Clear Coat Finish<br>3-3/4" H<br><br>Ball Bearing Side Glides<br>Included, for 24" Deep<br>Cabinets Only<br><br>Note: 26" Glide Sold Seperately<br>for 27" Deep Pantry | RD18 | A | A | A | A | A | A | A | A* | A* | 10.0 |
| | RD21 | A | A | A | A | A | A | A | A* | A* | 11.0 |
| | RD24 | A | A | A | A | A | A | A | A* | A* | 11.0 |
| | RD27 | A | A | A | A | A | A | A | A* | A* | 11.0 |
| | RD30 | A | A | A | A | A | A | A | A* | A* | 13.0 |
| | RD33 | A | A | A | A | A | A | A | A* | A* | 15.0 |
| | RD36 | A | A | A | A | A | A | A | A* | A* | 16.0 |

### PANTRY CABINET-WITH ROLL-OUT TRAYS

| | ITEM CODE | A7 | CO66 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 18" Wide: 2 Doors<br>24" & 30" Wide: 4 Doors<br><br>3 Roll Outs with Ball Bearing Glide<br><br>1 Shelf in the Bottom Box<br><br>84" & 90" H: 2 Adj. Shelves in the Top Box<br><br>96" H: 3 Adj. Shelves in the Top Box<br><br>Upper Door: 30", 36", 42" H<br>Lower Door: 49-1/2" H | WP188427 | A | A | A | A | A | A | A | A* | A* | 120.0 |
| | WP189027 | A | A | A | A | A | A | A | A* | A* | 135.0 |
| | WP189627 | A | A | A | A | A | A | A | A* | A* | 143.0 |
| | WP248427 | A | A | A | A | A | A | A | A* | A* | 150.0 |
| | WP249027 | A | A | A | A | A | A | A | A* | A* | 156.0 |
| | WP249627 | A | A | A | A | A | A | A | A* | A* | 170.0 |
| | WP308427 | A | A | A | A | A | A | A | A* | A* | 178.0 |
| | WP309027 | A | A | A | A | A | A | A | A* | A* | 185.0 |
| | WP309627 | A | A | A | A | A | A | A | A* | A* | 192.0 |

Please visit www.GrandJK.com for more information. QUALITY, SERVICES & PRICES are guaranteed ONLY at Grand JKC, Grand JK Corp & Grand JK Cabinetry Inc. Visit www.GrandJK.com for more information. We ship to the USA, Canada & beyond.

A: Available to Order   A*: Available to Order Soon   N: Not Available   C: Call Firs

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Note: Style and product availability may vary slightly from those shown in this catalog due to material availability and/or improvements to our designs. Specifications are subject to change without notice. Finger joint technique is used in some of our molding and decorative items, which is acceptable in industry standard. Natural variations of wood make the possibility of the finger joints visible. There is ¼" to ½" deviation on all vanity cabinets. Check with your sales representative for product specification before planning your projects.



## OVEN CABINET-SINGLE

| | | ITEM CODE | CO.86 | J.5 | K.10 | K.6 | M.01 | S.1 | S.2 | S.8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 27" Deep 2 Drawers: 6" H & 11-1/2" H 2 Doors: 12",18", 24" H | OC308427 | C | C | C | C | C | C | C | C | 144.0 |
| | | OC309027 | A | A | A | A | A | A | A* | A* | 152.0 |
| | | OC309627 | A | A | A | A | A | A | A* | A* | 152.0 |
| | 30" Cab. Opening: 28-1/2" W 33" Cab. Opening: 31-1/2" W | OC338427 | C | C | C | C | C | C | C | C | 157.0 |
| | | OC339027 | A | A | A | A | A | A | A* | A* | 160.0 |
| | Opening Height: 38.5" - 49.5" Upper Rail: 9-1/4" H | OC339627 | A | A | A | A | A | A | A* | A* | 185.0 |
| | Note: Trim or Add to Fit. | | | | | | | | | | |

## OVEN CABINET-DOUBLE

| | | ITEM CODE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 27" Deep 1 Drawer: 7-1/2" H 2 Doors: 12", 18", 24" H | OC308427WO | C | C | C | C | C | C | C | C | 124.0 |
| | | OC309027WO | A | A | A | A | A | A | A* | A* | 130.0 |
| | | OC309627WO | A | A | A | A | A | A | A* | A* | 143.0 |
| | 30" Cab. Opening: 28-1/2" W 33" Cab. Opening: 31-1/2" W | OC338427WO | C | C | C | C | C | C | C | C | 132.0 |
| | | OC339027WO | A | A | A | A | A | A | A* | A* | 141.0 |
| | Opening Height: 43-1/2" - 59-1/4" | OC339627WO | A | A | A | A | A | A | A* | A* | 145.0 |
| | Upper Rail: 8" H Lower Rail: 8" H | | | | | | | | | | |
| | Note: Trim or Add to Fit. | | | | | | | | | | |

## DUMMY DOOR - FULL DOOR

| | | ITEM CODE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12", 15", 21" 24" Wide | W1230F | A | A | A | A | A | A | A* | A* | 5.0 |
| | | W1236F | A | A | A | A | A | A | A* | A* | 6.0 |
| | 28", 30", 36", 42" High | W1242F | A | A | A | A | A | A | A* | A* | 7.0 |
| | 3/4" Thick | W1530F | C | C | C | C | C | C | C | C | 5.5 |
| | | W1536F | C | C | C | C | C | C | C | C | 6.5 |
| | *21" W x 28" H (Vanity) | W1542F | C | C | C | C | C | C | C | C | 7.5 |
| | Predrilled Hinge Holes | | | | | | | | | | |
| | | BDD21* | C | C | C | C | C | C | C | C | 6.0 |
| | | BDD24 | A | A | A | A | A | A | A* | A* | 7.0 |

## DUMMY DOOR & DRAWER

| | | ITEM CODE | CO.86 | J.5 | K.10 | K.6 | M.01 | S.1 | S.2 | S.8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 30" High 1-1/2" Thick | B18F | A | A | A | A | A | A | A* | A* | 11.0 |
| | | B30F | A | A | A | A | A | A | A* | A* | 18.0 |
| | B18F: 1 DR, 1 DRW B30F: 2 DR, 2 DRW B36F: 2 DR, 2 DRW | B36F | A | A | A | A | A | A | A* | A* | 24.0 |

## DUMMY DOOR - TALL DOORS

| | | ITEM CODE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4 Dumy Doors 84" 90", 96" High 24", 27" Deep 1-1/2" Thick | BDD8424 | C | C | C | C | C | C | C | C | 46.0 |
| | | BDD9024 | C | C | C | C | C | C | C | C | 51.0 |
| | | BDD9624 | C | C | C | C | C | C | C | C | 54.0 |
| | Use It for Tall Cabinets | BDD8427 | C | C | C | C | C | C | C | C | 48.0 |
| | | BDD9027 | C | C | C | C | C | C | C | C | 52.0 |
| | Predrilled Hinge Holes | BDD9627 | C | C | C | C | C | C | C | C | 55.0 |

## DISHWASHER RETURN PANEL

| | | ITEM CODE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3" Return Filler 23-1/4" Deep Panel 34-1/2" High | DWR (L/R) | A | A | A | A | A | A | A* | A* | 9.5 |
| | Note: Not Assembled | | | | | | | | | | |

## REFRIGERATOR RETURN PANEL

| | | ITEM CODE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3" Return Filler 26-1/4" Deep Panel 84", 90", 96" High | RRP8427 | A | A | A | A | A | A | A* | A* | 26.0 |
| | | RRP9027 | A | A | A | A | A | A | A* | A* | 28.4 |
| | Optional 1-1/2" Return Filler Sold Seperately (Item Code: Frame8 or CM34-1 1/2) | RRP9627 | A | A | A | A | A | A | A* | A* | 30.0 |
| | Note: Not Assembled | | | | | | | | | | |

## FINISHED SKIN PANEL

| | | ITEM CODE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1/4" Thick 36" Wide 96" High | BP3696 | A | A | A | A | A | A | A* | A* | 13.2 |
| | | BP9636 | A | A | A | A | A | A | A* | A* | 13.2 |
| | BP3696: Short Grain BP9636: Long Grain | | | | | | | | | | |

A: Available to Order    A*: Available to Order Soon    N: Not Available    C: Call First

barcode13e0d1ab 873eb965-0-106  INV - Investigation  -

## WALL FILLER BOX



| | ITEM CODE | | | | | | | | | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3" Wide 15" Deep 30", 36", 42" High | DER30F | C | C | C | C | C | C | C | C | 18.0 |
| | DER36F | C | C | C | C | C | C | C | C | 24.0 |
| | DER42F | C | C | C | C | C | C | C | C | 30.0 |

## WALL FILLER



| | ITEM CODE | | | | | | | | | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| All-wood 3", 6,12" Wide 30", 36", 42" High  Matching Finish on One Side | WF330 | A | A | A | A | A | A | A* | A* | 1.5 |
| | WF336 | A | A | A | A | A | A | A* | A* | 2.0 |
| | WF342 | A | A | A | A | A | A | A* | A* | 2.5 |
| | WF630 | A | A | A | A | A | A | A* | A* | 2.0 |
| | WF636 | A | A | A | A | A | A | A* | A* | 3.5 |
| | WF642 | A | A | A | A | A | A | A* | A* | 4.5 |
| | WF1236 | A | A | A | A | A | A | A* | A* | 7.0 |

## BASE FILLER



| | ITEM CODE | | | | | | | | | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| All-wood 3" or 6" Filler  Toe-Kick Attached | BF3 | A | A | A | A | A | A | A* | A* | 2.5 |
| | BF6 | A | A | A | A | A | A | A* | A* | 5.0 |

## TOE KICK



| | ITEM CODE | | | | | | | | | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 4-1/2" Wide 1/4" Thick 96" Long | TK8 | A | A | A | A | A | A | A* | A* | 0.8 |

## SCRIBE MOLDING



| | ITEM CODE | | | | | | | | | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/4" Wide 1/4" Thick 96" Long | SM8 | A | A | A | A | A | A | A* | A* | 0.5 |

## OUTSIDE CORNER MOLDING



| | ITEM CODE | CO#6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/4" Deep 3/4" Wide 1/4" Thick 96" Long | OCM8 | A | A | A | A | A | A | A* | A* | 0.7 |

## QUARTER ROUND MOLDING



| | ITEM CODE | CO#6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/4" Deep 3/4" Wide 120" Long | QRM10 | A | A | A | A | A | A | A* | A* | 2.0 |

## FACE FRAME DADO-FILLER



| | ITEM CODE | CO#6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 1-1/2" Wide 3/4" Thick 96" - 120" Long  Note: Good for Ref. Panel & Semi-Custom Cabinet | CM34-1/2 | A | A | A | A | A | A | A* | A* | 2.5 |

## TALL FILLER



| | ITEM CODE | CO#6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3", 6" Wide 3/4" Thick 120" Long | CM34-3 | A | A | A | A | A | A | A* | A* | 5.0 |
| | CM34-6 | A | A | A | A | A | A | A* | A* | 10.0 |

## COVE MOLDING



| | ITEM CODE | CO#6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| Standing Height: 2-1/2" Standing Depth: 3/4" 120" Long | ST10 | A | A | A | A | A | A | A* | A* | 9.5 |

## COVE MOLDING - WITH BASE - SMALL



| | ITEM CODE | CO#6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|---|
| Standing Height: 2-1/4" Standing Depth: 3-7/8" 120" Long | AST10 3-1/4 | A | A | A | A | A | A | A* | A* | 10.0 |

QUALITY, SERVICES & PRICES are guaranteed ONLY at Grand JKC, Grand JK Corp & Grand JK® Cabinetry Inc. Visit www.GrandJK.com for more information. We ship to the USA, Canada & beyond.

28

A: Available to Order    A*: Available to Order Soon    N: Not Available    C: Call First

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086444

Note: Style and product availability may vary slightly from those shown in this catalog due to material availability and/or improvements to our designs. Specifications are subject to change without notice. Finger joint technique is used in some of our molding and decorative items, which is acceptable in industry standard. Natural variations of wood make the possibility of the finger joints visible. There is ¼" to ½" deviation on all vanity cabinets. Check with your sales representative for product specification before planning your projects.

## COVE MODING - WITH BASE - LARGE

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| AST10 5-1/4 | A | A | A | A | A | A | A* | A* | 12.0 |

Standing Height: 3-3/4"
Standing Depth: 4"
120" Long

## CROWN MOLDING

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| CM10 | A | A | A | A | A | A | N | N | 9.5 |

Standing Height: 2-1/8"
Standing Depth: 1-3/4"
120" Long

## CROWN MOLDING - WITH BASE - SMALL

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| ACM10 3-1/4 | A | A | A | A | A | A | N | N | 10.0 |

Standing Height: 2-1/4"
Standing Depth: 3-7/8"
120" Long

## CROWN MOLDING - WITH BASE - LARGE

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| ACM10 5-1/4 | A | A | A | A | A | A | N | N | 12.0 |

Standing Height: 3-1/4"
Standing Depth: 5-1/4"
120" Long

## CROWN DENTIL MOLDING - WITH BASE - SMALL

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| CCM10-B | A | A | A | A | A | A | N | N | 11.0 |

Standing Height: 3"
Standing Depth: 3-1/4"
120" Long

## CROWN DENTIL MOLDING - WITH BASE - LARGE

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| CCM10-A | A | A | A | A | A | A | N | N | 13.0 |

Standing Height: 4"
Standing Depth: 4"
120" Long

## DENTIL MOLDING

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| WDM10 | A | A | A | A | A | N | N | N | 4.5 |

2-1/4" Wide
3/4" Thick
120" Long

## OGEE MOLDING

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| OGM10 | A | A | A | A | A | A | A* | A* | 5.5 |

3" Wide
3/4" Thick
120" Long

## BASE MOLDING

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| BM10 | A | A | A | A | A | A | A* | A* | 4.5 |

4" Wide
3/4" Thick
120" Long

## LIGHT RAIL MOLDING

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| TLR10-A | A | A | A | A | A | A | A* | A* | 10.0 |

1-1/2" Wide
2-1/4" Deep
120" Long

## CHAIR RAIL MOLDING - 1/2

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| CR10 | A | A | A | A | A | A | A* | A* | 2.0 |

1-1/8" Wide
3/4" Thick
120" Long

## CHAIR RAIL MODING

| ITEM CODE | CO-de | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|
| FSM10 | A | A | A | A | A | A | A* | A* | 4.0 |

1-5/8" Wide
3/4" Thick
120" Long

A: Available to Order   A*: Available to Order Soon   N: Not Available   C: Call First

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086445

29

## FLUTED FILLER

3" Wide
3/4" Thick
96" Long

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| PCVFF3 | A | A | A | A | A | A | A | A* | 4.0 |

## FLUTED BLOCK

Plinth - BB3*4: 3" W x 4" H
Rosette - FB3*3: 3" W x 3" H

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| BB3*4 | A | A | A | A | A | A | A | A* | 0.5 |
| FB3*3 | A | A | A | A | A | A | A | A* | 0.5 |

## FRIEZE VALANCE

4-1/2" Wide
3/4" Thick
30" - 60" Long

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| V30A | A | A | A | A | A | N | N | N | 1.5 |
| V36A | A | A | A | A | A | N | N | N | 2.0 |
| V42A | A | A | A | A | A | N | N | N | 2.5 |
| V54A | A | A | A | A | A | N | N | N | 4.0 |
| V60A | A | A | A | A | A | N | N | N | 5.0 |

## ARCH VALANCE

4-1/2" Wide
3/4" Thick
30"-60" Long

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| V30B | A | A | A | A | A | A | A | A* | 1.5 |
| V36B | A | A | A | A | A | A | A | A* | 2.0 |
| V42B | A | A | A | A | A | A | A | A* | 2.5 |
| V48B | A | A | A | A | A | A | A | A* | 3.0 |
| V54B | A | A | A | A | A | A | A | A* | 4.0 |
| V60B | A | A | A | A | A | A | A | A* | 5.0 |

## ARCH VALANCE - FLATE LARGE

36" - 60" Wide
8" High
3/4" Thick

*15" High
Note: Finger Joined  Panel

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| RPV36 | C | C | C | C | C | C | C | C | 4.0 |
| RPV42 | C | C | C | C | C | C | C | C | 5.0 |
| RPV54 | C | C | C | C | C | C | C | C | 8.0 |
| RPV60* | C | C | C | C | C | C | C | C | 10.0 |

## ARCH VALANCE- LARGE RAISED PANEL

36"-60" Long
3/4" Thick
15" High
4-1/2" Arch Height

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| RPV36-A | A | A | N | A | N | A | A | A* | 6.0 |
| RPV42-A | A | A | N | A | N | A | A | A* | 7.0 |
| RPV54-A | A | A | N | A | N | A | A | A* | 10.0 |
| RPV60-A | A | A | N | A | N | A | A | A* | 12.0 |

## CORBEL - TALL GRAPE

3-1/2" Wide
3" Deep
18" High

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| OLC318 | A | A | A | A | A | A | N | N | 2.0 |

## CORBEL - TALL ACANTHUS

3-1/2" Wide
3" Deep
18" High

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| RLC318 | A | A | A | A | A | A | N | N | 2.0 |

## CORBEL - WIDE GRAPE

4-1/2" Wide
5" Deep
10" High

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| GC58 | A | A | A | A | A | A | N | N | 3.0 |

## CORBEL - WIDE ACANTHUS

4-1/2" Wide
5" Deep
10" High

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| RC58 | A | A | A | A | A | A | N | N | 3.0 |

## CORBEL - WIDE MISSION

4-1/2" Wide
5" Deep
10" High

| ITEM CODE | CO J6 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|
| SC58 | C | C | C | C | C | C | C | C | 3.0 |

Base Price list as of 2-10-106 *INV - Investigation -

QUALITY, SERVICES & PRICES are guaranteed ONLY at Grand JKC, Grand JK Corp & Grand JK Cabinetry Inc. Visit www.GrandJK.com for more information. We ship to the USA, Canada & beyond.

30

A: Available to Order   A*: Available to Order Soon   N: Not Available   C: Call First

APPX086446

Note: Style and product availability may vary slightly from those shown in this catalog due to material availability and/or improvements to our designs. Specifications are subject to change without notice. Finger joint technique is used in some of our molding and decorative items, which is acceptable in industry standard. Natural variations of wood make the possibility of the finger joints visible. There is ¼" to ½" deviation on all vanity cabinets. Check with your sales representative for product specification before planning your projects.

### CORBEL - NARROW ACANTHUS

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3-1/2" Wide, 8-1/4" Deep, 13" High | RC313 | A | A | A | A | A | A | N | N | 8.0 |

### CORBEL - LARGE ACANTHUS

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 5-1/2" Wide, 7" Deep, 30" High | RC530 | A | A | A | A | A | A | N | N | 27.0 |

### CORBEL - LARGE MISSION

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 5-1/8" Wide, 7" Deep, 30" High | SC530 | C | C | C | C | C | C | C | C | 27.0 |

### CORBEL - EXTRA LARGE ACANTHUS

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 6-1/4" Wide, 7-1/2" Deep, 34-1/2" High | CB34 1/2A | A | A | A | A | A | A | N | N | 29.0 |

### POST - FULL TRADITIONAL

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3" Wide, 3" Deep, 34-1/2" High | SP3X34 1/2 | A | A | A | A | A | A | A* | A* | 5.0 |

### POST - FULL ROPE

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3" Wide, 3" Deep, 34-1/2" High | RP34 1/2 | A | A | A | A | A | A | N | N | 5.0 |

### POST - SPLIT ROPE

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 2" Wide, 3/4" Thick, 18" - 42" High | RPS18 | A | A | A | A | A | A | N | N | 0.5 |
| | RPS24 | A | A | A | A | A | A | N | N | 1.0 |
| | RPS30 | A | A | A | A | A | A | N | N | 1.5 |
| | RPS36 | A | A | A | A | A | A | N | N | 1.8 |
| | RPS42 | A | A | A | A | A | A | N | N | 2.1 |

### ONLAY - GRAPE

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 20" Wide, 3/4" Thick, 4-1/2" High | GRPO | A | A | A | A | A | A | N | N | 1.0 |

### ONLAY - LEAF

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 20" Wide, 3/4" Thick, 4-1/2" High | RRPO | A | A | A | A | A | A | N | N | 1.0 |

### ONLAY - SMALL GRAPE ORNAMENT

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3" Wide, 4" High, 3/4" Thick | SGO | A | A | A | A | A | A | N | N | 0.5 |

### ONLAY - SMALL LEAF ORNAMENT

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 3" Wide, 4" High, 3/4" Thick | RGO | A | A | A | A | A | A | N | N | 0.5 |

### KEY STONE

| | ITEM CODE | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| Top 6" W & Bottom 4" W, 12" High, 3/4" Thick | CO12 | C | C | C | C | C | C | C | C | 1.0 |

A: Available to Order    A*: Available to Order Soon    N: Not Available    C: Call First



## GLASS SHELF - NOT TEMPERED

Use on WM****H Cab.

Note: Caution When Shipping

| ITEM CODE | CO-R6 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|
| GS-15 (WM1530/36/42H) | A | A | A | A | A | A | A* | A* | 6.0 |
| GS-18 (WM1830/36/42H) | A | A | A | A | A | A | A* | A* | 8.0 |
| GS-24 (WM2430/36/42H) | A | A | A | A | A | A | A* | A* | 8.5 |
| GS-27 (WM2730/36/42H) | A | A | A | A | A | A | A* | A* | 9.0 |
| GS-30 (WM3030/36/42H) |  |  |  |  |  |  |  |  |  |
| GS-WDC24*12 (WWDC2430/36/42H) | A | A | A | A | A | A | A* | A* | 10.0 |
| GS-WDC27*15 (WWDC2730/36/42H) | A | A | A | A | A | A | A* | A* | 12.0 |

## GLASS INSERT - NOT TEMPERED - GRID PATTERN

Use on WM****H Cab.

In Red (K): For K8 & K10 Cab.

Note: Caution When Shipping

*Two Separate Glass Inserts for WM24 & 27** Cab.

| ITEM CODE | CO-R6 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|
| GI-12/24*30 (WM1230/2430-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-12/24*30-K (WM1230/2430-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-12/24*36 (WM1236/2436-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-12/24*36-K (WM1236/2436-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-12/24*42 (WM1242/2442-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-12/24*42-K (WM1242/2442-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-15/30*30 (WM1530/3030-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-15/30*30-K (WM1530/3030-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-15/30*36 (WM1536/3036-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-15/30*36-K (WM1536/3036-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-15/30*42 (WM1542/3042-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-15/30*42-K (WM1542/3042-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-18*30 (WM1830-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-18*30-K (WM1830-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-18*36 (WM1836-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-18*36-K (WM1836-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-18*42 (WM1842-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-18*42-K (WM1842-01) | A | A | A | A | A | A | A | A* | 5.0 |
| GI-27*30 (WM2730-01)* | A | A | A | A | A | A | A | A* | 5.0 |
| GI-27*30-K (WM2730-01)* | A | A | A | A | A | A | A | A* | 5.0 |
| GI-27*36 (WM2736-01)* | A | A | A | A | A | A | A | A* | 5.0 |
| GI-27*36-K (WM2736-01)* | A | A | A | A | A | A | A | A* | 5.0 |
| GI-27*42 (WM2742-01)* | A | A | A | A | A | A | A | A* | 5.0 |
| GI-27*42-K (WM2742-01)* | A | A | A | A | A | A | A | A* | 5.0 |

## VANITY - BASE CABINET

33" High
21" Deep
2 Curved Doors: 27-3/4" H
No Shelf

| ITEM CODE | CO-R6 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|
| SVA24 | A | A | A | A | A | A | N | N | N | 35.0 |

## VANITY - BASE CABINET

33" High
21" Deep
2 Doors: 27-3/4" H
1 Shelf
Note: Not Cut for Plumbing

| ITEM CODE | CO-R6 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|
| SVA24P | A | A | A | A | A | A | A | A* | A* | 41.0 |

## VANITY - BASE CABINET

33" High
21" Deep
1 Drawer: "6" or 7" H
1 Door: 20" or 21-3/8" H
1 adj. shelf

*Only A7/K10/K8/M01 Upper Drawers

| ITEM CODE | CO-R6 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|
| SVA09P | A | A | A | A | A | A | A | A* | A* | 29.0 |
| SVA21P | A | A | A | A | A | A | A | A* | A* | 55.0 |

## VANITY - BASE CABINET

33" High
21" Deep

1 Small Drawer: "6" or 7" H
2 Large Drawer: 10-1/4" or 10-5/8" H

*Only A7/K10/K8/M01 Upper Drawers

| ITEM CODE | CO-R6 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|
| SVA09D | A | A | A | A | A | A | A | A* | A* | 42.0 |
| SVA12D | A | A | A | A | A | A | A | A* | A* | 50.0 |
| SVA15D | A | A | A | A | A | A | A | A* | A* | 58.0 |
| SVA18D | A | A | A | A | A | A | A | A* | A* | 63.0 |
| SVA21D | A | A | A | A | A | A | A | A* | A* | 68.0 |
| SVA24D | A | A | A | A | A | A | A | A* | A* | 73.0 |

## VANITY - SINK CABINET

33" High
21" Deep
1 Dummy Drawer: "6" or 7" H
2 Doors: 20" or 21-3/8" H
No Shelf

*Only A7/K10/K8/M01 Upper Drawers

| ITEM CODE | CO-R6 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT.LB |
|---|---|---|---|---|---|---|---|---|---|
| SVA2421 (FA2421) | C | C | C | C | C | C | C | C | C | 38.0 |
| FA3021 | A | A | A | A | A | A | A | A* | A* | 40.0 |

A: Available to Order   A*: Available to Order Soon   N: Not Available   C: Call First

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Note: Style and product availability may vary slightly from those shown in this catalog due to material availability and/or improvements to our designs. Specifications are subject to change without notice. Finger joint technique is used in some of our molding and decorative items, which is acceptable in industry standard. Natural variations of wood make the possibility of the finger joints visible. There is ¼" to ½" deviation on all vanity cabinets. Check with your sales representative for product specification before planning your projects.

## VANITY SINK CABINET COMBO

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 33" High / 21" Deep / 1 Dummy Drawer / 2 Drawers: 12" W / 1 Doors: 18" W x 20" or 21-3/8" H / No Shelf / *Door on Right | FA3021DL | A | A | A | A | A | A | A* | A* | | 65.0 |
| | FA3021DR* | A | A | A | A | A | A | A* | A* | | 65.0 |

## VANITY SINK CABINET COMBO

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 33" High / 21" Deep / 1 Dummy Drawer / 2 Drawers: 12" W / 2 Doors: 18" W x 20" or 21-3/8" H / No Shelf / *Door on Right | FA3621DL | A | A | A | A | A | A | A* | A* | | 67.0 |
| | FA3621DR* | A | A | A | A | A | A | A* | A* | | 67.0 |

## VANITY SINK CABINET COMBO

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 33" High / 21" Deep / 1 Dummy Drawer / 6 Drawers: 12" W / 2 Doors: (12", 18" ) x 20" or 21-3/8" H / No Shelf | FA4821D | A | A | A | A | A | A | A* | A* | | 102.0 |
| | FA6021D | A | A | A | A | A | A | A* | A* | | 120.0 |

## VANITY SINK CABINET COMBO

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 33" High / 21" Deep / 1 Dummy Drawer / 3 Drawers: 12" W / 4 Doors: 12" x 20" or 21-3/8" H / No Shelf | FA6021DD | A | A | A | A | A | A | A* | A* | | 138.0 |

## VANITY LINEN CABINET

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 18" Wide / 81" High / 24" Deep / 2 Doors: 47-7/8" & 27-3/4" / 4 Shelves | SVA188124P | A | A | A | A | A | A | A* | A* | | 96.0 |

## VANITY COUNTERTOP LINEN CABINET

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12" Wide / 45-1/2" High / 12" Deep / 2 Drawers: 6", 7" H with Ball Bearing Side Glide / 1 Door: 30-5/8" or 33-1/2" H / 3 Shelves | DV1245 | A | A | A | A | A | A | A* | A* | | 40.0 |

## VANITY MEDICINE CABINET

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12" Wide / 33" High / 6" Deep / 1 Door / 2 Adj. Shelves | W V12336 | A | A | A | A | A | A | A* | A* | | 16.0 |

## VANITY MIRROR

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Wooden Frame / Beveled Edge Mirror / Not Tempered | SVAM2427 | A | A | A | A | A | A | A* | A* | | 15.0 |
| | SVAM3027 | A | A | A | A | A | A | A* | A* | | 18.0 |

## DECORATIVE FOOT & SUPPORT

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 24" Wide / 7" Deep / 4-1/2" High / Note: Use It with Vanity Base 24" (SVA24) | *24 | A | A | A | A | A | A | N | N | | 3.5 |

## DECORATIVE FOOT & SUPPORT

| | ITEM CODE | A | CO-06 | J-5 | K-10 | K-8 | M-01 | S-1 | S-2 | S-8 | WT./LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 30" Wide / 7" Deep / 4-1/2" High / Note: Use It with Vanity Base 24" (SVA24) | *30 | A | A | A | A | A | A | N | N | | 4.0 |

A: Available to Order    A*: Available to Order Soon    N: Not Available    C: Call First

QUALITY, SERVICES & PRICES are guaranteed ONLY at Grand JKC, Grand JK Corp & Grand JK Cabinetry Inc. Visit www.GrandJK.com for more information. We ship to the USA, Canada & beyond.

## SAMPLE DOOR



| | | | CO 8C | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11-3/4" W 14-1/2" H 3/4" Thick | SAMPLE DOOR | A | A | A | A | A | A | A* | A* | | 1.0 |

## SAMPLE MOLDING BOX



| | | | |
|---|---|---|---|
| Assorted Moldings: 6"/EA | SAMPLE MOLDING BOX | C | 5.0 |

## PART - CABINET SIDE PANEL-FINISHED (L&R)



| | | CO 8C | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| 23-1/5" W 34-1/2" H 1/2" Thick<br><br>Matching Finished on One Side<br>Pre-cut Toe Kick<br>Pre-drilled Shelf Holes<br>Dadoed for Bottom Panel<br>Dadoed for Back Panel | Part-CSP | C | C | C | C | C | C | C | C | 3.0 |

## PART - CABINET SIDE PANEL



| | | | |
|---|---|---|---|
| 18", 27" Wide 96" H 1/2" Thick<br><br>Both Side Clear Coat Finish<br><br>Dadoed for Back Panel | Part-CSP 18*96 | C | 20.0 |
| | Part-CSP 27*96 | C | 30.0 |

## PART - CABINET BOTTOM PANEL



| | | | |
|---|---|---|---|
| 36" W 96" H 1/2" Thick<br><br>Both Side Clear Coat Finish | Part-CBP-36*96 | C | 39.0 |

## PART - CABINET SHELF



| | | ITEM CODE | CO #8 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Wood Shelf<br><br>22-1/2" or 25-1/2" Wide<br>96" High<br>5/8" Thick<br><br>Clear Coat Finish<br>4 Side Edge Banded | Part-WS 22.5*96 | | | | | C | | | | | 28.0 |
| | Part-WS 25.5*96 | | | | | C | | | | | 28.0 |

## TOUCH UP



| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Wax Stick | FIL-STIK | A | A | A | A | A | A | A* | A* | | 0.1 |

## TOUCH UP



| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Marker | MARKER | A | A | A | A | A | A | A* | A* | | 0.1 |

## TOUCH UP



| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Stain or Lacquer 4 OZ. | STAIN/LACQUER | A | A | A | A | A | A | A* | A* | | 0.6 |

## DRAWER GLIDE - FULL EXTENSION SOFT-CLOSE UNDERMOUNT



| | | | |
|---|---|---|---|
| Steel<br><br>Capacity: 75 lbs for 9" - 24" Base | UMFE 15"-S (H) | C | 3.5 |
| | UMFE 18"-S | C | 4.2 |
| | UMFE 21"-S | C | 5.5 |

## DRAWER GLIDE - FULL EXTENSION BALL BEARING SIDE MOUNT



| | | | |
|---|---|---|---|
| Steel<br><br>Capacity: 75 lbs for 9" - 24" Base<br><br>*S: Soft-Close | BBG10" | C | 3.8 |
| | BBG14" | C | 5.5 |
| | BBG14"-S | C | 5.5 |
| | BBG16" | C | 6.2 |
| | BBG16"-S | C | 6.5 |
| | BBG18" | C | 7.8 |
| | BBG20" | C | 8.2 |
| | BBG20"-S | C | 8.6 |
| | BBG22" | C | 9.8 |
| | BBG22"-S | C | 10.2 |
| | BBG26" | C | 10.3 |

34

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Note: Style and product availability may vary slightly from those shown in this catalog due to material availability and/or improvements to our designs. Specifications are subject to change without notice. Finger joint technique is used in some of our molding and decorative items, which is acceptable in industry standard. Natural variations of wood make the possibility of the finger joints visible. There is ¼" to ½" deviation on all vanity cabinets. Check with your sales representative for product specification before planning your projects.

### HINGE

| | | ITEM CODE | A2 | CO-86 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Metal Concealed 6 Way Adj. | 0803 | | | | | C | | | | | 0.3 |

### HINGE - BI-FOLDING

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Metal Concealed<br><br>For Bi-folding Doors Open 165 Degree<br><br>Use It on LS3612 | 0804 | | | | | C | | | | | 0.3 |

### HINGE - FRAME & DOOR

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Metal Concealed<br><br>Connecting Frame & Door<br><br>Use It on LS3612 | 0805 | | | | | C | | | | | 0.4 |

### HINGE - UPWARD OPENING

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Pnenumatic Lift | 0806 | | | | | C | | | | | 0.3 |

### HINGE - SOFT CLOSE ADAPTOR

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Metal Clip on Hinge Adaptor Soft close | 0803A | | | | | C | | | | | 0.1 |

### LAZY SUAN TURN PLATE

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Lazy Susan Turn Plate Metal (Black)<br><br>6" x 6" | 620 | | | | | C | | | | | 1.0 |

### SHELF REST - METAL

| | | ITEM CODE | A2 | CO-86 | J5 | K10 | K8 | M01 | S1 | S2 | S8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Metal Shelf Rest<br><br>3/16" Hole | 8802 | | | | | C | | | | | 0.01 |

### SHELF REST - FOR GLASS SHELF

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Rubber  Glass Shelf Rest<br><br>3/16" Hole | 8801 | | | | | C | | | | | 0.01 |

### RETAINER CLIP - FOR GLASS INSERT

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Retainer Clip for Glass Insert<br><br>3/4" x 3/8" x 3/8" | 8801A | | | | | C | | | | | 0.01 |

### DOOR BUMPER

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Clear Rubber 3/8" x 1/2" 3/16"Hole | 8803 | | | | | C | | | | | 0.01 |

### L - BRACKET-90 DEGREE

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Metal<br><br>7/8" x2-1/8"x 2-1/8" | 9810 | | | | | C | | | | | 0.1 |

### L - BRACKET 135 DEGREE

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Metal<br><br>5/8" x 1-7/8"x 1-7/8" | 9800 | | | | | C | | | | | 0.1 |

### TRASH BIN - PLASTIC

| | | ITEM CODE | | | | | | | | | | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Gray 7 Gallon<br><br>Use It on BWBK18-2 | 6910 | | | | | C | | | | | 3.0 |

A: Available to Order    A*: Available to Order Soon    N: Not Available    C: Call First

© at Grand JKC, Grand JK Corp & Grand JK Cabinetry Inc. Visit www.GrandJK.com for more information. QUALITY, SERVICES & PRICES are guaranteed ONLY at Grand JKC, Grand JK Corp & Grand JK Cabinetry & beyond. We ship to the USA, Canada & beyond.

APPX086451

0-106 INV - Investigation  -

| | ITEM CODE | CO 68 | J 5 | K 10 | K 8 | M 01 | S 1 | S 2 | S 8 | WT/LB |
|---|---|---|---|---|---|---|---|---|---|---|

**STEEL KNOB**

| Satin Nickel 1-3/16" Zinc Die Cast | SN-B-3910 | C | | | | | | | | 0.3 |

**STEEL KNOB - THICKER**

| Satin Nickel-Thicker 1-3/16" Zinc Die Cast | MS-407 | C | | | | | | | | 0.3 |

**SPIRAL KNOB - COPPER**

| Spiral Copper Knob | 033677 | C | | | | | | | | 0.4 |

**SPIRAL PULL - COPPER**

| Spiral Copper Pull | 033676 | C | | | | | | | | 0.3 |

**PULL- BOW - BRUSHED**

| Brushed Pull- Bowed 6-1/16" L x 1" H | 868-128 | C | | | | | | | | 0.1 |

**PULL -STEEL**

| Stainless Steel 4-12/16" L x 1-3/16" H 6/16" Dia. | 032672 | C | | | | | | | | 0.3 |

**PULL - STEEL**

| Stainless Steel 5-13/16" L x 1-1/4" H 6/16" Dia. | 031672 | C | | | | | | | | 0.4 |

**PULL - STEEL-THICK**

| Stainless Steel 5-7/8" L x 1-1/4" H 7/16" Dia. | 150-96 | C | | | | | | | | 0.4 |

36   Minimum Purchase: 20pc   Note: Screws may not be included, ask your sales representative for updated information

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086452

Barcode: 3894979-02 A-570-106 INV - Investigation

# ONE YEAR LIMITED WARRANTY



**WARRANTY.** J&K Cabinetry hereby warrants that all cabinets sold by J&K Cabinetry are free from defects in material and workmanship for a period of one year from the date of purchase. This warranty is expressly and exclusively limited to repair or replacement of the defective part at the sole discretion of J&K Cabinetry, and does not include labor for removal or replacement of the defective part. This warranty applies only to the original purchaser and is not transferable to any other party. This warranty does not extend to defects caused by improper handling, storage, installation, assembly or disassembly, damage, product modifications, exposure to the elements, misuse, abuse, or negligence.

**VARIATIONS AND ENVIRONMENTAL EXPOSURES NOT COVERED.** By purchasing the product, the original purchaser acknowledges that natural wood may vary in texture, color, and wood grain and it may exhibit subtle changes as it ages. Sunlight, smoke, moisture, household cleaners, and other environmental conditions may cause the materials to vary from their original color and to warp, split, or crack. These variations are considered to be natural and related to the environmental exposure of the product and are not covered under this warranty.

**UPDATED PRODUCT LINES.** J&K Cabinetry  periodically updates and makes changes to its product line and specifications. If a warranty claim is filed against obsolete or changed product and repair is not possible, J&K Cabinetry  will replace the part under warranty with a new part of the same style or with a similar style currently offered J&K Cabinetry  is not responsible for a replacement product that may not match the installed product exactly.

**DISCLAIMERS AND ADDITIONAL LIMITATIONS.** J&K Cabinetry makes no other warranties other than those set forth above, and the original purchaser's exclusive remedies are limited to those stated above. **ALL OTHER WARRANTIES ARE HEREBY DISCLAIMED, INCLUDING AN IMPLIED WARRANTY OF MERCHANTABILITY AND AN IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.** In no event will J&K Cabinetry be liable for consequential or incidental damages, including but not limited to damages arising from personal injury, lost profits, loss of business opportunity, loss of property, economic losses, or statutory or exemplary damages, whether any of the preceding damages are due to negligence, warranty, strict liability, or otherwise. This limited liability applies to any and all parties, including an end-user or homeowner to which the original purchaser sells J&K Cabinetry's product.

**INDEMNIFICATION OF J&K Cabinetry  BY THE ORIGINAL PURCHASER FOR ASSEMBLY AND INSTALLATION WORK.** Additionally, with regard to any product assembled or installed by the original purchaser or its agents the original purchaser agrees to indemnify, defend, and hold J&K Cabinetry harmless from and against any and all claims, lawsuits, judgments, losses, civil penalties or actions, costs, liabilities, damages, and expenses (including attorney's fees) by any party, entity, or class, arising from or related to any (a) acts or omissions of the original purchaser or its agents or contractors, (b) products provided by the original purchaser or its agents or contractors, (c) dispute regarding the original purchaser 's product warranties, guarantees, covenants, or representations, any breach thereof, and the breach of any applicable law or otherwise, (d) disputes regarding promotional or advertising matter, fixtures, displays, guarantees, representations, warranties, labels, and instructions, verbal or written, furnished by the original purchaser or its agents or contractors, (e) disputes regarding infringement of any patent, design, trade name, trademark, copyright, trade secret, or any other right or entitlement of any third party, (f) environmental, property, and toxic tort claims, lawsuits, judgments, losses, civil penalties, or actions, and (g) claims against J&K Cabinetry by the original purchaser 's employee regarding workers' compensation matters. This agreement to indemnify agreement to indemnify, defend, and hold harmless J&K Cabinetry applies irrespective of any negligence by J&K Cabinetry except to the extent determined in legal proceedings that the loss resulted from the sole fault or negligence of J&K Cabinetry.

**NON-TRANSFERABILITY OF WARRANTY.** J&K Cabinetry's warranty is not transferable to end-users, including consumers and homeowners who purchase J&K Cabinetry. products through the original purchaser. Any and all end-user warranty claims must be handled through and by the original purchaser, which may independently provide warranties to the end-user. Where the original purchaser, through its independent warranty with an end-user, is liable for a claim that (1) would otherwise have been covered by J&K Cabinetry's warranty to the original purchaser but for its non-transferability and (2) occurs within one-year from the end-user's date of purchase, J&K Cabinetry will reimburse the original purchaser for the repair or replacement cost, up to the amount and only for the limited claims covered under this warranty.

**SUBMITTING A CLAIM.** To submit a warranty claim, the original purchaser must contact the J&K Cabinetry office or warehouse from which the product was purchased. The original purchaser must present (1) a copy of the invoice for the product as proof of purchase, dated no earlier than one years from the date of warranty claim and (2) if the claim originated from an end-user, a copy of the end-user's the original purchaser sales receipt, dated no earlier than one year from the date of warranty claim. At its discretion, J&K Cabinetry may require an inspection of the allegedly defective product before repairing or replacing the product. J&K Cabinetry may require returning the allegedly defective product, which may be returned per J&K Cabinetry 's Defective Products Return Policy.

**For more information please visit our web site at www.grandjk.com**

Barcode:3894973-02 A-570-106 INV - Investigation -



Visit **www.grandjk.com** for more information

Your Company Information

J&K Cabinetry reserves the right to change or modify cabinets as part of its ongoing development.
Note: Due to printing limitations, color pictures cannot be guaranteed to match actual cabinet materials.
Please check with your dealer(s) for actual door samples when making your selection.

Filed By: theightbill@ssleycain.com, Filed Date: 5/13/19 6:44 PM, Submission Status: Approved

©2013 J&K Cabinetry

APPX086454

# EXHIBIT 4B

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086455

Barcode:3894973-02 A-570-106 INV - Investigation



# J&K CABINETRY

## Quality Kitchen & Bathroom Cabinets

**VISIT OUR J&K SHOWROOM**



www.jk cabinetry.com

Barcode: 3854971-04 A-570-106 INV - Investigation



AFFORDABLE
DISTINCTIVE
QUALITY

S8 - White Shaker Style

**About J&K**

**Door Styles**

**Cabinet Features**

**Gallery**
Crème Maple Glazed
Cinnamon Maple Glazed
Mahogany Maple
Chocolate Maple Glazed
Expresso Maple
Mocha Maple Glazed
Black Coffee Maple
White ShakerMaple

**Product Guide**
Base Cabinets
Wall Cabinets
Tall Cabinets
Molding
Accessories

Barcode:3894973-02 A-570-106 INV - Investigation -





## About us

J&K Cabinetry - originating in Georgia back in 2003 - has expanded throughout the United States with its very dedicated manufacturer, has finally reached the Gulf south area. You can now find J&K Cabinetry in [                    ].

Our signature pieces blend beautifully with styles ranging from classic American charm to modern downtown elegance. J&K Cabinetry showroom offers over 100,000 square feet in total for quality cabinetry that is exceptionally affordable, with the supporting nation-wide J&K network in over 10 different states.

As a wholesale distributor, we specialize in high-quality and stylish cabinetry. We offer semi-custom and Ready-to-Assemble (RTA) cabinets. With the great quality and affordability, homeowners searching ideal kitchen and bathroom experience have turned to J&K for over a decade.

> "Superior craftmanship does not neccessarily equal to a hefty price tag.
> Let J&K helps build your dream kitchen at an affordable budget!"

### Exceptional Value

At J&K Cabinetry, we believe customers are of paramount importance. And therefore J&K offers the very best quality, affordable pricing and great customer service to provide the best customer satisfaction.

We understand, care, trust and respect our clients, suppliers, staff and all our stakeholders. Valuing these relationships continues to make us a better company and one you can rely on.

### Being the best at what we do

To be the best at what we do, we strive for perfection and go the extra mile to excel in all areas of our business. This in turn fosters an environment of excellence and a goal by all our staff to exceed expectations and compliance benchmarks.

Regardless of the kitchen size, we carry cabinets to accommodate all of your designs, from traditional to contemporary. With the all wood construction, European style concealed hinges, and soft-close systems, customers will sure be pleased with the beauty of J&K's Cabinets.

Barcode:3894973-02 A-570-106 INV - Investigation  -

# THE DOOR STYLE FAMILY


**Crème Maple Glazed (A7)**


**Cinnamon Maple Glazed (CO66)**


**Chocolate Maple Glazed (M01)**


**Mocha Maple Glazed (K10)**


**Mahogany Maple (J5)**


**Expresso Maple (K8)**


**Black Coffee Shaker Maple (S1)**


**White Shaker Maple (S8)**


**Gregi Maple (K3)**

# THE CABINET FEATURES



*"We understand quality is important – even in the places you can't easily see."*

Each of J&K Cabinets are proundly made of ALL SOLID WOOD for maximum durability together with the beauty of real wood.

(1)  Full overlay door panel, 3/4" think door panel
(2)  6-way adjustable European hidden metal hinges with soft-close
(3)  Adjustable, 3/4 shelf, 5/8" thick cabinet-grade plywood, metal shelf rest
(4)  Dovetail drawer, 1/2" thick solid wood sides
(5)  Full extension, under-mounted, soft-close, steel concealed drawer glides
(6)  1/2" thick cabinet grade plywood box
(7)  Metal bracket reinforcements for base cabinets



Barcode:3894973-02 A-570-106 INV - Investigation -



THE
# Design Inspiration

CO66 - Cinnamon
Maple Glazed

Traditional kitchen,
an island with 3 bar-
stools built in bench
for the breakfast
nook and desk.

Creme Maple Glazed

Here you will find inspirational designs on the beauty and versatility
of J&K cabinets, from traditional to modern, big to small.

Use an island unit to create extra work-station and dinning area,
provides extra space for food preparation and entertaining friends and family

A7 - Creme Maple

Traditional kitchen, da
sophia e sgan, sid me

J5 - Mahogany Maple



S1 - Black Coffee Shaker

K10 - Mocha Maple Glazed

**Ideas** for your **Dream** Kitchen

A clever combination of units is key to creating a versatile kitchen that will maximise your space and create a flexible living area.

M01 - Chocolate Maple Glazed

S8 - White Shaker

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086461



Barcode:3891973-0 A-570-106 INV - Investigation -

M01 - Chocolate Maple Glazed

K8 - Expresso Maple

S8 - White Shaker

S1 - Black Coffee Shaker

The stunning beauty in expresso color with contrasting worktop and flooring gives the modern kitchen a classic edge

**VANITY** Inspiration

S1 - Black Coffee Shaker

The shaker style provides strong horizontal lines, together with simple hardware, help create a modern style kitchen.

K8 - Espresso Maple

A7 - Creme Maple Glazed

S8 - White Shaker

S1 - Black Coffee Shaker

Barcode:3894973-02 A-570-106-INV - Investigation -

## BASE CORNER CABINETS    WALL CABINETS



### Base Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| B09 | 9 | | |
| B12 | 12 | | |
| B15 | 15 | 24 | 34½ |
| B18 | 18 | | |
| B21 | 21 | | |

1 Drawer
1 Door
1 Adj. Shelf

| Item Code | W | D | H |
|---|---|---|---|
| B24 | 24 | 24 | 34½ |
| B27 | 27 | | |

1 Drawer
2 Doors
1 Adj. Shelf

| Item Code | W | D | H |
|---|---|---|---|
| B30 | 30 | | |
| B33 | 33 | 24 | 34½ |
| B36 | 36 | | |
| B42 | 42 | | |

2 Drawers,
2 Doors
1 Adj. Shelf

### Drawer Base Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| DB12-3 | 12 | | |
| DB15-3 | 15 | | |
| DB18-3 | 18 | | |
| DB21-3 | 21 | | |
| DB24-3 | 24 | 24 | 34½ |
| DB30-3 | 30 | | |
| DB33-3 | 33 | | |
| DB36-3 | 36 | | |
| DB42-3 | 42 | | |

1 Small Drawer
2 Large Drawers

### Sink Base Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| SB27 | 27 | 24 | 34½ |

1 Dummy Drawer
2 Doors
No Shelf

| Item Code | W | D | H |
|---|---|---|---|
| SB30 | 30 | | |
| SB33 | 33 | 24 | 34½ |
| SB36 | 36 | | |
| SB42 | 42 | | |

2 Dummy Drawers
2 Doors
No Shelf

### Spice Rack

| Item Code | W | D | H |
|---|---|---|---|
| SP09 | 9 | 24 | 34½ |

1 Door
3 Wooden Shelves
Stardard Ball Bearing Side Glide

### Spice Drawer

| Item Code | W | D | H |
|---|---|---|---|
| BWRC6 | 6 | 24 | 34½ |

5 Square Drawers
No Glides

### Base Waste Basket Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| BWBK15-2 | 15 | | |
| BWBK18-2 | 18 | 24 | 34½ |

1 Drawer
1 Door
1 Bin Cut-out
*Trash Bin NOT included

### Base End Corner

| Item Code | W | D | H |
|---|---|---|---|
| BEC24 | 9 | 24 | 34½ |

2 Dummy Drawers
2 Doors
1 Adj. Shelf

### Base End Shelf (L/R)

| Item Code | W | D | H |
|---|---|---|---|
| BES09 | 9 | 24 | 34½ |

3 Fixed Shelves
Matching Color Finish
Specify left (L) or right (R) when ordering assembly

### Base Blind Corner (L/R)

| Item Code | W | D | H |
|---|---|---|---|
| BBC42 | 42 | 24 | 34½ |

1 Drawer
1 Door
1 Adj. Shelf
Min. 3" pull off from the wall when install
Specify left (L) or right (R) when ordering assembly

### Base Corner Diagonal w/ Lazy Susan

| Item Code | W | D | H |
|---|---|---|---|
| CBD36 | 36 | 24 | 34½ |

1 Full Door
No Shelf

### Lazy Susan

| Item Code | W | D | H |
|---|---|---|---|
| LS3612 | 36 | 24 | 34½ |

2 Doors
2 Wooden Kidney Shaped Lazy Susan

### Corner Sink Base

| Item Code | W | D | H |
|---|---|---|---|
| CSB36 | 36 | 24 | 34½ |

1 Full Door
No Shelf

### 30"H Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W0930 | 9 | | |
| W1230 | 12 | | |
| W1530 | 15 | 12 | 30 |
| W1830 | 18 | | |
| W2130 | 21 | | |

1 Door
2 Adj. Shelves

| Item Code | W | D | H |
|---|---|---|---|
| W2430 | 24 | | |
| W2730 | 27 | | |
| W3030 | 30 | 12 | 30 |
| W3330 | 33 | | |
| W3630 | 36 | | |
| W4230 | 42 | | |

2 Doors
2 Adj. Shelves

### 36"H Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W0936 | 9 | | |
| W1236 | 12 | | |
| W1536 | 15 | 12 | 36 |
| W1836 | 18 | | |
| W2136 | 21 | | |

1 Door
2 Adj. Shelves

| Item Code | W | D | H |
|---|---|---|---|
| W2436 | 24 | | |
| W2736 | 27 | | |
| W3036 | 30 | 12 | 36 |
| W3336 | 33 | | |
| W3636 | 36 | | |
| W4236 | 42 | | |

2 Doors
2 Adj. Shelves

### 42"H Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W0942 | 9 | | |
| W1242 | 12 | | |
| W1542 | 15 | 12 | 42 |
| W1842 | 18 | | |
| W2142 | 21 | | |

1 Door
3 Adj. Shelves

| Item Code | W | D | H |
|---|---|---|---|
| W2436 | 24 | | |
| W2736 | 27 | | |
| W3036 | 30 | 12 | 36 |
| W3336 | 33 | | |
| W3636 | 36 | | |
| W4236 | 42 | | |

2 Doors
2 Adj. Shelves

15

# WALL CABINETS

## 30"H Wall Cabinet - Glass Insert Ready

| Item Code | W | D | H |
|---|---|---|---|
| WM1530H | 15 | | |
| WM1830H | 18 | 12 | 30 |
| WM2130H | 21 | | |

1 Door
2 Adj. Shelves Not Included
Matching Color Interior
Glass Shelf & Insert NOT Included

| Item Code | W | D | H |
|---|---|---|---|
| WM2430H | 24 | | |
| WM2730H | 27 | 12 | 30 |
| WM3030H | 30 | | |

2 Doors
2 Adj. Shelves Not Included
Matching Color Interior
Glass Shelf & Insert NOT Included

## 36"H Wall Glass Cabinet - Glass Insert Ready

| Item Code | W | D | H |
|---|---|---|---|
| WM1536H | 15 | | |
| WM1836H | 18 | 12 | 36 |
| WM2136H | 21 | | |

1 Door
2 Adj. Shelves Not Included
Matching Color Interior
Glass Shelf & Insert NOT Included

| Item Code | W | D | H |
|---|---|---|---|
| WM2436H | 24 | | |
| WM2736H | 27 | | 36 |
| WM3036H | 30 | | |

2 Doors
2 Adj. Shelves Not Included
Matching Color Interior
Glass Shelf & Insert NOT Included

## 42"H Wall Glass Cabinet - Glass Insert Ready

| Item Code | W | D | H |
|---|---|---|---|
| WM1542H | 15 | | |
| WM1842H | 18 | 12 | 42 |
| WM2142H | 21 | | |

1 Door
3 Adj. Shelves Not Included
*Matching Color Interior
**Glass Shelf & Insert NOT Included

| Item Code | W | D | H |
|---|---|---|---|
| WM2442H | 24 | | |
| WM2742H | 27 | | 42 |
| WM3042H | 30 | | |

2 Doors
3 Adj. Shelves Not Included
Matching Color Interior
Glass Shelf & Insert NOT Included

## Wall Horizontal Drawers

| Item Code | W | D | H |
|---|---|---|---|
| WWRC6 | 30 | 12 | 6 |

12" Deep
5 Square Drawers

## 12"H Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W3012 | 30 | | |
| W3312 | 33 | 12 | 12 |
| W3612 | 36 | | |

2 Door
No Shelf

## 15"H Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W3015 | 30 | | |
| W3315 | 33 | 12 | 15 |
| W3615 | 36 | | |

2 Door
No Shelf

## 18"H Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W3018 | 30 | | |
| W3318 | 33 | 12 | 18 |
| W3618 | 36 | | |

2 Door
No Shelf

## 21"H Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W3021 | 30 | | |
| W3321 | 33 | 12 | 21 |
| W3621 | 36 | | |

2 Door
1 Adj. Shelf

## 24"H Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W3024 | 30 | | |
| W3624 | 36 | 12 | 24 |

2 Door
1 Adj. Shelf

## Wine Rack

| Item Code | W | D | H |
|---|---|---|---|
| 30WR | 30 | | |
| 36WR | 36 | 12 | 15 |

30WR - 10 Compartments
36WR - 14 Compartments
Matching Color Finish

## Plate Rack

| Item Code | W | D | H |
|---|---|---|---|
| WCD3018 | 30 | | |
| WCD3618 | 36 | 12 | 18 |

WCD3018 - 10 Plates
WCD3618 - 12 Plates
Matching Color Finish

## 12"H Refrigerator Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W301227 | 30 | | |
| W331227 | 33 | 27 | 12 |
| W361227 | 36 | | |

27" Deep
2 Doors
No Shelf

## 15"H Refrigerator Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W301527 | 30 | | |
| W331527 | 33 | 27 | 15 |
| W361527 | 36 | | |
| W421527 | 42 | | |

27" Deep
2 Doors
No Shelf

## 18"H Refrigerator Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W301827 | 30 | | |
| W331827 | 33 | 27 | 18 |
| W361827 | 36 | | |
| W421827 | 42 | | |

27" Deep
2 Doors
No Shelf

## 21"H Refrigerator Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W302127 | 30 | | |
| W332127 | 33 | 27 | 21 |
| W362127 | 36 | | |

27" Deep
2 Doors
1 Adj. Shelf

## 24"H Refrigerator Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| W302427 | 30 | | |
| W332427 | 33 | 27 | 24 |
| W362427 | 36 | | |

27" Deep
2 Doors
1 Adj. Shelf

## Microwave Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| WBL2730 | | | 30 |
| WBL2736 | 27 | | 36 |
| WBL2742 | | 12 | 42 |
| WBL3030 | | | 30 |
| WBL3036 | 30 | | 36 |
| WBL3042 | | | 42 |

2 Doors
1 Open Shelf
Opening: 24"W × 18"H × 37"W
Shelf Overhang: 6"



## Wall End Shelf

| Item Code | W | D | H |
|---|---|---|---|
| WES0930 | | | 30 |
| WES0936 | 9 | 12 | 36 |

3 Fixed Shelves
Matching Color Finish

| Item Code | W | D | H |
|---|---|---|---|
| WES0942 | 9 | 12 | 42 |

4 Fixed Shelves
Matching Color Finish

## Open Shelf Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| WOS2430 | | | 30 |
| WOS2436 | 24 | | 36 |
| WOS2442 | | 12 | 42 |
| WOS3030 | | | 30 |
| WOS3036 | 30 | | 36 |
| WOS3042 | | | 42 |

30"H - 36"H: 2 Adj. Shelves
42"H: 3 Adj. Shelves

## Decorative Range Hood

| Item Code | W | D | H |
|---|---|---|---|
| RHE3624 | 36 | 8 | 24 |
| RHE4224 | 42 | | |

## Appliance Garage

| Item Code | W | D | H |
|---|---|---|---|
| AG2418 | 24 | 24 | 18 |
| AG2718 | 27 | 27 | |

Apply with Wall Diagonal Cabinet

## Lattice Wall Cabinet

| Item Code | W | D | H |
|---|---|---|---|
| WAR365118 | 36 | 18 | 51 |

Items:
W303618 (1)
30WR (1)
DER51 (2)

17

## WALL CORNER CABINETS

| Item Code | W | D | H |
|---|---|---|---|
| **Wall Diagonal Corner Cabinet** | | | |
| WDC2430 | 30 | | 30 |
| WDC2436 | 33 | 12 | 36 |
| WDC273615 | 36 | 15 | |
| 1 Door | | | |
| 2 Adj. Shelves | | | |
| WDC2442 | 30 | 12 | 42 |
| WDC274215 | 36 | 15 | |
| 1 Door | | | |
| 3 Adj. Shelves | | | |

**Wall Diagonal Corner Glass Cabinet - Glass insert Ready**

| Item Code | W | D | H |
|---|---|---|---|
| WMDC2412H | 24 | 12 | 12 |
| WMDC271215H | 27 | 15 | |
| 2 Doors | | | |
| No Shelf | | | |
| WMDC2430H | 24 | 12 | 30 |
| WMDC2436H | | | 36 |
| WMDC273615H | 27 | 15 | |
| 2 Doors | | | |
| 1 Adj. Shelf | | | |
| WMDC2442H | 24 | 12 | 42 |
| WMDC274215H | 27 | 15 | |
| 2 Doors | | | |
| 2 Adj. Shelves | | | |

**Wall End Corner Cabinet**

| Item Code | W | D | H |
|---|---|---|---|
| WEC1230 | 12 | 12 | 30 |
| WEC1236 | | | 36 |
| 2 Doors | | | |
| 2 Adj. Shelves | | | |
| WEC1242 | 12 | 12 | 42 |
| 2 Doors | | | |
| 3 Adj. Shelves | | | |

**Wall Blind Corner Cabinet**

| Item Code | W | D | H |
|---|---|---|---|
| WCC3030 | 30 | 12 | 30 |
| WCC3036 | | | 36 |
| 2 Adj. Shelves | | | |
| WCC3042 | 30 | 12 | 42 |
| 3 Adj. Shelves | | | |

## TALL CABINETS

| Item Code | W | D | H |
|---|---|---|---|
| **Pantry Cabinet** | | | |
| WP188427 | | | 84 |
| WP189027 | 18 | 27 | 90 |
| WP189627 | | | 96 |
| 2 Doors | | | |
| 3 Pull Out Tray | | | |
| 84"H - 90"H: 2 Adj. Shelves | | | |
| 96"H: 3 Adj. Shelves | | | |
| Upper Door: 30", 36", 42" H | | | |
| Lower Door: 49½" H | | | |
| WP248427 | | | 84 |
| WP249027 | 24 | 27 | 90 |
| WP249627 | | | 96 |
| WP308427 | | | 84 |
| WP309027 | 30 | 27 | 90 |
| WP309627 | | | 96 |
| 4 Doors | | | |
| 3 Pull Out Tray | | | |
| 84"H - 90"H: 2 Adj. Shelves | | | |
| 96"H: 3 Adj. Shelves | | | |
| Upper Door: 30", 36", 42" H | | | |
| Lower Door: 49½" H | | | |

**Single Oven Cabinet**

| Item Code | W | D | H |
|---|---|---|---|
| OC308427 | | | 84 |
| OC309027 | 30 | | 90 |
| OC309627 | | 27 | 96 |
| OC338427 | | | 84 |
| OC339027 | 33 | | 90 |
| OC339627 | | | 96 |
| 2 Doors | | | |
| 2 Drawers | | | |
| 1 Adj. Shelf | | | |

**Double Oven Cabinet**

| Item Code | W | D | H |
|---|---|---|---|
| OC308427WO | | | 84 |
| OC309027WO | 30 | | 90 |
| OC309627WO | | 27 | 96 |
| OC338427WO | | | 84 |
| OC339027WO | 33 | | 90 |
| OC339627WO | | | 96 |
| 2 Door | | | |
| 1 Drawers | | | |
| 1 Adj. Shelf | | | |

## VANITIES



| Item Code | W | D | H |
|---|---|---|---|
| **Vanity Sink Base Cabinet** | | | |
| SVA2421 | 24 | 21 | 33 |
| FA3021 | 30 | | |
| 1 Dummy Drawer | | | |
| 2 Doors | | | |
| *Also as FA2421 | | | |
| FA3021DL | | | |
| FA3021DR | 30 | 21 | 33 |
| 1 Dummy Drawer | | | |
| 2 Dummy Drawers (12" W) | | | |
| 1 Doors (18" W) | | | |
| DL = Door on Left; DR = Door on Right | | | |
| FA3621DL | | | |
| FA3621DR | 36 | 21 | 33 |
| 1 Dummy Drawer | | | |
| 2 Dummy Drawers (12" W) | | | |
| 2 Doors (12" W) | | | |
| DL = Door on Left; DR = Door on Right | | | |
| **Vanity Sink Base Cabinet-Combo** | | | |
| FA4821D | 48 | 21 | 33 |
| FA6021D | 60 | | |
| 1 Dummy Drawer | | | |
| 6 Drawers (12" W) | | | |
| 2 Doors (12" W / 18" W) | | | |
| No S | | | |
| FA6021DD | 60 | 21 | 33 |
| 1 Dummy Drawer | | | |
| 3 Drawers (12" W) | | | |
| 4 Doors (12" W) | | | |
| **Vanity Drawer Base Cabinet** | | | |
| SVA09D | 9 | | |
| SVA12D | 12 | | |
| SVA15D | 15 | 21 | 33 |
| SVA18D | 18 | | |
| SVA21D | 21 | | |
| SVA24D | 24 | | |
| 2 Large Drawers | | | |
| 1 Small Drawer | | | |
| **Vanity Base Cabinet** | | | |
| SVA09P | 9 | | |
| SVA12P | 12 | | |
| SVA15P | 15 | 21 | 33 |
| SVA18P | 18 | | |
| SVA21P | 21 | | |
| 1 Drawer | | | |
| 1 Adj. Shelves | | | |
| 1 Door | | | |



| Item Code | W | D | H |
|---|---|---|---|
| **Vanity Base Cabinet** | | | |
| SVA24P | 24 | 21 | 33 |
| 2 Doors | | | |
| 1 Shelf | | | |
| *Not cut for plumbing | | | |
| **Vanity Sink Base Cabinet - Curved Door** | | | |
| SVA24 | 24 | 21 | 33 |
| 2 Curved Doors | | | |
| **Linen Cabinet** | | | |
| SVA188124D | 18 | 24 | 81 |
| 3 Adj. Shelves | | | |
| 3 Drawers | | | |
| 1 Door | | | |
| SVA188124P | 18 | 24 | 81 |
| 4 Adj. Shelves | | | |
| 2 Doors | | | |
| (Upper: 47⅞" H; Lower: 27¾" H) | | | |
| **Countertop Linen Cabinet** | | | |
| DV1245 | 12 | 12 | 45½ |
| 1 Door (30⅜" H or 33½" H)* | | | |
| 2 Small Drawers | | | |
| 2 Adj. Shelves | | | |
| *Varies with door style | | | |
| **Medicine Cabinet** | | | |
| WV12336 | 12 | 6 | 33 |
| 1 Door | | | |
| 2 Adj. Shelves | | | |
| **Vanity Mirror** | | | |
| SVAM2427 | 24 | 1³/₁₆ | 27 |
| SVAM3027 | 30 | | 27 |
| Wooden Frame | | | |
| Beveled Edge Mirror | | | |
| Not Tempered | | | |

19

**PANELS & FILLERS**　　　　　　　　　　　　　　**MOLDING, TOE KICK & VALANCE**



**Dishwasher Return Panel**

| Item Code | W | D | H |
|---|---|---|---|
| DWR | 3 | 24 | 34½ |
| Note: Not Assembled | | | |

**Refrigerator Panel with 3" Return Filler**

| Item Code | W | D | H |
|---|---|---|---|
| RRP8427 | | | 84 |
| RRP9027 | 3 | 27 | 90 |
| RRP9627 | | | 96 |
| Note: Not Assembled | | | |

**Refrigerator Return Panel**

| Item Code | W | D | H |
|---|---|---|---|
| RRP9027-¾ | | | 90 |
| RRP9627-¼ | ¾ | 27 | |
| RRP9648-¾ | | | 96 |
| RRP9648-½ | ½ | 48 | |

**Panel**

| Item Code | W | D | H |
|---|---|---|---|
| BP3696 | 36 | | 96 |
| BP4896 | 48 | ¼ | |
| BP9636 | 96 | | 35 |
| BP9648 | | | 48 |
| BP3696, BP4896: Horizontal Grain | | | |
| BP9636, BP9648: Vertical Grain | | | |

**Base Filler**

| Item Code | W | D | H |
|---|---|---|---|
| BF3 | 3 | 3¼ | 34½ |
| BF6 | 6 | | |

**Wall Filler**

| Item Code | W | D | H |
|---|---|---|---|
| WF330 | | | 30 |
| WF336 | 3 | | 36 |
| WF342 | | | 42 |
| WF630 | ¾ | | 30 |
| WF636 | 6 | | 36 |
| WF642 | | | 42 |
| WF1236 | 12 | | 36 |

**Wall Filler Box**

| Item Code | W | D | H |
|---|---|---|---|
| DER30F | | | 30 |
| DER36F | 3 | 15 | 36 |
| DER42F | | | 42 |

**Tall Filler**

| Item Code | W | D | H |
|---|---|---|---|
| CM34-1 ½ | 1½ | | |
| CM34-2 | 2 | | |
| CM34-3 | 3 | | |
| CM34-4 | 4 | ¾ | 120 |
| CM34-6 | 6 | | |
| CM34-9 | 9 | | |

**Fluted Filler**

| Item Code | W | D | H |
|---|---|---|---|
| PCVFF3 | 3 | ¾ | 96 |

**Quarter Round Molding**

| Item Code | W | D | H |
|---|---|---|---|
| QRM10 | ¾ | ¾ | 120 |

**Chair-rail Molding**

| Item Code | W | D | H |
|---|---|---|---|
| CR10 | 1⅛ | ¾ | 120 |

**Outside Corner Molding**

| Item Code | W | D | H |
|---|---|---|---|
| OCM8 | ¾ | ¾ | 96 |

**Full Chair Rail Molding**

| Item Code | W | D | H |
|---|---|---|---|
| FSM10 | 1⅝ | ¾ | 120 |

**Toe Kick**

| Item Code | W | D | H |
|---|---|---|---|
| TK8 | 4½ | ⅛ | 96 |

**Decorated Toe Kick**

| Item Code | W | D | H |
|---|---|---|---|
| *24 | 24 | 7 | 4½ |
| *30 | 30 | 7 | 4½ |

**Scribe Molding**

| Item Code | W | D | H |
|---|---|---|---|
| SM8 | ¾ | ¼ | 96 |

**Base Molding**

| Item Code | W | D | H |
|---|---|---|---|
| BM10 | 4 | ¾ | 120 |
| BM10-4 ½ | 4½ | | |

**Wide Beaded Molding**

| Item Code | W | D | H |
|---|---|---|---|
| WPM10 | 2¼ | ¾ | 120 |

**Wide Dentil Molding**

| Item Code | W | D | H |
|---|---|---|---|
| WDM10 | 2¼ | ¾ | 120 |

**Dentil Crown Molding**

| Item Code | W | D | H |
|---|---|---|---|
| CCM10-A | 4 | 4 | 120 |
| Large Dentil Crown Molding | | | |
| CCM10-B | 3 | 3½ | 120 |
| Small Dentil Crown Molding | | | |

**Traditional Molding**

| Item Code | W | D | H |
|---|---|---|---|
| TLR10-A | 1½ | 2¼ | 120 |

**Light Rail Molding**

| Item Code | W | D | H |
|---|---|---|---|
| TLR10-3 | 3 | 2¼ | 120 |

21

# MOLDING, TOE KICK & VALANCE

### Crown Molding

| Item Code | W | D | H |
|---|---|---|---|
| CM10 | 2⅛ | | |
| CM10-3¼ | 3¼ | 1¾ | 120 |
| CM10-4¼ | 4¼ | | |
| CM10-5¼ | 5¼ | | |

### Crown Molding with Base

| Item Code | W | D | H |
|---|---|---|---|
| ACM10-3¼ | 3¼ | ¾ | 120 |
| Crown Molding with Base (Small) | | | |
| ACM10-4¼ | 4¼ | ¾ | 120 |
| Crown Molding with Base (Medium) | | | |
| ACM10-5¼ | 5¼ | ¾ | 120 |
| Crown Molding with Base (Large) | | | |

### Cove Crown Molding

| Item Code | W | D | H |
|---|---|---|---|
| ST10 | 3¼ | | |
| ST10-4¼ | 4¼ | ¾ | 120 |
| ST10-5¼ | 5¼ | | |

### Cove Crown Molding with Base

| Item Code | W | D | H |
|---|---|---|---|
| AST10-3¼ | 3¼ | 2¼ | 120 |
| AST10-4¼ | 4¼ | 3¼ | 120 |
| AST10-5¼ | 5¼ | 4¼ | 120 |

### Ogee Molding

| Item Code | W | D | H |
|---|---|---|---|
| OGM10 | 3 | ¾ | 120 |

### Frieze Valance

| Item Code | W | D | H |
|---|---|---|---|
| V30A | 30 | | |
| V33A | 33 | | |
| V36A | 36 | | |
| V42A | 42 | ¾ | 4½ |
| V48A | 48 | | |
| V54A | 54 | | |
| V60A | 60 | | |

### Arched Valance

| Item Code | W | D | H |
|---|---|---|---|
| V30B | 30 | | |
| V33B | 33 | | |
| V36B | 36 | | |
| V42B | 42 | ¾ | 4½ |
| V48B | 48 | | |
| V54B | 54 | | |
| V60B | 60 | | |

### Arched Valance - Flat

| Item Code | W | D | H |
|---|---|---|---|
| RPV30 | 30 | | |
| RPV36 | 36 | | |
| RPV42 | 42 | | |
| RPV48 | 48 | ¾ | 8 |
| RPV54 | 54 | | |
| RPV60 | 60 | | 15 |
| RPV72 | 72 | | |
| RPV42-12 | 42 | | 12 |

Note: Finger Joined Panel

### Valance

| Item Code | W | D | H |
|---|---|---|---|
| RPV30-A | 30 | | |
| RPV36-A | 36 | | |
| RPV42-A | 42 | | |
| RPV48-A | 48 | ¾ | 15 |
| RPV54-A | 54 | | |
| RPV60-A | 60 | | |
| RPV72-A | 72 | | |

4½ Arch Height

# ACCESSORIES

### Plain Block

| Item Code | W | D | H |
|---|---|---|---|
| BB3*4 | 3 | ¾ | 4 |

### Rosette Block

| Item Code | W | D | H |
|---|---|---|---|
| FB3*3 | 3 | ¾ | 3 |

### Decorated Block

| Item Code | W | D | H |
|---|---|---|---|
| FB3*6 | 3 | ¾ | 6 |

### Turn Post

| Item Code | W | D | H |
|---|---|---|---|
| SP3×34½ | 3 | 3 | 34½ |

### Split Post

| Item Code | W | D | H |
|---|---|---|---|
| RPS18 | | | 18 |
| RPS24 | | | 24 |
| RPS30 | 2 | ¾ | 30 |
| RPS36 | | | 36 |
| RPS42 | | | 42 |

### Twist Full Turn Post

| Item Code | W | D | H |
|---|---|---|---|
| RP34½ | 3 | 3 | 34½ |

### Glass Rack

| Item Code | W | D | H |
|---|---|---|---|
| 30GR | 30 | 12 | 1½ |
| 36GR | 36 | | |

*Matching color finish



### Corbel - Wide Mission

| Item Code | W | D | H |
|---|---|---|---|
| SC58 | 4½ | 5 | 10 |

### Corbel - Large Mission

| Item Code | W | D | H |
|---|---|---|---|
| SC530 | 5½ | 7 | 30 |

### Corbel - Large Acanthus

| Item Code | W | D | H |
|---|---|---|---|
| RC530 | 5½ | 7 | 30 |

### Corbel - Extra Large Acanthus

| Item Code | W | D | H |
|---|---|---|---|
| CB34½ | 6¼ | 7½ | 34½ |

### Corbel - Wide Grape

| Item Code | W | D | H |
|---|---|---|---|
| GC58 | 4½ | 5 | 10 |

### Corbel - Tall Grape

| Item Code | W | D | H |
|---|---|---|---|
| OLC318 | 3 | 3 | 18 |

### Corbel - Tall Acanthus

| Item Code | W | D | H |
|---|---|---|---|
| RLC318 | 3 | 3 | 18 |

23

Barcode:3894973-02 A-57

# DUMMY DOORS & DUMMY DRAWERS

### Corbel - Wide Acanthus

| Item Code | W | D | H |
|---|---|---|---|
| RC58 | 4½ | 5 | 10 |

### Corbel - Narrow Acanthus

| Item Code | W | D | H |
|---|---|---|---|
| RC313 | 3½ | 8 | 13 |

### Roll Out Tray

| Item Code | W | D | H |
|---|---|---|---|
| RD18 | 18 | | |
| RD21 | 21 | | |
| RD24 | 24 | | |
| RD27 | 27 | | |
| RD30 | 30 | | |
| RD33 | 33 | | |
| RD36 | 36 | | |

- Clear Coat Finish
- Ball Bearing Side Glides included for 24" Deep Cabinets Only
- 26" Glide Sold Seperately for 27" Deep Pantry

### Shell Overlay

| Item Code | W | D | H |
|---|---|---|---|
| AC | 18½ | ⅓ | 3½ |

### Grape Onlay

| Item Code | W | D | H |
|---|---|---|---|
| GRPO | 20 | ¾ | 4½ |

### Leaf Onlay

| Item Code | W | D | H |
|---|---|---|---|
| RRPO | 20 | ¾ | 4½ |

### Leaf Ornament

| Item Code | W | D | H |
|---|---|---|---|
| RGO | 3 | ¾ | 4 |

### Round Ornament

| Item Code | W | D | H |
|---|---|---|---|
| ASO | 6 | ¾ | 6 |

### Overlay

| Item Code | W | D | H |
|---|---|---|---|
| AB | 13¾ | ¾ | 4 |

### Tulip

| Item Code | W | D | H |
|---|---|---|---|
| TF | 2¾ | 2¾ | 4½ |

### Keystone

| Item Code | W | D | H |
|---|---|---|---|
| CO12 | 6 | ¾ | 12 |

### Knee Drawer

| Item Code | W | D | H |
|---|---|---|---|
| FD24 | 24 | | |
| FD27 | 27 | 21 | 6 |
| FD30 | 30 | | |
| 1 Drawer | | | |
| FD36 | 36 | 21 | 6 |
| 2 Drawers | | | |

### Base Dummy Doors & Drawers

| Item Code | W | D | H |
|---|---|---|---|
| B09F | 9 | | |
| B12F | 12 | | |
| B15F | 15 | 1½ | 30 |
| B18F | 18 | | |
| B21F | 21 | | |
| 1 Dummy Drawer 1 Dummy Doors | | | |
| B24F | 24 | | |
| B27F | 27 | | |
| B30F | 30 | 1½ | 30 |
| B33F | 33 | | |
| B36F | 36 | | |
| 2 Dummy Drawers 2 Dummy Doors | | | |

### Base Dummy Door (Side)

| Item Code | W | D | H |
|---|---|---|---|
| BDD21 | 21 | ¾ | 28½ |
| BDD24 | 24 | ¾ | 30½ |

### Dummy Drawers (Small)

| Item Code | W | D | H |
|---|---|---|---|
| D09 | 9 | | |
| D12 | 12 | | |
| D15 | 15 | | |
| D18 | 18 | ¾ | n/a* |
| D21 | 21 | | |
| D24 | 24 | | |
| D27 | 27 | | |
| D33 | 33 | | |

*Depends on color

### Dummy Drawers (Large)

| Item Code | W | D | H |
|---|---|---|---|
| DD12 | 12 | | |
| DD15 | 15 | | |
| DD18 | 18 | | |
| DD21 | 21 | ¾ | n/a* |
| DD24 | 24 | | |
| DD30 | 30 | | |
| DD36 | 36 | | |

*Depends on color



### Dummy Doors

| Item Code | W | D | H |
|---|---|---|---|
| F09 | 9 | | |
| F12 | 12 | | |
| F15 | 15 | | |
| F18 | 18 | ¾ | n/a* |
| F21 | 21 | | |
| F27 | 27 | | |
| F33 | 33 | | |
| *Depends on color | | | |
| LS12 | 9 | ¾ | |

### Tall Dummy Doors (Side)

| Item Code | W | D | H |
|---|---|---|---|
| BDD8424 | | | 84 |
| BDD9024 | 24 | | 90 |
| BDD9624 | | ¾ | 96 |
| BDD8427 | | | 84 |
| BDD9027 | 27 | | 90 |
| BDD9627 | | | 96 |
| 4 Dummy Doors | | | |

### Tall Dummy Doors (Front-Base)

| Item Code | W | D | H |
|---|---|---|---|
| WP18BF | 18 | | |
| WP24BF | 24 | ¾ | 49½ |
| WP30BF | 30 | | |

### 12"H Wall Dummy Doors

| Item Code | W | D | H |
|---|---|---|---|
| W3012F | 30 | ¾ | 12 |
| W3612F | 36 | | |

### 15"H Wall Dummy Doors

| Item Code | W | D | H |
|---|---|---|---|
| W3015F | 30 | ¾ | 15 |
| W3615F | 36 | | |

25

## DUMMY DOORS & DUMMY DRAWERS

### 18"H Wall Dummy Doors

| Item Code | W | D | H |
|---|---|---|---|
| W3018F | 30 | ¾ | 18 |
| W3618F | 36 | | |

### 21"H Wall Dummy Doors

| Item Code | W | D | H |
|---|---|---|---|
| W3021F | 30 | ¾ | 21 |
| W3621F | 36 | | |

### 24"H Wall Dummy Doors

| Item Code | W | D | H |
|---|---|---|---|
| W3024F | 30 | ¾ | 24 |
| W3624F | 36 | | |

### 30"H Wall Dummy Doors

| Item Code | W | D | H |
|---|---|---|---|
| W0930F | 9 | | |
| W1230F | 12 | | |
| W1530F | 15 | | |
| W1830F | 18 | ¾ | 30 |
| W2130F | 21 | | |
| W2730F | 27 | | |
| W3330F | 33 | | |

### 36"H Wall Dummy Doors

| Item Code | W | D | H |
|---|---|---|---|
| W0936F | 9 | | |
| W1236F | 12 | | |
| W1536F | 15 | | |
| W1836F | 18 | ¾ | 36 |
| W2136F | 21 | | |
| W2736F | 27 | | |
| W3336F | 33 | | |

### 42"H Wall Dummy Doors

| Item Code | W | D | H |
|---|---|---|---|
| W0942F | 9 | | |
| W1242F | 12 | | |
| W1542F | 15 | | |
| W1842F | 18 | ¾ | 42 |
| W2142F | 21 | | |
| W2742F | 27 | | |
| W3342F | 33 | | |

### 30"H Door Frame for Glass Insert

| Item Code | W | D | H |
|---|---|---|---|
| WM0930 | 9 | | |
| WM1230 | 12 | | |
| WM1530 | 15 | | |
| WM1830 | 18 | ¾ | 30 |
| WM2130 | 21 | | |
| WM2730 | 27 | | |
| WMDC2430 | 15 | | |

*Glass insert not included

### 36"H Door Frame for Glass Insert

| Item Code | W | D | H |
|---|---|---|---|
| WM0936 | 9 | | |
| WM1236 | 12 | | |
| WM1536 | 15 | | |
| WM1836 | 18 | ¾ | 36 |
| WM2136 | 21 | | |
| WM2736 | 27 | | |
| WMDC2436 | 15 | | |

*Glass insert not included

### 42"H Door Frame for Glass Insert

| Item Code | W | D | H |
|---|---|---|---|
| WM0942 | 9 | | |
| WM1242 | 12 | | |
| WM1542 | 15 | | |
| WM1842 | 18 | ¾ | 42 |
| WM2142 | 21 | | |
| WM2742 | 27 | | |
| WMDC2442 | 15 | | |

*Glass insert not included



K3 - Greige Maple

### Warranty

J&K Cabinetry hereby warrants that all cabinets sold by J&K Cabinetry are free from defects in material and workmanship for a period of one year from the date of purchase. This warranty is expressly limited to repair or replacement of the defective part at the discretion of J&K Cabinetry, and does not include labor for removal or replacement. This warranty only applies to the original consumer purchaser and is not transferable to subsequent owners. This warranty does not extend to defects caused by improper handling, storage, installation, assembly or disassembly, damages, product modifications, exposure to the elements including humidity or heat which may result in damaging the cabinets, misuse, abuse or negligence.

### Variations and Environmental Exposures Not Covered

By purchasing the product, the original purchaser acknowledges that natural wood may vary in texture, color, and wood grain and it may exhibit subtle changes as it ages. Sunlight, smoke, moisture, household cleaners, and other environmental conditions that may cause the materials to vary from their original color and to warp, split, or crack. These variations are considered to be natural and related to the environmental exposure of the product and are not covered under this warranty.

### Updated Product Lines

J&K Cabinetry periodically updates and makes changes to its product line and specifications. If a warranty claim is filed against obsolete or changed product and repair is not possible, J&K Cabinetry will replace the part under warranty with a new part of the same style or with a similar style currently offered. J&K Cabinetry is not responsible for a replacement product that may not match the installed product exactly.

### Disclaimers and Additional Limitations

J&K Cabinetry makes no other warranties other than those set forth above, and original purchaser's exclusive remedies are limited to those stated above. All other warranties are hereby disclaimed, including an implied warranty of merchantability and an implied warranty of fitness for a particular purpose. In no event will J&K Cabinetry be liable for consequential or incidental damages, including but not limited to damages arising from personal injury, lost profits, loss of business opportunity, loss of property, economic losses, or statutory or exemplary damages, whether from negligence, warranty, strict liability or otherwise. This limited liability applies to any and all parties, including end-user or homeowner to which the original purchaser sells J&K Cabinetry's product.

### Printing Limitations

Cabinets stain colors might vary from the photos in this catalog due to printing limitation. It is advised to view the actual door samples when making your selection.

27

Barcode:3894973-02 A-570-106 INV - Investigation

PUBLIC VERSION



[                    ]

[          ]
[          ]

[          ]
[          ]

**www.jk-cabinetry.com**

**For further information, please conact sales@jk-cabinetry.com**

**HOW TO BE J&K'S DEALER**

To learn more, download and complete the dealer
application form *http://jk-cabinetry.com* and
email to *sales@jk-cabinetry.com* or
fax to [                    ]

Our sales representatives will contact you and
work out the best solution for you.

**Note:**
[1] J&K Cabinetry reserves the right to change or modify cabinets as part of its on-going development.
[2] Picture colors are not guaranteed to match actual cabinet metarials due to print limitations. Please check with your dealer(s)
for actual door samples when making your selection.

©Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Barcode:3894973-02 A-570-106 INV - Investigation  -

# EXHIBIT 4C

APPX086471

Barcode:3894973-02 A-570-106 INV - Investigation -

# J&K CABINETRY



**2017 EDITION**

Barcode:3894973-02 A-570-106 INV - Investigation  -

# *Table of Contents*



| | |
|---|---|
| Our History | 03 |
| Our Products | 04 |
| Kitchen Cabinets Gallery | 06 |
| Bathroom Cabinets Gallery | 32 |
| Accessories & Decors | 36 |
| Door Styles & Finishes | 40 |
| Enviromental Commitment | 43 |
| Standard Features | 44 |
| Finest Finishes | 45 |
| Warranty & Terms | 46 |

Barcode:3894973-02 A-570-106 INV - Investigation  -

# *Our History*

Our first J&K Cabinetry company was originated in Atlanta, Georgia back in 2003, with our goal of providing to our customers the highest quality of cabinets available at an affordable price.  We are also the manufacturer for our own J&K's distinctive and stylish line of kitchen cabinets and bathroom vanities.  For the past 13 years, J&K Cabinetry has been expanding steadily from the East Coast, through the Mid-way North and South, and to the West Coast of the U.S. with more than 15 warehouses and showroom locations.

J&K Cabinetry continues to grow today as a unique cabinet brand as well as a leading cabinet wholesaler in the nation.  One of the keys to our continued success lies in our commitment to continually improve both the product quality and the design style with our customers' needs in mind.  For we believe that customer satisfaction is both the reward and the guarantee of our successful accomplishment of our company goal.  And we value our growth and continued improvements just as our customers do.



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086474

Barcode:3894973-02 A-570-106 INV - Investigation  -

# Our Product

As the manufacturer and direct wholesaler of our own J&K's cabinetry products, we are able to eliminate the middle-person cost and significantly reduce the product price for our customers, without losing the actual product quality and value. All of our cabinets and vanities are constructed with 100% solid wood doors and frames, 1/2" to 5/8"-thick plywood boxes, soft-close metal door hinges, full-extension drawer with soft-close  metal glides, and more.  We insist in making all these "optional upgrades" a necessary standard, efficiently improving the overall quality, functionality, durability, and value of our products, without adding the burden of higher price for our customers.

All J&K's cabinets are Ready-To-Assemble (RTA) and Semi-Customizable to our customers' specific needs.  As our own manufacturer, we are able to maintain quality control and strict supervision over our cabinet production process through high-tech machinery and detailed hand-crafting.  We also believe that by focusing on the excellent craftsmanship and unique designs of our cabinet styles, we can offer a more personalized experience for our customers and homeowners when they choose their dream kitchens with us.



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved
APPX086475

Barcode:3894973-02 A-570-106 INV - Investigation -

*Welcome*
*To Your Dream Kitchen!*



Barcode:3894973-02 A-570-106 INV - Investigation  -



Shown/
TRANSITIONAL Kitchen Cabinet
in **Pearl Maple Glazed (H9).**

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086477

Barcode:3894973-02 A-570-106 INV - Investigation -



Barcode:3894973-02 A-570-106 INV - Investigation -



Door Style / **Transitional**
Finished Color / **Pearl with Glaze**

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086479

Barcode:3894973-02 A-570-106 INV - Investigation -

Double-stacked
Crown Moldings

Your kitchen — the
heart of
your home
envisioned in
new styles.





APPX086480

Barcode:3894973-02 A-570-106 INV - Investigation  -



Shown/
TRANSITIONAL Kitchen Cabinet
in **Greige Maple (K3).**

Barcode:3894973-02 A-570-106 INV - Investigation -



Barcode:3894973-02 A-570-106 INV - Investigation  -





Semi-customized
Wine Rack



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086483

Barcode:3894973-03 A-570-106 INV - Investigation  -



Door Style / **Transitional**
Finished Color / **Greige**

APPX086484

Barcode:3894973-03 A-570-106 INV - Investigation  -



Barcode:3894973-03 A-570-106 INV - Investigation -



Shown/
CONTEMPORARY Kitchen Cabinet
in **White Maple (S8).**

APPX086486

Barcode:3894973-03 A-570-106 INV - Investigation -



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086487

Barcode:3894973-03 A-570-106 INV - Investigation -

Your kitchen —
a personal
space in the comfort
of your home.







Door Style/ **Contemporary**
Finished Color/ **White**

Barcode:3894973-03 A-570-106 INV - Investigation  -



Door Style/ **Contemporary**
Finished Color/ **Java Coffee**



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086489

Barcode:3894973-03 A-570-106 INV - Investigation -



Shown/
CONTEMPORARY Kitchen Cabinet
in **Java Coffee Maple (S1).**

APPX086490

Barcode:3894973-03 A-570-106 INV - Investigation  -



Shown/
TRANSITIONAL Kitchen Cabinet in **Espresso Maple (K8)**.

Filed By: Lori Ellis, Filed Date: 9/26/19 4:31 PM, Submission Status: Approved
Page 221 of 260

Barcode:3894973-03 A-570-106 INV - Investigation -



Door Style/ **Transitional**
Finished Color/ **Espresso**



Barcode:3894973-03 A-570-106 INV - Investigation  -

Door Style/ **Traditional**
Finished Color/ **Cinnamon with Glaze**





Barcode:3894973-03 A-570-106 INV - Investigation -

Shown/
TRADITIONAL Kitchen Cabinet in **Cinnamon Maple Glazed (CO66).**



APPX086494

Barcode:3894973-03 A-570-106 INV - Investigation  -

Shown/
TRADITIONAL Kitchen Cabinet
in **Mahogany Maple (J5).**



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Barcode:3894973-03 A-570-106 INV - Investigation  -



Door Style/ **Traditional**
Finished Color/ **Mahogany**



APPX086496

Barcode:3894973-03 A-570-106 INV - Investigation -




Door Style/ **Traditional**
Finished Color/ **Creme with Glaze**

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086497

Barcode:3894973-03 A-570-106 INV - Investigation  -



Shown/
TRADITIONAL Kitchen Cabinet
in **Creme Maple Glazed (A7).**

Barcode:3894973-03 A-570-106 INV - Investigation   -



Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

Barcode:3894973-03 A-570-106 INV - Investigation  -



Shown/
TRADITIONAL Kitchen Cabinet
in **Chocolate Maple Glazed (M01).**

Door Style/ **Traditional**
Finished Color/ **Chocolate with Glazed**



Barcode:3894973-03 A-570-106 INV - Investigation  -

Door Style/ **Traditional**
Finished Color/ **Mocha with Glaze**





Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086501

Barcode:3894973-03 A-570-106 INV - Investigation -



Barcode:3894973-03 A-570-106 INV - Investigation -



TRANSITIONAL Vanity Cabinet in **Espresso Maple (K8)** finish.

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086503

Barcode:3894973-03 A-570-106 INV - Investigation -



TRANSITIONAL Vanity Cabinet
in **Greige Maple (K3)** finish.



Barcode:3894973-03 A-570-106 INV - Investigation  -





TRADITIONAL Vanity Cabinet
in **Cinnamon Maple Glazed
(CO66)** finish.

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086505

Barcode:3894973-03 A-570-106 INV - Investigation  -



TRADITIONAL Vanity Cabinet
in **Mahogany Maple (J5)** finish.

Barcode:3894973-03 A-570-106 INV - Investigation -
# Lazy Susans




# Spice Pull-Outs




APPX086507

Barcode:3894973-03 A-570-106 INV - Investigation -



Glass Rack



Wine Rack



Waste Bin Pull-Out



Sink Base Tilt-Out Tray

Barcode:3894973-03 A-570-106 INV - Investigation -

## Moldings & Fluted Fillers




## Large Corbels




Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved
APPX086509

Barcode:3894973-03 A-570-106 INV - Investigation -

# Small Corbels




# Onlay Decors




APPX086510

Barcode:3894973-03 A-570-106 INV - Investigation  -



**A7**
Creme Maple Glazed



**CO66**
Cinnamon Maple Glazed



**K10**
Mocha Maple Glazed



**J5**
Mahogany Maple



**M01**
Chocolate Maple Glazed

TRADITIONAL

NOTE/  Product photography in this catalog have been reproduced as accurately as printing technologies permit.
We strongly recommend you view an actual product sample for best color and wood grain representation.

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086511

Barcode:3894973-03 A-570-106 INV - Investigation   -







**H9 — NEW!**
Pearl Maple Glazed

**H8**
Hazel Maple
(Coming Soon!)

**H3 — NEW!**
Chestnut Maple



TRANSITIONAL





**K3**
Greige Maple

**K8**
Espresso Maple

NOTE/  Not all door styles and finishes are available at certain locations.  Please check with your local J&K CABINETRY showroom for current availability.

## CONTEMPORARY



**S8**
White Maple

**S2**
Almond Maple

**S1**
Java Coffee Maple

---

NOTE/ Product photography in this catalog have been reproduced as accurately as printing technologies permit.
We strongly recommend you view an actual product sample for best color and wood grain representation.

NOTE/ Not all door styles and finishes are available at certain locations.  Please check with your local J&K CABINETRY
showroom for current availability.

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086513

Barcode:3894973-03 A-570-106 INV - Investigation  -

# *Our Environmental Commitment*

We believe that healthy environment is a backbone to the happy lives of our customers and our society.  In addition to our continued effort to improve our product qualities and values, J&K Cabinetry is committed to manufacturing and selling environmental-friendly and healthy products for our customers.

J&K cabinets' hardwood-plywood materials are compliant with "California 93120 Phase 2" (CARB 2) standard for formaldehyde.  Our cabinets' solid wood materials are sourced from forests that are responsibly managed in line with the "Forest Stewardship Council" (FSC) principles and criteria.  And we use "AkzoNobel"—a leading global company in sustainable paints and coatings—for  our cabinet finishes.



Barcode:3894973-03 A-570-106 INV - Investigation  -

## *Standard Features*

All J&K's cabinets and vanities are superiorly constructed with 100% solid wood and proudly come with the following STANDARD features:

1. **Door Panel:**  3/4"-thick solid wood; full overlay door.

2. **Door Hinge:** 6-way adjustable; soft-close metal; hidden Euro-style.

3. **Adjustable Shelf:** 5/8"-thick cabinet-grade plywood; clear coat finish on all sides and edges; with metal shelf rests.

4. **Drawer:** 1/2"-thick solid wood on all sides; full extension pull-out; dovetail construction.

5. **Drawer Glide:** full extension pull-out; soft-close metal; concealed under-mount.

6. **Plywood Box:** 1/2" to 5/8"-thick cabinet-grade plywood; clear coat finish on interior sides; matching color finish on exterior sides.

7. **Metal Bracket:** corner bracket reinforcements in base cabinets for maximum stability.

8. **Door Bumper:** promote quiet-closing and reduce slamming for maximum durability.

NOTE: As we continue to improve our product qualities and designs, the actual functionality of Door Hinge and Drawer Glide may vary slightly between existing and newest product styles and finishes. Please check with your local J&K Cabinetry showroom or dealer for most current updates.

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086515

# *Finest Furniture Finishes*

Our J&K's solid wood cabinet finishes are processed through the following excellent craftsmanship details:

1. The finest solid maple wood is sanded until smooth and vacuumed.

2. An equalizer stain is applied to balance the base color of the wood.

3. A toner is applied to establish color uniformity.

**NOTE**:Not actual product; image for reference only.

4. A deep penetrating stain is applied to reveal the hidden beauty of the natural grain.

5. All stained surfaces are hand-rubbed and wiped of excess stain, and then slowly air-dried.

6. A wood sealer is applied, penetrating all exposed wood surfaces for uniform protection.

7. All surfaces are hand-sanded, providing a smooth, consistent surface.

8. A glaze is applied by hand (if applicable).

9. A color consistency examination is performed with additional touch-up if needed.

10. A final protective top coat is applied, maximizing resistance to scuffing, moisture, fading and most household chemicals.

Barcode:3894973-03 A-570-106 INV - Investigation  -

# *Warranty and Terms*



## J&K CABINETRY WARRANTY

J&K CABINETRY, including its direct wholesaler and/or retailer companies or corporations, business entities or groups (collectively as "J&K CABINETRY"), hereby warrants that all cabinets sold by J&K CABINETRY are free from unnatural defects in material and workmanship under normal use and proper care for the period of ONE (1) YEAR from the date of original purchase.  This Warranty is expressly and exclusively limited to the repair or replacement of the defective product(s) at the sole discretion of J&K CABINETRY, and does not cover the labor cost for the repair or replacement, removal or transportation of the defective product(s). This Limited Warranty applies only to the Original Purchaser and is not transferable to any other party.

This Limited Warranty becomes void if any of the cabinet product(s) and part(s) is altered by the Original Purchaser for any reason from its original form.  This Limited Warranty does not cover product damages resulting from, but not limited to, 1) improper packaging, shipping, handling, or storage; 2) self-modification or customization, self-assembling or disassembling, or self-installation or demolition; and/or 3) negligence, misuse, abuse, or lack of proper inspection, maintenance, or care of the cabinet product(s) and part(s) by the Original Purchaser.

## NATURAL OCCURRENCES AND ENVIRONMENTAL EXPOSURES NOT COVERED

By purchasing J&K CABINETRY's solid wood product(s), the Original Purchaser fully acknowledges that all solid wood materials by nature will experience certain degree of expansion and contraction, warping and cracking, and/or color variations; these are due to environmental factors including, but not limited to, 1) temperature and humidity changes; 2) excessive heat or cold and dryness or moisture, or the lack thereof; 3) prolonged exposure to any and all types of light sources, smokes, and household chemicals; 4) the aging of natural solid wood; and/or 5) normal wear and tear, accidents, or acts of God.  These are considered natural occurrences and not defects in material and workmanship, and are not covered under this Limited Warranty.

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086517

Barcode:3894973-03 A-570-106 INV - Investigation  -

## UPDATED PRODUCT LINES

J&K CABINETRY periodically updates and makes changes to its product lines and specifications without notice. If a warranty claim is filed against obsolete or changed product(s) and repair is not possible, J&K CABINETRY reserves the right to replace the product(s) under warranty with the most similar item currently available.  J&K CABINETRY cannot guarantee the finished color and style of the replacement product(s) will match exactly with the finished color and style of the defective product(s).

## DISCLAIMERS, ADDITIONAL LIMITATIONS, AND INDEMNIFICATIONS

J&K CABINETRY makes no other warranties, and there are no implied warranties, other than those set forth herein, and/or extending beyond the terms of this Limited Warranty.  In no event will J&K CABINETRY be liable for incidental or consequential damages to the Original Purchaser or to any party, including but not limited to damages arising from personal injury, lost profits, loss of business opportunity, loss of property, economic losses, or statutory or exemplary damages, whether due to negligence, warranty, strict liability or otherwise.  Additionally, the Original Purchaser agrees to indemnify, defend, and hold J&K CABINETRY harmless from and against any and all claims, lawsuits, civil penalties, losses, or expenses (including attorney's fees) by any party, or entity, or class, arising from but not limited to the acts or omissions, the negligence or fault of the Original Purchaser, or its employees, representatives, agents, or contractors.  This indemnification of J&K CABINETRY applies irrespective of any negligence by J&K CABINETRY, except to the extent determined in legal proceedings that the loss resulted from the sole fault or negligence of J&K CABINETRY.

## SUBMITTING A CLAIM

To submit a warranty claim on defective product(s), the Original Purchaser must contact the local J&K CABINETRY showroom or dealer from which the product(s) was originally purchased.  The Original Purchaser must present a copy of the original Invoice for the product(s) as Proof of Purchase.  If a return of the defective product(s) is required, the Original Purchaser must obtain a proper return authorization before sending any product back to the local J&K CABINETRY showroom or dealer.  J&K CABINETRY is not responsible for any product sent by the Original Purchaser without prior approval or authorization. J&K CABINETRY, at its sole discretion, may require an inspection of the allegedly defective product(s) before a repair or replacement is issued under this Limited Warranty.

Barcode:3894973-03 A-570-106 INV - Investigation  -



www.jandkcabinets.com

Copyrights © 2017 J&K International Group, Ld.C.  All Rights Reserved.

APPX086319

Barcode:3894973-03 A-570-106 INV - Investigation  -

# EXHIBIT 5

APPX086520

Barcode:3894973-03 A-570-106 INV - Investigation  -

# ENTIRE EXHIBIT NOT CAPABLE OF PUBLIC SUMMARY

APPX086521

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

Barcode:3894973-03 A-570-106 INV - Investigation  -

# EXHIBIT 6A

APPX086540

Barcode:3894973-03 A-570-106 INV - Investigation  -



## *Exceptional Value with Endless Possibilities*

BECOME A DEALER   DEALER ONLY   LOGIN

PRODUCTS   OUR SERVICES   OUR CLIENTS   TOOLS   CONTACT US   WHERE TO BUY

## FAQ

**How many styles of cabinets do you offer?**
We currently carry 8 lines with unique finishes. Please see all the door collections here.

**Do you have showrooms?**
Yes, our showrooms are in our distribution centers located in [                                    ] Contact our regional Grand
JK Cabinetry Distribution center for more information.

Many of authorized Grand JK Cabinetry dealers also display our product. Please contact them to find out by using our Dealer Locator.

**Do you sell granite?**
Yes, only sell to authorized Grand JK Cabinetry retailers, and prefabricated granites only distributed in [                                    ]
locations. They come in 8' x 25.5", 9' x 25.5", 3' x 6', 3' x 8', 3' x 9', 42" x 8', etc... Each location may vary in color and sizes. Please call us or visit our
locations for more details. Container Volume Granite Purchase is available.

**Do you sell sink & hardware?**
Yes, only sell to authorized Grand JK Cabinetry retailers and only distributed in [                                    ] locations. Please call us or visit
our locations for more details.

**Are all the cabinets made of solid wood?**
Yes, all of our cabinets are made of solid maple wood door and frames with plywood constructed box. No compressed woods or particle boards are
used.

**Do you have a specification book?**
Yes, click "Specification" to download the spec book that we have. Please note that when you need to place an order, please consult your authorized
Grand JK Cabinetry retailer for available sizes.

**I am a homeowner, can I purchase Grand JK cabinets online?**
Grand JK cabinetry does not sell cabinets directly to homeowners and does not sell them online, prices vary according to authorized Grand JK
Cabinetry retailers, you can contact your dealer for pricing. In some instances the cost to ship a cabinet may exceed the cost of the item purchased.
Because of the intricacies of cabinetry varieties, sizes and shapes, it is best to seek the advice of authorized J&K Cabinetry retailers. By doing so, you
will be certain to get the right solution for your home.

There are many factors critical to the success of a functional and aesthetically pleasing design and good installation. Many of authorized Grand
JK Cabinetry retailers use the latest technology to create designs with electronic software programs. Reducing errors through proper measurements,
appliance and detailed mechanical specifications as well as construction specifics is necessary, and relying on a professional is recommended.

For the Grand JK retailers nearest you please visit your authorized Grand JK Cabinetry retailers or you can have your licensed contractor to purchase
from us.

**Can I, a homeowner order a Grand JK Cabinetry price list?**
Each authorized Grand JK Cabinetry retailers establishes their own pricing policies, which reflect shipping and handling costs to their specific areas.
Additionally, pricing a cabinet order can be quite complex depending on the size of your space and the storage and decorative options you choose as
well as any construction upgrades you desire. Please consult your authorized Grand JK retailer for a design and precise quote on your new kitchen,
bath or other room installation.

**When can I expect to receive my cabinets?**
Grand JK cabinetry is made to order for our authorized Grand JK Cabinetry retailers. In most cases, they can expect an order roughly 2-3 weeks
(depending on geographic of authorized Grand JK retailers and timing of your order).

For homeowners, we recommend to consult with your authorized Grand JK Cabinetry retailer due to possible assembly and semi-custom or
modification of cabinet(s).

**How will cabinets be shipped?**
We ship them unassembled and/or assembled in boxes, on pallet(s) and wrapped with stretched wraps.

**Where can I get replacement parts, touch-up materials or polish/cleaner for my Grand JK cabinetry?**
We offer touch-up material in different forms, such as fill sticks, markers, aerosol cans and quarts of stain to meet a variety of needs. However, since we
do not sell direct, this product must be ordered and purchased from authorized Grand JK Cabinetry retailers.

**Translate »**

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086541

[                    ]                                                    9/24/2019

Barcode:3894973-03 A-570-106 INV - Investigation  -

**What wood material is used for Grand JK Cabinetry?**
Solid maple wood is the main wood specie we use for cabinet doors, frames, moldings decoration parts, and drawers. And plywood is used for cabinet box construction.

**What if my retailers does not have a sample, style or color that I'm interested in?**
An authorized Grand JK retailer can order door samples that we offer. You can also order samples online.

**Why I visited two retailers who both sold Grand JK products, and the cabinet names were not the same?**
Style names may be different from retailer to retailer. Please bring a picture of the Grand JK cabinetry to your authorized Grand JK Cabinetry retailer so they can identify the exact style that you're looking for and provide you with information specific to their store.

**How to maintain and care for my new Grand JK cabinets?**
For cleaning and maintenance, please read our maintenance page in the specification.

**What is Grand JK Cabinetry's warranty?**
Our warranty guarantees your cabinetry to be free from defects in material and/or workmanship under normal residential usage to the original purchaser for one year of the product. For a copy of the warranty and more details, please visit our warranty page.

**Can I purchase a stain to coordinate the trim around my windows with my cabinetry?**
You can order a stain through an authorized Grand JK Cabinetry retailer.

**How to apply stains?**
Click here for stain application instruction.

**Where are Grand JK products assembled?**
All Grand JK cabinets are assembled in the United States in our distribution centers in [                                           ], or your authorized Grand JK Cabinetry retailer.

**How do I apply for a job?**
We're always looking for enthusiastic and dedicated workers to join our family. To view our current job openings, please visit our Employment page.

**Can I purchase Grand JK cabinetry for rooms other than kitchen and bathroom in my house?**
Grand JK cabinetry is available for the kitchen, pantry, bathroom, office or library, great or family room, laundry and craft rooms, dining room, bedroom, and entry way – basically almost anywhere in your home where you want beautiful semi-customized furniture.

**Can I purchase only doors or drawer fronts for my cabinetry?**
We offer the option to purchase only the doors and/or drawer fronts. However, sizes are limited. Your local authorized Grand JK Cabinetry retailer is the best resource to determine available sizes.

**Can I get replacement parts from Grand JK Cabinetry?**
Grand JK Cabinetry at its option may elect to repair or to replace any Grand JK Cabinetry product covered by this warranty. We are always innovating and actively seeking out ways to improve our product offering and to make your life easier. As such, some replacement parts are subject to availability, and may differ from those originally supplied. Contact your authorized Grand JK Cabinetry retailer for more info.

**I have a project that needs a large amount of cabinets, who should I talk to?**
If you have a multi-unit project or container volume, we have a container volume pricing.

**How do I go about ordering this high quantity of cabinetry?**
Please visit your local authorized Grand JK Cabinetry retailer so that they can contact a Grand JK Cabinetry sales representative to get you correct pricing information.

**I am a wholesaler; would Grand JK Cabinetry be able to produce doors according to my specification?**
Contact our regional Grand JK Cabinetry Distribution center for detail.

**I am a wholesaler interested in developing my own unique designs, my own designed box construction and my own specification?**
Contact our regional Grand JK Cabinetry Distribution center for detail.

**Can I purchase container loads of Grand JK cabinets?**
Yes, you are wholesalers, builders, contractor, home centers, whom are interested purchasing container loads. Contact our regional Grand JK Cabinetry Distribution center for detail.

**I need to replace a cabinet, but the style has been discontinued. What should I do?**
Contact our regional Grand JK Cabinetry Distribution center for detail.

**How do I become a Grand JK Cabinetry retailer?**
Grand JK Cabinetry currently sells through an established network of kitchen and bath retailers. In some areas Grand JK Cabinetry may be interested in establishing new dealer locations if a dealer meets specified criteria.

If you are interested in becoming a dealer and meet the criteria, please complete this literature request form, or fill out on our "becoming a dealer" page. Make sure to indicate that you're a trade professional. A Grand JK Cabinetry sales representative will contact you.

**Can't find an answer to your question?**
Contact our regional Grand JK Cabinetry Distribution center for detail.

**Translate »**

Barcode:3894973-03 A-570-106 INV - Investigation  -

Like  Share  Sign Up to see what your friends like.

AFFILIATES & ASSOCIATION

         

ABOUT US ♦ EMPLOYMENT ♦ FAQ ♦ WARRANTY ♦ RETURN POLICY ♦ PRIVACY STATEMENT



© 2019 Grand J&K Corp., Grand JK Cabinetry Inc. and Grand JK&C Ltd.
All rights reserved. Designed by: Imagespring

  

01114600

Translate »

Barcode:3894973-03 A-570-106 INV - Investigation  -

# EXHIBIT 6B

APPX086544

J&K CABINETRY

Barcode:3894973-03 A-570-106 INV - Investigation  -

[                                                                    ]

# FAQ

**I am a contractor/remodeler, how do I purchase cabinets from you?**

**What wood material is used for J&K Cabinetry?**

h solid maple wood for our cabinet doors, and maple wood for our frames, moldings, decor, and drawers. We also use 3/4 inch plywood for the cabinet box construction.

nd **E2 Charcoal** door frames are made of 3/4 inch maple wood and the center door and center drawer panels are 1/4 inch cabinet grade plywood. They also come in 3/4 inch plywood for the cabinet box construction.

**Where are your cabinets assembled?**

**Can we get a door style in a different color?**

**Are all your cabinets soft-close?**

**Do you offer kitchen design service?**

**Do you have a showroom?**

**I am a homeowner, am I able to buy directly from you?**

**Do you offer counter tops, sinks, or hardware?**

**How long does it take to receive my cabinets?**

**How are cabinets packaged and shipped?**

**What is your return policy?**

**Does J&K Cabinetry offer a warranty?**

**Can't find an answer to your question?**

Please contact us at sales@jkcabinetry.com or [                              ]

Main menu                                                                    ⌄

Premium RTA Cabinets at Wholesale prices. Official J&K Cabinetry Wholesale. Opened in 2003, Providing Quality Cabinets At An Affordable Prices. Your Partner for Highest Quality of All-Wood Cabinets At An Affordable Price! We Are Now Conveniently Available Through a Network of Wholesalers and Dealers Nationwide! S8 S1 S2 S5 K3 H9 H8 H3 K3 A7 C066 M01 K10 K8 J5

Barcode:3894973-03 A-570-106 INV - Investigation  -

# EXHIBIT 7

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/27/19 4:44 PM, Submission Status: Approved

APPX086546

**PUBLIC VERSION**

## DECLARATION OF [[          ]]

I, [[            ]], declare and state as follows:

1.      I am currently employed as [[             ]] of wooden cabinets and vanities located in [[         ]]. I have worked in the wooden cabinets and vanities industry for [[       ]].

2.      In my capacity as [[              ]] of wooden cabinets and vanities, I [[             ]], including both domestically-produced and imported cabinets. I frequently communicate with U.S. producers and importers of wooden cabinets and vanities. Accordingly, I possess extensive knowledge of the U.S. wooden cabinets and vanities market, including of cabinets imported from countries such as China.

3.      [[             ]] produced by [        ] and then imported into the United States and sold by [            ]. From that experience and based on my knowledge of the wooden cabinets and vanities industry, I understand that [      ] is the exclusive supplier of [      ]. That is, it is my understanding that [           ] and then imported and sold in the United States by [      ]. Based on my [[      ]] in the industry, these imported cabinets compete head-to-head with domestically-produced wooden cabinets and vanities.

4.      For the time that [[      ]] [         ], and including from July 2018 through December 2018, [      ] has consistently represented to me that they sell cabinets made of solid maple wood. These representations have been made to me in direct discussions with [       ] representatives and also through information provided on [      ] websites and in [      ] product catalogs.

5.      Based on my experience in the wooden cabinets and vanities industry, maple is significantly more expensive than birch. This is true for both solid wood and veneers. In many instances, maple solid wood or veneers can be twice as expensive as birch solid wood or veneers.

6.      The text surrounded by square brackets in this affidavit contains business proprietary information, the release of which would cause serious commercial harm to [[         ]].

APPX086547

Barcode:3894973-03 A-570-106 INV - Investigation -

**PUBLIC VERSION**

7.  I declare, under penalty of perjury, under the laws of the United States, that to the best of my knowledge, the foregoing is true and correct. Executed on September 25, 2019 in [[                    ]].

[[                                        ]]
  [[                              ]]

[[              ]]
[[                ]]

APPX086548

| | | | |
|---|---|---|---|
| Preliminary Determination Memorandum for Dalian Meisen Woodworking Co., Ltd. (October 2, 2019) | C.R. 1437 | P.R. 1413 | APPX086549-APPX086550 |

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
POI: 07/01/2018- 12/31/2018
~~Proprietary Document~~
E&C/OV: KJA
**Public Version**

October 2, 2019

MEMORANDUM TO:        The File

THROUGH:              Emily Halle
                      Program Manager
                      Enforcement and Compliance, Office V

FROM:                 Kabir Archuletta
                      Senior International Trade Analyst
                      Enforcement and Compliance, Office V

SUBJECT:              Wooden Cabinets and Vanities and Components Thereof from the
                      People's Republic of China:  Preliminary Determination
                      Memorandum for Dalian Meisen Woodworking Co., Ltd.

As explained in the Preliminary Decision Memorandum,[1] we have preliminarily assigned Dalian
Meisen Woodworking Co., Ltd. (Meisen) a rate based on total adverse facts available pursuant to
section 776(a) and (b) of the Tariff Act of 1930, as amended.  We based this determination on
factual information submitted by Meisen itself, publicly available product information submitted
by the petitioner,[2] and an affidavit from a person with first-hand knowledge of the allegations
raised by the petitioner.[3]  In the Petitioner Meisen Pre-prelim Comments, the petitioner alleges
that Meisen represented the products it sold to the United States as made of solid maple but it
only reported birch as a factor of production (FOP) in this investigation.  Accordingly, the
petitioner alleges that Meisen failed to accurately report its U.S. sales and FOPs and should be
assigned a rate based on total adverse facts available.

In addition to the marketing materials submitted by the petitioner and the sworn affidavit, which
we find particularly concerning, Commerce considered the following information submitted by
Meisen in reaching its preliminary determination detailed in the Preliminary Decision
Memorandum.

---

[1] *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of
China:  Decision Memorandum for Preliminary Affirmative Determination of Sales at Less-Than-Fair Value," dated
October 2, 2019 (Preliminary Decision Memorandum).
[2] The petitioner is the American Kitchen Cabinet Alliance.
[3] *See* Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of
China:  Pre-Preliminary Comments for Meisen," dated September 26, 2019 (Petitioner Meisen Pre-prelim
Comments).

1. A price list for J&K Miami, contains [   ] pages of products, the vast majority of which are identified as [                  ].[4]  Specific products include [                               ], among many others.[5]

2. A price list for J&K Miami is labeled [                                      ].[6]

3. Other price lists reference numerous products described as [                           ], among many others.[7]

4. Numerous commercial invoices submitted by Meisen reference products described as [                  ],[8] [                  ],[9] [                        ],[10] [                ],[11] [                       ],[12] among many others.

5. The J&K Cabinetry 2019 Edition Catalog[13] submitted by Meisen advertises the first step in J&K's production process as:  The finest solid maple wood is sanded until smooth and vacuumed[14]

---

[4] *See* Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Section A Questionnaire Response," dated July 3, 2019 at Exhibit 3.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *See* Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Supplemental Section A Questionnaire Response," dated August 13, 2019 (Meisen SuppA), at Exhibit 10.

[9] *See* Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Supplemental Section C Questionnaire Response," dated August 27, 2019, at Exhibit 3.

[10] *Id.*, at Exhibit 4.

[11] *Id.*

[12] *Id.*, at Exhibit 7.

[13] The exact same information also appeared in the 2018 Edition Catalog, *see* Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Pre-Preliminary Comments for Meisen," at Exhibit 3 pg 49.

[14] *See* Meisen SuppA, at 63.

2

| | | | |
|---|---|---|---|
| Meisen Post-Prelim Supplemental Questionnaire (October 24, 2019) | C.R. 1466 | P.R. 1446 | APPX086551-APPX086562 |

Barcode:3903938-01 A-570-106 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
POI: 07/01/2018- 12/31/2018
~~Proprietary Document~~
E&C/OV:  KJA
Public Version

**October 24, 2019**

**Dalian Meisen Woodworking Co., Ltd.**
c/o Jeffrey S. Neeley
Husch Blackwell
750 17th St. NW, Suite 900
Washington, DC 20006-4675

Re:    Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components
        Thereof from The People's Republic of China:  Post-Prelim Supplemental Questionnaire

Dear Mr. Neeley:

This letter concerns the less-than-fair-value investigation of wooden cabinets and vanities and
components thereof from the People's Republic of China, and your client in this proceeding,
Dalian Meisen Woodworking Co., Ltd (Meisen).  In the Preliminary Decision Memorandum
accompanying the *Preliminary Determination*,[1] Commerce applied adverse facts available
(AFA) to Meisen because record information indicated that Meisen marketed and had sales of
merchandise under consideration during the period of investigation that were produced using
maple wood, a primary raw material that Meisen failed to report as a factor of production in its
questionnaire responses.  In the Preliminary Decision Memorandum, we stated that we would
continue to consider the application of AFA to Meisen based on any rebuttal factual information
provided by Meisen and, if appropriate, any further information requested by Commerce after
the issuance of this preliminary determination.  Accordingly, Commerce is requesting additional
information, as detailed in the enclosed supplemental questionnaire (*see* Attachment).  Please file
your supplemental response in accordance with the filing requirements and guidelines (including
the guidelines regarding English translations) as outlined in Commerce's original questionnaire.
Meisen's response to this supplemental questionnaire, along with the appropriate summarization
of proprietary data, as required by 19 CFR 351.304(c), is due no later than **November 4, 2019**.

With certain, limited exceptions, you are required to file electronically all submissions for all
proceedings using Enforcement and Compliance's Antidumping and Countervailing Duty
Centralized Electronic Service System (ACCESS).  Those instructions were provided in the
original questionnaire.

Commerce must conduct this investigation in accordance with statutory and regulatory deadlines.
If you are unable to respond completely to every question in the attached questionnaire by the

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary
Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of
Provisional Measures*, 84 FR 54106 (October 9, 2019).

established deadline, or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response.  Meisen should be aware that the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit because Commerce must have time to consider the extension request and decide on its disposition.[2]  If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline.  Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request.  Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  Commerce will not accept any requested information submitted after the deadline.  As required by section 351.302(d) of our regulations, we will reject such submissions as untimely.  Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

Should you have any questions about this matter, please contact Kabir Archuletta at (202) 482-2593.

Sincerely,

Emily Halle
Acting Program Manager, Office V
Enforcement and Compliance

Attachment

---

[2] *See Extension of Time Limits*, 78 FR 57790, 57792 (September 20, 2013).

Barcode:3903938-01 A-570-106 INV - Investigation  -

## ATTACHMENT

## SECTION C AND D SUPPLEMENTAL QUESTIONNAIRE

### Wooden Cabinets and Vanities from China

### *Dalian Meisen Woodworking Co. Ltd. (Meisen)*

**NOTE:**    *In accordance with 19 CFR 351.303(e), "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document.  A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department."*

**NOTE:**    *Please repeat the question prior to giving your response when responding to this supplemental questionnaire.*

**NOTE:**    *If a calculation worksheet is requested, please submit the requested worksheet in hardcopy format as well as electronic format in Excel.*

**NOTE:**    *If changes to your Section D, factors of production, or Section C, U.S. sales, database are required, please re-submit them accordingly.*

## SECTION D

1.  On page 14 of your supplemental section D and E questionnaire response, dated September 16, 2019 (SuppDE), the Department of Commerce (Commerce) requested that you confirm that the list of factors of production (FOPs) reported in your initial section D response, dated July 19, 2019 (SDQR), was an exhaustive list of FOPs used in the production of merchandise under consideration during the period of investigation (POI).

    On page 15 of your SuppDE, you confirmed that Meisen only consumed birch boards in the production of the merchandise under consideration during the POI.  However, other submissions in this investigation appear to indicate that maple wood was used to produce the subject cabinets sold during the POI.  Specifically, in Exhibit 41 of your supplemental section A questionnaire response, dated August 13, 2019 (SuppA), you provided the J&K Cabinetry 2019 catalog, where on page 63 J&K Cabinetry advertises production of its cabinets as follows:  "The finest solid maple wood is sanded until smooth and vacuumed."

    In exhibit 3 of your section A questionnaire response, dated July 3, 2019 (SAQR), you submitted a price list for "[                              ]" (J&K Cabinetry NC LTD), a price list containing [   ] pages of products identified as [                ], including [

3

Barcode:3903938-01 A-570-106 INV - Investigation  -

], among others (J&K Miami), and numerous price lists referencing products described as [
          ], among others.

   a.  Please explain why the promotional material of your U.S affiliates advertises cabinets made of maple.

   b.  Please state whether you produced and/or sold cabinets made with maple wood during the POI and submit documentation supporting your response.

   c.  Please provide documentation maintained in the normal course of business that identifies the species of wood consumed to produce subject cabinets that you made and sold during the POI.

   d.  Please submit documentation supporting Meisen's total purchases of wood boards during July 2018, and ensure that your documentation is accurately and completely translated.

2.  In Exhibit 4 of your SDQR, you provided a list of input suppliers.  Please provide a table that details all of Meisen's suppliers of wood inputs.  Include in your table the name and address of the supplier, the wood input supplied, a detailed description of each type of wood input supplied (including species of wood), the quantity and value of wood input supplied, and whether or not that wood input was used to produce wooden cabinets and vanities sold in the U.S. market during the POI.

3.  In Exhibit 3 of your SuppDE, you provided a screen shot labeled "[
                  ]."  However, in Exhibit 40 of your SuppA, in response to a request for Meisen's chart of accounts at the highest level of detail, account [     ] was labeled simply "[     ]."

   a.  Please confirm that the chart of accounts submitted in Exhibit 40 of your SuppA is Meisen's chart of accounts at the highest level of detail, as requested, and that it was in effect during the POI.

   b.  Please submit the Chinese-language version of your chart of accounts and confirm that the chart of accounts submitted in Exhibit 40 of your SuppA was an accurate translation, or revise and resubmit the English-language version, if necessary.

   c.  Please state whether Meisen maintains any account(s) that track the species of wood and submit documentation supporting your response.

4.  On page 6 of your SuppDE, you stated that "{p}er the Department's request, Meisen has included a field for the production quantity in m2 in the FOP database provided along with this submission."  However, it does not appear that such information has been included in your FOP database.  Please revise your FOP database to include a field for

4

production quantity in meters squared, as requested.

5.  In Exhibit 5 of your SuppDE, you provided monthly material movement schedules for each month of the POI.  And in Exhibit 14.1 you provided withdrawal slips for wood boards in August 2018.  However, your withdrawal slips are nearly illegible.

   a.  Please confirm that the submitted monthly material movement schedules are as they are maintained in the normal course of business.  If these documents were altered in any way for purposes of submission in this proceeding, please identify the alterations and submit copies of the schedules as they are maintained in the normal course of business.

   b.  Please provide a detailed narrative description accompanies by a flow chart that illustrates the wood material purchase, inventory-in, warehousing, and consumption process.  Include in your chart all activities from purchase to consumption of wood, the documentation generated at each point in the process, and the types of information tracked (*e.g.*, wood species) in each document.

   c.  Please provide **clear and legible** samples of each document identified in your flow chart for December 2018.

   d.  Please report how long your wood inputs remained in inventory during the POI and submit documentation supporting your response.

6.  In Exhibit 5 of your SuppDE, you provided monthly material movement schedules for the POI that contain fields for "[                               ]," among other variables.

   a.  Please provide an exhaustive key to the [            ] used in the normal course of business, including any that were not used during the POI.  Please also identify those [            ] that were not used during the POI.

   b.  Please identify all [            ] that are used to represent wood board products and any other wood inputs used to produce cabinets and vanities, whether or not consumed during the POI and, provide the descriptions in both English and Chinese.

   c.  Please provide a narrative description of the values in the [            ] field for wooden boards (*i.e.*, [               ]), as well as any other [            ] used in the normal course of business.  Submit documentation supporting your response.

   d.  Please explain the difference between wooden boards that contain data in the [            ] field and [               ], which does not.

    e.   Please provide an exhaustive, English-language key to all [    ] expressed in Chinese.

    f.   Please provide documentation supporting your reported [          ] for [             ] in July 2018 and identify where in your documentation the species of wood is evident.

    g.   Please provide documentation supporting your reported [          ] for [             ] in July 2018 and identify where in your documentation the species of wood is evident.

7.   In Exhibit 6-2 of your SuppDE, you provided production design drawings.

    a.   Please state whether the submitted production design drawings represent production designs that are maintained in the normal course of business.  If not, please submit copies of the original documents as maintained in the normal course of business, along with complete translations, for each product included in Exhibit 6-2.

    b.   On page 1 of Exhibit 6-2, you provided a table labeled "[    ]" that identifies the [                ] that is almost entirely in English.  Please state whether this document is maintained in the normal course of business or whether it was created for purposes of this questionnaire response.  If the latter, please provide copies of the original documents as maintained in the normal course of business, along with complete translations, for each product included in Exhibit 6-2.

    c.   Please report whether the production design drawings in Exhibit 6-2 identify a species of wood.  If so, please report where the species is identified.

8.   On page 28 of your SuppDE, you stated that "coal is used in the boiler to generate heat." However, in Exhibit 4 of your SDQR, you did not report the suppliers of coal nor did you report a distance to those suppliers.  In your FOP database, you did not report a distance for your coal FOP.

    a.   Please report how coal is delivered to Meisen's factory.

    b.   Please revise Exhibit 4 of your SDQR to include supplier names, mode of transport, and distance from the factory, if coal is delivered to Meisen's factory.

9.   On page 15 of your SuppDE, you stated that Meisen "did not consume pallets in the production of the {merchandise under consideration (MUC)}."  On pages 24-25 of your SuppDE, you stated that the cost of purchasing plastic pallets is recorded in account [    ].

6

    a. Please explain how Meisen uses plastic pallets and submit supporting documentation.

    b. If Meisen used pallets in the production of MUC, please report an FOP for pallets and report the weight in kilograms of a single pallet.

## SECTION C

10. A review of the U.S. sales database submitted with your supplemental Section C questionnaire response, dated August 27, 2019 (SuppC), reveals a number of what appear to be unusual expenses as they relate to gross unit price. For each expense identified below, provide a narrative explanation of the circumstances that resulted in these expenses, a statement indicating that any errors identified in your data are cured, if appropriate, and documentation supporting the accuracy of your reported data:

    a. International freight expenses equal to [        ] percent of gross unit price.
    b. U.S. other transportation expenses equal to [        ] percent of gross unit price.
    c. Inventory carrying costs equal to [        ] percent of gross unit price.
    d. Inland freight from warehouse to customer equal to [        ] percent of gross unit price.
    e. Indirect selling expenses equal to [        ] percent of gross unit price.
    f. U.S. customs duties equal to [        ] percent of gross unit price.
    g. Inland freight from port to warehouse expenses equal to [        ] percent of gross unit price.
    h. Advertising expenses equal to [        ] percent of gross unit price.
    i. Repacking expenses equal to [        ] percent of gross unit price.
    j. Warranty expenses equal to [        ] percent of gross unit price.
    k. U.S. brokerage expenses equal to [        ] percent of gross unit price.
    l. Credit expenses equal to [        ] percent of gross unit price.
    m. Other discounts equal to [    ] percent of gross unit price.
    n. Commissions equal to [    ] percent of gross unit price.

11. In your SuppC, you responded to sixteen requests for clarification by stating that the identified issue was due to clerical/data entry errors and that the issue has been corrected in the revised database. These errors were related to what appear to be high expenses or revenues relative to gross unit price (assembly revenue, modification revenue, repacking revenue, warranty expenses), missing or unreported expenses (U.S. other transportation, commissions) or [              ] values (modification revenue, advertising expenses, warranty expenses, entered value). You also stated that you corrected missing invoice dates, missing shipment dates, missing entered values, and incorrect payment dates.

Notwithstanding the difficulties associated with reviewing a database that has been substantially revised to address pervasive errors and inaccuracies, it is not clear based on your revisions that the identified errors have been sufficiently remedied. For example, your database still contains [    ] observations with missing shipment dates and [        ] observations with missing payment dates, and payment dates [

7

]date of sale and [                                      ]date of sale.

a.  Please confirm the accuracy of your reported shipment and payment dates.

b.  Please describe your practice with respect to date of sale and payment whereby payments can be received [                              ] the date of sale and as many as [                 ] the date of sale.

c.  As previously requested in the SuppC, please explain why you reported [   ] observations without shipment dates and submit documentation supporting your response.  If these transactions [         ] after submission of your questionnaire response or your reporting was in error, please provide the relevant shipment dates.

d.  For each revenue item identified below, provide a narrative explanation of the circumstances that resulted in what appears to be unusual revenue, a statement indicating that any errors identified in your data are cured, if appropriate, and documentation supporting the accuracy of your reported data:

  i.  Freight revenue equal to [         ] percent of gross unit price.
  ii.  Assembly revenue equal to [      ] percent of gross unit price.
  iii.  Storage revenue equal to [    ] percent of gross unit price.
  iv.  Installation revenue equal to [    ] percent of gross unit price.
  v.  Design revenue equal to [    ] percent of gross unit price.
  vi.  Credit card processing revenue equal to [   ] percent of gross unit price.
  vii.  Repacking revenue equal to [   ] of gross unit price.

e.  On page 44 of your SuppC, you stated that the reported entered value is based on the transfer prices in effect during the POI.  However, your reported entered values range from [ ] percent to [         ] percent of gross unit price.  Further, you reported [      ] entered values equal to [                   ] of gross unit price and [   ] entered values [                 ] percent of gross unit price.

  i.  Please confirm the accuracy of your entered values and any expenses whose calculations were based on the transfer prices in effect during the POI.
  ii.   Please explain why your reported entered values range from [ ] percent to [         ] percent of gross unit price.
  iii.  Please submit documentation supporting your reported entered values for observations [                                    ].

f.  Adjusting your reported gross unit prices by all revenue and expense items reported in your database (*i.e.*, excluding items valued with surrogate values such as domestic inland freight and brokerage) results in [       ] transactions with negative net U.S. prices as low as [

                                                                                    ],

8

and net U.S. prices as low as [        ] percent of gross unit price (observation
[        ], apparently the result of a gross unit price reported as [        ]; also of note
is an entered value of [        ], equal to [        ] percent of gross unit price).

    i.    Please explain why your reported gross unit prices result in [    ]
transactions with negative net U.S. prices.

    ii.    Please explain the circumstances regarding observation numbers [
] that resulted in the net prices identified above and submit
documentation supporting your response.

g.    An analysis of your gross unit price to weight ratios reveals extremely unusual
patterns.  For example, you reported observation number [      ] with a gross
weight per piece of [                ] and a gross unit price of [        ]; this item
was coded as a [                                                      ].
Similarly, you reported observation number [      ] with a gross weight per piece
of [      ] and a gross unit price of [        ]; this item was coded as a [
].  Conversely, you reported
observation number [      ] with a gross weight per piece of [        ] and a gross
unit price of [        ]; this item was coded as a [                            ].
Similarly, you reported observation number [        ] with a gross weight per piece
of [      ] and a gross unit price of [      ]; this item was coded as a [
].

    i.    Please explain why you reported [   ] observations with a price of less
than [                                ] and confirm the accuracy of such
data.

    ii.    Please explain why you reported [   ] observations with a gross unit
price of more than [                        ] and confirm the
accuracy of such data.

    iii.    Please explain the circumstances regarding observation numbers [
] that resulted in the weight to price ratios identified
above and submit documentation supporting your response.

    iv.    You reported a net weight of [ ] for [   ] observations for which you
reported gross weights of between [                            ].  Please
report the missing net weights.

h.    An analysis of your reported net to gross weight ratios reveals that you reported
[   ] observations where the net weight is [                  ] of the gross
weight.  For example, you reported observation [        ] with a gross weight of [
] and a net weight of [                        ].  Similarly, you
reported observation number [        ] with a gross weight of [                    ]
and a net weight of [                              ].  Please confirm the accuracy of

9

Barcode:3903938-01 A-570-106 INV - Investigation  -

your reported weights and submit documentation supporting your reported net and gross weights for observation numbers [                          ].

12. On page 8 of your SuppC, you reported that J&K Miami and J&K Georgia record sales of MUC when they receive payment.  On page 7 of your SuppC, you stated that J&K provides estimates to its customers that are not binding and are not entered into the accounting system when issued.  You further stated that the customer can negotiate the terms of sales up until payment and it is J&K Georgia's position that the terms of sale are not finalized until the payment was made during the POI.  Please state whether the same situation applies to J&K Miami and J&K Georgia and clarify whether it is their contention that the material terms of sale are finalized when payment is made.

13. In Exhibit 3 of your SuppC, you provided invoice number [      ] from J&K Georgia, dated [        ].  In your U.S. sales database, you reported a shipment and payment date of [        ].

    a.  Please provide documentation supporting your reported shipment and payment dates.

    b.  Please explain why J&K Georgia allowed a price quoted in [              ] to be claimed in [          ] and then applied a [
                                        ].  Provide documentation supporting your reported [          ].

14. In your U.S. sales database, you reported [      ] observations with no payment dates.  Of these observations, you reported [      ] observations with no payment dates but with credit expenses ranging from more than [                  ].

    a.  Please explain the basis on which you calculated credit expenses where no payment date was reported.

    b.  Please confirm that the missing payment dates represent sales for which you have not been paid.

    c.  If observations with no payment dates represent sales for which you have not yet been paid, please report the date of your forthcoming supplemental questionnaire response as a proxy for payment date and recalculate your credit expense based on that proxy date.

15. In your U.S. sales database, you reported [  ] observations with credit expenses greater than [              ] percent of gross unit price where only [  ] of those observations has a payment date that [          ] shipment and invoice date.

    a.  Please reexamine your reported credit expenses and confirm the accuracy of your calculations.

Filed By: Kabir Archuletta, Filed Date: 10/24/19 1:37 PM, Submission Status: Approved

Barcode:3903938-01 A-570-106 INV - Investigation  -

  b.  Please provide documentation supporting your reported invoice date, shipment date, and payment date for invoice numbers [
         ].

16. On page 18 of your SuppC, you reported seven types of "other revenue" amounts.  On page 19 of your SuppC, you stated that the "J&K Companies confirm that they do not collect more in revenues than the fees that they are intended to represent."

  a.  Please provide a detailed description of your reported other revenue fields and submit documentation supporting each type of revenue:
    i.   Storage fees
    ii.  Bad check fees
    iii. Credit card processing fees
    iv.  Installation fees
    v.   Design fees
    vi.  Custom duty fees
    vii. Loading fees

  b.  For each revenue item, please identify the corresponding expense in your U.S. sales database that these fees are intended to offset.  If you have not reported a corresponding expense for any revenue items, please do so and submit a calculation worksheet and documentation supporting your reported expenses, as necessary.

17. On page 38 of your SCQR, you stated that you reported the customer's U.S. postal "ZIP" code in field DESTU.  However, you failed to report anything for [   ] observations.  Moreover, you reported zip codes [                         ], which do not appear to be valid U.S. zip codes.  Please report a valid U.S. zip code for all observations in your U.S. sales database.

18. On pages 38 and 39 of your SuppC, you stated that all expenses listed in Exhibit C-8 of your SCQR are paid by J&K headquarters and that this location "coordinates nationwide advertising efforts for all J&K locations" including "TV advertising, trade shows, branding and marketing materials."  Please report an indirect selling expense ratio for J&K headquarters or explain why it would be inappropriate to do so.  Provide a calculation worksheet and supporting documentation from the POI.

19. In Exhibit 2 of your SCQR, you provided a list of customer codes and customer names, identifying [              ] customer codes.  Please add a variable to your U.S. sales database to also report consolidated customer code, in accordance with the following instructions:

Filed By: Kabir Archuletta, Filed Date: 10/24/19 1:37 PM, Submission Status: Approved

**Consolidated Customer Code**

FIELD NAME:        CCUSCODU

DESCRIPTION:        Report only one name or code for each of your customers, even if more than one name or accounting code exists for that customer in your books and records.  For example, if you use different codes for regional offices of the same customer, report the same code for this customer, regardless of the location of the office.

NARRATIVE:        Provide a list of consolidated customer names and codes as an attachment to your response, ensuring that each customer is assigned only one discrete code for this field.

20. On page 42 of your SuppC, you responded to a request for an explanation why you believe it is appropriate to calculate a single inventory carrying period of [        ] for all J&K companies and not for each location by stating that "the JK Companies do not maintain an inventory record system that tracks inventories from purchase to sale in the manner expected by Commerce," that they track inventory based on "experience of what they physically see sitting in the warehouses," and that based on the "companies individual experience in running their operations the average number of days has been estimated to be [  ] days."  Also on page 42, you responded to a request for a description of the factors considered by the J&K companies to derive their estimated inventory carrying period and for documentation supporting your response by referring to your answer above.  However, your response is wholly unsupported by any documentation whatsoever.  Your estimate must be supported by something more substantive than a mere claim of experience and knowledge.  Accordingly, please fully respond to the questions already asked in your SuppC:

   a.  Please explain why you believe it is appropriate to calculate a single inventory carrying period for all J&K companies and not for each location.

   b.  Please describe the factors considered by the J&K companies to derive their estimated inventory carrying period and submit documentation supporting your response.

   c.  Please provide monthly inventory values for each J&K company and use this information along with POI sales for each reseller to calculate an actual inventory turnover rate during the POI. Please explain and document your calculations and revise your inventory carrying costs accordingly.

APPX086562

| | | | |
|---|---|---|---|
| Meisen Post-Prelim Supplemental Questionnaire Response (November 6, 2019) | C.R. 1475-1478 | P.R. 1459 | APPX086563-APPX087930 |

Barcode:3916211-01 A-570-106 INV - Investigation -

# HUSCH BLACKWELL

Jeffrey S. Neeley
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

November 6, 2019

Case No. A-570-106
Total Pages: 127
Investigation
E&C: Office V

**PUBLIC VERSION**
Business Proprietary Information removed from
brackets on Narrative Pages 1-2, 4, 7-11, 13-29, 32-
34, Exhibits SC2-1 to SC2-20, and Exhibits SD2-1 to
SD2-14.

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re:**   *Wooden Cabinets and Vanities from the People's Republic of*
*China: Post-Prelim Supplemental Questionnaire Response*

Dear Secretary Ross:

On behalf of Dalian Meisen Woodworking Co., Ltd. ("Dalian Meisen") and its affiliates,

we hereby submit the foregoing revised response to Post Prelim Supplemental Questionnaire

issued by the U.S. Department of Commerce on October 24, 2019 in the above-referenced

proceeding.

**REQUEST FOR PROPRIETARY TREATMENT**

Certain information contained herein is business confidential data that is proprietary.

This information is enclosed with brackets ("[ ]").  Disclosure of this information would cause

Husch Blackwell LLP

## SECTION C AND D SUPPLEMENTAL QUESTIONNAIRE

### Wooden Cabinets and Vanities from China

#### *Dalian Meisen Woodworking Co. Ltd. (Meisen)*

**NOTE:**     *In accordance with 19 CFR 351.303(e), "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department."*

**NOTE:**     *Please repeat the question prior to giving your response when responding to this supplemental questionnaire.*

**NOTE:**     *If a calculation worksheet is requested, please submit the requested worksheet in hardcopy format as well as electronic format in Excel.*

**NOTE:**     *If changes to your Section D, factors of production, or Section C, U.S. sales, database are required, please re-submit them accordingly.*

**SECTION D**

1.   On page 14 of your supplemental section D and E questionnaire response, dated September 16, 2019 (SuppDE), the Department of Commerce (Commerce) requested that you confirm that the list of factors of production (FOPs) reported in your initial section D response, dated July 19, 2019 (SDQR), was an exhaustive list of FOPs used in the production of merchandise under consideration during the period of investigation (POI).

On page 15 of your SuppDE, you confirmed that Meisen only consumed birch boards in the production of the merchandise under consideration during the POI. However, other submissions in this investigation appear to indicate that maple wood was used to produce the subject cabinets sold during the POI. Specifically, in Exhibit 41 of your supplemental section A questionnaire response, dated August 13, 2019 (SuppA), you provided the J&K Cabinetry 2019 catalog, where on page 63 J&K Cabinetry advertises production of its cabinets as follows:  "The finest solid maple wood is sanded until smooth and vacuumed."

In exhibit 3 of your section A questionnaire response, dated July 3, 2019 (SAQR), you submitted a price list for "[                                        ]" (J&K Cabinetry NC LTD), a price list containing [    ] pages of products identified as [                    ], including [

], among others (J&K Miami), and numerous price lists referencing products described as [

], among others.

    a.   Please explain why the promotional material of your U.S affiliates advertises cabinets made of maple.

**Response**

      In its original Section D response and its supplemental Section D response, Meisen reported its factors of production based upon its purchase records which can be reconciled to its purchase invoices as part of the factors of production to demonstrate that it purchased birch and reported the use of birch as part of its production.

      The J&K Companies which are 17 separately operated companies (in 16 locations) independently purchase and sell wooden cabinets.  The product brochure submitted on the record of this investigation was printed by J&K Headquarters which was then utilized by all the J&K locations and excerpts from the product brochure were incorporated into each of the independent J&K location websites.  During the POI there were no sales of products that were either solid maple or with a maple face, or that in any other ways used maple.

      The J&K Companies provide in Exhibit SD2-1 a summary of the product codes sold by the J&K Companies during the POI.  As detailed in this summary, only [

].

The majority of the maple references indicate the [

] rather than the type of wood that comprise the construction.  However, even for the sales of these few nominally "maple" products, the products were in fact made of birch with a maple look and are not maple.

     b.   Please state whether you produced and/or sold cabinets made with maple wood during the POI and submit documentation supporting your response.

**<u>Response</u>**

Meisen only produced wooden cabinets produced from birch as was reported in its factors of production.  The J&K Companies only sold the cabinets produced by Meisen during the POI.  Therefore, by extension the J&K Companies only sold cabinets that were produced by Meisen using birch wood.  See Exhibit SD2-2 for supporting documentation.

     c.   Please provide documentation maintained in the normal course of business that identifies the species of wood consumed to produce subject cabinets that you made and sold during the POI.

**<u>Response</u>**

See Exhibit SD2-2 for the requested supporting documentation.

     d.   Please submit documentation supporting Meisen's total purchases of wood boards during July 2018, and ensure that your documentation is accurately and completely translated.

**<u>Response</u>**

Meisen provides in Exhibit SD2-2 the following documents for all purchases of wood boards in July 2018:

- **Purchase orders**
- **Purchase invoices**
- **Goods delivery receipt**
- **Warehouse-in slip**

As demonstrated by this documentation, Meisen purchased only birch wood boards during July 2018.  Meisen also provides in Exhibit SD2-2 a table summarizing these purchases the sum of which reconciles to the July 2018 wood purchases as recorded in the inventory movement schedule.

3

2.  In Exhibit 4 of your SDQR, you provided a list of input suppliers. Please provide a table that details all of Meisen's suppliers of wood inputs. Include in your table the name and address of the supplier, the wood input supplied, a detailed description of each type of wood input supplied (including species of wood), the quantity and value of wood input supplied, and whether or not that wood input was used to produce wooden cabinets and vanities sold in the U.S. market during the POI.

**Response**

 **The requested information is provided in Exhibit SD2-3.  As detained in this table,**

**Meisen only purchased birch wood during the POI.**

3.  In Exhibit 3 of your SuppDE, you provided a screen shot labeled "[

         ]." However, in Exhibit 40 of your SuppA, in response to a request for Meisen's chart of accounts at the highest level of detail, account [   ] was labeled simply "[  ]."

 a.  Please confirm that the chart of accounts submitted in Exhibit 40 of your SuppA is Meisen's chart of accounts at the highest level of detail, as requested, and that it was in effect during the POI.

**Response**

 **The chart of accounts submitted in Exhibit 40 of the Supplemental Section A**

**Questionnaire is at the highest level of detail and was in effect during the POI.  In**

**reviewing the submitted chart of accounts, Meisen identified that certain account codes**

**were missing.  Meisen provides in Exhibit SD2-4 the complete chart of accounts in effect**

**during the POI.**

 b.  Please submit the Chinese-language version of your chart of accounts and confirm that the chart of accounts submitted in Exhibit 40 of your SuppA was an accurate translation, or revise and resubmit the English-language version, if necessary.

**Response**

 **The Chinese-language version of the chart of accounts is provided in Exhibit SD2-4**

4

along with an English translation.  Meisen confirms the translations provided are accurate.

    c.  Please state whether Meisen maintains any account(s) that track the species of wood and submit documentation supporting your response.

**Response**

    **The species of wood can be tracked in Meisen's raw material sub-ledger and monthly material movement schedule both of which are included in Exhibit SD2-7 (see pages 79 to 81).**

4.  On page 6 of your SuppDE, you stated that "{p}er the Department's request, Meisen has included a field for the production quantity in m2 in the FOP database provided along with this submission." However, it does not appear that such information has been included in your FOP database. Please revise your FOP database to include a field for production quantity in meters squared, as requested.

**Response**

    **Meisen inadvertently omitted this field from the FOP database.  Meisin provides a revised FOP database along with this submission which includes the field for production quantity in m2 (see field PRODQTY_M2).  Meisen has also added the fields for the distance and mode of transportation for the COAL input. See Exhibit SD2-14.**

5.  In Exhibit 5 of your SuppDE, you provided monthly material movement schedules for each month of the POI. And in Exhibit 14.1 you provided withdrawal slips for wood boards in August 2018. However, your withdrawal slips are nearly illegible.

    a.  Please confirm that the submitted monthly material movement schedules are as they are maintained in the normal course of business. If these documents were altered in any way for purposes of submission in this proceeding, please identify the alterations and submit copies of the schedules as they are maintained in the normal course of business.

    b.  Please provide a detailed narrative description accompanies by a flow chart that illustrates the wood material purchase, inventory-in, warehousing, and consumption process. Include in your chart all activities from purchase to consumption of wood, the documentation generated at each point in the

5

process, and the types of information tracked (*e.g.*, wood species) in each document.

**Response**

A flow chart illustrates the wood material purchase, inventory-in, warehousing, and consumption process is provided in Exhibit SD2-6.  The purchase process starts with the purchase order issued to wooden board suppliers, which states the wood species, thickness, quantity, unit price, specification and other requirements of the wood boards.

Upon receipt of the wood boards, Meisen checks the quality and quantity of the boards.  Confirmation of the actual quantity of wood boards received is documented via the goods receipt note issued by Meisen.   The goods delivery note contains the wood species, thickness, quality and quantity in pieces and  cubic meters.  Upon issuance of the goods receipt note, the supplier issues the sales invoice which contains the wood species, thickness, quantity in cubic meters and purchase value.

The purchased wood boards are then moved to the warehouse at which time the warehouse-in slip is generated.  The warehouse-in slips record the stock code, thickness, quantity and value of the wood boards.  The accounting department prepares an accounting voucher based on the warehouse-in slips and supplier invoices.  A monthly purchase summary is also prepared in the normal course of business.

With respect to consumption of the wood boards, the production department prepares a monthly production plan based on sales orders.  The production plan specifies the wood species, quantity and size of wood board required to the finished products.

When wood board is withdrawn from the warehouse, a warehouse-out slip is generated which details the stock code, thickness and quantity of the board.  Meisen's production staff also prepares a monthly report of raw material withdrawals in the normal

6

course of business which contains the species of the wood material consumed.  This report is presented to the general manager and used to evaluate production efficiencies.

The accounting department prepares an accounting voucher based on the warehouse-out slips.  The raw material movements are reflected in the raw material sub-ledger as well as in the monthly material movement schedule.  The wood species is specified in both the raw material sub-ledger and the monthly material movement schedule.

    c.  Please provide **clear and legible** samples of each document identified in your flow chart for December 2018.

**Response**

The requested documentation for December 2018 is provided in Exhibit SD2-7.

    d.  Please report how long your wood inputs remained in inventory during the POI and submit documentation supporting your response.

**Response**

Meisen does not track or record the length of time wood inputs remain in inventory in the normal course of business. The wood inputs are consumed on a continuous and rolling basis and, therefore, management does not consider it necessary to track how quickly it turns its wood board inventory.  As explained above, Meisen prepares monthly purchase and withdrawal reports in the normal course of business.  Meisen provides in Exhibit SD2-8 the monthly reports for wood board purchases and withdrawals prepared during the POI.  Meisen notes that the monthly totals reconcile to the monthly material movement schedules provided in Exhibit SD2-5.

6.  In Exhibit 5 of your SuppDE, you provided monthly material movement schedules for the POI that contain fields for "[                       ]," among other variables.

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 11/7/19 11:48 AM, Submission Status: Approved

a.  Please provide an exhaustive key to the [                ] used in the normal course of business, including any that were not used during the POI. Please also identify those [                ] that were not used during the POI.

**Response**

Meisen provides in Exhibit SD2-9 its Stock Codes Archive report extracted from its accounting system.  Meisien has highlighted those stock codes that were not used during the POI.

b.  Please identify all [                ] that are used to represent wood board products and any other wood inputs used to produce cabinets and vanities, whether or not consumed during the POI and, provide the descriptions in both English and Chinese.

**Response**

The stock codes used for wood board products are represented by two categories:

[                ] which is the code assigned to imported birch board [

] which is the code assigned to domestic birch board includes code [                ]).

c.  Please provide a narrative description of the values in the [                ] field for wooden boards (*i.e.*, [                            ]), as well as any other [                ] used in the normal course of business. Submit documentation supporting your response.

**Response:**

Please see below for a description of the wood board codes:

- **20A - Birch board with thickness of 20mm, surface with three or less than three knots, each knot with diameter less than 5mm;**
- **20B - Birch board with thickness of 20mm, surface with four to six knots, each knot with diameter less than 10mm;**
- **20C - Birch board with thickness of 20mm, surface with more than six knots;**
- **25A - Birch board with thickness of 25mm, surface with three or less than three knots, each knot with diameter less than 5mm.**

These classifications are standard knowledge in the wood industry.  Both Meisen

**and its wood board suppliers rely on these codes and, therefore, there is no supporting**

**documentation for these classifications.**

> d.  Please explain the difference between wooden boards that contain data in
>     the [              ] field and [                 ], which does not.

**<u>Response</u>**

**[                  ] is a subtotal of all of the specific codes assigned to the different**

**types of birch boards [                                              ].**

> e.  Please provide an exhaustive, English-language key to all [      ] expressed in
>     Chinese.

**<u>Response</u>**

**The requested information is provided in Exhibit SD2-10.**

> f.  Please provide documentation supporting your reported [                     ]
>     for [                          ] in July
>     2018 and identify where in your documentation the species of wood is
>     evident.

Response:

**Supporting documentation for the July 2018 [                  ] for [**

**                                    ] is provided in the monthly material**

**movement schedule presented on page 1 of Exhibit SD2-5.  As detailed in this schedule, the**

**species of wood is listed in the 'Material' column.**

> g.  Please provide documentation supporting your reported [                     ]
>     for [                                ] in July 2018
>     and identify where in your documentation the species of wood is evident.

**<u>Response</u>**

**Supporting documentation for the July 2018 [                  ] for [**

9

**] is provided in the monthly material**

**movement schedule presented on page 1 of Exhibit SD2-5.  As detailed in this schedule, the**

**species of wood is listed in the 'Material' column.**

7.  In Exhibit 6-2 of your SuppDE, you provided production design drawings.

   a.  Please state whether the submitted production design drawings represent
   production designs that are maintained in the normal course of business. If not,
   please submit copies of the original documents as maintained in the normal
   course of business, along with complete translations, for each product included
   in Exhibit 6-2.

**Response**

   **Meisen confirms that the submitted production design drawings represent**

**production designs that are maintained in the normal course of business. The production**

**drawings are used at the factory workshops as a reference during production.  Meisen**

**provides a full translation of the production design drawings in SD2-11.**

   b.  On page 1 of Exhibit 6-2, you provided a table labeled "[          ]" that
   identifies the [                                    ] that is almost entirely in
   English. Please state whether this document is maintained in the normal course
   of business or whether it was created for purposes of this questionnaire
   response. If the latter, please provide copies of the original documents as
   maintained in the normal course of business, along with complete translations,
   for each product included in Exhibit 6-2.

**Response**

   **The table referenced by the Department was created for purpose of the**

**questionnaire response. It is a summary of the wooden parts dimensions shown in the**

**design drawing.  In the normal course of business, Meisen only maintains the production**

**design drawings.**

c.   Please report whether the production design drawings in Exhibit 6-2 identify a species of wood. If so, please report where the species is identified.

**Response**

**The production design drawings only reference solid wood.  No species of wood is specified in the drawings.**

8.   On page 28 of your SuppDE, you stated that "coal is used in the boiler to generate heat." However, in Exhibit 4 of your SDQR, you did not report the suppliers of coal nor did you report a distance to those suppliers. In your FOP database, you did not report a distance for your coal FOP.

a.   Please report how coal is delivered to Meisen's factory.

**Response**

**Coal is delivered to the Meisen factory by truck.**

b.   Please revise Exhibit 4 of your SDQR to include supplier names, mode of transport, and distance from the factory, if coal is delivered to Meisen's factory.

**Response**

**See Exhibit SD2-12 for a revised supplier table.  The coal supplier has been added to the table as has an additional plywood supplier that was inadvertently omitted from Exhibit 4. Meisen has also updated the distance for the CARTON input.**

9.   On page 15 of your SuppDE, you stated that Meisen "did not consume pallets in the production of the {merchandise under consideration (MUC)}." On pages 24-25 of your SuppDE, you stated that the cost of purchasing plastic pallets is recorded in account [          ].

Please explain how Meisen uses plastic pallets and submit supporting documentation.

**Response**

**Meisen uses plastic pallets for moving materials internally at the factory.  These**

11

**pallets were not for used for shipping or packing purposes and do not accompany the finished good when transported to the customer.  See Exhibit SD2-13 for support of how the plastic pallets are used in the normal course of business.**

    a.  If Meisen used pallets in the production of MUC, please report an FOP for pallets and report the weight in kilograms of a single pallet.

**<u>Response</u>**

     **Not applicable.  Please see the response provided to question 9.a.**

Barcode:3908319-01 A-570-106 INV - Investigation  -

| SD2-1 | Summary of J&K Company Product Codes | BPI |
|-------|--------------------------------------|-----|

APPX086609

Information Not Susceptible to Public Summary

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

APPX086928

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

APPX086930

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

APPX086931

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

APPX086959

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

APPX086969

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

APPX086978

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

APPX087065

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

APPX087091

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

APPX087447

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

Barcode:3908319-01 A-570-106 INV - Investigation  -

| SD2-2 | **Summary of Wood Purchases for POI and Supporting Documentation** | BPI |
|-------|-------------------------------------------------------------------|-----|

Information Not Susceptible to Public Summary

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

APPX087542

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

APPX087637

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

APPX087642

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

Barcode:3908319-01 A-570-106 INV - Investigation  -

| SD2-5 | Monthly Material Movement Schedule | BPI |
|---|---|---|

Information Not Susceptible to Public Summary

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

Barcode:3908319-01 A-570-106 INV - Investigation  -

| SD2-7 | Document Flow Chart Support | BPI |
|-------|---------------------------|-----|

Information Not Susceptible to Public Summary

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

APPX087699

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

APPX087713

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

| SD2-8 | Monthly Wood Purchase Report | BPI |
|---|---|---|

Information Not Susceptible to Public Summary

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

| SD2-9 | Stock Code Archive Report | BPI |
|---|---|---|

Information Not Susceptible to Public Summary

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

PAGE IS CONFIDENTIAL WITH NO
PUBLIC REDACTED VERSION

# PAGE IS CONFIDENTIAL WITH NO PUBLIC REDACTED VERSION

Barcode:3908319-01 A-570-106 INV - Investigation  -

| SD2-11 | Translated Production Design Drawings | BPI |
|---|---|---|

PUBLIC VERSION

Information Not Susceptible to Public Summary

| | | | |
|---|---|---|---|
| Meisen 2nd Post-Prelim Supplemental Questionnaire (November 18, 2019) | C.R. 1525 | P.R. 1487 | APPX087931-APPX087940 |

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
POI: 07/01/2018- 12/31/2018
~~Proprietary Document~~
E&C/OV: KJA
Public Version

November 18, 2019

**Dalian Meisen Woodworking Co., Ltd.**
c/o Jeffrey S. Neeley
Husch Blackwell
750 17th St. NW, Suite 900
Washington, DC 20006-4675

Re:   Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components
      Thereof from The People's Republic of China:  Second Post-Prelim Supplemental
      Questionnaire

Dear Mr. Neeley:

This letter concerns the less-than-fair-value investigation of wooden cabinets and vanities and
components thereof from the People's Republic of China, and your client in this proceeding,
Dalian Meisen Woodworking Co., Ltd (Meisen).  We continue to review your supplemental
questionnaire response dated November 7, 2019, and have identified certain areas that require
additional clarification, as detailed in the enclosed supplemental questionnaire (*see* Attachment
I).  Please file your supplemental response in accordance with the filing requirements and
guidelines (including the guidelines regarding English translations) as outlined in Commerce's
original questionnaire.  Meisen's response to this supplemental questionnaire, along with the
appropriate summarization of proprietary data, as required by 19 CFR 351.304(c), is due no later
than **November 20, 2019**.

With certain, limited exceptions, you are required to file electronically all submissions for all
proceedings using Enforcement and Compliance's Antidumping and Countervailing Duty
Centralized Electronic Service System (ACCESS).  Those instructions were provided in the
original questionnaire.

Commerce must conduct this investigation in accordance with statutory and regulatory deadlines.
If you are unable to respond completely to every question in the attached questionnaire by the
established deadline, or are unable to provide all requested supporting documentation by the
same date, you must notify the official in charge and submit a request for an extension of the
deadline for all or part of the questionnaire response.  Meisen should be aware that the
likelihood of Commerce granting an extension will decrease the closer the extension request is
filed to the applicable time limit because Commerce must have time to consider the extension
request and decide on its disposition.[1]  If you require an extension for only part of your response,
such a request should be submitted separately from the portion of your response filed under the

---

[1] *See Extension of Time Limits*, 78 FR 57790, 57792 (September 20, 2013).

current deadline.  Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request.  Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5:00 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  Commerce will not accept any requested information submitted after the deadline.  As required by section 351.302(d) of our regulations, we will reject such submissions as untimely.  Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

Should you have any questions about this matter, please contact Kabir Archuletta at (202) 482-2593.

Sincerely,

Emily Halle
Acting Program Manager, Office V
Enforcement and Compliance

Attachment

2

# ATTACHMENT I

## SECOND POST-PRELIM SUPPLEMENTAL QUESTIONNAIRE

### Wooden Cabinets and Vanities from China

#### *Dalian Meisen Woodworking Co. Ltd. (Meisen)*

**NOTE:**    *In accordance with 19 CFR 351.303(e), "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document.  A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department."*

**NOTE:**    *Please repeat the question prior to giving your response when responding to this supplemental questionnaire.*

**NOTE:**    *If a calculation worksheet is requested, please submit the requested worksheet in hardcopy format as well as electronic format in Excel.*

**NOTE:**    *If changes to your Section D, factors of production, or Section C, U.S. sales, database are required, please re-submit them accordingly.*

1.   On page 2 of your post-prelim supplemental questionnaire response dated November 7, 2019 (Post-prelim Supp), in response to a request for an explanation why the promotional material of your U.S. affiliates advertises cabinets made of maple, you stated that the "majority of the maple references indicates the [                            ] rather than the type of wood that comprise the construction."  You further stated that "even for the sales of these few nominally 'maple' products, the products were in fact made of birch with a maple look and are not maple."  In Exhibit 1 of your Post-prelim Supp you submitted a summary of product codes sold by the J&K Companies.

   a.   Please provide Exhibit 1 in excel format.

   b.   Please revise Exhibit 1 to identify those product descriptions that refer to the [                  ] rather than the type of wood and those products that are "nominally 'maple'" but in fact made of birch.

   c.   Please justify your bracketing in the following sentence or publicly state the bracketed information:  The majority of the maple references indicate the [                                      ] rather than the type of wood that comprise the construction.

3

    d.  Please confirm that the product descriptions in Exhibit 1 are identical to those product descriptions in the price lists submitted in Exhibit 3 of your section A questionnaire response, dated July 3, 2019 (SAQR). If not, please revise Exhibit 1 of your Post-prelim Supp so that the product descriptions match exactly to those provided in your SAQR.

    e.  Please directly address why your marketing materials state that "the finest solid maple wood is sanded until smooth and vacuumed" if the cabinets sold during the period of investigation were, in fact, made of birch.

    f.  Please explain why you only advertise cabinets made of solid maple wood in the catalog used by all of your U.S. affiliates when maple is not the "type of wood that comprise the construction" and "the products were in fact made of birch with a maple look and are not maple."

    g.  In addition to the references in your sales catalog, please state whether your sales representatives present your products as being made of solid maple wood to your U.S. customers.

    h.  Please submit documentation demonstrating that you advertised the products sold during the POI as being made of birch wood.

2. In Exhibit 3 of your SAQR, you submitted a price list for "[                      ]" (J&K Cabinetry NC LTD). Please state whether the reference to [                 ] refers to the [    ] of the cabinets or the "nominal" species of wood from which the cabinets were made.

3. In Exhibit 3 of your SAQR, you submitted a price list containing [  ] pages of products identified as [           ], including [                    ], among others (J&K Miami). Please resubmit that price list and revise it to include whether, for each product, the reference to [   ] indicates the [    ] or the nominal species of wood from which the cabinets were made.

4. As detailed in Attachment II, the websites of multiple J&K Cabinetry locations claim that their cabinets are made of solid maple.

    a.  One J&K website claims that "{w}e pride ourselves in using 3/4 inch solid maple wood for our cabinet doors, and maple wood for our frames, moldings, decor, and drawers." Please confirm the accuracy of this statement or state whether your affiliate is misrepresenting the actual species of wood used to produce the cabinets sold in the United States.

    b.  The website of J&K Louisiana clearly states that "all our cabinets are made of solid maple wood door and frames with plywood constructed box" and that "solid maple wood is the main wood specie *(sic)* we use for cabinet door, frames,

4

molding decoration parts, and drawers."  Please confirm the accuracy of this statement or state whether your affiliate is misrepresenting the actual species of wood used to produce the cabinets sold in the United States.

5

APPX087935

Attachment II



## FAQ

**I am a contractor/remodeler, how do I purchase cabinets from you?**

**What wood material is used for J&K Cabinetry?**

We pride ourselves in using 3/4 inch solid maple wood for our cabinet doors, and maple wood for our frames, moldings, decor, and drawers. We also use 3/4 inch plywood for the cabinet box construction.

Our NEW economy line **E1 Dove** and **E2 Charcoal** door frames are made of 3/4 inch maple wood and the center door and center drawer panels are 1/4 inch cabinet grade plywood. They also come in 3/4 inch plywood for the cabinet box construction.

**Where are your cabinets assembled?**

**Can we get a door style in a different color?**

**Are all your cabinets soft-close?**

**Do you offer kitchen design service?**

**Do you have a showroom?**

**I am a homeowner, am I able to buy directly from you?**

**Do you offer counter tops, sinks, or hardware?**

**How long does it take to receive my cabinets?**

**How are cabinets packaged and shipped?**

**What is your return policy?**

https://www.jkcabinetry.com/pages/faq

6

11/18/2019     Frequently Asked Questions | J&K Cabinetry Louisiana | New Orleans Quality Kitchen & Bath Cabinetry Wholesales

Case 1:20-cv-00499-NMB Document 63 Filed 05/26/21 Page 1892 of 1902

Barcode:3911696-01 A-570-106 INV - Investigation -

 **J&K CABINETRY**
Quality Kitchen & Bath Wholesales

HOME    ABOUT ▾    PRODUCT ▾    BLOG    SUPPORT ▾    BECOME A DEALER

Search...

# Frequently Asked Questions

| Q1: | Are all the cabinets made of solid wood? |
|---|---|
| Ans: | Yes, all our cabinets are made of solid maple wood door and frames with plywood constructed box. No compressed woods or particle boards are used. |

| Q2: | How will the cabinets be shipped |
|---|---|
| Ans: | Cabinets will be shipped un-assembled and/or assembled in boxes, on pallet(s) and wrapped with stretched wraps.<br><br>Please refer to our Shipping & Delivery page for more details. |

| Q3: | What wood material is/are used for J&K Cabinetry? |
|---|---|
| Ans: | Solid maple wood is the main wood specie we use for cabinet door, frames, molding decoration parts, and drawers. And plywood is used for cabinet construction. |

| Q4: | Why should I buy from J&K Cabinetry? |
|---|---|
| Ans: | J&K Cabinetry provides our customers with superior quality and service for their kitchens and bathrooms . As one of the largest distributors of cabinetry in the United J&K group has over 10 years of excellence quality word-of-mouth in the industry.<br><br>And now, your ideal kitchen cabinets and bathroom vanities are available at a great discounted price. Thanks to our extensive distribution network, J&K provides a qui time. You can now enjoy the saving of storage overheads, which in turns improve not only your efficiency and satisfaction, but also satisfaction of your customers.<br><br>When you are purchasing through J&K, you can feel comfortable and knowing your are dealing with industry professionals, with the experience of getting your job dor |

| Q5: | How much does shipping cost? |
|---|---|
| Ans: | Your shipping price is based on your order and location. For your convenience, simply select the cabinets and accessories you are interested in purchasing and enter delivery address information, and J&K will take care for the rest.<br><br>You can also pick-up by your own truck to save the shipping cost. |

| Q6: | What is your return policy? |
|---|---|
| Ans: | Our return policy is variable depending on the specific product ordered on our website, please see return policy for each of the product types below:<br><br>**RTA Kitchen & Bathroom Cabinets** - RTA cabinets may be returned within 14 days of receipt. You will be responsible for a 25% restocking fee and the shipping cost back to the manufacturer. The item must be in good condition, and shipped back in the original packaging. To process a claim, email support@jk-cabinetry.com your confirmation number, reason for return, and specific SKU of the item you'd like to return. We'll then provide you with a Return Authorization number and shipping det order for you to receive credit, you must receive a Return Authorization number from us prior to shipping out the return. Once the returned item is received by the manufacturer, they will inspect it for damages. Please allow up to 7 days of receipt for the manufacturer to inspect the returned item(s) If everything is in tact, we will t the credit to your account minus the 25% restocking fee. Please also note original shipping costs will not be refunded.<br><br>**Assembled Kitchen & Bathroom Cabinets** - Assembled Kitchen & Bathroom cabinets can not be returned for any reason due to our manufacturer's policies.<br>reason, it it important to carefully inspect your order immediately upon receipt. If everything is in tact, no issues, and nothing is damaged, it will be replaced |

Back to the top ⊕

Filed By: Kabir Architects   Filed Date: 11/18/19 10:59 AM, Submission Status: Approved

Case 1:20-cv-00499-NMB   Document 62   Filed 05/26/21   Page 1893 of 1902

same item only, please see our damage policies on this FAQ.

**Barcode:3911696-01 A-570-106 INV - Investigation -**

**Bathroom Vanities, Vanity Tops, Bathroom Furniture Vanities, Mirrors, and Bathtubs** - These items may be returned within 5 days of receipt. You will be resp
for a 25% restocking fee and the shipping cost to send back to the manufacturer. The item must be in good condition, and shipped back in the original packaging. To
claim, email support@jk-cabinetry.com your confirmation number, reason for return, and specific SKU of the item you'd like to return. We'll then provide you with a Re
Authorization number and shipping details. In order for you to receive credit, you must receive a Return Authorization number from us prior to shipping out the retur
the returned item is received by the manufacturer, they will inspect it for damages. Please allow up to 7 days of receipt for the manufacturer to inspect the returned it
everything is in tact, we will then issue the credit to your account minus the 25% restocking fee. Please also note original shipping costs will not be refunded.

**Sinks, Hardware, Faucets, Garbage disposals, Hand-dryers, and Range Hoods** - These items may be returned within 14 days of receipt. You will be responsible
restocking fee and the shipping cost to send back to the manufacturer. The item must be in good condition, and shipped back in the original packaging. To process a
email support@jk-cabinetry.com your confirmation number, reason for return, and specific SKU of the item you'd like to return. We'll then provide you with a Return
Authorization number and shipping details. In order for you to receive credit, you must receive a Return Authorization number from us prior to shipping out the retur
the returned item is received by the manufacturer, they will inspect it for damages. Please allow up to 7 days of receipt for the manufacturer to inspect the returned it
everything is in tact, we will then issue the credit to your account minus the 25% restocking fee. Please also note original shipping costs will not be refunded.

| Q6: | What is your cancellation policy? |
|---|---|
| Ans: | All cancellations must be emailed within 24 hours of the purchase to Support@jk-cabinetry.com. Because of our tight delivery time frames, all orders canceled during period will be subject to a 25% re-stocking fee on the order. Any order that has left the warehouse for shipment can not be canceled for any reason. |

| Q7: | What if my cabinets are shipped damaged or items are missing? |
|---|---|
| Ans: | Every effort is made to ensure that your items arrive undamaged. Unfortunately, on occasion there are conditions beyond our control that can cause damage during Customer will be given a bill of lading that you are responsible to check off to ensure that you have received all of your items prior to signing off on the delivery. If at th delivery, you have any missing item(s) you must indicate this on the freight company's bill of lading in order to process a claim. Missing item claims will not be honored specific missing item(s) was not indicated on the bill of lading at the time of the delivery. Also at the time of delivery if you notice any visible damage, document the dan the freight company's bill of lading. If you suspect that there might be concealed damaged, please note that on the bill of lading as well. If any problems were indicated bill of lading, please contact us at Support@jk-cabinetry.com to inform of us of the problem. All claims must be made within 7 days of the delivery or they will not be h J&K Cabinetry is only responsible for providing replacement parts/items, we will not be able to reimburse any additional labor costs incurred by the customer to repai replace damaged items. |

| Q8: | What if my cabinets are delivered and I discover concealed damage |
|---|---|
| Ans: | If you find any concealed damage please email us at support@jk-cabinetry.com within 7 days of delivery to inform us of the damage (before any installation / assembly include in your email the date of delivery, the item(s) that were damaged, description of damaged items, and a digital photo of all damaged items. This is necessary in us to process a freight claim. All claims must be properly submitted within 7 days of delivery or they may not be honored by the manufacturer. We will provide replace items as quickly as possible once all information is received. Please do not discard damaged/defective products, in most cases you will be required to return these iten however we will provide you with paid return postage. J&K Cabinetry is only responsible for providing replacement parts/items, we will not be able to reimburse any ad labor costs incurred by the customer to repair or replace damaged items. |

| Q9 | Do you offer bulk purchase discounts? |
|---|---|
| Ans: | Please contact our sales representatives for further discussion. |

| Q10: | Do the cabinets have a matching finished interior? |
|---|---|
| Ans: | interior of glass cabinets does carry matching finish. Other cabinets carry the natural wood finishes. |

| Q11: | Do you offer custom cabinets or modifications? |
|---|---|
| Ans: | In many of our cabinet lines, we are able to make some custom modifications to existing stock cabinets. These modifications include increased cabinet depth, decrea cabinet depth, base oven cabinet conversions, and base microwave cabinet conversions, and single wall oven cabinet to double wall oven cabinet conversions. To fin |

Back to the top ⬆

Frequently Asked Questions | J&K Cabinetry Louisiana | Affordable Quality Kitchen & Bath Cabinetry Wholesales

more information about these custom modifications, please contact our customer service department.

Barcode:3911696-01 A-570-106 INV - Investigation -

| Q12: | Do you offer kitchen design service? |
|---|---|
| Ans: | Yes - We offer kitchen design service. Our NKBA certified design staff will design a functional and aesthetically pleasing kitchen lay-out, and we will provide you with 3D renderings of your kitchen, and a total quote for your order via email. Kitchen Design revisions are not included in our design service. Please contact our sales repres for further information. |

| Q13: | Can I order left hinge single door cabinets and left door location blind corner cabinets in the RTA cabinet collection? |
|---|---|
| Ans: | All of our RTA single door cabinets are standard right door hinge, and blind corner cabinets are right door location. However, upon assembly of single door wall cabin can reverse the frame to get a desired left door swing. Additionally the frame may be reversed during assembly of blind corner cabinets to get a desired left door loca blind on the right. For assembled orders, you may select whether you prefer a left or right door hinge location or door location for blind corner cabinets, and this pro be completed by the manufacturer for you. |

| Q14: | How should I measure kitchen for more accurate estimation? |
|---|---|
| Ans: | 1. Start with the first wall on the left and work to your right around the room. First, measure the overall length of each wall in your kitchen.<br>2. Indicate all breaks in walls (windows) by measuring from the corner to the outside edge of the molding, and also indicate any permanent appliances.<br>3. Measure to center line of plumbing, ducting and outlets. Compare measurement "A" against the total for measurements "B". Finally, measure the height of refrige that we can adjust the height of cabinet above the refrigerator.<br><br>>> Please visit our page "**How to measure your kitchen**" for more details. |

| Q15: | Do you reface cabinets? |
|---|---|
| Ans: | We DO NOT reface cabinets as the cost of doing this is very close to price of buying the whole cabinet. Therefore it is more suggested to re-model the kitchen with J&refacing it. |

| Q16: | How do I adjust my cabinet doors? |
|---|---|
| Ans: | Minor door alignment can be corrected by adjusting the hinges. Generally, when you open the cabinet door, you will find the side-to-side adjustment slot on the door the hinge and the up-and-down or left-and-right adjustment on the frame portion of the hinge. |

**Sign Up for our Newsletter**

Enter your email address...    SIGN UP

Subscribe to our newsletter and always be the first to hear about what is happening.

**Affiliates & Association**



**Main Menu**

Home
About
Product
Blog
Support
Become a Dealer

**Footer**

Search
Terms
Warranty
Shipping
Sitemap

**Social**

  
 

© 2019 J&K Cabinetry Louisiana | Affordable Quality Kitchen & Bath Cabinetry Wholesales. COPYRIGHT © 2016 J&K CABINETRY LOUISIANA, LLC © 2016 J&K INTERNATIONAL GROUP, LLC - ALL RIGHTS RESERVED.


     

Back to the top

**Filed By: Kabir Archuletta, Filed Date: 11/18/19 10:59 AM, Submission Status: Approved**

Barcode:3911696-01 A-570-106 INV - Investigation  -

| | | | |
|---|---|---|---|
| Meisen 2nd Post-Prelim Supplemental Questionnaire Response (November 21, 2019) | C.R. 1526 | P.R. 1492 | APPX087941-APPX088577 |

**HUSCH BLACKWELL**

Jeffrey S. Neeley
Partner

750 17th St. N.W., Suite 900
Washington, DC  20006-4675
Direct: 202.378.2357
Fax: 202.378.2319
jeffrey.neeley@huschblackwell.com

November 21, 2019

Case No. A-570-106
Total Pages:15
Investigation
E&C: Office V

**PUBLIC VERSION**
Business Proprietary Information removed from brackets on Narrative pages 1-2, 4 and Exhibit SD2-1 Revised

Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attention: Enforcement and Compliance
Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Re:    *Wooden Cabinets and Vanities from the People's Republic of*
       *China: 2nd Post-Prelim Supplemental Questionnaire Response*

Dear Secretary Ross:

On behalf of Dalian Meisen Woodworking Co., Ltd. ("Dalian Meisen") and its affiliates, we hereby submit the foregoing revised response to 2nd Post Prelim Supplemental Questionnaire issued by the U.S. Department of Commerce on November 18, 2019 in the above-referenced proceeding.

**REQUEST FOR PROPRIETARY TREATMENT**

Certain information contained herein is business confidential data that is proprietary. This information is enclosed with brackets ("[ ]").  Disclosure of this information would cause substantial competitive and commercial harm to the parties.  Such data is marked as "Proprietary

Husch Blackwell LLP

# ATTACHMENT I
## SECOND POST-PRELIM SUPPLEMENTAL QUESTIONNAIRE

### Wooden Cabinets and Vanities from China

*Dalian Meisen Woodworking Co. Ltd. (Meisen)*

**NOTE:**   *In accordance with 19 CFR 351.303(e), "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department."*

**NOTE:**   *Please repeat the question prior to giving your response when responding to this supplemental questionnaire.*

**NOTE:**   *If a calculation worksheet is requested, please submit the requested worksheet in hardcopy format as well as electronic format in Excel.*

**NOTE:**   *If changes to your Section D, factors of production, or Section C, U.S. sales, database are required, please re-submit them accordingly.*

1.    On page 2 of your post-prelim supplemental questionnaire response dated November 7, 2019 (Post-prelim Supp), in response to a request for an explanation why the promotional material of your U.S. affiliates advertises cabinets made of maple, you stated that the "majority of the maple references indicates the [                                                        ] rather than the type of wood that comprise the construction." You further stated that "even for the sales of these few nominally 'maple' products, the products were in fact made of birch with a maple look and are not maple." In Exhibit 1 of your Post-prelim Supp you submitted a summary of product codes sold by the J&K Companies.

    a.    Please provide Exhibit 1 in excel format.

**Response:**

   **Exhibit SD2-1 of the Post-Prelim Supp is being provided in conjunction with this response in Excel format and includes the revisions requested in Question 1.b. below. See Exhibit SD2-1 Revised.**

    b.    Please revise Exhibit 1 to identify those product descriptions that refer to the [                  ] rather than the type of wood and those products that are "nominally 'maple'" but in fact made of birch.

**Response:**

   **Exhibit SD2-1 Revised as submitted along with this response has been revised to add the**

**product descriptions to identify the [          ] rather than the type of wood.**

    c.    Please justify your bracketing in the following sentence or publicly state the bracketed information: The majority of the maple references indicate the [                                        ] rather than the type of wood that comprise the construction.

**Response:**

    **The bracketing of the phrase "[                                        ]" was inadvertently bracketed and was not caught in the final review of the bracketing of the response and this phrase should be bracketed in the following manner:**

    **"[          ] on sample cabinets such as "Maple Glazed"**

    d.    Please confirm that the product descriptions in Exhibit 1 are identical to those product descriptions in the price lists submitted in Exhibit 3 of your section A questionnaire response, dated July 3, 2019 (SAQR). If not, please revise Exhibit 1 of your Post-prelim Supp so that the product descriptions match exactly to those provided in your SAQR.

**Response:**

    **The product descriptions provided in Exhibit SD2-1 of the Post-Prelim supplemental response will not be identical and cannot be identical to the product descriptions provided in the price lists in Exhibit A-3 of the Section A Response.  Exhibit SD2-1 of the Post-Prelim Supplemental was extracted from actual invoices and invoice listings as submitted to the Department.  Exhibit A-3 of the Section A Response are generic and basic price lists that are used as pricing guides for the sales persons and do not include the final descriptions including any variations or customization as extracted from the invoice descriptions.**

    **To put this another way, if you are ordering a cabinet from a brochure at Home Depot – the sales person presents a catalog with basic descriptions which is the starting point.  Then after discussion with the customer and further tweaks to the design a final product is selected to fit certain measurements and requirements and while the basic cabinet remains the same, the fine tuning and changes will result in additional codes and markings being denoted on the final order/invoice.  The same is true here.**

    **Any revisions to create a concordance between Exhibit SD2-1 of the Post-Prelim Supplemental Response and Exhibit A-3 of the Section A Response is a manual line item by line item exercise that cannot be done via the use of a computer program but must be done by a human being.  The 72 hours given by the Department to complete this task is an unreasonably short period of time and impossible to do even if J&K devotes every single individual working on this case to review the price lists.  Furthermore, it should be noted that the invoice descriptions can vary by the 16 sales locations, thereby compounding the burden of linking Exhibits A-3 and Exhibit SD2-1 of the Post-Prelim Supplemental response.  For the aforementioned reasons, it is not possible to create the direct linkage as expected by the Department in the time allotted for this questionnaire response.  This is an**

2

exercise that is better suited for an on-site verification where the Department can select discrete line-items from the price lists in Exhibit A-3 along with the product description and then compare that to the final product description on the invoice in order to understand in context the variations that result from the transformation of a basic product description to a final invoiced product description.

e.      Please directly address why your marketing materials state that "the finest solid maple wood is sanded until smooth and vacuumed" if the cabinets sold during the period of investigation were, in fact, made of birch.

**Response:**

**The marketing materials are not a reflection of the actual material used in the production of the wooden cabinets during the POI but rather a reflection of the "look" of the cabinets. They have been marketed as maple because they look like maple. The wooden cabinets produced by Dalian Meisen are made of birch and that has been demonstrated on the record of this investigation through the purchase documentation submitted at Exhibit SD2-2 of the Post-Prelim Supplemental response.**

f.      Please explain why you only advertise cabinets made of solid maple wood in the catalog used by all of your U.S. affiliates when maple is not the "type of wood that comprise the construction" and "the products were in fact made of birch with a maple look and are not maple."

**Response:**

**The J&K companies advertise its cabinets as solid maple wood as there is no optical difference in the finished good between maple and birch once the cabinet is finished. For the antidumping duty investigation on Wooden Cabinets from China, the Department must determine whether the prices, adjustments, to prices, and factors of production are correct. Meisen and the J&K companies relied on the actual production records and usage records to determine and report the raw material used for the production of the merchandise under investigation. In this case, that information has been accurately reported to the Department and has been identified as birch. Regardless of the marketing materials that are disseminated to customers, the fact is that Dalian Meisen produced all of its wooden cabinets using birch, and the J&K Companies purchased all of the wooden cabinets sold in the United States from Dalian Meisen.**

g.      In addition to the references in your sales catalog, please state whether your sales representatives present your products as being made of solid maple wood to your U.S. customers.

**Response:**

**The J&K Company sales representatives present the products as being made of solid wood with a maple look.**

Filed By: jeffrey.neeley@huschblackwell.com, Filed Date: 11/21/19 2:04 PM, Submission Status: Approved

     h.     Please submit documentation demonstrating that you advertised the products sold during the POI as being made of birch wood.

**Response:**

     **The J&K Companies do not advertise the products sold in the United States in its marketing materials as being made of birch.**

2.     In Exhibit 3 of your SAQR, you submitted a price list for "[                   ]" (J&K Cabinetry NC LTD). Please state whether the reference to [                       ] refers to the [      ] of the cabinets or the "nominal" species of wood from which the cabinets were made.

**Response:**

     **J&K Cabinetry NC Ltd., places the phrase [                             ]" on its documentation and this refers to the [      ] of the cabinets in question and not to the species of wood.**

3.     In Exhibit 3 of your SAQR, you submitted a price list containing [  ] pages of products identified as [         ], including [

                                 ], among others (J&K Miami). Please resubmit that price list and revise it to include whether, for each product, the reference to [     ] indicates the [   ] or the nominal species of wood from which the cabinets were made.

**Response:**

     **J&K Miami's price list references the [           ] of the cabinet and this reference is not related to the species of the wood.  As all references are to the [     ] there is no need to revise and resubmit this exhibit.**

4.     As detailed in Attachment II, the websites of multiple J&K Cabinetry locations claim that their cabinets are made of solid maple.

     a.     One J&K website claims that"{w}e pride ourselves in using 3/4 inch solid maple wood for our cabinet doors, and maple wood for our frames, moldings, decor, and drawers." Please confirm the accuracy of this statement or state whether your affiliate is misrepresenting the actual species of wood used to produce the cabinets sold in the United States.

**Response:**

     **The J&K companies advertise their cabinets as solid maple wood as there is no optical difference in the finished good between maple and birch once the cabinet is**

finished.  For the antidumping duty investigation on Wooden Cabinets from China, the Department must determine whether the prices, adjustments, to prices, and factors of producion are correct.  Meisen and the J&K ccompanies relied on the actual production records and usage records to determine and report the raw material used for the production of the merchandise under investigation.   In this case, that information has been accurately reported to the Department and has been identified as birch.  Regardless of the marketing materials that are disseminated to customers, Dalian Meisen produced all of its wooden cabinets using birch, and the J&K Companies purchased all of the wooden cabinets sold in the United States from Dalian Meisen.

> b.      The website of J&K Louisiana clearly states that "all our cabinets are made of solid maple wood door and frames with plywood constructed box" and that "solid maple wood is the main wood specie we use for cabinet door, frames, molding decoration parts, and drawers." Please confirm the accuracy of this statement or state whether your affiliate is misrepresenting the actual species of wood used to produce the cabinets sold in the United States.

**Response:**

The J&K companies advertise their cabinets as solid maple wood as there is no optical difference in the finished good between maple and birch once the cabinet is finished.  For the antidumping duty investigation on Wooden Cabinets from China, the Department must determine whether the prices, adjustments, to prices, and factors of production are correct.  Meisen and the J&K companies relied on the actual production records and usage records to determine and report the raw material used for the production of the merchandise under investigation.  In this case, that information has been accurately reported to the Department and has been identified as birch.  Regardless of the marketing materials that are disseminated to customers, the fact is that Dalian Meisen produced all of its wooden cabinets using birch, and the J&K Companies purchased all of the wooden cabinets sold in the United States from Dalian Meisen.