Slip Op. 21-158

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

**Court No. 20-00109**

DALIAN MEISEN WOODWORKING CO, LTD.,

*Plaintiff*,

and

CABINETS TO GO, LLC,

*Plaintiff-Intervenor*,

v.

UNITED STATES,

*Defendant*,

and

AMERICAN KITCHEN CABINET ALLIANCE,

*Defendant-Intervenor*.

Before: M. Miller Baker, Judge

**OPINION**

[Granting Plaintiff's motion for judgment on the agency record and remanding for further administrative proceedings.]

Dated: November 18, 2021

*Stephen W. Brophy*, Husch Blackwell, LLP, of Washington, DC, for Plaintiff. With him on the briefs were *Jeffrey S. Neeley* and *Nithya Nagarajan*.

*Mark Ludwikowski*, Clark Hill PLC of Washington, DC, for Plaintiff-Intervenor. With him on Plaintiff-Intervenor's written submission were *Courtney Gayle Taylor*, *R. Kevin Williams*, and *William Sjoberg*.

*Ioana Cristei*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, for Defendant. With her on the brief were *Bryan M. Boynton*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Tara K. Hogan*, Assistant Director. Of counsel on the brief was *W. Mitch Purdy*, Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

*Luke A. Meisner*, Schagrin Associates of Washington, DC, for Defendant-Intervenor. With him on the brief was *Roger B. Schagrin*.

*Baker*, Judge: It's often said that bad facts make bad law. This case, which involves the Department of Commerce's imposition of hefty antidumping duties on ersatz maple cabinets imported from China, certainly has bad facts.

Commerce's investigation revealed that a Chinese producer markets and sells its wooden cabinets in the United States as maple even though they are made of birch, a less costly grade of wood. To borrow a metaphor that could have been written for this case, the producer's advertising in the United States is a "complete fraud from bark to core." *Aptix Corp. v. Quick-*

*turn Design Sys., Inc.*, 269 F.3d 1369, 1373 (Fed. Cir. 2001).

Less than amused, the Department applied "total adverse facts available"—trade law jargon for imposing the steepest possible antidumping duties because a producer has not been forthcoming in an investigation. Here, however, the producer did exactly what it was supposed to do: truthfully respond to Commerce's questions and otherwise fully cooperate. That the producer defrauded consumers is of no moment for antidumping purposes, as the Department lacks jurisdiction to police false advertising violations.

The court accordingly remands so that Commerce can rethink this one. In the meantime, the Federal Trade Commission, state Attorneys General, and the plaintiffs' class action bar may wish to take a close look at the producer's swindling of its U.S. customers.

### Statutory and Regulatory Background

The Tariff Act of 1930, as amended, provides a mechanism to combat dumping—the sale of imported merchandise in the United States at "less than its fair value." 19 U.S.C. § 1673(1). Under that statute, domestic producers and other affected entities can petition Commerce and the International Trade Commission to investigate alleged dumping and its effects on U.S. industry. *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334 (CIT 2020). If the Department determines that dumping is occurring, and the ITC

determines that the dumping harms domestic industry, Commerce can impose antidumping duties on top of any other applicable duties. 19 U.S.C. §1673. These duties are "in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." *Id.*

To determine whether dumping is occurring, the Tariff Act requires the Department to make "a fair comparison . . . between the export price or constructed export price and normal value." *Id.* § 1677b(a). Thus, Commerce's dumping determination also establishes the amount of the applicable duty so long as other statutory conditions are satisfied.

## A. Normal value

"Normal value" is generally "the price a producer charges in its home market." *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010); *see also* 19 U.S.C. § 1677b(a)(1)(B)(i) (defining normal value by reference to home market sales "in the ordinary course of trade"). In cases (such as this) involving imports from nonmarket economies,[1] the statute generally requires Commerce to determine normal value based on "the value of the factors of production utilized in

---

[1] A "nonmarket economy" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

producing the merchandise," combined with general overhead costs, profit, and certain other costs and expenses. *See* 19 U.S.C. § 1677b(c)(1). "Factors of production" include, but are not limited to, labor, raw material inputs, energy, and capital costs. *Id.* § 1677b(c)(3).

## B. Export price and constructed export price

The "export price" to which Commerce compares the import's "normal value" is the foreign producer/exporter's price for unaffiliated U.S. customers. *See id.* § 1677a(a). The "constructed export price" that the Department alternatively uses for this comparison is the price that the foreign producer/exporter's affiliated seller in turn charges U.S. customers. *See id.* § 1677a(b); *see also U.S. Steel Corp.*, 621 F.3d at 1353; *Hung Vuong*, 483 F. Supp. 3d at 1353 n.34 (citing *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1298–99 (CIT 2017)).[2] This case involves a constructed export price—the price the foreign producer's affiliate first charged U.S. purchasers.

---

[2] Commerce makes certain statutory adjustments to the price of goods to reflect various costs involved in preparing them for sale in the United States, and the adjustments to constructed export price are more extensive than the adjustments to export price. *See* 19 U.S.C. § 1677a(c) (listing adjustments to both), (d) (listing additional adjustments to constructed export price).

## C. Control numbers

To ensure that the normal value can accurately be compared to the export price or constructed export price for the same product, Commerce assigns what it calls "control numbers" to products based on "specified physical characteristics determined in each antidumping proceeding." *Hung Vuong*, 483 F. Supp. 3d at 1340 (quoting *GODACO Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342, 1348 n.1 (CIT 2020)). "All products whose product hierarchy characteristics are identical are deemed to be part of the same control number and are regarded as identical merchandise for the purposes of comparing export prices to normal value." *Id.* (cleaned up) (quoting *Am. Tubular Prods., LLC v. United States*, Slip Op. 15-98, at 5 n.1, 2015 WL 5236010, at *2 n.1 (CIT Aug. 28, 2015)).

The Department insists that respondents tie their factors of production to control numbers because it uses them to calculate the value of the imported product "to ensure that a fair comparison is made between the U.S. price and normal value." *Thuan An Prod. Trading & Serv. Co. v. United States*, 348 F. Supp. 3d 1340, 1353 (CIT 2018) (cleaned up). The use of a control number thus allows the Department to add up the cost of the particular factors of production used to manufacture a particular imported product and to then compare the sum of those costs to the U.S. price (export price or constructed export price) for that product.

### D. "Adverse facts available"

In certain circumstances, Commerce must supply facts not in the administrative record to complete its antidumping investigation. If "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), "*or*" if

> (2) an interested party or any other person—
>
> > (A) withholds information that has been requested by [Commerce] . . . under this subtitle,
> >
> > (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
> >
> > (C) significantly impedes a proceeding under this subtitle, *or*
> >
> > (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
>
> [Commerce] . . . *shall*, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

*Id.* § 1677e(a)(2) (emphasis added).

Because the use of "facts otherwise available" is a means for filling in gaps in the record, *see Bebitz Flanges Works Private Ltd. v. United States*, 433 F. Supp. 3d 1309, 1316–17 (CIT 2020), Commerce sometimes refers to using "total" or "partial" facts otherwise available. The distinction relates to whether portions of the respondent's data are usable. "Depending on the severity of a party's failure to respond to a request for information . . . , Commerce may select either partial or total [facts otherwise available]." *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1324 (CIT 2015).

Once Commerce finds it necessary to resort to facts otherwise available—whether partial or total—the Department may (but need not) take the second step of determining whether the respondent "failed to cooperate by not acting to the best of its ability to comply" with Commerce's "request for information." 19 U.S.C. § 1677e(b). If the Department affirmatively determines that the respondent has failed to cooperate, it may then apply an "adverse inference" by selecting "facts otherwise available" that are most unfavorable to the respondent. *See id.*; *see also Hung Vuong*, 483 F. Supp. 3d at 1336.

The statute, however, allows the use of an adverse inference only for purposes of "selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A). This means that Commerce's use of an adverse inference in any matter is limited by how

Commerce employs facts otherwise available. If Commerce applies "total" facts otherwise available, though, it may apply a correspondingly "total" adverse inference if it also determines that the respondent failed to cooperate. If the Department does this, the result is "total adverse facts available," or "total AFA."

### E. Verification

Under the statute, Commerce "shall verify all information relied upon in making . . . a final determination in an investigation." *Id.* § 1677m(i)(1). Commerce's regulations provide for on-site visits to producers and exporters "in order to verify the accuracy and completeness of submitted factual information." 19 C.F.R. § 351.307(d)(1)–(3). "Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1508 (CIT 1990) (cleaned up).

## Factual and Procedural Background

### A.

This case stems from an antidumping investigation that Commerce undertook at the request of the American Kitchen Cabinet Alliance, which describes itself as a group "of domestic producers of wooden cabinets and vanities." ECF 18, at 2. The Alliance's petition alleged that Chinese producers were dumping wooden cabinets and vanities in the U.S. market to the

detriment of domestic industry. *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 84 Fed. Reg. 12,587, 12,587 (Dep't Commerce Apr. 2, 2019).

In response, the Department began an antidumping investigation covering the period from July 1, 2018, through December 30, 2018. *Id.* Commerce selected the three largest Chinese producers/exporters of wooden cabinets and vanities as mandatory respondents, including Plaintiff Dalian Meisen Woodworking Co., Ltd. Appx001123.

As a mandatory respondent, Meisen had to respond to questionnaires and other informational requests from Commerce. As relevant here, those questionnaires included three separate areas of inquiry.

Commerce's Section C questionnaire, seeking information necessary for the Department to establish the export price or constructed export price, asked Meisen to provide its U.S. sales database with prices. Argument at 8:30–9:15. Meisen reported the dollar value of each U.S. sale, and its database coded each U.S. sale with the control number "4" for a birch product.[3] *Id.*;

---

[3] Commerce's questionnaire instructed Meisen to code its products by type of wood used in the manufacturing. As relevant here, Commerce required Meisen to assign "Code 4" to products manufactured with birch (considered a "common-grade hardwood") and "Code 5" to products manufac-

*see also* Appx082808–082816 (Exhibit C-1 to Schedule C questionnaire); ECF 55, at 15 (the Alliance's acknowledgment that Meisen used the control number for birch in its sales database).

Commerce's Section D questionnaire, seeking information on the factors of production, asked Meisen what type of wood the company used. *See* Appx082664 (questionnaire request to "[r]eport each raw material used to produce a unit of the merchandise under consideration"). Meisen responded that it used birch for the face of its cabinets. Appx082707; *see also* ECF 55, at 15 (the Alliance's acknowledgment that Meisen "reported that all of its cabinets were produced from birch wood").[4]

Commerce's Section A questionnaire asked Meisen to report general company information, including price lists and promotional and advertising materials. Appx080038; Appx080041. Meisen's responses revealed that much, if not all, of its promotional, advertising, and sales materials characterized its products

---

tured with maple (considered a "middle-grade hardwood"). Appx001195 (citing the questionnaire).

[4] Meisen's Schedule D questionnaire response apparently also included the control number "Code 4" for birch, but the relevant pages are not included in the parties' Joint Appendix. *See also* ECF 57, at 3–4 (Meisen brief explaining that the company reported "that it only used birch wood in its production").

as manufactured with maple, a higher-grade wood than birch.[5]

Because Meisen's Section C (sales database with prices) and D (factors of production) questionnaire responses said the company's cabinets were birch, but its Section A (customer-facing advertising, sales, and promotional materials) questionnaire responses characterized those same products as maple, the Alliance "conducted a factual investigation" that it provided to the Department. Appx086547. That investigation revealed (consistent with Meisen's own submission) that the company's promotional and advertising materials represented its products as made of maple, which is much more expensive than birch. *Id.*; *see also* Appx086276, Appx086281, Appx086286, Appx086349.

In view of the representations in Meisen's advertising, promotional, and sales materials, Commerce preliminarily determined that Meisen sold maple rather than birch cabinets in the United States. Appx001049. The Department further preliminarily determined that the company "did not accurately report its [factors of production]" because its submission "only includ[ed factors of production] data for the consumption of birch

---

[5] A catalog from J&K Cabinetry, for example, described the first step in the production process for Meisen's cabinets: "The finest solid maple wood is sanded until smooth and vacuumed." Appx084945; ECF 46, at 15–16 (Alliance citing Appx084945); ECF 58, at 8 (Meisen quoting the same statement and citing Appx084967).

wood." Appx001049–001050. Commerce declared that it would not rely on any of the company's factors-of-production data because the data all related solely to birch wood:

> A complete and accurate accounting of all [factors of production] used in the production of the merchandise under consideration is required for the calculation of [normal value], and so we cannot calculate [normal value]. Because [normal value] is in turn required for the calculation of an [antidumping] margin, we also cannot calculate Meisen's weighted-average dumping margin using the data it reported.

Appx001050.

Commerce therefore found that "Meisen failed to provide complete and accurate information regarding its production process and [factors of production], withheld information, failed to provide information in the form or manner requested, and significantly impeded this investigation" for purposes of 19 U.S.C. § 1677e(a)(2)(A), (B), and (C). The Department also determined that these failures required applying total facts otherwise available. Appx001049.

Commerce then chose to apply a total adverse inference under 19 U.S.C. § 1677e(b), finding that Meisen failed to cooperate by not acting to the best of its ability to comply with the Department's "requests for information regarding its inputs." Appx001049. As

a result, rather than calculating the company's dumping margin based on its factual submissions, Commerce preliminarily assigned Meisen a dumping margin of 262.18 percent, the highest possible rate. Appx001050.

Even so, the Department stated that it would "continue to consider the application of [adverse facts available] to Meisen based on any rebuttal factual information provided by Meisen and, if appropriate, any further information requested by Commerce after this preliminary determination." Appx001050.

## B.

After Commerce issued its preliminary determination, it suspended verification and issued two "post-preliminary" questionnaires to Meisen probing the discrepancy between the company's representations to the Department ("we sell birch cabinets") and its representations to its customers ("we sell maple cabinets"). Appx086551 (first post-preliminary supplemental questionnaire); Appx087931 (second post-preliminary questionnaire). Meisen's responses confirmed that the company's original submissions were correct: the company manufactures its cabinets using birch but (falsely) markets and promotes them as maple. *See* Appx086572; Appx087951.

After receiving these responses, Commerce informed Meisen that the Department would not verify of any of the company's questionnaire responses and

would continue to apply total facts otherwise available with an adverse inference. Commerce referred to "[t]he dissonance between what Meisen marketed to its customers and what Meisen reported to Commerce" and asserted that the company should have flagged its false advertising to the Department early in the investigation. Appx001107.

Commerce then issued an "issues and decision memorandum" affirming the bottom-line result of its preliminary determination—application of total adverse facts available with a 262.18 percent dumping margin, Appx001193—but its factual conclusion changed dramatically. Whereas the preliminary determination found that Meisen lied to the Department, *see* Appx001049–001050, Commerce belatedly realized—after reviewing the company's post-preliminary questionnaire responses—that the company's original questionnaire responses were truthful after all. Meisen didn't lie to the Department—it lied to its U.S. customers: "[T]here can be no question that [the company] is intentionally misleading its customers into believing that they are purchasing maple cabinets and that [the company's] customers believe that they are paying for products made of maple wood." Appx001196.

Reflecting its changed understanding of the background facts, Commerce offered completely different reasons for applying total adverse facts available against Meisen.

*First*, the Department asserted that through false advertising, the company created the "potential of masking dumped sales." Appx001197. Because the company sold its birch products as maple cabinets, "the degree to which Meisen may be selling at [less-than-fair value] is effectively obscured." *Id*. "*[B]y misrepresenting the product being sold*," the company "subverted Commerce's intent and process" and "thereby distort[ed] the comparison [the Department] is tasked with making." *Id*. (emphasis added). As a result, Commerce could not "calculate an accurate margin with the data reported by Meisen," *id*., and "verification of the accuracy of the [company]'s reported data" would not "resolve the discrepancy." *Id*. The Department accordingly rejected any use of Meisen's data "for this final determination." *Id*.

*Second*, Meisen's "U.S. sales database is comprised of sales of merchandise priced under [control numbers] [for maple] that are not included in its [factors-of-production] database," Appx001197, and "Meisen's U.S. [control numbers] do not represent the maple cabinets it purported to sell and the record does not contain [factors of production] data for the products Meisen represented selling in the U.S. market," *id*. Because of this discrepancy, Commerce asserted that it could not "calculate an accurate dumping margin with the data reported by Meisen," *id*., and "verification of [the company's] reported data" would not "resolve the discrepancy." *Id*. This provided another reason for the Department to reject Meisen's data. *Id*.

*Third*, the Department faulted the company for not flagging and explaining in its initial questionnaire responses "the discrepancy between its wood consumption and marketing materials that appeared to directly contradict its consumption claims." Appx010199. Because Meisen failed to do so, Commerce "was forced to delay verification and issue two supplemental questionnaires before [the company] directly addressed the issue." *Id.*

*Finally*, the company "gave conflicting and unconvincing reasons as to why its marketing materials misrepresented the species of wood used in its cabinets." Appx001200.

Commerce then found that Meisen withheld information, failed to report information on time, and significantly impeded the investigation, such that Commerce had to resort to facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(2)(A), (B), and (C). Appx001200. Commerce did not, however, directly explain the applicability of these provisions to its four reasons set forth above.

Commerce also found that Meisen's failure to affirmatively flag its false advertising for the Department's attention reflected a failure to cooperate justifying an adverse inference pursuant to 19 U.S.C. § 1677e(b)(1)(A). Appx001200. Commerce thus applied "total AFA," or total adverse facts available. That meant that rather than using the company's information to calculate Meisen's dumping margin,

Commerce supplied other information, and in so doing selected from "adverse" information in a way that maximized the company's duties at 262.18 percent. Appx001116–001117.[6] The Department later published this result in the Federal Register. *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 17,855 (Dep't Commerce Mar. 31, 2020).

## C.

Meisen timely sued under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and 1516a(a)(2)(B)(i) to contest Commerce's final determination. ECF 12. The complaint asserted that the Department's decisions not to verify the company's data and "to assign Meisen a margin based on total adverse facts available" were not supported by substantial evidence and were not in accordance with law. *Id.* ¶¶ 10, 12. The company asked the court to remand this case with instructions to verify Meisen's data and recalculate the antidumping margin. *Id.* at 5.

---

[6] Commerce also stated that it "shared relevant public information" about Meisen's "untruthful [advertising] to consumers in the United States" with the Federal Trade Commission for "further investigation, and if appropriate, enforcement action." Appx001200.

Cabinets to Go, LLC, intervened as a matter of right as a plaintiff. ECF 17. It described itself as an importer of subject merchandise that participated in the proceedings before Commerce, ECF 13, at 1, and stated that the antidumping rate for its suppliers is based on the rates assigned to the mandatory respondents, including Meisen, so any change in the latter's rate could affect the rate for those suppliers. ECF 13, at 2.[7] Although Cabinets to Go stated that it intended

---

[7] The Tariff Act requires that importers of record pay duties assessed, 19 U.S.C. § 1505, and by regulation Commerce prohibits exporters from reimbursing their importers. 19 C.F.R. § 351.402(f)(1)(i); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1367, 1375 (CIT 2013) (explaining that "the non-reimbursement regulation exists to ensure that the antidumping duty order's incentive for importers to buy at non-dumped prices is not negated by exporters who sell at dumped prices while removing the importer's exposure to antidumping liability").

In this case, that means Cabinets to Go, as importer of record, must pay the duties assessed on its exporter suppliers, who were successful separate-rate applicants that were not individually investigated. Their rate was based on the weighted average of the rate assigned to investigated mandatory respondents, excluding entities with zero and *de minimis* margins and margins (such as Meisen's here) based entirely on facts otherwise available. *See* 19 U.S.C. § 1673d(c)(5)(A); *see also New Am. Keg v. United States*, Slip Op. 21-30, at 7–9 (CIT 2021) (discussing how Commerce calculates the rate of successful separate-rate applicants that are not individually investigated). Thus, if the

to support Meisen's challenge "to certain aspects of Commerce's final results in this investigation," *id.*, its intervention motion failed to identify what relief, if any, it seeks from the court.

Finally, the Alliance (whose petition sparked the Department's investigation) intervened as of statutory right to support Commerce's decision. ECF 22.

Meisen then filed the pending Rule 56.2 motion for judgment on the agency record. ECF 57 (confidential); ECF 58 (public); *see* USCIT R. 56.2. Cabinets to Go stated that it would neither file a Rule 56.2 motion nor take any position on Meisen's motion for judgment. ECF 32, at 1. The government (ECF 54) and the Alliance (ECF 55, public; ECF 56, confidential) oppose Meisen's motion. Meisen replied, ECF 59, and the court heard oral argument.

## Jurisdiction and Standard of Review

The court has subject-matter jurisdiction under 28 U.S.C. § 1581(c).

---

court were to remand for recalculation of Meisen's rate as the company requests, the court could also order the Department to recalculate the rate for Cabinets to Go's suppliers as long as Meisen's new rate did not fall within one of the exceptions discussed above. That recalculation, in turn, might affect the rate ultimately paid by Cabinets to Go as importer of record.

In actions such as this brought under 19 U.S.C. § 1516a(a)(2)(A)(i)(II), "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

As to evidentiary issues, the question is not whether the court would have reached the same decision on the same record, but rather whether the administrative record as a whole permits Commerce's conclusion—even if the court might have weighed the evidence differently:

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

As to legal questions, the familiar framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (Commerce's "interpretation

governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous").

## Discussion

### I.

Commerce concluded that Meisen withheld information, failed to timely report information, and significantly impeded the investigation such that the Department was compelled to apply facts otherwise available under 19 U.S.C. § 1677e(a)(2)(A), (B), and (C). The court considers each provision in turn.

### A.

Commerce must apply facts otherwise available when it determines that a respondent "withholds information that has been requested by [the Department] . . . under this subtitle." 19 U.S.C. § 1677e(a)(2)(A). Of the four grounds the Department articulated for its decision, only the last—Meisen's "conflicting and unconvincing reasons as to why its marketing materials misrepresented the species of wood used in its cabinets," Appx001200—might constitute "withholding of information" from Commerce.[8]

---

[8] For example, Commerce's faulting of Meisen for not affirmatively flagging its false advertising for the Department's attention could hardly be characterized as "withhold[ing] information *that has been requested by*

The Department cited three passages in Meisen's post-preliminary questionnaire response as evidence of "conflicting and unconvincing" reasons:

> The marketing materials are not a reflection of the actual material used in the production of the wooden cabinets during the POI but rather a reflection of the "look" of the cabinets. They have been marketed as maple.

> The J&K companies advertise their cabinets as solid maple wood as there is no optical difference in the finished good between maple and birch once the cabinet is finished.

> [A]ll our cabinets are made of solid maple wood door and frames with plywood constructed box . . . solid maple wood is the main wood species we use for cabinet door, frames, molding decoration parts, and drawers.

Appx001200 n.496.

The final cited passage is easily disposed of, because it appears in the company's (false) advertising *disclosed* to the Department. *See* Appx087953. As a result, the Department could not reasonably characterize it as evidence of Meisen's withholding of information. *Cf. Ad Hoc Shrimp Trade Action Comm. v.*

---

*[Commerce]* . . . under this subtitle." 19 U.S.C. § 1677e(a)(2)(A) (emphasis added).

*United States*, 70 F. Supp. 3d 1328, 1335 (CIT 2015) ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and the substantial evidence standard of review can be translated roughly to mean is the determination unreasonable?") (cleaned up) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006)).

The first two passages cited by the Department were responses, respectively, to these questions:

> Please directly address why your marketing materials state that "the finest solid maple wood is sanded until smooth and vacuumed" if the cabinets sold during the period of investigation were, in fact, made of birch.

> Please explain why you only advertise cabinets made of solid maple wood in the catalog used by all of your U.S. affiliates when maple is not the "type of wood that comprise [sic] the construction" and "the products were in fact made of birch with a maple look and are not maple."

Appx087951. Commerce essentially asked Meisen why it lied to customers, and the Department found the company's responses "evasive and conflicting."

Even accepting Commerce's characterization, the Department lacks any authority to investigate why

antidumping respondents engage in false advertising, just as it lacks the authority to ask respondents why they violate environmental or antitrust laws, or why their executives are disreputable people. Commerce's authority is circumscribed by statute, which permits the Department to apply facts otherwise available when a respondent "withholds information . . . requested by [Commerce] *under this subtitle*." 19 U.S.C. § 1677e(a)(2)(A) (emphasis added). "[T]his subtitle" refers to Subtitle IV of the Tariff Act of 1930, as amended, which authorizes the Department to levy countervailing and antidumping duties. In asking Meisen *why* it lied to its customers, a subject the statute does not address, Commerce exceeded its regulatory writ. The Department's invocation of § 1677e(a)(2)(A) was therefore contrary to law.

## B.

Subject to a qualification not relevant here, Commerce must apply facts otherwise available when it determines that a respondent "fails to provide such information [requested by the Department] by the deadlines for submission of the information or in the form and manner requested." *Id.* § 1677e(a)(2)(B). Although Commerce also invoked this provision, it did so unreasonably, as Meisen timely responded and provided information in the "form and manner requested." Therefore, Commerce's invocation of facts otherwise available under 19 U.S.C. § 1677e(a)(2)(B) is both unsupported by substantial evidence and contrary to law.

## C.

The final statutory basis Commerce invoked for applying facts otherwise available is § 1677e(a)(2)(C), which requires the Department to apply facts otherwise available when a respondent "*significantly* impedes a proceeding *under this subtitle*." *Id.* § 1677e(a)(2)(C) (emphasis added). The court presumes that in citing this provision Commerce relied on three of its reasons.

First, Commerce faulted Meisen for not flagging its false advertising in the company's original questionnaire responses, which caused the Department to waste time and resources ascertaining whether Meisen lied to Commerce or lied to its customers. Appx010199. The Department appears to have reasoned that by so causing this delay and expense, Meisen "significantly impeded" its work.

The problem with this reasoning, however, is that Commerce acknowledges that Meisen fully and truthfully complied with the Department's original questionnaires. In Section D of the company's original questionnaire responses, Meisen certified[9] that it

---

[9] Meisen certified that its questionnaire responses were truthful. Appx001004; *see also* 19 C.F.R. § 351.303(g) (requiring parties submitting factual information to Commerce to certify the accuracy of such submissions using a form acknowledging that "U.S. law . . . imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government").

manufactured its cabinets using birch. In section C of those responses, Meisen certified that it sold birch cabinets at certain prices. And in Section A of its responses, which Meisen also certified, the company produced promotional and marketing materials and sale invoices in which it told its customers that the cabinets were maple.

Meisen's responses established *prima facie* that the company lied to its customers, a point the Department emphasized: "[T]here can be no question that [the company] is intentionally misleading its customers into believing that they are purchasing maple cabinets and that [the company's] customers believe that they are paying for products made of maple wood." Appx001196. That point is critical. It's not that the Commerce couldn't make sense of Meisen's information because of the discrepancy between what the company told the Department and what it told its customers. To the contrary, after reviewing the company's post-preliminary questionnaire responses, the Department fully understood the implications of the discrepancy, and was (understandably) appalled.

But when a respondent fully and truthfully complies with Commerce's information requests on subjects that the Department is allowed to investigate under the Tariff Act—and here no party seriously disputes that Meisen truthfully complied and that its responses were not materially misleading—as a matter of law a respondent does not "*significantly* impede[ ] a

proceeding *under this subtitle*." 19 U.S.C. § 1677e(a)(2)(C) (emphasis added). Insofar as Commerce relied on Meisen's failure to flag its false advertising to determine that the company "significantly impede[d]" the Department's work, that determination was contrary to law.

Of course, the discrepancy between what Meisen told Commerce ("we make birch cabinets") and what it told its customers ("we make maple cabinets") was a legitimate area of inquiry for the Department. After all, if the company lied to Commerce (rather than its customers), then Meisen's factors of production and sales databases (which used the control number for birch) would not have been correct, and any dumping margin based on such data would be understated. The Department appropriately probed the issue with post-preliminary questionnaires and concluded that Meisen's *advertising* was false, not its responses to Commerce. That should have resolved the issue.

Commerce, though, complained that because of Meisen's failure to flag the discrepancy, the Department "*was forced to delay verification* and issue two [post-preliminary] questionnaires before [the company] directly addressed the issue." Appx010199 (emphasis added). But Commerce was not "forced to delay" anything; the Department *chose* not to verify. Verification seeks to confirm the accuracy of respondents' information submissions, which Commerce may not take on faith. *See* 19 U.S.C. § 1677m(i)(1). Had the

Department verified Meisen's initial questionnaire responses, it could have confirmed that Meisen's representations to Commerce were true (and conversely, that its representations to its customers were false). In effect, the Department substituted its post-preliminary questionnaires for verification, and any resulting delay was Commerce's fault, not Meisen's.

It appears that the second basis for Commerce's conclusion that Meisen "significantly impeded" the investigation was the Department's finding that the company's false advertising "effectively obscured" the "degree to which" the company might have been "selling at [less than fair value]." Appx001197. Because antidumping duties are based on the difference between the U.S. export price or constructed export price and the home market price, artificially raising the U.S. price would mitigate, if not entirely eliminate, the effect of such duties.

In calculating an antidumping margin based on the export price or constructed export price, however, the statute requires (as relevant here) Commerce to use the "*price at which the subject merchandise is first sold (or agreed to be sold)* in the United States." 19 U.S.C. § 1677a(1), (b) (emphasis added). The statute also allows the Department to adjust that price in various specified circumstances, *see id.* § 1677a(c), (d), none of which include a respondent's manipulation of the price through otherwise illegal activity. Contrary to the government's argument, *see* ECF 54, at 22 ("Commerce

reasonably concluded that Meisen's U.S. sales price does not represent the U.S. sales price of birch cabinets"), a respondent's otherwise illegal manipulation of the U.S. sales price of its products is statutorily irrelevant for antidumping purposes.

A respondent might illegally manipulate the U.S. sales price of its products in any number of ways. It might fix prices in violation of the antitrust laws. Or it might constrain supply by hiring cyber hackers to disable its competitors' production operations. Or, as here, it might increase demand by falsely advertising the nature of its product. In all these contexts, the law provides remedies for illegal conduct that manipulates prices, but they are outside the Tariff Act and beyond the Department's antidumping jurisdiction. Insofar as Commerce relied on Meisen's illegal manipulation of the U.S. sales price for its products to determine that the company "significantly impede[d]" the investigation, that determination was contrary to law.

Finally, the court presumes that the third and final basis for Commerce's conclusion that Meisen "significantly impeded" the investigation was the Department's finding that the company's lies to its customers prevented Commerce from using the proper control number to match the raw material used in production (birch) with the products actually marketed by the company (maple). *See* Appx001197.

At argument, however, the parties clarified that Meisen's responses to Commerce's Section C (sales

database) and D (factors of production) questionnaires *both* proffered the control number for birch. That is, Meisen's control numbers for its sales database and factors of production *matched*. Counsel for the government candidly explained that the Department still declined to accept the control number for birch in the sales database because Meisen *marketed* its cabinets as maple. Argument at 31:30–34:20.

In view of this concession about the record, Commerce's finding that Meisen's questionnaire responses prevented the Department from matching control numbers in the sales database with the reported factors of production is not supported by substantial evidence. Rather than accepting the company's truthful information, the Department instead refused to use that information because Meisen lied to its customers, a subject beyond Commerce's statutory authority. As a result, Commerce's assertion that it could not use the control number for birch to match the company's raw material input with its product sales is unsupported by substantial evidence because *no* evidence on the record supports it.[10] The Department's assertion is

---

[10] Not only is Commerce's position devoid of any support in the record, it conflicts with the Department's position in the parallel countervailing duty proceeding, where it stated that "Meisen purchased only birch sawn wood . . . . *Regardless of Meisen's representations to its customers, we obtained verifiable data*" from the company. *Issues and Decision Memorandum, Comment 9, Wooden Cabinets and Vanities and Components Thereof from the People's*

also contrary to law because the Department rejected Meisen's birch control numbers based on the company's false advertising, a subject beyond Commerce's regulatory authority.

* * *

Commerce's reasons for rejecting Meisen's information and supplying facts otherwise available do not withstand scrutiny. The court therefore remands for the Department to reconsider whether and to what extent it will use the company's information in its antidumping calculations. Insofar as the Department chooses to use Meisen's information, it must then undertake verification. *See* 19 U.S.C. § 1677m(i)(1).

## II.

Commerce also found that Meisen's failure to affirmatively flag its false advertising for the Department's attention reflected a failure to cooperate warranting an adverse inference under 19 U.S.C. § 1677e(b)(1)(A). Appx001200. A necessary (but not sufficient) condition to Commerce so applying an adverse inference, however, is the Department's lawful determination to apply facts otherwise available. *See* 19 U.S.C. § 1677e(b). Because the court finds that Commerce's application of facts otherwise available is contrary to law and unsupported by substantial

---

*Republic of China*, 85 Fed. Reg. 11,962 (Dep't Commerce Feb. 28, 2020), *quoted in* ECF 57, at 42–43 (emphasis added).

evidence, the court also remands for the Department to reconsider its application of an adverse inference.

## III.

As noted above, Plaintiff-Intervenor Cabinets to Go failed to request any relief in its intervention motion or at the merits stage. In view of this failure, the court ordered the company to explain why it should not be dismissed from the case. ECF 66. In response, Cabinets to Go belatedly clarified that it requests relief after all in the form of an order directing Commerce, if ordered to recalculate Meisen's rate, to also recalculate the rate for Cabinets to Go's suppliers. ECF 67, at 1; *see also above* note 7.

Because Cabinets to Go, an intervenor, seeks relief different from the relief sought by Meisen, it must possess independent constitutional standing. *See Prime-Source Bldg. Prods., Inc. v. United States*, 494 F. Supp. 3d 1307, 1319–20 (CIT 2021) (Baker, J., concurring) (discussing *Town of Chester, N.Y. v. Laroe Estates*, 137 S. Ct. 1645 (2017), and *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020)). Although Cabinets to Go plainly suffers injury-in-fact (it pays the import duties charged to its suppliers), the company acknowledges it is unknowable whether Commerce's recalculation of its suppliers' rates would reduce those rates (and thus what Cabinets to Go ultimately pays). *See* ECF 67.

Such uncertainty over the efficacy of the relief sought ordinarily defeats standing for lack of redressability. *See, e.g.*, *Consumer Watchdog v. Wis. Alumni Rsch. Found.*, 753 F.3d 1258, 1261 (Fed. Cir. 2014) (for constitutional standing, a "party must show that it is likely, rather than merely speculative, that a favorable judicial decision will redress the injury").

Nevertheless, where "Congress has accorded a procedural right to a litigant, such as the right to appeal an administrative decision, certain requirements of standing—namely immediacy and redressability, as well as prudential aspects that are not part of Article III—may be relaxed." *Id.* For example, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.7 (1992).

Thus, the uncertainty over whether the relief sought by Cabinets to Go will redress its injury does not defeat its standing, because Congress granted the company a procedural right to seek that relief. *See* 19 U.S.C. § 1516a(a)(2)(A) (authorizing any "interested party who [was] a party" in an antidumping proceeding before Commerce to challenge the result in the CIT); *id.* § 1516a(d) (granting any "interested party" in

an antidumping proceeding before Commerce "the right to appear and be heard as a party in interest" before the CIT).

\* \* \*

On remand, Commerce may decide to use some or all of Meisen's information. If it does, and if it recalculates Meisen's rate, it must also as necessary recalculate the rate for Cabinets to Go's suppliers accordingly. *See above* note 7.

## Conclusion

For the reasons explained above, the court grants Meisen's motion for judgment on the agency record and also grants Cabinets to Go the relief it seeks. A separate remand order will issue requiring Commerce to reconsider whether it will use Meisen's information and, insofar as it recalculates Meisen's rate, to also recalculate the rate for Cabinets to Go's suppliers.

Dated: November 18, 2021    /s/ *M. Miller Baker*
      New York, NY      M. Miller Baker, Judge