A-570-106
Remand
Slip Op. 21-158
POI: 07/01/2018 – 12/31/2018
~~Proprietary Document~~
E&C/OV: RG
Public Version

**Dalian Meisen Woodworking Co., Ltd. v. United States,**
**Court No. 20-00109, Slip Op. 21-158 (CIT November 18, 2021)**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT),

issued on November 18, 2021.[1]  These final results of redetermination concern Commerce's final

determination in the less-than-fair-value (LTFV) investigation of wooden cabinets and vanities

and components thereof (wooden cabinets and vanities) from the People's Republic of China

(China) covering the period of investigation (POI) July 1, 2018, through December 31, 2018, in

which Commerce based the final dumping margin for one of the mandatory respondents, Dalian

Meisen Woodworking Co., Ltd (Meisen), on total adverse facts available (AFA).[2]  In the

*Remand Opinion and Order*, the CIT held that Commerce's reasons for rejecting Meisen's

information and relying on AFA to determine Meisen's dumping margin are beyond the

agency's statutory authority under sections 776(a) and 776(b) of the Tariff Act of 1930, as

amended (the Act).  In connection with those findings, the CIT required Commerce to reconsider

---

[1] *See Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00109, Slip Opinion 21-158 (CIT November 18, 2021); and *Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00109, Order (CIT November 18, 2021) (collectively, *Remand Opinion and Order*).
[2] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 11953 (February 28, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 17855 (March 31, 2020) (*Corrected Final Determination*).

whether, and to what extent, Commerce will use Meisen's information for determining its dumping margin; and, if Commerce relies on any of Meisen's information for the remand redetermination, to verify the information Commerce relies on in determining Meisen's dumping margin. Finally, the CIT directed Commerce to revise the separate rate assigned to Cabinets to Go's[3] suppliers, as necessary.

Pursuant to the *Remand Opinion and Order*, we reassessed the administrative record of this investigation to determine whether we can rely on Meisen's information for determining a dumping margin. In connection with this assessment, we issued four supplemental questionnaires to Meisen and attempted to verify the information supplied by Meisen, both on the record of the underlying investigation and in its responses to the additional supplemental questionnaires. We also issued a draft redetermination, in which we determined that Meisen's reported information was not reliable for the purpose of calculating a final dumping margin for this company, and we solicited, and received, comments on this decision.[4]

As outlined below, for these final results of redetermination, we continue to find that the application of total AFA to Meisen is warranted, albeit for reasons which differ from those outlined in the *Final Determination*. Therefore, we continue to base Meisen's final dumping margin on the highest dumping margin on the investigation record, 262.18 percent.[5] Additionally, because we are not calculating a dumping margin for Meisen, it is unnecessary to recalculate the dumping margin assigned to Cabinets to Go's suppliers.

---

[3] Cabinets to Go, LLC (Cabinets to Go) intervened as a matter of right as a plaintiff.
[4] *See* Draft Results of Redetermination Pursuant to Court Remand, *Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00109, Slip Op. 21-158 (November 18, 2021), issued April 29, 2022 (Draft Remand Results); *see also* Meisen's Letter, "Resubmission of Comments on Draft Remand Redetermination," dated May 16, 2022 (Meisen's Comments); and Petitioner's Letter, "Comments on Draft Remand Redetermination," dated May 6, 2022 (Petitioner's Comments). The petitioner is the American Kitchen Cabinet Alliance.
[5] Because we are not changing Meisen's cash deposit rate from the rate assigned in the underlying investigation, Commerce does not intend to issue revised cash deposit instructions to U.S. Customs and Border Protection (CBP) should the CIT affirm Commerce's redetermination.

## II.      BACKGROUND

On March 26, 2019, Commerce initiated the LTFV investigation of wooden cabinets and vanities from China, and we published the *Initiation Notice* on April 2, 2019.[6]  Subsequently, we selected three Chinese exporters and producers of subject merchandise as mandatory respondents:  The Ancientree Cabinet Co., Ltd. (Ancientree), Meisen, and Rizhao Foremost Woodwork Manufacturing Company Ltd (Foremost).[7]

In October 2019, Commerce preliminarily found that wooden cabinets and vanities from China were being sold in the United States at LTFV.[8]  Also in the *Preliminary Determination*, Commerce determined that the application of total AFA to Meisen was warranted and assigned the highest dumping margin on the record, which was alleged in the Petition,[9] to Meisen.

In February 2020, Commerce issued its *Final Determination* and continued to find that wooden cabinets and vanities from China were sold at LTFV in the United States by all three mandatory respondents and the China-wide entity.[10]  Commerce also continued to find that the application of total AFA was appropriate for Meisen.  On March 31, 2020, Commerce published the *Corrected Final Determination* after correcting certain formatting errors in the company names that were present in the *Final Determination*.[11]

On November 18, 2021, the CIT held that the application of total AFA to Meisen in the *Final Determination* was both unsupported by substantial evidence and contrary to the law.

---

[6] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Initiation of Less-Than-Fair-Value Investigation*, 84 FR 12587 (April 2, 2019) (*Initiation Notice*).

[7] *See* Memorandum, "Respondent Selection," dated June 4, 2019.

[8] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures Preliminary Determination*, 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[9] *See* Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Wooden Cabinets and Vanities from the People's Republic of China," dated March 6, 2019 (Petition).

[10] *See Final Determination*.

[11] *See Corrected Final Determination*.

Therefore, the CIT remanded the decision back to Commerce.  On April 29, 2022, Commerce released to parties the Draft Remand Results, in which we found that the continued application of total AFA to Meisen was warranted.[12]  We invited interested parties to comment on our findings.[13]  On May 6, 2022, Meisen and the petitioner timely submitted comments on the Draft Remand Results.[14]

## III.    REMANDED ISSUE

In the *Remand Opinion and Order*, the CIT held that Commerce's justifications for using facts otherwise available were unsupported by substantial evidence and contrary to law.[15]  As a result, the CIT also held that the conditions necessary for applying an adverse inference pursuant to section 776(b) of the Act had not been met, and it ordered Commerce to:  (1) reconsider whether it can rely on Meisen's information for its dumping analysis; (2) verify the information Commerce deems to be useable for its dumping analysis; (3) calculate a new dumping margin for Meisen, if Meisen's information allows Commerce to do so; and (4) revise the separate rate assigned to the suppliers of Cabinets to Go, if Commerce calculates a new dumping margin for Meisen.[16]

Accordingly, we reviewed the information submitted by Meisen on the record of this investigation, requested additional and clarifying information.  We also attempted to verify Meisen's submissions.  As discussed in detail below, we explain why the application of total AFA to Meisen is appropriate based on the facts of this record and why this determination is in accordance with the Act, Commerce's practice, and judicial precedent.

---

[12] *See* Draft Remand Results.
[13] *Id.*
[14] Meisen submitted comments on May 6, 2022, but Commerce found that this submission contained new factual information (NFI).  We permitted Meisen to refile its comments by May 16, 2022, with the NFI redacted.  *See* Meisen's Comments; *see also* Petitioner's Comments.
[15] *See Remand Opinion and Order* at 25, 28, 30, and 31-33.
[16] *Id*. at 3, 32, and 35.

IV.    **DISCUSSION**

**A.  APPLICATION OF AFA TO MEISEN IN THE LTFV INVESTIGATION**

In the *Final Determination*, Commerce found that Meisen subverted Commerce's investigation by misrepresenting the products that it sold in the United States, thereby distorting the comparison that Commerce is tasked with making.  Further, because Meisen did not disclose its misrepresentation until late in the proceeding, we found that Meisen significantly impeded this investigation.[17]  Additionally, because the missing information was within Meisen's possession and because Meisen had the ability not to misrepresent its reported data, it failed to cooperate to the best of its ability and, thus, the application of total AFA was appropriate.  These findings were based largely on record information indicating that Meisen marketed its sales of subject merchandise during the POI as being constructed of a more expensive primary raw material, maple, than the raw material that it actually used, birch.[18]

In making the final determination, we relied on the fact that the marketing materials distributed by Meisen's U.S. affiliates, the J&K Companies,[19] contained false advertising.  In particular, the J&K Companies admitted that they represented to purchasers of Meisen's wooden cabinets and vanities that the merchandise they purchased was made of solid, higher-grade maple

---

[17] *See Final Determination* IDM at Comment 22.

[18] *Id*.

[19] The J&K Companies include:  (1) J&K AZ (official name, J&K Cabinetry Inc.); (2) J&K Los Angeles (official name, Grand JK&C Ltd); (3) J&K SF (official name, Grand J&K Corp); (4) J&K CO (official name, J&K 10 Cabinetry Ltd); (5) J&K Miami (official name, J&K 8 Inc); (6) J&K Orlando (official name JK Cabinetry FL); (7) J&K GA (official name, J&K 2 Ltd); (8) J&K IL (official name J&K Cabinetry Inc); (9) J&K NOLA (official name, J&K Cabinetry New Orleans, Inc); (10) J&K Boston (official name, J&K Cabinets Ltd); (11) J&K NJ Zheng (official name, Zheng Holdings Ltd); (12) J&K NJ Maple (official name, MS Maple Inc.); (13) J&K NY (official name Meisen Ltd); (14) J&K NC (official name J&K Cabinetry NC Ltd); (15) J&K OH (official name J&K Cabinetry Inc); (16) J&K Dallas (official name, J&K Cabinetry Inc.); (17) J&K Houston (official name J&K Cabinetry Houston LLC); and (18) J&K WA (official name Grant J&K Cabinetry Inc).  Meisen reported that, during the POI, J&K Orlando was not involved in the sale of subject merchandise.  *See* Meisen's Letter, "Supplemental Section A Questionnaire Response," dated August 13, 2019," dated August 13, 2019 (Meisen's August 13 SAQR), at 13.

wood, when in actuality, the merchandise was made, instead, of common grade birch wood.[20]

We found that the dissonance between the products that the customers believed they were

purchasing and the products that they actually purchased obscured our ability to analyze

Meisen's reported data, and, thus, we were unable to calculate accurately the "fair" value of the

merchandise.[21]  We also found it meaningful that Meisen waited until late in the investigation to

disclose the discrepancy between how it marketed its products and how it reported its factors of

production (FOP), and that Meisen's untimely disclosure of information amounted to a failure to

cooperate by not acting to the best of its ability, in accordance with section 776(b) of the Act.[22]

Thus, for the *Final Determination*, we applied the highest corroborated dumping margin on the

record to Meisen, 262.18 percent.

## B.  ANALYSIS

Upon the CIT's issuance of its *Remand Opinion and Order*, we re-examined Meisen's

responses in the underlying investigation.[23]  After evaluating the information on the record, we

issued four supplemental questionnaires to Meisen identifying deficiencies in, and requesting

clarification regarding, its previous responses.  Meisen provided timely responses to these

supplemental questionnaires.[24]  Subsequently, to verify Meisen's information, we issued a

---

[20] *See Final Determination* IDM at Comment 22.
[21] *Id*.
[22] *Id*.
[23] *See* Meisen's Letters, "Response to Quantity and Value Questionnaire," dated April 22, 2019 (Meisen's April 22 Q&V Response); "Separate Rate Application," dated May 13, 2019 (Meisen's May 13 SRA); "Section A Questionnaire Response," dated July 3, 2019 (Meisen's July 3 AQR); "Section C Questionnaire Response," dated July 19, 2019 (Meisen's July 19 CQR); "Section D Questionnaire Response," dated July 19, 2019; "Section E Questionnaire Response," dated July 22, 2019; "Reconciliations Submission," dated August 8, 2019; Meisen's August 13 SAQR; "Supplemental Reconciliations Questionnaire Response," dated August 14, 2019 (Meisen's August 14 Reconciliations); "Second Reconciliation Submission," dated August 23, 2019 (Meisen's August 23 Reconciliations); "Supplemental Section C Questionnaire Response," dated August 27, 2019 (Meisen's August 27 SCQR); "Supplemental Section D-E Questionnaire Response," dated September 16, 2019; and "Revised Response to Question 13 of the Supplemental Section D-E Questionnaire Response," dated September 18, 2019.
[24] *See* Meisen's Letters, "REM 21-158 Third Supplemental Section C Questionnaire," dated January 11, 2022 (Meisen's January 11 SCQR); "REM 21-158 Third Supplemental Section D Questionnaire," dated January 19,

questionnaire in lieu of on-site verification, requesting documentation to support Meisen's record submissions.[25]  Meisen provided a timely response to this questionnaire.[26]

Following our examination of Meisen's ILVQR, on March 23, 2022, we placed NFI on the record of this proceeding, related to a potentially undisclosed U.S. affiliate in Florida, and we allowed parties the opportunity to comment.[27]  On March 28, 2022, Meisen submitted comments and rebuttal factual information (RFI) in response to the March 23 NFI Memo.[28]  On March 31, 2022, we placed additional NFI on the record, related to the same entity in Florida and additional possible unreported affiliates in New York, and we again allowed parties to comment.[29]  On April 6, 2022, both Meisen and the petitioner submitted comments and RFI in response to the March 31 NFI Memo.[30]

For these final results of redetermination, we find that, for reasons different from those in the underlying investigation, we are unable to rely on Meisen's data.  As discussed in further detail below, the information Meisen reported could not be verified and is unreliable; as a result, it is not an appropriate basis for calculating a dumping margin.  Specifically, Meisen not only failed to provide critical information in its ILVQR, including important source documentation requested by Commerce, but this submission also revealed significant, and pervasive, problems throughout Meisen's reported data, including the fact that Meisen's U.S. sales database contains

---

2022; "REM 21-158 Third Supplemental Section E Questionnaire," dated January 20, 2022; "REM 21-158 Fourth Supplemental Section C Questionnaire," dated February 14, 2022 (Meisen's February 14 SCQR); "REM 21-158 Supplemental Section C and D Questionnaire Response," dated February 16, 2022 (Meisen's February 16 SCDQR).
[25] *See* Commerce's Letter to Meisen, dated February 28, 2022 (Commerce's ILVQ).
[26] *See* Meisen's Letter, "In Lieu of Onsite Verification Questionnaire Response," dated March 8, 2022 (Meisen's ILVQR).
[27] *See* Memorandum, "New Factual Information," dated March 23, 2022 (March 23 NFI Memo).
[28] *See* Meisen's Letter, "Comments on New Factual Information," dated March 28, 2022.
[29] *See* Memorandum, "New Factual Information," dated March 31, 2022 (March 31 NFI Memo).
[30] *See* Meisen's Letter, "Comments on New Factual Information," dated April 6, 2022 (Meisen's April 6 Rebuttal Comments and RFI); *see also* Petitioner's Letter, "Comments and Rebuttal Factual Information in Response to Merch 31, 2022 New Factual Information," dated April 6, 2022 (Petitioner's April 6 Comments and RFI).

many errors.[31]  *See* Appendix for a list of all issues discovered in, or as a result of, Meisen's

ILVQR.  Additionally, Meisen's ILVQR revealed that Meisen failed to disclose all of its U.S.

affiliates, some of whom may have been involved in the sale or distribution of subject

merchandise.

Because Meisen withheld information related to U.S. affiliated parties involved in the

sale or distribution of subject merchandise, significantly impeded this proceeding, and reported

data that could not be verified, we find that the continued use of facts available (FA) is

appropriate, in accordance with sections 776(a)(2)(A), (C), and (D) of the Act.  Further, because

Meisen had the missing information in its possession, and but failed to provide it, we find that

Meisen failed to cooperate to the best of its ability in responding to Commerce's requests for

information, in accordance with section 776(b) of the Act.  Therefore, we continue to base

Meisen's final dumping margin on total AFA.  In light of this finding, we have not revised the

separate rate for Cabinets to Go's suppliers.

## C.  DISCUSSION OF THE METHODOLOGY

### 1.  Non-Market Economy (NME) Status

In the underlying investigation, we treated China as an NME country.[32]  This was not

contested in this remand proceeding, and, therefore, we continue to treat China as an NME

country for this remand redetermination.

### 2.  Separate Rate Determinations

In proceedings involving NME countries, Commerce maintains a rebuttable presumption

that all companies within an NME country are subject to government control, and, therefore,

---

[31] The U.S. sales database analyzed for purposes of this remand determination is Meisen's most recent U.S. sales database, submitted in Meisen's February 14 SCQR at Exhibit R2C-2.
[32] *See Preliminary Determination* PDM at 9, unchanged in *Final Determination*.

should be assessed a single weighted-average dumping margin.  In the underlying investigation, we found that certain producers and exporters, including Meisen, qualified for separate rates.[33] Separate-rate eligibility was not contested in this remand proceeding.  Accordingly, we made no changes to our findings regarding the companies that qualified for separate rates.

### 3. China-Wide Entity

In the underlying investigation, we determined that certain producers and/or exporters of wooden cabinets and vanities from China failed to rebut the presumption of government control and were, therefore, ineligible for a separate rate.[34]  The rate assigned to the China-wide entity was not contested in this remand proceeding.  Accordingly, we made no changes to the China-wide entity or the rate assigned to the entity for this remand redetermination.

### D. APPLICATION OF TOTAL AFA TO MEISEN

#### 1. *Legal Framework*

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act provide that, if necessary information is not available on the record, or if an interested party:  (1) withholds information requested by Commerce; (2) fails to provide such information by the deadlines for submission of the information, or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 of the Act; (3) significantly impedes a proceeding, or (4) provides such information but the information cannot be verified as provided in section 782(i) of the Act, Commerce shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination.

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for

---

[33] See *Final Determination*, 85 FR at 11955.
[34] See *Final Determination* IDM at 7 and Comment 3.

information, Commerce may use an inference adverse to the interests of that party in selecting

the facts otherwise available.[35]  In doing so, Commerce is not required to determine, or make any

adjustments to, a weighted-average dumping margin based on any assumptions about

information an interested party would have provided if the interested party had complied with the

request for information.[36]  In addition, the SAA explains that Commerce may employ an adverse

inference "to ensure that the party does not obtain a more favorable result by failing to cooperate

than if it had cooperated fully."[37]  Furthermore, affirmative evidence of bad faith on the part of a

respondent is not required before Commerce may make an adverse inference in selecting from

the facts available.[38]

In *Nippon Steel*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held

that, while the Act does not provide an express definition of the "failure to act to the best of its

ability" standard, the ordinary meaning of "best" is "one's maximum effort."[39]  Thus, according

to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" is

that the respondent do the maximum it is able to do.  This best-of-its-ability standard requires a

respondent to put forth its maximum effort to provide Commerce with full and complete answers

to all inquiries in a proceeding.[40]  The Federal Circuit indicated that inadequate responses to an

---

[35] *See* 19 CFR 351.308(a); and *Notice of Final Results of Antidumping Duty Administrative Review:  Stainless Steel Bar from India*, 70 FR 54023, 54025-26 (September 13, 2005); *see also Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances:  Carbon and Certain Alloy Steel Wire Rod from Brazil*, 67 FR 55792, 55794-96 (August 30, 2002).

[36] *See* section 776(b)(1)(B) of the Act.

[37] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA) at 870; *see also Certain Polyester Staple Fiber from Korea:  Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663, 69664 (December 10, 2007).

[38] *See, e.g.*, *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); and *Antidumping Duties; Countervailing Duties:  Final Rule*, 62 FR 28296, 27340 (May 19, 1997).

[39] *Id.*

[40] *See China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1359 (CIT 2003) (*China Steel*) (quoting *Steel Auth. of India, Ltd. v. United States*, 149 F. Supp. 2d 921, 930 (CIT 2001) (*SAIL*)).

agency's inquiries would suffice to find that a respondent did not act to the best of its ability. While the Federal Circuit noted that the "best of its ability standard" does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[41]  The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[42]  In addition, a failure to act to the best of one's ability can be due to "either a willful decision not to comply or behavior below the standard for a reasonable respondent."[43]

2. *Application of AFA*

As explained in more detail below, pursuant to sections 776(a)(2)(A), (C) and (D) of the Act, we find that application of FA is appropriate because Meisen withheld information that was requested by Commerce, significantly impeded this investigation, and provided information that could not be verified.  Specifically, in its ILVQR, Meisen did not include all of the source documentation requested by Commerce.  Further, a review of this response revealed that Meisen's U.S. sales database contains significant and pervasive errors, and it signaled to Commerce that Meisen failed to identify all affiliated parties which were potentially involved in the sale or distribution of subject merchandise during the POI.  Based on Meisen's ILVQR, Commerce investigated Meisen's affiliations further, the results of which demonstrate that Meisen failed to report one affiliated company, and potentially others.

---

[41] *Id.*; *see also Nippon Steel*, 337 F.3d at 1382.
[42] *Id.*
[43] *See China Steel*, 264 F. Supp. 2d at 1359 (quoting *SAIL*, 149 F. Supp. 2d at 930).

We also discuss further below that, pursuant to section 776(b) of the Act, the use of adverse inferences is warranted.  Specifically, we find that, in numerous instances, Meisen had information in its possession, but failed to provide that information when requested, while in other instances, Meisen provided essential and fundamental information (such as information related to the product characteristics of the merchandise sold in the United States) which we have determined is incorrect and unreliable.  Accordingly, we find that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference is warranted in selecting from the facts available.

The significant and pervasive inaccuracies and omissions call into question the reliability of Meisen's entire response and lead to the conclusion that Meisen's reported information cannot be used to compute an accurate dumping margin.  Based on the totality of the deficiencies contained in Meisen's ILVQR, the application of total AFA is appropriate.  As a result, we are assigning a final margin to Meisen based on total AFA, in accordance with sections 776(a) and (b) of the Act.

**a. Meisen's ILVQR Reconciliations**

As noted above, the J&K Companies consist of 18 affiliated entities, 17 of which sold wooden cabinets and vanities to U.S. customers during the POI.  In Commerce's ILVQ, we selected two of these entities, J&K GA and J&K IL, and requested that Meisen provide source documentation supporting the worksheets it used to reconcile the total sales by these resellers during the POI to their tax returns.[44]  Specifically, Commerce's ILVQ requested:

> Please provide a reconciliation of the total quantity and value of the sales reported in your U.S. sales database for SELLERUs J&K GA and J&K IL to the total revenue in their respective tax returns.  *Every step of your reconciliation must include screenshots from your accounting system, and both printouts and Excel*

---

[44] These worksheets are also known as the "Q&V reconciliation worksheets."

*versions of each companies' profit and loss statements, trial balances, and sales ledgers.* Both reconciliations must include the following:

    a. Worksheets demonstrating how the POI tax return revenue total ties to the general ledger sales revenue account. Please include the relevant supporting documents from your accounting system, such as screenshots and printouts from the general ledger, sub-ledger, *etc*.

    b. Worksheets demonstrating how the sales revenue from the sales ledger ties to the sales quantities and values reported your U.S. sales database. The worksheets should identify the total quantity and value of all sales in the fiscal year overlapped by the POI and identify the quantity and value of each category of non-subject merchandise sales that are excluded from your reported sales of subject merchandise (*e.g.*, domestic sales, sales outside the POI, sales to foreign markets other than the United States, *etc.*). *Please include the relevant supporting documents from your accounting system, such as screenshots and printouts from the general ledger, sub-ledger, etc., to support your claim that these categories are accurately excluded from the sales database.*

    c. A detailed narrative explaining *how all worksheets and supporting documentation tie together.*[45]

In Commerce's ILVQ, we also requested:

For J&K IL, *provide a print-out of the "Sales" account from Quickbooks for October 2018 sales.* Using screenshots from your accounting system, tie the total values in this account for this month to your U.S. sales reconciliation worksheets and the quantity and value of sales reported for this month in your U.S. sales database.

For J&K GA, *provide a print-out of the "Sales" account from Quickbooks for November 2018 sales. Using screenshots from your accounting system*, tie the total values in this account for this month to your U.S. sales reconciliation worksheets and the quantity and value of sales reported for this month in your U.S. sales database.

For J&K IL's first, last, and highest value sales booked in October 2018, in the "Sales" account, provide the commercial invoice to the customer. Using these invoices, identify the customer of the transaction and the product sold. Additionally, for each invoice, provide the following information:

---

[45] *See* Commerce's ILVQ at 3 (emphasis added).

    a. If the transaction is for subject merchandise, tie the sale to the U.S. sales database.

    b. If the sale is not reported in the U.S. sales database, justify why it was not reported and support your answer with source documentation.

    c. Ensure that the documentation you include in your response contains screenshots of these transactions from your accounting system.

For J&K GA's first, last, and highest value sales booked in November 2018, in the "Sales" account, provide the commercial invoice to the customer.  Using these invoices, identify the customer of the transaction and the product sold. Additionally, for each invoice, provide the following information:

    a. If the transaction is for subject merchandise, tie the sale to the U.S. sales database.

    b. If the sale is not reported in the U.S. sales database, justify why it was not reported and support your answer with source documentation.

    c. Ensure that the documentation you include in your response contains screenshots of these transactions from your accounting system.[46]

In response, Meisen provided certain requested information.  However, as discussed in detail below, it failed to respond completely to the above questions, and it omitted significant and essential documentation necessary to verify the accuracy and completeness of its U.S. sales database.[47]

i.    <u>J&K GA</u>

Commerce's reconciliation exercise required Meisen to tie the total sales quantity (in pieces) and value (in U.S. dollars) of J&K GA's sales reported in its U.S. sales database to the total revenues reported in J&K GA's 2018 tax returns.  In our request for these reconciliations, we specifically instructed Meisen to provide source documentation, such as screenshots from the company's accounting systems.[48]  In response, J&K GA's reconciliation contained the first page

---

[46] *Id*. at 4-5 (emphasis added).
[47] *See* Meisen's ILVQR at Exhibits SVE-3 and SVE-4.
[48] *See* Commerce's ILVQ at 4-5:

> <u>Every step</u> of your reconciliation must include screenshots from your accounting system, and both printouts and Excel versions of each companies' profit and loss statements, trial balances, and sales ledgers…. Please include the relevant supporting documents from your accounting system, such as screenshots and printouts from the general ledger, sub-ledger, *etc.*, to support your claim that {any excluded} categories are accurately excluded from the sales database.

of its tax return and bank statements to tie to the tax return, but none of the requested screenshots or printouts from its accounting system.[49]  Ultimately, while J&K GA provided Excel worksheets with numbers and calculations to demonstrate how its reconciliation functioned mathematically,[50] Meisen failed to provide any of the requested source documentation to substantiate the underlying figures.  Further, based on the information that Meisen did submit in its ILVQR, and as discussed further below, we are not able to tie J&K GA's reported U.S. sales to its books and records, and, therefore, we are unable to verify J&K GA's reported U.S. sales.

Meisen's failure to provide the requested source documentation and to tie J&K GA's reported sales to J&K GA's books and records is particularly problematic in light of two additional facts.  First, Meisen clearly understood Commerce's requests, given Meisen's response in connection with J&K IL's quantity and value (Q&V) reconciliation, which contained most of the source documentation we requested.[51]  Second, based on the documentation Meisen provided elsewhere in its ILVQR,[52] it also appears that J&K GA did possess such documents, *i.e.*, it used a Quickbooks-based accounting system from which it could have provided screenshots.

J&K GA's Total POI Sales

In its ILVQR, Meisen attempted to tie J&K GA's 2018 tax return to J&K GA's total 2018 sales revenue recorded in its Quickbooks accounting system (hereinafter referred to as the

---

[49] *See* Meisen's ILVQR at Exhibit SVE-4.  Similarly, Meisen failed to provide any screenshots tying one of the sales selected for individual examination (known as "sales trace two") to its accounting system.
[50] *Id.*  While Meisen claims that the Excel worksheets themselves are source documents, as discussed in Comment 1 below, there is no support for this claim on the record.  Rather, the Excel worksheets appear to be just that – worksheets – and there is no evidence demonstrating that they are merely unaltered downloads of information contained in J&K GA's accounting system.  Thus, we do not consider these worksheets to be source documents.
[51] *Id*. at Exhibit SVE-3.
[52] In Step 1B of J&K GA's Q&V reconciliation, J&K GA specifically reported the "Quickbooks Sales Revenue" for each month of 2018.  In J&K GA's November 2018 reconciliation, J&K GA provided screenshots of sales booked in its accounting system (maintained using Quickbooks).  *See* Meisen's ILVQR at Exhibits SVE-3 and SVE-7.  Therefore, we know that J&K GA uses Quickbooks for some of its accounting purposes, but it still failed to provide source documentation linking its reconciliation to its accounting system.

"tax return reconciliation").  However, as explained in detail below, in numerous instances, the values relied upon in this reconciliation did not tie with each other, resulting in the fact that Meisen failed, ultimately, to tie the total value reported in the U.S. sales database to an independent source (in this case, its federal tax return).  Meisen provided no explanation as to why some of these differences existed, despite our request that J&K GA provide "a detailed narrative explaining how all worksheets and supporting documentation tie together";[53] and, where it did provide explanations, it failed to substantiate its claims using source documentation. The facts underlying these observations are as follows:

The total revenue reflected on J&K GA's 2018 tax return is $[      ].  This total does not match the total 2018 revenue recorded in J&K GA's accounting system (Quickbooks), $[      ].[54]  Meisen claimed that this [   ] percent difference was due to "timing differences between receipt and deposit of payments."[55]  However, it provided no documentation to substantiate its assertion.

From the above figures, Meisen deducted $[      ], which it indicated was related to the removal of sales taxes.[56]  The resulting value was $[      ].[57]  Despite our clear instruction that "{e}very step of {the} reconciliation must include screenshots from {the Company's} accounting system," Meisen failed to supply documentation directly from its accounting system to support its total "Quickbooks Sales Revenue" amounts or its "sales tax adjustment."[58]  Instead, Meisen provided an Excel "summary" worksheet purportedly showing all of J&K GA's 2018 invoices and the associated sales taxes for each invoice.  Meisen added the sales invoices and

---

[53] *See* Meisen's ILVQR at 6.
[54] *Id*. at 4-5 and Exhibit SVE-4, Step 1.
[55] *Id*. at 5.
[56] *Id*. at 5 and Exhibit SVE-4, Step 1.
[57] *Id*.
[58] *Id*. at 4-5 and Exhibit SVE-4.

sales taxes reported in this worksheet to arrive at the $[       ] "Quickbooks Sales Revenue"

amount on the reconciliation worksheet and to arrive at the $[       ] it deducted from the total

"Quickbooks Sales Revenue."[59]  While we acknowledge that the individual invoices supplied for

J&K GA in Meisen's ILVQR tie to this worksheet, the fact that certain sales invoices, supplied at

the same time, are included on a worksheet,[60] created by Meisen for the purpose of this

investigation, does not overcome Meisen's failure to provide the specific documentation

requested in the ILVQ, nor does it demonstrate the accuracy or completeness of Meisen's overall

reconciliation.[61]

   J&K GA did not attempt to tie this derived figure (*i.e.*, its 2018 "Quickbooks Sales

Revenue" of $[       ]) to the total value of J&K GA's sales reported in the U.S. sales database.

Instead, J&K GA began that part of the sales reconciliation using a total sales revenue amount of

$[       ], labeled "FY 2018 Net Sales Revenue P&L," which is in an Excel worksheet that

Meisen refers to as J&K GA's profit and loss (P&L) statement.[62]  Meisen stated that, "{t}he

income net of sales taxes calculated in Step 1 {*i.e.*, the tax return reconciliation}, varies slightly

compared to the sales revenue recorded in the profit and loss statement for 2018."[63]  While

Meisen noted a difference between the two values, it provided no explanation as to why the total

revenue shown on J&K GA's purported P&L statement (derived from J&K GA's Quickbooks

system) differed from the total revenue that Meisen claimed was recorded in J&K GA's

---

[59] *Id.* at Exhibit SVE-4, Step 1B.
[60] *See infra* at "J&K GA's November 2018 Sales," where we explain that J&K GA did not demonstrate that it provided source documentation for the specific sales we requested in the ILVQ.
[61] *See* Commerce's ILVQ at 4 ("{For w}orksheets demonstrating how the POI tax return revenue total ties to the general ledger sales revenue account{,} {p}lease include the relevant supporting documents from your accounting system, such as screenshots and printouts from the general ledger, sub-ledger, *etc.*).
[62] *See* Meisen's ILVQR at Exhibit SVE-4, Steps 1 and 2.
[63] *Id.* at 6.  Meisen refers to a calculated "income net of sales taxes."  In Meisen's 2018 tax return reconciliation, J&K GA's monthly "Quickbooks Sales Revenues" are added together.  Then, Meisen deducts sales taxes to arrive at an amount that "varies slightly" compared to the sales revenue recorded in the profit and loss statement for 2018.

Quickbooks accounts themselves.[64]  Considering J&K GA's 2018 P&L statement was allegedly

derived from the total revenue and expenses recorded in J&K GA's accounting system, an

explanation and support for this difference was necessary.[65]

Finally, J&K GA deducted from the P&L statement figure an amount which it

characterized as pre-POI sales.  Specifically, in J&K GA's Q&V reconciliation, Meisen deducted

the value of the pre-POI 2018 sales ($[          ]) from the total value of J&K GA's 2018 sales

($[          ]) to derive a total POI sales value of $[          ].[66]  Meisen again did not provide

source documentation for this step, but instead merely provided a sales ledger worksheet for

J&K GA's January through June 2018 sales (*i.e.*, the 2018 months prior to the POI).[67]  Similarly,

despite its label, "Jul 2018 – Dec 2018 Net Sales – Sales Ledger," the $[          ] figure was not

accompanied by screenshots from Meisen's sales ledger; it is noteworthy that, as further detailed

below, the J&K GA 2018 sales ledger worksheet that was provided later in Meisen's ILVQR

does not reconcile with this value.[68]

To better illustrate Meisen's calculation, we provide a screenshot of Meisen's submission

in Excel format.

---

[64] *Id*. at Exhibit SVE-4.

[65] *See* Meisen's August 23 Reconciliations at 1 ("In order to address {Commerce}'s reporting requirements, the J&K Companies have used the accounting software to generate the appropriate reports summarizing and supporting the sales quantities and values recorded in the accounting systems").

[66]*See* Meisen's ILVQR at Exhibit SVE-4, Steps 2 and 2A.

[67] *Id*. at Exhibit SVE-4, Step 2A.

[68] *Id*. at Exhibit SVE-4, Step 2.

[

]⁶⁹

The total POI sales value in this Q&V reconciliation worksheet (Worksheet 1)

($[          ]) does not tie to the POI sales value in the worksheet provided with the November

reconciliation (Worksheet 2) that Meisen separately submitted, which purportedly includes the

Q&V of pre-POI and POI sales (*i.e.*, all of 2018).⁷⁰  To determine this, we calculated the total

sales value of both the pre-POI sales and the POI sales on Worksheet 2 follows:  (1) for each

month, we summed the sales value for each row of the ledger (*i.e.*, the products and services

sold), to arrive at a total monthly sales value;⁷¹ (2) we added all of the Q&Vs of the pre-POI

months together to arrive at the total pre-POI Q&V ([          ]); and (3) we separately added the

---

⁶⁹ *Id.*
⁷⁰ *Id.* at Exhibit SVE-6.
⁷¹ *See* Meisen's Comments at 10-11.  Meisen stated that it was unable to follow the calculation described in the
Draft Remand Comments and that the calculation was "complicated."  For these final results, we rephrased our
explanation.

total sales values of the POI months together to arrive at the POI sales value (*i.e.*, $[        ]).[72]
As can be seen from these figures, the value of pre-POI sales in this document ties to the value
shown in the reconciliation worksheet;[73] however, the POI sales value does not.[74]

The difference between the POI sales value in Worksheet 2 and POI sales value used in
J&K GA's Q&V reconciliation, Worksheet 1, is $[        ], or [    ] percent.  Thus, the POI
value from J&K GA's Q&V reconciliation does not tie to the POI-inclusive Worksheet 2 value.[75]
Meisen attempts to explain this gap in its comments on the Draft Remand Results, but as further
explained in Comment 1, we continue to find this gap to be irreconcilable.

Finally, J&K GA made certain adjustments to its calculated POI value of $[        ] to
arrive at the total Q&V reported in the U.S. sales database.  To support these adjustments, J&K
GA provided the following Excel files:  a P&L worksheet (that, as discussed above, does not tie
to its total revenue listed in Quickbooks), a worksheet labeled as a sales ledger for January
through June 2018, a listing of non-subject merchandise sales, and a listing of the values of
intercompany sales.[76]  None of these files are supported by source documentation, so the source
of the data in each of these Excel files is unclear.[77]

---

[72] For calculating the total Q&V for the POI sales in the 2018 sales ledger (Exhibit SVE-6), we added the total Q&V
of the sales, services, and parts that reportedly were sold for each month:

> July 2018, [                        ];
> August 2018, [                        ];
> September 2018, [                        ];
> October 2018, [                        ];
> November 2018, [                        ]; and
> December 2018 [                        ].

[73] In the Draft Remand Results at 17, we also stated that the pre-POI sales values in the two worksheets do not tie.
Meisen argues in its comments that this is not correct, and having evaluated the information again, we agree.  *See*
Meisen's Comments at 10.
[74] We performed the same exercise with the sales quantities, and they matched without discrepancy.
[75] *See* Meisen's ILVQR at Exhibit SVE-4, Step 2, *cf.* Exhibit SVE-6.
[76] *Id*. at Exhibit SVE-4 Steps 2A and 2B.
[77] *Id*. at Exhibit SVE-4.

<u>J&K GA's November 2018 Sales</u>

Meisen also failed to provide all of the necessary information for J&K GA's November 2018 sales reconciliation.  In addition to requesting that J&K GA reconcile the Q&V of its sales of subject merchandise as reported in its U.S. sales database for November 2018 to its accounting system, we also requested that it provide the sales invoices for the first, last, and highest value sales booked during November 2018.[78]  In response, J&K GA provided neither a print-out of the "Sales" account from its accounting system, nor screenshots from its accounting system that would reconcile the sales recorded in it to the total Q&V of its sales reported for the month.[79]  Importantly, J&K GA did not provide any other source documentation from its accounting system in response to Commerce's request.[80]  Because J&K GA's source documentation is so limited (*e.g.*, no accounting system screenshot(s) of the November 2018 sales ledger and no sales account printout), we are unable to see all of the sales invoices booked in November 2018 by J&K GA, and we are unable to tie the total November Q&V of J&K GA's sales to its books and records.  Furthermore, in light of the inadequate and incomplete information that Meisen supplied in its ILVQR, we are unable to definitively determine whether Meisen provided support for the first or last November 2018 sales reported in the U.S. sales database, as we requested.[81]

---

[78] *See* Commerce's ILVQ at 4-5.
[79] *See* Meisen's ILVQR at Exhibits SVE-6 and SVE-7.
[80] *Id.*; *cf.* Commerce's ILVQ at 4 ("For J&K GA, provide a print-out of the 'Sales' account from Quickbooks for November 2018 sales.  Using screenshots from your accounting system, tie the total values in this account for this month to your U.S. sales reconciliation worksheets and the quantity and value of sales reported for this month in your U.S. sales database").
[81] Meisen reported that invoice number [      ] was the first sale that J&K GA booked in November 2018 (J&K GA uses the term "invoice" and "estimate" interchangeably).  *See* Meisen's ILVQR at Exhibit SVE-7.  In the U.S. sales database, based on the invoice date (SALINDTU) and the sequential order of the invoice numbers, J&K GA created five invoices before invoice [      ].  *See* Meisen's August 27 SCQR at 8 (Meisen explained that all J&K Company invoices were numbered sequentially).  Based on the earliest PAYDATE1U and invoices with the earliest SALINDTUs, there were five invoices created before invoice [      ] (*i.e.*, invoices [                              ]).  *Id.* (Meisen explained that the date of payment is when J&K GA records sales in its accounting system.)  Absent

In its ILVQR, Meisen provided no explanation as to how it selected one invoice over another, and there were multiple invoices that were booked on the first and last days of November 2018.  In its comments on the Draft Remand Results, however, Meisen reiterated that J&K GA's sales are booked into its accounting system at the time of payment, and then explained that the first sale it provided in its ILVQR was paid at [                    ] and that the last sale it provided in its ILVQR was paid at [                    ].[82]  However, as we further explain in Comment 1, without source documentation to demonstrate that J&K GA provided the correct sales (*i.e.*, that sales weren't booked before or after the sales provided by Meisen in its ILVQR), we cannot determine that Meisen provided the specific sales we requested.  Accordingly, Meisen failed to provide Commerce with the requested source documentation from J&K GA's accounting system, and thus, failed to demonstrate that it provided the first and last November 2018 invoices, as requested.  Therefore, we are unable to verify J&K GA's November 2018 sales as accurate and complete.

Conclusion

Commerce considers the reconciliation process to be "one of the most important tasks performed" at verification.[83]  Commerce has stated numerous times that reconciliations are

---

additional information showing when J&K GA received payment for invoice number [      ] and these other five invoices, or screenshots of the actual sales ledger showing the entry of all six transactions, it is impossible to determine which invoice was booked in J&K GA's accounting system first.

Similarly, Meisen asserted that invoice [      ] was the last sale booked in November 2018.  Based on the SALINDTU and the sequential order of invoice numbers, J&K GA generated three invoices after this invoice.  Based on the latest PAYDATE1U, and the invoices with the latest SALINDTUs, there were also three invoices generated after invoice [      ] (*i.e.*, invoices [                    ]).  As with the "first" sale discussed above, it was also impossible to confirm that this was J&K GA's last sale in November given the missing source documentation.

[82] *See* Meisen's Comment at 11 (citing Meisen's ILVQR at Exhibit SVE-7).
[83] *See, e.g., Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair Value, Final Affirmative Determination of Critical Circumstances*, 83 FR 16319 (April 16, 2018) (*CDMT from Korea*), and accompanying IDM at Comment 2.

necessary in order to confirm the completeness and accuracy of the reported information.[84]
Meisen failed to successfully reconcile J&K GA's reported U.S. sales, either in total or on a
monthly basis, with J&K GA's books and records.  J&K GA's failure to reconcile completely its
U.S. sales database to its tax returns prevented us from verifying the completeness and accuracy
of its reported information.

In sum, because Meisen failed to provide the requested J&K GA source documentation,
and because J&K GA's POI sales do not tie to its own "reconciliation," we find that J&K GA
failed to reconcile the sales reported in the U.S. sales database to its books and records, and that
we are able to verify the accuracy and completeness of J&K GA's U.S. sales.

ii.    J&K IL

As with J&K GA, we requested that J&K IL provide the sales invoices for the first, last,
and highest value sales booked during October 2018.  In response, like J&K GA, J&K IL failed
to provide a print-out of the "Sales" account from its accounting system, and it also it failed to
demonstrate that it provided the specific sales requested by Commerce.

In particular, J&K IL provided a worksheet which it claimed was an excerpt of its
download of its October 2018 sales ledger.  This document shows the quantity and value, by
product, of the sales of all merchandise booked in J&K IL's accounting system in October
2018.[85]  J&K IL also provided self-created lists of the various fees charged, credits received, and
non-subject sales made, as well as a screenshot of the end of J&K's October 2018 sales
account.[86]  Despite providing this information, J&K IL did not provide Commerce with

---

[84] See *CDMT from Korea* IDM at Comment 2; *see also Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014), and accompanying IDM at Comment 6.
[85] *See* Meisen's ILVQR at Exhibit SVE-5.
[86] *Id.*

sufficient information necessary to verify its response, *i.e.*, "a print-out of the 'Sales' account from Quickbooks for October 2018 sales."[87]   Because J&K IL's source documentation is so limited (*i.e.*, it is only a screenshot of nine invoices from the end of October, but according to the U.S. sales database, J&K IL issued more than nine invoices in October 2018), we are unable to see all of the sales invoices issued in October 2018 by J&K IL.

With respect to the sale with the highest value, J&K IL provided a copy of invoice [    ].  In its comments on the Draft Remand Results, Meisen stated that it selected this invoice because it had the highest total product and service value plus sales taxes.[88]   However, Meisen did not provide the sales tax information for any invoice not specifically selected for verification, and it did not provide the printout of its sales account to support its response (as requested). Because Meisen failed to provide Commerce with the requested printout from its accounting system, we are unable to confirm that that Meisen provided the specific invoice requested. Accordingly, in responding to Commerce's ILVQ, we find that Meisen withheld necessary information, within its possession, and, as a result, we were unable to confirm the accuracy of J&K IL's reported October 2018 sales data.

---

[87] *Id*. at 7.
[88] *See* Meisen's Comments at 13.

iii.   <u>Analysis</u>

The CIT has held that "inconsistent and irreconcilable information" constitutes a gap in the record information.[89]  For example, in *Qingdao Sea-Line*, the CIT held that:

> Commerce properly disregarded Sea-Line's responses regarding its U.S. sales price because the information was not verifiable, reliable, or usable without undue difficulty in accordance with {section 782 (e) of the Act}.  Thus, Commerce properly identified a gap in the record regarding Sea-Line's U.S. sales price information and resorted to {facts available} in order to complete its review of Sea-Line's dumping margin…. U.S. sales price is "a fundamental element in the dumping analysis" and it was reasonable for Sea-Line to maintain such information…. Sea-Line's subsequent failure to provide complete information regarding the additional price components shows that Sea Line at least was inattentive or careless in responding to Commerce's questionnaires, thus justifying the application of AFA.[90]

Significantly, the CIT held that a respondent's submission of unreliable information for a fundamental element of the dumping analysis, like the sales value, was a sufficient basis for applying AFA, as U.S. sales price is a "fundamental element in the dumping analysis."[91]

Similar to *Qingdao Sea-Line*, Meisen failed to demonstrate that the Q&V of the sales sold by J&K GA were "verifiable, reliable, and usable without undue difficulty."  Here, J&K GA used Quickbooks during the POI,[92] but failed to provide any screenshots or other source documentation, and failed to provide an explanation as to why it could not provide the requested information.  In addition, Meisen failed to provide necessary documentation to support the U.S. sales prices in selected months for both J&K GA and J&K IL, and it also failed to reconcile J&K GA's reported sales, in total, to an independent source (its U.S. federal tax return).  Thus, Meisen

---

[89] *See Qingdao Sea-Line International Trading Co. v. United States*, 503 F. Supp. 3d 1355, 1365-1366 (CIT 2021) (*Qingdao Sea-Line*).

[90] *Id*. at 1367-68 and 1372.

[91] *Id*. at 1372 (quoting *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307 (Fed. Cir. 2014) (internal quotations omitted), where the Federal Circuit upheld an application of AFA to a respondent that repeatedly failed to provide necessary information, did not explain its failure, and did not provide supporting documentation regarding its available information).

[92] *See* Meisen's ILVQR at Exhibit SVE-7.

failed to establish the accuracy and completeness of a fundamental element in the dumping analysis, the U.S. sales price for each of these affiliates, and because verification is a sampling exercise, and these were only two samples of Meisen's 17 reported U.S. affiliates, it failed to establish that the U.S. sales database in its entirety was accurate and complete.

The CIT has consistently held that it is the respondent's burden to provide all necessary documentation to demonstrate its reported information.[93] In *Hung Vuong Corp.*, the CIT held that "Commerce is entitled to insist on the original records because 'failure to submit primary source documentation' means that Commerce is 'unable to verify the accuracy of the information submitted.'"[94] In *Fujian II*, the CIT sustained Commerce's finding that the respondent failed verification because it was unable to comply with significant information requests, and, thus, could not demonstrate that it had fully and accurately reported all U.S. sales.[95] In *Thyssen*, the CIT agreed that Commerce:

> is "not required to itemize beforehand every possible type of document" needed during verification, and its outline clearly indicated its list of items was "not necessarily all inclusive…." Similarly, {Commerce} is not required to request that missing information be provided at a future date. Rather…if Commerce's requests for information are reasonable, a party must comply with them in full in order to avoid failing verification{.}[96]

The CIT also held that Commerce is "entitled to infer from {the respondent's} failure to provide the requested documentation…that {the respondent's} related data…would be similarly

---

[93] *See Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 276 F. Supp. 2d 1371,1377 (CIT 2003) (*Fujian II*); *see also Thyssen Stahl v. United States*, 886 F. Supp. 23, 26-27 (CIT 1995) (*Thyssen*); *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (CIT 2020) (*Hung Vuong Corp*); and *Thyssen Stahl AG v. AK Steel Corp.*, No. 97-1508, 1998 U.S. App. LEXIS 17064 (Fed. Cir. 1998) (*Thyssen II*).
[94] *See Hung Vuong Corp*, 483 F. Supp. 3d at 1349 (quoting *Thyssen II*) ("{I}nternally generated documents cannot, for the purpose of verification, replace the actual source documents").
[95] *See Fujian II*, F Supp. 2d 1371 at 1377 (quoting *Cf. Branco Perez Citrus, S.A. v. United States*, 175 F. Supp 2d 1363, 1370 (CIT 2001), "Indeed, a party's failure to provide requested information is sufficient grounds for the use of facts available.").
[96] *See Thyssen*, 866 F. Supp. 23 at 26-27.

unreliable.[97]  Moreover, the Federal Circuit sustained Commerce's application of AFA due to the respondent's failure to provide source documentation.[98]

To summarize, the courts have consistently held that it is not only the respondent's responsibility to provide the information requested by Commerce, but it is also the respondent's responsibility to provide documentation that allows Commerce to actually verify information that the respondent placed on the record.  In this case, Meisen failed to provide the requested source documentation necessary to verify that Meisen accurately and completely reported J&K GA's total U.S. sales, as well as individually-selected sales made by J&K GA in November 2018 and J&K IL in October 2018.  Further, the record indicates that the information requested by Commerce (*i.e.*, screenshots, printouts sourced directly from an accounting system, *etc.*) was available to J&K GA and J&K IL.[99]

Meisen was required to provide documentation that could satisfy Commerce's requests (*i.e.*, demonstrate, using *source* documentation, that the sales data reported were rooted in the J&K Companies' books and records),[100] and as we explain above, the Q&V reconciliation is one of the most important tasks performed at verification.  Meisen's failure to provide the necessary source documentation for Commerce to conduct this task not only made it impossible for Commerce to verify a substantial portion of Meisen's U.S. sales, but it also calls into question whether the remainder of the J&K Companies' sales are verifiable.[101]  Accordingly, pursuant to

---

[97] *See Fujian II*, 276 F. Supp. 2d at 1377.

[98] *See Thyssen II*, 1998 U.S. App. LEXIS 17064 at 13-14.

[99] *See, e.g.*, Meisen's ILVQR at Exhibit SVE-7, where J&K GA demonstrates that it records its sales in Quickbooks and J&K IL demonstrates that it understood Commerce's request to reconcile its transaction ledger by providing a screenshot of the last page of October 2018.

[100] *See Hung Vuong Corp.*, 483 F. Supp. 3d at 1348-1354.

[101] As the CIT has noted, verification, by its nature, is an exercise in sampling.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Preliminary Results and Preliminary Rescission of New Shipper Review; 2015-2016*, 82 FR 31301 (July 6, 2017) (*TRBs from China*), and accompanying IDM at 14 fn. 65.  Further, the CIT held, it "is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness.  Normally, an audit entails selective examination rather than testing of an entire universe."  *See Bomont Indus. V. United States*, 733 F. Supp. 1507, 1508 (CIT 1990) (*Bomont*).

section 776(a)(2)(D) of the Act, and consistent with *Fujian II* and *Thyssen II*, it is appropriate to apply FA in these final results of redetermination because all of J&K GA's sales and J&K IL's October sales are unverifiable due to Meisen's failure to provide the source documentation clearly outlined in Commerce's ILVQ. undermining the reliability of Meisen's overall response. Further, pursuant to section 776(b) of the Act, it is appropriate to apply AFA because Meisen failed to act to the best of its ability by failing to provide source documentation that it had in its possession and failing to provide Commerce with the specific sales selected for examination.

### b. Meisen's Sales Database Errors

Meisen's ILVQR also indicated that its U.S. sales database contains pervasive and significant errors. In Commerce's ILVQ, we selected six-line items by the sequence number (SEQU) reported in Meisen's U.S. sales database and instructed Meisen to provide source documentation to demonstrate that the transaction-specific data reported for these line-items were accurate and consistent with the information its books and records.[102] We also requested that Meisen support the product characteristics and associated control numbers (or "CONNUMs") it reported for three additional line-items in the U.S. sales database.[103]

---

[102] *See* Commerce's ILVQ at 5-6. Hereafter, we refer to the selected sales document packages we requested and that Meisen provided in its ILVQR as "sales traces." We assigned each sales trace a number, and references to that sales trace number refer to the information submitted within a particular exhibit:

- Sales trace one refers to information submitted at Exhibit SVE-8.
- Sales trace two refers to information submitted at Exhibit SVE-9.
- Sales trace three refers to information submitted at Exhibit SVE-10.
- Sales trace four refers to information submitted at Exhibit SVE-11.
- Sales trace five refers to information submitted at Exhibit SVE-12.
- Sales trace six refers to information submitted at Exhibit SVE-13.

[103] Hereinafter, we refer to the documents that Meisen provided to substantiate its reported product characteristics for these additionally-selected CONNUMs as "CONNUM-specific reconciliations." We assigned each CONNUM-specific reconciliation a number, and references to that reconciliation refer to the information submitted within a particular exhibit:

- CONNUM-specific reconciliation one refers to information submitted at Exhibit SVE-14.

Every sales trace provided in Meisen's ILVQR revealed issues and errors in the U.S. sales database, and two of the three CONNUM-specific reconciliations revealed that the U.S. sales database contains sales with inaccurately reported product characteristics and CONNUMs. Many of the errors impact fundamental areas of Commerce's analysis, such as how products are defined (*i.e.*, unique CONNUMs) and which price averaging methodology is appropriate (*i.e.*, they impact the differential pricing test, which uses consolidated customer codes and final shipment destinations).

Significantly, of the nine sales for which Meisen provided sales-specific information (either in the form of sales traces or CONNUM-specific reconciliations), three (33 percent) have incorrectly-reported product characteristics and CONNUMs; five (55 percent) have incorrectly-reported customer destinations; and one (11 percent) has an unverifiable customer code. With respect to the latter point, we note that the problems in Meisen's data are not limited to the sales trace packages. In particular, we found that both the customer code (CUSCODU) and the consolidated customer code fields in the U.S. sales database (CCUSCODU) contain significant issues because: (1) the reported CUSCODUs for two customers (including an additional customer from J&K GA's November 2018 sales reconciliation) cannot be tied to the U.S. sales database; and (2) Meisen admittedly used an inaccurate method for reporting all CCUSCODUs.

We also found other issues and errors in Meisen's ILVQR that call into question the accuracy and completeness of Meisen's submissions. Specifically, of the six sales traces that Meisen provided: five (83 percent) are missing documentation to support the reported sale terms/freight expenses; three (50 percent) are reported with incorrect entered values (which are

---

- CONNUM-specific reconciliation two refers to information submitted at Exhibit SVE-15.
- CONNUM-specific reconciliation three refers to information submitted at Exhibit SVE-16.

used to compute various movement and selling expenses); two (33 percent) are missing further manufacturing expenses; and one (17 percent) is reported with the wrong shipment date (which is used to determine the universe of sales of the U.S. sales database).

Each of these failures is discussed in turn, below.

i.   Sales Terms

The demonstration and documentary support of the reported sales terms is an important part of Commerce's verification of Meisen's U.S. sales database because the information reported in the field SALETERU impacts our understanding of the freight expenses incurred by the respondent.  For example, we expect a sale reported with "customer pickup" sales terms to have no U.S.-inland-freight-to-customer expense.  On the other hand, a sale that J&K delivered itself, or paid to have delivered, indicates that the J&K Company incurred an expense that should be reported in its U.S. sales database.  Accordingly, the correct reporting of Meisen's U.S. sales terms is imperative so that Commerce may have confidence that Meisen reported freight expenses for all appropriate sales in its U.S. sales database.  As mentioned above, Meisen failed to provide documentation to demonstrate the accuracy of the reported sales terms for five of the six sales traces provided in its ILVQR.

In its U.S. sales database, Meisen reported that J&K NY delivered the items in sales trace six to the customer.[104]  In Meisen's ILVQR, Meisen stated that it substantiated the terms of delivery for this transaction by providing a packing slip.[105]  However, it is not clear *how* the packing slip demonstrates the sales terms or how other sales documents provide any insight into the sales terms of this transaction (*e.g.*, the sales invoice contains a "pick up date" and a "ship" date and they are the same).  On this particular packing slip, Meisen placed a red box around a

---

[104] *See* Meisen's ILVQR at Exhibit SVE-13; *see also* Meisen's February 14 SCQR at Exhibit R2C-2.
[105] *See* Meisen's ILVQR at Exhibit SVE-13.

signature and wrote "SALETERU," but it is unclear how this signature demonstrates that a J&K Company delivered the items in this sale to the customer.[106]  Further, because Meisen provided no explanation in its ILVQR, it is not clear to whom this signature belongs or why this signature signifies that the merchandise was delivered.  Furthermore, because this was reportedly a delivered sale, in the absence of more conclusive documentation, we would expect to see delivery documentation as a demonstration that this merchandise was, in fact, delivered.  However, Meisen did not provide any such documentation to substantiate its reported terms of delivery.[107]  Accordingly, Meisen failed to demonstrate with source documentation the SALETERU reported for sales trace six in its U.S. sales database.

In its U.S. sales database, Meisen reported that sales traces two and four were picked up by the customer.[108]  In Meisen's ILVQR, Meisen stated that these terms of delivery are also substantiated by packing slips.[109]  However, the packing lists in these two sales traces contain the same exact information as that provided for sales trace six, which is reportedly a delivered sale.[110]  Specifically, on the packing slip for sales trace two, Meisen placed a red box around a signature and wrote "SALETERU."[111]  On the packing slip for sales trace four, there is a signature and date at the bottom of the document.[112]  It is not clear who these signatures belong to, why these signatures mean that the customer picked up the merchandise, or why these signatures do not signify the same thing as the signature for sales trace six (*i.e.*, that the sale was delivered).  Therefore, Meisen failed to demonstrate using source documentation the

---

[106] *Id.*
[107] *Id.*
[108] *Id.* at Exhibits SVE-9 and SVE-11; *see also* Meisen's February 14 SCQR at Exhibit R2C-2.
[109] *See* Meisen's ILVQR at Exhibits SVE-9 and SVE-11.
[110] *Id.*
[111] *Id.* at Exhibit SVE-9.
[112] *Id.* at Exhibit SVE-11.  In this example, Meisen did not place a red box around any element of the sales documents to demonstrate the sales terms.

SALETERUs reported for sales traces two and four in its U.S. sales database.  Relatedly, this also signifies that Meisen failed to demonstrate that it incurred no freight expenses for these transactions (*i.e.*, that it had accurately reported freight expenses of zero for them).

In its U.S. sales database, Meisen reported that sales trace three was a sale with sales terms of free on board (FOB) China.[113]  In Meisen's ILVQR, Meisen stated that the terms of delivery for this transaction are substantiated by a packing slip.[114]  The packing list shows a customer signature and that the customer reimbursed J&K Miami for certain shipping and import expenses.[115]  However, it is unclear how the packing slip reflects that the sales terms reported in the U.S. sales database demonstrate that Meisen directly shipped the merchandise from China to the customer in the United States, as it explained the "FOB China" sales had been.  In fact, none of the documentation provided for sales trace three contains evidence that the merchandise was ever delivered to a customer.[116]  The importation and freight forwarder documentation all indicate that Meisen shipped the merchandise to J&K Miami, but the documentation does not demonstrate when, if ever, Meisen or J&K Miami shipped the merchandise to the final customer

---

[113] *Id*. at Exhibit SVE-10; *see also* Meisen's February 14 SCQR at Exhibit R2C-2.  According to Meisen, where a sale is reported as "FOB China":

> J&K Companies are responsible for all transportation expenses after the merchandise leaves China….  For the sales with SALETERU "FOB China," the customer assumes responsibility for the goods shipped from China.  In the normal course of business, the logistics provided invoices {to} the J&K Company for the movement expenses from China to the U.S.  These expenses are subsequently charged back to the U.S. customer.

> {D}irect shipments to the customer {were} corrected in the revised U.S. sales database to {indicate} FOB China….  {T}he material was shipped directly from the factory in China to the U.S. customer….  The J&K Companies have corrected the SALETERU to {FOB China}.

*See* Meisen's August 27 SCQR at 14 and 31; *see also* Meisen's January 10 SCQR at 23-24.
[114] *See* Meisen's ILVQR at Exhibit SVE-10.
[115] *Id*.
[116] *Id*.

(or to a different address other than the address of J&K Miami).[117]  Thus, Meisen failed to demonstrate, using source documentation, the sales terms for sales trace three.

In its U.S. sales database, Meisen reported that the customer picked up the merchandise sold in sales trace five.[118]  In Meisen's ILVQR, Meisen stated that its source documentation, which indicates that J&K SF shipped the merchandise, is incorrect because the customer picked up the merchandise instead.[119]  It appears that, for purposes of verification, Meisen added a typed note onto the packing slip to explain this discrepancy:

> NOTE:  Originally the customer wanted this order to be shipped or delivered, but the customer wanted the item on the same day, so they sent someone over to pick it up instead.  That's why the originally intended shipping never occurred.[120]

Despite this explanation, Meisen did not provide documentation to demonstrate that the terms of delivery changed from a shipment to a pickup.  Instead, the sales invoice and packing list that Meisen did provide indicates that J&K SF shipped the merchandise.  Also of note, the "bill to" and the "ship to" addresses were both located on the U.S. East Coast, and the seller, J&K SF, was located in San Francisco, CA.  Considering the geographical distance between the seller and the customer, it is not clear how the customer was able to simply pick up the merchandise that same day, as Meisen claims.  Accordingly, Meisen failed to demonstrate with source documentation the SALETERU reported for sales trace five in its U.S. sales database.  Relatedly, this also signifies that Meisen failed to demonstrate that it incurred no freight expenses for this transaction (*i.e.*, that it had accurately reported freight expenses of zero for them).

---

[117] *Id.*
[118] *See* Meisen's February 14 SCQR at Exhibit R2C-2; *see also* Meisen's ILVQR at Exhibit SVE-12.
[119] *See* Meisen's ILVQR at Exhibit SVE-12.
[120] *Id.* at Exhibit SVE-9.

Ultimately, in response to our request that the respondent "provide…documents which support the transaction or invoice-specific data fields in the sales listing reported," consistent with *Hung Vuong Corp.* and *Thyssen* affirmed in *Thyssen II*, it is reasonable for Commerce to expect Meisen's response to contain documents that clearly demonstrate the sales terms, a data field we specifically requested that Meisen substantiate.[121]  In Meisen's previous submissions, sales documents clearly noted when the customer picked up the merchandise.[122]  In consideration of the fact that there were tens of thousands of sales made by each of the U.S. affiliates during the POI, and the fact that it has been almost four years since the J&K Companies made the sales at issue, it is reasonable for Commerce to expect that the staff of the J&K Companies are not recalling these sales terms from memory or that a signature without any additional information can somehow mean two different things.[123]

Therefore, Meisen failed to provide sales terms documentation for five of six sales traces. Thus, pursuant to section 776(a)(2)(D) of the Act, we find that Meisen's reported sales terms could not be verified.  Further, pursuant to section 776(b) of the Act, it is appropriate to apply AFA because Meisen failed to act to the best of its ability by failing to provide source documentation that it had in its possession, and that formed the basis for the data reported in its U.S. sales database.

---

[121] *See* Commerce's ILVQ at 6; *see also Hung Vuong Corp.*, 483 F. Supp. 3d at 1348-1354; *Thyssen*, 866 F. Supp. at 26-27; and *Thyssen II*, 1998 U.S. App. LEXIS 17064 at 13-14.

[122] *See* Meisen's August 27 SCQR at Exhibits SC-1, SC-4, SC-5, SC-6; *see also* Meisen's January 11 SCQR at Exhibit RC-2a, RC-2b, RC-7, RC-9a, RC-15a, RC 15b, RC-21, RC-22b; and Meisen's February 14 SCQR at Exhibit R2C-9.

[123] As explained above, Meisen provided packing lists with signatures and stated that these were demonstrations of customer pickups.  At the same time, Meisen provided a packing list with a signature and stated that this was a demonstration of a customer delivery.  There is no other information about the customer pickup or delivery provided with these packing slips.

ii.   <u>Destination</u>

Destination (*i.e.*, region) is one of three factors, along with purchaser and time period, which Commerce uses in its differential pricing analysis to determine the methodology to calculate dumping margins.[124]  The questionnaire was clear on the information needed to be reported in the destination field,[125] and Meisen confirmed that the destinations reported in its U.S. sales database were correct.[126]  However, as noted above, an analysis of the source documentation provided for the six sales traces and three product characteristic reconciliations indicates that the ZIP codes of five of the nine sampled sales are incorrect.

For sales traces one, three, four, and six, and CONNUM-specific reconciliation one, the destination ZIP code reported in the U.S. sales database does not match the ZIP code in the sales invoices provided.  Specifically:

- Sales trace one is for SEQU [      ], a sale made by J&K AZ.[127]  The invoice states that the merchandise will be delivered to "[                              ]," but in U.S. sales database, Meisen reported a ZIP code of [      ].[128]

- Sales trace three is for SEQU [      ], a sale made by J&K FL.[129]  In its U.S. sales database, Meisen reported that this sale was an FOB China sale.[130]  In consideration

---

[124] *See Preliminary Determination* PDM at 35-37, for a detailed discussion of Commerce's differential pricing analysis.
[125] *See* Meisen's July 19 CQR at 38 ("Report the U.S. postal 'ZIP' code of the customer's place of delivery").
[126] *See* Meisen's February 14 SCQR at 21.
[127] *See* Meisen's ILVQR at Exhibit SVE-10.
[128] *Id. cf.* Meisen's February 14 SCQR at Exhibit R2C-2.
[129] *See* Meisen's ILVQR at Exhibit SVE-10.
[130] *See* Meisen's February 14 SCQR at Exhibit R2C-2.  Meisen explained that "{f}or the sales with SALETERU 'FOB China', the customer assumes responsibility for the goods shipped from China.  In the normal course of business, the logistics {companies} provided invoices {to} the J&K Company for the movement expenses from China to the U.S.  These expenses are subsequently charged back to the U.S. customer." *See* Meisen's August 27 SCQR at 14.  Further, in a separate response, Meisen explained that transactions were previously reported with the wrong sales terms because they "were direct shipments to the customer.  For these [      ] transactions the material was shipped [                              ]… .  The SALETERU DS01 has been corrected in the revised U.S. sales database to DS08 or FOB China." *See* Meisen's January 11 SCQR at 24.

of Meisen's record explanations of its "FOB China" sales (*i.e.*, they are direct shipments from China to the U.S. customer), the documentation provided for this sales trace is both insufficient and contradictory.  First, the invoice does not indicate the final sales terms.  Instead, it merely reflects that this is an out of state sale (*i.e.*, the ultimate customer of this J&K FL sale was located out of the state of Florida).[131] Second, neither the sales invoice nor the freight documentation identifies the location of the final customer.[132]  Instead, these documents only identify J&K FL [

] of the merchandise—which is inconsistent with the reported sales terms.[133]  Finally, the ZIP code that is reported in the U.S. sales database, [     ], is the ZIP code for [     ], *i.e.*, it is not the ZIP code of the customer who is being billed (*i.e.*, [     ]) (though this customer is in [          ] and, therefore, this in-state ZIP code cannot be the destination of the merchandise, either).[134]  Considering J&K FL was responsible for shipping this merchandise to its ultimate customer, and the ultimate customer was located outside of the state of Florida, the ZIP code reported in the U.S. sales database ([

]), is irreconcilable with the documentation provided for verification.

- Sales trace four is for SEQU [     ], a sale made by J&K NJ Zheng.[135]  In the U.S. sales database, Meisen reported [     ] as the ZIP code for this sale.[136]  In its ILVQR, Meisen stated that the sales invoice supports the ZIP code reported in the U.S. sales database.[137]  However, the sales invoice that Meisen supplied with this sales trace

---

[131] *See* Meisen's ILVQR at Exhibit SVE-10.
[132] *Id.*
[133] *Id.*
[134] *See* Meisen's February 14 SCQR at Exhibit R2C-2.
[135] *See* Meisen's ILVQR at Exhibit SVE-11.
[136] *See* Meisen's February 14 SCQR at Exhibit R2C-2.
[137] *See* Meisen's ILVQR at Exhibit SVE-11.

does not identify this ZIP code because there is no "Ship to" address and the customer

ZIP code is [      ], *i.e.*, it is different from the ZIP code Meisen reported in the U.S.

sales database.[138]

- Sales trace six is for SEQU [      ], a sale made by J&K NY.[139]  In the U.S. sales

  database, Meisen reported [     ] as the ZIP code for this sale.[140]  In its ILVQR,

  Meisen stated that the sales invoice supports the ZIP code reported in the U.S. sales

  database.[141]  However, the sales invoice does not identify this ZIP code because there

  is no "Ship to" address and the customer ZIP code is [     ], *i.e.*, it is different from

  the ZIP code that Meisen reported in the U.S. sales database.[142]

- CONNUM-specific reconciliation one was for SEQU [     ], a sale made by J&K

  GA.[143]  In the U.S. sales database, Meisen reported [     ] as the ZIP code for this

  sale.[144]  However, the invoice for this transaction includes a "Ship To" address with a

  ZIP code of [     ], *i.e.*, it is different from the ZIP code that Meisen reported in the

  U.S. sales database.[145]

In consideration of these destination reporting errors, we have no confidence that Meisen

correctly reported the destinations for the non-examined sales reported in its U.S. sales database.

In *CWP from Vietnam*, Commerce found, at verification, that the respondent misreported

the destinations of several of its U.S. sales and, as a result, Commerce applied AFA to certain

---

[138] *Id.*
[139] *Id.* at Exhibit SVE-13.
[140] *See* Meisen's February 14 SCQR at Exhibit R2C-2.
[141] *See* Meisen's ILVQR at Exhibit SVE-13.
[142] *Id.*
[143] *Id.* at Exhibit SVE-14.
[144] *See* Meisen's February 14 SCQR at Exhibit R2C-2.
[145] *See* Meisen's ILVQR at Exhibit SVE-14.

sales.[146]  In this case, the majority of the sales traces indicate that Meisen reported incorrect

destinations.  Moreover, the CIT held in *GOQ* that it is reasonable for Commerce to assume that

where there is one error, there exists the potential for more errors.[147]  Therefore, it is reasonable

for us to conclude that the destination errors discovered in Meisen's ILVQR were not limited to

the sales selected for an individual sales trace exercise or product characteristic reconciliation.

Pursuant to section 776(a)(2)(D) of the Act, we find that Meisen's reported U.S. ZIP codes could

not be verified.  Further, as explained above, because the documentation provided revealed that

the ultimate destination was indeed different from the destination reported in the U.S. sales

database, we find that Meisen had access to this information as well.  Therefore, pursuant to

section 776(b) of the Act, we find that Meisen failed to act to the best of its ability by not

reporting the correct destinations that it had in its possession.

    iii.    <u>Purchaser</u>

The accuracy and verifiability of the purchaser is also crucial to Commerce's dumping

analysis.  Correctly identifying all of the customers of the respondent is essential to ensure that

the reported customers are unaffiliated with the respondent, and it is also critical to the accuracy

of our differential pricing analysis.  With respect to the latter point, for purposes of the

differential pricing analysis, Commerce's standard practice is to use the consolidated customer

code (CCUSCODU).[148]  By reporting consolidated customer codes, the respondent is identifying

---

[146] *See Circular Welded Carbon-Quality Steel Pipe from the Socialist Republic of Vietnam:  Final Determination of Sales at Less Than Fair Value*, 81 FR 75042 (October 28, 2016) (*CWP from Vietnam*), and accompanying IDM at Comment 4.

[147] *See Government of Quebec v. United States*, Slip Op. 2022-21, 18-19 (CIT March 18, 2022) (*GOQ*), stating:

> While the impact of the discovered errors, taken alone…may be small, Commerce could
> reasonably infer that there may remain other errors.  Thus, Commerce's determination that {the
> entirety of a particular submission} is unreliable is not unreasonable.  Accordingly, Commerce's
> determination was supported by substantial evidence and not contrary to law.

[148] *See, e.g., Certain Steel Nails from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012–2013*, 85 FR 18816 (April 8, 2015), and accompanying IDM at Comment 15.

the customers that are affiliated with one another that may have overarching agreements or buying power with the respondent.  We provided the following instructions to Meisen for reporting consolidated customer codes:

> Report only one name or code for each of your customers, even if more than one name or accounting code exists for that customer in your books and records.  For example, if you use different codes for regional offices of the same customer, report the same code for this customer, regardless of the location of the office.

> NARRATIVE:  Provide a list of consolidated customer names and codes as an attachment to your response, ensuring that each customer is assigned only one discrete code for this field.[149]

In response, Meisen added a CCUSCODU field to its U.S. sales database.[150]  Because Meisen did not provide a key with that questionnaire response (despite its claim otherwise[151]) we requested, and received, a key to Meisen's CCUSCODUs during this remand proceeding.[152]  For verification, we requested that Meisen demonstrate the accuracy of its reporting for certain customers reported with the same CCUSCODUs.[153]  In response, Meisen stated the following:

> The CCUSCODU assigned to each of the customers was generated for the sole purpose of responding to {Commerce}'s questions and is not used in the normal course of business.  To prepare the list of consolidated customer codes … the J&K Companies sorted through the names and assigned consolidated customer codes and entities with similar names were assigned consolidated codes {*sic*}. Using similar names was the only manner in which the J&K Companies could

---

[149] *See* Commerce's Letter, "Post-Prelim Supplemental Questionnaire," October 24, 2019, at 12.
[150] *See* Meisen's Letter, "Post-Prelim Supplemental Questionnaire Response," dated November 6, 2019, at 34 (Meisen's November 6 PPQR).
[151] *Id*. at 21 ("A key to the consolidated customers is provided in Exhibit SC2-18"); *cf.* Exhibit SC2-18.
[152] *See* Meisen's February 16 SCDQR at 1.
[153] *See* Commerce's ILVQ at 8:

> At Exhibit R3C-1 of your supplemental section C and D questionnaire, dated February 16, 2022 (February 16 SCDQR), you provide a list of consolidated customer codes (CCUSCODUs)….

> Demonstrate using source documentation that {two customers with the same CCUSCODU} are affiliated, or the same customer, and appropriately both coded {with that CCUSCODU}.

> At Exhibit R3C-2 of your February 16 SCDQR, you provide sample invoices for three customers that you have reported with {the same CCUSCODU}….  Demonstrate using source documentation that these three companies are affiliated, or the same customer, and appropriately coded under one CCUSCODU.

hope to create the consolidated code – CCUSCODU – that {Commerce} requested{.}

Upon receipt of this questionnaire and further review of the individual customer accounts, the J&K Companies have found that {the requested customers} are not affiliated.  As noted, the J&K Companies assigned the CCUSCODU for these {customers} because it searched for common names and thought that these {customers} were affiliated.  Because the Department asked for information that is not in the J&K Companies {sic} normal books and records, and because the J&K Companies nevertheless made a good faith effort to provide {Commerce} with the information requested, this error occurred….

{Commerce} has not instructed the J&K Companies to correct Exhibit R3C-1, but the J&K Companies propose that {Commerce} correct this error (as it likely would do in on onsite verification) by assigning the CUSCODU for these two entities to the variable CCUSCODU {in the SAS program}….[154]

In other words, Meisen, for the first time in the ILVQR, notified Commerce that its reported CCUSCODU data were based on assumptions, rather than its books and records.  In this statement Meisen acknowledges that this method is inaccurate, but rather than notify Commerce before submitting a response of its difficulty/inability to respond to our instruction, and request further guidance, Meisen simply consolidated its U.S. customers by "similar names," rather than affiliation.  While Meisen belatedly (*i.e.*, in its ILVQR) suggests a solution for the two examples selected by Commerce, this solution ignores that Meisen developed the entire CCUSCODU field using a methodology that is admittedly incorrect.  Based on our evaluation of the data and other record information, and the numerous discrepancies noted therein, we find that that Meisen's CCUSCODU data are unreliable and that we cannot rely upon them for the differential pricing analysis.

The other purchaser field reported is the customer code field (CUSCODU).  However, Meisen's ILVQR signaled to Commerce that there are significant issues with Meisen's reporting there, as well.  Two of the customers reported within Meisen's ILVQR could not be tied to the

---

[154] *See* Meisen's ILVQR at 20-21.

customer code information Meisen supplied on this record.  First, in responding to our question regarding J&K GA's November 2018 sales reconciliation, Meisen provided a sales invoice to a customer with only a first name and no last name, no address, and no other identifying information, *i.e.*, "[      ]."[155]  In its U.S. customer code key, Meisen did not provide the customer code (and by extension, the customer's name), nor did it provide the customer's name in the U.S. sales database for this entity (*i.e.*, [        ]).[156]  Second, in sales trace three, the sales invoice identifies the customer as "[                      ]."[157]  However, Meisen also did not provide in its U.S. customer code key, the customer code (and by extension, customer's name) associated with the sale, *i.e.*[      ].[158]  Despite this, Meisen placed a red box around the customer address on the sales invoice, wrote "CUSCODU," and implied that it had confirmed the accuracy of the customer code reported for this invoice.[159]

In undertaking the above analysis of Meisen's ILVQR, we discovered that Meisen also failed to include customer codes, and by extension, the customer identities, for [   ] of Meisen's [   ] U.S. customers, impacting approximately [     ] of the U.S. sales made by six of the 17 J&K Companies.[160]  Specifically, Meisen excluded all customer codes sequentially above the customer code number [      ] (*i.e.*, [            ], *etc.*) from its customer code list.[161]  Meisen provided no explanation as to why it provided an incomplete customer code key and, without the customer identities of each customer code reported in the U.S. sales database, we cannot be assured that Meisen's U.S. customers are unaffiliated with Meisen or the J&K Companies.  (*e.g.*,

---

[155] *See* Meisen's ILVQR at Exhibit SVE-7.
[156] *See* Meisen's July 19 CQR at Exhibit C-2.
[157] *See* Meisen's ILVQR at Exhibit SVE-10.
[158] *See* Meisen's July 19 CQR at Exhibit C-2.
[159] *See* Meisen's ILVQR at Exhibit SVE-10.
[160] *See* Meisen's February 14 SCQR at Exhibit R2C-2.
[161] *See* Meisen's July 19 CQR at Exhibit C-2.

the "[     ]" from J&K GA's November 2018 reconciliation[162])  We also cannot be assured that

the differential pricing analysis would be accurate.

In sum, we were unable to tie two of the customers of two of Meisen's U.S. sales in

Meisen's ILVQR to its U.S. sales listing, and, equally or even more importantly, Meisen failed to

supply essential customer information for a significant portion of its U.S. sales.  Thus, pursuant

to section 776(a)(2)(D) of the Act, Meisen reported both consolidated and unconsolidated

customer codes that could not be verified.  Further, we find that Meisen had access to

documentation to support its reported purchaser information, but failed to provide this

documentation.  Therefore, the use of adverse inferences pursuant to section 776(b) of the Act is

appropriate.

     iv.    <u>Product Characteristics</u>

Accurate product characteristic information is a cornerstone of Commerce's dumping

analysis.  CONNUMs are created using the physical characteristics of the merchandise produced

(in the FOP database) and imported into the United States (in the U.S. sales database).  We use

these for identifying comparable merchandise in both the U.S. sales database for the differential

pricing analysis (in addition to purchaser, destination, and time) and to determine whether

subject merchandise is being, or is likely to be, sold in the United States at LTFV (in terms of

defining both the appropriate U.S. price averaging groups and the appropriate normal value

(NV)).  In this investigation, the CONNUM is comprised of the following product

characteristics:  completeness (COMPLETEU) (*e.g.*, whether the merchandise was assembled,

ready to assemble (RTA), or a component), product volume (PRODVOLU), material used for

the face of the product (FACETYPEU), drawer count (DRAWERU), door count (DOORU),

---

[162] *See* Meisen's ILVQR at Exhibit SVE-7.

door/drawer style (DOSTYLEU), surface coating (SURFCOATU), and material used for the box of the product (BOXMATU).  In Commerce's ILVQ, we selected nine CONNUMs (six chosen as part of the sales trace exercise and three additional ones) and requested that Meisen do the following:

> Prepare sales traces for {six} SEQUs in accordance with the instructions below. For the sales trace of each selected sale, a complete set of documents should be submitted for that sale supporting all sale/invoice-specific information listed in the U.S. sales file reported to Commerce….  You should provide a worksheet or annotate the provided documents to explain how each column (*e.g.*, product characteristics, date of sale and invoice, gross price, quantity, shipping date, payment date, commissions, *etc.*) of the sales files is linked to the source documents and to the sales listing….  For each U.S. sale listed above, provide a sales-trace package which includes documents which support the transaction or invoice-specific data fields in the sales listing reported to Commerce.[163]

> For {three}SEQUs list the product characteristic codes you assigned in your U.S. sales database, and PRODCODU and PRODCOD1U.  Support each reported characteristic, and product code, with product samples, designs, drawings, "plain views," bill of materials, specification sheets or other documentation.  Provide the customer purchase order, final customer invoice, and a screenshot from Quickbooks recording the sale of the product for each of these transactions.[164]

Meisen provided the requested data in its ILVQR.[165]  However, in three of the nine instances, the documents supplied show that Meisen reported certain product characteristics, and, therefore, its CONNUMs, incorrectly.[166]  Specifically, and as discussed in more detail below, the reported CONNUMs in sales traces four and five and CONNUM-specific reconciliation three are

---

[163] These fields include:  PRODCODU, PRODCODU1, *CONNUMU, COMPLETEU, PRODVOLU, FACETYPEU, DRAWERU, DOORU, DOSTYLEU, SURFCOATU, BOXMATU, PRODWIDU, PRODHEIGHU, PRODEEPU, HARDWAREU, SOFTCLOSU,* SALEU, CONSIGNU, CUSCODU, CCUSCODU, SELLERU, SALINDTU, SALEDATU, INVOICU, SHIPDTU, PAYDATEXU, PAYAMTXU, SALETERU, PAYTERMU, QTYU, QTYADJU, GRSWT, FRTREVU, ASMBLREVU, MODREVU, RPKREVU, STORAGE_REVU, INSTALL_REVU, BADCHECK_REVU, CC_REVU, DESIGN_REVU, DUTY_REVU, LOADING_REVU, OTHDISU, and ENTVALUE (emphasis added).
[164] *See* Commerce's ILVQ at 5-7 (Footnote 151 appears as footnote 7 in original).
[165] *See* Meisen's ILVQR at Exhibits SVE-8 through SVE-16.
[166] In the Draft Remand Results, we stated that Meisen had incorrectly reported the product characteristics and CONNUM for an additional selected sale (CONNUM-specific reconciliation two).  This was a [          ] reported with the characteristics of an [          ].  Upon consideration of Meisen's Comments and a further review of the record, we find that [          ] can be considered a [          ] under our scope definition, and, therefore, the CONNUM for this transaction appears to be correct.

of further manufactured merchandise; however, Meisen did not report the CONNUMs for these products pursuant to Commerce's instructions regarding merchandise sold under this scenario.

Regarding the three further manufactured products, Commerce instructed Meisen to report the following:

> Assign a control number to each unique product reported in the section C sales data file …. If the product sold is further manufactured in the United States, *report the control number of the product imported, not the product sold.*[167]

In response, Meisen stated that, "{f}or products that were further manufactured, J&K Companies reported the CONNUM of the product imported, not the product sold."[168]  However, for sales traces four and five, and the third CONNUM-specific reconciliation, Meisen reported the sales in the U.S. sales database using the product characteristics of the further manufactured product and not the product characteristics of the product imported into the United States.[169]  For sales trace four, Meisen explained that the merchandise was:

> a custom made range hood that is similar to {a standard range hood} …. J&K NJ never imported this product but instead custom assembled the product using pieces from other cabinets with leftover side-panels and parts from damaged products that were imported well before the POI.[170]

For sales trace five, Meisen explained that:

> {t}he customer purchased only the frame of the cabinet for this transaction. The J&K Company charged {the customer} for the whole cabinet at the time of sale, but due to {Commerce's} specific instructions when preparing the CEP response to include in PRODCODU1 the specifics of the merchandise actually shipped {*sic*}, the information was populated in the CEP database using the physical characteristics of {a similar product, [          ]}.[171, 172]

---

[167] *See* Commerce's Letter to Meisen containing the initial questionnaire, dated June 5, 2019 (Initial Questionnaire) at C-5 (emphasis added).

[168] *Id.*

[169] *See* Meisen's ILVQR at 15 and Exhibit SVE-11.

[170] *Id.* at 15.

[171] *Id.*

[172] In the Draft Remand Results, we incorrectly referred to this product as [          ]. Product code [          ] is [          ]. In Meisen's Comments, Meisen treats the information about sales trace five as both proprietary and public information. Because Meisen disclosed the product sold and imported as public information in part of its argument, we are treating this information as public in these final results. *See* Meisen's Comments at 21.

In other words, the product imported and sold to the customer was a cabinet, the product received by the customer was a frame of a cabinet, but Meisen reported the product characteristics of [          ].[173]  In Comment 2, we address Meisen's confusion with reporting the information in field PRODCODU1 in the product characteristic fields.

For CONNUM-specific reconciliation three, Meisen provided:  (1) a sales invoice that contained a line item for [

                                    ]; and (2) a purchase order that shows that the [

      ] was comprised of several non-reported product-codes.[174]  In the U.S. sales database, this sale is reported as an [                ], indicating that the CONNUM does not reflect the imported product, but the final [                ] product.[175]  Ultimately, for sales traces four and

---

[173] *See* Meisen's ILVQR at 15 and Exhibit SVE-12.  We note that, in the initial questionnaire, Commerce did not identify product characteristic coding options applicable to a [                    ].  However, Meisen did not notify Commerce that it sold merchandise with product characteristics that did not conform to the product characteristics provided in the initial questionnaire.  Further, when Meisen elsewhere identified a characteristic that was not captured by the initial questionnaire, it created a new code.  This suggests that Meisen was aware that, in addition to notifying Commerce of difficulties in reporting, it could have also added an additional code to ensure its sales were reported accurately.  *See* Meisen's August 27 SCQR at 4:

> On page 12 of your SCQR, you stated that J&K companies have followed the above coding instructions to report surface coating in this field.  The proposed codes ranged from 00 (none), to 20 (Other – specify). However, in your US sales database you reported [     ] transactions coded as [     ], and provided no explanation as to what those codes represent.  Please revise your coding of this characteristic to conform with those requested in the questionnaire and provide a detailed explanation of any transaction coded as "Other."  Submit documentation supporting your response.

Meisen responded:

> Codes 20 and 21 reported in field SURFCOATU indicate the following types of surface coating:
> 20 Colored polyurethane (PU) coating (grain obscuring)
> 21 Colored polyurethane (PU) coating (not grain obscuring){.}

> It is necessary to separately distinguish these product characteristics because the types of surface coating and finishing used by Meisen and sold by the J&K Companies do not conform to any of the coating and finishing types provided by {Commerce}.

[174] *See* Meisen's ILVQR at Exhibit SVE-15.
[175] *See* Meisen's February 14 SCQR at Exhibit R2C-2.

five, and CONNUM-specific reconciliation three, Meisen did not report the CONNUMs in the

U.S. sales database pursuant to Commerce's instructions regarding CONNUMs and further

manufactured merchandise, *i.e.*, the reported CONNUMs incorrectly reflect characteristics of the

further manufactured merchandise and not the imported merchandise.  Additionally, it is unclear

how many of Meisen's sales contain similar errors because:  (1) two of the three further

manufactured CONNUMs were not reported as such, and so we cannot simply assume that this

methodological issue is limited to sales of products identified as further manufactured in the U.S.

sales database;[176] and (2) none of these products, or the associated sales, have consistent,

distinguishing factors that would allow Commerce to otherwise identify all of the CONNUMs

with similar reporting inaccuracies.[177]

In summary, Meisen specifically stated that it reported its CONNUMs based on the

merchandise as it was imported, and it also stated that it crafted its CONNUMs based on a

separate set of instructions for reporting the relevant product characteristics.  Because Meisen's

ILVQR revealed that this is not the case, Meisen failed to establish the accuracy of its reported

CONNUMs for almost half of the products selected for verification in Commerce's ILVQ.

Further, we have no assurance that there are no additional sales in the U.S. sales database with

similarly-misreported CONNUMs.  Notably, after receiving the Initial Questionnaire or any of

the supplemental questionnaires, Meisen did not contact Commerce and request clarification

regarding any product characteristic reporting issues, but, instead, indicated that it clearly

understood Commerce's instructions.[178]

---

[176] *See infra* at "Other ILVQR Errors."

[177] *See* Meisen's February 14 SCQR at Exhibit R2C-2.

[178] *See* Meisen's July 19 CQR at 7 ("For products that were further manufactured, J&K Companies reported the CONNUM of the product imported, not the product sold").

Commerce's practice is to apply AFA where respondents have reported incorrect CONNUMs.[179]  The Federal Circuit agreed with this practice in *Goodluck*, specifically, with respect to the discovery of incorrect product characteristics during the verification process.[180] The Federal Circuit held that:

> {d}espite receiving clear instructions … Goodluck failed to {report product characteristics that reflected the} coding ranges ordered by Commerce.  Notably, Goodluck was *aware* of the … instructions{.}  This evidence supports Commerce's conclusion that Goodluck's errors were "the result of both inattentiveness and carelessness."  Thus, Commerce did not abuse its discretion in applying all facts available with an adverse inference.[181]

Further, Commerce's regulations contemplate that if a respondent experiences difficulty in responding to the questionnaire, it may notify Commerce within 14 days of the issuance of the questionnaire, but Meisen did not notify Commerce of any difficulty in reporting.[182]

Therefore, we find that Meisen provided information that cannot be verified, thus warranting the use of FA, in accordance with section 776(a)(2)(D) of the Act.  Further, because this information was in Meisen's possession, and Meisen had the ability to seek guidance from Commerce but failed to do so, we find that Meisen failed to cooperate to the best of its ability in complying with a request for information, within the meaning of section 776(b) of the Act.

---

[179] *See, e.g., Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium:  Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 82 FR 16378 (April 4, 2017) (*CTL Plate from Belgium*), and accompanying IDM at Comment 9; *see also Certain Plastic Decorative Ribbon from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 84 FR 1055 (February 1, 2019), and accompanying IDM at Comment 12b; *Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 82 FR 16345 (April 4, 2017); and *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from India:  Final Affirmative Determination of Sales at Less than Fair Value*, 83 FR 16296 (April 16, 2018) at Comment 2, *aff'd Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021) (*Goodluck*).
[180] *See Goodluck*, 11 F.4th at 1343.
[181] *Id*. (quoting *Nippon Steel*, 337 F.3d at 1380-84 ("While the {'best of ability'} standard does not require perfection, and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.")).
[182] *See* 19 CFR 351.301I(1)(iii).

v.    Certain Movement Expenses

In explaining how it reported its international movement expenses, Meisen claimed that

"{t}he J&K Companies do not link inbound freight expenses to the final product sold."[183]

Therefore, Meisen used a freight allocation calculation worksheet to calculate its inbound,

international movement expenses – it added all of the movement expenses incurred for its sales

invoices to the J&K Companies for merchandise that entered the United States during the POI.[184]

By the nature of this allocation methodology, the calculation did not capture the freight expenses

of the subject merchandise that entered the United States prior to, but was sold during, the POI,

and it also potentially captured the freight expenses of merchandise that entered the United

States, but was not sold, during the POI.[185]   Despite the potential inaccuracies of this

methodology, based on Meisen's record statements, we initially considered Meisen's allocation

of its international movement expenses (freight from China to the United States (INTNFRU),

freight from the U.S. port to the J&K warehouse (INLFPWU), U.S. Duties (USDUTY), and

brokerage and handling expenses (USBROKU)) to be reasonable.

However, documentation contained in Meisen's ILVQR showed that Meisen is able to

link import documentation with individual sales transactions (contradicting Meisen's earlier

statements), meaning that an allocation methodology is unnecessary and inappropriate.

Specifically, for each ILVQR sales trace (of merchandise produced in China), Meisen tied the

merchandise sold to a CBP 7501 entry form, to a packing list with Meisen's invoice number, and

a freight brokerage invoice.[186]   Meisen explained that it provided these documents because they

were some of the only "documents *related to this transaction* retained by the J&K

---

[183] *See* Meisen's July 19 CQR at 32.
[184] *See* Meisen's February 14 SCQR at Exhibit R2C-15.
[185] *Id.*
[186] *See* Meisen's ILVQR at Exhibits SVE-8,9,10,12, and 13.

Companies."[187]   Accordingly, Meisen's assertion that it could not link transactions reported in its

U.S. sales database to the associated freight documentation is undermined by Meisen's ILVQR

where it submitted, five times, CBP 7501 forms, Meisen invoices, and Meisen packing lists, and

in four instances, the broker's invoice, which it tied directly to its U.S. sales.[188]

When calculating the dumping margin, Commerce requires respondents to report their

expenses on the most specific basis possible.[189]   It is Commerce's practice to apply AFA when

we determine that respondents have not accurately represented the information available to them

in their books and records.  In *Citric Acid from Canada*, Commerce faced a similar situation

where a respondent was not forthcoming about the information it was able to report to

Commerce.[190]   In that case, prior to verification, Commerce had accepted the respondent's

assertion that it was unable to report its sales and expenses in the currency in which they were

incurred.  During verification, Commerce learned that the respondent had the ability to report its

information in the correct currency, but that it had opted not to do so.[191]   As a result of the

respondent's failure, Commerce ultimately applied AFA to all of the impacted sales and

expenses.[192]   Finally, in *CTL Plate from Italy*, the Commerce based a respondent's final dumping

---

[187] *Id.*, *e.g.*, at 12 (emphasis added).
[188] *Id.* at 12-14, and 16.  These documents contain the bill of lading number, the importing carrier, Meisen's invoice number, and in certain instances, the brokerage invoice number and the amount charged by the broker to the J&K Company – all which Meisen used to compile its allocated international movement expenses.
[189] *See, e.g.*, 19 CFR 351.401(g)(1), which permits respondents to rely on allocations only where "transaction-specific reporting is not feasible."
[190] *See Notice of Final Determination of Sales at Less Than Fair Value:  Citric Acid and Certain Citrate Salts from Canada*, 74 FR 16843 (April 13, 2009) (*Citric Acid from Canada*), and accompanying IDM at Comment 4.
[191] *Id.*  Commerce stated:

> Despite {Commerce's} request that JBLT report sales and expense information in the currency in which it was incurred, JBLT did not provide information pertaining to certain Canadian sales and U.S. freight expense in the manner requested.  Additionally, JBLT's assertion that it could not report certain sales and expense data in the currency in which they were incurred, did not verify. Because it was possible for JBLT to have provided sales and expense data in the currency in which they were denominated or incurred, we find that JBLT withheld information requested by {Commerce}.

[192] *Id.*

margin on total AFA, in part because of our verification finding "that it was possible to link all of {the respondent's} U.S. sales to transaction-specific freight expenses," but the respondent failed to report its expenses in this manner.[193]

Consistent with Commerce's practice, we find that the application of AFA here is similarly warranted.  Meisen stated that it was unable to link individual U.S. sales to import documentation; however, upon verification, we learned that this was not the case.  Therefore, we find that Meisen withheld information requested by Commerce, and provided information that could not be verified, pursuant to sections 776(a)(2)(A) and (D) of the Act.  Further, consistent with section 776(b) of the Act, Meisen failed to act to the best of its ability in this investigation by not reporting its freight expenses in the most specific manner possible, despite having the means to do so.

vi.   <u>Entered Values</u>

In response to a supplemental questionnaire, Meisen stated that the entered value it reported in its U.S. sales database "is based on the transfer prices in effect during the POI between Meisen and the J&K Companies."[194]  To determine the transfer price in effect during the POI for each sale in the U.S. sales database, Meisen relied on multiple price lists that were time- and location-specific.[195]  Meisen selected the "correct" price list based on:  (1) the date of the sale to the unaffiliated U.S. customer; and (2) the J&K Company that made the sale.

However, information provided in half of Meisen's ILVQR sales traces demonstrates that Meisen reported incorrect entered values in its U.S. sales database.[196]  According to Meisen, the

---

[193] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 82 FR 16345 (April 4, 2017) (*CTL Plate from Italy*), and accompanying IDM at Comment 4.
[194] *See* Meisen's August 27 SCQR at 44.
[195] *Id*. at Exhibit SC-33.  These price lists were internal price lists for sales from Meisen to the J&K Companies.
[196] *See* Meisen's ILVQR at 13-15.

reasons for these errors were clerical (*i.e.*, in one instance Meisen selected the price for an incorrect product from the correct price list, and in the other two instances Meisen selected the price for the correct product, but from the incorrect price list). Given that these errors impacted half the sales traces, we have little confidence that other transactions in Meisen's U.S. sales database were free from similar clerical errors. Thus, because Meisen computed the amount of various expenses (as discussed further below) using the reported entered value, we find that these errors undermine the reliability of those expenses.

Additionally, we find that the issues associated with Meisen's reported entered value are greater than Meisen's own acknowledgment. First, as noted above, Meisen based its reported CONNUMs on product characteristics of the sale to the first unaffiliated customer, rather than those of the imported merchandise.[197] This means that the entered values selected for these transactions are for different products.[198] Specifically, Meisen's ILVQR shows the following:

- Sales trace four, *i.e.*, SEQU [      ], was a sale of a custom-made range hood that was produced using components from other imported merchandise.[199] In its U.S. sales database, Meisen reported that the entered value for this hood was $[      ]. Although in its ILVQR Meisen claimed that this was incorrect because it had relied on the wrong price on the price list (and, instead, it should have reported an entered value of $[      ], the entered value of a range hood with the product code it used in its books and records for this sale), we disagree. As we established above in the "Product Characteristics" discussion, the imported product for this sale was not the finished range hood; rather, it was multiple components of other imported cabinets, and the

---

[197] *See supra* at "Product Characteristics"; *see also* Meisen's ILVQR at Exhibits SVE-11 and SVE-12.
[198] *See* Meisen's ILVQR at 14-15 and Exhibit SVE-11.
[199] *Id.* at 15.

entered value for the hood bears no relationship to the product(s) which actually entered.

- Sales trace five, *i.e.*, SEQU [        ], was documented as a sale of an RTA cabinet, but: (1) the customer only received the frame of the cabinet;[200] and (2) Meisen reported this frame as [                ]. In its ILVQR, Meisen stated that it reported this product as [                ] because [                ] is similar to the frame of a cabinet.[201] In its U.S. sales database, Meisen reported that the entered value for this sale was $[    ], the transfer price for [                ].[202] However, as Meisen demonstrated in its ILVQR, and as we established in the "Product Characteristics" discussion above, the actual imported product for this sale was an RTA cabinet, with an entered value of $[        ], not the proxy product selected to represent the further manufactured product.[203] Therefore, the entered value reported for this further manufactured product is incorrect.

Second, as discussed above, Meisen knew the entered values of the merchandise it sold, but instead of reporting the actual value of the merchandise upon entry, it estimated these values using a price-list price based on the date of sale from J&K Companies to the U.S. customer.[204] Due to the timing of Meisen's sales, the J&K Companies' imports, and the sale to the ultimate customer, for sales in two of the six sales traces,[205] the price-list price (based on the date of sale)

---

[200] *Id*. at 15 and Exhibit SVE-12.
[201] *Id*. at 15.
[202] *Id*. at Exhibit SVE-12; *see also* Meisen's February 14 SCQR at Exhibit R2C-2.
[203] *See* Meisen's ILVQR at Exhibit SVE-12.
[204] *Id*. at Exhibits SVE-8, SVE-9, SVE-10, SVE-12, and SVE-13.
[205] Specifically, we are referring to sales traces one and six. For sales trace four, Meisen did not report the merchandise imported. Therefore, we are unable to determine if the price list price differs from the actual price of the merchandise imported; that said, we are also unable to verify that Meisen correctly reported the entered value for this transaction.

differed from the actual entered value of the merchandise on Meisen's packing list/invoice (the price upon entry).[206]

Reporting the incorrect entered value could have a significant impact on Meisen's dumping margin calculation because Meisen calculated a significant number of its U.S. sales expense fields using entered value (*i.e.*, warranty expenses, U.S. duties, Section 301 duties, and inventory carrying costs). Moreover, we are unable to isolate this issue to only a portion of Meisen's sales because we cannot know how many: (1) clerical errors Meisen made in its entered value reporting; (2) sales Meisen incorrectly reported as of non-further manufactured merchandise; and (3) sales were of products imported during time periods subject to different price lists.

Because Meisen was unable to substantiate the accuracy of its reported entered values in its ILVQR, we find that Meisen's reported warranty, U.S. duty, Section 301 duty, and inventory carrying expenses could not be verified, within the meaning of section 776(a)(2)(D) of the Act. Pursuant to section 776(b) of the Act, Meisen failed to act to the best of its ability in reporting accurate entered values because certain of the observed errors resulted from inattentiveness and/or carelessness,[207] and Meisen had the ability to report certain expenses on a more precise basis, but it failed to do so.

---

[206] *See* Meisen's August 27 SCQR at 44 and Exhibit SC-33. We also note that, because Meisen did not use the "correct" price list in certain instances, the entered value it reported tied to the actual entered value of the merchandise entirely by accident. Had it reported entered value under its incorrect methodology, the other two entered values reported would also have been incorrect because they did not tie to the reported transfer prices in Meisen's invoices to the J&K Companies. Therefore, whether we review the entered values based on our own assessment (where Meisen systemically used the incorrect criteria for reporting information in this field) or whether we use Meisen's own assessment (where Meisen made careless errors), the result is the same – Meisen reported its entered value wrong.
[207] *See Nippon Steel*, 337 F.3d at 1382-83.

vii.   <u>Other ILVQR Errors</u>

*Further manufacturing expenses* – As addressed above, Meisen's ILVQR contained evidence that Meisen reported incorrect product characteristics for three products that were further manufactured in the United States, and it failed to report further manufacturing expenses for two of those sales.[208]  Given the high proportion of inaccuracies in the sampled transactions, we have no confidence that Meisen reported further manufacturing expenses for all appropriate sales.

*Incorrect shipment date* –The universe of sales is determined by the date of sale reported in the U.S. sales database, and the date of sale is typically either the earlier of shipment date to the first unaffiliated customer or commercial invoice date.  Commerce instructed Meisen to "{r}eport the date of shipment from the factory or distribution warehouse to the customer."[209]  Meisen explained that FOB China sales were direct sales from Meisen to the U.S. customer, that the J&K Companies paid the costs for shipment, and that the U.S. customer was charged all of the associated freight expenses incurred by the J&K Companies.[210]  However, based on the FOB China sale examined in Meisen's ILVQR, sales trace three, Meisen incorrectly reported the date of shipment as the date of the packing list (*i.e.*, [                    ]), rather than the date the merchandise departed Meisen's factory, which was several months earlier (*i.e.*, [                    ]).  Meisen did not explain why it selected the date of the packing list as the date of shipment and whether this choice was limited to this sale or was the methodology used to determine the date of shipment for all of its FOB China sales.  Because Meisen reported the incorrect shipment date for sale trace three, and almost all of its FOB China sales were reported in the same manner, it is

---

[208] *See* Meisen's ILVQR at Exhibits SVE-11 and SVE-12; *see also* Meisen's February 14 SCQR at Exhibit R2C-2.
[209] *See* Meisen's July 19 CQR at 17.
[210] *See* Meisen's August 27 SCQR at 14; *see also* Meisen's January 11 SCQR at 24.

reasonable to conclude that Meisen similarly reported the incorrect shipment date for its FOB China sales generally. As a result, we have significant concerns over the accuracy of the U.S. sales database universe of sales.[211]

In conclusion, these additional issues, while less frequently observed in the provided sales traces, are significant, and contribute to a finding that Meisen's reported U.S. sales data, as a whole, could not be verified within the meaning of section 776(a)(2)(D) of the Act. Further, as explained *supra*, Meisen failed to act to the best of its ability because it had the necessary information in its possession but chose not to provide it.

   viii.   Conclusion

In summary, the reporting errors discovered following our analysis of Meisen's ILVQR were pervasive and significant. As a result, we have no confidence in the accuracy of Meisen's reported U.S. sales data overall, and, thus, we consider these data to be unverified. Further, we note that, in certain instances (such as those involving Meisen's customer code lists and Meisen's international movement expenses), Meisen withheld information explicitly requested by Commerce.

We note that the CIT has upheld Commerce's decision to reject a respondent's data *in toto* when "it is flawed and unverifiable."[212] As in *SAIL*, where the deficiencies to a respondent's submissions were "pervasive and persistent," the problems encountered in reviewing Meisen's ILVQR were extensive and, as noted above, called the integrity of Meisen's submissions to Commerce into question.[213] In *Goodluck*, the Federal Circuit addressed the finality of verification and Commerce's authority in drawing conclusions from its verification findings:

---

[211] *See* Meisen's ILVQR at Exhibit SVE-3.
[212] *See SAIL*, 149 F. Supp. 2d at 928 (citing *Heveafil Sdn. Bhd. v. United States*, 25 CIT 147 (2001)).
[213] *Id*.

Verification represents a point of no return.  The purpose of verification is "to test information provided by a part for accuracy and completeness."  At that stage, Commerce enjoys "broad discretion" to promulgate and enforce its procedural rules.[214]

Therefore, for this final remand redetermination, we find that Meisen withheld certain requested information, and it provided other information that could not be verified.  Thus, we determine that the use of FA is warranted in determining Meisen's final dumping margin, pursuant to sections 776(a)(2)(A) and (D) of the Act.

As described above, we find that Meisen had the ability to provide verifiable information in this investigation, but it did not.  Therefore, we find that Meisen failed to cooperate to the best of its ability in this investigation.[215]  Under these circumstances, we find that an adverse inference is warranted in selecting from among the facts otherwise available with respect to Meisen in accordance with section 776(b) of the Act and 19 CFR 351.308(a).[216]  Finally, because Meisen's actions have left the entirety of the reported sales database unreliable, we find it appropriate to apply AFA in determining Meisen's weighted-average dumping margin.

### c. Unreported U.S. Affiliate

As noted above, there are a plethora of issues surrounding Meisen's ILVQR response.  These alone are a sufficient basis to find that use of AFA is warranted in determining Meisen's margin.  However, the issues with Meisen's responses do not end there.  Instead, some of the information in Meisen's ILVQR revealed potentially larger problems in its reporting, including

---

[214] *See Goodluck.*, 11 F 4th at 1343.
[215] *See Nippon Steel*, 337 F. 3d at 1383 (noting that Commerce need not show intentional conduct existed on the part of the respondent, but merely that a "failure to cooperate to the best of a respondent's ability" existed (*i.e.*, information was not provided "under circumstances where it is reasonable to conclude that less than full cooperation has been shown.")).
[216] *Id.*, 337 F. 3d at 1382-83.

the possibility that Meisen failed to report to Commerce the existence of all of its U.S. affiliates during the POI and their associated sales of subject merchandise.

We requested that Meisen identify all of its U.S. affiliates at the outset of this investigation.[217]  In its questionnaire responses, Meisen explained that, during the POI, it only sold merchandise through 16 locations with 17 affiliated companies in the United States.  It identified the owners of these 16 companies, as well as the owners of J&K International LLC (J&K Headquarters), which Meisen claimed that, while affiliated with Meisen, was not involved in the sale of subject merchandise during the POI.[218]  Meisen explained that some of the owners of the J&K Companies owned other companies that were involved in storing and warehousing subject merchandise, and it identified several more of these types of U.S. affiliates (herein referred to collectively as J&K Company affiliates).[219]  Meisen also acknowledged that it was required to report all affiliated companies to Commerce, regardless of whether they were directly involved in the sale of subject merchandise.[220]

However, Meisen's ILVQR called into question whether Meisen has been entirely forthcoming about all of its U.S. affiliates during this investigation.  In particular, a review of the record information indicates that Meisen failed to report at least one company with which it was affiliated during the POI ([                              ]), contrary to the requirements of Commerce's questionnaire, and it also failed to disclose potentially significant transactions with J&K NY's largest U.S. customer, [                                   ], thereby preventing Commerce from investigating a potential affiliation with this company.

---

[217] *See* Meisen's July 3 AQR at questions 3A, 3C, 3D.
[218] *See* Meisen's May 13 SRA at Exhibit 18; *see also* Meisen's July 3 AQR at Exhibit 1; and Meisen's August 13 SAQR at 14 and Exhibit A-26.
[219] *See* Meisen's August 13 SAQR at 23.
[220] *Id*. at 16 (Meisen cited Commerce's definition of affiliation prior to identifying its own affiliates).

In its ILVQR, consistent with the record, Meisen reported that sales trace six is a sale made by affiliate J&K NY to [                    ].  In reviewing the documents provided in this sales trace package, we noted that:  (1) J&K NY and [                    ] had the same fax number during and after the POI;[221] and (2) [                    ] address ([                        ]) is also the same address that another J&K Company affiliate, [                                    ] reported as its address in its 2018 federal tax forms.  [        ] also received the completed tax forms for the tax year immediately before and during the POI at this address.[222]  In particular, on [                ], and [                ], [        ] received its completed federal tax forms from its accountant at [                ].  The letter from the accountant begins "Dear [    ] Members."  The enclosed documents were federal tax forms for the years 2017, and 2018, respectively, and the forms were completed using the [                ] address.[223]  Because ILVQR information indicated that J&K NY's customer, [                ], and [        ] used the same address during the POI, and because [                ] and J&K NY shared a fax number during the POI, we investigated further to better understand the relationship between [                    ], the J&K Companies, and the affiliates of the J&K Companies.  We placed two memoranda with NFI on the record, explained to the parties what we noticed in that information (*e.g.*, that there was potential overlap locations and contact information between [                ] and the J&K Companies), and invited

---

[221] *See* Meisen's ILVQR at Exhibit SVE-13.  [                    ] fax number on the sales invoice provided by Meisen is [                ].  On this sales invoice, the J&K NY letterhead identifies J&K NY's fax number as the same number, [                ].

[222] *See* Meisen's August 13 SAQR at Exhibit 37b.

[223] We reviewed the record and found that [                    ], the owner of 25 percent of [                ], also owned 100 percent of another affiliate, [                    ], (which in turn owns [    ] percent of Meisen).  [                ] is also [                    ], who is the majority shareholder of Meisen.  *See* Meisen's August 13 SAQR at Exhibits A-26 and A-28.  During the POI, [                ] owned [    ] percent of [                    ] and [    ] percent of [                ]; and [                ] owned [        ] percent of Meisen and [                    ] percent of Meisen.  *See* diagram below for an illustration of the overlap of ownership between [                ].

comments and RFI in response.[224]  Certain information set forth in the March 31 NFI Memo, the

Petitioner's April 6 Comments and RFI, and Meisen's April 6 Comments and RFI indicates that

Meisen failed to report all of its U.S. affiliates.

      i.     [ _ _ _ _ ]

In the March 31 NFI Memo, at Attachment 5, we placed on the record a news article

from Long Island (LI) Business News.[225]  This article, which is dated November 30, 2018 (*i.e.*,

during the POI), states that a large industrial property located at [                ], an

address adjacent to [          ], was purchased by a subsidiary of [     ].[226, 227]  Of note, prior to

the issuance of Commerce's ILVQ, Meisen did not identify any subsidiaries of [    ].

In response to this article, Meisen reiterated that it had already established for the record

that [     ] and J&K Headquarters occupied [          ] until April 2017.[228]  Then, Meisen

provided additional, new, information:

> {t}he property identified in Attachment 5 {[          ]} was not a purchase by
> [            ], but was rather an investment by an individual who also happened
> to have ownership interest owned {*sic*} [          ] and was aware of the
> property becoming available for sale since J&K had operated close by before
> vacating [            ].[229]

---

[224] *See* March 23 NFI Memo and March 31 NFI Memo.
[225] *Id.* at Attachment 5.
[226] *Id.*, stating:

> [          ] industrial property has sold for [          ].  [
>                                                    ], a supplier of kitchen and
> bath cabinets.  The company, which already leases an adjacent property at [            ], will use the
> new acquisition for warehousing and distribution."

[227] As noted above, [            ] is also known as [                          ].  *See*
Meisen's August 13 SAQR at 27 and Exhibit A-21 ([
                        ]).
[228] *See* Meisen's April 6 Comments and RFI at 13.
[229] *Id.*

Meisen also provided a signed affidavit from the General Manager of J&K Headquarters, Mr.

Ting J. Zheng.[230]  In the affidavit, Mr. Zheng discusses an additional company, "[

]", that was:

> owned in part by an owner of [      ] and to the best of {his} knowledge was
> created and operated only to own the property at [                    ].
> Other than its *affiliation with* [      ], {he} know{s} of no other connections that
> [                ] had with any company in the kitchen cabinet industry.[231]

In other words, according to Meisen, the owner of [    ] also owned a company called "[

]," which in turn purchased a warehouse located at [              ].  Importantly, [     ]

was solely owned by [                              ] the majority owner of Meisen.[232]  [

]  also owned 25 percent of [        ] and is the partial owner of another J&K Company

affiliate, [            ].[233]  Further, [     ] owned over [   ] percent of Meisen.[234]  Therefore,

according to Meisen, an individual with significant ownership of, and affiliation with, Meisen

and three J&K Company affiliates ([     ], [        ], and [            ]), purchased the warehouse

at, or "invested" in, [            ] via [                ].[235]  Meisen did not identify "[

]" as an affiliate prior to the submission of its ILVQR or our subsequent release of

NFI.  For clarity:

---

[230] *Id.* at Exhibit NFI-12.
[231] *Id.* (emphasis added).  We note that the individual who is identified as the General Manager of J&K Headquarters in Meisen's April 6 Comments and RFI was previously identified on the record as the owner of J&K Headquarters during the POI.
[232] *See* Meisen's August 13 SAQR at Exhibit A-28.
[233] *Id.* at Exhibit A-26.
[234] *Id.*
[235] *See* Meisen's April 6 Comments and RFI at 13; *cf.* March 31 NFI Memo at Attachment 5, Meisen's August 13 SAQR at Exhibits A-26 and A-28.

[

]

The petitioner's RFI submission provided additional information about [                ].

Specifically, [                ] was purchased, during the POI, by "[

]$^{236}$ and was established in just a few short months prior to the POI, with

J&K Headquarters (at [                ]) as the "service process name and address."$^{237}$   In other

words, Meisen repeatedly asserts that [                ] was occupied by J&K Headquarters until

April 2017, but contrary to that assertion, the State of New York's records indicate that as of

May 18, 2018, [                ] was still used as the J&K Headquarters service address.   Hereafter

---

$^{236}$ *See* Petitioner's April 6 Comments and RFI at Exhibit 11.
$^{237}$ *See* Petitioner's April 6 Comments and RFI at Exhibit 6; *cf.* Meisen's August 13 SAQR at Exhibit A-8.  ([                ] was established on [                ] with "[                                        ]" as its "service process name and address."  J&K Headquarters' articles of incorporation use the following service process name and address:  [                                        ]).

we refer to this company as [                    ] because the petitioner provided a New York

corporate record that refers to the company as that name.[238]

     Record information indicates that [                    ] is affiliated with Meisen and

should have been reported to Commerce.  During the POI, [                    ] was owned by

[                    ], who partially owned [                    ], and solely owned [      ].[239] [

 ] owned [  ] percent of Meisen.  [                    ] also had a familial relationship to the majority

owner of Meisen.[240]  Accordingly, Meisen, [        ], [           ], [      ], and [

 ] were affiliated during the POI pursuant to sections 771(33)(A) and (F) of the Act

because, based on the ownership of the companies, they were under the common control of the

family grouping that owns the majority shares of Meisen.[241]

     In *Uttam Galva*, *Bayley*, and *Ferro Union*, the CIT and the Federal Circuit sustained

Commerce's application of total AFA to the respondent because it withheld information

requested by Commerce, failed to provide requested information, and significantly hindered the

proceeding.[242]  Similarly, in this case, we only became aware of [                    ] as a

---

[238] *See* Petitioner's April 6 Comments and RFI at Exhibit 6.

[239] *See* Meisen's August 13 SAQR at Exhibit A-26.

[240] *Id*. at Exhibits A-26 and A-28.

[241] Section 771(33) of the Act provides that the following persons shall be considered to be "affiliated" or "affiliated persons":

    (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.

    (B) Any officer or director of an organization and such organization.

    (C) Partners.

    (D) Employer and Employee.

    (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.

    (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

    (G) Any person who controls any person and such other person.

[242] *See Uttam Galva Steels Limited v. United States*, 425 F. Supp 3d 1366, 1371-72 (CIT 2020) (*Uttam Galva I*) and *Uttam Galva Steels Ltd. v. United States*, 518 F. Supp. 3d 1333, 1339 (CIT 2021) (*Uttam Galva II*), *aff'd Uttam Galva Steels Ltd. v. United* States, 2022 U.S. App. LEXIS 12135, at *10-11 (Fed. Cir. 2022) (*Uttam Galva III*) (collectively, *Uttam Galva*); *see also Shandong Dongfang Bayley Wood Co. v. United States*, 375 F. Supp. 3d 1339,

result of information discovered in Meisen's ILVQR.  Meisen's failure to identify [

] as one of its affiliates during the POI and to describe [                    ]'s

operations, ownership, and addresses leaves significant questions unaddressed.  In the most basic

sense, Meisen failed to allow Commerce to examine whether [                    ] was

involved in the warehousing, sale, and/or distribution of subject merchandise during the POI.

This is particularly relevant considering that [                ], the owner of [                    ]

and [        ], is in the practice of purchasing properties and renting them exclusively to the J&K

Companies for the warehousing of subject merchandise.[243]  In particular, the record shows that

[              ] owns shares in at least two additional real estate companies, [

], that exclusively rent buildings to J&K Companies for the warehousing of subject

merchandise.  [                  ] "bought a warehouse that is located in City of Industry, CA and

rented this warehouse to GRAND JK&C LTD (J&K-Los Angeles) for the purpose of storing

J&K products,"[244] and [        ] "bought a warehouse that is located in Raleigh, NC and rented

this warehouse to J&K CABINETRY NC LTD (J&K-NC) for the purpose of storing J&K

products."[245]

 Meisen's failure to disclose this affiliation is also significant because [                ], a

dealer of subject merchandise, operated out of the address leased by "a subsidiary of [          ],"

(*i.e.*, [                ]) during the POI, and, eventually operated out of [                        ]'s

---

1346 (CIT 2019) (*Bayley*); and *Ferro Union, Inc. v. United States*, 74 F. Supp. 2d 1289, 1296 (CIT 1999) (*Ferro Union*).  In *Ferro Union*, Commerce was able to identify the sales that were impacted by the respondent's reporting failure, and it applied partial AFA to those sales.  In this case, we are unable to isolate the impact of Meisen's reporting failures.
[243] *See* Meisen's August 13 SAQR at 23-26 and Exhibit A-26.
[244] *Id*. at 23.
[245] *Id*. at 26.

property at [          ].[246]  Further, the LI Business News article states that the J&K affiliate,

"which already leases an adjacent property at [          ], will use the new acquisition for

warehousing and distribution."[247]  In other words, a J&K Company affiliate that was leasing, or

leasing out, [          ], where [          ] was operating its wooden cabinet and vanity

retail location, would use the purchase of [          ] by [          ] to assist with

warehousing and distribution.  This is also relevant because the owner of [     ] and [

          ] was a relative to the majority owner of Meisen and several of the J&K Company

owners, owns several other J&K Company affiliates involved in the warehousing and

distribution of subject merchandise, and owns a substantial percentage in Meisen through

wholly-owned [     ].  Finally, while Meisen repeatedly states that [     ] (*i.e.*, [

          ]'s sister company), was not involved in the sale of subject merchandise during the

POI, and was "only a holding company,"[248] other record facts suggest otherwise.  Specifically,

the physical location of J&K NY, which was owned by [          ], was

the destination of subject merchandise addressed to recipients named "[     ]," "[     ]," and "[

          ]."[249]  Further, in many of the sales reconciliations provided by the J&K Companies,

---

[246] *See* Meisen's ILVQR at Exhibit SVE-13; *see also, e.g.*, Petitioner's April 6 Comments and RFI at Exhibit 3
([          ] applied for Paycheck Protection Program loans with [
          ]).
[247] *See* March 31 NFI Memo at Attachment 5.
[248] *See* Meisen's April 6 Comments and RFI at Exhibit NFI-16.
[249] *See* Meisen's August 13 SAQR at 19 and Exhibits A-26 and A-28; *see also* Meisen's February 14 SCQR at
Exhibit R2C-19.

intercompany sales labeled "[     ]" were identified as affiliated sales and removed from the total quantity and value of the sales reported to Commerce.[250, 251]

Accordingly, the fact that Meisen failed to identify this affiliation and describe the scope of the operations of [                    ] during the POI prevented Commerce from conducting a fulsome affiliation analysis and its impact on Meisen's reported U.S. sales data.

Ultimately, Meisen failed to report all of its U.S. affiliates during the POI.  Specifically, [                    ] was affiliated with Meisen during the POI within the meaning of sections 771(33)(A) and (F) of the Act, but despite Commerce's multiple requests,[252] Meisen failed to identify this company as an affiliate.  Accordingly, pursuant to sections 776(a)(2)(A) and (C) of the Act, we find that Meisen withheld information requested by Commerce and significantly impeded this investigation.  Further, we find that Meisen knew of this affiliation, but failed to report it to Commerce.  By failing to provide information within its possession, Meisen failed to act to the best of its ability within the meaning of section 776(b) of the Act.  Based on the above, and consistent with Commerce's practice that has been upheld by the CIT, we find that the application of total AFA to Meisen is appropriate.[253]

---

[250] *See* Meisen's August 14 Reconciliations at Exhibit C-14d (J&K Seattle's Q&V Reconciliation); *see also* Meisen's August 23 Reconciliations at Exhibits C-15a (J&K AZ's Q&V reconciliation), C-15d (J&K CO's Q&V reconciliation), C-15e (J&K FL's Q&V reconciliation), C-15g (J&K IL's Q&V reconciliation), C-15h (J&K NC's reconciliation), C-15j (J&K NJ Zheng's Q&V reconciliation), C-15k (J&K NY's Q&V reconciliation), and C-15l (J&K OH's Q&V reconciliation).

[251] Relatedly, the record also contains information related to transactions with another company with a possible name variation of "[     ]," (i.e., [               ]).  While Meisen now maintains that this company is a separate and distinct entity from [     ] (*see* Meisen's Comments at 22-24), Meisen failed to provide information in its questionnaire responses regarding this affiliate or explain how it is related to the other J&K Companies.  Thus, there is no record evidence to support Meisen's assertion that [     ] and [               ] are not the same entity.  In the interest of completeness, we note that [               ] also had significant transactions with the J&K Companies during the POI, including with [                              ].  Meisen also sold subject merchandise to [                         ] before the start of the POI, and Meisen stated that it only sold subject merchandise through its affiliated companies.  *See* Meisen's July 3 AQR at question 3b and Exhibits A-6 and A-16; *see also* Meisen's February 14 SCQR at Exhibit R2C-19.

[252] *See* Meisen's May 13 SRA at 20; *see also* Initial Questionnaire at A-14; and Meisen's August 13 SAQR at 23.

[253] *See Uttam Galva I*, 425 F. Supp 3d at 1371-72; *see also Uttam Galva II*, 518 F. Supp. 3d at 1339; *Uttam Galva III*, 2022 U.S. App. LEXIS 12135 at 10; *Bayley.*, 375 F. Supp. 3d at 1346; and *Ferro Union*, 74 F. Supp. 2d at 1296.

ii.     [        ]

Additional record statements and information call into question whether Meisen has failed to report additional U.S. affiliates or company names under which it was doing business as (dba).  First, in a sworn affidavit, the General Manager and owner of J&K Headquarters (Ting J Zheng) states that, "no other affiliated companies that have not already been identified to {Commerce} as affiliated with the 'J&K Companies' in our submissions, existed during the POI."[254]  However, seven paragraphs later, this individual states that [                    ] "was owned in part by an owner of {[     ]}…. Other than its affiliation with {[     ]}, I know of no other connections that [                ] had with any company in the kitchen cabinet industry."[255]  In other words, the General Manager/owner of J&K Headquarters makes two contradicting statements in the same sworn affidavit:  (1) all companies affiliated with the J&K Companies have been reported to Commerce, and (2) there is a company affiliated with J&K Companies that was not reported to Commerce.

In particular, ample record evidence suggests that one company, [            ], could be another unreported J&K Company (or an affiliate) that was dba [        ], J&K NY's "customer" from sales trace six.  The following occurred at [          ] *during the POI*:

- [                    ] leased [            ];[256]

- [      ] received its completed federal tax forms from its accountant at [        ];[257]

- [      ] wrote [          ] as its own address in federal tax documents;[258]

---

[254] *See* Meisen's April 6 Comments and RFI at Exhibit NFI-12.
[255] *Id*.
[256] *See* March 31 NFI Memo at Attachment 5.
[257] *See* Meisen's August 13 SAQR at Exhibit A-36b.
[258] *Id*. at Exhibit A-37b.

- [          ] used [          ] as its storefront and for official business;[259]

- [          ] used the same fax number as J&K NY;[260] and

- [          ] was J&K NY's "customer" with the highest dollar-amount of purchases, purchasing almost [   ] percent more subject merchandise from J&K NY, by value, compared to the next largest customer.[261]

Furthermore, J&K Headquarters was the service process name and address provided to the State of New York by [          ] when it was established in 2016, strongly suggesting that the company was related to the J&K Companies when it was established.[262]  From all of these facts, it is reasonable to infer that [          ] could be a J&K Company or a J&K Company affiliate.[263]

    The accuracy and transparency of Meisen's affiliation responses is also undermined by several statements in Meisen's April 6 Comments and RFI that contradict other information on the record.  Meisen states that [          ]:

> does not share and has never shared an address with the J&K Companies and nothing on the record shows that company 'sharing' an address.  They do not share any physical locations and they do not share phone numbers or emails with either J&K International or J&K NY… this report claims that [          ]

---

[259] See Meisen's ILVQR at Exhibit SVE-13; see also Petitioner's April 6 Comments and RFI at Exhibits 5c and 5d.
[260] See Meisen's ILVQR at Exhibit SVE-13.
[261] [          ] was J&K NY's largest customer, with $[          ] and [          ] pieces of subject merchandise purchased during the POI.  The next largest customer purchased $[     ] and [   ] pieces of subject merchandise from J&K NY.  In other words, [          ] purchased [   ] percent by value and [   ] percent by pieces more subject merchandise from J&K NY than the next largest customer.
[262] See Petitioner's April 6 Comments and RFI at Exhibit 1.  [          ] was established on [          ] with "[          ]" as its service process name and address.
[263] Events that occurred after the POI with respect to [          ] also call the completeness of Meisen's affiliation responses into question:
- according to the Small Business Administration, within three years of [          ] multimillion dollar [          ] purchase, [          ] was using that address; and
- [          ] and J&K NY appear to currently use the same J&K NY showroom, [          ], to sell subject merchandise.
See Petitioner's April 6 Comments and RFI at Exhibits 2 and 3; cf. Meisen's April 6 Comments and RFI at 12 ("a reported address at [          ] … is for the current wholesale location for J&K-NY").

       *{sic}* has a reported address at [                                            ].  We are
attaching a copy of a picture of that address from Google Maps in NFI-15 of this
submission.  As can be seen, this address is not for [                    ] *{sic}* at all,
but rather is for the current wholesale location for J&K-NY.[264]

Meisen's statements here are directly contradicted by other information on this record.  Meisen's

assertion that [                ] and the J&K Companies do not currently and have never shared a

physical location is undermined by [                    ]'s own present-day website.  According to

[                    ] website, [                    ] is located at [                    ] while its retail operation

is under construction.[265]  However, [                    ] is J&K NY's address.[266]  Specifically, [

   ]'s website states the following:

   [



        ]{.}

Thus, we acknowledge that the location in the picture referenced by Meisen in its April 6

Comments is of J&K NY's location,[267] but it is unreasonable to suggest that [                    ]'s

website directs its customers to its own supplier (and a competing retailer) or to an incorrect

address, which is coincidentally that of its supplier.

     Further, the above statement from Meisen is misleading.  First, Meisen states that the

J&K Companies and [                ] do not, and have not, "shared any physical locations and

they do not share phone numbers or emails with either J&K International or J&K NY."  Notably,

however, [                ] and J&K NY *shared a fax number* during the POI.[268]  Thus, while

---

[264] *See* Meisen's April 6 Comments and RFI at 7-8 and 12.
[265] *See* Petitioner's April 6 Comments and RFI at Exhibit 2.
[266] *See* Meisen's April 6 Comments and RFI at Exhibit NFI-15.
[267] *Id.*
[268] *See* Meisen's ILVQR at Exhibit SVE-13.

Meisen's statement may arguably be true, it also sidestepped evidence on the record and avoided reporting that [          ] and J&K NY did share other contact information.

Another related statement made by Meisen that undermines its affiliation reporting is its statement that it has "already established above that [          ] occupied [

          ] along with J&K Headquarters until April 2017."[269]  The affidavit provided by Meisen also claims that, after April 2017, "to the best of {Mr. Zheng's} knowledge" the building at [          ] was put up for lease.[270]  However, [          ] and J&K Headquarters continued to use [          ] during the POI.[271]

Finally, Mr. Zheng also states that [     ] "*ceased its operations* in April 2017," and in the same submission Meisen states that, "{i}n order to be fully transparent with {Commerce}, counsel to J&K has learned that J&K Headquarters and one of its older and now defunct entities [          ] used to occupy a showroom at [          ] but vacated this location in approximately March 2017 and *ceased operations as a cabinet retailer in April 2017*."[272]  These statements are undermined by several other record facts:

- Meisen states several times that [     ] operated as a holding company during the POI (*i.e.*, July 1, 2018, through December 31, 2018);[273]

- during the POI, J&K GA shipped merchandise to companies named "[          ]," "[     ]," and "[     ]" located at [          ];[274] and

- sales to [     ] were considered "intercompany" sales that occurred during the POI, and were removed during Q&V reconciliations for several of the J&K Companies.[275]

---

[269] *See* Meisen's April 6 Comments and RFI at 8.
[270] *Id*. at Exhibit NFI-12.
[271] *Id*. at Exhibit A-37b.
[272] *See* Meisen's April 6 Comments and RFI at 8 and Exhibit NFI-12 (emphases added).
[273] *Id*. at Exhibit NFI-16.
[274] *See* Meisen's February 14 SCQR at Exhibit R2C-19.
[275] *See*, *e.g.*, Meisen's August 23 Reconciliations at Exhibit C-15a.

Thus, the sworn affidavit provided by Meisen either omits relevant facts, or it calls into question

the extent of "the knowledge" the General Manager/owner of J&K Headquarters had of the J&K

Companies and its affiliates and the accuracy of the rest of Meisen's April 6 Comments and RFI.

It also undermines the claim that Meisen has been forthcoming about its affiliations to

Commerce throughout this investigation, and any assertion that suggests that [            ] is

not affiliated with, or the same company as, a J&K Company or a J&K Company affiliate.[276]

     Were we to accept Meisen's denial of an affiliated relationship with [            ], or

that a J&K Company or an affiliate was not dba [            ], we would also be required to

accept certain untenable concepts.  First, we would have to accept the idea that [            ] is

sending its own customers to its competition around the block while its own retail operation is

under construction.  Second, we would have to accept the idea that it is either a coincidence, or

unimportant or irrelevant, that, over the last five years, including during the POI, [            ]

occupied the three properties the record shows were leased or owned by the J&K Company

affiliates.[277]  Third, we would have to accept the notion that [            ] used J&K

Headquarters as the "service process and name" when it filed its application for a business

license with the State of New York without having any relationship with J&K Headquarters.

Finally, we would have to disagree that it is reasonable for two unrelated competing companies,

with two separate physical locations, to share a fax machine number.

     As noted above, Meisen failed to report all of its U.S. affiliates during the POI.  Further,

the information on the record about [            ] strongly suggests that Meisen withheld other

---

[276] Meisen at no point explicitly states in its April 6 Comments and RFI that [            ] is not affiliated with
Meisen or any of the J&K Company affiliates.  Meisen also never claims that a J&K Company or affiliate is not dba
[            ].
[277] According to [            ]'s sales invoice from J&K NY, it was operating out of [            ].  According to
the Small Business Administration, [            ] eventually operated out of both [            ].
According to [            ]'s website, it is currently operating out of [            ], J&K NY's address.

significant information relevant to Commerce's analysis.  Accordingly, Meisen's evasive and contradictory statements around [                    ], in conjunction with the overlap in physical locations between [                    ] and the J&K Company affiliates, calls into question the transparency and accuracy of Meisen's affiliation responses.

Meisen's April 6 Comments and NFI submission contains additional statements that conflict with record information.  Meisen attempts to discredit a report placed on the record by Commerce that suggests that another company was operating at [                    ] named [                    ].  In particular, Meisen states that "{t}he founding date of the company of 2007 predates the formation of any of the J&K Companies so this is inaccurate."[278]  However, in an earlier submitted supplemental questionnaire response, Meisen explained the formation of its first U.S. affiliates:

> The Meisen factory was formed on September 21, 2006.  But even before then, a few J&K companies were already formed:
>> J&K 2 Ltd (J&K-GA) was formed on October 27, 2003,
>> J&K 3 Ltd (old J&K-NY) was formed on December 18, 2003,
>> J&K 8 Inc (J&K-Miami) was formed on October 1, 2005, and
>> Grand JK&C Ltd (J&K-Los Angeles) was formed on March 16, 2006.[279]

Therefore, Meisen's statement that the founding of "J and K Kitchen and Bath" in 2007 predates the founding of any Companies is belied by Meisen's prior statements, and again, calls into question the reliability of its April 6 Comments and RFI.

iii.    The "Orlando Company"

Finally, we note that one of the other sales traces involved a company located in Orlando, Florida that was using a name similar to the J&K Companies, [

---

[278] *See* Meisen's April 6 Comments and NFI at 11.
[279] *See* Meisen's August 13 SAQR at 27.  The information provided in Petitioner's April 6 Comments and RFI, Exhibit 8, regarding [        ] is consistent with this response.

].[280]  Record information showed that the company was using J&K Company logos, J&K

Company storefront signage, *etc.*[281]  Compared to all other customers of subject merchandise, [

] made the highest dollar-value and volume of purchases of subject merchandise from J&K

Miami during the POI.[282]  In the March 31 NFI Memo, we also stated that the owner of [       ],

[             ], appeared to be engaged in the management of several companies with J&K names

and he also appears to be located geographically in or around the companies in question.[283]

In response to the March 31 NFI Memo, Meisen stated that this was a company

committing trademark infringement and that J&K Miami sold merchandise to any customer

willing to purchase its merchandise until J&K Headquarters told it not to (after the POI).[284]  To

demonstrate this, Meisen provided an electronic copy of a cease and desist letter, notifying the

[    ] company officials of their infringement.  In this letter, the attorney stated, "{w}e ask that

you reply by February 14, 2019, of your intention to comply with these requests.  If we fail to

hear from you or you respond you do not intend to comply then we will have no choice but to

recommend further action to our client."  Though Meisen stated that "{t}his issue of the

unauthorized use of the J&K name was addressed and to the best of our knowledge was stopped

prior to the start of this remand proceeding," Meisen provided none of the evidence on which

---

[280] *See* March 31 NFI Memo.
[281] *Id.*; *see also* Meisen's ILVQR at Exhibit SVE-10.
[282] According to Meisen's U.S. sales database, [                    ] purchased a greater quantity and value of subject merchandise compared to all other customers.  The total value of [                    ] purchases was $[
           ].  The value of the individual customer with the second highest value of subject merchandise purchases was $[             ], or [  ] percent of [                ] J&K FL purchases.
[283] *See* March 31 NFI Memo.
[284] *See* Meisen's March 28 Comments and RFI at 2; *see also* Meisen's April 6 Comments and RFI at 7 ("{T}he J&K Companies sold merchandise during the POI and prior to the POI to any entity that was willing to purchase them. There was no written directive from J&K Headquarters to each of the individual J&K Companies not to conduct such business, until J&K Headquarters learned of the widespread misuse of the J&K name.  Once J&K Headquarters learned of this potentially deceptive use of its company name, it immediately took action and issued cease and desist letters as well as instructed the individual J&K Companies to cease selling the merchandise to these fake J&Ks.").

this infringement action was supposedly based, nor any evidence related to the disposition of the action (either that the company ceased using the name or underwent subsequent legal action).

In Meisen's April 6 Comments and NFI, Meisen provided additional cease and desist letters to illustrate that trademark infringement was/is a common issue for the J&K Companies. Notably, among the 23 additional letters that Meisen provided in this filing was a *second* letter to the same Orlando company, sent by a different attorney, only three days after the first letter was sent (and during the 14-day response period allotted by the first letter).[285]

Record information indicates that the owner of [       ], [            ] may also have been associated with a company using a "J&K" name at [            ] during the POI, "[

], " that was managed by [                              ], who is also [        ] of the owners of J&K NY and J&K NJ Zheng.[286]  Meisen has challenged the reliability of this source (Dun & Bradstreet), including the suggestions that the owner of the Orlando company made "false statements to news sources, as he opened and closed other companies."[287]

We acknowledge that the evidence on the record with respect to the Orlando company is not definitive.  Therefore, we have not relied on this information in reaching our determination to rely on AFA in determining Meisen's dumping margin.

*3.  Conclusion*

---

[285] Again, no follow up support documentation was provided.
[286] *See* March 23 NFI Memo at Attachment 6; *see also* March 31 NFI Memo at Attachments 2 and 3. [
] was a registered agent and vice president of [                    ].  A Dun and Bradstreet report indicates that [              ] was also the owner and manager of a company called [            ], located at [
].  In this report, there is no timeframe associated with [            ] ownership of this company.  A separate Dun and Bradstreet report on [            ] indicates that the company was established in [    ] at [            ], that the company is an importer, and that the "Executive" is [        ].  According to Meisen's August 13, SAQR, [            ] also owned [    ] percent of [            ], a J&K Company affiliate that owned a warehouse that was rented to J&K NJ Zheng during the POI (Exhibit A-26).
[287] *See* Meisen's April 6 Comments and NFI at 7.

As explained above, pursuant to section 776(a)(2)(D) of the Act, Meisen's U.S. sales

database could not be verified due to pervasive errors and failures to provide requested source

documentation.  Also, pursuant to section 776(a)(2)(A) of the Act, we find that Meisen had the

ability to provide verifiable information, but it did not.  Therefore, Meisen failed to act to the

best of its ability, pursuant to section 776(b) of the Act.  Additionally, in accordance with

sections 776(a)(2)(A) and (C) of the Act, Meisen failed to report at least one U.S. affiliate ([

]) during the POI.  We find that Meisen had the ability to provide information

about its unreported U.S. affiliate(s) in this investigation, but it did not.  Accordingly, pursuant to

section 776(b) of the Act, we find that Meisen failed to act to the best of its ability in reporting

its affiliate information to Commerce.  Either of these reasons alone could be sufficient for a

total AFA determination, but together, they overwhelmingly support the application of total AFA

in determining Meisen's dumping margin this final remand redetermination.

With respect to the first point, Meisen failed to provide the source documentation

required to verify J&K GA and J&K IL's Q&V and sales reconciliations, and the sample

sales/CONNUMs selected for verification were replete with significant errors.  It is the

respondent's burden to demonstrate that its reported data were accurate and Meisen failed to do

so.  Further, as the CIT explained in *GOQ*, "the very existence of errors has significance" and it

is reasonable for Commerce to assume that where there is one error, there exists the potential for

more errors.[288]  Moreover, these are not errors that can be corrected by an adjustment or two –

these are errors in the destination of the subject merchandise, the product characteristics and

CONNUMs, entered value, and further manufacturing – and they impact the accuracy of the

---

[288] *See GOQ*, Slip Op. 22-21 at 18-19 and n. 10.

differential pricing test, the correct products used for NV/U.S. price comparisons, and various U.S. movement and selling expense fields in the U.S. sales database.

With respect to the second point, Meisen failed to report all of its U.S. affiliates. Specifically, an owner of several companies affiliated with Meisen and the J&K Companies was also the owner of at least one other unreported affiliated company, [                    ], and additional record information suggests that Meisen was not transparent about its potential affiliation with [              ].  Commerce's practice is to apply total AFA where a company does not timely report its affiliations, and, in this case, our awareness of [                    ] (an affiliate) and [                ] (a potential affiliate), was only obtained as a result of our investigation of this issue after verification.[289]

4. *Selection of an AFA Rate*

In deciding which facts to use when determining the AFA rate, section 776(b) of the Act and 19 CFR 351.308(c)(1) authorize Commerce to rely on information derived from:  (1) the petition; (2) a final determination in the investigation; (3) any previous review or determination; or (4) any information placed on the record.  In the underlying investigation, we determined that the Petition dumping margin of 262.18 percent, which was the highest corroborated dumping margin on the record, was the most appropriate margin to select for the application of adverse inference.  Therefore, in this final remand redetermination we continue to find 262.18 percent to be the appropriate margin to assign as AFA.

---

[289] *See*, *e.g.*, *Certain Corrosion-Resistant Steel Products from India:  Final Results of Countervailing Duty Administrative Review*; 2015-2016, 84 FR 11053 (March 25, 2019), and accompanying IDM at Comment 3, *aff'd Uttam Galva I*, 425 F. Supp 3d at 1371-72, *Uttam Galva II*, 518 F. Supp. 3d at 1339 and *Uttam Galva III*, 2022 U.S. App LEXIS 12135 at *10-11; *see also, e.g.*, *Certain Hardwood Plywood Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 FR 53460 (November, 16, 2017), and accompanying IDM at Comment 1, *aff'd Bayley*, 375 F. Supp. 3d at 1346.

## V.    DRAFT REMAND RESULTS COMMENTS

**Comment 1:  Whether Meisen Provided Adequate Documentation and Meisen's ILVQR Contained All Documentation Meisen Was Able to Submit**

*Meisen's Comments*

A.    <u>J&K GA</u>[290]

- Commerce's claim that Meisen failed to provide "any of the requested source documentation" is not supported by record information.  Meisen provided documentation to the best of its ability that was maintained and kept in the normal course of business.  Meisen provided a substantial amount of supporting documentation, such as bank statements, a tax return, a P&L statement from Quickbooks, and a complete 2018 sales extract from Quickbooks.

- Given that Meisen was only allotted five days to respond to Commerce's ILVQ, it was impossible to provide all invoices and bank statements to substantiate the differences in the sales revenues in J&K GA's Q&V reconciliation.

- Commerce appears not to be familiar with Quickbooks because all Quickbooks reports can be output to Excel, and those are the reports that Meisen provided.

- The sales summary used for the Q&V reconciliation is a full extract of the 2018 sales ledger from Quickbooks.  Commerce could have substantiated the creditability of this extract by comparing it to J&K GA's P&L statement, or by comparing any of the J&K GA sales in the U.S. sales database to the extract.

- Certain documentation provided for the Q&V reconciliation was also submitted three years ago in this investigation.

---

[290] *See* Meisen's Comments at 5-12.

- The J&K Companies operate as "Mom & Pop" shops and, therefore, the systems they use are not sophisticated.  Having an unsophisticated accounting software program is not a sufficient basis for punishing a respondent.

- For the adjustments made to the total value of POI sales for non-subject merchandise and intercompany sales, Quickbooks does not have a feature that would have allowed J&K GA to isolate those sales.  Therefore, these steps had to be done manually.

- For J&K GA's November 2018 reconciliation, J&K GA records sales in its Quickbooks in the "Sales" account at the time of payment.  Using the information that J&K GA maintains in the normal course of business, J&K GA identified the first and last sales based upon J&K GA's method of record keeping and it fully complied with Commerce's request.

B.   J&K IL[291]

- Commerce is not willing to accept documentation that was created for the sole purpose of responding to Commerce's request for information.

- The claim that Meisen provided limited source documentation for J&K IL's October 2018 reconciliation is incorrect.  Meisen submitted a complete October 2018 sales ledger, but Commerce incorrectly assumed that it was an "inventory sales" ledger.

---

[291] *Id.* at 12-13.

C.      Sales Terms and Destination[292]

- Meisen provided all source documentation for sales terms and destination that was available in its normal course of business for the six sales traces.

- Commerce found that the sales terms documentation submitted prior to the ILVQR was sufficient.

D.      Certain Movement Expenses and Entered Values[293]

- Considering time limitations and the limitations of the J&K Companies' accounting systems, it would not have been reasonable to require Meisen to report transaction-specific inbound freight expenses, nor would it have been possible for Meisen to report these expenses on a transaction-specific basis.

- The entered value of each transaction is not recorded in Quickbooks and reporting this information required the J&K Companies to manually populate each transaction in the U.S. sales database.

**Commerce's Position:**

We disagree with Meisen's assertion that it supplied all documentation necessary for Commerce to verify the accuracy of its U.S. sales database.  We also disagree with Meisen's claim that it supplied all documentation that it was able to provide in its ILVQR.  In Commerce's ILVQ, we outlined specific documentary requests and Meisen not only failed to fulfill all of those requests, but it also failed to notify Commerce of any difficulties in responding to those requests.[294]  Meisen's failure to supply the requested documentation resulted in Commerce not

---

[292] *Id*. at 13-14.
[293] *Id*. at 17-19.
[294] *See supra* at section IV.D.2.a., "Meisen's ILVQR Reconciliations"; *see also* Commerce's ILVQ at 4-6.

being able to tie the information reported in Meisen's U.S. sales database to source

documentation, rendering much of the information in the U.S. sales database unverifiable.

A.    J&K GA

As outlined above, Commerce's ILVQ specifically requested that every step of J&K

GA's Q&V reconciliation be accompanied by screenshots from its accounting system and

printouts of its P&L statement, trial balance, and sales ledger.[295]  We also specifically stated that,

to support any adjustments made to the total Q&V of the POI sales, Meisen must provide

supporting documents from its accounting system, "such as screenshots and printouts from the

general ledger, sub-ledger, *etc*."[296]  Meisen did not provide this source documentation.  Instead,

Meisen claims that the sales summary "extract" that was "directly generated from Quickbooks"

and its Excel version/report of its P&L statement constitute supporting documentation sufficient

for verification.

We disagree.  First, and most importantly, Meisen did not submit the specific information

requested by Commerce, *i.e.*, screenshots from J&K GA's accounting system, or explain why it

could not submit such information.  Indeed, underlying the majority of Meisen's comments is the

presumption that it can pick and choose which of the specific information requested by

Commerce it was required to supply.  In this case, we specifically, and clearly, requested

screenshots and printouts from J&K GA's accounting system.  However, Meisen did not provide

a single screenshot or printout to support its J&K GA Q&V reconciliation.[297]  We asked for this

information because we knew that this information was available to Meisen, and that this would

have been a sufficient method for linking J&K GA's tax return to the U.S. sales database.

---

[295] *Id*.
[296] *See* Commerce's ILVQ at 4.
[297] *See* Meisen's ILVQR at Exhibit SVE-4.

This information was reasonable to request and available to J&K GA.  The record demonstrates that J&K GA can produce screenshots of Quickbooks and that J&K GA's Quickbooks system has a "Print" feature that generates reports in a portable document format (PDF).[298]  Additionally, in its Q&V reconciliation, J&K IL provided screenshots from its Quickbooks system showing the monthly quantities and values of its sales, which tied to its sales ledger report, and it provided a screenshot of its P&L statement directly from its Quickbooks system.[299]  We also know, based on the various reports Meisen submitted throughout this proceeding, that both the "Print" feature (which prints reports from Quickbooks into PDF), and Meisen's ability to take screenshots of its Quickbooks accounts, are distinct features from Quickbooks' Excel report generation feature.  In sum, record information indicates that Meisen could have supplied other information, outside of Excel reports and worksheets, such as the screenshots or printouts we requested, but it decided not to do so.  Moreover, if Meisen was unable to provide screenshots and printouts as Commerce requested, it was obligated to notify Commerce of its difficulty in responding, and to respond to Commerce with an alternative method linking the third-party source documentation (*i.e.*, its 2018 federal tax return) to the U.S. sales database, using *source* documents.[300]

Meisen also suggests that it was impossible to supply documentation to support the differences between its tax return and its Quickbooks sales revenue worksheet because it was limited by the amount of time it was allotted to respond to Commerce's ILVQ.  Specifically, Meisen states that "in the five days allotted to prepare and provide the ILVQR sales

---

[298] *Id*. at Exhibit SVE-6.

[299] *Id*. at Exhibit SVE-3.  Of note, this is distinctly different from the P&L worksheet provided by J&K GA that we are unable to link to J&K GA's Quickbooks system.

[300] *See Mannesmannrohren-Werke Ag. v. United States*, 120 F. Supp. 2d 1075, 1097 (CIT 2000) (*Mannesmann*) (where the CIT explained that, if the respondent "was having difficulty responding to Commerce's requests it could have informed Commerce instead of silently resting on an inadequate response.").

reconciliations and manually cross {reference} all invoices recorded in Quickbooks against the bank statements to identify the specific payments that comprise the timing difference was an impossible task given the time allotted."[301]   However, we disagree that this task was insurmountable and could not be completed in the allotted time.  Meisen did not need to cross-reference "all" invoices, but only the ones where payment dates were recorded before or after the POI; considering Meisen's own statement that the difference was small, this task should not have required providing more than a handful of sales invoices.  Additionally, Meisen's assertion that it only had five days is false.  Including the extension that we granted, Meisen had a total of eight days to prepare its ILVQR.  In our response to Meisen's second extension request, we explained that the information requested in Commerce's ILVQ was less than the information that is typically requested during an in-person verification, and that the time allotted to the respondent to prepare its response to our ILVQ was longer than the time typically provided to respondents for in-person verifications.[302]   Therefore, we disagree that we afforded Meisen inadequate time to provide Commerce with the information requested in our ILVQ.

Meisen contends that its submission of "over 5000 pages of documentation in just the ILVQR" is sufficient for verification.[303]   While we acknowledge that the quantity of pages submitted is high, it is the quality of those pages that is relevant.  Meisen was required to submit source documentation tying the J&K GA sales information reported in its U.S. sales database to J&K GA's 2018 federal tax return, but in those 5,000 pages it failed to do so.

Second, while Meisen suggests that we assume that its Excel worksheets were directly sourced from J&K GA's Quickbooks system, the "sales summary extract" and the Excel

---

[301] *See* Meisen's ILVQR at 5-6.
[302] *See* Commerce's Letter, "In Lieu of Verification Questionnaire Response Second Extension Request," dated March 7, 2022.
[303] *See* Meisen's Comments at 7.

worksheet "P&L statement," which cannot be tied to J&K GA's accounting system, provided with J&K GA's Q&V reconciliation, are not source documents.  Meisen suggests that our assertion that these "reports" do not constitute source documentation is due to a lack of familiarity with Quickbooks.  However, this is not true.  Based on our experience with accounting systems such as Quickbooks, Excel reports cannot be assumed to be directly sourced from J&K GA's accounting system.  A download of data from an accounting system is not a source document in and of itself.  When data are downloaded and copied in a format different from the original source documentation, we have no assurance that the information in that download has not been manipulated or that it is an accurate copy.  Thus, to ensure the information received was accurate and has not been altered in any way, Commerce requested screenshots directly from the accounting systems themselves.  There is no indication that the Excel worksheets Meisen provided were directly sourced from Quickbooks and presented in their unaltered form, and Commerce cannot simply presume their authenticity for the purposes of verifying other information on the record.  To do so would defeat the purpose of verification. The CIT and the Federal Circuit have held that "secondhand 'summary reports' purporting to reflect information in source documents" are not equivalent to the original source documents.  In *Hung Vuong Corp.*, the CIT reiterated a finding made by the Federal Circuit, that "'failure to submit primary source documentation' means that Commerce is 'unable to verify the accuracy of the information submitted … internally generated documents cannot, for the purpose of verification, replace actual source documents.'"[304]

---

[304] *See Hung Vuong Corp.*, 483 F. Supp. 3d at 1349 (quoting *Thyssen II*, 1998 U.S. App. LEXIS 17064 at 13).  The CIT and the Federal Circuit held in *Hung Vuong Corp.* and *Thyssen II* that the application of facts available was warranted because certain information was unverifiable due to the respondents' failures to provide original source documentation.

Moreover, record information suggests that these worksheets were not directly sourced from Quickbooks. The 2018 sales "extracts" (*i.e.*, the "sales summary" at Exhibit SVE-4 and the 2018 sales ledger at Exhibit SVE-6) contain modifications, and, therefore, could not have been "directly generated from {J&K GA's} Quickbooks" as Meisen claims.[305] Specifically, in the "sales summary" worksheet, under each month there is an Excel cell containing a formula, calculating the sum of several fields, and at the top of the worksheet, there are more cells containing formulas, calculating the sum of the total value of sales.[306] In the 2018 "sales ledger" provided with J&K GA's November 2018 reconciliation, Meisen removed the part of the ledger that would have included discounts and refunds.[307] A worksheet with formulas created for the purpose of the verification exercise cannot possibly have been "direct" from Quickbooks.

The 2018 Excel "P&L statement" also does not appear to be directly derived from Quickbooks either. We explain *supra* that the "P&L statement" Excel worksheet begins with a Quickbooks sales revenue amount that Meisen does not tie to the Quickbooks sales revenue amount used for its tax return reconciliation.[308] Meisen stated that it:

> acknowledges that an explanation for the minor discrepancy … was warranted, {and that} this constitutes an unreconciled difference …. What is more important to note is that Meisen provided documentation and support to the best of its ability and for negligible line items … it was simply not able to do so due to the fact that it did not have or did not maintain this level of detail in its records in the normal course of business.[309]

Meisen's ILVQR thus fails to tie J&K GA's 2018 total sales revenue in step one of its Q&V reconciliation to the "P&L statement" Excel worksheet total sales revenue in step two of its Q&V reconciliation, and it is unreasonable to suggest that J&K GA could not have explained

---

[305] *See* Meisen's Comments at 9.
[306] *See* Meisen's ILVQR at Exhibit SVE-4 Step 1B.
[307] *Id*. at Exhibit SVE-6 *cf*. Exhibit SVE-4 Step 2A.
[308] *Id*. at Exhibit SVE-4, Step 1A; *cf. id*. at Step 2B. In Meisen's Comments, it acknowledges that this difference "is unreconciled" and should be explained, but it remains unexplained. *See* Meisen's Comments at 7.
[309] *See* Meisen's Comments at 8.

the difference between these two figures due to lacking *any* supporting record information for said difference. Because the information in the P&L worksheet conflicts with other information submitted by J&K GA, and because Meisen did not link source documentation to this P&L worksheet, we have no reason to assume that it was directly derived from Quickbooks.

Meisen argues that Commerce could have verified the accuracy of its 2018 "sales summary" by comparing it to J&K GA's "P&L statement," or by comparing it to any of the J&K GA sales in the U.S. sales database. This suggestion fails to understand the purpose of verification using source documentation. Commerce cannot confirm the accuracy and completeness of a worksheet using another worksheet that is not supported by source documentation, or using by the U.S. sales database, the specific information we were attempting to verify. The only way that these worksheets could have been verified as accurate was by tying them to the original source, *i.e.*, J&K GA's accounting system.

Meisen also points out, without explaining the relevance, that certain worksheets provided in J&K GA's Q&V reconciliation were provided three years ago in response to a previous questionnaire.[310] The fact that J&K GA submitted a Q&V reconciliation three years ago is of no relevance. In Commerce's ILVQ, we provided J&K GA with the opportunity to substantiate its worksheets, clearly outlining the information we needed, and allowing Meisen an opportunity to explain and substantiate any differences between its tax return, its accounting system, and its U.S. sales database. Regardless of the information that was previously submitted (which notably, did not contain source documentation from J&K GA's accounting system, and did not attempt to tie the Q&V of J&K GA's POI sales to a third-party source document[311]), Meisen did not comply with the requests in Commerce's ILVQ.

---

[310] *Id.* at 9.
[311] *See* Meisen's August 23 Reconciliations at Exhibit C-15f.

In the Draft Remand Results, Commerce found that adjustments made to the POI sales revenue for internal and non-subject merchandise sales are not supported by source documentation.  In its comments, Meisen reiterates that its internal and non-subject merchandise sales adjustments were done manually because it cannot isolate this information within the Quickbooks system.  However, that these were manual adjustments does not undermine this finding and it also did not preclude Meisen from providing source documentation to support at least some of the information supplied in the steps taken to make these adjustments (*e.g.*, sample invoices of non-subject merchandise/internal sales that could be tied to these lists).

Regarding the reconciliation of J&K GA's November 2018 sales, Meisen claims that it used information from its normal books and records to select the first and last sales reported to Commerce.  Meisen further explains that it selected the first and last sales based on the time of payment because it recorded sales in its accounting system upon payment.  While this very well may be the case, this argument does not entirely address the issue explained in the Draft Remand Results.[312]  As we explained, "in light of the inadequate and incomplete information that Meisen supplied in its ILVQR, we are unable to definitively determine whether Meisen provided support for the first or last November 2018 sales reported in the U.S. sales database, as we requested."[313] In other words, Meisen failed to supply requisite source documentation for the verification of J&K GA's November 2018 sales, *i.e.*, a printout from Quickbooks of all of J&K GA's November 2018 sales.  Further, in its comments, Meisen did not point us to anything on the record to substantiate its assertion that these were indeed the first and last sales made by J&K GA in November 2018.  Accordingly, Meisen's claim that these were the appropriate sales, while potentially reasonable, is unverifiable.  We have no way of knowing whether there was a

---

[312] *See* Draft Remand Results at 19.
[313] *Id*. at 20.

sale paid for before the first purported sale, and we have no way of knowing whether there was a sale paid for after the last purported sale.  Despite our request, Meisen provided no documentation that would have allowed us to confirm that these selected sales were correct.

Finally, regarding J&K GA's reconciliations, Meisen argues that a "lack of sophistication in the use of an accounting software program is not a sufficient basis to punish a respondent."[314] We disagree with Meisen's characterization of our findings.  We are not penalizing Meisen for its U.S. affiliates' use of Quickbooks or a self-proclaimed "lack of sophistication."  In fact, we did not take issue with J&K IL's Q&V reconciliation, which relied entirely on Quickbooks.  We are simply unable to rely on the data provided for J&K GA because we do not have any assurance that the downloaded information used for the Q&V reconciliation is an accurate reflection of the actual information recorded in J&K GA's Quickbooks accounts, or that the sales selected for the November 2018 reconciliation were, in fact, the first and last sales booked in J&K GA's Quickbooks system during that month.

B.    J&K IL

With respect to J&K IL's October 2018 reconciliation, Meisen states that it provided the highest value sales from the month as requested, and that it provided its October 2018 sales ledger.  Meisen explained that it selected the highest value invoice – using an invoice price inclusive of sales taxes, which is why its selected invoice did not match the highest invoice value reported in the U.S. sales database (where all values are reported exclusive of taxes).  Similar to our findings for J&K GA's November 2018 reconciliation, we find that Meisen's explanation for the highest value invoice selected is potentially reasonable, but we continue to find that this

---

[314] *See* Meisen's Comments at 10.

information is unverifiable due to Meisen's failure to supply the specific information that we requested (which would have confirmed Meisen's explanation).

Regarding J&K IL's October 2018 reconciliation, Meisen also states that "in fact, {Commerce} has is {sic} not willing to accept documentation that is created for the sole purpose of responding to {Commerce's} request for information."[315]  This argument is circular.  We agree with the notion that Commerce will not consider documentation created for the sole purpose of responding to a request for information to be source documentation.  We explain in detail above that Commerce cannot rely on anything other than original documentation as a "source" without first being assured that the data have not been manipulated or altered.  Further, ample case precedent supports the fact that Commerce does not consider documents created for the sole purpose of reporting to Commerce to be source documents.[316]

Meisen notes that we incorrectly "assumed" that a document labeled "October 2018 Sales Ledger - J&K IL," with a subheading of "Inventory" was an "'inventory sales ledger."  Because we relied on the record information in determining how to refer to this document, we disagree that we "assumed" that this document was an "inventory sales ledger."[317]  We agree that it is incorrect to refer to this document in its entirety as an inventory sales ledger.  In the analysis above, we removed all references to an inventory sales ledger and instead refer to the document as a sales ledger worksheet.  Also of note, this minor discrepancy in terminology does not impact our analysis of the information that Meisen did and did not provide in its ILVQR.

---

[315] *Id.* at 12.
[316] *See, e.g., Forged Steel Fittings from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 50339 (October 5, 2018), and accompanying IDM at Comment 5; *see also, e.g., Stainless Steel Bar from Spain:  Final Results of Antidumping Duty Administrative Review*, 72 FR 42395 (August 2, 2007), and accompanying IDM at Comment 2.
[317] In this sales ledger worksheet, there are sub-headings for "Inventory," "Total Inventory," "Parts," "Total Parts," "Service," "Total Service," "Other Charges," "Total Other Charges," "Discounts," and "Total Discounts."  *See* Meisen's ILVQR at Exhibit SVE-5.

Meisen also contends that the October 2018 sales ledger it provided is sufficient for the October 2018 sales reconciliation exercise, but we disagree.  We requested that Meisen "provide a print-out of the 'sales' account from Quickbooks for October 2018 sales.  Using screenshots from your accounting system, tie the total values *in this account* for this month to your U.S. sales reconciliation worksheets."[318]  The October sales ledger, which is a purported download of the quantity and value of each product sold, is not a printout of the sales account as Commerce requested.[319]  Meisen's argument that the documentation it provided is sufficient is undermined by two facts:  (1) J&K IL understood our request because it provided some, but not all of the documentation we requested;[320] and (2) we are unable to confirm that J&K IL provided the highest value sales invoice from October 2018 without complete source documents.  Therefore, J&K IL understood what information it was asked to provide (*i.e.*, a complete printout of the sales account from October 2018), but did not provide it, and this choice prohibited Commerce from being able to verify J&K IL's October 2018 sales as accurate.

C.   <u>Sales Terms and Destination</u>

Meisen does not provide any further clarification or explanation as to how the documents it provided demonstrate the reported sales terms and destinations reported in the U.S. sales database are accurate.  Instead, Meisen only claims that it provided all source documentation for the reported sales terms and destination in its ILVQR that was available in the normal course of business.  Meisen also does not state why it was unable to provide the requested source documentation, or how it was able to report information in its U.S. sales database prior to submitting its ILVQR without this documentation.  However, the information reported in the

---

[318] *See* Commerce's ILVQ at 4 (emphasis added).
[319] *See* Meisen's ILVQR at Exhibit SVE-5.
[320] *Id*.

U.S. sales database, for which we found Meisen did not support its reported sales terms and destinations, must have come from some source.

Meisen does not claim to have reported its U.S. sales database from memory, nor does it claim to have discarded the documentation that it relied upon for reporting its sales database. Therefore, Meisen should have been able to provide the requested source documentation to support its reporting in the U.S. sales database.  Of course, suggesting that the information reported in the U.S. sales database was derived solely from memory would not only seem impossible for [     ] transactions, but it also, again, would call into question the accuracy of the U.S. sales database.  Further, Meisen brought this case before the CIT, and specifically "asked the court to remand this case with instructions to verify Meisen's data{.}"[321]  Thus, because we notified Meisen that the source of all information it submitted on the record would be used by Commerce for verification,[322] and we placed onto the record *five* verification outlines where we outlined the types of documents we required from Foremost and Ancientree, the other two respondents at verification,[323] all of which were available to Meisen.  Meisen had ample notice that the J&K Companies would need to retain the source documentation relied upon for reporting the U.S. sales database.  Accordingly, we disagree with the notion that Meisen was not aware of or otherwise unable to provide the source documentation necessary to demonstrate how it determined the information it reported in the U.S. sales database.

As Meisen points out in its comments, and as we addressed in the Draft Remand Results, Meisen did provide sales invoices prior to submitting its ILVQR (some of which were self-

---

[321] *See Remand Opinion and Order* at 18.
[322] *See* Initial Questionnaire at G-4.
[323] *See* Commerce's Letters, "Verification Agenda," dated October 16, 2019; "Third Country Reseller Verification Agenda," dated October 18, 2019; "Verification Agenda," dated October 17, 2019; "Verification Agenda," dated December 9, 2019; and "Verification Agenda," dated October 24, 2019.

selected) that clearly indicated the sales terms of those sales.[324]  This demonstrates that the J&K

Companies do record more information about their sales than the information provided within

Meisen's ILVQR, and that it is reasonable for Commerce to expect that the J&K Companies

maintain this information.  Further, that Meisen provided sales invoices with the sales terms on

them previously does not alleviate Meisen of its obligation to allow Commerce to verify the

accuracy of the information reported in its U.S. sales database for the sales selected in

Commerce' ILVQ.

D.      Certain Movement Expenses and Entered Values

        Meisen argues that the time limitations and the limitations of the J&K Companies'

accounting systems made it unreasonable and impossible for Meisen to report transaction-

specific inbound freight expenses.  Meisen thus acknowledges that it was capable of reporting

transaction-specific inbound freight expenses, but that it did not do so because it would have

been too cumbersome given the various restraints the company faced.[325]  Again, Meisen claims

that it was reasonable for it to determine, without consulting Commerce, and contrary to

Commerce's regulations and its own record statements, the appropriate way to report its

information.

        As explained above, 19 CFR 351.401(g)(1) permits respondents to rely on allocations

only where "transaction-specific reporting is not feasible."  In cases where the respondent is able

to report transaction-specific information, but to do so would be too cumbersome, 19 CFR

351.401(g)(2) states:

> Any party seeking to report an expense or a price adjustment on an allocated basis
> must demonstrate to {Commerce's} satisfaction that the allocation is calculated
> on as specific a basis as is feasible, and must explain why the allocation
> methodology used does not cause inaccuracies or distortions.

---

[324] *See* Meisen's Comments at 13; *see also* Draft Remand Results at 31 (n. 110).
[325] *See* Meisen's Comments at 17.

In this case, Meisen never notified Commerce that it was possible for the J&K Companies to link inbound freight expenses to individual sales. Meisen also never asked to use an alternative methodology or implied that any other methodology than the one it employed was available. Further, Meisen never demonstrated that its allocation methodology was not distortive.

The responses to Commerce's questionnaires made it impossible for Commerce to identify that Meisen had the ability to report transaction-specific information prior to the ILVQR because Meisen submitted several misleading statements. Specifically, Meisen stated the following:

- "Because the sales from all Meisen affiliates in the U.S. to the first unaffiliated customers usually go into the inventory of the affiliate (*i.e.*, J&K Dallas here) *it is not possible* to directly trace the sale to the first unaffiliated U.S. customer to an entry, and to a Form 7501."[326]
- "The J&K Companies do not link inbound freight expenses to the final product sold."[327]
- "As explained above, the J&K Companies do not link inbound freight expenses to the final product sold."[328]
- "Because the J&K Companies do not track {freight between the J&K Companies} on {*sic*} transaction-specific basis, these expenses have been allocated over total shipment volume for each location to derive an expense factor used to calculate the freight expenses reported in field USOTHTRU."[329]
- "{S}ince the J&K Companies sell the merchandise from inventory, the merchandise that was imported during the time period September 24, 2018 to December 31, 2018, may not have been sold by the J&K Company during the same time period. The J&K Companies have been conservative and assumed all sales made on or after September 24, 2018, incurred the additional Section 301 duties for purposes of this response."[330]
- "All purchases from Meisen are commingled in inventory at the J&K locations. Given that the J&K Companies *are unable to link inventory entries to exits*, the reported entered value is based on the transfer prices in effect during the POI between Meisen and the J&K Companies."[331]

---

[326] *See* Meisen's May 13 SRA at 7 (emphasis added).
[327] *See* Meisen's July 19 CQR at 32.
[328] *Id*. at 34.
[329] *Id*. at 36.
[330] *Id*. at 37.
[331] *See* Meisen's August 27 SCQR at 44 (emphasis added).

Had we known that transaction-specific information was available, and that Meisen claimed not to have the resources to report it, we would have been able to request that Meisen fulfill its regulatory obligation to demonstrate that its allocation methodology did not cause inaccuracies or distortions. Instead, Meisen led Commerce to believe that Meisen and the J&K Companies had no way of reporting transaction-specific inbound freight expenses. We, therefore, did not request that Meisen demonstrate whether the allocation methodology it used was accurate and non-distortive. Given that Meisen had the ability throughout this proceeding to provide transaction-specific inbound freight, as indicated by its ILVQR,[332] but did not provide any indication of its ability to do so until its ILVQR, Commerce was precluded from analyzing and determining whether the allocation methodology used by Meisen is acceptable.

Rather than making several misleading and inaccurate statements to support the information it wanted to report, Meisen was obligated to notify Commerce of any difficulties it faced when responding to Commerce's requests for information. In the Initial Questionnaire, we notified Meisen that "if an interested party promptly informs Commerce of difficulties it is having in responding to a request for information, Commerce will consider modifying its request to the extent necessary to avoid imposing an unreasonable burden of the party."[333] Moreover, Meisen is familiar with how to notify Commerce of difficulties in reporting, but it simply failed to do so.[334]

---

[332] *See, e.g.*, Meisen's ILVQR at 12 ("As supporting documentation, the J&K Companies are providing the following which are the only documents related to this transaction retained by the J&K Companies: … Form 7501 and Exhibit SC-33 Extract for entered value; Bill of Lading and Arrival Notice; Invoice from Meisen to J&K Company…").

[333] *See* Initial Questionnaire at I-7.

[334] For example, on June 19, 2019, one of the other mandatory respondents, Foremost, submitted a letter onto the administrative record explaining difficulties it had in reporting certain information. *See* Foremost's Letter, "Notice of Reporting Difficulties and Reporting Exemption Request," dated June 19, 2019. Based on Foremost's explanation, after considering the reasonableness of its request, we partially granted its request. *See* Memorandum, "Reporting Exemption Request," dated June 26, 2019. Importantly, in our response, we noted that the facts underlying the request were subject to verification. *Id*. What is notably different in Meisen's situation is that

In *Mannesmann*, the CIT held that the respondent's argument, "that its records and the time allowed to it to reply were insufficient to allow a complete response" was inappropriate because it is the respondent's burden to develop the record.[335]  The CIT explained that, if the respondent "was having difficulty responding to Commerce's requests, it could have informed Commerce instead of silently resting on an inadequate response."[336]  Therefore, consistent with *Mannesmann* and with the information reported on the record, we continue to find that Meisen misrepresented the information it was *able* to report, and that it failed to fulfill its obligation to build an accurate record and notify Commerce of any difficulties it had in responding to requests for information; as a result, we are unable to establish that these allocated inbound movement expenses were accurate and not distorted.

A similar rationale can be attributed to our finding with respect to Meisen's reported entered values.  Meisen clearly stated that it was unable to link its entries with its sales, and for this reason it needed to use Meisen's internal transfer price lists to report its entered values.[337]  Then, for the first time in its ILVQR, Meisen reported that it did have the ability to link its entries to its sales.[338]  Therefore, it is reasonable to infer that Meisen could have reported the entered values for each sale.  Interestingly, Meisen argues that it would have been too cumbersome to individually report each entered value, yet Meisen *manually entered* each entered value using price list prices.  The fact that Meisen could manually enter the price list prices undercuts its argument that it could not have instead have reported the *actual* entered values it

---

Meisen's responses prevented Commerce from both understanding any difficulties it may have had in reporting, and also from verifying that its statements were true (in fact, upon verification, we discovered that the statements it did make were not true).

[335] *See Mannesmann*, 120 F. Supp. 2d at 1097.

[336] *Id.*

[337] *See, e.g.*, Meisen's August 27 SCQR at 44.

[338] *See, e.g.*, Meisen's ILVQR at 12.

had in its possession.[339]  Even if we were to accept the idea that the determination and manual

entry of the pricelist prices as entered values was significantly less burdensome than reporting

the actual entered values (though Meisen makes no such claim), Meisen was not at liberty to

misrepresent the information it had in its possession, and it was required to notify Commerce of

any difficulties it had in reporting the specific information requested.  By withholding this

information, Meisen has self-selected the information it reported, not only for entered value, but

for all the variables that rely on the entered value (*i.e.*, warranty expenses, U.S. customs duties,

section 301 duties, and inventory carrying costs).

Therefore, after consideration of the above arguments made by Meisen, we continue to

find that Meisen failed to provide all documentation requested, and that Meisen was indeed able

to provide such documentation.  We also find the following:  all of J&K GA's sales, J&K IL's

October sales, and the sales terms, destinations, inbound freight expenses, and entered values

reported in the U.S. sales database, were unverifiable.

**Comment 2:  Whether Inconsistencies and Errors in Meisen's ILVQR are Significant**

*Meisen's Comments*

A.     <u>J&K GA Q&V Reconciliation</u>[340]

- The difference due to a time lag between the sales reported in J&K GA's tax return

  and the Quickbooks revenue amount is negligible ($[      ], or only [    ] percent of

  J&K GA's total 2018 sales revenue).

- The unreconciled difference between the 2018 sales ledger extract from Quickbooks

  and the P&L statement from Quickbooks is also negligible ($[       ] or [    ]

  percent).

---

[339] *See* Meisen's Comments at 19.
[340] *Id*. at 6-10.

- Negligible differences in a Q&V reconciliation do not warrant the application of total AFA.[341]  The courts have consistently held that the purpose of the antidumping duty (AD) law is remedial, not punitive, and therefore, instead of applying AFA, it would have been more reasonable for Commerce to make a downward adjustment to the J&K GA invoice prices equal to these differences.[342]

- Commerce states that the information in "the sales ledger extract for January to June 2018 conflicts with information presented in Exhibit SVE-6," but this is wrong.

- Commerce provided a calculation of J&K GA's 2018 sales ledger POI sales value that Meisen does not understand.  To reconcile the 2018 sales ledger to J&K GA's Q&V reconciliation, Commerce should compare the $[    ] calculated in J&K GA's Q&V reconciliation to the total value recorded in the sales ledger provided in Exhibit SVE-6 ($[    ]).  The difference, $[    ], is equal to the value of internal sales.

B.   Sales Terms[343]

- The five sales traces with insufficient documentation of sales terms only represent 0.0015 percent of the total sales quantity.  It is, therefore, inappropriate to apply AFA to all U.S. sales on this basis.

---

[341] *Id*. at 6 (quoting *Nippon Steel*, 337 F.3d at 1382, and citing *Certain Uncoated Groundwood Paper from Canada: Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018) (*Uncoated Paper from Canada*), and accompanying IDM at Comment 98 and *Stainless Steel Sheet and Strip in Coils from Taiwan; Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 67 FR 76721 (December 12, 2002) (*Sheet and Strip from Taiwan*), and accompanying IDM at Comment 7).
[342] *Id*. at 8 (quoting *Nucor Corp. v. United States*, 414 F.3d 1331, 1336 (Fed. Cir. 2005) (*Nucor*)).
[343] *Id*. at 13.

C.      <u>Destination</u>[344]

- Commerce mischaracterizes the methodology used by Meisen and the J&K
  Companies to report the transaction-specific destination for U.S. sales.

- The destination inconsistencies in the four sales traces in the ILVQR have no impact
  on the differential pricing analysis because the four sales traces with inconsistent ZIP
  codes belong to the same region for the purpose of Commerce's differential pricing
  analysis.

- The only sale with inconsistent destinations that impacts the differential pricing
  analysis is the one in the CONNUM-specific reconciliation, which only represents
  [     ] percent of the total sales quantity.  This trivial difference does not warrant the
  application of AFA to all U.S. sales.

D.      <u>Purchaser</u>[345]

- The omission of a single customer code from the customer code list does not warrant
  total AFA.  It is simply the result of the enormous amounts of data that Meisen placed
  on the record.

- The customer code list was on the record prior to the issuance of Commerce's ILVQ,
  but Commerce did not seek clarification regarding customer code discrepancies.

E.      <u>Product Characteristics</u>[346]

- For both sales trace four and five, Meisen appropriately and reasonably selected
  similar/identical products to those sold to the customer for the purpose of assigning
  the product characteristics.

---

[344] *Id*. at 14.
[345] *Id*.
[346] *Id*. at 15-17.

- For sales trace four, J&K NJ did not import the product it sold. It custom assembled a range hood using leftover pieces and parts from other products imported prior to the POI and reported the characteristics of the product it sold, a range hood.

- For sales trace five, the customer only purchased a frame of a cabinet, but was charged for an RTA cabinet. The product characteristics for [          ] (*i.e.*, [        ]) are comparable/matching to the product sold to the customer.

- For CONNUM-specific reconciliation three, a [              ], Meisen reported the characteristics of the final product.

- Commerce instructed Meisen to report the specifics of the merchandise actually shipped in the field PRODCODU1. Therefore, for sales trace four, the entire transaction was reported using the physical characteristics of [       ], [        ]. Contrary to Commerce's suggestion, Meisen should not have created a new product code for cabinet frames. Meisen also had no need to notify Commerce of this issue. Unlike surface coating, there was no need to create a new product code for cabinet frames because there was a comparable product code, with its associated product characteristics, available.

- For CONNUM-specific reconciliation three, Commerce assumed that: (1) Meisen produced, and that the J&K companies imported, a related product to the product that was sold; and (2) the CONNUM for that imported product could have been reported. This is the type of issue that Commerce would have raised and Meisen would have explained at an in-person verification.

- Even accepting that Meisen incorrectly reported the product characteristics for sales traces four and five, and CONNUM-reconciliation three, the impact of these errors is insignificant (*e.g.*, range hoods account for only [    ] percent of total sales value) and they should not serve as the basis for the application of total AFA.

- For CONNUM-specific reconciliation two, the product, a [              ], was correctly reported as an [              ].

F.    Entered Values[347]

- Entered values are not used to calculate importer specific assessment rates.  In an investigation, they are used only to calculate certain price adjustments.

- Minor differences in entered values do not have a material impact on the price adjustments Commerce would calculate for warranty expenses, U.S. customs duties, section 301 duties, and inventory carrying costs because each of those expenses was based on allocation methodologies and not an invoice or line-item specific amount.

- Meisen manually populated the values in the entered value field for each of the transactions in the U.S. sales database using pricelists from Meisen for two separate pricing periods.  Manually entering so many entered values inevitably leads to minor data entry errors.

- The sales with incorrect entered values constitute just minor corrections against even the most rigorous verification standards.  It is Commerce's practice to accept minor corrections when the impact is on a small percentage of the database, and when they are the result of clerical errors.[348]

---

[347] *Id*. at 18-20.
[348] *Id.* at 19-20 (quoting *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Ukraine:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 35272 (July 2, 2021) (*Pipe from Ukraine*), and

- The methodology used for reporting the entered values for sales traces four and five was reasonable because it was based on the best information available. Commerce cannot fault Meisen and assign total AFA when it used and reported the best information available.

- Commerce claims that Meisen should have reported the entered value of the RTA cabinet imported for sales trace five, even though the customer only purchased the frame of that cabinet. This transaction was unique and the information from this sale should not be used to infer that the methodology of reporting entered values for the entire database is incorrect.

- The Federal Circuit has held that draconian penalties are inappropriate for clerical errors[349] and that the AD law is not intended to be punitive or retaliatory.[350]

G.    Other ILVQR Errors[351]

- The assertion that Meisen failed to accurately report its further manufacturing expenses is incorrect. Meisen acted to the best of its ability to accurately report its further manufacturing expenses in the U.S. sales database.

- The two sales traces that Commerce identified represent only [     ] percent of the total sales quantity and cannot be used to indicate errors exist within the whole database. Therefore, the application of AFA to all U.S. sales on this basis is inappropriate.

---

accompanying IDM at Comment 1; *Certain Hot-Rolled Steel Flat Products from the United Kingdom:  Final Determination of Sales at Less Than Fair Value*, 81 FR 53436 (August 12, 2016) (*HRS from the UK*), and accompanying IDM at Comment 1; and *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 77 FR 64475 (October 22, 2012) (*CWP from the UAE*), and accompanying IDM at Comment 1).

[349] *Id*. at 20 (quoting *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208-09 (Fed. Cir. 1995) (*NTN Bearing*)).

[350] *Id*. at 21 (quoting *Nucor*, 414 F. 3d at 1336 and citing *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1206 (Fed. Cir. 2014) (*Guangdong Wireking*)).

[351] *Id*. at 21-22.

**Commerce's Position:**

We disagree with Meisen's assertions that the inconsistencies and errors discovered at verification are minor and do not justify the application of total AFA.  We also disagree with the notion that Meisen acted to the best of its ability when reporting product characteristics, inbound movement expenses, and entered value information, without notifying Commerce of its difficulties in reporting its data in the manner it was requested.  In Meisen's ILVQR, we discovered many unreconciled and unsupported inconsistencies.  Specifically, there were several unsupported discrepancies throughout J&K GA's Q&V reconciliation, in the sales traces and CONNUM-specific reconciliations, and between what we requested Meisen report, what Meisen said it reported in its U.S. sales database, what Meisen actually reported in its U.S. sales database, and the source documentation provided.  This was the case for the fields reporting product characteristics, sales terms, destinations, entered values, further manufacturing expenses, shipment date, and inbound freight expenses, and as discussed above, and in additional detail below, the impacts of these discrepancies, individually and collectively, are significant.  As a result of these multiple verification failures, we continue to find that we are unable to rely on the U.S. sales database in its entirety.

It is important to note that, in its comments, Meisen does not disagree with most of our findings.  Meisen does not oppose our findings with respect to most of the discrepancies we found in our discussion of J&K GA's Q&V reconciliation, the unreconciled/inconsistent sales terms, inconsistent destinations, unreconciled customer codes, incorrect entered values, unreported further manufacturing expenses, or an incorrect shipment date.  In fact, Meisen did not comment at all on our finding regarding the incorrectly reported shipment date discovered at

verification.  Instead, Meisen focuses on the number of sales where we discovered these issues,

and its belief that it acted reasonably when reporting incorrect information.

Woven throughout Meisen's Comments is the argument that the discrepancies and errors

discovered at verification are all too small to warrant the application of total AFA to Meisen.

Meisen provides some figures regarding the percentage of sales affected by the discrepancies in

an attempt to support its argument.[352]  However, Meisen appears to misunderstand the purpose of

verification.

As Commerce has consistently explained, "{v}erification, by its nature, is an exercise in

sampling."[353]  During verification, Commerce selects samples of record information and

attributes the accuracy of those samples to the rest of the data supplied by the respondent.

Hypothetically, if the results of Meisen's ILVQR were the inverse of what they are (*e.g.*, Meisen

provided all source documentation necessary for six sales traces, and all documentation tied to

the U.S. sales database), Meisen would, and should, expect us to infer that the accuracy of those

six sales traces to the rest of the U.S. sales database.[354]  Indeed, it would be unreasonable for us

---

[352] According to Meisen:  (1) the difference between J&K GA's total Quickbooks revenue and federal tax return
revenue is [     ] percent of J&K GA's total sales value; (2) the difference between J&K GA's total Quickbooks
revenue and J&K GA's total Quickbooks revenue in its P&L statement is [     ] percent; (3) the number of incorrect
sales terms in the sales traces represents only [     ] percent of the total sales quantity; (4) the "one" inconsistent
region (per the differential pricing analysis) discovered in the ILVQR is only [     ] percent of the total sales
quantity; (5) range hoods, one of which was found in Meisen's ILVQR to be incorrectly reported, only account for [
] percent of the total sales value, while the number of other incorrect CONNUMs discovered in the ILVQR are
insignificant; (6) sales discovered to have incorrect entered values only represent [     ] percent of total sales
quantity; and (7) sales discovered to be incorrectly reported without further manufacturing expenses only account
for [     ] percent of the total sales quantity.
[353] *See TRBs from China* IDM at 14 (n. 65).
[354] *See, e.g., Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Determination of Sales at
Less Than Fair Value*, 81 FR 49953 (July 29, 2016), and accompanying IDM at Comment 5 ("{A}s a
reasonableness test of POSCO's standard yield losses, we compared, for a sample product, the product-specific
standard yield losses at several stages of production to the POI average actual yield losses{.}"  Based on this sample
product that we selected for verification, we determined that POSCO appropriately captured its yield losses, and
therefore its entire cost database also appropriate captured yield losses.); *see also, e.g., Certain Hot-Rolled Steel Flat
Products from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 81 FR 53419 (August
12, 2016), and accompanying IDM at Comment 7 (We tested the accuracy of POSCO's assertion that the material
terms of sales could change after the purchase order/confirmation date for certain sales channels and, after "we

---

to look at six accurate and complete sales traces, determine that our findings were so restrictive that they cannot be applied to the U.S. sales database, and, therefore, presume that the remainder of the U.S. sales database is unverified.  Yet, that is the exact rationale Meisen argues we should apply here.

As the CIT explained, "verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness.  Normally, an audit entails selective examination rather than testing an entire universe."[355]  The CIT also held that "{v}erification is a spot check and is not intended to be an exhaustive examination of the respondent's business."[356]  Further, as we cite above, the CIT unmistakably noted that applying the information from sample information to the entirety of a submission is reasonable:

> While the impact of the discovered errors, taken alone … may be small, Commerce could reasonably infer that there may remain other errors.  Thus, Commerce's determination that {the entirety of a particular submission} is unreliable is not unreasonable.[357]

Consistent with these CIT holdings, in this case we are treating the information discovered at verification as a representative sample of the information within the rest of the administrative record.

In addition to Commerce's practice and the CIT's holdings, this administrative record strongly indicates that where there is one error in Meisen's U.S. sales database, it is likely that multiple errors exist.  In fact, when we discovered errors within the U.S. sales database, they

---

collected samples contracts, order, and invoice summaries," Commerce "found meaningful material changes following the purchase order/confirmation date in each of the … channels verified."  As a result, we continued to use the information reported by the respondent).

[355] *See Bomont*, 733 F. Supp. at 1508.

[356] *See Monsanto Co. v. United States*, 698 F. Supp. 275, 281 (CIT 1988) (*Monsanto*).

[357] *See GOQ*, Slip Op. 2022-21 at 18-19.

were rarely, if ever, singular in nature.[358]  For example, in Commerce's Post-Prelim

Questionnaire, we specifically noted that Meisen's U.S. sales database contained pervasive errors

and inaccuracies due to the significant number of transactions impacted by each issue identified:

> In {Meisen's August 27 SCQR}, you responded to sixteen requests for
> clarification by stating that the identified issue was due to clerical/data entry
> errors and that the issue has been corrected in the revised database.  These errors
> were related to what appear to be high expenses or revenues relative to gross unit
> price (assembly revenue, modification revenue, repacking revenue, warranty
> expenses), missing or unreported expenses (U.S. other transportation,
> commissions) or [            ] values (modification revenue, advertising expenses,
> warranty expenses, entered value).  You also stated that you corrected missing
> invoice dates, missing shipment dates, missing entered values, and incorrect
> payment dates.
>
> Notwithstanding the difficulties associated with reviewing a database that has
> been substantially revised to address pervasive errors and inaccuracies, it is not
> clear based on your revisions that the identified errors have been sufficiently
> remedied.  For example, your database still contains [  ] observations with
> missing shipment dates and [     ] observations with missing payment dates, and
> payment dates [                                    ]date of sale and [       ]
>                                        ]date of sale.[359]

After outlining these issues, we requested that Meisen correct several inconsistencies within its

sales database.[360]  These errors impacted numerous transactions.[361]  Further, even after we put

---

[358] Throughout Meisen's August 27 SCQR, we discovered many issues – none of which were limited to a single error.  For example:

- Meisen stated, "the dates for these transactions were reported incorrectly for [     ] out of [      ] transactions identified by {Commerce}."
- Commerce stated, "you report [     ] billing adjustments …."  In response, Meisen explained, "the J&K Companies have determined that these were physical returns and did not involve any adjustments to the price."
- Commerce stated, "you reported [    ] observations with modification revenue in excess of [     ] percent of gross unit price …."  In response, Meisen stated, "{t}he … amounts reported for these observations were due to clerical error."
- Commerce noted that "[    ] observations {were reported with} warranty expenses in excess of [    ] percent of gross unit price."  Meisen explained that "{t}his was a clerical error …."

[359] *See* Commerce's Letter, "Post-Prelim Supplemental Questionnaire," dated October 24, 2019, at 7 (Commerce's Post-Prelim Questionnaire)).
[360] *Id*. at 8.
[361] *See* Meisen's November 6 PPQR at 18, 23, 25, 26, 29, and 32 (For example:  "As a result of the corrections, there are no longer any missing shipment dates and [    ] records with missing payment dates …. For [        ] of the

Meisen on notice for its pervasive errors and inaccuracies, we discovered more errors during this remand proceeding – impacting thousands of transactions.[362]  Therefore, based on record information, we have no reason to assume that the issues discovered in Meisen's ILVQR are individual, one-off issues or that in relying on the record, there is a systematic way for Commerce to correct these errors, given that so many identified errors are "clerical" in nature.

In consideration of Commerce's well-established practice, the CIT's holdings, and record information, Meisen's claim — that these sales traces and identified errors impact only a small percentage of the U.S. sales database — is distortive, and moreover, irrelevant.  What is relevant is the fact that eight of nine, or 89 percent, of the selected transactions for verification contained various discrepancies and errors.  Also above, in "Meisen's Sales Database Errors," we calculated the frequency of each error as it appeared in the sampled transactions selected for verification.  Of the six sales traces that Meisen provided:  five (83 percent) are missing documentation to support the reported sale terms/freight expenses; three (50 percent) are reported with incorrect entered values (which are used to compute various movement and selling

---

[ ] records … the reported {INLFWCU} was incorrect due to human input error in manually preparing the sales database ….  The J&K Companies have corrected the net weight for {[   ]} records in the sales database ….  The J&K Companies have corrected the ZIP codes reported {for [   ] observations.}").

[362] Examples of transaction-specific errors discovered include:

- [                    ] were reported with incorrect CONNUMs;
- [   ] transactions were reported with incorrect product codes;
- [            ] transactions were reported with the wrong FOPs because Meisen failed to report one of its FOPs (mirrors);
- [                 ] transactions were reported with the wrong product volume;
- [                 ] transactions were reported with incorrect sales terms;
- [                 ] transactions were reported with incorrect freight revenue amounts;
- [               ] transactions were reported with incorrect INLFWCU;
- [            ] transactions were incorrectly reported without further manufacturing expenses;
- [             ] transactions were incorrectly reported without repacking expenses; and
- [               ] transactions were reported with incorrect gross and/or net weights.

*See* Meisen's January 10 SCQR at 3-4, 6, 9, 22-24, 28, and 29; *see also* Meisen's February 14 SCQR, *e.g.*, at 4-5 and 19.

expenses); two (33 percent) are missing further manufacturing expenses; and one (17 percent) is reported with the wrong shipment date.  Of the nine sales for which Meisen provided sales-specific information (either in the form of sales traces or CONNUM-specific reconciliations), three (33 percent) have incorrectly-reported product characteristics and CONNUMs; five (55 percent) have incorrectly-reported customer destinations; and one (11 percent) has an unverifiable customer code.  The prevalence of these errors is certainly not, as Meisen puts it, negligible, insignificant, or minor.  Further, these errors are in addition to Meisen failing to substantiate the sales it reported in the U.S. sales database for J&K GA altogether and the October 2018 sales of J&K IL.  Considering the prevalence of discrepancies and errors discovered in Meisen's ILVQR, we reasonably and appropriately determined that the U.S. sales database, overall, was unreliable.

A.      J&K GA's Q&V Reconciliation

Meisen argues that the differences throughout its reconciliation are negligible and do not warrant the application of total AFA.  While we agree with Meisen that certain of the discrepancies themselves are negligible, we disagree with notion that these Q&V discrepancies alone were used as Commerce's justification for the application of AFA.  In the Draft Remand Results, we stated:

> {Meisen} omitted significant and essential documentation necessary to verify the accuracy and completeness of Meisen's U.S. sales database ….  Meisen failed to provide any of the requested source documentation to substantiate the underlying figures.  Further, based on the information that Meisen did submit in its ILVQR, and as discussed further below, we are not able to tie J&K GA's reported U.S. sales to its books and records, and, therefore, we are unable to verify J&K GA's reported U.S. sales.[363]

---

[363] *See* Draft Remand Results at 13.

In other words, one reason we determined that the application of total AFA to Meisen was appropriate was that Meisen failed to provide the source documentation necessary to support J&K GA's Q&V reconciliation. The fact that there were several figures within the reconciliation that we could not tie only underscored Meisen's ultimate failure of not supporting its reconciliation with source documentation. Therefore, because the AFA determination in this case is due to Meisen's failure to provide source documentation (in addition to the various other, significant reasons outlined in these final results), we do not find Meisen's references to *Uncoated Paper from Canada*, *Sheet and Strip from Taiwan*, and *Nucor* to be applicable to our findings.

Meisen argues that the differences between the various total revenue values in "Step 1" of J&K GA's Q&V reconciliation are too small to warrant the application of AFA. The first instance in the reconciliation where figures do not tie is the difference of $[      ] between the total revenue reported in J&K GA's tax return, $[        ], and the total "Quickbooks Sales Revenue," $[        ].[364] Meisen explained that this difference was due to a time lag "between the receipt and deposit of payments."[365] It also stated that this "Quickbooks Sales Revenue" can be tied to its "complete sales ledger for 2018."[366] The next total revenue value reported by Meisen was calculated by deducting $[      ], or [   ] percent of that sales revenue, to arrive at a supposedly sales tax exclusive sales revenue, $[        ].[367] Meisen stated that "support for the sales taxes is included in the sales summary."[368]

---

[364] *Id.* at 15; *see also* Meisen's ILVQR at Exhibit SVE-4 Step 1.
[365] *See* Meisen's ILVQR at 5.
[366] *Id.*
[367] *See* Draft Remand Results at 15. Though we addressed this [        ] percent unreconciled difference in the Draft Remand Results, Meisen did not comment on this issue. *See* Meisen's ILVQR at Exhibit SVE-4 Step 1.
[368] *See* Meisen's ILVQR at 5.

Of note, the "complete sales ledger for 2018" and the "sales summary" are the same document.  As explained above, the 2018 sales ledger/sales summary is an Excel spreadsheet that has not been tied to Meisen's actual accounting system and has not been confirmed as accurate or complete.  Therefore, we are unable to verify the accuracy of the "Quickbooks Sales Revenue" amount and we are unable to confirm that these time lag and sales tax differences are accurate and rooted in J&K GA's accounting system.

"Step 2" of J&K GA's Q&V reconciliation begins with Meisen's explanation that, "{t}he income net of sales taxes calculated in Step 1 ([          ]) varies slightly compared to the sales revenue recorded in the profit and loss statement for 2018 ([          ])."[369]  Meisen does not attempt to explain this difference.  Instead, in its comment, Meisen tangentially agrees, but suggests that this difference has "been explained as de minimis":

> Meisen acknowledges that an explanation for the minor discrepancy ([     ] of total sales revenue) between the sales revenue presented on the Profit and Loss Statement and the sales ledger extract was warranted, this constitutes an unreconciled difference and, therefore, this difference has been explained as de minimis and without significance.[370]

However, Meisen is not the arbiter of significance in this investigation, particularly not when it presents two different total sales revenue amounts from the same accounting system, and it failed to provide source documentation to support either one; we are also faced with several unsubstantiated differences from Meisen's tax return, *i.e.*, the one source document that we were provided.

Meisen also disagrees with our statement that "the sales ledger extract for January to June 2018 conflicts with information presented in Exhibit SVE-6."  As explained above, we agree with Meisen that the Q&V for the pre-POI sales in the 2018 sales ledger worksheet (Worksheet

---

[369] *Id.* at 6 and Exhibit SVE-4 Step 1; *cf. id.* at Step 2.
[370] *See* Meisen's Comments at 8.

2) (Exhibit SVE-6) ties to the pre-POI sales ledger worksheet used in J&K GA's Q&V reconciliation (Exhibit SVE-4).

Then, Meisen provides a *post hoc* explanation for the difference between the POI values reported in the 2018 sales ledger worksheet at Exhibit SVE-6 and used in J&K GA's Q&V reconciliation. Meisen states that "{t}he difference – $[      ] – is equal to the internal sales to the other J&K locations and that fact is detailed in the reconciliation in Exhibit SVE-4." We disagree that this sufficiently explains the difference between the two (unsubstantiated) J&K GA POI sales values on this record for three reasons.

The first reason is that Meisen did not provide any source documents to support the internal sales listed in the reconciliation. Therefore, while we assessed the unsubstantiated figures to understand, and then explain, the gap in the record, Meisen did not tie this internal sales list to a single source document.

The second reason is that the difference between the two values is $[      ], and not $[      ]. While this difference is small, Meisen did not address the difference in the Draft Remand Results, and so it also remains unexplained.

Third, the record does not support Meisen's argument. Meisen claims that J&K GA's Q&V reconciliation uses a sales value that is inclusive of POI sales, while the 2018 sales ledger includes a sales value that is exclusive of POI sales, thus, that is why there is a "$[      ]" difference between the two values. A further dissection of this rationale is necessary to understand why that does not appear feasible:

- The first part of Meisen's claim is that the POI sales value in the Q&V reconciliation is inclusive of internal sales. According to Meisen, the POI sales value plus the pre-POI sales value equals the "FY 2018 Net Sales Revenue" from the "P&L Statement,"

($[      ]).  Also, Meisen deducts $[      ] from the POI sales value in demonstrating how this value ties to the sales database.  Thus, Meisen asserts that it is reasonable to conclude that this "P&L Statement" value includes all sales, internal and external.

- The second part of Meisen's claim is that the POI sales in the 2018 sales ledger worksheet are *exclusive* of internal sales.  However, as Meisen argues, and we agree, the pre-POI sales value in J&K GA's Q&V reconciliation ($[      ]) *ties* to the 2018 sales ledger worksheet.  Therefore, it is simply not reasonable, as Meisen suggests, to conclude that the pre-POI sales and the POI sales in the *same sales ledger* are reported on different bases (*i.e.*, that the pre-POI sales values in the 2018 sales ledger include internal-sales and the POI sales values in the 2018 sales ledger do not include internal-sales).

In sum, we do not find Meisen's explanation convincing.  We recognize that there is a possibility that an element to Meisen's explanation remains missing, but that is the ultimate issue – without Meisen's source documentation, which we requested as a means of verifying Meisen's reported data, we simply cannot establish how these two figures tie.  Accordingly, we continue to find that the discrepancy between the POI values in J&K GA's 2018 sales ledger and J&K GA's Q&V reconciliation calls into question the accuracy of the Q&V reconciliation, and further supports our reasoning for applying AFA to Meisen for its failure to support adequately the J&K Q&V reconciliation.

B.    Sales Terms

Meisen failed to provide documentation to demonstrate the accuracy of the reported sales terms for five out of six sales traces provided in its ILVQR.  Meisen does not refute these findings, but instead claims that it submitted all the documentation it was able to provide, and

that these five sales are too small in number for Commerce to apply total AFA to Meisen.  In Comment 1 above, we explain why we disagree with the notion that Meisen provided all of the documentation it was able to for these sales traces, and that it also failed to notify Commerce of any difficulties in responding to our request for information.  Meisen did not explain how the documentation provided in its ILVQR serves to verify Meisen's reporting of these sales (*i.e.*, how signatures on packing lists provide insight into whether merchandise was shipped or delivered), and instead, Meisen "silently rested on an inadequate response."  We explain earlier in Comment 2 that we disagree with the argument that the number of issues we found were too small to warrant the use of AFA.  This is because verification is a sampling exercise, and the information, or lack of information, gathered from these sales is reasonably attributed to the rest of the U.S. sales database.  Further, we find that the application of AFA to Meisen is warranted, not simply due to the unsubstantiated sales terms in its sales traces, but due to the pervasive issues and unsubstantiated information identified in Meisen's ILVQR that Commerce can reasonably find are representative of the potential reliability (or lack thereof) of the entire U.S. sales database.

C.      Destination

        In addition to its argument that the destination errors discovered are trivial and do not warrant AFA, Meisen makes two arguments regarding the Draft Remand Results destination findings.  First, Meisen states that we mischaracterized the methodology that it used to report the transaction-specific destination for its U.S. sales.  However, Meisen did not explain how we mischaracterized its destination reporting methodology.  Therefore, we cannot respond to this argument, but for the purpose of clarity, our understanding of how Meisen reported its ZIP codes is based on the questions asked in Commerce's questionnaires, and Meisen's responses.

In the Initial Questionnaire, we requested that Meisen report the field "DESTU" using "the U.S. postal 'ZIP' code of the customer's place of delivery."  In response, Meisen stated, "{t}he J&K Companies have reported the customer's U.S. postal 'ZIP' code in this field." Additionally, during this remand proceeding, we noted that one of the sales invoices appeared to show that the destination of the merchandise was in [          ].  Since the U.S. sales database did not include postal codes from [          ], this indicated that Meisen incorrectly reported the ZIP code as a place other than the destination of the merchandise.  Therefore, we requested that Meisen identify all of the sales in its U.S. sales database that were "sold to an unaffiliated customer and destined for a location outside of the United States."  Additionally, because there appeared to be confusion regarding what information should have been reported in the field "DESTU," we provided Meisen with an opportunity to ensure its information was correctly reported.  We asked that Meisen, "ensure that the correct destination is reported in the U.S. sales database."  In response, Meisen stated, that "{t}he J&K Companies confirm that the zip codes reported in the DESTU field are correct."  Therefore, based on the information we requested, and the responses provided, our understanding until reviewing Meisen's ILVQR was that Meisen/the J&K Companies reported the ZIP code of the customer's place of delivery in DESTU. Regardless of the methodology Meisen and the J&K Companies purportedly used for reporting the destination in the U.S. sales database, the destinations reported in the U.S. sales database do not appear to be determined using the specific methodology twice requested by Commerce and confirmed as being used by Meisen.

Meisen does not disagree with our assessment of destinations of the sales in its ILVQR – the destination of the merchandise does not tie to the destination reported in the U.S. sales database.  Still, after we provided Meisen with the opportunity to double check its reported

information, it unequivocally confirmed that the ZIP codes it reported were correct. This is

another example of Meisen claiming something that is not supported by record information, and

further calls into question the reliability of the U.S. sales database.

Meisen also argues that the incorrect destinations discovered in its ILVQR have little or

no impact on the differential pricing analysis. This is because, according to Meisen, only one of

the five sales traces with incorrect destinations was reported with a destination in an incorrect

differential pricing region. Further, Meisen asserts that this transaction represents too small of a

percentage of the U.S. sales database to justify the application of total AFA to Meisen.[371] This

argument does not withstand scrutiny. The record shows that two of the five sales traces with

incorrect destinations were reported with an incorrect region.[372] In addition to the sales trace

Meisen discusses in its comments, Meisen also did not provide adequate documentation to

demonstrate the destination of one of the other sales traces.[373] Thus, Meisen's claim that only

one sales trace was reported with the incorrect region is false. Rather, the region is incorrect for

two, or potentially three, of five sales traces with incorrect destinations in Meisen's ILVQR.

Further, while some of the verified destinations may be in the same region as the region used for

the differential pricing analysis, we cannot know whether this was simply a coincidence.

Because we have no confidence that these errors we discovered are largely limited to

---

[371] With respect to Meisen's argument about the small number of transactions with destination errors discovered at verification, we address this issue at length at the beginning of this comment.

[372] *See* Meisen's ILVQR at Exhibits SVE-11 and SVE-14; *see also, e.g.*, Memorandum, "Final Determination Analysis Memorandum for Rizhao Foremost Woodworking Manufacturing Company Ltd.," dated February 21, 2020, at Attachment 1. In sales trace four, the reported ZIP code was [                    ]. This is in the Northeast region of the United States according to Commerce's margin program at line 2122. The correct ZIP code is [
            ]. The correct region for this ZIP code is the South (line 2131 of the margin program). For CONNUM-reconciliation one, the reported ZIP code was [                ]. This is in the West region of the United States according to Commerce's margin program at line 2137. The correct ZIP code is [                ]. The correct region for this ZIP code is the South (line 2130 of the margin program).

[373] *See* Meisen's ILVQR at Exhibit SVE-13. For sales trace three, while we cannot know the correct region, the ZIP code in the U.S. sales database was in Florida, but the destination was outside of Florida.

destinations in the same region, we also have no confidence that the differential pricing analysis can be properly applied.  We continue to find that total AFA is warranted, in part, because of the pervasiveness of this error (*i.e.*, five of nine ZIP codes reported in ILVQR were incorrect) and its significant impact on our ability to conduct a meaningful differential pricing analysis.  Consistent with the Draft Remand Results, we are not applying total AFA to Meisen based on this error alone.  As we have explained several times, we find that the application of AFA to Meisen is appropriate due to the pervasive errors discovered throughout Meisen's ILVQR.

D.    Purchaser

Meisen argues that the omission of "a single" customer code from its customer code list does not warrant the application of total AFA.  While a single omission may not warrant the application of AFA, this is not the circumstance we are faced with in this remand redetermination.  The issues with Meisen's purchaser reporting are five-fold:  (1) Meisen used an imprecise methodology to report CCSUCODU that we cannot possibly rely on for a dumping margin calculation; (2) during verification, we discovered that [                    ] CUSCODUs were not identified in its customer code key, a number *significantly* more than the "one" customer Meisen says it failed to identify; (3) Meisen failed to confirm the accuracy of the customer in sales trace three because, in its attempt to demonstrate the accuracy of its U.S. sales database, Meisen referred us to the customer code key, where the customer code was missing; (4) these [   ] missing customer codes also did not allow us to tie the customer shown on another sales invoice provided by J&K GA to the U.S. sales database; and (5) we were unable to determine whether Meisen accurately reported its affiliations with its customers.

Meisen notes that we did not seek clarification regarding its missing customer codes prior to issuing the ILVQ, and that this omission resulted from the fact that Meisen was required to submit copious amounts of data on the record over the course of this proceeding.  However,

regardless of the volume of data it placed on the record, it was Meisen's burden to develop an adequate record.[374]  In this case, Commerce provided Meisen with many opportunities to correct its information (as detailed above), and as a general matter, seeks to identify and alert respondents of deficiencies in questionnaire responses.  However, it would be unreasonable to require Commerce to identify every piece of missing or incorrect information, particularly when the respondent has consistently submitted thousands of errors with every submission.  As the CIT stated, if this type of argument were to "prevail, the result would be to undermine the administrative process and shift the burden of creating an adequate record from respondents to Commerce."[375]

Meisen also ignores the fact that it was still required to confirm in its ILVQR the accuracy of the data reported in its U.S. sales database.  When Meisen compiled its sales traces, Meisen did not attempt to confirm the accuracy of data reported in this field, but only noted with a red box where the customer's identification was located on the sales invoice.  Significantly, Meisen explained that the CUSCODUs reported in its U.S. sales database were the J&K Companies' "internal accounting customer codes{.}"[376]  Therefore, even if the customer codes were not included in the customer code list provided to Commerce, accidentally or otherwise, Meisen could have reconciled the customer name in the sales trace to the customer code recorded in its accounting system to demonstrate its accuracy, but it did not do so.

---

[374] *See, e.g.*, *Mannesmann*, 120 F. Supp. 2d at 1097:

> Mannesmann has the burden of creating an adequate record ....  Its inadequate responses to the questionnaires specified by Commerce are substantial record evidence in support of Commerce's conclusion that it did not respond to the best of its ability.  That Mannesmann submitted a large overall volume of material does not change the support for this conclusion.

*See also Ta Chen Stainless Steel Pipe v. United States*, 23 CIT 804, 820 (CIT October 28, 1999) ("Commerce grounds its argument on the truism that the respondent has the burden of creating an accurate record").

[375] *See Chinsung Indus. Co. v. United States*, 705 F. Supp. 598, 601 (CIT 1989).

[376] *See* Meisen's July 19 CQR at 15.

Accordingly, it was Meisen's responsibility to confirm that the customer information in the sales invoice reconciled to record information and tied to source documents.  Instead, Meisen did not address the disconnect between its sales database and the sales documents provided, despite purportedly maintaining this information in its normal course of business, and Commerce was unable to confirm the accuracy of the U.S. customer information reported for two sales invoices submitted in Meisen's ILVQR.

E.     <u>Product Characteristics</u>

In the Draft Remand Results, we found that Meisen incorrectly reported the product characteristics for sales traces four and five, and for CONNUM-specific reconciliations two and three.[377]  For these final results, we continue to find that Meisen incorrectly reported the product characteristics for sales traces four and five, and CONNUM-specific reconciliation three.  With respect to CONNUM-reconciliation two, a [                    ], we considered Meisen's comments and revisited the record information.  As discussed above in section 2b.iv., we agree that [

          ] may properly be reported as [                    ].  However, for the other three products at issue, we find that Meisen improperly departed from Commerce's instructions for reporting product characteristics, and it failed to timely notify Commerce of any potential difficulties in reporting those characteristics.  The underlying rationale for Meisen's product characteristics arguments is this:  without notifying Commerce of difficulties in reporting, Meisen determined alternatives to Commerce's reporting requirements, and it believes those alternatives are appropriate and reasonable.

For sales trace four, Meisen argues that it appropriately and reasonably reported the product characteristics of a range hood because:  (1) the product sold to the ultimate customer

---

[377] *See* Draft Remand Results at section IV.D.2b.iv., "Product Characteristics."

was a range hood; and (2) J&K NJ "assembled" this product in the United States from the scrap

of other imports.  Meisen states that the merchandise was "assembled" by J&K NJ in the United

States from "leftover side panels and parts from damaged products."[378]  Meisen did not notify

Commerce that the J&K Companies produce/"assemble" wooden cabinets and vanities in the

United States from scraps of merchandise imported from Meisen.  This is a complicated fact

pattern, and we cannot at this late stage of the proceeding determine the precise way in which

Meisen should have reported this information for this specific transaction, or even whether it was

appropriate to even report this as a sale of Meisen's merchandise at all.  However, it is clear that

Meisen disregarded our instructions, and reported information in a manner different than what

was requested.[379]  Even if Meisen had determined that the instructions provided in the Initial

Questionnaire could not be applicable to certain of its sales, it was obligated to contact

Commerce to determine the best way to report such information.

For sales trace five, Meisen argues that it appropriately and reasonably reported the

product characteristics of [          ] because the product sold to the ultimate customer was a

frame of a cabinet, which has matching characteristics to [          ].  For this sales trace,

Meisen argues that it did not report the product as it was imported (an RTA cabinet) because

Commerce's instructions for a different field, PRODCODU1, required the respondent to report

the merchandise as shipped.  Meisen explains that because Commerce instructed it to report the

specifics of merchandise "actually shipped" in field PRODCODU1, it was reasonable for Meisen

to populate the database using the physical characteristics of a proxy of the product sold.  We

disagree, and we have concerns with this assertion for several reasons.  First, Commerce did not

---

[378] *See* Meisen's Comments at 15.
[379] We also now know that the U.S. sales database may contain other sales that were "assembled" from scrap, and that the appropriateness of including those sales, and their impact on our calculations, remains unknown.

provide Meisen with *any* instructions on how to report field PRODCODU1.  Meisen added the

field PRODCODU1 on its own volition.[380]  The Initial Questionnaire only included reporting

instructions for the field PRODCODU and did not request information for merchandise "actually

shipped."[381]  Second, unless explicitly stated (*i.e.*, the instructions for reporting CONNUMU and

the product characteristics fields), an instruction for one field is not controlling for the

instructions for another.  Considering them as such is improper, and it is concerning that Meisen

believes it was appropriate to take the instructions from one field and apply them to a different

field with a completely unique set of instructions.[382]  Indeed, and to the contrary, Meisen

unequivocally stated that it reported its CONNUMs based on the merchandise *as it was*

*imported*.[383]  This statement indicates that Meisen understood our request for information, and

understood how the CONNUMs should be reported (*i.e.*, based on the product imported).  For

Meisen to now, only after failing verification, state that it reported its some of its product

characteristics and some of its CONNUMs in a different manner calls into question the accuracy

of every statement Meisen made on this record regarding how it reported its CONNUMs.  Lastly,

because of the conflicting statements made by Meisen (*i.e.*, it determined its CONNUMs based

on PRODCODU1 versus the merchandise as imported), it is unclear whether Meisen reported

product characteristics on a consistent basis.

 Meisen also suggests that for sales trace five, reporting a similar product as a proxy for a

frame of a cabinet was reasonable because [    ] has matching product characteristics

---

[380] *See* Initial Questionnaire; *see also* Meisen's CQR at 7 ("In addition, the field PRODCODU1 has been added to report the internal product code {u}sed in its internal system").
[381] *Id*. at C-4 ("Report the commercial product code assigned by your company in the normal course of business to the specific product sold in the United States.  If the product sold is further manufactured in the United States, report the product code of the product *sold*, not the product *imported*") (emphasis added).
[382] *Id*. (in footnote above); *cf*. C-5 ("If the product sold is further manufactured in the United States, report the control number of the product *imported*, not the product *sold*") (emphasis added).
[383] *See* Meisen's CQR at 7 ("For products that were further manufactured, J&K Companies reported the CONNUM of the product imported, not the product sold").

to the frame of a cabinet.  As explained above, we find reporting the actual product sold, and not the imported product, to be incorrect.  Nevertheless, this argument fails, as well.  We are unable to determine the accuracy of this alternative product because Meisen did not notify Commerce of its choice to report the product characteristics based on the product as sold, rather than as imported.  In turn, Meisen never notified Commerce that it selected proxy products for certain sales.  These failures precluded Commerce from being able to assess the products in question, *e.g.*, we do not know the product characteristics of the frame of a cabinet because they were never reported to us.  Thus, it is not clear how Meisen determined that the product characteristics of the frame of a cabinet and the [                    ] "match."

The last argument Meisen makes specific to sales trace five is that it did not need to create a "new product code" for cabinet frames, as it did for surface coating.  That is because, according to Meisen, there was a comparable product code that it could assign to the cabinet frame, and then it was reasonable to use the product characteristics of that product code. Notwithstanding our above findings, Meisen conflates product codes with product characteristics, suggesting that we asked it to create a "new product code."  This is inaccurate. To be clear, product code information is used for checking the accuracy of a submission (it is not used for calculating a margin or for determining a CONNUM).  Accordingly, we did not need an alternate product code to be reported (especially not an incorrect one), and we did not suggest that Meisen "should have … create{d} a new product code" for a product that did not have a product code.[384]  Rather, we simply noted that Meisen is familiar with the process for characterizing merchandise outside of the confines of the characteristics put forth in the Initial Questionnaire, a completely different proposition related to a related, but also different, topic.

---

[384] *See* Meisen's Comments at 16.

For CONNUM-reconciliation three, where we found that Meisen incorrectly reported the further manufactured product characteristics of a custom-made cabinet, Meisen argues that we "assume{d} that Meisen produced and that the J&K companies imported a related product and that the CONNUM for that imported product could have been reported." Meisen states that "given the actual facts surrounding this sale" it believes that the CONNUM should match the final product.[385] We disagree. We did not make any such assumptions, but only stated the facts: Meisen incorrectly reported the product characteristics because it reported the product characteristics of the further manufactured merchandise and not the imported product as we requested. We did not state what Meisen should or could have reported because Meisen precluded Commerce from considering this issue, and providing additional guidance as needed, by never notifying Commerce of issues that apparently caused it to deviate from our requests.

Commerce asked Meisen to report CONNUMs based on the merchandise as imported, and Meisen confirmed that it followed Commerce's instructions. Despite this, Meisen improperly took it upon itself to be the authority for determining when it was appropriate to depart from this reporting requirement. Moreover, Meisen did not notify Commerce of its difficulties in reporting the product characteristics and CONNUMs for certain of its sales, and we only learned of Meisen's alternative reporting methods during our review of Meisen's ILVQR. Therefore, we continue to find that AFA is appropriate, in part, because Meisen failed to follow Commerce's reporting instructions, and it incorrectly reported its CONNUMs for further manufactured products as a result. Furthermore, because we cannot assess how extensive Meisen's CONNUM reporting problem is, we cannot identify which sales in the U.S. sales

---

[385] *Id*. at 16-17.

database were reported on the correct basis, or the incorrect basis, or which ones were further manufactured.

F.    Entered Values

In the initial questionnaire, Commerce requested that Meisen "{r}eport the entered value for all CEP sales and for EP sales for which {entered value} is known."[386]  As we explain above, Meisen stated that it could not report the actual entered values for its sales, and, therefore, it reported entered values using two of Meisen's intercompany price lists.  Also explained above, Meisen should have reported its actual entered values, but failed to do so.  Accordingly, our assessment of whether Meisen accurately reported its entered values is based on the information we find that Meisen should have reported to Commerce (the actual entered values of the imported merchandise) and not the price list values of merchandise sold.  However, even if we were to accept Meisen's methodology for determining entered value, we still identified three incorrect entered values in Meisen's ILVQR.

According to Meisen, the errors discovered with respect to entered values in Meisen's ILVQR are minor.  Meisen reminds Commerce that entered values are not used to calculate assessment rates, but instead are only used to calculate certain price adjustments.  In this case, Meisen contends that reporting the incorrect entered values results in immaterial differences in the associated expenses (warranty expenses, U.S. customs duties, section 301 duties, and inventory carrying costs) because it calculated those expenses on an allocated basis, *i.e.*, they were not transaction or invoice specific.  While there is no way of knowing the impact of these incorrect entered values on the margin calculation, Meisen's characterization of the differences between correct and incorrect entered values is wrong.  The correct entered values for two out of

---

[386] *See* Initial Questionnaire at C-30.

the three incorrect entered values were 73 and 91 percent different from the correct entered value, and we are unable to determine the correct entered value of the third sale because the record lacks sufficient information to do so.  Further, Meisen suggests that, because the fields calculated using entered value are allocated, the impact of these errors are minimized.  It is not clear why this is so, however, because Meisen computed the expenses in these fields using percentages, and so the differences between the amounts could be significant.  Using the warranty ratio that Meisen reported for J&K SF as an example, the per-unit warranty expense (WARRU) computed using the incorrect entered value from sales trace five is [      ] per piece, while using the actual entered value, WARRU is [     ] per piece – a [   ] percent increase.[387]  As another example, Meisen calculated U.S. duties using a percentage multiplied by entered value.  The U.S. duty (USDUTYU) computed using the incorrect entered value for the product in sales trace five is [     ] per piece compared with [     ] per piece using the correct entered value, a [   ] percent difference.[388]  In sum, the impact of these entered value errors on the U.S. sales expenses, taken together, could easily be significant in our calculation of the overall dumping margin.

We acknowledge Meisen's claim that sales trace five (involving the sale of a frame of a cabinet, but the importation of a whole cabinet), was unique and its argument that the information from that sale should not be used to make inferences about the rest of the database.  However, this situation was not limited to a single sales trace; Meisen's ILVQR revealed an additional, similar situation in the sales selected for individual examination.  Because Meisen's

---

[387] These warranty expenses are calculated using J&K SF's warranty ratio of [   ] percent.  Also of note, Meisen used the reported entered values to calculate the denominator of all the J&K Companies' warranty ratios.  Therefore, even though we used this J&K SF ratio for this example, the ratio is also wrong because the denominator is calculated using the wrong entered values.  *See* Meisen's February 14 SCQR at 39 and Exhibit R2C-24.

[388] *Id*. at Exhibit R2C-15.  We calculated these figures using the U.S. Customs duty rate for J&K SF, [   ] percent.

ILVQR was the first instance where we learned about the circumstances of sales trace five, Meisen did not timely notify Commerce of this issue, and we have no way of identifying which sales were further manufactured, and thus, we cannot assume that this was a unique set of circumstances for the J&K Companies or accurately assess how extensive the reporting problem is.

We also disagree that we should consider Meisen's "revised" entered values as the equivalent of a minor correction. As noted above, given the extent of Meisen's reporting problems discovered as a result of its ILVQR, we have no basis to conclude the errors are limited to the three transactions at issue. While Meisen cites several cases where Commerce accepted minor corrections of clerical errors, they are inapposite. In those cases, Commerce was able to assess the impact of the corrections and confirm that they were either limited to specific transactions and/or were easily and accurately implemented across all affected sales.[389, 390] Neither is the case here. Importantly, and unlike in the cited cases, Meisen did not investigate whether its database contained additional errors of the same nature, and, as explained in detail above, we have little confidence that these errors were limited to the three selected sales.[391] Further, Meisen's errors also involved methodology, with no avenue available to correct course now. Finally, even were we to accept the three new values as corrections, this would not solve

---

[389] *See Pipe from Ukraine* IDM at Comment 1 ("{The respondent} mistakenly attributed a hot-formed product code and its associated costs to a cold-drawn CONNUM in its cost calculation worksheets … for the final determination, we have accepted and relied on the minor cost correction submitted"); *see also HRS from the UK* IDM at Comment 1 ("We verified how TSUK made the reporting error and agree … we concluded that the reporting error, while it affected many transactions and cascaded into other fields in TSUK's databases, was due to a clerical error and, thus, was an acceptable verification correction"); and *CWP from UAE* IDM at Comment 1 ("Universal indicated that it had updated its home market sales quantity and value … as part of the minor corrections, Universal stated that eight sales … should be removed from the home market database and reclassified as third-country sales …. Universal first informed {Commerce} at the outset of verification that it was reclassifying them as third-country sales as a minor correction").

[390] Also of note, *Pipe from Ukraine* involved an in lieu of in-person verification questionnaire, just as this case did.

[391] *See GOQ*, Slip Op. 22-21 at 18-19.

the overarching problem, which is that we do not know how many other sales were reported with incorrect entered values.

Finally, we agree with Meisen that "draconian penalties" are inappropriate for clerical errors.[392]  However, as we explain above, the errors in Meisen's reported entered values are more than mere clerical errors; they involved issues of methodology as well as implementation.  Thus, we disagree with Meisen that *NTN Bearing* applies.  We similarly disagree with Meisen's reliance on *Nucor* and *Guangdong Wireking*.  In the Draft Remand Results, we did not state that it is appropriate to apply total AFA to Meisen based on its entered value errors alone.  However, as we have explained several times, we find that the application of total AFA to Meisen is appropriate due to the pervasive errors of various types discovered throughout Meisen's ILVQR.

Other ILVQR Errors[393]

Meisen disagrees with our finding that it failed to correctly report its further manufacturing expenses because it acted to the best of its ability to report these expenses.  However, as we explain above, Meisen did not follow Commerce's instructions for further manufactured merchandise (although it was able to do so), and we first discovered this when Meisen submitted its ILVQR.  Because Meisen had the submitted information that could not be verified, we continue to find that Meisen failed to act to the best of its ability in this investigation, pursuant to sections 776(a)(2)(D) and 776(b) of the Act.

---

[392] *See* Meisen's Comments at 20 (citing *NTN Bearing*, 74 F.3d at 1208-09).
[393] In the Draft Remand Results, this section included a discussion of Meisen's ILVQR sales with missing further manufacturing expenses and one sale with incorrect shipment date.  Meisen did not comment on our finding that it incorrectly reported shipment date for one of six sales traces.

**Comment 3:  Whether Certain Statements Made in the "Unreported U.S. Affiliate" Draft Remand Results Analysis Were Accurate**

*Meisen's Comments*[394]

- [                ] is a "former entity" that did not operate or do business during the POI.  It is referred to as [    ] by Meisen in all of its responses.  Commerce incorrectly referred to [    ] as J&K NY/Meisen Ltd./J&K Cabinetry NY[395] without factual support.[396]  J&K NY and [    ] are distinct corporate entities.

- Commerce incorrectly stated that [                ] was in New York.  [                  ] was another distinct corporate entity that was in New Jersey.

- The J&K Companies provided a full list of all corporate entities using the J&K name that were in operation during the POI.

- Commerce incorrectly concluded that J&K Headquarters shared an address with [                  ].

**Commerce's Position:**

Meisen raises concerns with the identity of several corporate entities referenced in the Draft Remand Results.  As an initial matter, the fact that Meisen needs to elaborate further on the businesses with which it has relationships (be they affiliated or not) at this late stage in the proceeding only underscores the complexity of the fact pattern here and that Meisen did not report this information in a clear and transparent manner.  As the respondent, Meisen bears the burden of building the record.  However, as we have explained, Meisen has not met this burden.

---

[394] *See* Meisen's Comments at 22-24.

[395] Meisen uses these names interchangeably to refer to the same J&K Company entity operating out of [        ].  *See, e.g.*, Meisen's August 13 SAQR at 15, 27, and 33.

[396] *See* Meisen's Comments at 23-24 (citing page 60 where "{Commerce} starts conflating the specific names of the currently operating entity Meisen Ltd. which has a dba of J&K Cabinetry NY but is referred throughout Meisen's responses as J&K NY.").

We have made every effort to evaluate and understand the information that Meisen provided, but Meisen's failure to report the requested information in a clear, complete, and accurate manner has impeded this proceeding and resulted in an incomplete picture of its POI activities. Though Meisen identifies certain errors regarding corporate identities and relationships in the Draft Remand Results, and we have revised our analysis with respect to these entities, our ultimate conclusion remains the same – Meisen's sales information was not verifiable, and Meisen failed to report at least one affiliated company, meaning that use of total AFA in determining Meisen's weighted-average dumping margin is warranted. Below, we discuss Meisen's claims in turn.

First, Meisen argues that we conflated J&K NY with [    ], and we agree that in one instance, we incorrectly referred to [    ] as J&K NY when intending to identify the destination of merchandise shipped to [    ]. Second, Meisen argues that we incorrectly stated that J&K Headquarters shares an address with [        ] during the POI. We agree that one statement made in the Draft Remand Results implied, without record support, that the two companies shared an address during the POI. Third, Meisen argues that we incorrectly discussed [        ] as if it were [    ], located in New York. We agree with Meisen's assertion that we made certain assumptions, not supported by the record, when using the names [    ] and [        ] interchangeably, and we have revised our analysis accordingly. While we agree with Meisen on these few minor points, as discussed further below, we disagree that correction of these points changes our overall analysis, which reflects the information available on the record.

We relied on record information and determined that Meisen failed to report all of its U.S. affiliates during the POI, particularly [        ], and that it made several inconsistent statements throughout the course of the investigation that indicate that Meisen had

not been forthcoming about its affiliations to Commerce, particularly with respect to J&K NY's largest customer, [                    ].  Meisen did not address this primary conclusion in its comments, but instead chose to address ancillary facts in an attempt to diminish the importance of the deficiencies in Meisen's U.S. affiliate reporting.  While we have addressed these ancillary issues below, our conclusion that Meisen did not report all of its U.S. affiliates remains unchanged.

In the Draft Remand Results, we explained that Meisen's ILVQR indicated that it failed to report all of its U.S. affiliates, including, but not limited to, [                         ].  In addition, we explained that Meisen made several inconsistent statements throughout the course of the investigation that indicate that Meisen has not been forthcoming about its affiliations to Commerce, particularly with respect to [                ].  One such example of Meisen's failure to be forthcoming is with respect to its repeated assertion that [        ]³⁹⁷ "ceased operations in April 2017" and was only a holding company during the POI.³⁹⁸  In Meisen's comments, it continues to argue that [      ] is a "former entity" that did not operate or do business during the POI. However, as outlined above, several record facts and statements continue to undermine Meisen's the assertions that [      ] is a former entity that did not operate or do business during the POI:

- During the POI J&K GA shipped subject merchandise to "[                    ],"
  "[    ]," and "[      ]" located at J&K NY's address.³⁹⁹

---

³⁹⁷ Also of note, the owner of [                    ] is also the owner of the unreported affiliate, [                ].  *See* Meisen's April 6 Comments and RFI at Exhibit NFI-12.
³⁹⁸ *See* Meisen's April 6 Comments and RFI at 8 and Exhibit NFI-12.
³⁹⁹ *Id*.

- Sales to "[       ]" were considered "Intercompany" sales that occurred during the POI, and Meisen removed them during the Q&V reconciliations for several of the J&K Companies.[400]

In the Draft Remand Results, we also included in the above analysis various references to a J&K Company known as "[                    ]."  In its comments on the Draft Remand Results, Meisen argues that [                    ] is a separate corporate entity based in New Jersey, distinct from [      ], and it maintained that Commerce erred when we treated these companies as the same.  However, Meisen failed to provide information in its questionnaire responses regarding this affiliate or explain how it is related to the other J&K Companies.  For example, Meisen failed to include this company on its list of affiliates in its section A or supplemental section A questionnaire responses (*i.e.*, the section related to general information about the respondent),[401] and it is not among the companies shown in its company brochures or other marketing materials.[402]  Thus, there is no record evidence to support Meisen's assertion that [      ] and [                    ] are not the same entity.

Meisen's failure to identify completely all affiliated parties in this investigation has contributed confusion to an already complex analysis of Meisen's reported, often intertwined relationships.  That said, given the absence of information on the record related to this particular entity, we are unable to determine definitively whether [      ] is the same, or a separate, company as/from [                    ].  Therefore, we are no longer treating the two company names as the same entity, and we have removed from our analysis the instances where we use the names

---

[400] *See, e.g.*, Meisen's August 23 Reconciliations at Exhibit C-15a.
[401] *See* Meisen's July3 AQR at question 3 (citing Meisen's May 13 SRA at 20-21 and Exhibit 19); *see also* Meisen's August 13 SAQR at 14-26 and Exhibit A-26.
[402] *See* Meisen's May 13 SRA at Exhibit 18.

[      ] and [                       ] interchangeably.[403]  However, the fact that we may not have understood information that Meisen did not clearly report does not undermine our findings in any way.  To the contrary, it underscores the fact that the information Meisen reported to Commerce in this investigation is a conglomeration of contradictions and inconsistencies that we cannot rely on for calculating a dumping margin.  Furthermore, when Meisen was given the opportunity to identify all of its U.S. affiliates involved in the sale of subject merchandise, Meisen did not report [                       ], nor did Meisen state that during the POI any of the J&K Companies were dba [                        ].  Contrary to Meisen's apparent understanding, reporting U.S. affiliates to Commerce during an investigation is not an iterative process.  The time for Meisen to notify Commerce of all its affiliates, and the names they did business under during the POI, was in response to the multiple questionnaires we issued during this investigation.  Yet, that is not what Meisen has done in this case.  Instead, Meisen now, only after we issued the Draft Remand Results, attempts to clarify information that should have been explained or reported to Commerce in its response to the Initial Questionnaire or in its response to the supplemental section A questionnaire (or any other supplemental questionnaire).  Ultimately, Meisen's comments alert Commerce to a new gap in the record – there may be an additional unreported affiliated company, or one (or more) of the J&K Companies may have operated under another name that was not clearly reported to Commerce during the POI.  This further supports our finding that Meisen has not been transparent or forthcoming about its U.S. affiliates.

Meisen's claim that it provided a complete list of "all corporate names and entities using the J&K name that were in operation during the POI," also indicates that Meisen thought it

---

[403] *See supra* at section IV.2.c.i.

acceptable to only report to Commerce its affiliated companies that used only "J&K" name (as opposed to companies with variations thereof or those that did not use "J&K" in the name). This, again, calls the completeness of Meisen's submissions into question.  The reporting requirements for U.S. affiliates were never limited to only the corporate names and entities "using the J&K name."[404]  In fact, during the investigation, Meisen appeared to understand that it was necessary for it to report *all of its affiliates* involved in the sale or distribution of subject merchandise.[405]  Therefore, the fact that Meisen failed to report at least one U.S. affiliate, [

],[406] and potentially others such as [                    ] and [

],[407] is consistent with Meisen's unrealistic implication that it was adequate only to report to Commerce its affiliated companies that used "the J&K name."

---

[404] *See* Meisen's July 3 AQR at questions 3A, 3C, and 3D.
[405] *See* Meisen's August 13 SAQR at 16.  Meisen cited Commerce's definition of affiliation prior to identifying its own affiliates:

> The term affiliated persons (affiliates) includes:  (1) members of a family; (2) an officer or director of an organization and that organization; (3) partners; (4) employers and employees; (5) any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and that organization; (6) two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and (7) any person who controls any other person and that other person.  Control exists when a person is legally or operationally in a position to exercise restraint or direction over another person.  A control relationship should also have the potential to affect decisions concerning the production, pricing, or cost of the merchandise under investigation or review. (Section 771(33) of the Act; sections 351.102(b) and 351.401(f) of the regulations.)

> Examples of situations which may indicate control include (but are not limited to):  (a) joint ventures and franchises; (b) lender/borrower situations; (c) a close relationship with a supplier, (sub) contractor, lender, distributor, exporter or reseller; and (d) a group of companies controlled by, for example, a family, a corporation, or the same investors.  An example of affiliation by common control may be the affiliation between the owners of a joint venture when each owner is in a control position with that joint venture.  Section 351.102(b) of Commerce's regulations states that the term person includes any interested party as well as any other individual, enterprise, or entity, as appropriate.

> In Commerce's practice, the term person includes any company, individual, organization, partnership or group.

[406] *See supra* at section IV.D.2.c.i.
[407] *Id.* at sections IV.D.2.c.ii. and iii.

Meisen also takes issue with two additional supposed technical points that we address herein, but notes no other discrepancies in the Draft Remand Results findings on Meisen's unreported U.S. affiliates.  Specifically, Meisen claims we confused the various names used by J&K NY with [     ], and it also believes we incorrectly concluded that J&K Headquarters shared an address with [            ] during the POI.  While we agree with Meisen with respect to these points, we also note that these facts are peripheral to our analysis and that our conclusions are not premised largely on them.  These claims are no more than distractions.  Whether we "conflat{ed}" the names of [    ] and J&K NY, or inferred that J&K Headquarters and [

   ] shared an address, or not, the result is the same:  Meisen failed to report all of its U.S. affiliates and was not forthcoming in its responses.  Indeed, rather than clearly identifying all companies involved in the sale and/or distribution of subject merchandise (affiliated or not) and clearly identifying all customer relationships, Meisen put forth a Gordian knot of information regarding its relationships and left it for Commerce to unravel.

Still, we have reviewed the record, and considered Meisen's Comments, and as result, we modified the analysis in these final remand results to ensure every statement accurately reflects record information.  With respect to the first discrepancy identified above, in the Draft Remand Results, we stated:

> Specifically, J&K NJ Maple and J&K NJ Zheng, which were wholly owned by [                                    ], J&K NY which was owned by [                         ] went by the name "[    ]" and were actively trading subject merchandise during the POI.[408]

Then in a footnote to this statement, we note, "{t}hroughout the POI, J&K GA shipped merchandise to [    ] at J&K NY's address."  As a correction to these statements, in these final results, we instead state:

---

[408] *See* Draft Remand Results at 59-60.

Specifically, *the physical location* of J&K NY, which was owned by [
    ] *was the destinations of subject addressed to recipients named* "[  ]," "[    ]," and "[         ]."[409]

Meisen did not note any other instance where we appeared to "conflate" the two companies, and we find that every other statement regarding [   ] and J&K NY reflects record facts.

With respect to the second purported discrepancy, Meisen points out that in the Draft Remand Results, we stated that "{d}uring the POI … [    ] and J&K Headquarters received their completed federal tax forms from their accountants at [     ]." Meisen argues that this statement is tantamount to Commerce stating that J&K Headquarters occupied [       ] during the POI, the same address as [      ]. This statement was based on specific observations of record information. First, in its articles of incorporation, J&K Headquarters is identified as "[    ]." Then, a letter from [   ] accountant is addressed to "[      ]" at [     ]. Thus, while we think it was reasonable to deduce from this information that J&K Headquarters was the recipient of federal tax information at [     ], we acknowledge that the letter could have been addressed to only [   ], which is also an "[  ]." As such, we have revised our analysis as follows: "during the POI …. [   ] received its completed federal tax forms from its accountant at [     ]."[410] Important still is the fact that [   ], an affiliate of [   ], *i.e.*, J&K Headquarters, which was owned by [      ] Meisen's majority owner, received mail at [      ] address during the POI. With slightly modified phrasing, our ultimate finding that Meisen failed to report all of its U.S. affiliates remains the same.

**Comment 4:  Whether the Application of Total AFA to Meisen was Appropriate**

*Meisen's Comments*

---

[409] *See supra* at section IV.D.2c.ii., "[     ]" (emphasis added).
[410] *Id.*

- The errors and discrepancies Commerce discovered in Meisen's ILVQR were negligible; the findings should not be applied to the rest of the U.S. sales database, and the application of total AFA to Meisen unwarranted.[411]

- Compliance with the "best of its ability" standard is determined by assessing the effort put forth by the respondent.[412]

- Commerce may apply FA only when there is a gap in the record and the missing information must be necessary for Commerce's determination.[413]

- Commerce may only apply adverse inferences if it finds that a party did not cooperate to the best of its ability.[414]  The "best of its ability standard" does not require perfection.[415]

- Total AFA is not permissible where there is useful information on the record.[416] Commerce must explain why the application of partial FA or AFA is not a sufficient remedy.[417]

- Commerce "may not … characterize a party's failure to provide information that does not exist as a 'refusal' to provide data."[418]

- An AFA rate cannot be based on the conduct of a "hypothetical, well-resourced respondent."[419]  Adverse inferences should only be applied where it is reasonable for Commerce to expect that more forthcoming responses should have been made.[420]

---

[411] *See* Meisen's Comments at 13-22.
[412] *Id*. at 2 (quoting *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1270 (CIT 2018) (*Guizhou Tyre*)).
[413] *Id*. (quoting *Huvis Corp. v. United States*, 31 CIT 1803, 1806 (CIT November 20, 2007) (*Huvis*); and *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1359 (CIT 2019) (*Clearon*)).
[414] *Id*. (quoting section 776(b) of the Act).
[415] *Id*. at 2-3 (quoting *Nippon Steel*, 337 F.3d at 1382).
[416] *Id.* at 4 quoting (*Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1375 (CIT 2019) (*Nat'l Nail*)).
[417] *Id.* (quoting *Ferro Union*, 74 F. Supp 2d. at 1296).
[418] *Id.* at 3 (quoting *AK Steel Corp. v. United States*, 21 CIT 1204, 1223 (1997) (*AK Steel*)).
[419] *Id.* at 3 (quoting *Nat'l Nail*, 390 F. Supp. 3d at 1373).
[420] *Id*. (quoting *Nippon Steel*, 337 F.3d at 1383).

- Commerce must balance its statutory obligation of finding an accurate dumping margin with the goal of inducing compliance.[421]  It must consider whether the assigned rate is overly punitive.[422]

*Petitioner's Comments*[423]

- Commerce correctly applied total AFA to Meisen.

**Commerce's Position:**

We disagree with Meisen that the application of total AFA is not warranted for the final results of this remand redetermination.  As we explained above, we find that application of facts available is appropriate, pursuant to sections 776(a)(2)(A), (C) and (D) of the Act, because Meisen withheld information that was requested by Commerce, significantly impeded this investigation, and provided information that could not be verified.  Specifically, in its ILVQR, Meisen did not include all the source documentation requested by Commerce.  Further, a review of Meisen's ILVQR revealed that Meisen's U.S. sales database contains significant and pervasive errors, and it signaled to Commerce that Meisen failed to identify all affiliated parties which were potentially involved in the sale or distribution of subject merchandise during the POI.  Pursuant to section 776(b) of the Act, we also find that the use of adverse inferences is warranted.  Specifically, we find that, in numerous instances, Meisen had information in its possession, but failed to provide that information when requested, while in other instances, Meisen provided essential and fundamental information (such as information related to the product characteristics of the merchandise sold in the United States) which we have determined

---

[421] *Id.* (citing *F.lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (*F.lii de Cecco*) and *Chia Far Indus. Factory Co. v. United States*, 343 F. Supp. 2d 1344, 1366 (CIT 2004) (*Chia Far*)).
[422] *Id.* (citing *Chia Far*, 343 F. Supp. 2d at 1366).
[423] *See* Petitioner's Comments, generally.

is incorrect and unreliable. The significant and pervasive inaccuracies and omissions call into question the reliability of Meisen's entire response and lead to the conclusion that Meisen's reported information cannot be used to compute an accurate dumping margin. Accordingly, we find that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference is warranted in selecting from the facts available. As a result, we are assigning a final margin to Meisen based on total AFA, in accordance with sections 776(a) and (b) of the Act.

We disagree with Meisen's suggestion that the errors and discrepancies discovered in Meisen's ILVQR are minor or negligible. As we detail at length in Comment 2 above, the frequency of errors and discrepancies in the sales tested for verification undermines our confidence that other data not specifically examined at verification do not also suffer similar defects. As the CIT has held, and as Commerce has consistently explained, verification, by its nature, is a spot check (or sampling exercise), and when samples reveal that the data examined at verification are replete with errors, omissions, and discrepancies, we reasonably can determine that those errors, omissions, and discrepancies are also present within other pieces of record information not specifically examined.[424]

Meisen quotes *Guizhou Tyre* in suggesting that it put forth its best effort, and that it, therefore, acted to the best of its ability. In *Guizhou Tyre*, the CIT held that,

> {c}ompliance with the "best of its ability" standard is determined by assessing whether the respondent puts forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. Therefore, Commerce can apply adverse facts available (AFA) only when it has first made a supported finding under {section 776(a) of the Act} that information is missing from the record for an enumerated reason, followed by a separate finding under {section 776(b) of the Act} that there has been a failure to cooperate.[425]

---

[424] *See, e.g., Monsanto*, 698 F. Supp. at 281; *see also, e.g., CTL Plate from Italy* IDM at Comment 4.
[425] *See Guizhou Tyre*, 348 F. Supp 3d at 1270.

We disagree that *Guizhou Tyre* supports Meisen's case, however.  To the contrary, and consistent with *Guizhou Tyre*, we find that Meisen failed to put forth its best effort in this investigation, because it deliberately withheld information in its possession, much of it fundamental to Commerce's analysis (such as information related to its affiliated parties) and it provided unverifiable data which were replete with errors, including data essential to the accurate computation of a dumping margin (such as information related to product characteristics and CONNUMs).

Further, while we agree with Meisen that the information missing from the record must be necessary to our determination (*see, e.g.*, *Huvis* and *Clearon*), we disagree that there is no gap here.  As we have explained at length throughout these final results, Meisen failed to establish the accuracy and completeness of its reported sales information at verification, and the errors and omissions were substantial.[426]  These errors not only created significant concerns about the

---

[426] Specifically, we explain the following:

- Meisen failed to reconcile J&K GA's U.S. sales to its accounting system, undermining our confidence in the completeness and accuracy of the universe of reported U.S. sales as a whole.
- Meisen failed to demonstrate the accuracy of the reported sales terms for five of six sales traces provided in its ILVQR, calling into question its reported movement expenses.
- Five of nine destinations from the sales sampled in Meisen's ILVQR were irreconcilable with the source documentation provided, rendering the differential pricing analysis unreliable.
- Two customer codes from the sales sampled in Meisen's ILVQR were unverifiable.  We also discovered that Meisen failed to report customer information for [   ] customer codes during the course of this proceeding.  This calls into question the accuracy of Meisen's affiliation reporting, which is further underscored by the fact that Meisen's ILVQR revealed the existence of unreported affiliates, including a potential affiliation with one of J&K NY's largest U.S. customers.
- A third of the CONNUMs tested in Meisen's ILVQR revealed inconsistencies with the characteristics of the merchandise imported by the J&K Companies, as well as methodological problems in the way that Meisen assigned CONNUMs, the most fundamental building block of Commerce's dumping analysis.  This also renders the differential pricing analysis unreliable and indicates that a CEP-NV comparison would not be accurate.
- Meisen's failure to notify Commerce of its ability to report transaction-specific inbound freight expenses, and its statements that misrepresented its reporting abilities, prevented Commerce from fulfilling its regulatory obligation to ensure that the allocation methodology did not cause inaccuracies or distortions.
- Meisen's failure to notify Commerce of its ability to report actual entered values, and its failure to report its CONNUMs in the correct manner, impacted its entered value reporting, and, by extension, the accuracy of various reported selling and movement expenses.

specific data fields where these errors were discovered, but they also undermine the accuracy of

other information reported by Meisen and undermine our ability to calculate an accurate

dumping margin.

Additionally, Meisen's failure to report to Commerce all of its U.S. affiliates also created

a substantial gap in this record that significantly impeded this investigation.  Without this

information, we are unable to determine whether Meisen reported the correct universe of U.S.

sales, whether some of the sales in the U.S. sales database reported as "unaffiliated party" sales

were actually intercompany, affiliated party sales that were incorrectly reported (*e.g.*, sales to

[                    ]), or whether Meisen incurred expenses provided by affiliates that needed to be

tested to determine that they were charged at arm's-length prices.  In *Uttam Galva III*, the

Federal Circuit held that the respondent's failure to identify all of its affiliates meant that

"Commerce had no opportunity to pursue {the relevant} lines of inquiry due to Uttam Galva's

failure to cooperate{,}"[427] and that it was reasonable to conclude on this basis that there was both

a gap in the record, and, thus, total AFA was warranted.[428]

Meisen quotes *Clearon* when implying that the information missing from this record is

not material to our analysis.  However, in *Clearon*, the CIT held that the application of facts

available is lawful if Commerce provides a reasonable explanation for how the missing

information relates to Commerce's ability to make its determination.[429]  Throughout these final

---

- Meisen failed to report further manufacturing expenses for two out of three further manufactured products in its sales traces, and it also provided no way for Commerce to assess the extent of this error or correct it because it did not identify further manufactured sales as such in its U.S. sales database.
- Meisen reported the incorrect date of shipment for one out of six of its sales traces, raising concerns over the accuracy of the universe of reported sales.

[427] *See Uttam Galva III*, 2022 U.S. App LEXIS 12135 at 10 (quoting *Uttam Galva II*, 476 F. Supp. 3d at 1393).
[428] *Id*.
[429] *See Clearon Corp.*, 359 F. Supp 3d at 1359-1360 ("Thus, a determination as to whether the use of facts available or adverse facts available is lawful depends on whether the information missing from the record … is necessary to its determination.").

results, we explain why each ILVQR failure indicates that we are missing necessary information

from this record pursuant to sections 776(a)(2)(A), (C), and (D) of the Act.  Any one of these

significant errors, in isolation, may well have led Commerce to conclude that some or all of

Meisen's data are not useable.  However, when these errors are viewed in combination, along

with the other, extensive issues discovered as a result of verification, that conclusion becomes

inescapable.  Therefore, we continue to find that the application of facts available, in accordance

with section 776(b) of the Act, is warranted.

In *Nippon Steel*, the Federal Circuit held that, "{t}he statutory trigger for Commerce's

consideration of an adverse inference is simply a failure to cooperate to the best of respondent's

ability, regardless of motivation or intent."[430]  Consistent with *Guizhou Tyre* and *Nippon Steel,*

we also find that, regardless of Meisen's perceived effort or stated intent, these gaps in the record

are the result of Meisen's failure to cooperate to the best of its ability.  We address Meisen's

failure to act to the best of its ability throughout these final remand results, as well.[431]

We agree with Meisen that the acting to the best of one's ability does not require

perfection.  In *Nippon Steel*, the Federal Circuit held:

---

[430] *See Nippon Steel*, 337 F.3d at 1382-1383.
[431] *See, e.g., supra* at Comments 1-3:

- In Comment 1, we explain that despite Commerce's clear requests for documentation, and its ability to provide said documentation, Meisen failed to provide documentation to support its J&K GA Q&V reconciliation, the J&K GA November reconciliation, the J&K IL October reconciliation, and several of the fields we attempted to verify (*i.e.*, sales terms (SALETERU) (and by extension inland freight (INLFWCU)) and destination (DESTU)).
- In Comment 2, we explain that despite stating in its questionnaire responses that it reported its fields pursuant to Commerce's instructions, and despite stating that it confirmed the accuracy of certain fields, Meisen incorrectly reported its product characteristic and entered value reporting, failed to confirm the accuracy of, and reconcile inconsistencies in certain fields in the U.S. sales database (*i.e.*, SALETERU, DESTU, consolidated customer codes (CCUSCODU), customer codes (CUSCODU), further manufacturing expenses (FURMANU), and shipment date (SHIPDATU)), and provided documentation with other unsupported inconsistencies (*i.e.*, inconsistencies that are not supported by record documentation in J&K GA's Q&V reconciliation).
- In Comment 3 above, we explain that, despite notifying Commerce that is understood the statutory definition of affiliations, and thus, the affiliates it was required to report, Meisen failed to identify all of its U.S. affiliates to Commerce during this investigation.

> While the standard does not require perfection and recognizes that mistakes
> sometimes occur, it does not condone inattentiveness, carelessness, or inadequate
> record keeping ….  An adverse inference may not be drawn merely from a failure
> to respond, but only *under circumstances in which it is reasonable for Commerce
> to expect that more forthcoming responses should have been made; i.e., under
> circumstances in which it is reasonable to conclude that less than full cooperation
> has been shown.*  While intentional conduct, such as deliberate concealment or
> inaccurate reporting, surely evinces a failure to cooperate, the statute does not
> contain an intent element.  "Inadequate inquiries" may suffice.[432]

The errors, omissions, and discrepancies discovered in, and as a result of, Meisen's

ILVQR indeed meet the Federal Circuit's criteria for failing to meet the "best of its ability"

standard.  These are not simply limited and minor "mistakes."  Whether it was, for example, its

failure to notify Commerce of difficulties, a failure to submit screenshots or source documents

from its accounting system, or the decision not to disclose all affiliated parties, Meisen "failed to

do the 'maximum it was able to do.'"[433]  Further, Meisen on several occasions demonstrated that

it did not fully cooperate with this investigation when it:  (1) failed to provide documentation we

reasonably could expect for Meisen to have or maintain;[434] (2) made statements regarding the

manner by which it could report certain record information, but then contradicted those

statements;[435] (3) reported information inconsistent with its books and records;[436] (4) confirmed

the accuracy of fields where we found many inaccuracies;[437] (5) indicated that it understood our

requests, but did not fulfill those requests;[438] (6) self-selected information that did not conform to

Commerce's requests without notifying Commerce of its deviation from the information

---

[432] *See Nippon Steel*, 337 F.3d at 1382-1383 (emphasis added).
[433] *See Nat'l Nail*, 390 F. Supp. 3d at 1370 (quoting *Nippon Steel*, 337 F.3d at 1382).
[434] *See supra* at sections IV.D.2a., 2b.i. and iii., and Comment 1.
[435] *Id.* at section IV.D.2b.iv. and Comment 2.
[436] *Id.* at sections IV.D.2b.ii., v., iv., vi, vii, and viii., and Comment 2.
[437] *Id.* at Comment 2.
[438] *Id.* at sections IV.D.2a.i., 2b.iv., 2c. and Comments 1, 2, and 3.

requested;[439] and (7) failed to disclose all information requested and necessary for Commerce's determination.[440]

Meisen quotes *Nat'l Nail*, and implies that we cannot apply total AFA to Meisen if there is useable information on the record.[441]  *Nat'l Nail* held that before Commerce can apply total AFA, it must first determine whether the use of facts available is warranted due to a gap in the record, in accordance with section 776(a) of the Act.[442]  However, as explained above, the record here lacks a useable U.S. sales database for Meisen, which is necessary for calculating an accurate dumping margin, and, therefore, we cannot calculate a dumping margin for Meisen. Thus, Commerce's finding in these final remand results complies fully with the standard set forth in *Nat'l Nail.*

Meisen also cites *Ferro Union,* suggesting that we must explain why the application of partial FA or AFA is not a sufficient remedy.[443]  Again, the errors, omissions, and discrepancies discovered in, and as a result of, Meisen's ILVQR, are significant and pervasive, and we explain in these final results that because Meisen was not forthcoming about many of these issues, we cannot isolate them to only certain sales in the U.S. sales database.  Therefore, pursuant to section 776(a) of the Act, this record lacks a useable U.S. sales database and we must rely on facts available for Meisen's U.S. sales information.  Further, because these errors, discrepancies, and omissions are so pervasive, and there is no record information that could inform Commerce as to how to isolate these issues, we are unable to rely on any of Meisen's U.S. sales information, and, thus, are unable to apply partial FA.  Thus, the application of total facts available is

---

[439] *Id.* at section IV.D.2b. and Comment 2.
[440] *Id.* at section IV.D.2b.iii. and c. and Comments 2 and 3.
[441] *See* Meisen's Comments at 4 quoting (*Nat'l Nail*, 390 F. Supp. 3d at 1375).
[442] *See Nat'l Nail,* 390 F. Supp. 3d at 1374-75.
[443] *Id.* (quoting *Ferro Union*, 74 F. Supp 2d. at 1296).

appropriate in accordance with 776(a) of the Act.  Additionally, in numerous instances, Meisen

had information in its possession, but failed to provide that information when requested, while in

other instances, Meisen provided essential and fundamental information which we have

determined is incorrect and unreliable.  Therefore, we find that, pursuant to section 776(b) of the

Act, Meisen failed to act to the best of its ability and the application of total AFA is warranted.

　　　　Meisen quotes *AK Steel* to assert that we cannot apply AFA to Meisen for its failure to

provide information that does not exist.  However, Meisen does not specifically state how this

case applies to our findings in the Draft Remand Results.[444]  In *AK Steel*, the respondent was

unable to report some of its product characteristics, but it notified Commerce of this problem.[445]

Thus, information was missing from the record, but Commerce determined that it was

unavoidable because the respondent had provided an adequate explanation as to why that

information did not exist.  Furthermore, in *AK Steel*, Commerce was able to verify that this

information did not exist, and Commerce was able to determine that the number of sales

impacted by this missing information was small.[446]  In contrast, here, the vast majority of the

information associated with Meisen's failures not only existed but was accessible to Meisen

(*e.g.*, the leasing agreement with [                    ]).  Where the information may not have existed,

or Meisen would have had difficulty in retrieving it (such as with the product characteristics for

certain further manufactured products),[447] Meisen failed to notify Commerce or to request

guidance on the appropriate way to proceed,[448] but instead made a unilateral decision to report

---

[444] *Id.* at 3.
[445] *See AK Steel*, 21 CIT at 1217-20*; see also Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate from Canada; Final Results of Antidumping Duty Administrative Reviews*, 61 FR 13815, 13830 (March 28, 1996) at Comment 32.
[446] *Id.*
[447] *See* Meisen's Comments at 15.
[448] *See* Meisen's ILVQR at 14-15, where we learned for the first time that Meisen took it upon itself to report proxy information for the product characteristics of certain custom-made merchandise rather than notify Commerce of its difficulty in determining those characteristics.

CONNUMs in a manner other than that requested by Commerce.  Therefore, the potential information that "does not exist" is not the same as the information that did not exist in *AK Steel*.

We also find unavailing Meisen's claim that it was not able to provide source documentation to support certain of its record information because "it was not maintained in and kept in the normal course of business"[449] or because it was not "available in its normal course of business for the six sales traces."[450]  We explain in Comment 1 above why these arguments are not valid.  Meisen does not state why it was unable to provide such documentation, or how it was able to report information in its U.S. sales database prior to submitting its ILVQR without this documentation (*i.e.*, the information reported in the U.S. sales database must have come from a source).  Accordingly, we disagree with Meisen's claim that this is a mitigating fact.

Meisen further suggests that, considering its resources, it complied with Commerce's requests as much as it was able.  Meisen quotes *Nat'l Nail*, and argues that we cannot apply total AFA to Meisen because Meisen and the J&K Companies are not a "hypothetical, well-resourced respondent."  Meisen also quotes *Nippon Steel*, arguing that we can only apply AFA to a respondent "under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown."[451]  We disagree with the notion that Meisen's resources limited its ability to provide full, complete, and honest responses to Commerce's request for information, or its ability to notify Commerce of difficulties in providing full and complete responses.  Further, consistent with *Nippon Steel*, we find that it is reasonable for Commerce in this case to expect that more forthcoming responses should have

---

[449] *Id.* at 6, 7, 8, 13, and 14.
[450] *Id.*
[451] *See* Meisen's Comments at 3 (quoting *Nippon Steel*, 337 F.3d at 1383).

been made.[452]  All information requests and findings in this case are reasonable, based on what Meisen indicated it could report and provide to Commerce, and on the level of attentiveness, carefulness, and record keeping that Commerce expects from a party familiar with the applicable rules and regulations.[453]

Specifically, it is reasonable for Commerce to:  (1) request screenshots of J&K GA's accounting system because throughout the investigation Meisen provided screenshots from the J&K Companies' accounting systems; (2) find that Meisen failed to cooperate when we learned that Meisen's repeated assertions that it was unable to provide transaction-specific information for its inbound freight and entered values were not true; (3) expect that the information reported in Meisen's U.S. sales database is rooted in source documents or an accounting system, and that the information was not simply recalled from someone's memory (and it is also reasonable for Commerce to be concerned if the latter were the case); (4) expect that Meisen maintained the source documentation it relied on for reporting the information in its U.S. sales database; (5) find that Meisen failed to act to the best of its ability when it reported its CONNUMs in a manner different from how it said it reported its CONNUMs; (6) find that Meisen failed to act to the best of its ability when it failed to notify it of any difficulties it had in reporting; (7) find that Meisen's U.S. sales database is unreliable when, among other things, not one of the six sales traces tested in Meisen's ILVQR were without multiple errors or discrepancies;[454] (7) take issue

---

[452] *See supra*, generally.
[453] *See Nippon Steel*, 337 F.3d at 1382.
[454] Specifically:

- Sales trace one has an incorrect destination and incorrect entered value per Commerce's methodology of using the actual entered value of the imported product.
- Sales trace two has unverifiable sales terms, unverifiable freight expenses, and incorrect entered value according to Meisen's price list methodology.

with the fact that [              ], a reported J&K NY customer, appears to  share addresses and

fax numbers with the J&K Companies and J&K Company affiliates;[455] (8) take issue with the

fact that Meisen has made inconsistent record statements about [      ] and failed to identify [

              ] as a U.S. affiliate and explain its role in the sale of subject merchandise during

the POI); and finally (9) find a lack of cooperation when Meisen failed to report at least one of

its U.S. affiliates involved in the sale and/or distribution of subject merchandise.  Accordingly,

because we believe that our expectations and findings in this case were reasonable, we reject the

notion that this decision was based on expectations suitable only for a "well-resourced

respondent," or that Meisen could not have provided more forthcoming responses.

   Contrary to Meisen's argument that Commerce must balance its statutory obligation of

finding an accurate dumping margin with the goal of inducing compliance, there is no

information for Commerce to "balance."[456]  As explained in detail throughout these final results

of redetermination, the errors, omissions, and discrepancies discovered in, and as a result of,

Meisen's ILVQR are pervasive and significant.  Accordingly, Meisen failed verification, and this

resulted in the finding that its U.S. sales database is entirely unusable.  Without a U.S. sales

database, we cannot calculate a dumping margin.

---

- Sales trace three has an incorrect destination, unverifiable sales terms, unverifiable freight expenses, unverifiable customer code, incorrect shipment date, and incorrect entered value per Meisen's price list methodology.
- Sales trace four has an incorrect destination, unverifiable sales terms, unverifiable freight expense, incorrect product characteristics, unreported further manufacturing expenses, and incorrect entered value according to both Meisen's methodology and Commerce's methodology of using actual entered value of the imported product.
- Sales trace five has unverifiable/incorrect sales terms, unverifiable/incorrect freight expenses, incorrect product characteristics, unreported further manufacturing expenses, and incorrect entered value per Commerce's methodology of using the actual entered value of the imported product.
- Sales trace six has an incorrect destination, unverifiable sales terms, unverifiable freight documentation, and incorrect entered value per Commerce's methodology of using the actual entered value of the imported product.

[455] We find Meisen's denial of this fact, in the face of voluminous record evidence to the contrary, inexplicable.
[456] *See* Meisen's Comments at 3 (citing *F.lii de Cecco*, 216 F.3d at 1032 and *Chia Far*, 343 F. Supp. 2d at 1366).

Finally, Meisen argues that Commerce must consider whether the margin assigned to Meisen in the Draft Remand Results is overly punitive.[457]  We have considered the margin assigned to Meisen, and we find that the errors, omissions, and discrepancies were frequently the direct result of Meisen's failures to cooperate, [458] and as a result, the application of total AFA is warranted.  Section 776(b)(2) of the Act identifies potential sources of information for adverse inferences:  (A) the petition; (B) a final determination in the investigation under this title; (C) any previous review under section 751 or determination under section 753; or (D) any other information placed on the record.  Absent any suggestion from an interested party that a different margin would be appropriate to use as the total AFA margin for Meisen, we continue to select the AFA-margin already selected for the China-wide entity, the corroborated dumping margin from the Petition, 262.18 percent.  Commerce has consistently found it appropriate to apply total AFA to companies that failed verification due to the discovery of many errors.[459]  In *N.M. Garlic Growers* and *Uttam Galva*, the courts held that because the respondent provided false or incomplete information regarding its affiliations, total AFA was warranted.[460]  Also of note, in *N.M. Garlic Growers*, the respondent argued that the dumping margin it was assigned, 376.67 percent, was overly punitive, and the CIT held that this margin was supported by record evidence.[461]  Therefore, the assignment of the Petition dumping margin as the total AFA rate to Meisen, as a result of significant pervasive discrepancies and errors discovered in sampled sales

---

[457] *Id*. (citing *Chia Far*, 343 F. Supp. 2d at 1366).

[458] This includes Meisen determining what is reasonable and correct regarding the method of submitting information rather than following Commerce's instructions, Meisen making factually incorrect statements on the record, Meisen making statements that were inconsistent with the information it reported, and Meisen failing to report necessary information to Commerce.

[459] *See, e.g., CTL Plate from Italy* IDM at Comment 1; *see also, e.g., CTL Plate from Belgium* IDM at Comment 11; and *Certain Biaxial Integral Geogrid Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 82 FR 3284 (January 11, 2017), and accompanying IDM at Comment 9.

[460] *See N.M. Garlic Growers Coalition & El Bosque Farm v. United States*, 352 F. Supp. 3d 1281, 1292 (CIT 2018) (*N.M. Garlic Growers*); *see also, e.g., Uttam Galva III*, 2022 U.S. App. LEXIS 12135, at 10-12.

[461] *See N.M Garlic Growers*, 352 F. Supp 3d at 1286, 1297.

of Meisen's ILVQR, Meisen's failure to tie sales data to its books and records, *and* the finding

that Meisen failed to identify all of its U.S. affiliates involved in the sale and/or distribution of

subject merchandise, is not overly punitive, but is supported by record information, Commerce's

practice, and court precedent.

## VI.    FINAL RESULTS OF REDETERMINATION

In accordance with the *Remand Opinion and Order*, Commerce reconsidered the record

information submitted by Meisen, conducted additional analysis of this information, requested

additional clarification of the record information, and conducted verification of Meisen's

submissions.  Based on our analysis of Meisen's ILVQR, we have determined that the

application of total AFA is warranted.  Accordingly, we continue to find that assigning a margin

of 262.18 percent, based on total AFA, to Meisen is appropriate.

6/6/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance

## Appendix

Meisen failed to provide the following requested source documents to support its U.S. sales database:

- source documents to support its J&K GA Q&V reconciliation;[462]
- source documents to support its J&K GA November 2018 reconciliation;[463]
- source documents to support its J&K IL October 2018 reconciliation;[464]
- source documents to substantiate the reported sales terms and freight expenses for five of six sales traces;[465]
- source documents to demonstrate the reported destination of one of six sales traces;[466] and
- source documents to demonstrate the reported customer codes of one of six sales traces.[467]

We identified the following errors in Meisen's ILVQR:

- incorrect destinations (*i.e.*, ZIP codes reported in the field DESTU) for four of six sales traces and one of three CONNUM-specific reconciliations.[468]
- incorrect consolidated customer codes;[469]
- incorrect product characteristics for two of six sales traces and one of three CONNUM-specific reconciliations;[470]
- incorrect entered values for three, or potentially four, of six sales traces;[471]
- incorrect further manufacturing expenses for two of six sales traces;[472] and
- incorrect date of shipment for one of six sales traces.[473]

Other pervasive issues discovered in, or as a result of, Meisen's ILVQR are the following:

- Meisen incorrectly told Commerce that it was unable to report transaction-specific movement expenses, and, therefore, it relied on an allocation methodology;[474]

---

[462] *See supra* at section IV.D.2.a.i., "J&K GA."
[463] *Id.*
[464] *Id.* at section IV.D.2.a.ii., "J&K IL."
[465] *Id.* at section IV.D.2.b.i, "Sales Terms."
[466] *Id.* at section IV.D.2.b.ii, "Destination."
[467] *Id.* at section IV.D.2.b.iii, "Purchaser."
[468] *Id.* at section IV.D.2.b.ii, "Destination."
[469] *Id.* at section IV.D.2.b.iii, "Purchaser."
[470] *Id.* at section IV.D.2.b.iv, "Product Characteristics."
[471] *Id.* at section IV.D.2.b.vi, "Entered Values."
[472] *Id.* at section IV.D.2.b.vii, "Other IVLQR Errors."
[473] *Id.*
[474] *Id.* at section IV.D.2.b.v., "Certain Movement Expenses."

- Meisen incorrectly told Commerce that it was unable to report actual entered values of the merchandise sold by the J&K Companies, and, therefore, it relied on an alternative entered value reporting methodology;[475] and

- Meisen failed to report at all of the affiliated entities involved in the sale and/or distribution of subject merchandise.[476]

---

[475] *Id*. at section IV.D.2.vi, "Entered Values."
[476] *Id*. at section IV.D.2.c., "Unreported U.S. Affiliate."