## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DALIAN MEISEN WOODWORKING CO., LTD., <br><br> *Plaintiff,* <br><br> CABINETS TO GO, LLC, <br><br> *Plaintiff-Intervenor,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> and <br><br> AMERICAN KITCHEN CABINET ALLIANCE, <br><br> *Defendant-Intervenor.* | Court No. 20-00109 |

## DEFENDANT-INTERVENOR'S RESPONSE
## TO COMMENTS ON REMAND RESULTS

Luke A. Meisner, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW,
Suite 500
Washington, DC 20001
(202) 719-7000

*Counsel for the American
Kitchen Cabinet Alliance*

Dated: November 17, 2021

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ...................................................................... 2

STANDARD OF REVIEW .......................................................................... 4

ARGUMENT .............................................................................................. 4

I.  Commerce's Decision to Apply Facts Available with an Adverse
    Inference Is Supported by Substantial Evidence and Is Otherwise
    in Accordance with Law .................................................................. 4

    A.  Meisen's Claims of Being Small and Unsophisticated Do Not
        Excuse Its Failure to Cooperate by Providing Accurate and
        Verifiable Data .......................................................................... 5

    B.  There Was No Need for Commerce to Issue a Supplemental
        Questionnaire as Part of Its Written Verification Process ..... 9

    C.  The Errors Identified by Commerce in Its Verification
        Process Warrant the Application of AFA ............................... 13

II.  Conclusion ..................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*AIMCOR v. United States*, 141 F.3d 1098 (Fed.Cir.1998) ..................... 10

*Bomont Industries v. United States*, 733 F. Supp. 1507 (Ct. Int'l Trade 1990) ........................................................................................ 14

*Diamond Sawblades Manufacturers' Coal. v. United States*, 2018 WL 5281941 (Ct. Int'l Trade 2018) ........................................................... 15

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021) .. 10

*Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) .............................................................................. 11

*Hyundai Steel Co. v. United States*, 282 F.Supp.3d 1332 (Ct. Int'l Trade 2018) ....................................................................................... 15

*Micron Technology, Inc. v. U.S.*, 117 F.3d 1386 (Fed. Cir. 1997) .......... 15

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) ....................................................................................... 10

*Mukand, Ltd. v. United States*, 767 F.3d 1300, 1305 (Fed. Cir. 2014) .. 13

*Nippon Steel v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) .. 6, 9

*Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011) ........................................................................... 14

## STATUTES

19 U.S.C. § 1677m(d) ....................................................................... 9, 11

## OTHER AUTHORITIES

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from the People's Republic of China*, 83 Fed. Reg. 16,322 (Dep't Commerce Apr. 16, 2018) ....................................................................... 7

*Forged Steel Fittings from China*, 83 Fed. Reg. 50,339, (Dep't Commerce Oct., 5, 2018) ................................................................. 7, 8

# GLOSSARY

**AD**
Antidumping

**AFA**
Adverse Facts Available

**AKCA**
American Kitchen Cabinet Association

**Commerce**
United States Department of Commerce

**CONNUM**
Control Number

**Meisen**
Dalian Meisen Woodworking Co., Ltd.

**Meisen Cmnts**
Meisen Comments in Opposition to Remand (Aug. 15, 2022)

**Remand Order**
*Dalian Meisen Woodworking Co., Ltd. v. United States*, 571 F. Supp. 3d 1364 (Ct. Int'l Trade 2021)

**Remand Results**
Final Results of Redetermination Pursuant to Court Remand (June 6, 2022)

**Def't Resp.**
United States' Response to Comments on Remand Results (Nov. 3, 2022)

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

DALIAN MEISEN WOODWORKING
CO., LTD.

       *Plaintiff,*

CABINETS TO GO, LLC,

       *Plaintiff-Intervenor*,

    v.

UNITED STATES,

       *Defendant,*

   and

AMERICAN KITCHEN CABINET
ALLIANCE

       *Defendant-Intervenor*.

Court No. 20-00109

## DEFENDANT-INTERVENOR'S RESPONSE
## TO COMMENTS ON REMAND RESULTS

    Pursuant to the Court's order, dated October 6, 2022, Defendant-Intervenor the American Kitchen Cabinet Alliance ("AKCA"), respectfully submits this response to comments filed by plaintiff Dalian Meisen Woodworking Co., Ltd., ("Meisen") and plaintiff-intervenor, Cabinets To Go, LLC, to the remand redetermination issued by

Department of Commerce ("Commerce") in the above-captioned action

*See* Opinion and Order, ECF No. 72, *Dalian Meisen Woodworking Co.,*

*Ltd. v. United States*, 571 F. Supp. 3d 1364 (Ct. Int'l Trade 2021)

("Remand Order"); Final Results of Redetermination Pursuant to Court

Remand, June 6, 2022 ("Remand Results"), ECF Nos. 74, 75. As

discussed in greater detail below, Commerce's Remand Results comply

with the Court's Remand Order and are supported by substantial

evidence and are otherwise in accordance with law. They should,

therefore, be upheld.

## SUMMARY OF ARGUMENT

Consistent with the Court's Remand Order, Commerce issued

supplemental questionnaires to Meisen and then conducted a full

verification of the information that Meisen had submitted in its

questionnaire responses. During the verification process, Meisen failed

to submit source accounting documents that Commerce had requested,

and the documents that Meisen did submit revealed pervasive and

persistent errors in the company's reported data. As a result, consistent

with the statute and its practice, Commerce applied total adverse facts

available ("AFA") to calculate Meisen's dumping margin.

2

Meisen's arguments that Commerce erred in applying total AFA are devoid of merit and should be rejected. First, to the extent it is relevant, Meisen's claims that it is a small and unsophisticated company are belied by the record. Moreover, Meisen's failure to maintain an adequate accounting system that would allow it to report accurate data is, by itself, a sufficient reason for Commerce to apply total AFA. Second, Meisen's complaints regarding Commerce's verification process—to the extent they are not waived based on Meisen's failure to raise them during the remand proceeding—fail to appreciate that the entire purpose of verification is to verify the accuracy of data that have already been submitted — not to solicit new or corrected factual information by issuing additional questionnaires. Finally, Meisen's contention that the errors identified at verification were inconsequential because they involved a small portion of its total sales quantity ignores the fact that there were numerous and widespread errors identified in eight of the nine transactions examined during verification. Commerce's spot-check of Meisen's data thus rendered the data inaccurate, unverifiable, and unusable, and this situation warranted the application of total AFA.

3

## STANDARD OF REVIEW

The AKCA believes that the standard of review set forth in the United States' Response to Comments on Remand Results (Nov. 3, 2022), ECF 91 ("Def't Resp.") adequately sets forth the relevant standard for this Court to apply to the Remand Results and adopts it by reference in these comments. *See* Def't Resp. at 10.

## ARGUMENT

**I.  Commerce's Decision to Apply Facts Available with an Adverse Inference Is Supported by Substantial Evidence and Is Otherwise in Accordance with Law**

In its Remand Results, Commerce concluded that it was unable to rely on Meisen's data, that Meisen had failed to cooperate to the best of its ability in responding to Commerce's requests for information, and that it was thus appropriate for Commerce to rely on total AFA to calculate Meisen's dumping margin. Remand Results at 7-8. This conclusion was based on: (1) Meisen's reported data not being verified as accurate; (2) Meisen's failure to provide critical information; (3) the discovery of widespread errors in the sales traces and CONNUM reconciliations provided by Meisen; and (4) Meisen's failure to disclose all of its U.S. sales affiliates. As demonstrated below, there is no merit to Meisen's arguments that these finding did not warrant Commerce's

4

application of total AFA in calculating the company's dumping margin. The Remand Results should, therefore, be sustained.

### A. Meisen's Claims of Being Small and Unsophisticated Do Not Excuse Its Failure to Cooperate by Providing Accurate and Verifiable Data

In is remand comments, Meisen repeatedly seeks to excuse its errors and failures by claiming that it is "not a multi-national steel" company but is instead a network of "Mom & Pop" companies with an "unsophisticated accounting system" that prevented Meisen from accurately reporting data in the manner requested by Commerce. *See* Meisen Comments in Opposition to Remand (Aug. 15, 2022), ECF 86 ("Meisen Cmnts") at 13, 17. The facts show otherwise. Even if these claims were true, however, it would not excuse Meisen from its obligation to report accurate and verifiable data to Commerce.

First of all, Meisen's claims that it is a small and unsophisticated company are belied by the record. Meisen was selected among hundreds of companies as one of the three mandatory respondents in the original investigation precisely because it was one of the largest Chinese producers and exporters of wooden cabinets and vanities and components China. *See* Commerce Preliminary Decision Memorandum

(Oct. 2, 2019), Appx1027-1028, Appx1031. In fact, Meisen reported in its response to Commerce's quantity and value questionnaire that it sold roughly $79 million worth of subject merchandise from July 1, 2018 through December 31, 2018. *See* Meisen Q&V Resp. (Apr. 22, 2019) at 3 (P.R. 392). That is almost $160 million in sales to the United States on an annualized basis. *See id.* Moreover, the fact that Meisen maintained multiple U.S. sales affiliates throughout the United States speaks to the company's complexity and sophistication. Meisen Cmnts at 13. These are not the operations of a simple "Mom & Pop" enterprise.

Meisen's appeals to its "unsophisticated accounting system" should also be rejected. It is not enough for a respondent to simply submit any information to Commerce; the information provided by the respondent must represent the "maximum it is able to do" and must be complete and accurate. *Nippon Steel v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). This standard presumes that parties are familiar with the rules and regulations governing the sales of goods from other countries into the United States "and requires that {parties}, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries ... take reasonable steps to keep and maintain full and

complete records documenting the information that a reasonable {party} should anticipate being called upon to produce" as part of an antidumping proceeding. *Id.* at 1383.

Consistent with the statute and the Federal Circuit's guidance, Commerce has applied AFA to respondents that fail to maintain full and complete records in the ordinary course of business that would allow the respondents to provide accurate and verifiable information to Commerce. *See, e.g.*, *Forged Steel Fittings from China*, 83 Fed. Reg. 50,339, (Dep't Commerce Oct., 5, 2018) ("*FSF from China*") and accompanying IDM at Comment 5; *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from the People's Republic of China*, 83 Fed. Reg. 16,322 (Dep't Commerce Apr. 16, 2018) and accompanying IDM at Comment 1 ("The proven unreliability of {the respondent's} accounting records over an extended period of time makes it impossible for Commerce to rely upon the underlying information used to formulate its reported factors of production and to create its cost reconciliation, making the cost reconciliation unverifiable."). The application of AFA to Meisen in this case is thus consistent with Commerce's application of AFA in prior cases to respondents that have

failed to maintain adequate accounting records. For example, in the final determination of *FSF from China*, Commerce applied total AFA to a respondent "that in the normal course of business . . . relies on anomalous financial accounting practices, which in turn call into question the accuracy and reliability of {the respondent's} reported information."  IDM in *FSF from China* at Comment 5. The cost reconciliation that the respondent provided in *FSF from China* was found to be "unreliable and unverifiable" because the respondent's "practices in the normal course of business would not produce financial statements which would reconcile to its costs." *Id.*

In its comments, Meisen argues that the "various errors in the sales database provided by Meisen … did not justify the application of total AFA {because these} errors have to be considered in light of the unsophisticated accounting system" employed by Meisen and its affiliates. Meisen Cmnts at 19. In other words, Meisen concedes that despite making well over $100 million in sale annually, it failed to maintain an accounting system that allowed it to document the information that a reasonable party should anticipate being called upon to produce as part of an antidumping proceeding. Like the respondent

in *FSF from China*, Meisen claims that its accounting system did not allow it to report accurate data that reconciled to its books and records. This failure, by itself, could warrants the application of total AFA. *Nippon*, 337 F.3d at 1383. But at a minimum, it is no excuse for failing to report accurate data.

## B. There Was No Need for Commerce to Issue a Supplemental Questionnaire as Part of Its Written Verification Process

Meisen also complains that the errors identified by Commerce during its verification process "would have been handled differently during an on-site verification where there is an interaction between Commerce and the company officials." Meisen Cmnts at 14. According to Meisen, Commerce should have issued supplemental verification questionnaires to Meisen as part of its written verification process to satisfy the requirements of 19 U.S.C. § 1677m(d). *Id.* at 14-15. These arguments are also baseless and should be rejected.

As an initial matter, as the United States correctly argues, because Meisen failed to raise these complaints in its comments on Commerce's draft remand redetermination, thereby depriving the agency of an opportunity to address them, Meisen failed to exhaust its administrative remedies and thus waived these arguments. *See* Def't

Cmnts at 36-42. The AKCA adds in this regard that the caselaw and principles regarding exhaustion and waiver cited by the United States apply equally in the context of remand proceedings. *See, e.g., Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008) ("Gerdau failed to raise the issue at the appropriate time on remand and thus abandoned its argument by failing to exhaust its administrative remedies before Commerce."); *AIMCOR v. United States*, 141 F.3d 1098, 1111–12 (Fed.Cir.1998) (holding that, when the appellant AIMCOR failed to raise an issue on remand to Commerce "during the applicable comment period," it "was precluded from raising this issue *de novo* before the court").

In addition, even if it had preserved its complaints regarding the verification process, Meisen's complaints would still have to be rejected as unpersuasive. The purpose of verification is to verify information already submitted by a respondent to test for its accuracy and completeness. *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021). Thus, it is not appropriate for a respondent to submit new or corrected information as part of the verification process. In *Goodluck India*, for example, the respondent attempted to submit,

10

through the verification process, certain information to correct errors in its sales and cost databases that were the result of misreported CONNUMs. *Id.* at 1339-40. Commerce rejected this material as untimely filed new factual information and applied AFA to the respondent based on "the scope of the errors and omissions identified at verification." *Id.* at 1341. On appeal, the CIT found that Goodluck's errors were correctible mistakes and remanded for Commerce to accept the new factual information. *Id.* On further appeal, however, the Federal Circuit reversed the CIT, holding that Commerce acted within its discretion in rejecting the respondent's revised submissions, because the errors were widespread and systemic as opposed to being "singular, such as a missing word or an error in arithmetic." *Id.* at 1343.

Meisen's reliance to 19 U.S.C. § 1677m(d) is unavailing, as that provision of the statute does not apply to verification. As the Court has recognized, "{v}erification—unlike Commerce's questionnaires sent to respondents at the beginning of an investigation or an administrative review—does not entail a 'request for information under this subtitle.'" *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020) (quoting 19 U.S.C. § 1677m(d)). Indeed, it would

defeat the purpose of verification if respondents were given another opportunity to correct their misreported data as part of the verification process rather than demonstrating the accuracy of the data that they reported during the information-gathering portion of the investigation.

Finally, the Court should dismiss Meisen's arguments that the spreadsheets it extracted from its accounting systems were an acceptable substitute for the screenshots that Commerce had requested as part of the verification process. *See* Meisen Cmnts at 16-18. The essential work of verification is tying the data reported by a respondent to documents that were created in the ordinary course of business – *i.e.,* before any AD proceedings were instituted. The Excel files and other documents that Meisen extracted from its accounting system were not original source documentation because they were in formats that could be edited or modified prior to submission. *See* Remand Results at 79-88. Accepting these types of documents as substitutes for the original source documents requested by Commerce would undermine the very purpose of the verification process.

## C. The Errors Identified by Commerce in Its Verification Process Warrant the Application of AFA

As part of the verification process, Commerce uncovered numerous and widespread errors with Meisen's reported data that were so "pervasive and persistent" that they called into question the reliability of all the data, ultimately rendering the data unverifiable. Remand Results at 55. These errors included: (1) the failure to report transaction-specific movement expenses; (2) the failure to report the correct product characteristics in reporting the CONNUM of each product; (3) the failure to report all of Meisen's affiliates in the United States; and (4) and incorrect values reported for data concerning the destination where the merchandise was sold, the ultimate purchaser of the merchandise, the entered values declared upon importation, the further manufacturing expenses incurred in the United States, and the date of shipment. *Id.* at 20-53. Where, as here, "none of the reported data is reliable or usable," *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1305, 1307–08 (Fed. Cir. 2014), that is, when it "exhibit[s] pervasive and persistent deficiencies that cut across all aspects of the data," *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d

13

1333, 1348 (Fed. Cir. 2011), Commerce correctly applies total AFA to calculate a respondent's dumping margin.

For the most part, Meisen does not dispute the errors that Commerce identified were, in fact, errors. Instead, in addition to offering feeble excuses for these errors based on its claims of being a small and unsophisticated company, Meisen argues that the errors represent "a small percentage of the total sales quantity" that Meisen sold during the period of investigation. Meisen Cmnts at 20-21. This argument should be rejected because misapprehends the nature of Commerce's verification process.

As Commerce explained in its Remand Results, "verification is like an audit, the purpose of which is to test the information provided by a party for accuracy and completeness. Normally, an audit entails selective examination rather than testing of an entire universe." Remand Results at 102 (*quoting Bomont Industries v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990)). The Federal Circuit has explained this auditing process in greater detail:

> While the anti-dumping statute unambiguously requires
> {Commerce} to verify "all" information processed by the
> constructed value calculations that are relied upon in
> making a final determination, this does not actually happen.

> Owing to the number of relevant issues and data points,
> {Commerce} does not, and cannot, perform the equivalent of
> a full-scale accounting audit of foreign respondents subject to
> verification. Instead, samples of suspicious data are verified
> until {Commerce} accountants get a "feel" for whether data
> supplied by the U.S. complainant or the foreign respondent
> is more accurate.

*Micron Technology, Inc. v. U.S.*, 117 F.3d 1386, 1396 (Fed. Cir. 1997).

Put succinctly, "verification is meant to spot-check the accuracy of a

respondent's prior-reported data." *Hyundai Steel Co. v. United States*,

282 F.Supp.3d 1332, 1350 (Ct. Int'l Trade 2018) (citation omitted). If a

respondent's data cannot be tied to its books and records for numerous

spot checks, Commerce must conclude that the data's accuracy overall

cannot be verified. *See id.*

In this case, eight of the nine transactions selected for verification

by Commerce contained *numerous* discrepancies and errors. Remand

Results at 104-105. In other words, 89 percent of the transactions

examined by Commerce as part of its spot-check could not be verified.

Commerce certainly acted within its discretion when it concluded that

these pervasive and persistent reporting errors warranted the

application of total AFA. In fact, this Court has remanded Commerce

for finding data to be accurate when only one of four spot checks showed

erroneously reported data. *Diamond Sawblades Manufacturers' Coal. v. United States*, 2018 WL 5281941 at *8 (Ct. Int'l Trade 2018) ("Given a maximum sample size of four sales traces, Commerce's conclusion that the error was 'isolated' and did not affect other sales is not sufficiently explained."). Thus, if Commerce had concluded that Meisen's data was verifiable, even though eight of the nine examined transactions showed serious errors, this Court would have to remand the agency's decision for being unsupported by substantial evidence.

## II.   Conclusion

For the foregoing reasons, the AKCA respectfully requests that the Court uphold Commerce's Remand Results as supported by substantial evidence and in accordance with law.

Respectfully submitted,

*/s/ Luke A. Meisner*
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 719-7000
*Counsel for the American Kitchen Cabinet Alliance.*

Dated: November 17, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing response brief contains 2,894 words (including text, quotations, footnotes, headings, and attachments), as calculated by the word processing system used to prepare this brief (Microsoft Word), and therefore complies with the Court July 13, 2022 Scheduling Order in this action.

Dated: November 17, 2021                    <u>/s/ Luke A. Meisner</u>
                                            Luke A. Meisner